Exhibit  H 9



41 of 44 DOCUMENTS

Copyright 2014 Energy Intelligence Group, Inc.
All Rights Reserved
International Oil Daily

November 11, 2014 Tuesday

**SECTION:** FEATURE STORIES

**LENGTH:** 551  words

**HEADLINE:** Singapore 'Fraud' Sends Bunker Fuel Firm Into Bankruptcy

**BODY:**

An alleged act of fraud committed in the Singapore trading subsidiary of ==OW Bunker, one of the world's largest suppliers of shipping fuel,== has culminated in the Danish firm's bankruptcy, pushing up premiums and leaving customers scrambling for alternatives.

OW Bunker said Friday it has filed for bankruptcy at the probate court in Aalborg, Denmark, relieved two key employees at its Singaporean unit, Dynamic Oil Trading, of their duties and reported them to the police. Through a lawyer, the two unidentified staff have reportedly denied the allegations.

OW Bunker, which was listed on Copenhagen's Nasdaq OMX exchange in March this year, has failed to secure new credit to plug the deficit stemming from trading losses caused by the alleged fraud, and claims to have exhausted all other options. "Since the credit facility was closed down on Wednesday, the underlying business has eroded significantly," OW Bunker Chairman Niels Henrik Jensen said in a statement.

"The banks hold mortgage over all receivables and consequently, without the provision of new, significant credit facilities in the immediate future, it is not possible to save the remaining business," he added. "It is now clear that such facilities will not be made available. Nor is a sale as going concern a realistic option. We are therefore left with no option but to file for bankruptcy."

Last Wednesday, OW Bunker said fraud committed by senior staff at Dynamic Oil Trading suggested a potential loss of US$125 million. A day later, OW Bunker said it should be assumed the firm has lost all its equity and that it was seeking in-court restructuring in order to continue its operations.

The firm now owes 13 banks $750 million as its trading loss has subsequently spiraled to $150 million, up from the $24.5 million originally announced in October, which OW Bunker had attributed to a dramatic slide in oil prices. The original $24.5 million risk management loss caused OW Bunker to post a $5.8 million net loss in the third quarter.

Traders estimate OW Bunker, which has 7% of the global bunker fuel market, trades 150,000-200,000 tons of bunker fuel monthly on a global basis. Launched in 2012, Dynamic Oil Trading undertakes global trading operations

Singapore 'Fraud' Sends Bunker Fuel Firm Into Bankruptcy International Oil Daily November 11, 2014 Tuesday

from its Singapore headquarters and is led by Chief Executive Lars Moller, according to its website.

News of the bankruptcy pushed up premiums of 380-centistoke bunker fuel in Singapore, which is a major hub for ship refueling. OW Bunker customers will now have to find new suppliers, which are likely to capitalize on the situation by raising prices.

But the supply-demand fundamentals should remain the same, notes one Singapore-based trader, who believes the knee-jerk reaction in the market is likely only temporary. "OW Bunker's suppliers must have the oil and the shipowners' demand has not changed," he said. "It's a matter of credit and who replaces OW Bunker."

The alleged fraud case is potentially one of the biggest financial scandals to hit Singapore since 2004, when China Aviation Oil ran up derivatives losses of $550 million. The company, which has a monopoly over China's jet fuel imports, managed to avoid bankruptcy by undergoing debt restructuring with support from its parent, China Aviation Oil Holding, and creditors including BP ( IOD Jan.26'05 ).

Clara Tan, Singapore

**LOAD-DATE:** November 19, 2014



5 of 44 DOCUMENTS

Copyright 2015 ProQuest Information and Learning
All Rights Reserved
Copyright 2015 National Association of Credit Management
Business Credit

May 2015

**SECTION:** SELECTED TOPIC; Pg. 46 Vol. 117 No. 5 ISSN: 0897-0181

**ACC-NO:** 27495

**LENGTH:** 1450 words

**HEADLINE:** Fraud, Accounting Scandals and the Effect on Trade Credit: Part II

**BYLINE:** McNamara, Joseph

**BODY:**

ABSTRACT

The second part of a series on fraud, accounting scandals and the effect on trade credit is presented. Fraud does not discriminate against any specific country or business sector. It is borderless and is done with the intent of deceiving its investors. The most common type of fraud detected at both bankrupt and non-bankrupt companies is improper revenue recognition, trailed by improper disclosure and expense manipulation. As noted in the April edition of Business Credit, Forensic Strategic Solutions Inc analyst Caitlin Glass said notable red flags to look for include complex webs of relationships, vendors with extensive personal connections to the company, lack of information, odd patterns in financial transactions, missing assets, poor recordkeeping and extensive use of cash. It is hard to determine whether this is the start of a new wave of companies trying to increase revenues and profits for its shareholders through whatever means, ethical or otherwise, necessary to keep their stock price up. There are, however, alternatives that companies can employ to combat this uncertainty and securitize A/R risk, even white selling to customers on open credit terms.

FULL TEXT

(Editor's Note: Part one of this story, from the April 2015 edition of Business Credit, explained the rising impact of inaccurate data, often caused on purpose. It delves into high-profile fraud scandals such as Enron and WorldCom. The article closed with the thought that, with increased business transactions occurring across borders and through modern technology, comes increased risk where fraud is concerned. NACM members can view the April 2015 article (page 48) at http://www.nacm.org/ business-credit-magazine.html. Member login is required).

Fraud, Accounting Scandals and the Effect on Trade Credit: Part II Business Credit May 2015

Fraud does not discriminate against any specific country or business sector. It is borderless and is done with the intent of deceiving its investors. Two distinct groups of people engage in these fraud schemes: "the people who are attempting to prop up the company in the hopes that the bank gives them more liquidity, and those who are doing it more for their own personal benefit," said Sheila Smith, head of reorganization services at Deloitte. The most common type of fraud detected at both bankrupt and non-bankrupt companies is improper revenue recognition, trailed by improper disclosure and expense manipulation.

The recent case of the Danish outfit OW Bunker, one of the world's largest marine fuel traders, is a glaring example of modern fraud. OW Bunker, founded in 1980 and operating in 29 countries at its peak, went from an impressive IPO success story to bankruptcy in eight months. Although its business was considered a low margin one, its high volume was attractive to many. OW Bunker went public in March 2014 and quickly amassed 20,000 new shareholders and drew close to $1 billion on the NASDAQ OMX Copenhagen exchange. By early October, derogatory news surfaced about weak profit warnings due to unrealized account loss before tax, triggered by the slide in oil prices of about $24 million. By Nov. 5, the OMX shares were suspended from the NASDAQ and, on the same day, OW Bunker management declared a loss of $275 million.

There were two separate issues behind the OW Bunker scandal. First, fraud by senior employees in a previously unknown Singapore-based subsidiary named Dynamic Oil Trading caused $125 million in losses. Second was a "risk management loss" in addition to the $24 million unrealized account loss mentioned above. Apparently, the loss was found after a review of OW Bunkers' risk management exposure-the total loss estimate was updated to $150 million, according to a work published by energy risk and derivatives management professional Alessandro Mauro. Lending partners quickly pulled back on their credit lines and, with no other viable solution, OW Bunker filed for bankruptcy protection on Nov. 7 in Denmark. Associated filings in other jurisdictions and countries followed in the days after.

The most alarming part of the OW Bunker case was that its lending facility, banking consortium and an auditing firm were just recently scrutinizing its records and books in an effort to present its IPO prospectus. How were these problems missed?

Another case under scrutiny for fraud is Tesco PLC, a British multi-national grocery and general merchandise retailer headquartered in the United Kingdom. Founded in 1919, it is the second-largest retailer in the world based on revenues and has stores in 12 countries throughout Europe and Asia. In September, Tesco announced it overstated first-half profits by about $424 million, blaming incorrect booking of payments from suppliers. The Financial Conduct Authority originally spearheaded investigations, but the Serious Fraud Office in the U.K. stepped in, classifying it as a criminal investigation focusing on accounting irregularities. It is looking at Téseos audited results for the past four years, including the role of its auditing firm. Actions like this tend to prompt the questions: "Which company will be next?" and "What can credit departments do to better prepare themselves for a potential case of fraud?"

As noted in the April edition of Business Credit, Forensic Strategic Solutions Inc. analyst Caitlin Glass said notable red flags to look for include complex webs of relationships, vendors with extensive personal connections to the company, lack of information, odd patterns in financial transactions, missing assets, poor recordkeeping and extensive use of cash.

However, it can be hard to "prepare" for potential fraud particularly when credit analysts already perform due diligence as part of the credit assessment process on sound, audited financial records. Although the above red flags are great to look for, in reality, the credit manager often does not have access to anything more than the publicly released financials and data that a given company produces. Strong customer relationships and an astute analytical team can

Fraud, Accounting Scandals and the Effect on Trade Credit: Part II Business Credit May 2015

help, but there will also be situations where the credit manager will be hardpressed to take action before it is too late.

Given the similarities in the above recent cases, questions of whether corporate fraud resurgence is apparent naturally emerge. It is hard to determine whether this is the start of a new wave of companies trying to increase revenues and profits for its shareholders through whatever means, ethical or otherwise, necessary to keep their stock price up. There are, however, alternatives that companies can employ to combat this uncertainty and securitize A/R risk, even while selling to customers on open credit terms.

Selling receivables to a banking facility, trade credit insurance, floor planning (or factoring) and options in "put" coverage are all solutions that can provide beneficial security to protect your company's assets against customer default. It should also be noted that the above options vary between institutions and that professionals such as brokers, attorneys and financial advisors should review contract and policy language to ensure there is true benefit to one's company/credit department.

All of this is not meant to report that the expanding global economy brings only doom and gloom by showing how some of the world's largest public companies went insolvent due to internal fraudulent acts and accounting irregularities. However, it does show what can happen, how quickly and that there is little a credit manager or financial officer can do to protect one of your company's most sacred possessions, its A/R, unless companies become aware of (and act on) the many protective options that are available.

SIDEBAR

The most alarming part of the OW Bunker case was that its lending facility, banking consortium and an auditing firm were just recently scrutinizing its records and books in an effort to present its IPO prospectus. How were these problems missed?

SIDEBAR

It is hard to determine whether this is the start of a new wave of companies trying to increase revenues and profits for its shareholders through whatever means, ethical or otherwise, necessary to keep their stock price up.

SIDEBAR

There are, however, alternatives that companies can employ to combat this uncertainty and securitize A/R risk.

JOSEPH MCNAMARA, CCE, CICP

Joseph McNamara, CCE, CICP is vice president of credit and political risk at Equinox Global, a Lloyd's of London coverholder specializing in trade credit insurance. McNamara is a frequent speaker at executivelevel events hosted by both NACM and FCIB and will do so again throughout the 119th Credit Congress. He previously worked for well-known companies including Panasonic, Castrol NA (a BP Amoco Company), Kemper Casualty and Samsung

Fraud, Accounting Scandals and the Effect on Trade Credit: Part II Business Credit May 2015

Electronics.

**LOAD-DATE:** May 12, 2015



4 of 44 DOCUMENTS

Copyright 2015 ProQuest Information and Learning Company
All Rights Reserved
ABI/INFORM
Copyright 2015 INSEAD
INSEAD Articles

June 2015

**SECTION:** Pg. n/a

**ACC-NO:** 3713730321

**LENGTH:** 1263 words

**HEADLINE:** New Tools Needed for Managing Uncertainty

**BODY:**

[...]reporting is not neutral and influences strategic and tactical decisions that firms routinely make. [...]some organisations are evolving toward complex adaptive systems where the knowledge and the power are systematically distributed within the organisation.

**FULL TEXT:**

Traditional risk management frameworks have failed to prevent major environmental, social and governance disasters. New ideas are needed from outside corporations.

OW Bunker was once one of the world's biggest traders of bunker oil. It had operations in 29 countries and claimed to control around 7 percent of worldwide bunker trade. The company went public in March 2014 on the NASDAQ OMX Copenhagen Exchange and its shares rallied 20 percent on the first day of trading. But in a matter of months, OW Bunker was no more. By November 7th, the company declared bankruptcy.

Company governance had failed OW Bunker's investors and a series of risk management problems soon emerged...

BP's Deepwater Horizon oil spill and Bangladesh Savar building collapse provide other well-known examples of catastrophic environmental and social failures with deep human and economic repercussions. For investors who must own shares exposed to these catastrophes, the consequences on financial performance can be devastating.

Diversification is not the answer

However, as tragic as these incidents may be, their financial impact on well-diversified investors may be limited as portfolio managers may be able to diversify idiosyncratic risk away. In contrast, systemic issues such as those associated with global warming may have a more profound impact on investors and companies as most sectors in most

New Tools Needed for Managing Uncertainty INSEAD Articles June 2015

countries are likely to be affected. Aside from the catastrophic hazards that debilitate organisations in a short period of time, these more structural issues are potentially more lethal in the longer run. For example, Global annual economic losses from an additional temperature increase of 2°C are estimated to be between 0.2 percent and 2 percent of income according to the Intergovernmental Panel on Climate Change (IPCC), a scientific intergovernmental body under the auspices of the United Nations. Shocks of this magnitude are likely to affect investment returns.

Understanding the risk reward framework is difficult for practitioners and academics alike. Traditional methods of financial modelling have struggled to address these issues. For example, a recent study by Dimensional Fund Advisors indicated that 81 percent of active equity mutual fund managers failed to beat their benchmarks over a ten year period ending in 2013 and only 52 percent of actively managed equity funds survived over this period. This failure is likely to be exacerbated as the world gets more integrated and more chaotic. Perhaps as a consequence of the underperformance of active management industry, exchange traded funds (ETFs) and index funds have experienced a strong development. However, diversification is unlikely to be the financial solution to global issues such as climate change or even to an increase in social and financial inequality.

New tools are needed

New concepts, new tools and new paradigms have to emerge. Collaboration between the financial sector and academics could help. For example, a leading investment bank has recently started to use a more structured approach to risk forecast. Facilitated by a deep interaction between the developing team and academia, the systematic scenario analysis requires that analysts not only issue a point forecast but also a range of possible outcomes. This is not the first time that such a collaboration would be fruitful. Index funds were the brainchild of the academic research in the sixties and seventies that have developed the notion of efficient markets. Behavioural finance became mainstream decades after it was first investigated in academic seminars.

So what might these new tools look like? A few trends are emerging.

First, the reporting around sustainability issues is becoming more robust, more sophisticated and more consistent. Integrated reporting is becoming mainstream internationally while the Sustainability Accounting Standards Board (SASB) was incorporated in 2011 as a U.S. non-profit organisation to develop and disseminate sustainability accounting standards. The debate is currently ongoing in intellectual circles (and academics are playing an important role in this process) but will plausibly move to regulatory and then legal circles in a relatively near future. Naturally, reporting is not neutral and influences strategic and tactical decisions that firms routinely make. For audit committees, already facing a barrage of regulatory issues, these new dimensions will have to be integrated into the corporate jigsaw puzzle.

Second, management styles are evolving. In a world where managers and investors face clearly identified threats, power gets concentrated in the hands of the most capable experts who then develop controls and procedures to address the potential hazards. This approach works less well for managing uncertainty, hazards for which the likelihood or even the nature is much less understood. For example, Daniel Bouton, former CEO of Société Générale, allegedly said after the Jérôme Kerviel incident that "we are a world leader in the most sophisticated sector in the world! We have the greatest mathematicians, we hire a third of the graduates from Polytechnique every year, our mission is precisely to negate all risks through the sheer power of calculations, of correlations, of controls. This is happening to us!" All the risk management apparatus did not help SocGen with the uncertainty associated with human behaviour. As a result, some organisations are evolving toward complex adaptive systems where the knowledge and the power are systematically distributed within the organisation.

Third, economists are starting to develop a framework to optimally allocate uncertainty. A traditional approach to risk management at the macro level has been to either concentrate it in the hands of a few sophisticated parties with a large capacity to absorb losses (insurance companies, for example) or to securitise it to spread it among a large number of market participants. However, insurance companies are notoriously adverse to ambiguity, effectively closing the first channel. This essentially leaves the second option. For example, think of an agricultural biotechnology firm that

New Tools Needed for Managing Uncertainty INSEAD Articles June 2015

develops a genetically modified crop that reduces the risk induced by pesticides and increase crop yields. The firm passes the uncertainty regarding the effect of this technology on health to consumers and to society at large. However, the company has also exposed itself to catastrophic lawsuits. Is there a way to separate the normal business risks from the uncertainty associated with the potential environmental damages? For example, is it possible to issue a new type of catastrophic bond that offers a buffer in case of environmental or social catastrophe? Research on how to price uncertainty in a portfolio has made progress but much remains to be done to fully understand this question.

Gilles Hilary  is an INSEAD Professor of Accounting and Control and  The Mubadala Chaired Professor in Corporate Governance and Strategy.  He is also a contributing faculty member to the  INSEAD Corporate Governance Initiative .

This is an edited version of an article that first appeared in the ICGN Yearbook 2015, a publication of the International Corporate Governance Network.

Follow INSEAD Knowledge on Twitter and Facebook

Credit: @Hamid Mazloomi

**LOAD-DATE:** June 15, 2015



3 of 44 DOCUMENTS

Copyright 2015 Mondaq Ltd.
All Rights Reserved



Mondaq Business Briefing

July 13, 2015 Monday

**LENGTH:** 1124 words

**HEADLINE:** Worldwide: Courts In New York And Singapore Reach Opposite Conclusions On The Validity Of Interpleader Applications Arising Out Of The OW Bunker Bankruptcy

**BYLINE:** Andrea Pincus, Charles G. Weller, Sally-Ann S. Underhill, Siân Fellows and Danielle Anderson

**BODY:**

   On 7 November 2014, OW Bunker A/S ("OW"), a global supplier and trader of marine fuel, filed for bankruptcy in Denmark. Further bankruptcies of OW subsidiaries and affiliates swiftly followed, including the bankruptcy of certain U.S. and Singapore-based OW entities.

   Protective interpleader proceedings were brought in the U.S. and Singapore by vessel owners and charterers who found themselves the subject of competing claims by third-party physical suppliers of the fuel, OW entities and/or ING, the bank to which it is alleged that OW assigned its rights under certain fuel supply contracts in December 2013.

   Interpleader proceedings are designed to protect a party facing multiple claims in respect of a single obligation, by asking the court to determine the entitlement of competing claimants and, in the interim, granting equitable relief by making a form of anti-suit injunction to restrain the competing claimants from proceeding elsewhere. OW, which had contracted to supply fuel to various vessel owners and charterers, often sub-contracted with third-party fuel suppliers who would physically deliver the bunkers to the vessel. In the wake of the bankruptcy, some suppliers sought to enforce maritime liens directly against vessels, regardless of whether the shipowners or charterers had already paid the amounts owed to the OW entities with whom they had contracted.

   In two recent decisions, the Federal District Court in New York (New York Court) and the High Court of Singapore ("Singapore Court") reached opposing conclusions on whether interpleader proceedings relating to: (i) contractual (or 'in personam') claims; and (ii) maritime lien (or 'in rem') claims that were asserted against the vessels that had received

Worldwide: Courts In New York And Singapore Reach Opposite Conclusions On The Validity Of Interpleader
Applications Arising Out Of The OW Bunker Bankruptcy Mondaq Business Briefing July 13, 2015 Monda

the fuel, could be brought in those courts.

### New York Proceedings

In the New York proceedings, in which this firm is acting, the third-party fuel suppliers argued that the New York Court lacked jurisdiction to give interpleader relief and adjudicate on the maritime lien claims against the vessels because:

The maritime lien in rem claims against the vessels were distinct from the in personam contractual claims against the shipowners and charterers, so the claims were not competing.Not all the vessels had been arrested or present in the jurisdiction when actions were commenced and injunctions issued, and the relevant parties had not consented to the substitution of the amounts paid to the court in place of their maritime liens.

On 2 July 2015, the New York Court found that the contractual (in personam) claims and the claims against the vessel (in rem) were merely "alternative procedural devices to obtain the same relief", citing extensive U.S. precedent on the scope of federal interpleader jurisdiction The judge found that in each of the 24 pending interpleader cases before her, the proceedings in contract and the proceedings against the vessels had, at their source, the same obligation for the payment of fuel and were "inextricably interrelated".

Notably, in the course of her judgment, the judge emphasised that the third-party suppliers were effectively attempting to jump the queue of OW creditors by proceeding directly against the vessel to collect the amounts owed, even though there were claims by other creditors directly competing on the very same legal basis. The judge further pointed out the irony that the fuel suppliers were seeking to rely on an equitable argument when their case relied on the inequitable premise that it was more fair for the shipowners to pay twice, or even three times, for the same fuel than for the fuel suppliers, who had effectively extended credit to OW, to take whatever 'haircut' might be imposed upon them in the bankruptcy proceedings or to wait to receive their portion of the interpleaded funds.

Having concluded that she had jurisdiction to adjudicate the claims, the judge went on to find that she had broad statutory authority to restrain the parties from instituting any proceedings that might affect the subject matter of the interpleader application in order to protect the vessel owners and charterers from parallel proceedings. Most significantly, the judge found her orders to be proper and necessary in each case. Among other things, her orders, upon deposit of funds into court, enjoined vessel arrests, as well as any other actions against the vessel owners and charterers to collect payment for the bunker supplies.

### Singapore Proceedings

In the earlier judgment in Singapore proceedings, which concerned ING (asserting the right to pursue OW's claims) and a third-party fuel supplier, the interpleader application was dismissed. ING was pursuing a contractual (in personam) claim against the shipowners who had purchased the fuel, while a third-party fuel supplier sought to rely on a maritime lien (in rem) claim, a retention of title clause and the laws of agency.

On 24 April 2015, in a short decision, the Singapore court concluded that the contractual (in personam) claim for payment brought by ING and the in rem claims asserted by the third-party fuel supplier through the retention of title clause and under the maritime lien were of a different nature, did not concern the same debt and, as such, could not be the subject of an interpleader application. The fact that there was a slight difference in the amount claimed by each party was described by the judge as indicative, but not determinative, that the subject matter debt was different.

As regards the agency claim, it was held to be too weak to amount to a prima facie claim and, therefore, could not be the subject of an interpleader application.

### Conclusion

Worldwide: Courts In New York And Singapore Reach Opposite Conclusions On The Validity Of Interpleader Applications Arising Out Of The OW Bunker Bankruptcy Mondaq Business Briefing July 13, 2015 Monda

As the industry attempts to navigate the fallout from OW's bankruptcy, the conflicting outcomes of the interpleader decisions in the U.S. and Singapore illustrate the difficulty that comes from a bankruptcy in which contractual claims and maritime lien claims interact, and the added complexity that comes from differences in the governing laws of different jurisdictions hearing similar proceedings.

While the Singapore court chose to focus more on the technical equivalence of the claims, the U.S. court drew on U.S. precedent for the broad application of interpleader relief to claims related to the same transaction or debt, regardless of whether they were brought in rem or in personam, and also addressed the legal fiction that an in rem claim could somehow be divorced from the actual person or legal entity that would pay the claim if due.

This article is presented for informational purposes only and is not intended to constitute legal advice.

Ms Andrea Pincus
Reed Smith
Global Customer Centre
20 Stanwix Street
Suite 1200
Pittsburgh
PA 15222-4899
UNITED STATES
E-mail: reedsmith@reedsmith.com
URL: www.reedsmith.com

**LOAD-DATE:** July 13, 2015



1 of 44 DOCUMENTS

Copyright 2015 IHS Maritime & Trade
All Rights Reserved



IHS Fairplay Daily News

July 16, 2015 Thursday 03:07 AM GMT

**LENGTH:** 366 words

**HEADLINE:** Distressed asset specialist keen to buy Daebo's debts

**BODY:**

A specialist in distressed assets has expressed interest in buying over some debts of troubled South Korean dry bulk shipping outfit Daebo International Shipping.

Robert Southey, co-founder of UK-based Trench Capital Partners, told IHS Maritime that his firm is contacting as many of Daebo's creditors as possible.

Soon after the Baltic Dry Index fell to a historic low in February, Daebo filed for rehabilitation in South Korea that month, followed by a Chapter 15 filing in the United States in March.

The company's total assets are worth KRW200.7 billion (USD175.7 million), while it has total debts of KRW307.7 billion.

Southey, who has been specialising in distressed loans and claims for around 10 years, said his firm which focuses exclusively on illiquid and distressed financial assets, has been trading the debts of Pan Ocean and bankrupt bunker trader OW Bunker.

Pan Ocean went into receivership in June 2013, but has since been acquired by a consortium comprising South Korean poultry processor Harim Group and private equity outfit JKL Partners.

Southey said, "We are looking to contact as many creditors as possible, but we understand it is unlikely that the top

Distressed asset specialist keen to buy Daebo's debts IHS Fairplay Daily News July 16, 2015 Thursday 03:07 AM GMT

10 creditors would sell. We haven't set a limit for how much we will buy, but will review it ongoing."

On 30 June, the Seoul Central District Court heard that Daebo's worth as a continuing enterprise was KRW47.6 billion, as it has affreightment contracts with compatriot power utilities; accounting firm Deloitte Anjin calculated that Daebo's liquidation value is KRW18.6 billion.

Notwithstanding Deloitte Anjin's opinion, Southey acknowledged that his firm would be taking a risk as freight recovery is uncertain.

"Whether or not Daebo can recover from the dry bulk crisis is almost impossible to say, as market has not, according to most reports, scrapped enough tonnage to cope with reduced (cargo) volumes yet, and we do not yet know how the rehabilitation will finally take form," said Southey.

"But I do believe that for investors that can withstand the illiquid nature of claims and more costly legal diligence in a transfer, buying claims can be a safer investment than bonds or equity of publicly traded shipping firms."

**LOAD-DATE:** July 16, 2015

## *Hedging gets physical; For many companies, hedging forms part of a responsible risk-management strategy*

The Business Times Singapore

November 18, 2009 Wednesday

Copyright 2009 Singapore Press Holdings Limited All Rights Reserved

**Length:** 647 words

**Byline:** David Hughes

## Body

I ADMIT I have always had problems getting my head around the idea of shipping-futures markets, forward-freight agreements (FFAs) and hedging.

And I have been severely told off on occasions for ever so tentatively using the words 'speculation' and 'futures' in the same breath. And then there was the time I whispered the word 'gambling'.

Those scoldings, however, were before the onset of the credit crunch. And since then, more than a few fingers have been burnt.

Last year, it appeared that unauthorised FFA dealing could have contributed to the spectacular crash of UK-based listed shipowner Britannia Bulk Holdings.

The company's practice was to enter into dry bulk FFAs as economic hedges relating to identifiable ship or cargo positions, and economic hedges of transactions expected to be carried out in the normal course of its shipping business.

Just over a year ago, Britannia said in one of its last statements that it had bought FFAs that appeared not to have been purchased to hedge identifiable ship or cargo positions.

'This resulted in the company being more exposed to falling charter rates and reduced overall demand for dry bulk shipping services than it would have been if its historic practice of using FFAs as economic hedges had been followed,' it said.

Further nails were knocked into Britannia's coffin by the bunker market. It said: 'In the three months ended Sept 30, 2008, the company entered into a bunker fuel hedge which is currently uncompetitive because it is hedged to prices that are significantly above the current market price of bunker fuel. As a result, the company currently estimates that its aggregate bunker fuel hedging losses for the three months . . . will be significant.'

Horrible warning?

They were significant - and helped ensure Britannia's demise.

So, a horrible warning to everybody else? Well, only to a point.

Some very successful companies have always kept well clear of hedging or futures in any form.

But for many other firms, hedging forms part of a responsible risk-management strategy. The futures markets certainly took a knock but they are here to stay.

In this context, some words spoken at Platts' recent Managing Oil and Energy Risk conference in London seem to to make sense.

Morten Dehn, general manager of ***OW Bunker*** risk management, said: 'The adoption of physical hedging as an instrument for managing risk will play a key part of risk management strategies in 2010 and beyond.'

MICHAEL DEHART

Hedging gets physical; For many companies, hedging forms part of a responsible risk-management strategy

SGX contract

**OW Bunker** is a major marine fuel supplier and trader.

Mr Dehn said: 'The physical hedging of bunker fuel purchases enables customers to buy products on a forward basis, and is a definitive and easily auditable hedging instrument that provides cost stability.

'Following the economic downturn, we are operating in a new era of responsibility, where companies have to exercise an appropriate level of conservatism.

'They must caution themselves against unnecessary risk taking, even if the appetite for risk returns as the markets begin to recover. Physical hedging provides this stability as part of a comprehensive risk management strategy that incorporates a mix of tools and instruments.'

Physical hedging, Mr Dehn said, allows customers to fix and lock in the price of bunker fuel in a specific port where they know they will be purchasing products, while still being able to lift in any port, and maintain the use of the contract.

Given OW's view, it is interesting that Singapore Exchange (SGX) will soon launch a fuel oil futures contract, to be traded on its derivatives platform, that will be physically deliverable, free-on-board at Singapore oil terminals.

The plan is to launch the contract, which will be based on 380-centistoke bunkers, in the first quarter of 2010. The size of the contract will be 100 tonnes.

It would seem that the thinking behind the new SGX contract fits in well with the cautious mood of the times we live in.

## Classification

**Language:** ENGLISH

**Publication-Type:** Newspaper

**Subject:** RISK MANAGEMENT (89%); AGREEMENTS (78%); CREDIT CRISIS (76%); HOLDING COMPANIES (74%); ECONOMIC DECLINE (74%); ECONOMIC CONDITIONS (74%); ECONOMIC NEWS (73%); MANAGERS & SUPERVISORS (64%)

**Company:** BRITANNIA BULK HOLDINGS INC (57%)

**Industry:** MARINE SHIPPING (90%); RISK MANAGEMENT (89%); FUEL MARKETS (89%); FUTURES (89%); RESIDUAL FUEL (86%); BULK SHIPPING (78%)

**Geographic:** LONDON, ENGLAND (57%); UNITED KINGDOM (57%)

**Load-Date:** November 17, 2009

## _OW Bunker_: Suppliers Must Take Responsibility For Supporting Ship Owners In Compliancy Drive - Says _OW Bunker_; Partnership-based relationship founded on a consultative understanding of the technical issues as well as customers' operations is key to success

M2 PressWIRE

March 18, 2010 Thursday

Copyright 2010 Normans Media Limited All Rights Reserved

**Length:** 883 words

## Body

Responsibility For Supporting Ship Owners In Compliancy Drive - Says _OW Bunker_; Partnership-based relationship founded on a consultative understanding of the technical issues as well as customers' operations is key to success

O.W. Bunker, one of the world's leading suppliers and traders of marine fuel, today announced that it believes that fuel suppliers must take a greater responsibility in working with ship owners and operators to help them overcome the technical difficulties that they are experiencing in striving to meet sulphur dioxide regulation such as the recently implemented EU Directive 2005/33/EC, which sets a 0.1% sulphur fuel limit for ships at berth in EU ports.

Some ship owners and operators have been experiencing problems when switching fuel, including loss of propulsion, engine failure, filter blockages, and damage to auxiliary pumps. This is corroborated by recent statistics from California following the implementation of CARB's (Californian Air Resources Board) July 2009 low sulphur regulation, which showed that loss of propulsion incidents increased in 2009 to 67, from an average of 23.6 incidents per year between 2004 and 2008. All these problems have a cost for the ship owners and the operators.

_OW Bunker_ believes that these incidents can be reduced if suppliers, who are responsible for quality and have a real technical understanding, work closer and collaborate with their customers to help manage the complexities of the switching process. And thereby helping the customers to save money, increase efficiencies and minimize downtime.

Steffen Kortegaard, Technical Director, _OW Bunker_, said:

"Switching to low sulphur fuel oils and distillates is complex, and there needs to be a deep understanding of the technical process. From appropriate flash points and safety margins for storing and handling, to testing lubricity prior to distillate utilization; from ensuring quality of fuel pumps and appropriately cooling the gas oil, to implementing the right training procedures for crews; from ensuring

MICHAEL DEHART

OW Bunker: Suppliers Must Take Responsibility For Supporting Ship Owners In Compliancy Drive - Says OW
Bunker; Partnership-based relationship founded on a

that there is a good length of time in changing between fuel oil and
gas oil and analyzing the filter pressure, to only using duplex filters
and making sure that there is compatibility with the blended fuels;
from fitting a cooler with sufficient capacity in the low viscosity
line and frequently testing pumps for leakages, right down to
understanding unusual noises that might mean that there is a problem."

Kortegaard continues:

"There is much that can be done to minimise risk and mitigate potential
problems. But it requires a change in the relationship between the fuel
supplier and the ship operator, where the onus is on developing a
partnership of responsibility based on a mutual understanding of the
challenges and a focus on implementing effective solutions - the
customers' success is equal to our success.

"Clearly ship owners and operators must develop an appropriate
procurement strategy depending on their trading routes and indeed their
brand commitments to the environment, whether it's always purchasing
fuel oil with a quality of 1.5% sulphur and under, or if they have
sporadic forays into ECAs and regulated zones they might be better
utilizing a double fuel oil system. The key is to have a plan, both
from a technical perspective and as part of an overall risk management
strategy. However, success is based on and driven by a partnership
approach between the fuel supplier and the customer."

O.W. Bunker is committed to ensuring that the customer is the primary
focus, providing products and services as well as knowledge, expertise
and advice that adds value. The company is in the process of developing
technical collateral and presentations to provide customers with a
guide for managing the technical, economical and risk management issues
related to low sulphur legislation and compliance.

Gotz Lehsten, Vice President, **_OW Bunker_**, said:

"Our focus must always be on the customer and their needs, taking every
opportunity to add value, rather than simply just supplying the
physical product. In the current economic and legislative environment
it is vital that suppliers take responsibility for every aspect of the
customer relationship, delivering solutions that meet their needs in
order to generate efficiencies and improve profitability. Maintaining
that preferred partner status can only be achieved by delivering
solutions, as well as quality products, that helps them solve the
issues that they face, founded on a fundamental knowledge and expertise
of the market that they operate in."

O.W. Bunker is encouraging all ship owners and operators to contact
them if they are having economical, technical or risk management
challenges with the low sulphur fuel limits for ships so they can get a
valid solution to their challenges.

Specific documentation on how to deal with compliancy and technical
issues related to switching to low sulphur grades of fuel can be

MICHAEL DEHART

OW Bunker: Suppliers Must Take Responsibility For Supporting Ship Owners In Compliancy Drive - Says OW Bunker; Partnership-based relationship founded on a

obtained by emailing *marketing@owbunker.com*

CONTACT: Nick Blythe, Director, Blue Communications
Tel: + 44 (0) 7917 138 723
e-mail: *nick@blue-comms.com*
WWW: *http://www.blue-comms.com*
O.W. Bunker
e-mail: *marketing@owbunker.com*

((M2 Communications disclaims all liability for information provided
within
information on
on the world wide web. Inquiries to *info@m2.com*)).

# Classification

**Language:** ENGLISH

**Publication-Type:** Newswire

**Journal Code:** M2P

**Subject:** NATURAL RESOURCES (77%); EUROPEAN UNION REGULATION & POLICY (75%); EUROPEAN UNION (75%); EUROPEAN UNION LAW (75%); AIR QUALITY REGULATION (70%)

**Industry:** RESIDUAL FUEL (78%); MARINE SHIPPING (78%)

**Geographic:** CALIFORNIA, USA (90%); EUROPEAN UNION MEMBER STATES (57%)

**Load-Date:** March 18, 2010

## *OW Bunker* to appoint more regional managers

International Resource News

June 23, 2010 Wednesday

Copyright 2010 Normans Media Limited All Rights Reserved



**Length:** 86 words

## Body

*OW* Bunker, a Denmark-based marine fuel trading company, is planning to appoint more regional managers by 2011.

The company aims to offer more responsibility for its own strategic decision-making in each region.

The firm is hiring regional directors, a global sales director, and some regional and global sales account executives in the regions of Asia, Northern Europe, Central Europe, the Mediterranean, the Middle East and South America.

[Editorial queries for this story should be sent to *irn@enpublishing.co.uk* ]

## Classification

**Language:** ENGLISH

**Publication-Type:** Newswire

**Journal Code:** IRN

**Subject:** MANAGERS & SUPERVISORS (88%); EDITORIALS & OPINIONS (53%)

**Geographic:** EUROPE (92%); SOUTH AMERICA (79%); ASIA (79%); NORTHERN EUROPE (73%); DENMARK (58%)

**Load-Date:** June 24, 2010

# *Focus on quality - not quantity; Singapore's bunker supply industry must think globally, as PSA has done in ports*

The Business Times Singapore

September 14, 2011 Wednesday

Copyright 2011 Singapore Press Holdings Limited All Rights Reserved

**Section:** SHIPPING TIMES; Strait Talk

**Length:** 871 words

**Byline:** David Hughes

## Body

IT'S no secret that Singapore's position as the No 1 global bunkering hub is going to come under pressure, particularly with the prospect of China soon being able to offer large quantities of marine fuel at competitive prices.

So, not surprisingly, the future of the local bunker industry was one of the subjects discussed at last week's Bunker Asia conference, held at the Swissotel The Stamford.

Søren Christian Meyer, global sales director at major international supplier and trader *OW Bunker*, said that Singapore must continue to focus on driving up bunkering standards as a means of maintaining its position as the world's largest bunkering port.

He said that, with the impending competition from China, Singapore must position itself as a champion for increased professionalism as a means of continued differentiation.

Mr Meyer told delegates: 'As well as striving to be as competitive as possible on price, Singapore must focus on building a reputation for being the world's bunkering capital of excellence, a region known for quality and value-added services.'

He cautioned: 'While bunker prices in China are currently higher, this could well change. There is real expansion in the development of storage facilities and terminals, as well as bunker barges. And the main bunkering players have so much financial resource that they can simply drop their prices to become competitive.'

But he added: 'Ship owners and operators are facing such significant issues and challenges that they are looking for more from their fuel suppliers than just a cheap deal. While price is obviously important, they need counsel just as much as quality products. Suppliers have an opportunity to differentiate themselves, and build close relationships with their customers, working with them to implement fuel procurement strategies that increase operational performance, environmental efficiency and profitability.'

**Money talks**

Perhaps that's right; I have my doubts, though. Bunkering is very much a business where money talks. And that is even more so now with the price of residual bunker fuel in the region of US$650 a tonne.

Nevertheless, Mr Meyer's contention that Singapore must 'continue the strides it is making in improving standards and infrastructure to become the symbol for progress within the bunkering industry' is still valid.

He believes that will help to alleviate the threat to supply and demand from China. It might - a bit. More importantly, it will help hold on to the trade from vessels which do not call in China or where the logistics of their voyages mean Singapore is the preferred bunkering port for reasons other than price.

'The Maritime and Port Authority of Singapore has made significant investments in improving standards beyond regulation, not just in bunkering but also in innovation and development schemes that will tackle the challenges that the shipping

MICHAEL DEHART

Focus on quality - not quantity; Singapore's bunker supply industry must think globally, as PSA has done in ports

industry faces,' he said. He added: 'Continued commitment to such initiatives and setting new benchmarks for excellence by which we should all be measured will create the foundation that will enable Singapore to retain its No 1 status within the global shipping industry.'

Well, yes and no. It depends on what yardstick you use. If in bunkering you judge it by how much fuel oil you deliver, or in the container business by how many TEUs (twenty-foot equivalent units) pass through the port or in the ship repair sector by how many ships go through the yards, and compared to Singapore's competitors, then eventually disappointment will come knocking at the door.

**Innovation**

Mr Meyer cites, as a good example of innovation in Singapore, the development of mass flow metering: 'Ensuring product quantity is one of the biggest issues for ship owners and operators. _**OW Bunker**_ championed the installation of mass flow meters over five years ago, and we now have over a third of the vessels in our global fleet using them, the latest being in our new physical locations in Panama, Montevideo and Gothenburg. Not only do they guarantee quantity, mass flow meters significantly increase efficiencies in the bunkering process, which must ultimately be one of the key drivers and incentives for improving standards.'

The trouble is, as Mr Meyer said, mass flow meters can also be used in Panama, Montevideo and Gothenburg - or Shanghai, Dalian or Shenzhen.

This is not to say that he is wrong to argue that Singapore should continue to strive for ever higher standards in all aspects of the maritime economy. He is right; the Republic must do that. But the objective should not be staying top physical bunker supply hub for ever. Rather, it should be becoming the centre for the global bunker business - and for all the other sectors of the maritime industry. As PSA has gone global in the ports business, so the bunker supply industry must also think globally.

The local bunker industry must continue to be at the top game in terms of standards of service and be the global industry's top innovator. Doing so - for example, by being in the forefront of the development of LNG as marine fuel and perhaps also of other innovative fuels such as emulsions - will doubtless help keep volumes up. But there is more to a business than just the front-end sales.

## Classification

**Language:** ENGLISH

**Publication-Type:** Newspaper

**Subject:** COMPANY PROFITS (76%)

**Industry:** MARINE TRANSPORTATION SUPPORT SERVICES (90%); RESIDUAL FUEL (77%); FUEL MARKETS (77%); MARINE SHIPPING (77%); HARBORS & PORTS (74%); PORT AUTHORITIES (69%)

**Geographic:** SINGAPORE (95%); CHINA (94%); ASIA (79%)

**Load-Date:** September 13, 2011