# Exhibit 36

**EXECUTION VERSION**

# USD 700,000,000 MULTICURRENCY REVOLVING BORROWING BASE FACILITIES AGREEMENT

_19 December_ **2013**

### O.W. BUNKER & TRADING A/S

**arranged by**
**ABN AMRO BANK N.V.**
**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**
**DANSKE BANK A/S**
**ING BANK N.V.**
**NATIXIS**
**and**
**NORDEA BANK DANMARK A/S**
**as Bookrunning Mandated Lead Arrangers**

**and**

**ING BANK N.V.**
**acting as Coordinator, Agent and Security Agent**

## ALLEN & OVERY

Allen & Overy LLP

0030155-0001031 AMBA:4005161.16

ING 00079

# CONTENTS

**Clause**                                                                                                    **Page**

1.    Definitions and Interpretation....................................................................................................1
2.    The Facilities..............................................................................................................................47
3.    Facility A Extension Option .....................................................................................................52
4.    Purpose .......................................................................................................................................54
5.    Conditions of Utilisation ..........................................................................................................54
6.    Utilisation ...................................................................................................................................56
7.    Optional Currencies...................................................................................................................57
8.    Ancillary Facilities ....................................................................................................................58
9.    Repayment...................................................................................................................................62
10.   Voluntary Prepayment and Cancellation................................................................................62
11.   Mandatory Prepayment and Cancellation...............................................................................64
12.   Restrictions..................................................................................................................................65
13.   Interest .........................................................................................................................................66
14.   Interest Periods...........................................................................................................................68
15.   Changes to the Calculation of Interest....................................................................................68
16.   Fees...............................................................................................................................................70
17.   Tax Gross Up and Indemnities.................................................................................................71
18.   Increased Costs...........................................................................................................................78
19.   Other Indemnities.......................................................................................................................79
20.   Mitigation by the Lenders.........................................................................................................81
21.   Costs and Expenses....................................................................................................................81
22.   Guarantee and Indemnity..........................................................................................................82
23.   Representations............................................................................................................................91
24.   Information Undertakings........................................................................................................100
25.   Financial Covenants .................................................................................................................103
26.   General Undertakings ..............................................................................................................107
27.   Events of Default......................................................................................................................117
28.   Changes to the Lenders...........................................................................................................122
29.   Changes to the Obligors..........................................................................................................127
30.   Role of the Administrative Parties.........................................................................................130
31.   The Security Agent...................................................................................................................140
32.   Borrowing Base ........................................................................................................................152
33.   Conduct of Business by the Finance Parties.........................................................................153
34.   Sharing among the Finance Parties .......................................................................................153
35.   Payment Mechanics .................................................................................................................155
36.   Set-Off.......................................................................................................................................159
37.   Notices.......................................................................................................................................159
38.   Calculations and Certificates..................................................................................................162
39.   Partial Invalidity.......................................................................................................................162
40.   Remedies and Waivers.............................................................................................................162
41.   Amendments and Waivers.......................................................................................................162
42.   Confidentiality...........................................................................................................................167
43.   Disclosure of Lender details by Agent .................................................................................171
44.   Counterparts...............................................................................................................................172
45.   Governing Law..........................................................................................................................172
46.   Enforcement...............................................................................................................................172
47.   USA Patriot Act........................................................................................................................174

**Schedule**                                                                                                    **Page**

1.      The Original Parties...................................................................................................175
        Part 1          The Original Obligors...................................................................175
        Part 2          The Original Lenders....................................................................177
2.      Conditions...............................................................................................................178
        Part 1          Conditions Precedent to Delivery of First Utilisation Request..........178
        Part 2          Conditions Precedent to First Utilisation .......................................181
        Part 3          Conditions Subsequent..................................................................185
        Part 4          Conditions Precedent required to be delivered by an Additional Obligor ....188
3.      Form of Utilisation Request .....................................................................................191
4.      Mandatory Cost Formulae .......................................................................................193
5.      Form of Transfer Certificate.....................................................................................196
6.      Form of Assignment Agreement ...............................................................................199
7.      Form of Accession Deed ..........................................................................................202
8.      Form of Resignation Letter.......................................................................................205
9.      Form of Compliance Certificate................................................................................206
10.     Timetables ...............................................................................................................208
11.     Form of Increase Confirmation .................................................................................209
12.     Form of Accordion Increase Certificate .....................................................................212
13.     Form of Accordion Accession Certificate ...................................................................213
14.     Form of Borrowing Base Certificate...........................................................................215
15.     Minimum Ancillary Facility Terms.............................................................................216


Signatures .......................................................................................................................222

0030155-0001031 AMBA:4005161.16

**THIS AGREEMENT** (the **Agreement**) is dated _19 December_ 2013 and made

**BETWEEN**:

(1)    **O.W. BUNKER & TRADING A/S** (the **Company**);

(2)    **THE SUBSIDIARIES** of the Company listed in Part 1 of Schedule 1 (The Original Parties) as original borrowers (the **Original Borrowers**);

(3)    **THE SUBSIDIARIES** of the Company listed in Part 1 of Schedule 1 (The Original Parties) as original guarantors (together with the Company, the **Original Guarantors**);

(4)    **ABN AMRO BANK N.V., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., DANSKE BANK A/S, ING BANK N.V., NATIXIS** and **NORDEA BANK DANMARK A/S** and  as bookrunning mandated lead arrangers (whether acting individually or together the **Arranger**);

(5)    **THE FINANCIAL INSTITUTIONS** listed in Part 2 of Schedule 1 (The Original Parties) as lenders (The Original Lenders);

(6)    **ING BANK N.V.** as Coordinator (the **Coordinator**);

(7)    **ING BANK N.V.** as agent of the Finance Parties (the **Agent**); and

(8)    **ING BANK N.V.** as security agent for the Secured Parties (the **Security Agent**).

**IT IS AGREED** as follows:

## 1.    DEFINITIONS AND INTERPRETATION

### 1.1    Definitions

In this Agreement:

**Acceptable Bank** means:

(a)    a bank or financial institution which has an Acceptable Rating; or

(b)    any other bank or financial institution approved by the Agent.

**Acceptable Rating** means a rating for long-term unsecured and non-credit-enhanced debt obligations of A- or higher by S&P or Fitch or A3 or higher by Moody's or a comparable rating from an internationally recognised credit rating agency.

**Accession Deed** means a document substantially in the form set out in Schedule 7 (Form of Accession Deed), with any amendments which the Agent and the Company may agree.

**Accordion Acceding Lender** has the meaning given to that term in Clause 2.3 (Accordion).

**Accordion Accession Certificate** means a certificate substantially in the form set out in Schedule 13 (Form of Accordion Accession Certificate).

**Accordion Increase Amount** has the meaning given to that term in Clause 2.3 (Accordion).

**ING   00082**

**Accordion Increase Certificate** means a certificate substantially in the form of Schedule 12 (Form of Accordion Increase Certificate).

**Accordion Increase Effective Date** means the date falling prior to the end of the Availability Period specified by the Borrower to the Agent as being the date on which the proposed increase in the amount of each Facility and the accession of any Accordion Acceding Lender is to take effect.

**Accordion Increase Lender** has the meaning given to that term in Clause 2.3 (Accordion).

**Accounting Principles** means generally accepted accounting principles in relation to the Company, in Denmark (which may in time be IFRS) or, in relation to each other Obligor, the jurisdiction of incorporation of the relevant Obligor.

**Additional Borrower** means a person which becomes an Additional Borrower in accordance with Clause 29 (Changes to the Obligors).

**Additional Guarantor** means a person which becomes an Additional Guarantor in accordance with Clause 29 (Changes to the Obligors).

**Additional Obligor** means an Additional Borrower or an Additional Guarantor.

**Administrative Party** means each of the Agent, the Arranger and the Coordinator.

**Advance Rate** means the percentages referred to in the definition of Borrowing Base.

**Affiliate** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company including in relation to Coöperatieve Centrale Raffeisen-Boerenleenbank B.A. only, any related bank (*aangesloten bank*) or member (*lid*) and any Subsidiary or Holding Company of any of the foregoing persons or any other Subsidiary of that Holding Company.

**Agent's Spot Rate of Exchange** means the Agent's spot rate of exchange for the purchase of the relevant currency with the Base Currency in the Amsterdam foreign exchange market at or about 11.00 a.m. on a particular day.

**Ancillary Commencement Date** means, in relation to an Ancillary Facility, the date on which that Ancillary Facility is first made available, which date shall be a Business Day within the Availability Period.

**Ancillary Commitment** means, in relation to an Ancillary Lender and an Ancillary Facility, the maximum Base Currency Amount which that Ancillary Lender has agreed (whether or not subject to satisfaction of conditions precedent) to make available from time to time under an Ancillary Facility and which has been authorised as such under Clause 8 (Ancillary Facilities), to the extent that amount is not cancelled or reduced under this Agreement or the Ancillary Documents relating to that Ancillary Facility.

**Ancillary Document** means each document relating to or evidencing the terms of an Ancillary Facility.

**Ancillary Facility** means any ancillary facility made available by an Ancillary Lender in accordance with Clause 8 (Ancillary Facilities).

**Ancillary Lender** means each Lender which makes available an Ancillary Facility in accordance with Clause 8 (Ancillary Facilities).

ING    00083

**Ancillary Outstandings** means, at any time, in relation to an Ancillary Lender and an Ancillary Facility then in force, the aggregate of the equivalent amounts in the Base Currency (as calculated by that Ancillary Lender) of the following amounts outstanding under that Ancillary Facility:

(a)     the principal amount under each overdraft facility (net of any Available Credit Balance, which for the avoidance of doubt is not available for Ancillary Facilities made available by any Ancillary Lender which gives notice to the Agent that it cannot perform set-off except to the extent that such Ancillary Facilities form part of a cash pooling arrangement);

(b)     the face amount of each guarantee, bond and letter of credit under that Ancillary Facility; and

(c)     the amount fairly representing the aggregate exposure (excluding interest and similar charges) of that Ancillary Lender under each other type of accommodation provided under that Ancillary Facility,

in each case as determined by such Ancillary Lender, acting reasonably in accordance with its normal banking practice and in accordance with the relevant Ancillary Document.

**Annual Financial Statements** has the meaning given to that term in Clause 24 (Information Undertakings).

**Approved Location** means a warehouse or other storage terminal located in Belgium or the Netherlands, each acceptable to the Security Agent.

**Assignment Agreement** means an agreement substantially in the form set out in Schedule 6 (Form of Assignment Agreement) with any amendments which the Agent may approve or reasonably require or any other form agreed between the Agent and the relevant assignor and assignee.

**Auditors** means one of PricewaterhouseCoopers, Ernst & Young, KPMG or Deloitte & Touche or any other firm approved in advance by the Majority Lenders (such approval not to be unreasonably withheld or delayed).

**Authorisation** means an authorisation, consent, approval, resolution, permit, licence, exemption, filing, notarisation or registration.

**Available Credit Balance** means, in relation to an Ancillary Facility, credit balances on any account of any Borrower of that Ancillary Facility with the Ancillary Lender making available that Ancillary Facility to the extent that those credit balances are freely available to be set off by that Ancillary Lender against liabilities owed to it by that Borrower under that Ancillary Facility (which set off for the avoidance of doubt is not applicable to those Ancillary Facilities made available by Nordea Bank Danmark A/S except to the extent that such Ancillary Facilities provided by Nordea Bank Danmark A/S form part of a cash pooling arrangement).

**Availability Period** means, in relation to a Facility, the period from and including the date of this Agreement to and including the relevant Termination Date.

**Available Commitment** means, in relation to a Facility, a Lender's Commitment under that Facility minus (subject as set out below):

(a)     the Base Currency Amount of its participation in any outstanding Utilisations under that Facility and the Base Currency Amount of the aggregate of its Ancillary Commitments; and

ING   00084

(b)     in relation to any proposed Utilisation, the Base Currency Amount of its participation in any other Utilisations that are due to be made under that Facility on or before the proposed Utilisation Date and the Base Currency Amount of its Ancillary Commitment in relation to any new Ancillary Facility that is due to be made available on or before the proposed Utilisation Date.

For the purposes of calculating a Lender's Available Commitment in relation to any proposed Utilisation, the following amounts shall not be deducted from that Lender's Commitment:

(i)     that Lender's participation in any Utilisations that are due to be repaid or prepaid on or before the proposed Utilisation Date; and

(ii)    that Lender's Ancillary Commitments to the extent that they are due to be reduced or cancelled on or before the proposed Utilisation Date.

**Available Facility** means, in relation to a Facility, the aggregate for the time being of each Lender's Available Commitment in respect of that Facility.

**Base Currency** means USD.

**Base Currency Amount** means:

(a)     in relation to a Utilisation:

    (i)     the amount specified in the Utilisation Request delivered by a Borrower for that Utilisation; or

    (ii)    if the amount requested is not denominated in the Base Currency:

        (A)     that amount converted into the Base Currency at the Agent's Spot Rate of Exchange on the date which is three Business Days before the Utilisation Date or, if later, on the date the Agent receives the Utilisation Request in accordance with the terms of this Agreement); or

        (B)     at any time that amount, as most recently adjusted under Clause 7.3 (Revaluation); and

(b)     in relation to an Ancillary Commitment:

    (i)     the amount specified as such in the notice delivered to the Agent by the Company pursuant to Clause 8.2 (Availability); or

    (ii)    if the amount specified is not denominated in the Base Currency, that amount converted into the Base Currency at the Agent's Spot Rate of Exchange on the date which is three Business Days before the Ancillary Commencement Date for that Ancillary Facility or, if later, the date the Agent receives the notice of the Ancillary Commitment in accordance with the terms of this Agreement),

in each case as adjusted to reflect any repayment, prepayment, consolidation or division of a Utilisation, or (as the case may be) cancellation or reduction of an Ancillary Facility;

(c)     other than in a circumstance covered under paragraphs (a) or (b) above, at any time in relation to any sum denominated in a currency other than the Base Currency, that amount

ING    00085

notionally converted into the Base Currency at the Agent's Spot Rate of Exchange at that time; and

(d)     other than a circumstance covered under paragraph (a) or (b) above, at any time in relation to any sum denominated in the Base Currency, the amount of that sum.

**Base Reference Bank Rate** means the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Agent at its request by the Base Reference Banks:

(a)     in relation to LIBOR, as the rate at which the relevant Base Reference Bank could borrow funds in the London interbank market;

(b)     in relation to EURIBOR, as the rate at which the relevant Base Reference Bank could borrow funds in the European interbank market;

(c)     in relation to CIBOR, as the rate at which the relevant Base Reference Bank could borrow funds in the Danish interbank market;

(d)     in relation to NIBOR, as the rate at which the relevant Base Reference Bank could borrow funds in the Oslo interbank market; and

(e)     in relation to STIBOR, as the rate at which the relevant Base Reference Bank could borrow funds in the Swedish interbank market,

in the relevant currency and for the relevant period, were it to do so by asking for and then accepting interbank offers for deposits in reasonable market size in that currency and for that period.

**Base Reference Banks** means, in relation to LIBOR, EURIBOR, CIBOR, NIBOR or STIBOR, ING Bank N.V. and Nordea Bank Danmark A/S or such other banks as may be appointed by the Agent in consultation with the Company.

**Basel III** means:

(a)     the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems". "Basel III: International framework for liquidity risk measurement, standards and monitoring" and Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee in December 2010, each as amended; and

(b)     any further guidance or standards published by the Basel Committee relating to "Basel III".

**Basel III Costs** means any Increased Cost which is attributable to the implementation or application of, or compliance with, Basel III or any law or regulation that implements or applies Basel III including any of the changes designed to strengthen any capital standards or introduce minimum liquidity or other requirements referenced in Basel III.

**Basel Committee** means the Basel Committee on Banking Supervision.

**Belgian Obligor** means an Obligor incorporated under the laws of Belgium.

**Belgian Receivables Security** means the Belgian law governed security document to be entered into between O.W. Bunker (Belgium) NV and the Security Agent in respect of (i) certain trade and intercompany receivables and (ii) insurances.

**Blocked Collection Account** means:

ING    00086

(a) any bank account specified in Schedule 1 (Security Assets) of the Dutch Accounts Security under the heading Blocked Collection Accounts; and

(b) any other present or future bank account opened or to be opened, in the name of a Danish Obligor in the Netherlands which is blocked in favour of the Security Agent so that no amounts can be withdrawn from such account without the prior written consent of the Security Agent and into which account all trade receivables of the Danish Obligors have been instructed to be paid (excluding those trade receivables payable by DFDS A/S).

**Borrower** means an Original Borrower or an Additional Borrower unless it has ceased to be a Borrower in accordance with Clause 29 (Changes to the Obligors).

**Borrowing Base** means, at any time, the aggregate (calculated in the Base Currency) value of:

(a) 100% of any Cash deposited in a Collection Account that is subject to a properly perfected first-ranking Transaction Security Document (subject to the reduction of the value of any Cash deposited by a Danish Obligor in a Blocked Collection Account by the amount withdrawn by a Danish Obligor from the corresponding Mirrored Account in accordance with the terms of the Dutch Accounts Security);

(b) 90% of the Value of any Secured Eligible Receivable;

(c) 90% of the Value of any Tier 1 Eligible Receivable;

(d) subject to the Tier 2 Caps, 50% of the Value of any Tier 2 Eligible Receivable; and

(e) 85% of the Value of any Eligible Inventory,

and where any element of the Borrowing Base is denominated in a currency other than the Base Currency, that element shall be included in the Borrowing Base using its Base Currency Amount.

**Borrowing Base Certificate** means a certificate substantially in the form set out in Schedule 14 (Form of Borrowing Base Certificate).

**Borrowings** has the meaning given to that term in Clause 25.1 (Financial definitions).

**Break Costs** means the amount (if any) by which:

(a) the interest (excluding the Margin) which a Lender should have received for the period from the date of receipt of all or any part of its participation in a Loan or Unpaid Sum to the last day of the current Interest Period in respect of that Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b) the amount which that Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

**Brokers** means Jefferies Bache Ltd. and BNP Paribas Commodities Futures Ltd. and any other party with whom an Obligor opens a brokerage account for the purposes of a Treasury Transaction.

**Business Day** means a day (other than a Saturday or Sunday) on which banks are open for general business in London, Amsterdam, Geneva, Paris, Copenhagen and New York and:

ING    00087

(a)     (in relation to any date for payment or purchase of a currency other than euro) the principal financial centre of the country of that currency; or

(b)     (in relation to any date for payment or purchase of euro) any TARGET Day.

**Carrier Company** means a special purpose vehicle being a wholly owned subsidiary of O.W. Tankers A/S whose sole purpose is owning barges and entering into charter agreements with members of the Group or third parties in relation to those barges.

**Cash** means, at any time, cash denominated either in the Base Currency or an Optional Currency in hand or at bank and (in the latter case) credited to an account in the name of a member of the Group with an Acceptable Bank and to which of a member of the Group is alone (or together with other members of the Group) beneficially entitled and for so long as:

(a)     that cash is repayable on demand;

(b)     repayment of that cash is not contingent on the prior discharge of any other indebtedness of any member of the Group or of any other person whatsoever or on the satisfaction of any other condition;

(c)     there is no Security over that cash except for Transaction Security or any Permitted Security constituted by a netting or set-off arrangement entered into by members of the Group in the ordinary course of their banking arrangements; and

(d)     the cash is freely and immediately available to be applied in repayment or prepayment of the Facilities.

**Cash Equivalent Investments** means at any time:

(a)     certificates of deposit maturing within one year after the relevant date of calculation and issued by an Acceptable Bank; or

(b)     any other debt security approved by the Majority Lenders,

in each case, denominated in either in the Base Currency or an Optional Currency and to which any member of the Group is alone (or together with other members of the Group) beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Security (other than Security arising under the Transaction Security Documents).

**Cashflow** has the meaning given to that term in Clause 25.1 (Financial definitions).

**CFC** means a controlled foreign corporation as such term is defined in section 957 of the Code.

**Change of Control** means any person or group of persons acting in concert gains direct or indirect control of the Company.  For the purposes of this definition:

(a)     **control** of the Company means:

        (i)      the power (whether by way of ownership of shares, voting powers, proxy, contract, agency or otherwise) to:

                 (A)     cast, or control the casting of, more than 50% of the maximum number of votes that might be cast at a general meeting of the Company;

ING      00088

(B)     appoint or remove all, or the majority, of the directors or other equivalent officers of the Company; or

(C)     give directions with respect to the management or policies of the Company with which the directors or other equivalent officers of the Company are obliged to comply; or

(ii)     the holding beneficially of more than 50% of the issued share capital of the Company (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital);

(b)     **acting in concert** means acting together pursuant to an agreement or understanding (whether formal or informal).

**Charged Property** means all of the assets of the Obligors which from time to time are, or are expressed to be, the subject of the Transaction Security.

**CIBOR** means, in relation to any Loan in DKK:

(a)     the applicable Screen Rate;

(b)     (if no Screen Rate is available for the Interest Period of that Loan) the Interpolated Screen Rate for that Loan; or

(c)     if:

(i)     no Screen Rate is available for the Interest Period of that Loan; and

(ii)     it is not possible to calculate an Interpolated Screen Rate for that Loan,

the Base Reference Bank Rate,

as of, in the case of paragraphs (a) and (c) above, the Specified Time on the Quotation Day for DKK and for a period equal in length to the Interest Period of that Loan and, if that rate is less than zero, CIBOR shall be deemed to be zero.

**Code** means the US Internal Revenue Code of 1986, as amended.

**Collateral** means any asset which forms part of the Borrowing Base and which is subject to the Transaction Security.

**Collection Account** means an account:

(a)     held in the Netherlands by an Obligor with the Agent or Security Agent, or otherwise in any other jurisdiction or with any other bank or financial institution as is approved by the Security Agent acting on behalf of all Lenders (such approval not to be unreasonably withheld or delayed);

(b)     identified in writing between the Company and the Agent as a Collection Account; and

(c)     subject to properly perfected first-ranking Transaction Security,

(as the same may be redesignated, substituted or replaced from time to time with the consent of the Agent).

ING    00089

**Commitment** means a Facility A Commitment or a Facility B Commitment.

**Compliance Certificate** means a certificate substantially in the form set out in Schedule 9 (*Form of Compliance Certificate*), with any amendments which the Agent and the Company may agree.

**Confidential Information** means all information relating to the Company, any Obligor, the Group, the Finance Documents or a Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or a Facility from either:

(a)     any member of the Group or any of its advisers; or

(b)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any member of the Group or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(i)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of Clause 42 (*Confidentiality*); or

(ii)    is identified in writing at the time of delivery as non-confidential by any member of the Group; or

(iii)   is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with the Group and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

**Confidentiality Undertaking** means a confidentiality undertaking substantially in the then current recommended form of the Loan Market Association or in any other form agreed between the Company and the Agent (acting on behalf of the Lenders).

**Credit Instrument** means any of the following instruments:

(a)     a standby letter of credit which is subject to the terms and conditions of the Uniform Customs and Practices for Documentary Credits, 2007 Revisions, ICC Publication No. 600 or the International Standby Practices 1998, ICC Publication No. 590, or any replacement terms and conditions to either of the foregoing;

(b)     a bank guarantee or standby letter of credit securing credit facilities made or to be made available to any Obligor, any other member of the Group or any agent of any member of the Group;

(c)     a bank guarantee or standby letter of credit securing or covering margin requirements of counterparts in connection with hedging and forward sale and purchase transactions undertaken by a Borrower or a Subsidiary of a Borrower;

(d)     a bank guarantee or standby letter of credit securing obligations of a Borrower or a Subsidiary of a Borrower to customs authorities;

ING    00090

(e)     a bank guarantee or standby letter of credit securing obligations of a Borrower or a Subsidiary of a Borrower in respect of VAT owing to authorities which are legally entitled to charge VAT;

(f)     a bond in favour of a court or arbitration tribunal which has jurisdiction over a Borrower or a Subsidiary of a Borrower;

(g)     a bid bond or a performance or a counter-guarantee issued in relation to a bid bond or a performance bond;

(h)     a bank guarantee, standby letter of credit, documentary letter of credit supporting rent obligations, charter payment obligations, obligations relating to services given by service providers, obligations to suppliers and obligations to banks providing bank credit facilities; and

(i)     any other similar instrument with the prior written consent of the Agent, the relevant Ancillary Lender, and the Majority Lenders,

in each case in a form complying with market practices and agreed between the relevant Borrower and the relevant Ancillary Lender and of a maturity of no longer than eighteen (18) months.

**Danish Obligor** means an Obligor incorporated under the laws of Denmark.

**Default** means:

(a)     an Event of Default; or

(b)     an event or circumstance specified in Clause 27 (Events of Default) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of them) be an Event of Default.

**Defaulting Lender** means any Lender:

(a)     which has failed to make its participation in a Loan available (or has notified the Agent or the Company (which has notified the Agent) that it will not make its participation in a Loan available) by the Utilisation Date of that Loan in accordance with Clause 6.4 (Lenders' participation);

(b)     which has otherwise rescinded or repudiated a Finance Document; or

(c)     with respect to which an Insolvency Event has occurred and is continuing,

unless, in the case of paragraph (a) above:

(i)     its failure is caused by:

    (A)     administrative or technical error; or

    (B)     a Disruption Event; and

    its participation in the Loan is made within three Business Days of its due date; or

(ii)    the Lender is disputing in good faith whether it is contractually obliged to make the payment in question.

ING    00091

**Delegate** means any delegate, agent, attorney or co-trustee appointed by the Security Agent.

**Designated Net Amount** means the amount notified by the Company to the Agent upon the establishment of a Multi-account Overdraft as being the maximum amount of Net Outstandings that will, at any time, be outstanding under that Multi-account Overdraft.

**Disposal** has the meaning given to that term in Clause 26.13 (Disposals).

**Disruption Event** means either or both of:

(a)  a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facilities (or otherwise in order for the transactions contemplated by the Finance Documents to be carried out) **provided that** the disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)  the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

(i)  from performing its payment obligations under the Finance Documents; or

(ii)  from communicating with other Parties in accordance with the terms of the Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

**Distribution Limit** has the meaning given to such term in Clause 26.17 (Dividends and share redemption).

**Dormant Subsidiary** means a member of the Group which does not trade (for itself or as agent for any person) and does not own, legally or beneficially, assets (including, without limitation, indebtedness owed to it).

**Dubai Obligor** means an Obligor incorporated under UAE Law.

**Dutch Accounts Security** means the Dutch law governed security document to be entered into between the Company, O.W. Supply & Trading A/S, O.W. Bunker Malta Limited, O.W. Bunker Middle East DMCC, O.W. Bunker China Limited, O.W. Bunker Far East (Singapore) Pte Ltd, Dynamic Oil Trading (Singapore) Pte.Ltd. and the Security Agent in respect of the Collection Accounts.

**Dutch Civil Code** means the *Burgerlijk Wetboek*.

**Dutch FSA** means the *Wet op het Financieel Toezicht.*

**Dutch Obligor** means an Obligor incorporated under the laws of the Netherlands.

**Dutch Omnibus Security** means the Dutch law governed security document to be entered into between O.W. Bunker (Netherlands) B.V., O.W. Global Trading SA and the Security Agent in respect of (i) certain non-commingled oil inventory located on land in the Netherlands, and (ii) certain title documents for oil inventory at sea.

**Eligible Inventory** means marine fuels which:

ING    00092

(a)     are owned by O.W. Global Trading SA (or any other Obligor to whom O.W. Global Trading SA transfers its global trading business);

(b)     have been paid for or for which a Credit Instrument is outstanding (the term of the financing of such marine fuels must not exceed 180 days unless otherwise agreed by the Security Agent acting on the instructions of the Majority Lenders);

(c)     are hedged in accordance with the Risk Policy and/or in respect of the cargo business of the Company in a manner acceptable to the Security Agent, for which a sales agreement has been executed by the Company and is in full force and effect; and

(d)     are:

     (i)     stored at an Approved Location, subject to original warehouse warrants provided to the Security Agent and subject to a properly perfected first-ranking Transaction Security Document; or

     (ii)    on board a vessel, the title to which is evidenced by a full set of original negotiable bills of lading which is held to the order of the Security Agent and which are the subject of a properly perfected first-ranking Transaction Security Document.

**Eligible Receivable** means a receivable of a Borrower:

(a)     in relation to which no debtor contractually possesses a right of set-off or counterclaim or other similar rights against the Borrower;

(b)     constituting a valid and binding payment obligation of a debtor which is not the subject of an Insolvency Event nor which is an Affiliate of the Company;

(c)     which is not subject to any dispute or litigation other than any dispute or litigation of a frivolous or vexatious nature, as substantiated by evidence in form and substance satisfactory to the Agent, unless such dispute or litigation:

     (i)     is ended within seven days;

     (ii)    the amount subject of such dispute or litigation is not in excess of ten per cent. (10%) of the face value of the relevant invoice; and

     (iii)   the amount subject of such dispute or litigation is not more than USD 100,000;

(d)     which is not subject to any prohibition on assignment and which is subject to a properly perfected first-ranking Transaction Security Document;

(e)     in respect of which the sales invoice has been delivered requiring the relevant debtor to pay all amounts in respect of such receivable into a Collection Account.

**English Omnibus Security** means the English law governed security document to be entered into between the Original Obligors (excluding O.W. Bunker (Belgium) N.V.) and the Security Agent in respect of (i) certain trade and intercompany receivables, (ii) insurances and (iii) certain brokerage accounts.

**Environment** means humans, animals, plants and all other living organisms including the ecological systems of which they form part and the following media:

ING    00093

(a)     air (including, without limitation, air within natural or man-made structures, whether above or below ground);

(b)     water (including, without limitation, territorial, coastal and inland waters, water under or within land and water in drains and sewers); and

(c)     land (including, without limitation, land under water).

**Environmental Claim** means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law.

**Environmental Law** means any applicable law or regulation which relates to:

(a)     the pollution or protection of the Environment;

(b)     the conditions of the workplace; or

(c)     the generation, handling, storage, use, release or spillage of any substance which, alone or in combination with any other, is capable of causing harm to the Environment, including, without limitation, any waste.

**Environmental Permits** means any permit and other Authorisation and the filing of any notification, report or assessment required under any Environmental Law for the operation of the business of any member of the Group conducted on or from the properties owned or used by any member of the Group.

**EURIBOR** means, in relation to any Loan denominated in euro:

(a)     the applicable Screen Rate;

(b)     (if no Screen Rate is available for the Interest Period of that Loan) the Interpolated Screen Rate for that Loan; or

(c)     if:

        (i)     no Screen Rate is available for the Interest Period of that Loan; and

        (ii)    it is not possible to calculate an Interpolated Screen Rate for that Loan,

        the Base Reference Bank Rate,

as of, in the case of paragraphs (a) and (c) above, the Specified Time on the Quotation Day for euro for a period equal in length to the Interest Period of that Loan and, if that rate is less than zero, EURIBOR shall be deemed to be zero.

**Event of Default** means any event or circumstance specified as such in Clause 27 (Events of Default).

**Excess Cashflow** has the meaning given to that term in Clause 25.1 (Financial definitions).

**Existing Facility Agreement** means the first amended and restated USD537,875,653 and DKK270,000,000 multicurrency term loan and revolving credit facility agreement as from time to time amended, varied, novated or supplemented originally dated 21 April 2008 and made between a group of banks and financial institutions, Nordea Bank Danmark A/S as agent and among others Wrist Marine Supplies A/S (formerly Newco AEP A/S) as borrower and guarantor.

ING    00094

**Existing Financial Indebtedness** means the Financial Indebtedness incurred pursuant to the Existing Facility Agreement as at the date of this Agreement.

**Existing Security** means all Security or Quasi-Security existing as at the date of this Agreement over the assets of any member of the Group in respect of the Existing Financial Indebtedness.

**Facility** means Facility A or Facility B.

**Facility A** means the revolving loan facility made available under this Agreement as described in paragraph (a)(i) of Clause 2.1 (The Facilities).

**Facility A Commitment** means:

(a)     in relation to an Original Lender, the amount set opposite its name under the heading **Facility A Commitment** in Part 2 of Schedule 1 (The Original Parties) and the amount of any other Facility A Commitment it acquires under this Agreement or it assumes in accordance with Clause 2.2 (Increase), Clause 2.3 (Accordion) or Clause 3 (Facility A Extension Option); and

(b)     in relation to any other Lender, the amount of any Facility A Commitment it acquires under this Agreement or it assumes in accordance with Clause 2.2 (Increase), Clause 2.3 (Accordion) or Clause 3 (Facility A Extension Option),

to the extent not cancelled, reduced or transferred by it under this Agreement.

**Facility A Loan** means a loan made or to be made under Facility A or the principal amount outstanding for the time being of that loan.

**Facility B** means the revolving loan facility made available under this Agreement as described in paragraph (a)(ii) of Clause 2.1 (The Facilities).

**Facility B Commitment** means:

(a)     in relation to an Original Lender, the amount set opposite its name under the heading **Facility B Commitment** in Part 2 of Schedule 1 (The Original Parties) and the amount of any other Facility B Commitment it acquires under this Agreement or it assumes in accordance with Clause 2.2 (Increase) or Clause 2.3 (Accordion); and

(b)     in relation to any other Lender, the amount of any Facility B Commitment it acquires under this Agreement or it assumes in accordance with Clause 2.2 (Increase) or Clause 2.3 (Accordion),

to the extent not cancelled, reduced or transferred by it under this Agreement.

**Facility B Loan** means a loan made or to be made under Facility B or the principal amount outstanding for the time being of that loan.

**Facility Office** means:

(a)     in respect of a Lender, the office or offices notified by that Lender to the Agent in writing on or before the date it becomes a Lender (or, following that date, by not less than five Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement; or

ING    00095

(b)     in respect of any other Finance Party, the office in the jurisdiction in which it is resident for tax purposes.

**FATCA** means:

(a)     sections 1471 to 1474 of the Code or any associated regulations or other official guidance;

(b)     any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of anything referred to in paragraph (a) above; or

(c)     any agreement pursuant to the implementation of anything referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

**FATCA Application Date** means:

(a)     in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014;

(b)     in relation to a "withholdable payment" described in section 1473(1)(A)(ii) of the Code (which relates to "gross proceeds" from the disposition of property of a type that can produce interest from sources within the US), 1 January 2017; or

(c)     in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within paragraphs (a) or (b) above, 1 January 2017,

or, in each case, such other date from which such payment may become subject to a deduction or withholding required by FATCA as a result of any change in FATCA after the date of this Agreement.

**FATCA Deduction** means a deduction or withholding from a payment under a Finance Document required by FATCA.

**FATCA Exempt Party** means a Party that is entitled to receive payments free from any FATCA Deduction.

**FATCA Protected Lender** means any Lender irrevocably designated as a "FATCA Protected Lender" by the Company by notice to that Lender and the Agent at least three months prior to the earliest FATCA Application Date for a payment by a Party to that Lender (or to the Agent for the account of that Lender).

**Fee Letter** means:

(a)     any letter or letters dated on or about the date of this Agreement between the Arrangers, the Agent, the Security Agent or the Coordinator respectively and the Company setting out any of the fees referred to in Clause 16 (Fees); and

(b)     any agreement setting out fees payable to a Finance Party referred to in Clause 2.2(f) (Increase), Clause 2.3(i) (Accordion), Clauses 3.1(f) and 3.2(e) (Facility A Extension Option) or under any provision of this Agreement or another Finance Document.

ING    00096

**Final Extended Termination Date** means in relation to Facility A, if the extension option is exercised pursuant to a Second Extension Request (as defined in Clause 3.1(b) (Facility A Extension Option)), the Initial Extended Termination Date as extended in accordance with Clause 3 (Facility A Extension Option).

**Finance Document** means:

(a)     this Agreement;

(b)     the Mandate Letter;

(c)     the Intercreditor Agreement;

(d)     any Accession Deed;

(e)     any Ancillary Document;

(f)     any Compliance Certificate;

(g)     any Borrowing Base Certificate;

(h)     any Fee Letter;

(i)     any Resignation Letter;

(j)     any Selection Notice;

(k)     any Transaction Security Document;

(l)     any Utilisation Request; and

(m)     any other document designated as a **Finance Document** by the Agent and the Company.

**Finance Party** means each Administrative Party, the Security Agent, each Lender or any Ancillary Lender.

**Financial Indebtedness** means any indebtedness for or in respect of:

(a)     moneys borrowed and debit balances at banks or other financial institutions;

(b)     any acceptance under any acceptance credit or bill discounting facility (including any dematerialised equivalent);

(c)     any note purchase facility or the issue of bonds (but not Trade Instruments), notes, debentures, loan stock or any similar instrument;

(d)     any Finance Lease (as defined in Clause 25 (Financial Covenants));

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis and meet any requirement for de-recognition under the Accounting Principles);

(f)     any Treasury Transaction (and, when calculating the value of that Treasury Transaction, only the marked to market value (or, if any actual amount is due as a result of the

ING    00097

termination or close-out of that Treasury Transaction, that amount) shall be taken into account);

(g)     any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of (i) an underlying liability (but not, in any case, Trade Instruments) of an entity which is not a member of the Group which liability would fall within one of the other paragraphs of this definition or (ii) any liabilities of any member of the Group relating to any post-retirement benefit scheme;

(h)     any amount raised by the issue of shares which are redeemable (other than at the option of the issuer) before the Termination Date in respect of Facility B or are otherwise classified as borrowings under the Accounting Principles);

(i)     any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under the Accounting Principles; and

(j)     any guarantee, indemnity or similar assurance against the financial loss of any person in respect of any item referred to in paragraphs (a) to (i) above (but without double counting).

**Financial Quarter** has the meaning given to that term in Clause 25.1 (Financial definitions).

**Financial Year** has the meaning given to that term in Clause 25.1 (Financial definitions).

**Fitch** means Fitch Ratings Limited or any successor to its ratings business.

**German Obligor** means an Obligor incorporated or established under the laws of Germany.

**Group** means the Company and each of its Subsidiaries for the time being.

**Group Structure Chart** means the structure chart relating to the Group in the agreed form.

**Guarantor** means an Original Guarantor or an Additional Guarantor, unless it has ceased to be a Guarantor in accordance with Clause 29 (Changes to the Obligors).

**HoldCo Facility** means the facility agreement of up to USD 150,000,000 to be entered into between (amongst others) Wrist Marine Supplies A/S (the current Holding Company of the Company) and Ares Management Ltd.

**HoldCo Facility Discharge Date** means the date on which the Agent receives from the Company signed and dated copies of:

(a)     a notice of cancellation and prepayment relating to all amounts outstanding under the HoldCo Facility; and

(b)     all necessary release documents and related registrations in respect of the HoldCo Facility Security;

in each case satisfactory to the Agent, as such date is communicated by the Agent to the Company.

**HoldCo Facility Security** means the second-ranking security granted by the Obligors in favour of Ares Management Ltd. in relation to the HoldCo Facility, in the agreed form provided that such is subject to and permitted in accordance with the Intercreditor Agreement.

ING    00098

**Holding Company** of any other person, means a person in respect of which that other person is a Subsidiary.

**IBOR** means CIBOR, EURIBOR, LIBOR, NIBOR, and/or STIBOR, as appropriate.

**IFRS** means international accounting standards within the meaning of IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements.

**Impaired Agent** means the Agent at any time when:

(a)     it has failed to make (or has notified a Party that it will not make) a payment required to be made by it under the Finance Documents by the due date for payment;

(b)     the Agent otherwise rescinds or repudiates a Finance Document;

(c)     (if the Agent is also a Lender) it is a Defaulting Lender under paragraph (a), (b) or (c) of the definition of **Defaulting Lender**; or

(d)     an Insolvency Event has occurred and is continuing with respect to the Agent;

unless, in the case of paragraph (a) above:

(i)     its failure to pay is caused by:

    (A)     administrative or technical error; or

    (B)     a Disruption Event; and

    payment is made within five Business Days of its due date; or

(ii)     the Agent is disputing in good faith whether it is contractually obliged to make the payment in question.

**Increase Confirmation** means a confirmation substantially in the form set out in Schedule 11 (Form of Increase Confirmation).

**Increase Lender** has the meaning given to that term in Clause 2.2 (Increase).

**Increased Costs** means:

(a)     a reduction in the rate of return from a Facility, an Ancillary Facility or on a Finance Party's (or its Affiliate's) overall capital;

(b)     an additional or increased cost; or

(c)     a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or an Ancillary Commitment or funding or performing its obligations under any Finance Document.

**Information Memorandum** means the document in the form approved by the Company concerning the Original Obligors which, at the request of the Company and on its behalf is to be prepared in relation to this transaction, approved by the Company and distributed by the Arrangers prior to the date of this Agreement.

ING    00099

**Initial Extended Termination Date** means in relation to Facility A, if the extension option is exercised pursuant to Clause 3.1 (Facility A Extension Option), the Termination Date as extended in accordance with Clause 3 (Facility A Extension Option).

**Insolvency Event** in relation to an entity means that the entity:

(a)    is dissolved (other than pursuant to a consolidation, amalgamation or merger);

(b)    admits in writing its inability generally to pay its debts as they become due;

(c)    makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(d)    institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official;

(e)    has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition is instituted or presented by a person or entity not described in paragraph (d) above and:

(i)    results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation; or

(ii)    is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof;

(f)    has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(g)    seeks or becomes subject to the appointment of an administrator, judicial manager, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets (other than, for so long as it is required by law or regulation not to be publicly disclosed, any such appointment which is to be made, or is made, by a person or entity described in paragraph (d) above;

(h)    has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter;

(i)    causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in paragraphs (a) to (g) above; or

(j)    takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

ING    00100

**Intellectual Property** means:

(a)    any patents, trade marks, service marks, designs, business names, copyrights, database rights, design rights, domain names, moral rights, inventions, confidential information, knowhow and other intellectual property rights and interests (which may now or in the future subsist), whether registered or unregistered; and

(b)    the benefit of all applications and rights to use such assets of each member of the Group (which may now or in the future subsist).

**Intercreditor Agreement** means the Intercreditor Agreement to be entered into between the Company, each Obligor as guarantor, each Lender, Wrist Marine Supplies A/S, Ares Management Ltd. and the Security Agent in respect of the Facilities and the HoldCo Facility in the agreed form.

**Interest Period** means each period determined under this Agreement by reference to which interest on a Loan or an Unpaid Sum is calculated.

**Interpolated Screen Rate** means, in relation to IBOR for any Loan, the rate which results from interpolating on a linear basis between:

(a)    the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than the Interest Period of that Loan; and

(b)    the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds the Interest Period of that Loan,

each as of the Specified Time on the Quotation Day for the currency of that Loan.

**Investors** mean Altor Equity Partners AB and their (or any subsequent) successors or assigns or transferees.

**Joint Venture** means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity.

**Legal Opinion** means any legal opinion delivered to the Agent under Clause 5.1 (Initial conditions precedent) or Clause 29 (Changes to the Obligors).

**Legal Reservations** means:

(a)    the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)    the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)    similar principles, rights and defences under the laws of any Original Jurisdiction; and

(d)    any other matters which are set out as qualifications or reservations as to matters of law of general application in the Legal Opinions.

**Lender** means:

(a)    an Original Lender; or

ING    00101

(b)     any bank, financial institution, trust, fund or other entity which has become a Party as a Lender in accordance with Clause 2.2 (Increase), Clause 2.3 (Accordion) or Clause 28 (Changes to the Lenders),

which in each case has not ceased to be a Lender in accordance with the terms of this Agreement.

**LIBOR** means, in relation to any Loan denominated in any currency other than euro, NOK, DKK or SEK:

(a)     the applicable Screen Rate;

(b)     (if no Screen Rate is available for the relevant currency or Interest Period of that Loan) the Interpolated Screen Rate for that Loan; or

(c)     if:

　　　　(i)     no Screen Rate is available for the currency of that Loan; or

　　　　(ii)    no Screen Rate is available for the Interest Period of that Loan and it is not possible to calculate an Interpolated Screen Rate for that Loan,

　　　　the Base Reference Bank Rate,

as of, in the case of paragraphs (a) and (c) above, the Specified Time on the Quotation Day for the currency of that Loan for a period equal in length to the Interest Period of that Loan and, if that rate is less than zero, LIBOR shall be deemed to be zero.

**Limitation Acts** means the Limitation Act 1980 and the Foreign Limitation Periods Act 1984.

**Loan** means a Facility A Loan or a Facility B Loan.

**Majority Lenders** means:

(a)     if there is no Utilisation then outstanding, a Lender or Lenders whose Commitments aggregate more than $66^{2\,3}$ per cent. of the Total Commitments;

(b)     if there is no Utilisation then outstanding and the Total Commitments have been reduced to zero, a Lender or Lenders whose Commitments aggregated more than $66^{2\,3}$ per cent. of the Total Commitments immediately prior to that reduction; or

(c)     at any other time, a Lender or Lenders whose participations in the outstanding Utilisations and whose Available Commitments then aggregate more than $66^{2\,3}$ per cent. of the aggregate of all of the outstanding Utilisations and the Available Commitments of all of the Lenders;

**Maltese Obligor** means an Obligor incorporated under the laws of Malta.

**Mandate Letter** means the letter dated 25 April 2013 and signed on 13 June 2013 between ING Bank N.V. and the Company.

**Mandatory Cost** means the percentage rate per annum calculated by the Agent in accordance with Schedule 4 (Mandatory Cost Formulae).

**Margin** means:

(a)     in relation to any Facility A Loan 1.75 per cent. per annum; and

ING     00102

(b)      in relation to any Facility B Loan 2.25 per cent. per annum.

**Material Adverse Effect** means, in the reasonable opinion of the Majority Lenders, a material adverse effect on:

(a)      the assets, business or financial condition of the Group taken as a whole; or

(b)      the ability of the Obligors taken together to perform their obligations under the Finance Documents; or

(c)      the validity or enforceability of, or the effectiveness or ranking of any Security granted or purporting to be granted pursuant to any of, the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents.

**Material Modification** has the meaning given to such term in Clause 17.10 (Material modifications).

**Minimum Ancillary Facility Terms** means those terms applicable to all Ancillary Facilities as set in Schedule 15 (Minimum Ancillary Facility Terms).

**Mirrored Account** means:

(a)      any bank account specified in specified in Schedule 1 (Security Assets) of the Dutch Accounts Security under the heading **Mirrored Accounts**; and

(b)      any other present or future bank account opened or to be opened, in the name of a Danish Obligor in the Netherlands which corresponds (by currency) to a Blocked Collection Account and from which amounts can be withdrawn in accordance with paragraph (g) or (h) of Permitted Financial Indebtedness without the prior written consent of the Security Agent.

**Month** means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month (and **Monthly** shall relate to such period), except that:

(a)      (subject to paragraph (c) below) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day;

(b)      if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month; and

(c)      if an Interest Period begins on the last Business Day of a calendar month, that Interest Period shall end on the last Business Day in the calendar month in which that Interest Period is to end.

The above rules in paragraphs (a)-(c) will only apply to the last Month of any period.

**Monthly Report** means the consolidated Monthly totals for the accounts payable, accounts receivable and Eligible Inventory of the Group.

**Moody's** means Moody's Investor Services Limited or any successor to its ratings business.

**Multi-account Overdraft** means an Ancillary Facility which is an overdraft facility comprising more than one account.

ING    00103

**Net Outstandings** means, in relation to a Multi-account Overdraft, the Ancillary Outstandings of that Multi-account Overdraft.

**Net Working Capital** means the aggregate of all inventory, trade receivables, other operational receivables (including but not limited to VAT) and prepayments less trade payables less other operational debt (including but not limited to VAT).

**New Lender** has the meaning given to that term in Clause 28 (Changes to the Lenders).

**NIBOR** means, in relation to any Loan in NOK:

(a)      the applicable Screen Rate;

(b)      (if no Screen Rate is available for the Interest Period of that Loan) the Interpolated Screen Rate for that Loan; or

(c)      if:

  (i)       no Screen Rate is available for the Interest Period of that Loan; and

  (ii)      it is not possible to calculate an Interpolated Screen Rate for that Loan,

  the Base Reference Bank Rate,

as of, in the case of paragraphs (a) and (c) above, the Specified Time on the Quotation Day for NOK and for a period equal in length to the Interest Period of that Loan and, if that rate is less than zero, NIBOR shall be deemed to be zero.

**Non-Consenting Lender** has the meaning given to that term in Clause 41.5 (Replacement of Lender).

**Non-Material Subsidiary** means any Subsidiary of the Company (which is not an Obligor) whose aggregate of earnings before interest, tax, depreciation and amortisation (calculated on the same basis as EBITDA, as defined in Clause 25 (Financial Covenants)) (in each case calculated on an unconsolidated basis and excluding all intra-Group items and investments in Subsidiaries of any member of the Group) comprises less than 5% of the EBITDA (as defined in Clause 25 (Financial Covenants)).

**Obligor** means a Borrower or a Guarantor.

**Obligors' Agent** means the Company, appointed to act on behalf of each Obligor in relation to the Finance Documents pursuant to Clause 2.5 (Obligors' Agent).

**OFAC** means the Office of Foreign Assets Control of the US Department of the Treasury (or any successor).

**Optional Currency** means a currency (other than the Base Currency) in which a Utilisation may be denominated under this Agreement.

**Original Financial Statements** means:

(a)      in relation to the Company, its audited consolidated financial statements for its Financial Year ended 31 December 2012;

(b)     in relation to each Original Obligor other than the Company, a Panamanian Obligor or a US Obligor, its audited financial statements for its Financial Year ended 31 December 2012;

(c)     in relation to a Panamanian Obligor or US Obligor, its unaudited financial statements for its Financial Year ended 31 December 2012; and

(d)     in relation to any other Obligor, other than a Panamanian Obligor or a US Obligor, its audited financial statements delivered to the Agent as required by Clause 29 (Changes to the Obligors).

**Original Jurisdiction** means, in relation to an Obligor, the jurisdiction under whose laws that Obligor is incorporated as at the date of this Agreement or, in the case of an Additional Obligor, as at the date on which that Additional Obligor becomes Party as a Borrower or a Guarantor (as the case may be).

**Original Obligor** means an Original Borrower or an Original Guarantor.

**Panamanian Obligor** means an Obligor incorporated under the laws of Panama.

**Participating Member State** means any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

**Party** means a party to this Agreement.

**Permitted Acquisition** means:

(a)     an acquisition by a member of the Group of an asset sold, leased, transferred or otherwise disposed of by another member of the Group in circumstances constituting a Permitted Disposal;

(b)     the incorporation of a limited liability company which on incorporation becomes a member of the Group, but only if that limited liability company is engaged in a business substantially the same as that carried on by the Group; and

(c)     an acquisition, for cash consideration, of (i) any or all of the issued share capital of a limited liability company or (ii) a business or undertaking carried on as a going concern, but only if:

         (i)     no Default is continuing on the closing date for the acquisition or would occur as a result of the acquisition;

         (ii)    the acquired company, business or undertaking is engaged in a business substantially the same as that carried on by the Group;

         (iii)   the consideration (including associated costs and expenses) for the acquisition and any Financial Indebtedness or other assumed actual or contingent liability (excluding all Net Working Capital), in each case remaining in the acquired company (or any such business) at the date of acquisition (when aggregated with the consideration (including associated costs and expenses) for any other Permitted Acquisition and any Financial Indebtedness or other assumed actual or contingent liability (excluding all Net Working Capital), in each case remaining in any such acquired companies or businesses at the time of acquisition (the **Total Purchase Price**) (for the avoidance of doubt excluding all Net Working Capital) together with the amount of any investment in any Permitted Joint Venture) does not in any

ING    00105

Financial Year of the Company exceed in aggregate USD 25,000,000 or its equivalent; and

(iv)     if such acquisition is not funded by a Utilisation.

Any acquisition will only be permitted under paragraph (c) above if the Company has delivered to the Agent not later than 10 Business Days before legally committing to make such acquisition a certificate signed by two directors of the Company to which is attached a copy of the latest audited accounts (or if not available, management accounts) of the target company or business.

Such certificate must give calculations showing in reasonable detail that the Company would have remained in compliance with its obligations under Clause 25 (Financial Covenants) if the covenant tests were recalculated for the Relevant Period ending on the most recent Quarter Date consolidating the financial statements of the target company (consolidated if it has Subsidiaries) or business with the financial statements of the Group for such period on a pro forma basis and as if the consideration for the proposed acquisition had been paid at the start of that Relevant Period.

**Permitted Disposal** means any sale, lease, licence, transfer or other disposal which, except in the case of paragraph (b), is on arm's length terms:

(a)     of trading stock or cash made by any member of the Group in the ordinary course of trading of the disposing entity;

(b)     of any asset by a member of the Group (the **Disposing Company**) to another member of the Group (the **Acquiring Company**), but if (other than to the extent such disposal is done by way of a lease, sub-lease, transfer of lease or charter agreement):

(i)     the Disposing Company is an Obligor, the Acquiring Company must also be an Obligor;

(ii)     the Disposing Company had given Security over the asset, the Acquiring Company must give equivalent Security over that asset; and

(iii)     the Disposing Company is a Guarantor, the Acquiring Company must be a Guarantor guaranteeing at all times an amount no less than that guaranteed by the Disposing Company;

(c)     of assets (other than shares, businesses, real property or Intellectual Property) in exchange for, or in respect of which the disposal proceeds are reinvested to purchase, other assets comparable or superior as to type, value and quality within 6 Months of the disposal;

(d)     of obsolete or redundant vehicles, plant and equipment for cash;

(e)     of Cash Equivalent Investments for cash or in exchange for other Cash Equivalent Investments;

(f)     to a Joint Venture, to the extent permitted by Clause 26.9 (Joint ventures);

(g)     of individual trade invoices on a non-recourse basis to one or more banks or financial institutions, except for such individual trade invoices issued by the Danish Obligors (other than the disposal of individual trade invoices which a Danish Obligor issued to DFDS A/S, each an **Excluded Disposal**) for whom the consent of the Security Agent must be obtained prior to entering into the relevant disposal;

ING     00106

(h)     arising as a result of any Permitted Security;

(i)     of assets (other than shares) for cash where the higher of the market value and net consideration receivable (when aggregated with the higher of the market value and net consideration receivable for any other sale, lease, licence, transfer or other disposal not allowed under the preceding paragraphs) does not exceed USD 25,000,000 (or its equivalent) in aggregate in any Financial Year of the Company.

**Permitted Distribution** means:

(a)     the payment of a dividend or distribution to the Company or any of its Subsidiaries; or

(b)     the payment of a dividend or distribution by the Company to its Holding Company **provided that**:

      (i)     the amount of such payment does not breach any applicable Distribution Limits; and

      (ii)    such payment or distribution is made when no Default is continuing or would occur immediately after the making of the payment.

**Permitted Financial Indebtedness** means Financial Indebtedness:

(a)     which is Existing Financial Indebtedness **provided that** such Existing Financial Indebtedness is irrevocably paid and discharged in full by no later than the first Utilisation Date;

(b)     arising under a foreign exchange transaction for spot or forward delivery entered into in connection with protection against fluctuation in currency rates where that foreign exchange exposure arises in the ordinary course of trade or in respect of Utilisations made in Optional Currencies, but not a foreign exchange transaction for investment or speculative purposes;

(c)     arising under a Permitted Loan or a Permitted Guarantee or as permitted by Clause 26.21 (Treasury Transactions);

(d)     of any person acquired by a member of the Group after the date of this Agreement which is incurred under arrangements in existence the date of this Agreement, but not incurred or increased or having its maturity date extended in contemplation of, or since, that acquisition, and outstanding only for a period of three months following the date of acquisition;

(e)     arising under the Finance Documents;

(f)     arising under the HoldCo Facility to the extent permitted under the Intercreditor Agreement;

(g)     which arises from a withdrawal of any amount from any Collection Account (other than any Blocked Collection Account) provided that at all times the aggregate amounts standing to the credit balance of the Collection Accounts taken as a whole is at least zero;

(h)     which arises from a withdrawal of any amount from a Mirrored Account, provided that immediately prior to such withdrawal, there is at least an equal amount standing to the credit of the corresponding Blocked Collection Account; and

(i)     not permitted by the preceding paragraphs and the outstanding amount of which, when aggregated with all other Permitted Financial Indebtedness, does not exceed the amount

ING    00107

permitted by Clause 25.2(c)(ii) (Financial condition) (or its equivalent in other currencies) in aggregate for the Group at any time.

**Permitted Guarantee** means:

(a)     the endorsement of negotiable instruments in the ordinary course of trade;

(b)     any performance or similar bond guaranteeing performance by a member of the Group under any contract entered into in the ordinary course of trade;

(c)     any guarantee of a Joint Venture to the extent permitted by Clause 26.9 (Joint ventures);

(d)     any guarantee permitted under Clause 26.18 (Financial Indebtedness);

(e)     any guarantee given in respect of the netting, set-off or off-set arrangements permitted pursuant to paragraph (b) or (c) of the definition of **Permitted Security**;

(f)     any guarantee given by the Company in respect of the Financial Indebtedness of a Carrier Company;

(g)     any guarantee given by the Company in respect of Financial Indebtedness permitted by Clause 26.21 (Treasury Transactions);

(h)     any guarantee given by a Guarantor in respect of the HoldCo Facility to the extent permitted by the Intercreditor Agreement;

(i)     any guarantee given by the Company in respect of Borrowings permitted under Clause 25.2(c)(ii) (Financial condition); or

(j)     any indemnity given in the ordinary course of the documentation of an acquisition or disposal transaction which is a Permitted Acquisition or Permitted Disposal which indemnity is in a customary form and subject to customary limitations.

**Permitted Joint Venture** means any investment in any Joint Venture where:

(a)     the Joint Venture is engaged in a business substantially the same as that carried on by the Group; and

(b)     in any financial year of the Company, the aggregate (the **Joint Venture Investment**) of:

(i)     all amounts subscribed for shares in, lent to, or invested in all such Joint Ventures by any member of the Group;

(ii)     the contingent liabilities of any member of the Group under any guarantee given in respect of the liabilities of any such Joint Venture; and

(iii)     the market value of any assets transferred by any member of the Group to any such Joint Venture,

(excluding all Net Working Capital) when aggregated with the Total Purchase Price in respect of Permitted Acquisitions in that Financial Year permitted pursuant to paragraph (c) of the definition of **Permitted Acquisition** does not exceed USD 25,000,000 (or its equivalent in other currencies).

**Permitted Loan** means:

ING   00108

(a)     any trade credit extended by any member of the Group to its customers on normal commercial terms and in the ordinary course of its trading activities;

(b)     Financial Indebtedness which is referred to in the definition of, or otherwise constitutes, Permitted Financial Indebtedness (except under paragraph (d) of that definition);

(c)     a loan made to a Joint Venture to the extent permitted under Clause 26.9 (Joint ventures);

(d)     a loan made by an Obligor to another Obligor or made by a member of the Group which is not an Obligor to another member of the Group;

(e)     any loan made by an Obligor to a member of the Group which is not an Obligor (whether directly or pursuant to a cash pooling arrangement under an Ancillary Facility) provided that the prior written approval of the Agent must be obtained by the Company before any such member of the Group (which is not an Obligor) incurs more than USD 10,000,000 in aggregate in Financial Indebtedness owed to any Obligor (or its equivalent) at any time; and

(f)     a loan made by a member of the Group to an employee or director of any member of the Group if the amount of that loan when aggregated with the amount of all loans to employees and directors by members of the Group does not exceed USD 1,000,000 (or its equivalent) at any time.

**Permitted Security** means:

(a)     any lien arising by operation of law and in the ordinary course of trading and not as a result of any default or omission by any member of the Group;

(b)     any netting or set-off arrangement entered into by any member of the Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances of members of the Group (including a Multi-account Overdraft) but only so long as:

(i)     such arrangement does not permit credit balances of Obligors to be netted or set off against debit balances of members of the Group which are not Obligors;

(ii)    such arrangement does not give rise to other Security over the assets of Obligors in support of liabilities of members of the Group which are not Obligors,

except, in the case of (i) and (ii) above, to the extent such netting, set-off or Security relates to, or is granted in support of, a loan permitted pursuant to paragraph (e) of the definition of **Permitted Loan**;

(c)     any off-set arrangement entered into by any member of the Group with its Trade Creditors or Trade Debtors for the purposes of netting accounts payable and accounts receivable;

(d)     any payment or close out netting or set-off arrangement pursuant to any Treasury Transaction or foreign exchange transaction entered into by a member of the Group which constitutes Permitted Financial Indebtedness, excluding any Security or Quasi-Security under a credit support arrangement (except to the extent that the Treasury Transaction for which such credit support arrangement is placed is entered into in accordance with the Risk Policy (being specifically that entitled "Oil Price Risk Management Policy – O.W. Broker Group 2014" dated October 2013);

(e)     any security interest arising under clause 24 or clause 25 of the general terms and conditions (*algemene bankvoorwaarden*) of any member of the Dutch Bankers' Association

ING    00109

(*Nederlandse Vereniging van Banken*) or any similar term applied by a financial institution in the Netherlands or an Ancillary Lender pursuant to its general terms and conditions, in each case only to the extent that those security interests cover Permitted Financial Indebtedness of the Group, or relate to the Collection Accounts for the purpose of any netting or set-off arrangement as described under (b) above;

(f)     any Security or Quasi-Security over or affecting any asset acquired by a member of the Group after the date of this Agreement if:

(i)     the Security or Quasi-Security was not created in contemplation of the acquisition of that asset by a member of the Group;

(ii)     the principal amount secured has not been increased in contemplation of or since the acquisition of that asset by a member of the Group; and

(iii)     the Security or Quasi-Security is removed or discharged within three months of the date of acquisition of such asset;

(g)     any Security or Quasi-Security arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to a member of the Group in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by any member of the Group;

(h)     any Existing Security so long as the Existing Security is irrevocably removed or discharged by no later than the Utilisation Date;

(i)     any Quasi-Security arising as a result of a disposal which is a Permitted Disposal;

(j)     any Security or Quasi-Security created pursuant to any of the Transaction Security Documents;

(k)     any Security or Quasi-Security created in respect of any Excluded Disposal;

(l)     any Security or Quasi-Security created pursuant to any of the HoldCo Facility Security, to the extent permitted by the Intercreditor Agreement; or

(m)     any Security or Quasi-Security created in respect of any Financial Indebtedness referred to in paragraph (g) of the definition of Permitted Financial Indebtedness, provided that no such Security shall be created over assets subject to the Transaction Security.

**Permitted Share Issue** means, subject to the terms of Clauses 11.2 (Change of Control) and 27.12 (Change of ownership), an issue of ordinary shares by the Company to its Holding Company or an issue of ordinary shares by an Obligor, paid for in full in cash upon issue and which by their terms are not redeemable and where such shares are of the same class and on the same terms as those initially issued by the Company or that Obligor.

**Prohibited Payment** means any bribe, rebate, payoff, influence payment, kickback or other payment or gift of money or anything of value (including meals or entertainment) to any officer, employee or ceremonial office holder of any government or instrumentality thereof, any political party or supra-national organization (such as the United Nations), any political candidate, any royal family member or any other person who is connected or associated personally with any of the foregoing that is prohibited under any applicable law or regulation or otherwise for the purpose of influencing any act or decision of such payee in his official capacity, inducing such payee to do or

ING     00110

omit to do any act in violation of his lawful duty, securing any improper advantage or inducing such payee to use his influence with a government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality.

**Pro Rata Share** means:

(a)     in respect of a Loan:

      (i)     for the purpose of determining a Lender's participation in a Loan, the proportion which its Available Commitment under the relevant Facility bears to the applicable Available Facility;

      (ii)     for any other purpose at any time:

            (A)     the proportion which a Lender's participation in the Loans (if any) bears to all the Loans;

            (B)     if there is no Loan outstanding at the relevant time, the proportion which its Commitments bear to the Total Commitments at that time; or

            (C)     if there is no Loan outstanding and the Total Commitments have been cancelled at the relevant time, the proportion which its Commitments bore to the Total Commitments immediately before being cancelled; and

(b)     when the term is used in relation to a Facility, the above proportions but applied only to the Loans and Commitments in respect of that Facility.

For the purpose of paragraph (b) above, the Agent will determine, in the case of a dispute, whether the term in any case relates to a particular Facility.

**Quarter Date** means the last day of a Financial Quarter.

**Quasi-Security** has the meaning given to that term in Clause 26.12 (Negative pledge).

**Quotation Day** means, in relation to any period for which an interest rate is to be determined:

(a)     (if the currency is sterling) the first day of that period;

(b)     (if the currency is euro) two TARGET Days before the first day of that period; or

(c)     (for any other currency) two Business Days before the first day of that period,

unless market practice differs in the Relevant Interbank Market for a currency, in which case the Quotation Day for that currency will be determined by the Agent in accordance with market practice in the Relevant Interbank Market (and if quotations would normally be given by leading banks in the Relevant Interbank Market on more than one day, the Quotation Day will be the last of those days).

**Receivables Obligor** means each Obligor which is party to the Belgian Receivables Pledge or the English Omnibus Security, in the latter case as a Receivables Chargor or a Danish Receivables Chargor (as such terms are defined in the English Omnibus Security).

**Receiver** means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property.

**Related Fund** in relation to a fund (the **first fund**), means:

ING    00111

(a)     a fund which is managed or advised by the same investment manager or investment adviser as the first fund; or

(b)     if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund.

**Relevant Interbank Market** means in relation to euro, the European interbank market and, in relation to any other currency, the London interbank market.

**Relevant Jurisdiction** means, in relation to an Obligor:

(a)     its Original Jurisdiction;

(b)     any jurisdiction where any asset subject to or intended to be subject to the Transaction Security to be created by it is situated, but in terms of any oil inventory assets, only the US, Belgium and the Netherlands; and

(c)     the jurisdiction whose laws govern the perfection of any of the Transaction Security Documents entered into by it.

**Relevant Period** has the meaning given to that term in Clause 25.1 (Financial definitions).

**Repayment Date** means the last day of an Interest Period for each Loan.

**Repeating Representations** means each of the representations and warranties set out in Clause 23.2 (Status) to Clause 23.7 (Governing law and enforcement), Clause 23.11 (No default) to Clause 23.13 (Non-Hong Kong company), paragraph (e) of Clause 23.14 (No misleading information), Clause 23.15 (Original Financial Statements), Clause 23.22 (Ranking) to Clause 23.24 (Legal and beneficial ownership), 23.25(Centre of main interests and establishments), Clause 23.27 (Sanctions) and 23.28 (Anti-corruption; Anti-Money Laundering).

**Representative** means any delegate, agent, manager, administrator, judicial manager, nominee, attorney, trustee or custodian.

**Requisite Lenders** means a Lender or Lenders whose Commitments aggregate 15% (or more) of the Total Commitments (or if the Total Commitments have been reduced to zero, aggregated 15% (or more) of the Total Commitments immediately prior to that reduction).

**Resignation Letter** means a letter substantially in the form set out in Schedule 8 (Form of Resignation Letter), with any amendments which the Agent and the Company may agree.

**Restricted Country** means a country or territory which is subject to any Sanctions.

**Restricted Person** means a person:

(a)     located, domiciled, resident, organised under the laws of or incorporated in a Restricted Country;

(b)     who is the government or owned or controlled by the government of a Restricted Country or by a party located, domiciled, resident, organised under the laws of or incorporated in a Restricted Country;

(c)     subject to any Sanction;

ING    00112

(d)     named on any Sanctions List; or

(e)     owned or controlled by, or to the best of any Obligor's knowledge and belief, acting or purporting to act on behalf of any of the persons listed in paragraphs (a),(b),(c) or (d) above,

to the extent that such person is not the subject of a valid exemption to such Sanctions.

**Risk Policy** means the risk policies of the Group entitled "Oil Price Risk Management Policy - O.W. Bunker Group 2014" and dated October 2013, "Treasury Policy" and dated October 2013, "Credit Policy for O.W. Bunker Group & Dynamic Oil Trading – version no. 4" and "Non-Life Insurance Policy - O.W. Bunker & Trading A/S and Group Companies" dated October 2013 as each approved by the executive board of the Group on 29 October 2013, relating to the Group's policies in respect of its dealings with trade counterparties, oil price risk management, interest and foreign exchange and general treasury risk management and providers of financial services, and delivered pursuant to Clause 5.1 (Initial conditions precedent), as the same may be amended from time to time.

**Rollover Loan** means, in respect of a Facility, one or more Loans:

(a)     made or to be made on the same day that a maturing Loan under the same Facility is due to be repaid;

(b)     the aggregate amount of which is equal to or less than the amount of the maturing Loan;

(c)     in the same currency as the maturing Loan (unless it arose as a result of the operation of Clause 7.2 (Unavailability of a currency)); and

(d)     made or to be made to the same Borrower for the purpose of refinancing that maturing Loan.

**S&P** means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. or any successor to its ratings business.

**Sanctions** means:

(a)     economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by:

    (i)     the US government and administered by OFAC;

    (ii)     the United Nations Security Council;

    (iii)     the European Union or any of its constituent countries;

    (iv)     the Swiss Confederation and administered by the State Secretariat for Economic Affairs SECO and/or the Directorate of Public International Law; or

    (v)     any other relevant economic sanctions authority; and

(b)     economic or financial sanctions imposed, administered or enforced from time to time by the US State Department, the US Department of Commerce or the US Department of the Treasury,

to the extent that such sanctions or trade embargoes are applicable to the business, dealings and activities of the Group (or the third parties with whom the Group is contracting or dealing) in the relevant jurisdiction, and for which that member of the Group (or the third party with whom the

ING    00113

Group is contracting or dealing and to whom such sanctions or trade embargoes are applicable) has no valid authorization or licence from the relevant competent authority.

**Sanctions List** means any of the lists of specifically designated nationals or designated persons or entities (or equivalent) held by:

(a)     the US government and administered by OFAC, the US State Department, the US Department of Commerce or the US Department of the Treasury;

(b)     the United Nations Security Council;

(c)     the European Union or any of its constituent countries; or

(d)     the Swiss Confederation,

each as amended, supplemented or substituted from time to time.

**Screen Rate** means:

(a)     in relation to LIBOR, the London interbank offered rate administered by the British Bankers' Association (or any other person which takes over the administration of that rate) for the relevant currency and period displayed on pages LIBOR01 or LIBOR02 of the Reuters screen (or any replacement Reuters page which displays that rate);

(b)     in relation to EURIBOR, the euro interbank offered rate administered by the Banking Federation of the European Union (or any other person which takes over the administration of that rate) for the relevant period displayed on page EURIBOR01 of the Reuters screen (or any replacement Reuters page which displays that rate);

(c)     in relation to CIBOR, the Copenhagen interbank offered rate administered by the Danish Bankers' Association (or any other person which takes over the administration of that rate) for DKK and for the relevant period displayed on page CIBOR= of the Reuters screen (or any replacement Reuters page which displays that rate);

(d)     in relation to NIBOR, the percentage rate per annum for NOK and for the relevant period displayed on page NIBR of the Reuters screen (or any replacement Reuters page which displays that rate); and

(e)     in relation to STIBOR, the Stockholm interbank offered rate administered by the Swedish Bankers' Association (or any other person which takes over the administration of that rate) for SEK and for the relevant period displayed on the appropriate page of the Reuters screen,

or in each case, on the relevant page of such other information service which publishes that rate from time to time in place of Reuters.  If such page or service ceases to be available, the Agent may specify another page or service displaying the relevant rate after consultation with the Company.

**Secured Eligible Receivable** means an Eligible Receivable which:

(a)     is backed by a letter of credit issued or confirmed by an Acceptable Bank; or

(b)     is credit insured with Atradius or any other insurance company or underwriter with an Acceptable Rating.

**Secured Parties** means each Finance Party from time to time party to this Agreement, any Receiver or Delegate.

ING    00114

**Security** means a mortgage, charge, pledge, lien, assignment by way of security, hypothecation or other security interest or encumbrance securing any obligation of any person or any other agreement or arrangement having a similar effect.

**Singapore Obligor** means an Obligor incorporated under the laws of Singapore.

**Specified Time** means a time determined in accordance with Part 1 of Schedule 10 (Timetables).

**STIBOR** means, in relation to any Loan in SEK:

(a)     the applicable Screen Rate;

(b)     (if no Screen Rate is available for the Interest Period of that Loan) the Interpolated Screen Rate for that Loan; or

(c)     if:

      (i)     no Screen Rate is available for the Interest Period of that Loan; and

      (ii)    it is not possible to calculate an Interpolated Screen Rate for that Loan,

     the Base Reference Bank Rate,

as of, in the case of paragraphs (a) and (c) above, the Specified Time on the Quotation Day for SEK and for a period equal in length to the Interest Period of that Loan and, if that rate is less than zero, STIBOR shall be deemed to be zero.

**Subsidiary** means an entity of which a person has direct or indirect control or owns directly or indirectly more than 50% of the voting capital or similar right of ownership and **control** for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise.

**Swiss Obligor** means an Obligor incorporated under the laws of Switzerland, or being resident in Switzerland for purposes of Swiss Withholding Tax.

**TARGET2** means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilises a single shared platform and which was launched on 19 November 2007.

**TARGET Day** means any day on which TARGET2 is open for the settlement of payments in euro.

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of them).

**Tax Credit** means a credit against, relief or remission for, or repayment of, any Tax.

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

**Tax Payment** means either an increase in payment made by an Obligor to a Finance Party under Clause 17.1 (Tax gross-up) or as a payment under Clause 17.2 (Tax indemnity).

**Termination Date** means the final date on which that Lender's participation in any Loan is to be repaid, being:

ING    00115

(a)     in relation to Facility A, subject to Clause 3 (Facility A Extension Option), the date falling 364 days after the date of this Agreement, the Initial Extended Termination Date or the Final Extended Termination Date (as the case may be); and

(b)     in relation to Facility B, the date falling 3 years after the date of this Agreement.

**Tier 1 Eligible Receivable** means an Eligible Receivable which:

(a)     is owed by a debtor with an Acceptable Rating;

(b)     has a tenor of not more than 45 days commencing from the date of the sales invoice giving rise to the receivable; and

(c)     is not more than 10 days past its due date.

**Tier 2 Eligible Receivable** means an Eligible Receivable which:

(a)     is owed by a debtor which does not have an Acceptable Rating but is nevertheless acceptable to the Security Agent;

(b)     has a tenor of not more than 45 days commencing from the date of the sales invoice giving rise to the receivable; and

(c)     is not more than 10 days past its due date.

**Tier 2 Cap** means:

(a)     a maximum aggregate Value of Tier 2 Eligible Receivables per debtor of USD 5,000,000 (prior and subject to the 50% deduction referred to in paragraph (d) of the definition of "Borrowing Base"); and

(b)     a maximum total aggregate Value of Tier 2 Eligible Receivables of USD 75,000,000.

**Total Commitments** means the aggregate of the Total Facility A Commitments and the Total Facility B Commitments, being USD 700,000,000 at the date of this Agreement (or its equivalent in an Optional Currency).

**Total Facility A Commitments** means the aggregate of the Facility A Commitments, being USD 270,000,000 at the date of this Agreement (or its equivalent in an Optional Currency).

**Total Facility B Commitments** means the aggregate of the Facility B Commitments, being USD 430,000,000 at the date of this Agreement (or its equivalent in an Optional Currency).

**Total Outstandings** means the aggregate amount of the Utilisations and Ancillary Outstandings from time to time.

**Trade Creditor** means a person to whom an Obligor is indebted for the purchase, storage or (any kind of) transportation of goods, or in relation to any service, lease or charter arrangement whether or not the debt is due.

**Trade Debtor** means a person who is indebted to an Obligor for the purchase, storage or (any kind of) transportation of goods, or in relation to any service, lease or charter arrangement whether or not the debt is due.

ING   00116

**Trade Instruments** means any performance bonds, advance payment bonds or documentary letters of credit issued in respect of the obligations of any member of the Group arising in the ordinary course of trading of that member of the Group.

**Transaction Security** means the Security created or expressed to be created in favour of the Security Agent pursuant to the Transaction Security Documents.

**Transaction Security Documents** means each of:

(a)      the Belgian Receivables Security;

(b)      the Dutch Accounts Security;

(c)      the Dutch Omnibus Security;

(d)      the English Omnibus Security; and

(e)      together with any other document entered into by any Obligor creating or expressed to create any Security over all or any part of its assets in respect of the obligations of any of the Obligors under any of the Finance Documents,

in each case in form and substance acceptable to the Security Agent (acting on behalf of all the Lenders).

**Transfer Certificate** means a certificate substantially in the form set out in Schedule 5 (Form of Transfer Certificate) with any amendments which the Agent may approve or reasonably require or any other form agreed between the Agent and the Company.

**Transfer Date** means, in relation to an assignment or a transfer, the later of:

(a)      the proposed Transfer Date specified in the relevant Assignment Agreement or Transfer Certificate; and

(b)      the date on which the Agent executes the relevant Assignment Agreement or Transfer Certificate.

**Treasury Transactions** means any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price.

**Unpaid Sum** means any sum due and payable but unpaid by an Obligor under the Finance Documents.

**US** means the United States of America.

**US Obligor** means an Obligor that is incorporated or organized under the laws of the US or any US State or that has a place of business or property in the US.

**US State** means any state of the US (including the District of Columbia).

**US Tax Obligor** means:

(a)      a Borrower which is resident for tax purposes in the US; or

(b)      an Obligor some or all of whose payments under the Finance Documents are from sources within the US for US federal income tax purposes.

ING    00117

**Utilisation** means the making of a Loan.

**Utilisation Date** means the date of a Utilisation, being the date on which the relevant Loan is, or is to be, made.

**Utilisation Request** means a notice substantially in the relevant form set out in Schedule 3 (Form of Utilisation Request).

**Value** means:

(a)     in respect of an Eligible Receivable, the value as determined by the relevant sales invoice; and

(b)     in respect of Eligible Inventory, the closing marked to market price on the day before (or such other day as may be requested by the Security Agent (acting reasonably)) the relevant Borrowing Base calculation pursuant to Clause 24.3 (Requirement as to financial statements) or Clause 32.2 (Borrowing Base Audit):

(i)     as quoted on Platts (or another source to be agreed from time to time between the Company and the Security Agent); or

(ii)     if no such quotation is available, as determined by the Security Agent (acting reasonably).

**VAT** means:

(a)     any Tax imposed in compliance with Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)     any other Tax of a similar nature (including goods and services tax, value added tax or consumption tax), whether imposed in a Participating Member State or in Hong Kong in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

**1.2     Construction**

(a)     Unless this Agreement expressly provides to the contrary, a reference in this Agreement to:

(i)     a **Party** or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents and, in the case of the Security Agent, any person for the time being appointed as Security Agent or Security Agents in accordance with the Finance Documents;

(ii)     an **amendment** includes a supplement, novation, extension (whether of maturity or otherwise), restatement, re-enactment or replacement (however fundamental and whether or not more onerous) and **amended** will be construed accordingly;

(iii)     a document in **agreed form** is a document which is previously agreed in writing by or on behalf of the Company and the Agent or, if not so agreed, is in the form specified by the Agent;

(iv)     **assets** includes present and future properties, revenues and rights of every description;

ING     00118

(v)     **disposal** includes a sale, transfer, assignment, grant, lease, licence, declaration of trust or other disposal, whether voluntary or involuntary, and **disposal** shall be construed accordingly;

(vi)    a **Finance Document** or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended or restated (including any change in the purpose of, any extension of, or any increase in the amount of a facility or any additional facility);

(vii)   **first-ranking** means ranking first in priority amongst all other creditors of the relevant Obligor, except those creditors which are mandatorily preferred at law, subject to any exceptions to the first-ranking position expressly set out in the respective Transaction Security Document;

(viii)  a **group of Lenders** includes all the Lenders;

(ix)    **guarantee** means (other than in Clause 22 (Guarantee and Indemnity)) any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(x)     **indebtedness** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(xi)    a **person** includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, body, fund a partnership or other entity (whether or not having separate legal personality);

(xii)   **properly perfected** in respect of the Charged Property of each Obligor (other than the Eligible Receivables of the Danish Obligors) means that all applicable notices of assignment or pledge, acknowledgments (if required) and security registrations have been served and/or filed in accordance with the terms of the relevant Transaction Security Documents;

(xiii)  **properly perfected** in respect of those Eligible Receivables of each Danish Obligor which are described as "Supply Receivables" in the English Omnibus Security means:

   (A)    such Eligible Receivables are subject to the English Omnibus Security;

   (B)    such Eligible Receivables are subject to the English law general terms and conditions of the Group entitled "OWB Group – Terms and Conditions of Sale for Marine Bunkers – Edition 2013" as amended and restated from to time to time, or such other set of general terms and conditions as may apply as amended and restated from time to time, which such general terms and conditions in each case have been accepted by the relevant debtor (as evidenced by its subsequent trading with one or more Obligors);

   (C)    a notice of assignment has been served upon the debtor and included on all invoices issued after the date of the English Omnibus Security to that debtor in respect of such Eligible Receivables in the agreed form set out in Part 1 of Schedule 4 (Deliverables: Supply Contracts) of the English Omnibus Security;

ING   00119

(D)    in respect of those Eligible Receivables of each Danish Obligor, the proceeds of such Eligible Receivables have been directed to be paid into a Blocked Collection Account in accordance with the terms of the Dutch Accounts Security;

(xiv)    a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(xv)    a provision of law is a reference to that provision as amended (and includes any subordinate legislation);

(xvi)    a Clause or Schedule is a reference to a clause of or schedule to this Agreement and reference to **this Clause** or **this Schedule** means the entirety of that clause or schedule; and

(xvii)    a time of day is a reference to Amsterdam time.

(b)    Section, Clause and Schedule headings in this Agreement are for ease of reference only and do not affect its interpretation.

(c)    Unless expressly stated to be otherwise, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(d)    A Borrower providing **cash cover** for an Ancillary Facility means a Borrower paying an amount in the currency of the Ancillary Facility to an interest-bearing account in the name of the Borrower and the following conditions being met:

(i)    the account is with the Ancillary Lender for which that cash cover is to be provided;

(ii)    until no amount is or may be outstanding under that Ancillary Facility, withdrawals from the account may only be made to pay the relevant Finance Party amounts due and payable to it under this Agreement in respect of that Ancillary Facility; and

(iii)    the Borrower has executed a Transaction Security Document over that account, in form and substance satisfactory to the Finance Party with which that account is held, creating first ranking Security in favour of that Finance Party over that account.

(e)    A Default is **continuing** if it has not been remedied or waived and an Event of Default is **continuing** if it has not been remedied or waived.

(f)    Any obligation of an Obligor under the Finance Documents which is not a payment obligation remains in force for so long as any payment obligation of any Obligor is outstanding or any Commitment is in force under the Finance Documents.

(g)    A Borrower **repaying** or **prepaying** Ancillary Outstandings means:

(i)    that Borrower providing cash cover for those Ancillary Outstandings;

(ii)    the maximum amount payable under the Ancillary Facility being reduced or cancelled in accordance with its terms; or

(iii)    the Agent or relevant Ancillary Lender being satisfied that it has no further liability under that Ancillary Facility,

ING    00120

and the amount by which Ancillary Outstandings are repaid or prepaid under paragraphs (i) and (ii) above is the amount of the relevant cash cover, reduction or cancellation.

(h)     An amount borrowed includes any amount utilised under an Ancillary Facility.

**1.3     Currency symbols and definitions**

(a)     **$, USD** and **dollars** denote the lawful currency of the US;

(b)     **£, GBP** and **sterling** denote the lawful currency of the United Kingdom;

(c)     **€, EUR** and **euro** denote the single currency of the Participating Member States;

(d)     **SEK** denotes the lawful currency of Sweden;

(e)     **NOK** denotes the lawful currency of Norway;

(f)     **DKK** denotes the lawful currency of Denmark; and

(g)     **CHF** denotes the lawful currency of Switzerland.

**1.4     Third party rights**

(a)     Unless expressly provided to the contrary in a Finance Document, a person who is not a party to a Finance Document has no right under the Contracts (Rights of Third Parties) Act 1999 (the **Third Parties Act**) to enforce or enjoy the benefit of any term of that Finance Document.

(b)     Notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to rescind or vary that Finance Document at any time.

**1.5     Belgian terms**

In this Agreement, where it relates to a Belgian person, a reference to:

(a)     an **attachment, sequestration, distress, execution or analogous process** includes any *uitvoerend beslag/saisie exécutoire* and *bewarend beslag/saisie conservatoire*;

(b)     an **amalgamation, demerger, merger, consolidation** or **corporate reconstruction** includes a *overdracht van algemeenheid/transfert d'universalité*, overdracht *van bedrijfstak/transfert de branche d'activité, splitsing/scission* and *fusie/fusion* and assimilated transaction in accordance with article 676 and 677 of the Belgian Companies Code (*gelijkgestelde verrichting/opération assimilée*);

(c)     the **Belgian Companies Code** means the Belgian *Wetboek van Vennootschappen/Code des Sociétés* dated 7 May 1999, as amended from time to time;

(d)     its **constitutional documents** means the *oprichtingsakte/acte constitutif, statuten/statuts* and *uittreksel van de Kruispuntbank voor Ondernemingen/extrait de la Banque Carrefour des Entreprises*;

(e)     a **composition, compromise, assignment** or **arrangement** includes a *minnelijk akkoord met schuldeisers/accord amiable avec des créanciers or gerechtelijke reorganisatie/réorganisation judiciaire*, as applicable;

ING     00121

(f)     **guarantee** means, only for the purpose of the guarantee granted by the Belgian Obligors under this Agreement, an independent guarantee and not a surety (*borg/cautionnement*);

(g)     an Obligor being **incorporated** in Belgium or of which its **jurisdiction of incorporation** is Belgium, means that such Obligor has its principal place of business (*voornaamste vestiging établissement principal* (within the meaning of the Belgian Law of 16 July 2004 on the conflicts of law code)) in Belgium.

(h)     a **liquidator, receiver, administrative receiver, administrator, compulsory manager** or other similar officer includes any *curator/curateur, vereffenaar/liquidateur, voorlopig bewindvoerder/administrateur provisoire, gerechtelijk deskundige/expert judiciaire, mandataris ad hoc/mandataire ad hoc, ondernemingsbemiddelaar/médiateur d'entreprise,* as applicable, and *sekwester/séquestre*;

(i)     a **Security** includes any mortgage (*hypotheek/hypothèque*), pledge (*pand/nantissement*), any mandate to grant a mortgage, a pledge or any other real security (*mandaat/mandat*), privilege (*voorrecht/privilège*), reservation of title arrangement (*eigendomsvoorbehoud/réserve de propriété*), any real security (*zakelijke zekerheid/sûreté réelle*) and any transfer by way of security (*overdracht ten titel van zekerheid/transfert à titre de garantie*);

(j)     a **suspension of payments, moratorium of any indebtedness** or **reorganisation** includes any *gerechtelijke reorganisatie/réorganisation judiciaire*;

(k)     a person being **unable to pay its debts** is that person being in a state of cessation of payments *(staking van betaling/cessation de paiements)*;

(l)     **wilful misconduct** means *opzet/intention*; and

(m)    **winding up, administration or dissolution** includes any *vereffening/liquidation, ontbinding/dissolution, faillissement/faillite* and *sluiting van een onderneming/ fermeture d'une enterprise.*

## 1.6    Danish terms

In this Agreement, where it relates to a Danish person, a reference to:

(a)     its **constitutional documents** means its articles of association (*vedtægter*) and an up-to-date transcript from the Danish Business Authority (*Erhvervsstyrelsen*) relating to it;

(b)     a **general assignment, arrangement or composition with or for the benefit of its creditors** includes, but is not limited to a *betalingsstandsning, rekonstruktionsbehandling, konkursbehandling* or *tvangsakkord* under Part I, IA, II or III of the Danish Bankruptcy Act (*konkursloven*);

(c)     a **liquidator, receiver, administrative receiver, administrator, compulsory manager** or **other similar officer** includes, but is not limited to a *tilsyn, rekonstruktør, kurator* or *likvidator* under Danish law;

(d)     the **Danish Companies Act** means the Consolidated Act No. 322 of 11 April 2011 on public and private limited liability companies (*Selskabsloven*), as amended and supplemented from time to time;

ING     00122

(e) **unlawful financial assistance** means any act prohibited pursuant to Articles 206, 210 and 211 of the Danish Companies Act;

(f) **merger** includes any fusion implemented in accordance with Articles 236 to 252 and Articles 271 to 290 and Articles 311 to 317 of the Danish Companies Act;

(g) a **corporate reconstruction** includes any contribution of part of its business in consideration of shares (*apportindskud*) and any demerger (*spaltning*) implemented in accordance with Articles 254 to 270 and Articles 291 to 310 and Article 318 of the Danish Companies Act; and

(h) a **winding-up, administration** or **dissolution** includes a *likvidation, oplosning pa grundlag af betalingserklæring* or *tvangsopløsning* under Chapter 14 of the Danish Companies Act.

## 1.7 Dutch terms

In this Agreement, where it relates to a Dutch person, a reference to:

(a) an **administrator** includes a *bewindvoerder*;

(b) an **attachment** includes a *beslag*;

(c) its **constitutional documents** means its deed of incorporation (*akte van oprichting*) and articles of association (*statuten*);

(d) **financial assistance** means any act prohibited by Article 2:98c of the Dutch Civil Code;

(e) a **moratorium** includes *surseance van betaling* and **a moratorium is declared** or **occurs** includes *surseance verleend*;

(f) a **necessary action to** authorise where applicable, includes without limitation:

    (i) any action required to comply with the Works Council Act of the Netherlands (Wet op de ondernemingsraden); and

    (ii) obtaining an unconditional positive advice (advies) from the competent works council(s);

(g) a **receiver** or an **administrative receiver** does not include a *curator* or *bewindvoerder*;

(h) a **security interest** includes any mortgage (*hypotheek*), pledge (*pandrecht*), retention of title arrangement (*eigendomsvoorbehoud*), right or retention (*recht van retentie*), right to reclaim goods (*recht van reclame*), and, in general, any right in rem (*beperkt recht*) created for the purpose of granting security (*goederenrechtelijk zekerheidsrecht*);

(i) any **step** or **procedure** taken in connection with insolvency proceedings includes a Dutch person having filed a notice under Section 36 of the Tax Collection Act of the Netherlands (*Invorderingswet 1990*);

(j) a **trustee in bankruptcy** includes a *curator*; and

(k) a **winding-up, administration** or **dissolution** includes a bankruptcy (*faillissement*) or dissolution (*ontbinding*);

ING   00123

**1.8     English terms**

In this Agreement, where it relates to an English person, a reference to:

(a)     its **constitutional documents** means its:

      (i)     certificate of incorporation;

      (ii)     certificate of change of name (if applicable);

      (iii)     memorandum of association (if applicable); and

      (iv)     articles of association.

(b)     **unlawful financial assistance** means any act referred to in or prohibited by sections 678 or 679 of the (UK) Companies Act 2006.

**1.9     German terms**

In this Agreement, where it relates to a German person, a reference to:

(a)     its **constitutional documents** means its articles of association (*Satzung*) or shareholders' agreement (*Gesellschaftsvertrag*) as the case may be and an up-to-date extract from the commercial register (*Handelsregisterauszug*) obtained, in each case, from the electronic commercial register (*elektronisches Handelsregister*);

(b)     the **German Civil Code** means the *Bürgerliches Gesetzbuch*;

(c)     **German Insolvency Law** means *Insolvenzordnung*;

(d)     a person being **unable to pay its debts** includes that person being illiquid (*zahlungsunfähig*) in the meaning of § 17 of the German Insolvency Law or over-indebted (*überschuldet*) in the meaning of § 19 of the German Insolvency Law or at risk of being unable to pay its debts as they fall due (*drohende Zahlungsunfähigkeit*) in the meaning of § 18 of the German Insolvency Law;

(e)     a **liquididator, receiver, administrative receiver, compulsory manager** or **administrator** includes an *Insolvenzverwalter, a vorläufiger Insolvenzverwalter or a Sachwalter*; and

(f)     a **winding up, administration** or **dissolution** includes insolvency proceedings (*Insolvenzverfahren*).

**1.10     Hong Kong terms**

In this Agreement, where it relates to a Hong Kong person, a reference to:

(a)     its **constitutional documents** means its:

      (i)     certificate of incorporation;

      (ii)     certificate of change of name (if applicable);

      (iii)     memorandum and articles of association;

      (iv)     register of directors;

ING     00124

(v)     register of members; and

(vi)    business registration certificate.

(b)    **unlawful financial assistance** means any act prohibited by section 47A of the Companies Ordinance (Cap. 32 of the Laws of Hong Kong).

## 1.11   Maltese terms

In this Agreement, where it relates to a Maltese person, a reference to:

(a)    its **constitutional documents** means its memorandum of association and articles of association;

(b)    **unlawful financial assistance** means any act referred to in or prohibited by Article 110 of the Maltese Companies Act (Chapter 386 of the Laws of Malta); and

(c)    **guarantee** means a suretyship as regulated by the provisions of Title XX of Part II of Book Second of the Maltese Civil Code (Chapter 16 of the Laws of Malta).

## 1.12   Norwegian terms

In this Agreement, where it relates to a Norwegian person, a reference to its **constitutional documents** means its:

(a)    certificate of registration (*firmaattest*);

(b)    articles of association (*vedtekter*); and

(c)    shareholders' register (*aksjeeierbok*).

## 1.13   Panamanian terms

In this Agreement, where it relates to a Panamanian person, a reference to its **constitutional documents** means its:

(a)    articles of association (*pacto social*); and

(b)    by-laws (*estatutos*), if any.

## 1.14   Singapore terms

In this Agreement, where it relates to a Singapore person, a reference to:

(a)    its **constitutional documents** means its certificate of incorporation, memorandum of association and articles of association; and

(b)    **unlawful financial assistance** means any act referred to in or prohibited by Section 76 of the Companies Act (Chapter 50) of Singapore

## 1.15   Swiss terms

In this Agreement, where it relates to a Swiss person, a reference to:

ING   00125

(a)     its **constitutional documents** means its articles of association and an extract from the commercial register, each certified by the commercial registrar;

(b)     **Swiss Guidelines** means the following guidelines issued by the Swiss Federal Tax Administration (each as issued, amended or replaced from time to time):

    (i)     guideline S-02.123 in relation to interbank loans of 22 September 1986 (*Merkblatt Verrechnungssteuer auf Zinsen von Bankguthaben, deren Gläubiger Banken sind (Interbankguthaben)* vom 22 September 1986);

    (ii)    guideline S-02.130.1 in relation to money market instruments and book claims of April 1999 (*Merkblatt vom April 1999 betreffend Geldmarktpapiere und Buchforderungen inländischer Schuldner*);

    (iii)   guideline S-02.122.1 in relation to bonds of April 1999 (*Merkblatt Obligationen vom April 1999*);

    (iv)    guideline S-02.128 in relation to syndicated credit facilities of January 2000 (*Merkblatt Steuerliche Behandlung von Konsortialdarlehen, Schuldscheindarlehen, Wechseln und Unterbeteiligungen vom Januar 2000*); and

    (v)     circular letter no. 34 (1.034-V-2011) of 26 July 2011 in relation to deposits (*Kreisschreiben Nr. 34 vom 26. Juli 2011 betreffend Kundenguthaben*).

(c)     **Swiss Non-Bank Rules** means the Swiss Ten Non-Bank Rule and the Swiss Twenty Non-Bank Rule.

(d)     **Swiss Non-Qualifying Bank** means any person which does not qualify as a Swiss Qualifying Bank.

(e)     **Swiss Qualifying Bank** means:

    (i)     a bank or other financial institution acting on its own account which is recognised as a bank by the banking laws in force in its jurisdiction of incorporation; or

    (ii)    a branch of a bank or other financial institution which is recognised as a bank by the banking laws in force in the jurisdiction where such branch is situated,

which, in each case, exercises as its main purpose a true banking activity, having bank personnel, premises, communication devices of its own and authority of decision making, all in accordance with the meaning of the Swiss Guidelines.

(f)     **Swiss Ten Non-Bank Rule** means the rule that the aggregate number of Lenders which are Swiss Non-Qualifying Banks must not at any time exceed 10 (ten), all in accordance with the Swiss Guidelines.

(g)     **Swiss Twenty Non-Bank Rule** means the rule that the aggregate number of creditors (including the Lenders), other than Swiss Qualifying Banks, of a Swiss Obligor under all outstanding borrowings (including under the Finance Documents), made or deemed to be made by such Swiss Obligor must not at any time exceed 20 (twenty), all in accordance with the Swiss Guidelines and being understood that for purposes of this Agreement the maximum number of 10 (ten) Swiss Non Qualifying Banks permitted under this Agreement shall be taken into account irrespective of whether or not 10 (ten) Swiss Non-Qualifying

ING     00126

Banks do so participate at any given time, all in accordance with the meaning of the Swiss Guidelines.

(h)     **Swiss Withholding Tax** means any taxes imposed under the Swiss Federal Act on Withholding Tax of 13 October 1965 (*Bundesgesetz über die Verrechnungssteuer*).

## 1.16    UAE terms

In this Agreement, where it relates to a Dubai person, a reference to:

(a)     its constitutional documents means:

    (i)      its memorandum of association;

    (ii)     its articles of association;

    (iii)    its certificate of registration with the DMCC;

    (iv)     a current trading license issued by the DMCC;

    (v)      a current certificate of good standing; and

    (vi)     an authentication certificate issued by the legal registrar at the DMCC identifying the current shareholders and directors of such UAE person;

(b)     **DMCC** means the Dubai Multi Commodities Centre;

(c)     **UAE** means the United Arab Emirates;

(d)     **UAE Civil Code** means UAE Federal Law No. 5 of 1985 (as amended) regarding the law of civil transactions; and

(e)     **UAE Law** means the laws of the Emirate of Dubai relating to the DMCC and, to the extent applicable in the DMCC, the laws of the Emirate of Dubai and the federal laws of the UAE (including the UAE Civil Code).

## 1.17    US terms

In this Agreement, where it relates to a US person, a reference to:

(a)     its **constitutional documents** means, as applicable, its certificate of incorporation, certificate of formation, bylaws or operating agreement (or their equivalents);

(b)     **ERISA** means the United States Employee Retirement Income Security Act of 1974;

(c)     **ERISA Affiliate** means any person treated as a single employer with any Obligor for the purpose of section 414 of the Code;

(d)     **fraudulent transfer law** means any applicable US bankruptcy and US State fraudulent transfer and conveyance statute and any related case law;

(e)     **investment company** has the meaning given to it in the United States Investment Company Act of 1940;

ING    00127

(f)     **Margin Regulations** means Regulations T, U and X issued by the Board of Governors of the United States Federal Reserve System;

(g)     **Margin Stock** means "margin stock" or "margin securities" as defined in the Margin Regulations;

(h)     **Plan** means an employee benefit plan (other than a multiemployer plan) as defined in section 3(3) of ERISA subject to provisions of Title IV or Section 302 of ERISA, or Section 412 of the Code:

(i)     maintained by any Obligor or any ERISA Affiliate; or

(ii)    to which any Obligor or any ERISA Affiliate is required to make any payment or contribution;

(i)     **public utility** has the meaning given to it in the United States Federal Power Act of 1920;

(j)     **Reportable Event** means:

(i)     an event specified as such in section 4043 of ERISA or any related regulation, other than an event in relation to which the requirement to give notice of that event is waived by any regulation; or

(ii)    a failure to meet the minimum funding standard under sections 412 or 430 of the Code or section 302 of ERISA, whether or not there has been any waiver of notice or waiver of the minimum funding standard under section 412 of the Code;

(k)     **US Bankruptcy Law** means the US Bankruptcy Code or any other US federal or US State bankruptcy, insolvency or similar law;

(l)     **US Borrower** means any Borrower that is a US Obligor; and

(m)     **US Guarantor** means any Guarantor that is a US Obligor.

## 2.     THE FACILITIES

### 2.1     The Facilities

(a)     Subject to the terms of this Agreement, the Lenders make available:

(i)     a revolving credit facility in an aggregate amount equal to the Total Facility A Commitments; and

(ii)    a revolving credit facility in an aggregate amount equal to the Total Facility B Commitments.

(b)     Each Facility will be available to all the Borrowers.

(c)     Subject to the terms of this Agreement and the Ancillary Documents, an Ancillary Lender may make all or part of its Facility B Commitments available to any Borrower as an Ancillary Facility.

### 2.2     Increase

(a)     A Borrower may by giving prior notice to the Agent by no later than the date falling five Business Days after the effective date of a cancellation of:

ING     00128

(i) the Available Commitments of a Defaulting Lender in accordance with Clause 10.5 (Right of cancellation in relation to a Defaulting Lender); or

(ii) the Commitments of a Lender in accordance with:

    (A) Clause 11.1 (Illegality); or

    (B) paragraph (a) of Clause 10.3 (Right of cancellation and repayment in relation to a single Lender),

request that the Commitments relating to any Facility be increased (and the Commitments relating to that Facility shall be so increased) in an aggregate amount of up to the amount of the Available Commitments or Commitments relating to that Facility so cancelled as follows:

    I. subject always to the Swiss Non-Bank Rules, the increased Commitments will be assumed by one or more Lenders or other banks, financial institutions, trusts, funds or other entities (each an **Increase Lender**) selected by the relevant Borrower (each of which shall not be a member of the Group or an Affiliate of a member of the Group and which (unless the Agent is an Impaired Agent) is further acceptable to the Agent acting reasonably) and each of which confirms in writing (whether in the relevant Increase Confirmation or otherwise) its willingness to assume and does assume all the obligations of a Lender corresponding to that part of the increased Commitments which it is to assume, as if it had been an Original Lender;

    II. each of the Obligors and any Increase Lender shall assume obligations towards one another and/or acquire rights against one another as the Obligors and the Increase Lender would have assumed and/or acquired had the Increase Lender been an Original Lender;

    III. each Increase Lender shall become a Party as a "Lender" and any Increase Lender and each of the other Finance Parties shall assume obligations towards one another and acquire rights against one another as that Increase Lender and those Finance Parties would have assumed and/or acquired had the Increase Lender been an Original Lender;

    IV. the Commitments of the other Lenders shall continue in full force and effect; and

    V. any increase in the Commitments relating to a Facility shall take effect on the date specified by the relevant Borrower in the notice referred to above or any later date on which the conditions set out in paragraph (c) below are satisfied.

(b) No Lender shall have any obligation to agree to an increase in its Commitments under this Clause and each Lender may, in its absolute discretion, decide whether or not it wishes to agree to such increase.

(c) An increase in the Commitments relating to a Facility will only be effective on:

(i) the execution by the Agent of an Increase Confirmation from the relevant Increase Lender; and

(ii) in relation to an Increase Lender which is not a Lender immediately prior to the relevant increase, the Agent being satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the

ING   00129

assumption of the increased Commitments by that Increase Lender. The Agent shall promptly notify the relevant Borrower and the Increase Lender upon being so satisfied.

(d)     Each Increase Lender, by executing the Increase Confirmation, confirms (for the avoidance of doubt) that the Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the increase becomes effective.

(e)     Unless the Agent otherwise agrees or the increased Commitments are assumed by existing Lenders, the relevant Borrower shall promptly on demand pay the Agent and the Security Agent the amount of all costs and expenses (including legal fees) reasonably incurred by either of them and, in the case of the Security Agent, by any Receiver or Delegate in connection with any increase in Commitments under this Clause 2.2.

(f)     The relevant Borrower may pay to the Increase Lender a fee in the amount and at the times agreed between the relevant Borrower (or the Obligors' Agent on its behalf) and the Increase Lender in a Fee Letter.

(g)     Clause 28.4 (Limitation of responsibility of Existing Lenders) shall apply *mutatis mutandis* in this Clause 2.2 in relation to an Increase Lender as if references in that Clause to:

(i)     an **Existing Lender** were references to all the Lenders immediately prior to the relevant increase;

(ii)    the **New Lender** were references to that **Increase Lender**; and

(iii)   a **re-transfer** and **re-assignment** were references to respectively a **transfer** and **assignment**.

## 2.3    Accordion

(a)     If no Default is continuing, nor in the opinion of the Agent (acting reasonably) would a Default or a Party being required to make a FATCA Deduction result from an increase of the Total Commitments under this Clause, after prior consultation with the Agent (acting on behalf of all of the Lenders excluding any FATCA Protected Lender) a Borrower may invite:

(i)     one or more Lenders by way of a written request to the Agent to be sent no later than 45 days before the Termination Date (each so willing Lender an **Accordion Increase Lender**); and/or

(ii)    any other bank, financial institution, trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets selected by the Company (each of which shall not be a member of the Group or an Affiliate of a member of the Group and which is (unless the Agent is an Impaired Agent) further acceptable to the Agent (acting reasonably)), which (in its sole discretion) confirms its willingness to assume and does assume all the obligations as a Lender (each an **Accordion Acceding Lender**),

to agree to participate in an increase in the Facilities of an aggregate amount up to USD 100,000,000 on a pro rata basis across the Facilities, or if the Termination Date in respect of Facility A has occurred at such time, on a pro rata basis under Facility B (such amount being the **Accordion Increase Amount**).

ING    00130

(b)     No Lender shall have any obligation to agree to an increase in its Commitments under this Clause and each Lender may, in its absolute discretion, decide whether or not it wishes to agree to such increase.

(c)     If any Accordion Increase Lender has obtained all applicable internal approvals to increase its Commitment by the amount specified by it and/or any Accordion Acceding Lender has obtained all applicable internal approvals to provide the Commitment in the amount specified by it, the relevant Borrower shall promptly notify the Agent of (i) the Accordion Increase Effective Date which shall be a date falling not earlier than the date falling twenty (20) Business Days after it has so informed the Agent, (ii) the Accordion Increase Amount and (iii) the amount of the Commitment per relevant Lender (including any Accordion Acceding Lenders) as of the Accordion Increase Effective Date. The Agent shall promptly notify the Lenders.

(d)     Each Accordion Increase Certificate and Accordion Accession Certificate is irrevocable and will not be regarded as having been duly completed unless it indicates the pro rata amounts of the Total Facility A Commitments (if applicable) and the Total Facility B Commitments which are the subject of that Accordion Increase Certificate or Accordion Accession Certificate.

(e)     An increase in the Total Commitments in respect of a new Commitment from a person which is not a Lender (each an **Accordion Acceding Lender**) is subject always to the Swiss Non-Bank Rules and will only be effective on the Accordion Increase Effective Date provided that:

        (i)      the Agent has executed an Accordion Accession Certificate from the Accordion Acceding Lender; and

        (ii)     immediately prior to the Accordion Increase Effective Date, the performance by the Agent of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the participation by that Accordion Acceding Lender, the completion of which the Agent shall promptly notify to the relevant Borrower and that Accordion Acceding Lender;

(f)     Provided that the Agent receives no later than twenty (20) Business Days prior to the proposed Accordion Increase Effective Date one or more Accordion Increase Certificates and/or one or more Accordion Accession Certificates duly signed by the relevant Accordion Increase Lenders and/or Accordion Acceding Lenders in the approved form agreeing to assume a proportion of the Accordion Increase Amount, then the Facility A Commitment (if applicable), and Facility B Commitment of each Accordion Increase Lender shall, with effect from the Accordion Increase Effective Date, be increased by its stated proportion of the Accordion Increase Amount in each Facility respectively, and the Facility A Commitment (if applicable), and Facility B Commitment of each Accordion Acceding Lender shall, with effect from the Accordion Increase Effective Date, be its stated proportion of the Accordion Increase Amount in each Facility respectively as set out in the Accordion Accession Certificate, as at that date and the aggregate amount of the Total Commitments shall be increased by the Accordion Increase Amount.

(g)     The Accordion Acceding Lender, by executing the Accordion Accession Certificate, confirms (for the avoidance of doubt) that the Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the increase becomes effective.

(h)     Unless the Agent otherwise agrees or the increased Commitment is assumed by an existing Lender, the relevant Borrower shall, on the Accordion Increase Effective Date pay to the Agent (for its own account) a fee of USD 3,000 and that Borrower shall promptly on demand pay the Agent and the Security Agent the amount of all costs and expenses (including legal fees) reasonably incurred by it in connection with any increase in Commitments under this Clause.

ING    00131

(i)     The relevant Borrower shall pay to each Accordion Increase Lender that increases its Commitment or each Accordion Acceding Lender a fee in the amount and at the times agreed between that Borrower and that Accordion Increase Lender or Accordion Acceding Lender in a Fee Letter between the relevant Borrower (or the Obligors' Agent on its behalf) and that Accordion Increase Lender or Accordion Acceding Lender setting out that fee.

(j)     Clause 28.4 (Limitation of responsibility of Existing Lenders) shall apply *mutatis mutandis* in this Clause 2.3 in relation to a Lender and Accordion Acceding Lender as if references in that Clause to:

      (i)     an **Existing Lender** were references to all the Lenders immediately prior to the relevant increase;

      (ii)    the **New Lender** were references to that Accordion Acceding Lender; and

      (iii)   a **re-transfer** and **re-assignment** were references to respectively a **transfer** and **assignment**.

(k)     On the date that the Agent executes each Accordion Increase Certificate or Accordion Accession Certificate, each Party shall acquire the same rights and assume the same obligations between themselves as they would have acquired and assumed had the relevant Accordion Increase Lender or Accordion Acceding Lender been an Original Lender with the Commitment specified by it in that Accordion Increase Certificate or Accordion Accession Certificate as applicable.

(l)     Unless otherwise provided for in the relevant Accordion Increase Certificate or Accordion Accession Certificate, the terms and conditions of the Facilities (other than changes resulting from the inclusion of the Accordion Increase Amount) shall remain unchanged and in full force and effect.

(m)    Following an increase in the amount of the Total Commitments, the Agent shall update Schedule 1 (The Original Parties) accordingly and make available the updated Schedule to all Parties.

## 2.4     Finance Parties' rights and obligations

(a)     The obligations of each Finance Party under the Finance Documents are several.  Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents.  No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(b)     The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor shall be a separate and independent debt.

(c)     A Finance Party may, except as otherwise stated in the Finance Documents, separately enforce its rights under the Finance Documents.

## 2.5     Obligors' Agent

(a)     Each Obligor (other than the Company) by its execution of this Agreement or an Accession Deed irrevocably (but in the case of any Maltese Obligor, revocably) appoints the Company (acting through one or more authorised signatories) to act on its behalf as its agent in relation to the Finance Documents and irrevocably (but in the case of any Maltese Obligor, revocably) authorises:

      (i)     the Company on its behalf to supply all information concerning itself contemplated by this Agreement to the Finance Parties and to give all notices and instructions (including, in the case of a Borrower, Utilisation Requests and Accordion Increase Requests), to execute on its

ING    00132

behalf any Accession Deed, Transfer Certificate or Assignment Agreement, to make such agreements and to effect the relevant amendments, supplements and variations capable of being given, made or effected by any Obligor notwithstanding that they may affect the Obligor, without further reference to or the consent of that Obligor; and

(ii)     each Finance Party to give any notice, demand or other communication to that Obligor pursuant to the Finance Documents to the Company,

and in each case the Obligor shall be bound as though the Obligor itself had given the notices and instructions (including, without limitation, any Utilisation Requests) or executed or made the agreements or effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

(b)     Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation, notice or other communication given or made by the Obligors' Agent or given to the Obligors' Agent under any Finance Document on behalf of another Obligor or in connection with any Finance Document (whether or not known to any other Obligor and whether occurring before or after such other Obligor became an Obligor under any Finance Document) shall be binding for all purposes on that Obligor as if that Obligor had expressly made, given or concurred with it.  In the event of any conflict between any notices or other communications of the Obligors' Agent and any other Obligor, those of the Obligors' Agent shall prevail.

(c)     Each German Obligor releases the Company to the fullest extent legally possible from the restrictions of Section 181 of the German Civil Code.

## 3.     FACILITY A EXTENSION OPTION

### 3.1     Extension option

(a)     The Company may, by notice to the Agent (the **Initial Extension Request**), not more than 90 days and not less than 45 days before the Termination Date for Facility A, request that the Termination Date in relation to Facility A be extended for a period of 364 days.

(b)     The Company may by notice to the Agent (the **Second Extension Request**) no more than 90 days and not less than 45 days before the Initial Extended Termination Date, request that the Initial Extended Termination Date in relation to Facility A with respect to Lenders who have agreed to the Initial Extension Request and any other Lender under Facility A at such time, be extended for a further period of 364 days.

(c)     The Agent shall promptly notify the Lenders of any Initial Extension Request or Second Extension Request (an **Extension Request**).

(d)     Each Extension Request is irrevocable.

(e)     Each Lender under Facility A may, in its sole discretion, agree to any Extension Request by sending a notice to the Agent.  Each Lender that agrees to an Extension Request (an **Extending Lender**) by the date falling 15 Business Days after the date of the relevant Extension Request, will extend its Facility A Commitments for a further period of 364 days, from the Termination Date or the Initial Extended Termination Date (as applicable) and the Termination Date or the Initial Extended Termination Date (as applicable) with respect to the Facility A Commitments of that Lender will be extended accordingly and all other terms and conditions of this Agreement shall remain unchanged and in full force and effect.

ING    00133

(f)     The Company shall pay to the Agent for each Extending Lender, a fee in the amount and at the times to be agreed between the Company, the Agent and the relevant Extending Lender in a Fee Letter.

**3.2     Non-Extending Lender**

(a)     If any Lender:

(i)      indicates that it does not agree to an Extension Request; or

(ii)     fails to reply to an Extension Request by the date falling 15 Business Days after the date of the relevant Extension Request,

it will be deemed to have refused that Extension Request (a **Non-Extending Lender**) and its Facility A Commitments will not be extended.

(b)     The Agent shall promptly notify the Company of the identity of each Non-Extending Lender.

(c)     The Company may, within ten Business Days' of its notification by the Agent of the identity of a Non-Extending Lender and subject always to the Swiss Non-Bank Rules, by notice to the Agent and the relevant Non-Extending Lender:

(i)      replace that Non-Extending Lender by requiring that Non-Extending Lender to (and that Non-Extending Lender shall) transfer pursuant to Clause 28 (Changes to the Lenders) all (and not part only) of its rights and obligations under this Agreement with respect to Facility A;

(ii)     require that Non-Extending Lender to (and that Non-Extending Lender shall) transfer pursuant to Clause 28 (Changes to the Lenders) all (and not part only) of the undrawn Facility A Commitments of that Lender; or

(iii)    require that Non-Extending Lender to (and that Non-Extending Lender shall) transfer pursuant to Clause 28 (Changes to the Lenders) all (and not part only) of its rights and obligations under Facility A,

to a Lender or any other bank, financial institution, trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (a **Replacement Lender**) selected by the Company (each of which shall not be a member of the Group or an Affiliate of a member of the Group and which is (unless the Agent is an Impaired Agent) further acceptable to the Agent and the Non-Extending Lender (acting reasonably)), which (in its sole discretion) confirms its willingness to assume and does assume all the obligations of the transferring Non-Extending Lender (including the assumption of the transferring Non-Extending Lender's participations or unfunded participations (as the case may be) on the same basis as the transferring Non-Extending Lender) for a purchase price in cash payable at the time of transfer equal to the outstanding principal amount of that Non-Extending Lender's participation in the outstanding relevant Loans and all accrued interest, Break Costs and other amounts payable in relation to the relevant Facility A Commitment under the Finance Documents.

(d)     Any transfer of rights and obligations of a Non-Extending Lender under this Clause 3 is subject to the following conditions:

(i)      the Company has no right under this Clause 3 to replace the Agent;

(ii)     neither the Agent nor any Lender will have any obligation to the Company to become or to find a Replacement Lender;

ING     00134

| | | |
|---|---|---|
| (iii) | | the transfer shall take place no later than five Business Days after the notice referred to in paragraph (c) above; and |
| (iv) | | in no event will the Non-Extending Lender be required to pay or surrender to the Replacement Lender any of the fees received by the Non-Extending Lender under the Finance Documents. |

(e)    The Company shall pay to the Agent for each Lender that increases its Facility A Commitments or participates as a Replacement Lender a fee in the amount and at the times to be agreed between the Company and the relevant Lender in a Fee Letter.

## 4.    PURPOSE

### 4.1    Purpose

Each Borrower shall apply all amounts borrowed by it under the Facilities towards the general corporate and working capital purposes of the Group (including towards repayment or prepayment of any Utilisation or the Existing Financial Indebtedness).

### 4.2    Monitoring

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

## 5.    CONDITIONS OF UTILISATION

### 5.1    Initial conditions precedent

(a)    A Borrower may only submit a Utilisation Request if the Agent has been provided with all of the documents and evidence set out in Part 1 of Schedule 2 (Conditions) in form and substance satisfactory to the Agent. The Agent shall notify the Company and the Lenders promptly upon being so satisfied.

(b)    The Lenders will only be obliged to comply with Clause 6.4 (Lenders' participation) in relation to any Utilisation if on or before the Utilisation Date for that Utilisation, the Agent has received all of the documents and other evidence listed in Part 2 of Schedule 2 (Conditions) in form and substance satisfactory to the Agent.  The Agent shall notify the Company and the Lenders promptly upon being so satisfied.

(c)    Other than to the extent that the Majority Lenders notify the Agent in writing to the contrary before the Agent gives the notifications described in paragraphs (a) and (b) above, the Lenders authorise (but do not require) the Agent to give that notification.  The Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

### 5.2    Further conditions precedent

Subject to Clause 5.1 (Initial conditions precedent), the Lenders will only be obliged to comply with Clause 6.4 (Lenders' participation) if on the date of the Utilisation Request and on the proposed Utilisation Date:

(a)    in the case of a Rollover Loan, no Event of Default is continuing or would result from the proposed Loan, and, in the case of any other Utilisation, no Default is continuing or would result from the proposed Utilisation;

ING    00135

(b)     in relation to the first Utilisation, all the representations and warranties in Clause 23 (Representations) or, in relation to any other Utilisation, the Repeating Representations to be made by each Obligor are true; and

(c)     the aggregate amount of the outstanding Utilisations and Ancillary Outstandings adjusted to take account of:

   (i)     the amount of the requested Utilisation;

   (ii)    the amount of any Utilisations which, pursuant to any other Utilisation Request, are to be made on or before the date for the making of the requested Utilisation; and

   (iii)   the amount of any Utilisation scheduled to be repaid on or before the date for the making of the requested Utilisation,

is less than or equal to the Borrowing Base as evidenced by the Borrowing Base Certificate most recently delivered to the Security Agent under this Agreement (which initially is the Borrowing Base Certificate delivered pursuant to Clause 5.1 (Initial conditions precedent)).

**5.3     Conditions subsequent**

Subject to Clause 5.1 (Initial conditions precedent), the obligations of the Lenders to continue to make the Facilities and the Available Commitments available shall only continue if the conditions subsequent set out in Part 3 of Schedule 2 are provided in form and substance satisfactory to the Agent on or before the deadlines set out in that Schedule.

**5.4     Conditions relating to Optional Currencies**

(a)     A currency will constitute an Optional Currency in relation to a Utilisation if:

   (i)     it is readily available in the amount required and freely convertible into the Base Currency in the Relevant Interbank Market on the Quotation Day and the Utilisation Date for that Utilisation; and

   (ii)    it is GBP, EUR, SEK, NOK, DKK, or CHF or has been approved by the Agent (acting on the instructions of all the Lenders) on or prior to receipt by the Agent of the relevant Utilisation Request for that Utilisation.

(b)     If the Agent has received a written request from the Company for a currency to be approved under paragraph (a)(ii) above, the Agent will confirm to the Company by the Specified Time:

   (i)     whether or not the Lenders have granted their approval; and

   (ii)    if approval has been granted, the minimum amount for any subsequent Utilisation in that currency.

**5.5     Maximum number of Utilisations**

(a)     A Borrower (or the Company) may not deliver a Utilisation Request if as a result of the proposed Utilisation 16 or more Utilisations in aggregate would be outstanding.

(b)     Any Loan made by a single Lender under Clause 7.2 (Unavailability of a currency) shall not be taken into account in this Clause 5.5.

ING     00136

6.      **UTILISATION**

6.1     **Delivery of a Utilisation Request**

A Borrower (or the Company on its behalf) may utilise a Facility by delivery to the Agent of a duly completed Utilisation Request not later than the Specified Time.

6.2     **Completion of a Utilisation Request for Loans**

(a)     Each Utilisation Request for a Loan is irrevocable and will not be regarded as having been duly completed unless:

    (i)      it identifies the Facility to be utilised;

    (ii)     the proposed Utilisation Date is a Business Day within the Availability Period applicable to that Facility;

    (iii)    the currency and amount of the Loan comply with Clause 6.3 (Currency and amount); and

    (iv)     the proposed Interest Period complies with Clause 14 (Interest Periods).

(b)     Only one Loan may be requested in each Utilisation Request.

6.3     **Currency and amount**

(a)     The currency specified in a Utilisation Request must be the Base Currency or an Optional Currency.

(b)     The amount of the proposed Loan must be:

    (i)      if the currency selected is the Base Currency, a minimum of USD 10,000,000 or, if less, the Available Facility; or

    (ii)     if the currency selected is an Optional Currency, the minimum amount specified by the Agent pursuant to paragraph (b)(ii) of Clause 5.4 (Conditions relating to Optional Currencies) or, if less, the Available Facility.

6.4     **Lenders' participation**

(a)     If the conditions set out in this Agreement have been met, and subject to Clause 5.1 (Initial conditions precedent), each Lender shall make its participation in each Loan available by the Utilisation Date through its Facility Office.

(b)     Other than as set out in paragraph (c) below, the amount of each Lender's participation in each Loan will be equal to its Pro Rata Share immediately prior to making the Loan.

(c)     If a Utilisation is made to repay Ancillary Outstandings, each Lender's participation in that Utilisation will be in an amount (as determined by the Agent) which will result as nearly as possible in the aggregate amount of its participation in the Utilisations bearing the same proportion to the aggregate amount of the Utilisations as its Pro Rata Share.

(d)     The Agent shall determine the Base Currency Amount of each Loan which is to be made in an Optional Currency and notify each Lender of the amount, currency and the Base Currency Amount of each Loan, the amount of its participation in that Loan and, if different, the amount of that participation to be made available in accordance with Clause 35.1 (Payments to the Agent) by the Specified Time.

ING    00137

**6.5     Cancellation of Commitments**

(a)     The Facility A Commitments which, at that time, are unutilised shall be immediately cancelled at the end of the Availability Period for Facility A.

(b)     The Facility B Commitments which, at that time, are unutilised shall be immediately cancelled at the end of the Availability Period for Facility B.

**7.     OPTIONAL CURRENCIES**

**7.1     Selection of currency**

A Borrower (or the Company on its behalf) shall select the currency of a Utilisation in a Utilisation Request.

**7.2     Unavailability of a currency**

If before the Specified Time on any Quotation Day:

(a)     a Lender notifies the Agent that the Optional Currency requested is not readily available to it in the amount required; or

(b)     a Lender notifies the Agent that compliance with its obligation to participate in a Loan in the proposed Optional Currency would contravene a law or regulation applicable to it,

the Agent will give notice to the relevant Borrower or Company to that effect by the Specified Time on that day.  In this event, any Lender that gives notice pursuant to this Clause 7.2 will be required to participate in the Loan in the Base Currency (in an amount equal to that Lender's proportion of the Base Currency Amount, or in respect of a Rollover Loan, an amount equal to that Lender's proportion of the Base Currency Amount of the Rollover Loan that is due to be made) and its participation will be treated as a separate Loan denominated in the Base Currency during that Interest Period.

**7.3     Revaluation**

(a)     If any Utilisation is denominated in an Optional Currency, the Agent shall at Monthly intervals after the date of this Agreement, recalculate the Base Currency Amount of each Utilisation by notionally converting into the Base Currency the outstanding amount of that Utilisation on the basis of the Agent's Spot Rate of Exchange on the date of calculation.

(b)     If any Ancillary Facility is denominated in a currency which is not the Base Currency, the Agent may at three-Monthly intervals after the date of this Agreement, request the relevant Ancillary Lenders to calculate and confirm the amount of such Ancillary Outstandings.

(c)     The Company shall, if requested by the Agent within three Business Days of any calculation under paragraphs (a) and (b) above, ensure that within three Business Days sufficient Utilisations and/or Ancillary Outstandings are prepaid or sufficient cash cover is provided by the relevant Borrower(s) to prevent the Base Currency Amount of the Total Outstandings from exceeding the Total Commitments following any adjustment to a Base Currency Amount under paragraphs (a) and (b) above.

(d)     Any cash cover provided by a Borrower to ensure compliance with paragraph (c) above will be returnable to that Borrower when, and to the extent, the Agent determines that the cash cover is no longer required.

ING     00138

7.4     **Agent's calculations**

Each Lender's participation in a Loan will be determined in accordance with Clause 6.4(d) (Lenders' participation).

8.      **ANCILLARY FACILITIES**

8.1     **Type of Facility**

An Ancillary Facility may be by way of:

(a)     an overdraft facility; or

(b)     a facility for issuance of Credit Instruments.

8.2     **Availability**

(a)     Subject to paragraphs (b), (c) and (d) below, if the Company and a Lender agree and except as otherwise provided in this Agreement, the Lender may provide all or part of its Facility B Commitment as an Ancillary Facility.

(b)     Subject to paragraph (d) below, the maximum aggregate amount of the Ancillary Commitments of all the Lenders shall not at any time exceed USD 250,000,000.

(c)     Subject to paragraph (d) below, the Ancillary Commitments shall be made available in a maximum amount per Ancillary Lender of USD 50,000,000.

(d)     For a maximum period of two (2) Months from the date of this Agreement:

(i)      the maximum aggregate amount of the Ancillary Commitments of all the Lenders shall not at any time exceed USD 300,000,000, of which Nordea Bank Danmark A/S may make available Ancillary Commitments in a maximum amount of USD 100,000,000; and

(ii)     subject to subparagraph (i) above, Nordea Bank Danmark A/S may provide part of its Facility A Commitment as an Ancillary Facility provided that all of its Facility B Commitment has been made available as an Ancillary Facility.

(e)     An Ancillary Facility shall not be made available unless the Agent has received, on or before the date of the first utilisation under that Ancillary Facility, from the Company:

(i)      a notice in writing of the establishment of an Ancillary Facility and specifying:

(A)     the incorporation of the Minimum Ancillary Facility Terms;

(B)     the proposed Borrower(s) which may use the Ancillary Facility;

(C)     the proposed Ancillary Commencement Date and expiry date of the Ancillary Facility;

(D)     the proposed type of Ancillary Facility to be provided;

(E)     the proposed Ancillary Lender;

(F)     the proposed Ancillary Commitment, the maximum amount of the Ancillary Facility and, in the case of a Multi-account Overdraft, its Designated Net Amount; and

ING     00139

(G)     the proposed currency of the Ancillary Facility (if not denominated in the Base Currency); and

(ii)     any other information which the Agent may reasonably request in connection with the Ancillary Facility.

(f)     The Agent shall promptly notify the Ancillary Lender and the other Lenders of the establishment of an Ancillary Facility.

(g)     Subject to compliance with paragraph (b) above:

(i)     the Lender concerned will become an Ancillary Lender; and

(ii)     the Ancillary Facility will be available,

with effect from the date agreed by the Company and the Ancillary Lender.

**8.3     Terms of Ancillary Facilities**

The terms of any Ancillary Facility must incorporate and comply with the Minimum Ancillary Facility Terms.

**8.4     Repayment of Ancillary Facility**

(a)     An Ancillary Facility shall cease to be available on the Termination Date applicable to the Facilities or such earlier date on which its expiry date occurs or on which it is cancelled in accordance with the terms of this Agreement.

(b)     If an Ancillary Facility expires in accordance with its terms, the Ancillary Commitment of the Ancillary Lender shall be reduced to zero.

(c)     No Ancillary Lender may demand repayment or prepayment of any Ancillary Outstandings prior to the expiry date of the relevant Ancillary Facility unless:

(i)     such repayment or prepayment relates to Ancillary Outstandings under a documentary letter of credit on the earlier to occur of:

(A)     the Termination Date; and

(B)     the date on which an acceleration notice is served under Clause 27.20 (Acceleration);

(ii)     the Total Commitments have been cancelled in full or all outstanding Utilisations under the Facilities have become due and payable in accordance with the terms of this Agreement;

(iii)     it becomes unlawful in any applicable jurisdiction or prohibited by the policies or restrictions applicable to such Ancillary Lender for the Ancillary Lender to perform any of its obligations as contemplated by this Agreement or to fund, issue or maintain its participation in its Ancillary Facility; or

(iv)     both:

(A)     the Available Commitments relating to the Facilities; and

(B)     the notice of the demand given by the Ancillary Lender,

ING     00140

would not prevent the relevant Borrower funding the repayment of those Ancillary Outstandings in full by way of a Utilisation.

(d)     If a Utilisation is made to repay Ancillary Outstandings in full, the relevant Ancillary Commitment shall be reduced to zero.

## 8.5     Limitation on Ancillary Outstandings

Each Borrower shall procure that:

(a)     the Ancillary Outstandings under any Ancillary Facility shall not exceed the Ancillary Commitment applicable to that Ancillary Facility; and

(b)     in relation to a Multi-account Overdraft, the Ancillary Outstandings shall not exceed the Designated Net Amount applicable to that Multi-account Overdraft.

## 8.6     Adjustment for Ancillary Facilities upon acceleration

(a)     In this Clause 8.6:

(i)     **Facility Outstandings** means, in relation to a Lender, the aggregate of the equivalent in the Base Currency of:

(A)     its participation in each Utilisation then outstanding (together with the aggregate amount of all accrued interest, fees and commission owed to it as a Lender under the Facilities); and

(B)     if the Lender is also an Ancillary Lender, the Ancillary Outstandings in respect of Ancillary Facilities provided by that Ancillary Lender (together with the aggregate amount of all accrued interest, fees and commission owed to it as an Ancillary Lender in respect of the Ancillary Facility); and

(ii)     **Total Facility Outstandings** means the aggregate of all Facility Outstandings.

(b)     If a notice is served under Clause 27.20 (Acceleration) (other than a notice declaring Utilisations to be due on demand), each Lender and each Ancillary Lender shall (subject to paragraph (g) below) promptly adjust (by making or receiving (as the case may be) corresponding transfers of rights and obligations under the Finance Documents relating to Facility Outstandings) their claims in respect of amounts outstanding to them under the Facilities and each Ancillary Facility to the extent necessary to ensure that after such transfers the Facility Outstandings of each Lender bear the same proportion to the Total Facility Outstandings as such Lender's Commitment bears to the Total Commitments, each as at the date the notice is served under Clause 27.20 (Acceleration).

(c)     If an amount outstanding under an Ancillary Facility is a contingent liability and that contingent liability becomes an actual liability or is reduced to zero after the original adjustment is made under paragraph (b) above, then each Lender and Ancillary Lender will make a further adjustment (by making or receiving (as the case may be) corresponding transfers of rights and obligations under the Finance Documents relating to Facility Outstandings to the extent necessary) to put themselves in the position they would have been in had the original adjustment been determined by reference to the actual liability or, as the case may be, zero liability and not the contingent liability.

(d)     Any transfer of rights and obligations relating to Facility Outstandings made pursuant to this Clause 8.6 shall be made for a purchase price in cash, payable at the time of transfer, in an amount equal to those Facility Outstandings (less any accrued interest, fees and commission to which the transferor

ING     00141

will remain entitled to receive notwithstanding that transfer, pursuant to Clause 28.10 (Pro rata interest settlement)).

(e)     Prior to the application of the provisions of paragraph (b) above, an Ancillary Lender that has provided a Multi-account Overdraft shall set-off any Available Credit Balance on any account comprised in that Multi-account Overdraft.

(f)     All calculations to be made pursuant to this Clause 8.6 shall be made by the Agent based upon information provided to it by the Lenders and Ancillary Lenders and the Agent's Spot Rate of Exchange.

(g)     This Clause 8.6 shall not oblige any Lender to accept the transfer of a claim relating to an amount outstanding under an Ancillary Facility which is not denominated (pursuant to the relevant Finance Document) in either the Base Currency, a currency which has been an Optional Currency for the purpose of any Utilisation or in another currency which is acceptable to that Lender.

**8.7     Information**

Each Borrower and each Ancillary Lender shall, promptly upon request by the Agent, supply the Agent with any information relating to the operation of an Ancillary Facility (including the Ancillary Outstandings) as the Agent may reasonably request from time to time.  Each Borrower consents to all such information being released to the Agent and the other Finance Parties.

**8.8     Affiliates of Lenders as Ancillary Lenders**

(a)     Subject to the terms of this Agreement, an Affiliate of a Lender may become an Ancillary Lender. In such case, the Lender and its Affiliate shall be treated as a single Lender whose Commitment is the amount set out opposite the relevant Lender's name in Part 2 of Schedule 1 (The Original Parties) and/or the amount of any Commitment transferred to or assumed by that Lender under this Agreement, to the extent (in each case) not cancelled, reduced or transferred by it under this Agreement.

(b)     The Company shall specify any relevant Affiliate of a Lender in any notice delivered by the Company to the Agent pursuant to paragraph (b)(i) of Clause 8.2 (Availability).

(c)     If a Lender assigns all of its rights and benefits or transfers all of its rights and obligations to a New Lender, its Affiliate shall cease to have any obligations under this Agreement or any Ancillary Document.

(d)     Where this Agreement or any other Finance Document imposes an obligation on an Ancillary Lender and the relevant Ancillary Lender is an Affiliate of a Lender which is not a party to that document, the relevant Lender shall ensure that the obligation is performed by its Affiliate.

**8.9     Amendments and Waivers – Ancillary Facilities**

No amendment or waiver of a term of any Ancillary Facility shall require the consent of any Finance Party other than the relevant Ancillary Lender unless such amendment or waiver itself relates to or gives rise to a matter which would require an amendment of or under this Agreement (including, for the avoidance of doubt, under this Clause 8).  In such case, Clause 41 (Amendments and Waivers) will apply.

ING     00142

9.      **REPAYMENT**

(a)     Subject to paragraph (b) below, each Borrower which has drawn a Loan shall repay that Loan on the last day of its Interest Period.

(b)     Without prejudice to each Borrower's obligation under paragraph (a) above, if:

　　　　(i)      one or more Loans are to be made available to a Borrower:

　　　　　　　　(A)     on the same day that a maturing Loan is due to be repaid by that Borrower;

　　　　　　　　(B)     in the same currency as the maturing Loan (unless it arose as a result of the operation of Clause 7.2 (Unavailability of a currency)); and

　　　　　　　　(C)     in whole or in part for the purpose of refinancing the maturing Loan; and

　　　　(ii)     the proportion borne by each Lender's participation in the maturing Loan to the amount of that maturing Loan is the same as the proportion borne by that Lender's participation in the new Loans to the aggregate amount of those new Loans,

the aggregate amount of the new Loans shall, unless the relevant Borrower or the Company notifies the Agent to the contrary in the relevant Utilisation Request, be treated as if applied in or towards repayment of the maturing Loan so that:

　　　　(A)     if the amount of the maturing Loan exceeds the aggregate amount of the new Loans:

　　　　　　　　I.      the relevant Borrower will only be required to make a payment under Clause 35.1 (Payments to the Agent) in an amount in the relevant currency equal to that excess; and

　　　　　　　　II.     each Lender's participation in the new Loans shall be treated as having been made available and applied by the Borrower in or towards repayment of that Lender's participation in the maturing Loan and that Lender will not be required to make a payment under Clause 35.1 (Payments to the Agent) in respect of its participation in the new Loans; and

　　　　(B)     if the amount of the maturing Loan is equal to or less than the aggregate amount of the new Loans:

　　　　　　　　I.      the relevant Borrower will not be required to make a payment under Clause 35.1 (Payments to the Agent); and

　　　　　　　　II.     each Lender will be required to make a payment under Clause 35.1 (Payments to the Agent) in respect of its participation in the new Loans only to the extent that its participation in the new Loans exceeds that Lender's participation in the maturing Loan and the remainder of that Lender's participation in the new Loans shall be treated as having been made available and applied by the Borrower in or towards repayment of that Lender's participation in the maturing Loan.

10.     **VOLUNTARY PREPAYMENT AND CANCELLATION**

10.1    **Voluntary cancellation**

　　　　The Company may, if it gives the Agent not less than 5 Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, cancel the whole or any part (being a minimum amount of

ING    00143

USD 10,000,000) of an Available Facility.  Any cancellation under this Clause 10.1 shall reduce the Commitments of the Lenders according to each Lender's Pro Rata Share under that Facility.

**10.2    Voluntary prepayment of Utilisations**

A Borrower to which a Utilisation has been made may, if it or the Company gives the Agent not less than 5 Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of a Utilisation (but if in part, being an amount that reduces the Base Currency Amount of the Utilisation by a minimum amount of USD 10,000,000).

**10.3    Right of cancellation and repayment in relation to a single Lender**

(a)      If:

      (i)      any sum payable to any Lender by an Obligor is required to be increased under Clause 13.4 (Minimum interest) or under paragraph (d) of Clause 17.1 (Tax gross-up);

      (ii)     any Lender claims indemnification from the Company or an Obligor under Clause 17.2 (Tax indemnity) or Clause 18.1 (Increased costs); or

      (iii)    any FATCA Protected Lender notifies the Agent of a FATCA Event pursuant to Clause 10.4 (Mandatory repayment and cancellation of FATCA Protected Lenders),

the Company may, whilst the circumstance giving rise to the requirement for that increase, indemnification or FATCA Event continues, give the Agent notice of cancellation of the Commitment(s) of that Lender and its intention to procure the repayment of that Lender's participation in the Utilisations.

(b)      On receipt of a notice referred to in paragraph (a) above in relation to a Lender, the Commitment(s) of that Lender shall immediately be reduced to zero.

(c)      On the last day of each Interest Period which ends after the Company has given notice under paragraph (a) above in relation to a Lender (or, if earlier, the date specified by the Company in that notice), each Borrower to which a Utilisation is outstanding shall repay that Lender's participation in that Utilisation together with all interest and other amounts accrued under the Finance Documents.

**10.4    Mandatory repayment and cancellation of FATCA Protected Lenders**

(a)      If on the date falling three months before the earliest FATCA Application Date for any payment by a Party to a FATCA Protected Lender (or to the Agent for the account of that Lender), that Lender is not a FATCA Exempt Party and, in the opinion of that Lender (acting reasonably), that Party will, as a consequence, be required to make a FATCA Deduction from a payment to that Lender (or to the Agent for the account of that Lender) on or after that FATCA Application Date (a **FATCA Event**):

      (i)      that Lender shall, reasonably promptly after that date, notify the Agent of that FATCA Event and the relevant FATCA Application Date;

      (ii)     if, on the date falling one month before such FATCA Application Date, that FATCA Event is continuing and that Lender has not been repaid pursuant to Clause 10.3 (Right of cancellation and repayment in relation to a single Lender):

            (A)     that Lender may, at any time between one month and two weeks before such FATCA Application Date, notify the Agent;

ING     00144

(B)     upon the Agent notifying the Company, the Commitment of that Lender will be immediately cancelled; and

(C)     each Borrower shall repay that Lender's participation in the Utilisations made to that Borrower on the last day of the Interest Period for each Utilisation occurring after the Agent has notified the Company or, if earlier, the last Business Day before the relevant FATCA Application Date.

## 10.5    Right of cancellation in relation to a Defaulting Lender

(a)     If any Lender becomes a Defaulting Lender, the Company may, at any time whilst the Lender continues to be a Defaulting Lender, give the Agent five Business Days' notice of cancellation of each Available Commitment of that Lender.

(b)     On the notice referred to in paragraph (a) above becoming effective, each Available Commitment of the Defaulting Lender shall immediately be reduced to zero.

(c)     The Agent shall as soon as practicable after receipt of a notice referred to in paragraph (a) above, notify all the Lenders.

## 11.     MANDATORY PREPAYMENT AND CANCELLATION

## 11.1    Illegality

If it becomes unlawful in any applicable jurisdiction, or prohibited by policies or restrictions applicable to such Lender, for a Lender to perform any of its obligations as contemplated by this Agreement or to fund, issue or maintain its participation in any Utilisation or it becomes unlawful or so prohibited for any Affiliate of a Lender for that Lender to do so:

(a)     that Lender shall promptly notify the Agent upon becoming aware of that event;

(b)     upon the Agent notifying the Company, each Commitment of that Lender will be immediately cancelled; and

(c)     to the extent that the Lender's participation has not been transferred pursuant to Clause 41.5 (Replacement of Lender), each Borrower must prepay that Lender's participation in the Utilisations made to that Borrower the date specified by the Lender in the notice delivered to the Agent (being no earlier than the last day of any applicable grace period permitted by law) and that Lender's corresponding Commitment(s) shall be cancelled in the amount of the participations prepaid.

## 11.2    Change of Control

Upon the occurrence of a Change of Control:

(a)     the Company shall promptly notify the Agent of the Change of Control;

(b)     a Lender shall not be obliged to fund a Utilisation (except for a Rollover Loan); and

(c)     if a Lender so requires and notifies the Agent, the Agent shall, by not less than 5 Business Days' notice to the Company, cancel the Commitments of that Lender and declare the participation of that Lender in all outstanding Utilisations and Ancillary Outstandings, together with accrued interest, and all other amounts accrued under the Finance Documents

ING    00145

immediately due and payable, whereupon the Commitments of that Lender will be cancelled and all such outstanding amounts will become immediately due and payable.

**11.3     Borrowing Base and additional Collateral**

If, on the date of delivery of a Borrowing Base Certificate by the Company pursuant to Clause 5.1 (Initial conditions precedent), Clause 24.4 (Borrowing Base) or on any other date that the Company is required to calculate the value of the Borrowing Base pursuant to Clause 32.2 (Borrowing Base Audit), the Total Outstandings exceeds the Borrowing Base, the Company must, within three Business Days from the date on which Borrowing Base Certificate was delivered or the Company was otherwise required to calculate the Borrowing Base:

(a)     prepay or repay any amount of the Loans (in order of maturity) and/or prepay or repay or provide cash cover in respect of Ancillary Outstandings, if any, to such extent as may be required to ensure that, following such prepayment, repayment or provision of cash cover, the Total Outstandings no longer exceeds the Borrowing Base; or

(b)     immediately increase the Borrowing Base by providing further Collateral to such extent as may be required to ensure that, following such increase, the Total Outstandings no longer exceeds the Borrowing Base; and

(c)     deliver a new Borrowing Base Certificate to the Security Agent that evidences and confirms that the Total Outstandings no longer exceeds the Borrowing Base.

**12.     RESTRICTIONS**

**12.1     Notices of Cancellation or Prepayment**

Any notice of cancellation, prepayment, authorisation or other election given by any Party under Clause 10 (Voluntary Prepayment and Cancellation) shall (subject to the terms of that Clause) be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

**12.2     Interest and other amounts**

Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs, without premium or penalty.

**12.3     Reborrowing of Facilities**

Unless expressly stated otherwise in this Agreement, any part of a Facility which is prepaid or repaid may be reborrowed in accordance with the terms of this Agreement. No amounts prepaid or repaid in accordance with Clauses 11.1 (Illegality), or 11.2 (Change of Control) may be reborrowed.

**12.4     Prepayment in accordance with Agreement**

No Borrower shall repay or prepay all or any part of the Utilisations or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

**12.5     No reinstatement of Commitments**

Subject to Clause 2.2 (Increase) and Clause 2.3 (Accordion), no amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

ING    00146

**12.6    Agent's receipt of Notices**

If the Agent receives a notice under Clause 10 (Voluntary Prepayment and Cancellation), it shall promptly forward a copy of that notice to either the Company or the affected Lender, as appropriate.

**12.7    Effect of repayment and prepayment on Commitments**

If all or part of any Lender's participation in a Utilisation under a Facility is repaid or prepaid and is not available for redrawing (other than by operation of Clause 5.2 (Further conditions precedent)), an amount of that Lender's Commitment (equal to the Base Currency Amount of the amount of the participation which is repaid or prepaid) in respect of that Facility will be deemed to be cancelled on the date of repayment or prepayment.

**12.8    Application of prepayments**

Any prepayment of a Utilisation (other than a prepayment pursuant to Clause 11.1 (Illegality) or Clause 10.3 (Right of cancellation and repayment in relation to a single Lender)) shall be applied pro rata to each Lender's Pro Rata Share of that Utilisation.

**13.    INTEREST**

**13.1    Calculation of interest**

The rate of interest on each Loan for each Interest Period is the percentage rate per annum which is the aggregate of the applicable:

(a)    Margin;

(b)    IBOR; and

(c)    Mandatory Cost, if any.

**13.2    Payment of interest**

The Borrower to which a Loan has been made shall pay accrued interest on that Loan on the last day of each Interest Period (and, if the Interest Period is longer than six Months, on the dates falling at six Monthly intervals after the first day of the Interest Period).

**13.3    Default interest**

(a)    If an Obligor fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to paragraph (b) below, is two per cent. per annum higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan in the currency of the overdue amount for successive Interest Periods, each of a duration selected by the Agent (acting reasonably). Any interest accruing under this Clause 13.3 shall be immediately payable by the Obligor on demand by the Agent.

(b)    If any overdue amount consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to that Loan:

(i)    the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

ING    00147

(ii) the rate of interest applying to the overdue amount during that first Interest Period shall be two per cent. per annum higher than the rate which would have applied if the overdue amount had not become due.

(c) Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

**13.4    Minimum interest**

(a) When entering into this Agreement, the Parties have assumed *in bona fide* that the interest payments under this Agreement and the other Finance Documents are not and will not become subject to any Tax Deduction on account of Swiss Withholding Tax.

(b) Notwithstanding paragraph (a), if a Tax Deduction on account of Swiss Withholding Tax should, at any time, be or become required by law in respect of any payment under this Agreement or any other Finance Document and should it be unlawful for the Company to comply with Clause 17.1 (Tax gross-up) for any reason (where this would otherwise be required by the terms of Clause 17.1 (Tax gross-up)) then:

(i) the applicable interest rate in relation to that interest payment shall be:

(A) the interest rate which would have applied to that interest payment as provided for in Clause 13.1 (Calculation of interest) divided by 1, minus:

(B) the rate at which the relevant Tax Deduction is required to be made under Swiss domestic tax law and/or applicable double taxation treaties (where the rate at which the relevant Tax Deduction is required to be made is for this purpose expressed as a fraction of (1)); and

(ii) the relevant Obligor shall:

(A) pay the relevant interest at the adjusted rate in accordance with Clause 13.4(b)(i)(A);

(B) make the Tax Deduction on the interest so recalculated; and

(C) all references to a rate of interest under the Finance Documents shall be construed accordingly and all provisions in Clause 17 (Tax Gross Up and Indemnities) (other than Clause 17.1(c) (Tax gross-up) shall apply to the deduction for Swiss Withholding Tax purposes on the recalculated interest payment.

(c) To the extent that interest payable under a Finance Document becomes subject to Swiss Withholding Tax, each relevant Lender and each relevant Obligor shall promptly co-operate in completing any procedural formalities (including submitting forms and documents required by the appropriate Tax authority) to the extent possible and necessary for the relevant Obligor to obtain authorization (a) to make interest payments without them being subject to Swiss Withholding Tax or (b) to being subject to Swiss Withholding Tax at a rate reduced under applicable double taxation treaties or (c) for a Lender to obtain a full or partial refund of Swiss Withholding Tax under applicable double taxation treaties and all provisions in Clauses 17.1 (Tax gross-up), 17.2 (Tax indemnity) and 17.3 (Tax Credit) shall apply in relation to such increased interest payment and Swiss Withholding Tax deduction.

ING    00148

(d)     No Obligor is required to increase or make any increased payment to a Lender under this Clause if the Swiss Ten Non-Bank Rule and/or the Swiss Twenty Non-Bank Rule is breached as a result solely of:

     (i)     that Lender, which indicated under Clause 17.4 (Lender Status Confirmation) that it is a Swiss Qualifying Bank, ceasing to be a Swiss Qualifying Bank (other than as a result of any change after the date it became a Lender under this Agreement in (or in the interpretation, administration, or application of) any law or treaty or any published practice or published concession of any relevant taxing authority); or

     (ii)    a non-compliance by that Lender with Clause 28.2(a) (Conditions of assignment or transfer), Clause 28.8 (Security over Lenders' rights) or Clause 28.9 (Exposure transfer transactions).

**13.5    Notification of rates of interest**

The Agent shall promptly notify the Lenders and the relevant Borrower (or the Company) of the determination of a rate of interest under this Agreement.

**14.     INTEREST PERIODS**

**14.1    Selection of Interest Periods and Terms**

(a)     A Borrower (or the Company on behalf of a Borrower) may select an Interest Period for a Loan in the Utilisation Request for that Loan.

(b)     Subject to this Clause 14, a Borrower (or the Company) may select an Interest Period of 1, 2, 3 or 6 Months or any other period agreed between the Company and the Agent (acting on the instructions of all the Lenders in relation to the relevant Loan).

(c)     An Interest Period for a Loan shall not extend beyond the Termination Date applicable to the relevant Facility under which it is utilised.

(d)     Each Loan has one Interest Period only.

(e)     The Interest Period applicable to Loans drawn on the first Utilisation Date shall be one Month or such other period as the Agent and the Company may agree.

(f)     The Agent shall notify each relevant Party of the duration of each Interest Period promptly after ascertaining it.

**14.2    Non-Business Days**

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

**15.     CHANGES TO THE CALCULATION OF INTEREST**

**15.1    Absence of quotations**

Subject to the other provisions of this Clause, if IBOR is to be determined by reference to the Base Reference Banks but a Base Reference Bank does not supply a quotation by the Specified Time on the Quotation Day, the applicable IBOR shall be determined on the basis of the quotations of the remaining Base Reference Banks.

ING     00149

**15.2    Market disruption**

(a)    If a Market Disruption Event occurs in relation to a Loan for any Interest Period, then the rate of interest on each Lender's share of that Loan for the Interest Period shall be the percentage rate per annum which is the sum of:

   (i)    the Margin;

   (ii)    the rate notified to the Agent by that Lender as soon as practicable and in any event by close of business on the Quotation Day (or, if earlier, on the date falling two Business Days prior to the date on which interest is due to be paid in respect of that Interest Period), to be that which expresses as a percentage rate per annum the cost to that Lender of funding its participation in that Loan from whatever source it may reasonably select; and

   (iii)    the Mandatory Cost, if any, applicable to that Lender's participation in the Loan.

(b)    If:

   (i)    the percentage rate per annum notified by a Lender pursuant to paragraph (a)(i) above is less than IBOR; or

   (ii)    a Lender has not notified the Agent of a percentage rate per annum pursuant to paragraph (a)(i) above,

   the cost to that Lender of funding its participation in that Loan for that Interest Period shall be deemed, for the purposes of paragraph (a) above, to be IBOR.

(c)    If a Market Disruption Event occurs the Agent shall, as soon as is practicable, notify the Company and the other Lenders participating in the affected Loans.

(d)    In this Agreement:

   **Market Disruption Event** means:

   (i)    at or about noon on the Quotation Day for the relevant Interest Period, IBOR is to be determined by reference to the Base Reference Banks and none or only one of the Base Reference Banks supplies a rate to the Agent to determine IBOR for the relevant currency and Interest Period; or

   (ii)    before close of business in London on the Quotation Day for the relevant Interest Period, the Agent receives notifications from a Lender or Lenders (whose participations in a Loan exceed 35 per cent. of that Loan) that the cost to it of funding its participation in that Loan from whatever source it may reasonably select would be in excess of IBOR.

**15.3    Alternative basis of interest or funding**

(a)    If a Market Disruption Event occurs and the Agent or the Company so requires, the Agent and the Company shall enter into negotiations (for a period of not more than thirty days) with a view to agreeing a substitute basis for determining the rate of interest and/or funding the affected Loan.

(b)    Any alternative basis agreed pursuant to paragraph (a) above shall, with the prior consent of all the Lenders and the Company, be binding on all Parties.

ING    00150

**15.4    Break Costs**

(a)    Each Borrower shall, within three Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs if all or any part of a Utilisation, Ancillary Outstanding or Unpaid Sum is paid by that Borrower on a day other than the last day of an applicable Interest Period for that Loan, Ancillary Outstanding or Unpaid Sum.

(b)    Each Lender shall, as soon as reasonably practicable after a demand by the Agent, provide a certificate confirming the amount of its Break Costs it claims.

**16.    FEES**

**16.1    Commitment fee**

(a)    The Company shall pay to the Agent (for the account of each Lender) a fee in the Base Currency computed at the rate of:

    (i)    35 per cent. of the applicable Margin per annum on that Lender's Available Commitment under Facility A for the Availability Period applicable to Facility A; and

    (ii)    40 per cent. of the applicable Margin per annum on that Lender's Available Commitment under Facility B for the Availability Period applicable to Facility B.

(b)    The accrued commitment fee is payable on the last day of each successive period of three Months which ends during the relevant Availability Period, on the last day of the relevant Availability Period and on the cancelled amount of the relevant Lender's Commitment at the time the cancellation is effective.

(c)    No commitment fee is payable to the Agent (for the account of a Lender) on any Available Commitment of that Lender for any day on which that Lender is a Defaulting Lender.

**16.2    Participation and arrangement fee**

The Company shall pay to the Lenders a participation and arrangement fee in the amount and in the manner agreed in a Fee Letter.

**16.3    Agency fee**

The Company shall pay to the Agent (for its own account) an agency fee in the amount and in the manner agreed in a Fee Letter.

**16.4    Security Agent fee**

The Company shall pay to the Security Agent (for its own account) a security agent fee in the amount and in the manner agreed in a Fee Letter.

**16.5    Other Fees**

The Company shall pay to the Agent any other fees in the amount and in the manner agreed in a Fee Letter.

ING    00151

**16.6    Commission and fees on Ancillary Facilities**

The rate and time of payment of commission, fees and any other remuneration in respect of each Ancillary Facility shall be determined by agreement between the relevant Ancillary Lender and the Borrower of that Ancillary Facility based upon normal market rates and terms.

**17.    TAX GROSS UP AND INDEMNITIES**

**17.1    Tax gross-up**

(a)    For the purposes of this Clause 17 (Tax Gross Up and Indemnities):

**Qualifying Lender** means a Lender which is beneficially entitled to interest payable to that Lender in respect of an advance under a Finance Document and is:

In respect of each payment made by or on behalf of a Belgian Obligor:

(i)    a "professional investor" within the meaning of article 105,3° of the Royal Decree implementing the Belgian Income Tax Code;

(ii)    a "credit institution" as referred to in article 105, 1°, a) of the Belgian Royal Decree of implementation of the Income Tax Code that is a resident in Belgium for tax purposes or that is acting through a permanent establishment in Belgium;

(iii)    a credit institution within the meaning of article 107, §2, 5, a), second dash of the Royal Decree implementing the Belgian Income Tax Code, that is acting through its head office and is resident for tax purposes in a country with which Belgium has entered into a double taxation agreement that is in force (irrespective of whether or not the double taxation agreement makes provision for exemption from tax imposed by Belgium) or in a country which is a member state of the European Economic Area;

(iv)    a credit institution within the meaning of article 107, §2, 5, a), second dash of the Royal Decree implementing the Belgian Income Tax Code, that is acting through a Facility Office which (i) itself qualifies as a credit institution within the meaning of the aforementioned article 107, §2, 5, a) second dash and (ii) is located in a country with which Belgium has entered into a double taxation agreement that is in force (irrespective of whether or not the double taxation agreement makes provision for exemption from tax imposed by Belgium) or in a country which is a member state of the European Economic Area; or

(v)    entitled to that payment without a Tax Deduction imposed by Belgium pursuant to a double taxation agreement (subject to the completion of any necessary procedural formalities) (a **Treaty Lender**).

(b)    Each Obligor shall make all payments to be made by it under the Finance Documents without any Tax Deduction, unless a Tax Deduction is required by law.

(c)    The Company shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Agent accordingly. Similarly, a Lender shall notify the Agent on becoming so aware in respect of a payment payable to that Lender. If the Agent receives such notification from a Lender it shall notify the Company and that Obligor.

(d)    If a Tax Deduction is required by law to be made by an Obligor or the Agent, the amount of the payment due from that Obligor or the Agent shall be increased to an amount which (after making

ING    00152

any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(e)     An Obligor is not required to make an increased payment under paragraph (c) above by reason of a Tax Deduction on account of Tax imposed by Belgium, if on the date on which the payment falls due:

(i)     the payment could have been made to the relevant Lender without a Tax Deduction if the Lender had been a Qualifying Lender, but on that date that Lender is not or has ceased to be a Qualifying Lender other than as a result of any change after the date it became a Lender under this Agreement in (or in the interpretation, administration, or application of) any law or treaty or any published practice or published concession of any relevant taxing authority; or

(ii)    that Lender is a Treaty Lender and the Obligor making the payment is able to demonstrate that the Tax Deduction would not have been required if the Lender had complied with its obligations under paragraph (h) below.

(f)     If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(g)     Within thirty days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Agent for the Finance Party entitled to the payment an original receipt (or a certified copy thereof) issued by the relevant Tax authority or other evidence reasonably satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant Tax authority.

(h)     A Treaty Lender and each Obligor which makes a payment to which that Treaty Lender is entitled shall co-operate in completing any procedural formalities necessary for that Obligor to obtain authorisation to make that payment without a Tax Deduction.

## 17.2    Tax indemnity

(a)     The Company shall (within three Business Days of demand by the Agent) pay to a Finance Party an amount equal to the loss, liability or cost which that Finance Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Finance Party in respect of a payment received or receivable (or payment deemed to be received or receivable) under a Finance Document.

(b)     Paragraph (a) above shall not apply:

(i)     with respect to any Tax assessed on a Finance Party:

(A)     under the law of the jurisdiction in which that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident for Tax purposes; or

(B)     under the law of the jurisdiction in which that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

ING   00153

(ii) to the extent a loss, liability or cost:

      (A) is compensated for by an increased payment under Clause 13.4 (Minimum interest) or Clause 17.1 (Tax gross-up); or

      (B) relates to a FATCA Deduction required to be made by a Party.

(c) A Finance Party making, or intending to make a claim under paragraph (a) above shall promptly notify the Agent of the event which will give, or has given, rise to the claim, following which the Agent shall notify the Company.

(d) A Finance Party shall, on receiving a payment from an Obligor under this Clause 17.2, notify the Agent.

## 17.3 Tax Credit

If an Obligor makes a Tax Payment and the relevant Finance Party determines in its absolute discretion that:

(a) a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

(b) that Finance Party has obtained, utilised and retained that Tax Credit,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

## 17.4 Lender Status Confirmation

(a) Each Original Lender confirms on the date of this Agreement whether or not it is a Swiss Qualifying Bank by reference to the information set out against its name in Part 2 of Schedule 1 (The Original Parties).

(b) Each Lender which becomes a Party to this Agreement after the date of this Agreement shall indicate, in the Transfer Certificate, Assignment Agreement or Increase Confirmation which it executes on becoming a Party, whether or not it is a Swiss Qualifying Bank.

(c) If a Lender fails to indicate its status in accordance with paragraph (b) above, then such Lender shall be treated for the purposes of this Agreement (including by each Obligor) as if it is a Swiss Non-Qualifying Bank until such time as it notifies the Agent which category applies (and the Agent, on receipt of such notification, shall inform the Company). For the avoidance of doubt, a Transfer Certificate, Assignment Agreement or Increase Confirmation shall not be invalidated by any failure of a Lender to comply with paragraph (b) above.

## 17.5 Tax and Other Affairs

No provision of this Agreement shall interfere with the right of any Finance Party to arrange its tax or any other affairs in whatever manner it thinks fit, oblige any Finance Party to claim any credit, relief, remission or repayment in respect of any payment under Clause 17.1 (Tax gross-up) in priority to any other credit, relief, remission or repayment available to it nor oblige any Finance Party to disclose any information relating to its tax or other affairs or any computations in respect thereof.

ING   00154

**17.6     Stamp taxes**

The Company shall pay and, within three Business Days of demand, indemnify each Secured Party and Arranger against any cost, loss or liability that Secured Party or Arranger incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document.

**17.7     VAT**

(a)     All amounts expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is or becomes chargeable on any supply made by any Finance Party to any Party under a Finance Document and such Finance Party is required to account to the relevant tax authority for the VAT, that Party must pay to such Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and such Finance Party must promptly provide an appropriate VAT invoice to that Party).

(b)     If VAT is or becomes chargeable on any supply made by any Finance Party (the **Supplier**) to any other Finance Party (the **Recipient**) under a Finance Document, and any Party other than the Recipient (the **Relevant Party**) is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather than being required to reimburse or indemnify the Recipient in respect of that consideration):

(i)     (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT.  The Recipient must (where this paragraph (i) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

(ii)     (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

(c)     Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any cost or expense, that Party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

(d)     Any reference in this Clause 17.7 to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term "representative member" to have the same meaning as in the Value Added Tax Act 1994 or any other applicable statutory provisions or regulation under any relevant jurisdictions, including without limitation any other jurisdiction having implemented Council Directive 2006/112/EC on the common system of value added tax) or, where applicable, the Goods and Services Tax Act (Chapter 117A) of Singapore and its related regulations.

(e)     In relation to any supply made by a Finance Party to any Party under a Finance Document, if reasonably requested by such Finance Party, that Party must promptly provide such Finance Party

ING     00155

with details of that Party's VAT registration and such other information as is reasonably requested in connection with such Finance Party's VAT reporting requirements in relation to such supply.

**17.8    FATCA information**

(a)    Subject to paragraph (c) below, each Party must, within ten Business Days of a reasonable request by another Party:

    (i)    confirm to that other Party whether it is:

        (A)    a FATCA Exempt Party; or

        (B)    not a FATCA Exempt Party; and

    (ii)    supply to that other Party such forms, documentation and other information relating to its status under FATCA (including its applicable "passthru payment percentage" or other information required under relevant US Treasury regulations or other official guidance including intergovernmental agreements) as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA.

(b)    If a Party confirms to another Party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not, or has ceased to be a FATCA Exempt Party, that Party must notify that other Party reasonably promptly.

(c)    A Finance Party is not obliged to do anything under paragraph (a) above which would or might in its reasonable opinion constitute a breach of:

    (i)    any law or regulation;

    (ii)    any fiduciary duty; or

    (iii)    any duty of confidentiality.

(d)    If a Party fails to confirm its status or to supply forms, documentation or other information requested in accordance with paragraph (a) above (including, for the avoidance of doubt, where paragraph (c) above applies), then:

    (i)    if that Party failed to confirm whether it is (or remains) a FATCA Exempt Party then such Party is to be treated for the purposes of the Finance Documents (and payments made under them) as if it is not a FATCA Exempt Party; and

    (ii)    if that Party failed to confirm its applicable "passthru payment percentage" then such Party is to be treated for the purposes of the Finance Documents (and payments made under them) as if its applicable passthru percentage is 100%,

until (in each case) such time as the Party in question provides the requested confirmation, forms, documentation or other information.

(e)    If a Borrower is a US Tax Obligor or the Agent reasonably believes that its obligations under FATCA require it to give a Borrower information about the Lenders' status under FATCA, each Lender must, within ten Business Days of:

    (i)    where a Borrower is a US Tax Obligor and the relevant Lender is an Original Lender, the date of this Agreement;

ING    00156

(ii)     where a Borrower is a US Tax Obligor and the relevant Lender is a New Lender, the relevant Transfer Date;

(iii)    the date a new US Tax Obligor accedes as a Borrower; or

(iv)    where a Borrower is not a US Tax Obligor, the date of a request from the Agent,

provide to the Agent:

(A)     a withholding certificate on Form W-8, Form W-9 or any other relevant form; or

(B)     any withholding statement or other document, authorisation or waiver the Agent may require to certify or establish the Lender's status under FATCA.

(f)      The Agent must promptly provide any withholding certificate, withholding statement, document, authorisation or waiver it receives from a Lender pursuant to paragraph (e) above to the relevant Borrower.

(g)      If any withholding certificate, withholding statement, document, authorisation or waiver a Lender provides to the Agent pursuant to paragraph (e) above is or becomes materially inaccurate or incomplete, the Lender must promptly update it unless it is unlawful for the Lender to do so (in which case, the Lender must promptly notify the Agent in writing).  The Agent must promptly provide any updated withholding certificate, withholding statement, document, authorisation or waiver to the relevant Borrower.

(h)      The Agent may rely on any withholding certificate, withholding statement, document, authorisation or waiver it receives from a Lender pursuant to paragraph (e) or (g) above without further verification.  The Agent is not liable for any action it takes under or in connection with paragraph (e), (f) or (g) above.

## 17.9    FATCA Deduction

(a)      Each Party may make any FATCA Deduction it is required by FATCA to make, and any payment required in connection with that FATCA Deduction, and no Party is required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

(b)      Each Party must, promptly upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such a FATCA Deduction) notify the Party to whom it is making the payment and, in addition, must notify the Company, the Agent and the other Finance Parties.

## 17.10   Material modifications

(a)      Without prejudice to the rights of any FATCA Protected Lender and any other term of this Agreement, if any Party (a **Concerned Party**) reasonably believes that:

(i)      any amendment or waiver to any term of this any Finance Document; or

(ii)     the exercise of any provision of any Finance Document,

ING    00157

may constitute a "material modification" for the purposes of FATCA that may result (directly or indirectly) in a Party being required to make a FATCA Deduction (a **Material Modification**) and the Agent, a Lender or the Company (as the case may be) notifies the other Parties in accordance with the terms of this Agreement accordingly, then that Material Modification may not be made unless:

(A)     the Parties enter into good faith negotiations (for not longer than 30 days) with a view to agreeing the Material Modification (and any amendments to the Finance Documents appropriate, desirable or required to take account of FATCA at that time and for the purpose of the Material Modification); and

(B)     the Concerned Party consents to that Material Modification and any other amendments agreed under paragraph (i) above.

## 17.11    US Tax Matters

Notwithstanding any other provisions of this Clause 17, an Obligor shall not be required to make a gross-up payment under Clause 17.1 (Tax gross-up) or an indemnity payment under Clause 17.2 (Tax indemnity) with respect to amounts owed by a US Tax Obligor to the extent that such payment was required as a result of the failure by a Lender to provide for delivery to the relevant US Tax Obligor any of the following US tax forms or certifications:

(a)     Prior to the first payment to be made by a US Tax Obligor pursuant to this Agreement after a Lender becomes a Party, two originals of the appropriate US tax forms or certifications certifying its entitlement to a complete exemption from US withholding tax on payments to be made under this Agreement, and, if the basis for such Lender's exemption is the "portfolio interest exemption" of Section 871 or 881 of the Code, certification that it is not a (1) a bank within the meaning of Section 881(c)(3)(A) of the Code, (2) ten per cent. shareholder of the US Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (3) it is not a controlled foreign corporation related to the US Borrower as described in Section 881(c)(3)(C) of the Code (the forms and certifications being referred to as **Withholding Tax Forms** without regards to the exemption or reduction in withholding they may certify);

(b)     Notwithstanding paragraph (a) above, if as a result of a change in law after a Lender became a Party to this Agreement, such Lender has become entitled to a gross-up payment under Clause 17.1 (Tax gross-up) or an indemnity payment under Clause 17.2 (Tax indemnity) with respect to amounts owed by a US Tax Obligor and such Lender transfers or assigns any of its rights or obligations under the Finance Documents or changes its applicable lending office, Withholding Tax Forms certifying that, based on the law at the time of the transfer, assignment or change, such transferee, assignee or Lender would not be subject to any greater amount of Tax covered by either Clause 17.1 (Tax gross-up) or Clause 17.2 (Tax indemnity) than would have been due in the absence of such transfer, assignment or change; and

(c)     If any previously delivered Withholding Tax Form expires, becomes inaccurate or becomes obsolete, at the relevant US Tax Obligor's request (or, in the case of inaccuracy, upon becoming aware of a change in circumstance that has rendered or will render the previous Withholding Tax Form inaccurate in any material respect), replacement or successor Withholding Tax Forms or certifying that it remains entitled to a complete exemption from US withholding tax on payments to be made under this Agreement; provided that, if as a result of a change in law after the prior Withholding Tax Forms were provided such Lender is unable to provide such subsequent Withholding Tax Forms, such Lender satisfy its obligation pursuant to this paragraph (c) by providing Withholding Tax Forms certifying its

ING    00158

entitlement to any exemption from or reduction in US withholding tax on such payments that it remains legally able to provide,

provided that for purposes of this Clause 17.11, the term "US Withholding tax" shall not include any tax imposed as a result of FATCA.

## 18.   INCREASED COSTS

### 18.1   Increased costs

Subject to Clause 18.3 (Exceptions) the Company shall, within three Business Days of a demand by the Agent, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates as a result of:

(a)   the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation;

(b)   compliance with any law or regulation made after the date of this Agreement; or

(c)   any Basel III Costs.

### 18.2   Increased cost claims

(a)   A Finance Party intending to make a claim pursuant to Clause 18.1 (Increased costs) shall notify the Agent of the event giving rise to the claim, following which the Agent shall promptly notify the Company.

(b)   Each Finance Party shall, as soon as practicable after a demand by the Agent, provide a certificate confirming the amount of its Increased Costs.

### 18.3   Exceptions

(a)   Clause 18.1 (Increased costs) does not apply to the extent any Increased Cost is:

(i)   attributable to a Tax Deduction required by law to be made by an Obligor;

(ii)   attributable to a FATCA Deduction required to be made by a Party;

(iii)   compensated for by Clause 17.2 (Tax indemnity) (or would have been compensated for under Clause 17.2 (Tax indemnity) but was not so compensated solely because any of the exclusions in paragraph (b) of Clause 17.2 (Tax indemnity) or Clause 17.11 (US Tax Matters) applied);

(iv)   compensated for by the payment of the Mandatory Cost; or

(v)   attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation; or

(vi)   attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement (but excluding any amendment arising out of Basel III) (**Basel II**) or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates).

ING   00159

(b)     In this Clause 18.3 reference to a **Tax Deduction** has the same meaning given to the term in Clause 1.1 (Definitions).

## 19.     OTHER INDEMNITIES

### 19.1    Currency indemnity

(a)     If any sum due from an Obligor under the Finance Documents (a **Sum**), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the **First Currency**) in which that Sum is received into another currency in which the amount is expressed to be payable under the relevant Finance Document (the **Second Currency**) for the purpose of:

  (i)     a Finance Party receiving an amount in respect of that Obligor's liability under the Finance Documents;

  (ii)    making or filing a claim or proof against that Obligor; or

  (iii)   obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within three Business Days of demand, indemnify the Arrangers and each other Secured Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b)     Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

### 19.2    Other indemnities

(a)     The Company shall (or shall procure that an Obligor will), within three Business Days of demand, indemnify the Arrangers and each other Secured Party against any cost, loss or liability incurred by it as a result of:

  (i)     the occurrence of any Event of Default;

  (ii)    a failure by an Obligor to pay any amount due under a Finance Document on its due date, including without limitation, any cost, loss or liability arising as a result of Clause 34 (Sharing among the Finance Parties);

  (iii)   funding, or making arrangements to fund, its participation in a Utilisation requested by a Borrower in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone); or

  (iv)    a Utilisation (or part of a Utilisation) not being prepaid in accordance with the Finance Documents.

(b)     The Company's liability in each case includes any loss or expense on account of funds borrowed, contracted for or utilised to fund any Loan or any other amount payable under any Finance Document.

ING     00160

**19.3    Indemnity to the Agent**

The Company shall promptly indemnify the Agent against:

(a)    any cost, loss or liability incurred by the Agent (acting reasonably) as a result of:

   (i)    investigating any event which it reasonably believes is a Default;

   (ii)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised; or

   (iii)    instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; and

(b)    any cost, loss or liability including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Agent (otherwise than by reason of the Agent's gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to Clause 35.11 (Disruption to Payment Systems etc) notwithstanding the Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Agent) in acting as Agent under the Finance Documents.

**19.4    Indemnity to the Security Agent**

(a)    Each Obligor jointly and severally shall promptly indemnify the Security Agent and every Receiver and Delegate against any cost, loss or liability incurred by any of them as a result of:

   (i)    any failure by the Company to comply with its obligations under Clause 21 (Costs and Expenses);

   (ii)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

   (iii)    the taking, holding, protection or enforcement of the Transaction Security;

   (iv)    the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Security Agent and each Receiver and Delegate by the Finance Documents or by law;

   (v)    any default by any Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents; or

   (vi)    acting as Security Agent, Receiver or Delegate under the Finance Documents or which otherwise relates to any of the Charged Property (otherwise, in each case, than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct).

(b)    The Security Agent and every Receiver and Delegate may, in priority to any payment to the Secured Parties, indemnify itself out of the Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this Clause 19.4 and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all moneys payable to it.

ING    00161

## 20.    MITIGATION BY THE LENDERS

### 20.1    Mitigation

(a)    Each Finance Party shall, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 11.1 (Illegality), Clause 13.4 (Minimum interest), Clause 17 (Tax Gross Up and Indemnities) or Clause 18.1 (Increased costs) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate or Facility Office.

(b)    Paragraph (a) above does not in any way limit the obligations of any Obligor under the Finance Documents.

### 20.2    Limitation of liability

(a)    The Company shall promptly indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 20.1 (Mitigation).

(b)    A Finance Party is not obliged to take any steps under Clause 20.1 (Mitigation) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

## 21.    COSTS AND EXPENSES

### 21.1    Transaction expenses

The Company shall, promptly on demand, pay to each Administrative Party, the Security Agent, and each Lender the amount of all costs and expenses (including legal fees) reasonably incurred by any of them (and, in the case of the Security Agent, by any Receiver or Delegate) in connection with the negotiation, preparation, printing, execution, syndication and perfection of:

(a)    this Agreement and any other documents referred to in this Agreement and the Transaction Security; and

(b)    any other Finance Documents executed after the date of this Agreement.

### 21.2    Amendment costs

If:

(a)    an Obligor requests an amendment, waiver or consent; or

(b)    an amendment is required pursuant to Clause 35.10 (Change of currency),

the Company shall, promptly on demand, reimburse each of the Agent and the Security Agent for the amount of all costs and expenses (including legal fees) reasonably incurred by the Agent and the Security Agent (and, in the case of the Security Agent, by any Receiver or Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

### 21.3    Security Agent's management time and additional remuneration

(a)    Any amount payable to the Security Agent under Clause 19.4 (Indemnity to the Security Agent) and this Clause 21 shall include the cost of utilising the Security Agent's management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as the Security

ING    00162

Agent may notify to the Company and the Lenders, and is in addition to any other fee paid or payable to the Security Agent.

(b)     Without prejudice to paragraph (a) above, in the event of:

(i)      a Default;

(ii)     the Security Agent being requested by an Obligor or the Majority Lenders to undertake duties which the Security Agent and the Company agree to be of an exceptional nature or outside the scope of the normal duties of the Security Agent under the Finance Documents; or

(iii)    the Security Agent and the Company agreeing that it is otherwise appropriate in the circumstances,

the Company shall pay to the Security Agent any additional remuneration that may be agreed between them or determined pursuant to paragraph (c) below.

(c)     If the Security Agent and the Company fail to agree upon the nature of the duties, or upon the additional remuneration referred to in paragraph (b) above or whether additional remuneration is appropriate in the circumstances, any dispute shall be determined by an investment bank (acting as an expert and not as an arbitrator) selected by the Security Agent and approved by the Company or, failing approval, nominated (on the application of the Security Agent) by the President for the time being of the Law Society of England and Wales (the costs of the nomination and of the investment bank being payable by the Company) and the determination of any investment bank shall be final and binding upon the Parties.

### 21.4    Enforcement and preservation costs

The Company shall, promptly on demand, pay to each Secured Party the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of or the preservation of any rights under any Finance Document and the Transaction Security and any proceedings instituted by or against the Security Agent as a consequence of taking or holding the Transaction Security or enforcing these rights.

## 22.     GUARANTEE AND INDEMNITY

### 22.1    Guarantee and indemnity

Each Guarantor irrevocably and unconditionally jointly and severally:

(a)     guarantees to each Finance Party punctual performance by each other Obligor of all that Obligor's obligations under the Finance Documents;

(b)     undertakes with each Finance Party that whenever another Obligor does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall immediately on demand pay that amount as if it were the principal obligor in respect of that amount; and

(c)     agrees with each Finance Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any cost, loss or liability it incurs as a result of an Obligor not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Finance

ING    00163

Document on the date when it would have been due.  The amount payable by a Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 22 if the amount claimed had been recoverable on the basis of a guarantee.

## 22.2   Continuing Guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

## 22.3   Reinstatement

If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by a Finance Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration, judicial management or otherwise, without limitation, then the liability of each Guarantor under this Clause 22 will continue or be reinstated as if the discharge, release or arrangement had not occurred.

## 22.4   Waiver of defences

The obligations of each Guarantor under this Clause 22 will not be affected by an act, omission, matter or thing which, but for this Clause 22, would reduce, release or prejudice any of its obligations under this Clause 22 including (without limitation and whether or not known to it or any Finance Party):

(a)     any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b)     the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c)     the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)     any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e)     any amendment, novation, supplement, extension restatement (however fundamental and whether or not more onerous) or replacement of a Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f)     any unenforceability, illegality, invalidity or non-provability of any obligation of any person under any Finance Document or any other document or security; or

(g)     any insolvency or similar proceedings.

## 22.5   Guarantor Intent

Without prejudice to the generality of Clause 22.4 (Waiver of defences), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however

ING     00164

fundamental) variation, increase, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents for the purposes of or in connection with any of the following:

(a)     business acquisitions of any nature;

(b)     increasing working capital;

(c)     enabling investor distributions to be made;

(d)     carrying out restructurings;

(e)     refinancing existing facilities;

(f)     refinancing any other indebtedness;

(g)     making facilities available to new borrowers;

(h)     any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and

(i)     any fees, costs and/or expenses associated with any of the foregoing.

**22.6    Immediate recourse**

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause 22.   This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

**22.7    Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

(a)     refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce them in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of such moneys, security or rights; and

(b)     hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause 22.

**22.8    Deferral of Guarantors' rights**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Agent otherwise directs, no Guarantor will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 22:

(a)     to be indemnified by an Obligor;

ING    00165

(b)     to claim any contribution from any other guarantor of any Obligor's obligations under the Finance Documents;

(c)     to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party;

(d)     to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which any Guarantor has given a guarantee, undertaking or indemnity under Clause 22.1 (Guarantee and indemnity);

(e)     to exercise any right of set-off against any Obligor; or

(f)     to claim or prove as a creditor of any Obligor in competition with any Finance Party.

If a Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Finance Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for the Finance Parties and shall promptly pay or transfer the same to the Agent or as the Agent may direct for application in accordance with Clause 35 (Payment Mechanics).

## 22.9    Release of Guarantors' right of contribution

If any Guarantor (a **Retiring Guarantor**) ceases to be a Guarantor in accordance with the terms of the Finance Documents for the purpose of any sale or other disposal of that Retiring Guarantor then on the date such Retiring Guarantor ceases to be a Guarantor:

(a)     that Retiring Guarantor is released by each other Guarantor from any liability (whether past, present or future and whether actual or contingent) to make a contribution to any other Guarantor arising by reason of the performance by any other Guarantor of its obligations under the Finance Documents; and

(b)     each other Guarantor waives any rights it may have by reason of the performance of its obligations under the Finance Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under any Finance Document or of any other security taken pursuant to, or in connection with, any Finance Document where such rights or security are granted by or in relation to the assets of the Retiring Guarantor.

## 22.10   Additional security

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Finance Party.

## 22.11   Limitation in respect of Belgian Obligors

The aggregate amount payable by any Belgian Obligor under this Clause 22 shall in all circumstances be limited to an amount equal to the greater of:

(a)     90% of its own funds (*eigen vermogen / capitaux propres*) calculated on the basis of the latest available audited annual financial statements at the date of this Agreement;

ING     00166

(b)     90% of its own funds (*eigen vermogen / capitaux propres*) calculated on the basis of the latest available audited annual financial statements at the date on which a demand is made on it under this Clause 22; and

(c)     the highest level of borrowing or on-lending to it and its Subsidiaries by any Borrower out of the proceeds of the Facilities which is outstanding between the date of this Agreement and the date on which the relevant demand under its guarantee is made.

## 22.12    Danish Guarantor Limitations

(a)     Notwithstanding anything set out to the contrary in this Agreement or any other Finance Document, the obligations of each Guarantor which is incorporated in Denmark (each a **Danish Guarantor**) under this Agreement or any other Finance Document to which it is a party:

  (i)     shall be limited if and to the extent required to comply with Danish statutory provisions including, without limitation, (i) Section 206(1) (as modified by Section 206(2)) of the Danish Companies Act and (ii) Section 210(1) (as modified by Section 210(2) and Sections 211 and 212 of the Danish Companies Act), and, accordingly, shall not include, and shall not be or be construed as, any indemnity, guarantee or security in respect of:

    (A)     any obligations incurred or undertaken in relation to the financing of a direct acquisition of shares issued or to become issued by such Danish Guarantor or by a direct or indirect Qualifying Parent Company of such Danish Guarantor (**Acquisition Debt**); nor

    (B)     any obligations other than Acquisition Debt of a Non Qualifying Shareholder.

  (ii)     shall, in relation to a Danish Guarantor other than the Company, further be limited to the amount equivalent to the higher of:

    (A)     the Equity on the date of this Agreement; and

    (B)     the Equity at the time or times that payment is requested from it, save that these limitations shall not apply to any obligations and liabilities of a Danish Guarantor in respect of amounts relating to the Facility and placed at the disposal of the Danish Guarantor by a Borrower by way of a loan or otherwise (other than as share capital).

(b)     For the purpose of this Clause:

**Equity** means the equity (*egenkapital*) of such Danish Guarantor calculated in accordance with the Accounting Principles;

**Qualifying Parent Company** means a parent company which is incorporated under the laws of any country covered by Executive Order No. 275 of 25 March 2010 on loans etc to foreign parent companies, as amended and supplemented from time to time; and

**Non Qualifying Shareholder** means any shareholder or parent company other than a Qualifying Parent Company.

## 22.13    Limitations in respect of German Obligors

(a)     Each of the Finance Parties agrees not to enforce the guarantee granted under this Agreement (the **Guarantee**) against any Guarantor incorporated in Germany as a limited liability company (*Gesellschaft mit beschränkter Haftung*) (a **German Guarantor**) if and to the extent the Guarantee

ING    00167

secures obligations of a shareholder of the German Guarantor and/or any affiliated company ((*verbundenes Unternehmen*) within the meaning of § 15 of the German Stock Corporation Act (*Aktiengesetz*)) of such shareholder other than any direct or indirect Subsidiary of the German Guarantor, and the enforcement of the Guarantee would cause:

(i)     the German Guarantor's assets (the calculation of which shall take into account the captions reflected in § 266 (2) A, B, C, D and E of the German Commercial Code (*Handelsgesetzbuch*) less the German Guarantor's liabilities (the calculation of which shall take into account the captions reflected in § 266 (3) B, C, D and E of the German Commercial Code (*Handelsgesetzbuch*)) (the **Net Assets**) to be less than the registered share capital (*Stammkapital*) of the German Guarantor (*Begründung einer Unterbilanz*); or

(ii)    an increase of a shortfall, if the Net Assets of the German Guarantor already fall short of the amount of the registered share capital (*Vertiefung einer Unterbilanz*).

(b)     For the purposes of the calculation of the Net Assets in paragraph (a) above the following items shall be adjusted as follows:

(i)     the amount of an increase in the registered share capital of the German Guarantor:

(A)     that has been effected without the prior written consent of the Agent after the date of this Agreement; or

(B)     any amount of an increase in the registered share capital that has not been fully paid up.

shall be deducted from the registered share capital;

(ii)    any loans and other contractual liabilities incurred in violation of a Finance Document shall be disregarded; and

(iii)   any loans provided to the German Guarantor by any member of the Group as far as such loans are contractually subordinated or subordinated under Section 39 (1) no 5 or (2) of the German Insolvency Code (*Insolvenzordnung*) shall be disregarded.

(c)     In addition, any German Guarantor shall realise, to the extent legally permitted, in a situation where after enforcement of the Guarantee the German Guarantor would not have Net Assets in excess of its registered share capital, any and all of its assets that are shown in the balance sheet with a book value (*Buchwert*) that is significantly lower than the market value of the asset if such asset is not necessary for the relevant German Guarantor's business (*betriebsnotwendig*).

(d)     The limitations set out in this Subclause shall not apply to a Guarantee granted by a German Guarantor in relation to any amounts borrowed under this Agreement that are on-lent to it or any of its Subsidiaries from time to time and have not been repaid. The Company will, promptly upon request of the Agent, provide the Agent with a list setting out amounts on-lent within the Group.

(e)     For the avoidance of doubt, nothing in this Agreement shall be interpreted as a restriction or limitation of the enforcement of:

(i)     the obligations owed under the Finance Documents by a German Guarantor in its capacity as a Borrower; or

(ii)    the Guarantee if and to the extent the Guarantee secures obligations of a German Guarantor's Subsidiaries.

ING   00168

(f) For the purpose of the calculation of the Net Assets and thus the enforceable amount, the relevant German Guarantor must deliver to the Agent within thirty (30) Business Days after receipt of a notice by the Agent of its intention to enforce the Guarantee (the **Notice**) an up-to-date balance sheet drawn-up by the Auditors (the **Balance Sheet**) together with a determination of the Net Assets drawn-up by the Auditors (the **Auditors' Determination**) and a list of amounts that are on-lent within the Group. The Balance Sheet and the Auditor's Determination must be prepared in accordance with accounting principles under the German Commercial Code (*Handelsgesetzbuch*) and be based on the same principles that were applied when establishing the relevant German Guarantor's balance sheet for its previous financial year. The Auditors' Determination must be up-to-date and in any event as of a date no earlier than 15 Business Days prior to the date of the Notice.

Should the relevant German Guarantor fail to deliver the Balance Sheet and/or the Auditor's Determination and/or the list of amounts that are on-lent within the Group within the period referred to above or if the relevant German Guarantor has generally ceased to make payments or upon filing of an application for insolvency proceedings by the relevant German Guarantor, the Finance Parties are entitled to enforce the Guarantee without the enforcement limitations provided for under this Subclause.

(g) The limitations set forth in this Subclause shall not apply if and so long as a domination agreement (*Beherrschungsvertrag*) and/or a profit and loss transfer agreement (*Gewinn- und Verlustabführungsvertrag*) (either directly or through a chain of domination and/or profit and loss transfer agreements) is or becomes effective between the relevant German Guarantor as dominated entity and the relevant Borrower (or a joint parent company of the relevant German Guarantor and such Borrower) as dominating entity. This paragraph (g) does not apply if the German Guarantor demonstrates (*nachweisen*) that the compensation claim (*Verlustausgleichsanspruch*) of the German Guarantor is not fully valuable (*voll werthaltig*).

(h) The provision of this Subclause shall apply mutatis mutandis to a Guarantor established in Germany as a limited liability partnership (*Kommanditgesellschaft*) with a limited liability company as sole general partner (*Komplementär*), and in such circumstance any reference in this Subclause to the German Guarantor shall be construed as a reference to the general partner of the relevant Guarantor.

## 22.14 Swiss Limitations

(a) If and to the extent that a Swiss Obligor becomes liable under the Finance Documents for obligations of its Affiliates other than its Subsidiaries and if complying with such obligations would be restricted under then applicable Swiss corporate law (the **Restricted Obligations**), the aggregate liability of the Swiss Obligor for Restricted Obligations shall be limited to the amount of unrestricted equity capital surplus (including the unrestricted portion of general and statutory reserves, other free reserves, retained earnings and, to the extent permitted by then applicable law, current net profits) available for distribution as dividends to the shareholders of the Swiss Obligor (the **Maximum Amount**), provided that this is a requirement under then applicable mandatory Swiss law and understood that such limitation shall not free the Swiss Obligor from its obligations in excess of the Maximum Amount, but that it shall merely postpone the performance date of those obligations until such time or times as performance is again permitted.

If and to the extent that a Swiss Obligor becomes liable under the Finance Documents for obligations of Subsidiaries which are not fully owned by such Swiss Obligor, the above mentioned restrictions shall, if required under then applicable mandatory Swiss law, apply accordingly to the pro rata share of the aggregate liability corresponding to the minority shareholding/s of any other shareholder/s in any such Subsidiary/ies.

ING    00169

(b)     Immediately after having been requested to perform the Restricted Obligations under the Finance Documents, the Swiss Obligor shall:

    (i)     perform any obligations which are not affected by the above limitations, and

    (ii)     in respect of any balance, if and to the extent requested by the Agent or required under then applicable Swiss law, provide the Agent with an interim balance sheet audited by the statutory auditors of the Swiss Obligor setting out the Maximum Amount, take any further corporate and other action as may be required by the Agent (including but not limited to obtaining board and shareholders' approvals and the receipt of any confirmations from the Swiss Obligor's statutory auditors) and other measures required to allow the Swiss Obligor to make the payments agreed hereunder with a minimum of limitations and, immediately thereafter, pay up to the Maximum Amount to the Agent.

(c)     In relation to payments made hereunder in satisfaction of Restricted Obligations, the Swiss Obligor shall:

    (i)     if and to the extent required by applicable law and subject to any applicable double tax treaties in force at the relevant time:

        (A)     deduct Swiss Withholding Tax at the rate of 35 per cent. (or such other rate as is in force at that time) from any such payment;

        (B)     pay any such deduction to the Swiss Federal Tax Administration; and

        (C)     notify and provide evidence to the Agent that the Swiss Withholding Tax has been paid to the Swiss Federal Tax Administration;

    (ii)     as soon as possible after a deduction for Swiss Withholding Tax is made as required by applicable law:

        (A)     ensure that any person which is entitled to a full or partial refund of the Swiss Withholding Tax, is in a position to be so refunded; and

        (B)     in case it has received any refund of the Swiss Withholding Tax, pay such refund to the Agent promptly upon receipt thereof.

(d)     For the avoidance of doubt, where a deduction for Swiss Withholding Tax is required pursuant to paragraph (c) above, the obligations of the Obligors under Clause 13.4 (Minimum interest), Clause 17.1 (Tax gross-up) and Clause 17.2 (Tax indemnity) of this Agreement shall remain applicable, save to the extent and for as long as that would cause the Maximum Amount to be exceeded.

(e)     If the enforcement of Restricted Obligations would be limited due to the effects referred to in this Clause 22.14, then the Swiss Obligor shall:

    (i)     to the extent permitted by applicable law, revalue and/or realize any of its assets that are shown on its balance sheet with a book value that is significantly lower than the market value of such assets, and

    (ii)     reduce its share capital to the minimum allowed under then applicable law.

ING     00170

**22.15    UAE limitations**

To the extent possible under UAE Law, the Parties agree that the provisions of Article 1092 of the UAE Civil Code, to the extent that a court would hold this article to be applicable to this guarantee, shall not apply in respect of the guarantee provided under this Agreement.

**22.16    US Terms**

Terms used in this Subclause are to be construed in accordance with the fraudulent transfer laws (as defined in Clause 1.17 (US terms).

(a)    Each US Guarantor acknowledges that:

(i)    it will receive valuable direct or indirect benefits as a result of the transactions financed by the Finance Documents;

(ii)    those benefits will constitute reasonably equivalent value and fair consideration for the purpose of any fraudulent transfer law; and

(iii)    each Finance Party has acted in good faith in connection with the guarantee given by that US Guarantor and the transactions contemplated by the Finance Documents.

(b)    Each Finance Party agrees that each US Guarantor's liability under this Clause 22 (Guarantee and Indemnity) is limited so that no obligation of, or transfer by, any US Guarantor under this Clause 22 (Guarantee and Indemnity) is subject to avoidance and turnover under any fraudulent transfer law.

(c)    Any term or provision of this Clause 22 or any other term in this Agreement or any Finance Document notwithstanding:

(i)    no member of the Group will have any obligation or liability, directly or indirectly, as guarantor or otherwise under this Agreement or any Finance Document with respect to any obligation or liability arising under any Finance Document of any US Borrower (the **US Obligations**); and

(ii)    not more than 65% of the stock or other equity interests (measured by the total combined voting power of the issued and outstanding voting stock or other equity interests) of, and none of the assets or property of, any member of the Group may be pledged directly or indirectly as security for any US Obligations,

in each case to the extent such obligation, liability or pledge would cause or result in any "deemed dividend" to any US Obligor pursuant to Section 956 of the Code; provided that this Clause shall not limit or reduce any obligation or liability of any Borrower.

(d)    Any term or provision of this Clause 22 or any other term in this Agreement or any Finance Document notwithstanding, no member of the Group shall guarantee or pledge any of its assets as security for the obligations of a US Borrower if:

(i)    such member of the Group is a "related person" (as defined in Section 267(b) or Section 707(b) of the Code) to such US Borrower;

(ii)    such member of the Group is not a "United States person" (as defined in Section 7701(a)(30) of the Code); and

ING    00171

(iii)    such US Borrower does not own a "controlling interest" (as defined in Section 163(j) of the Code) in such member of the Group,

to the extent such guarantee or pledge would cause such US Borrower to be disallowed, for US federal or state income tax purposes, a deduction (or any portion thereof) for interest expense paid that could otherwise have been utilized.

(e)    Each US Guarantor represents and warrants to each Finance Party that:

(i)    the aggregate amount of its debts (including its obligations under the Finance Documents) is less than the aggregate value (being the lesser of fair valuation and present fair saleable value) of its assets;

(ii)    its capital is not unreasonably small to carry on its business as it is being conducted;

(iii)    it has not incurred and does not intend to incur debts beyond its ability to pay as they mature; and

(iv)    it has not made a transfer or incurred any obligation under any Finance Document with the intent to hinder, delay or defraud any of its present or future creditors.

(f)    Each representation and warranty in this Subclause:

(i)    is made by each US Guarantor on the date of this Agreement;

(ii)    is deemed to be repeated by:

(A)    each Additional Guarantor on the date that Additional Guarantor becomes a US Guarantor; and

(B)    each US Guarantor on the date of each Utilisation Request, on each Utilisation Date, and on the first day of each Interest Period; and

(iii)    is, when repeated, applied to the circumstances existing at the time of repetition.

## 22.17    General Limitations

(a)    This guarantee does not apply to any liability of any Guarantor to the extent that it would result in this guarantee constituting unlawful financial assistance (as defined in this Agreement or under any applicable law).

(b)    With respect to any Additional Guarantor, its obligations under this Clause are also subject to any additional limitations set out in the Accession Deed applicable to such Additional Guarantor.

## 23.    REPRESENTATIONS

### 23.1    General

Each Obligor makes the representations and warranties set out in this Clause 23 to each Finance Party.

ING    00172

**23.2    Status**

(a)     It is a limited liability corporation (but in the case of O.W. Bunker Panama S.A., a corporation (*sociedad anónima*) and in the case of O.W. Bunker Malta Limited, a company), duly incorporated and validly existing under the law of its Original Jurisdiction.

(b)     It has the power to own its assets and carry on its business as it is being conducted.

**23.3    Binding obligations**

(a)     The obligations expressed to be assumed by it in each Finance Document to which it is a party are, subject to the Legal Reservations, legal, valid, binding and enforceable obligations; and

(b)     (Without limiting the generality of paragraph (a) above), subject to the Legal Reservations, each Transaction Security Document to which it is a party creates the security interests which that Transaction Security Document purports to create and those security interests are valid and effective.

**23.4    Non-conflict with other obligations**

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents and the granting of the Transaction Security do not and will not conflict with:

(a)     any law or regulation applicable to it;

(b)     the constitutional documents of any member of the Group; or

(c)     any agreement or instrument binding upon it or any member of the Group or any of its or any member of the Group's assets or constitute a default or termination event (however described) under any such agreement or instrument in each case to an extent which has, or would reasonably be expected to have, a Material Adverse Effect.

**23.5    Power and authority**

(a)     It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

(b)     No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Finance Documents to which it is a party.

**23.6    Validity and admissibility in evidence**

(a)     All Authorisations required or desirable:

(i)     to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party; and

(ii)    to make the Finance Documents to which it is a party admissible in evidence in its Relevant Jurisdictions (other than the requirement to translate any such Finance Document into Arabic),

have been obtained or effected and are in full force and effect except:

(A)     any Authorisation referred to in Part 3 of Schedule 2 (Conditions Subsequent); and

ING    00173

(B)     any Authorisation referred to in Clause 23.9 (No filing or stamp taxes),

which Authorisations will be promptly obtained or effected after the date of this Agreement.

(b)     All Authorisations necessary for the conduct of the business, trade and ordinary activities of members of the Group have been obtained or effected and are in full force and effect if failure to obtain or effect those Authorisations has or is reasonably likely to have a Material Adverse Effect.

## 23.7     Governing law and enforcement

Subject to the Legal Reservations set out in the legal opinions relating to UAE law provided pursuant to paragraphs 4(b)(xi) and 4(c)(iii), and the legal opinions relating to Danish law provided pursuant to paragraph 4(b)(ii) of Part 2 of Schedule 2 (Conditions):

(a)     the choice of governing law of the Finance Documents will be recognised and enforced in its Relevant Jurisdictions; and

(b)     any judgment obtained in relation to a Finance Document in the jurisdiction of the governing law of that Finance Document will be recognised and enforced in its Relevant Jurisdictions, subject to the then applicable judicial process requirements of such Relevant Jurisdiction.

## 23.8     Insolvency

No:

(a)     circumstance described in Clause 27.6 (Insolvency);

(b)     step described in Clause 27.7 (US Bankruptcy Laws); or

(c)     creditors' process described in Clause 27.9 (Creditors' process),

in each case subject to the qualifications in those Clauses, has been taken or, to the knowledge of the Company, threatened in relation to a member of the Group (excluding any Non-Material Subsidiary).

## 23.9     No filing or stamp taxes

Under the laws of its Relevant Jurisdictions it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents except:

(a)     stamp duty of € 0.15 that is payable for each original copy of this Agreement if signed or registered in Belgium;

(b)     stamp duty at the rate of USD 0.10 per USD 100 of face value of each Finance Document that is to be admitted in evidence in the courts of the Republic of Panama; and

(c)     any filing, recording or enrolling or any tax or fee payable in relation to a Transaction Security Document which is referred to in Part 3 of Schedule 2 or otherwise referred to in any Legal Opinion and which will be made or paid promptly after the date of the relevant Finance Document and by no later than the relevant date stipulated in Part 3 of Schedule 2.

ING    00174

**23.10   Deduction of Tax**

(a)     With the exception of any Panamanian Obligor, Belgian Obligor or Singapore Obligor and subject to:

    (i)     the carve-out under 23.12(c) (Compliance with Swiss Non-Bank Rules); and

    (ii)    each Lender's provision pursuant to Clause 17.11 (US Tax Matters) of a Witholding Tax Form establishing a complete exemption from U.S. withholding tax for payments to be made under this Agreement,

it is not required to make any Tax Deduction from any payment it may make under any Finance Document.

(b)     Each Belgian Obligor is not required to make any deduction for or on account of Tax from any payment it may make under any Finance Document to a Qualifying Lender.

**23.11   No default**

(a)     No Event of Default and, on the date of this Agreement, no Default is continuing or is reasonably likely to result from the making of any Utilisation or the entry into, the performance of, or any transaction contemplated by, any Finance Document.

(b)     No other event or circumstance is continuing which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or any of its Subsidiaries or to which its (or any of its Subsidiaries') assets are subject, to an extent or in a manner which has or is reasonably likely to have a Material Adverse Effect.

**23.12   Compliance with Swiss Non-Bank Rules**

(a)     Each Swiss Obligor is in compliance with the Swiss Non-Bank Rules.

(b)     For the purposes of paragraph (a) above, each Swiss Obligor shall assume that the aggregate number of Lenders under this Agreement which are Swiss Non-Qualifying Banks is ten.

(c)     No Obligor shall be in breach of this representation if in respect of either the Swiss Ten Non-Bank Rule or the Swiss Twenty Non-Bank Rule its number of creditors which are Swiss Non-Qualifying Banks is exceeded solely:

    (i)     by reasons of a failure by one or more Lenders to comply with Clauses 28.2(a) (Conditions of assignment or transfer), Clause 28.8 (Security over Lenders' rights) or Clause 28.9 (Exposure transfer transactions), or

    (ii)    because one or more Lenders, which indicated under Clause 17.4 (Lender Status Confirmation) that it is a Swiss Qualifying Bank, ceases to be a Swiss Qualifying Bank other than as a result of any change after the date it became a Lender under this Agreement in (or in the interpretation, administration or application of) any law or treaty, or any published practice or published concession of any relevant taxing authority.

ING   00175

### 23.13   Non-Hong Kong company

No Obligor is registered as a non-Hong Kong company within the meaning of Part XI of the Companies Ordinance (Cap. 32 of the Laws of Hong Kong).

### 23.14   No misleading information

Save as disclosed in writing to the Agent and the Arrangers prior to the date of this Agreement:

(a)   any factual information contained in the Information Memorandum was true and accurate in all material respects as at the date of the relevant report or document containing the information or (as the case may be) as at the date the information is expressed to be given;

(b)   any financial projection or forecast contained in the Information Memorandum has been prepared on the basis of recent historical information and on the basis of reasonable assumptions and was fair (as at the date of the relevant report or document containing the projection or forecast) and arrived at after careful consideration;

(c)   the expressions of opinion or intention provided by or on behalf of an Obligor for the purposes of the Information Memorandum were made after careful consideration and (as at the date of the relevant report or document containing the expression of opinion or intention) were fair and based on reasonable grounds;

(d)   no event or circumstance has occurred or arisen and no information has been omitted from the Information Memorandum and no information has been given or withheld that results in the information, opinions, intentions, forecasts or projections contained in the Information Memorandum being untrue or misleading in any material respect; and

(e)   all other written information provided by any member of the Group (including its advisers) to a Finance Party was true, complete and accurate in all material respects as at the date it was provided and is not misleading in any respect.

### 23.15   Original Financial Statements

(a)   Its Original Financial Statements were prepared in accordance with the Accounting Principles consistently applied unless expressly disclosed to the Agent in writing to the contrary prior to the date of this Agreement.

(b)   Its audited Original Financial Statements give a true and fair view of its financial condition and results of operations during the relevant financial year unless expressly disclosed to the Agent in writing to the contrary prior to the date of this Agreement.

(c)   There has been no material adverse change in its business or financial condition (or the business or consolidated financial condition of the Group, in the case of the Company) since the date of the Original Financial Statements.

(d)   Save as disclosed in writing to the Agent prior to the date of this Agreement, its most recent financial statements delivered pursuant to Clause 24.1 (Financial statements):

(i)   have been prepared in accordance with the Accounting Principles as applied to the Original Financial Statements; and

ING    00176

(ii)     give a true and fair view of (if audited) or fairly represent (if unaudited) its consolidated financial condition as at the end of, and consolidated results of operations for, the period to which they relate.

(e)     Since the date of the most recent financial statements delivered pursuant to Clause 24.1 (Financial statements) there has been no material adverse change in the business, assets or financial condition of the Group.

(f)     The annual accounting reference date of the Group is 31 December.

## 23.16   No proceedings pending or threatened

No litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency which are reasonably likely to be adversely determined and which, if adversely determined, are reasonably likely to have a Material Adverse Effect have (to the best of its knowledge and belief (having made due and careful enquiry)) been started or threatened against it or any of its Subsidiaries.

## 23.17   No breach of laws

(a)     It has not (and none of its Subsidiaries has) breached any law or regulation (except as regards to Sanctions and applicable anti-corruption laws and Anti-Money Laundering Laws to which Clauses 23.27 and 23.28 below respectively apply) which breach has or is reasonably likely to have a Material Adverse Effect.

(b)     No labour disputes are current or, to the best of its knowledge and belief (having made due and careful enquiry), threatened against any member of the Group which have or are reasonably likely to have a Material Adverse Effect.

## 23.18   Environmental laws

(a)     Each member of the Group is in compliance with Clause 26.3 (Environmental compliance) and to the best of its knowledge and belief (having made due and careful enquiry) no circumstances have occurred which would prevent such compliance in a manner or to an extent which has or is reasonably likely to have a Material Adverse Effect.

(b)     No Environmental Claim has been commenced or (to the best of its knowledge and belief (having made due and careful enquiry)) is threatened against any member of the Group where that claim has or is reasonably likely, if determined against that member of the Group, to have a Material Adverse Effect.

(c)     The cost to the Group of compliance with Environmental Laws (including Environmental Permits) is (to the best of its knowledge and belief, having made due and careful enquiry) adequately provided for.

## 23.19   Taxation

(a)     It is not (and none of its Subsidiaries is) materially overdue in the filing of any Tax returns and it is not (and none of its Subsidiaries is) overdue in the payment of any amount in respect of Tax of USD 1,000,000 (or its equivalent in any other currency) or more.

(b)     No claims or investigations are being, or are reasonably likely to be, made or conducted against it (or any of its Subsidiaries) with respect to Taxes such that a liability of, or claim against, any member of

ING     00177

the Group of USD 1,000,000 (or its equivalent in any other currency) or more is reasonably likely to arise.

(c)     It is resident for Tax purposes only in its Original Jurisdiction, except in the case of:

(i)     O.W. Global Trading SA which also has a branch located in The Netherlands; and

(ii)    O.W. Bunker Malta Limited which also has a branch located in Greece, through which it does not and will not make any payments under this Agreement.

## 23.20    Pari passu ranking

Its payment obligations under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

## 23.21    Security and Financial Indebtedness

(a)     No Security or Quasi-Security exists over all or any of the present or future assets of any member of the Group other than as permitted by this Agreement.

(b)     No member of the Group has any Financial Indebtedness outstanding other than as permitted by this Agreement.

## 23.22    Ranking

Subject to the Legal Reservations set out in the legal opinion relating to Danish law provided pursuant to paragraph 4(b)(ii) of Part 2 of Schedule 2 (Conditions), the Transaction Security has or will have the ranking in priority which it is expressed to have in the Transaction Security Documents and it is not subject to any prior ranking or *pari passu* ranking Security (except as expressly stated in the Transaction Security Documents).

## 23.23    Good title to assets

To the extent required to prevent a Material Adverse Effect (except in the case of any asset which is the subject of Transaction Security for which such proviso does not apply), it and each of its Subsidiaries has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted.

## 23.24    Legal and beneficial ownership

It and each of its Subsidiaries is the sole legal and beneficial owner of the respective assets over which it purports to grant Security.

## 23.25    Centre of main interests and establishments

(a)     Subject to paragraphs (b) and (c) below, for the purposes of The Council of the European Union Regulation No. 1346/2000 on Insolvency Proceedings (the **Regulation**), its centre of main interest (as that term is used in Article 3(1) of the Regulation) is situated in its Original Jurisdiction and it has no "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction.

ING     00178

(b)     The centre of main interest (as that term is used in Article 3(1) of the Regulation) of O.W. Global Trading SA is situated in the Netherlands and it has no "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction except for its "establishment" in Switzerland.

(c)     The centre of main interest (as that term is used in Article 3(1) of the Regulation) of O.W. Bunker Malta Limited is situated in Malta and it has no "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction except for its "establishment" in Greece.

**23.26   No adverse consequences**

(a)     It is not necessary under the laws of its Relevant Jurisdictions:

    (i)      in order to enable any Finance Party to enforce its rights under any Finance Document; or

    (ii)     by reason of the execution of any Finance Document or the performance by it of its obligations under any Finance Document,

that any Finance Party should be licensed, qualified or otherwise entitled to carry on business in any of its Relevant Jurisdictions.

(b)     No Finance Party is or will be deemed to be resident, domiciled or carrying on business in its Relevant Jurisdictions by reason only of the execution, performance and/or enforcement of any Finance Document.

**23.27   Sanctions**

No member of the Group, nor any of its respective directors, officers, employees or affiliates nor, to the best of its knowledge and belief (having made due and careful enquiry), other persons acting on behalf of any of the foregoing:

(a)     is a Restricted Person;

(b)     directly or indirectly transfers, uses or applies, nor permits to be transferred, used or applied, or provides the benefits of any money, proceeds or services to, or in favour of (i) a person that is the government of a Restricted Country (unless the proposed dealings with such government are not restricted by such Sanctions) or (ii) a person, corporate entity, government agency, vessel, or any other form of entity named on any Sanctions List or (iii) a person, corporate entity, government agency, vessel, or any other form of entity which is the subject of Sanctions (including Sanctions imposed generally against the country where such person is located, domiciled, resident, or under whose laws such person is organised or incorporated) unless the proposed dealings with such party or vessel are not restricted by such Sanctions) or (iv) a person that is owned or controlled by any such person mentioned in (i), (ii) or (iii) above or (v) any business activity prohibited by then-applicable Sanctions;

(c)     to the best of each Obligor's knowledge and belief, is acting or purporting to act on behalf of any of the persons listed in paragraphs (a) and (b) above; or

(d)     is or ever has been in violation of or subject to an investigation relating to Sanctions.

In respect of any Finance Party incorporated or established in Germany, the representations and warranties pursuant to this Clause 23.27 will be for the benefit of any such Finance Party, only if and to the extent that making of or as, the case may be, benefitting from such representations does not result in a violation of or conflict with section 7 of the German Foreign Trade Ordinance (§ 7 der Außenwirtschaftsverordnung) or a similar applicable anti-boycott statute.

ING    00179

**23.28   Anti-corruption; Anti-Money Laundering**

(a)   No member of the Group, nor any of its respective directors, officers, employees or affiliates nor, to the best of its knowledge and belief (having made due and careful enquiry), other persons acting on behalf of any of the foregoing has:

    (i)   violated or is in violation of any applicable anti-corruption law;

    (ii)   made, offered to make, promised to make or authorized the payment or giving of, directly or indirectly any Prohibited Payments; or

    (iii)   been subject to any investigation with regard to any actual or alleged Prohibited Payments.

(b)   The operations of the members of the Group are and have been conducted at all times in compliance with all applicable anti-money laundering laws and all applicable financial record keeping and reporting requirements, rules, regulations and guidelines applicable to it (collectively, **Anti-Money Laundering Laws**) and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving any member of the Group with respect to Anti-Money Laundering Laws is pending and, to the best of its knowledge, no such actions, suits or proceedings are threatened or contemplated.

**23.29   US laws**

It is not:

(a)   a public utility or subject to regulation under the United States Federal Power Act of 1920;

(b)   required to be registered as an investment company or subject to regulation under the United States Investment Company Act of 1940; or

(c)   subject to regulation under any US federal or US State law or regulation that limits its ability to incur or guarantee indebtedness.

**23.30   Times when representations made**

(a)   All the representations and warranties in this Clause 23 are made by each Original Obligor on the date of this Agreement.

(b)   The Repeating Representations are deemed to be made by each Obligor on the date of each Utilisation Request, on each Utilisation Date, on the first day of each Interest Period and, in the case of those contained in paragraphs (c) and (e) of Clause 23.15 (Original Financial Statements) and for so long as any amount is outstanding under the Finance Documents or any Commitment is in force, on each day (except that those contained in paragraphs(a) to (c) of Clause 23.15 (Original Financial Statements) will cease to be so made once subsequent financial statements have been delivered under this Agreement).

(c)   All the representations and warranties in this Clause 23 except Clause 23.14 (No misleading information) are deemed to be made by each Additional Obligor on the day on which it becomes (or it is proposed that it becomes) an Additional Obligor.

(d)   Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is deemed to be made.

ING   00180

## 24.   INFORMATION UNDERTAKINGS

The undertakings in this Clause 24 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

In this Clause 24:

**Annual Financial Statements** means the financial statements for a Financial Year delivered pursuant to paragraph (a) of Clause 24.1 (Financial statements).

**Quarterly Financial Statements** means the financial statements delivered pursuant to paragraph (e) of Clause 24.1 (Financial statements).

### 24.1   Financial statements

The Company shall supply to the Agent in sufficient copies for all the Lenders:

(a)   as soon as they are available, but in any event within 120 days after the end of each of its Financial Years, its audited consolidated financial statements for that Financial Year; and

(b)   as soon as they are available, but in any event within 120 days after the end of each of its Financial Years the audited financial statements (consolidated if appropriate) of each other Obligor (other than a Panamanian Obligor or a US Obligor) for that Financial Year;

(c)   as soon as they are available, but in any event within 180 days after the end of each of its Financial Years the unaudited financial statements (consolidated if appropriate) of each Panamanian Obligor and US Obligor for that Financial Year;

(d)   if applicable, as soon as they are available, but in any event within 180 days after the end of each of its Financial Years the audited financial statements (consolidated if appropriate) of each Panamanian Obligor and US Obligor for that Financial Year;

(e)   as soon as they are available, but in any event within 45 days after the end of each Financial Quarter of each of its Financial Years the consolidated financial statements of each Obligor for that Financial Quarter; and

(f)   as soon as they are available, but in any event within 60 days after the end of each calendar month its Monthly Report for that Month.

### 24.2   Provision and contents of Compliance Certificate

(a)   The Company shall supply a Compliance Certificate to the Agent with each set of its audited consolidated Annual Financial Statements and each set of its consolidated Quarterly Financial Statements.

(b)   The Compliance Certificate shall, amongst other things, set out (in reasonable detail) computations as to compliance with Clause 25 (Financial Covenants).

(c)   Each Compliance Certificate shall be signed by two directors of the Company and, if required to be delivered with the consolidated Annual Financial Statements of the Company, shall be reported on by the Company's Auditors in the form agreed by the Company and the Lenders before the date of this Agreement.

ING     00181

**24.3    Requirement as to financial statements**

If the Company notifies the Agent of a change in its Accounting Principles or the accounting practices, its Auditors (or, if appropriate, the Auditors of an Obligor) shall deliver to the Agent:

(a)     a description of any change necessary for those financial statements to reflect the Accounting Principles or accounting practices upon which the Company or that Obligor's Original Financial Statements were prepared; and

(b)     sufficient information, in form and substance as may be reasonably required by the Agent, to enable the Lenders to determine whether Clause 25 (Financial Covenants) has been complied with, to determine the Margin as set out in the definition of "Margin" and to make an accurate comparison between the financial position indicated in those financial statements or the Company or that Obligor's Original Financial Statements.

**24.4    Borrowing Base**

(a)     The Company shall supply to the Security Agent by email every second Wednesday falling in each fortnight, a duly completed Borrowing Base Certificate.  The Security Agent shall promptly deliver the Borrowing Base Certificate together with a determination of the Advance Rate to the Agent for prompt onward transmission to the Lenders.

(b)     Each Borrowing Base Certificate:

(i)     shall be based on information which is not older than five Business Days before the date of that Borrowing Base Certificate; and

(ii)    shall be duly signed and certified by the chief financial officer and the group treasury manager of the Company as being accurate and complete.

(c)     Each Borrowing Base Certificate shall attach, for information only:

(i)     the then current total of accounts payable of each Receivables Obligor (based on booked invoices with Trade Creditors and broken down per Receivables Obligor and including the names and addresses of those Trade Creditors); and

(ii)    on a quarterly basis only, a list of those Trade Creditors which are covered by acceptable credit insurance in order to qualify as Secured Eligible Receivables with their respective coverage limits as confirmed by Atradius as being correct, complete and up-to-date,

in each case, as at the date of the Borrowing Base Certificate, provided that the Company makes no representation or warranty in respect of any such information.

**24.5    Presentations**

Once in every Financial Year, or more frequently if requested to do so by the Agent if the Agent reasonably suspects a Default is continuing or may have occurred or may occur, at least two directors of the Company (one of whom shall be the chief financial officer) must give a presentation to the Finance Parties about the on-going business and financial performance of the Group.

ING    00182

24.6    **Information: miscellaneous**

The undertakings in this Clause 24 are subject to any Obligor's compliance with any disclosure obligations pursuant to the Danish Securities Trading Act and any applicable stock market regulation which remains in force from the date of this Agreement to the Termination Date.

The Company shall supply to the Agent (in sufficient copies for all the Lenders, if the Agent so requests):

(a)    at the same time as they are dispatched, copies of all documents dispatched by the Company to its shareholders generally (or any class of them) or dispatched by the Company or any Obligors to its creditors generally (or any class of them) including but not limited to a notification of change in ownership of any of the Obligors;

(b)    promptly upon making any material amendments to any constituent policy which forms part of the Risk Policy, provide a copy of such updated Risk Policy;

(c)    promptly upon becoming aware of them, the details of any litigation, arbitration, administrative or Tax authority proceedings which are current, threatened or pending against any member of the Group, and which, if adversely determined, are reasonably likely to have a Material Adverse Effect;

(d)    reasonably promptly and by no later than 2 Business Days of request where such information is obtainable, such information as the Security Agent may reasonably require about the Charged Property (including any hedging arrangements entered into pursuant to the brokerage accounts) and compliance of the Obligors with the terms of any Transaction Security Documents;

(e)    reasonably promptly and by no later than 2 Business Days of request where such information is obtainable, such information concerning the contents of each Borrowing Base Certificate and concerning the assets referred to therein as the Security Agent may request; and

(f)    reasonably promptly and by no later than 2 Business Days of request where such information is obtainable, such further information regarding the financial condition, assets and operations of the Group and/or any member of the Group (including any requested amplification or explanation of any item in the financial statements, budgets or other material provided by any Obligor under this Agreement, any changes to management of the Group and an up-to-date copy of its shareholders' register (or equivalent in its Original Jurisdiction)) as any Finance Party through the Agent may reasonably request.

24.7    **Notification of Default**

(a)    Each Obligor shall notify the Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

(b)    Promptly upon a request by the Agent, the Company shall supply to the Agent a certificate signed by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

(c)    The Company must promptly notify the Agent if it becomes aware that it expects to fail to comply with any terms of Clause 25 (Financial Covenants) at the end of the next Relevant Period.

**24.8**   **Know your customer checks**

(a)   If the Agent, any Lender or any prospective new Lender is obliged to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Obligor shall promptly upon the request of the Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender (for itself or on behalf of any prospective new Lender) in order for the Agent, such Lender or any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(b)   Each Lender shall promptly upon the request of the Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself) in order for the Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(c)   The Company shall, by not less than 10 Business Days' prior written notice to the Agent, notify the Agent (which shall promptly notify the Lenders) of its intention to request that one of its Subsidiaries becomes an Additional Obligor pursuant to Clause 29 (Changes to the Obligors).

(d)   Following the giving of any notice pursuant to paragraph (c) above, if the accession of such Additional Obligor obliges the Agent or any Lender to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Company shall promptly upon the request of the Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender (for itself or on behalf of any prospective new Lender) in order for the Agent or such Lender or any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the accession of such Subsidiary to this Agreement as an Additional Obligor.

**25.**   **FINANCIAL COVENANTS**

**25.1**   **Financial definitions**

In this Agreement:

**Borrowings** means, at any time, the aggregate outstanding principal, capital or nominal amount (and any fixed or minimum premium payable on prepayment or redemption) of any indebtedness of members of the Group for or in respect of:

(a)   moneys borrowed and debit balances at banks or other financial institutions;

(b)   any acceptances under any acceptance credit or bill discount facility (or dematerialised equivalent);

(c)   any note purchase facility or the issue of bonds (but not Trade Instruments), notes, debentures, loan stock or any similar instrument;

(d)   any Finance Lease;

ING   00184

(e)    receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis and meet any requirements for de-recognition under the Accounting Principles);

(f)    any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument (but not, in any case, Trade Instruments) issued by a bank or financial institution in respect of (i) an underlying liability of an entity which is not a member of the Group which liability would fall within one of the other paragraphs of this definition or (ii) any liabilities of any member of the Group relating to any post-retirement benefit scheme;

(g)    any amount of any liability under an advance or deferred purchase agreement if (i) one of the primary reasons behind the entry into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than 60 days after the date of supply;

(h)    any amount raised under any other transaction (including any forward sale or purchase agreement, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under the Accounting Principles; and

(i)    (without double counting) the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (h) above,

in each case excluding any withdrawals made by the Company from the Mirrored Accounts in accordance with paragraph (h) of "Permitted Financial Indebtedness".

**Business Acquisition** means the acquisition of a company or any shares or securities or a business or undertaking (or, in each case, any interest in any of them) or the incorporation of a company.

**Consolidated Tangible Net Worth** means the sum of all paid up capital, share premiums and distributable and non-distributable reserves (including, without limitation, amounts standing to the credit of any share premium account, capital redemption reserve account, plus (if not already included in reserves) any retained earnings), plus any subordinated loan capital less all intangible assets (including, without limitation, goodwill) and loans to associated Group companies, affiliates, shareholders and directors.

**Current Assets** means the aggregate (on a consolidated basis) of all inventory, work in progress, trade and other receivables of each member of the Group including prepayments in relation to operating items and sundry debtors (but excluding Cash and Cash Equivalent Investments) expected to be realised within twelve months from the date of computation but **excluding** amounts in respect of:

(a)    receivables in relation to Tax;

(b)    Exceptional Items and other non-operating items;

(c)    insurance claims; and

(d)    any interest owing to any member of the Group.

ING    00185

**Current Liabilities** means the aggregate (on a consolidated basis) of all liabilities (including Trade Creditors, accruals and provisions) of each member of the Group expected to be settled within twelve months from the date of computation but **excluding** amounts in respect of:

(a)     liabilities for Tax;

(b)     Exceptional Items and other non-operating items;

(c)     insurance claims; and

(d)     liabilities in relation to dividends declared but not paid by the Company or by a member of the Group in favour of a person which is not a member of the Group.

**EBITDA** means, in respect of any Relevant Period, the consolidated operating profit of the Group before taxation (including the results from discontinued operations), interest, depreciation and amortisation:

(a)     **before deducting** any interest, commission, fees, discounts, prepayment fees, premiums or charges and other finance payments whether paid, payable or capitalised by any member of the Group (calculated on a consolidated basis) in respect of that Relevant Period;

(b)     **not including** any accrued interest owing to any member of the Group;

(c)     **before taking into account** any Exceptional Items; and

(d)     **after deducting** the amount of any profit of any Non-Group Entity to the extent that the amount of the profit included in the financial statements of the Group exceeds the amount actually received in cash by members of the Group through distributions by the Non-Group Entity,

in each case, to the extent added, deducted or taken into account, as the case may be, for the purposes of determining operating profits of the Group before taxation.

**Exceptional Items** means any exceptional, one off, non-recurring or extraordinary items including gains or losses arising on:

(a)     the restructuring of the activities of an entity and reversals of any provisions for the cost of restructuring;

(b)     disposals, revaluations, write downs or impairment of non-current assets or any reversal of any write down or impairment;

(c)     disposals of assets associated with discontinued operations; and

(d)     any other items agreed between the Company and the Agent.

**Finance Lease** means any lease, hire purchase contract or other contract which would, in accordance with the Accounting Principles, be treated as a finance or capital lease.

**Financial Quarter** means the period commencing on the day after one Quarter Date and ending on the next Quarter Date.

**Financial Year** means the annual accounting period of the Group ending on 31 December in each year.

ING    00186

**Non-Group Entity** means any investment or entity (which is not itself a member of the Group (including associates and Joint Ventures)) in which any member of the Group has an ownership interest.

**Quarter Date** means each of 31 March, 30 June, 30 September and 31 December.

**Relevant Period** means each period of twelve months ending on or about the last day of the Financial Year and each period of twelve months ending on or about the last day of each Financial Quarter.

## 25.2    Financial condition

The Company shall ensure that:

(a)    *Current Ratio*: The ratio of Current Assets to Current Liabilities is not less than 1:1 at any time.

(b)    *Consolidated Tangible Net Worth*: Consolidated Tangible Net Worth of the Group is not less than:

   (i)    USD 140,000,000 at any time prior to the first anniversary of the Agreement; and

   (ii)    USD 150,000,000 at any time on and from the first anniversary of the Agreement.

(c)    *Maximum Indebtedness*: Borrowings do not exceed:

   (i)    in respect of Borrowings owed by Borrowers only, USD 800,000,000 (or its equivalent in other currencies) plus the aggregate amount raised pursuant to Clause 2.3 (Accordion); and

   (ii)    in respect of Borrowings owed by the Group, USD 1,050,000,000 (or its equivalent in other currencies) plus the aggregate amount raised pursuant to Clause 2.3 (Accordion).

## 25.3    Financial testing

The financial covenants set out in Clause 25.2 (Financial condition) shall be calculated in accordance with the Accounting Principles and tested by reference to each of the financial statements delivered pursuant to paragraphs (a) and (c) of Clause 24.1 (Financial statements) and/or each Compliance Certificate delivered pursuant to 24.2 (Provision and contents of Compliance Certificate).

## 25.4    Guarantor cover

(a)    Subject to paragraph (b) below, the Company must ensure that the aggregate of earnings before interest, tax, depreciation and amortisation calculated on the same basis as EBITDA (as defined in Clause 25.1 (Financial definitions)) of the Guarantors (in each case calculated on an unconsolidated basis and excluding all intra-group items and investments in Subsidiaries of any member of the Group) represent, at the end of each of its Financial Years, not less than 80 per cent. of EBITDA (as defined in Clause 25.1 (Financial definitions)) of the Group (excluding for the purposes of this calculation the Carrier Companies, O.W. Cargo Denmark A/S.

(b)    The Company need only perform its obligations under paragraph (a) above if it is not unlawful for the relevant person to become a Guarantor and that person becoming a Guarantor would not result in

personal liability for that person's directors or other management.  None of the Carrier Companies nor O.W. Cargo Denmark A/S is obliged to become a Guarantor.  Each Obligor must use, and must procure that the relevant person uses, all reasonable endeavours lawfully available to avoid any such unlawfulness or personal liability.  This includes agreeing to a limit on the amount guaranteed.  The Agent may (but shall not be obliged to) agree to such a limit if, in its opinion, to do so would avoid the relevant unlawfulness or personal liability.

(c)     For the purpose of paragraph (a) above:

(i)     subject to subparagraph (ii) below:

(A)     the contribution of each Guarantor will be determined from its financial statements which were consolidated into the latest consolidated financial statements of the Company delivered under this Agreement; and

(B)     the financial condition of the Group will be determined from the latest audited consolidated financial statements of the Company;

(ii)    if a person becomes a member of the Group after the date on which the latest audited consolidated financial statements of the Company were prepared:

(A)     the contribution of that person will be determined from its latest financial statements; and

(B)     the financial condition of the Group will still be determined from the latest audited consolidated financial statements of the Company but will be adjusted to take into account that person becoming a member of the Group; and

(iii)   the contribution of a Guarantor will:

(A)     if it has Subsidiaries, be determined from its unconsolidated financial statements;

(B)     be adjusted by adding any contribution to that Guarantor by any Joint Venture which is accounted for on a proportionate consolidation basis in relation to that Guarantor; and

(C)     exclude intra-group items which would be eliminated in the consolidated financial statements of the Company.

## 26.     GENERAL UNDERTAKINGS

The undertakings in this Clause 26 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

*Authorisations and compliance with laws*

### 26.1    Authorisations

Each Obligor shall promptly:

(a)     obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b)     supply certified copies to the Agent of any Authorisation required under any law or regulation of a Relevant Jurisdiction to:

ING     00188

     (i)     enable it to perform its obligations under the Finance Documents;

     (ii)    ensure the legality, validity, enforceability or admissibility in evidence of any Finance Document; and

     (iii)   carry on its business where failure to do so has or is reasonably likely to have a Material Adverse Effect.

**26.2**   **Compliance with laws**

Each Obligor shall (and the Company shall ensure that each member of the Group will) comply in all respects with all laws to which it may be subject (except as regards to Sanctions and applicable anti-corruption laws and Anti-Money Laundering Laws to which Clauses 26.25 and 26.26 below respectively apply), if failure so to comply has or is reasonably likely to have a Material Adverse Effect.

**26.3**   **Environmental compliance**

Each Obligor shall (and the Company shall ensure that each member of the Group will):

(a)     comply with all Environmental Law;

(b)     obtain, maintain and ensure compliance with all requisite Environmental Permits;

(c)     implement procedures to monitor compliance with and to prevent liability under any Environmental Law,

where failure to do so has or is reasonably likely to have a Material Adverse Effect.

**26.4**   **Environmental claims**

Each Obligor shall (through the Company), promptly upon becoming aware of the same, inform the Agent in writing of:

(a)     any Environmental Claim against any member of the Group which is current, pending or threatened; and

(b)     any facts or circumstances which are reasonably likely to result in any Environmental Claim being commenced or threatened against any member of the Group,

where the claim, if determined against that member of the Group, has or is reasonably likely to have a Material Adverse Effect.

**26.5**   **Taxation**

(a)     Each Obligor shall (and the Company shall ensure that each member of the Group will) pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties unless and only to the extent that:

     (i)     such payment is being contested in good faith;

     (ii)    adequate reserves are being maintained for those Taxes and the costs required to contest them which have been disclosed in its latest financial statements delivered to the Agent under Clause 24.1 (Financial statements); and

ING   00189

(iii)    such payment can be lawfully withheld and failure to pay those Taxes does not have or is not reasonably likely to have a Material Adverse Effect.

(b)    No member of the Group may change its residence for Tax purposes other than the change of its residence for Tax purposes by O.W. Global Trading SA from Switzerland to the Netherlands.

*Restrictions on business focus*

## 26.6   Merger

No Obligor shall (and the Company shall ensure that no other member of the Group will) enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction except for:

(a)    the solvent liquidation or reorganisation of any member of the Group which is not an Obligor so long as any payments or assets distributed as a result of such liquidation or reorganisation are distributed to other members of the Group;

(b)    a solvent reorganisation (including, without limitation, amalgamation, demerger, merger or reconstruction) of an Obligor where:

    (i)    prior to such a reorganisation, the entity which will become the surviving or successor entity following the reorganisation is an Obligor having obligations hereunder no less onerous than the obligations of the Obligor or Obligors which will be the subject of such reorganisation; and

    (ii)    if the assets of the Obligor or Obligors which will be the subject of such reorganisation were subject to Security in favour of the Finance Parties immediately prior to the reorganisation, the Agent is satisfied that the position of the Finance Parties will not be adversely affected or prejudiced in any respect and that all the steps required for the maintenance and preservation of:

        (A)    the validity, enforceability and ranking of the Security created or granted pursuant to the Security Documents; and

        (B)    the recourse of the Finance Parties under the Security Documents and to the Obligors pursuant to any other Finance Document have been taken.

## 26.7   Change of business

The Company shall procure that no substantial change is made to the general nature of the business of the Company, the Obligors or the Group taken as a whole from that carried on as at the date of this Agreement.

## 26.8   Acquisitions

(a)    Except as permitted under paragraph (b) below, no Obligor shall (and the Company shall ensure that no other member of the Group will):

    (i)    acquire a company or any shares or securities or a business or undertaking (or, in each case, any interest in any of them); or

    (ii)    incorporate a company.

ING   00190

(b)     Paragraph (a) above does not apply to an acquisition of a company, of shares, securities or a business or undertaking (or, in each case, any interest in any of them) or the incorporation of a company which is a Permitted Acquisition.

## 26.9   Joint ventures

(a)     Except as permitted under paragraph (b) below, no Obligor shall (and the Company shall ensure that no other member of the Group will):

    (i)     enter into, invest in or acquire (or agree to acquire) any shares, stocks, securities or other interest in any Joint Venture; or

    (ii)    transfer any assets or lend to or guarantee or give an indemnity for or give Security for the obligations of a Joint Venture or maintain the solvency of or provide working capital to any Joint Venture (or agree to do any of the foregoing).

(b)     Paragraph (a) above does not apply to any acquisition of (or agreement to acquire) any interest in a Joint Venture or transfer of assets (or agreement to transfer assets) to a Joint Venture or loan made to or guarantee given in respect of the obligations of a Joint Venture if such transaction is a Permitted Acquisition, a Permitted Disposal, a Permitted Loan or a Permitted Joint Venture.

### *Restrictions on dealing with assets and Security*

## 26.10   Preservation of assets

Each Obligor shall (and the Company shall ensure that each other member of the Group will) maintain in good working order and condition (ordinary wear and tear excepted) all of its assets necessary in the conduct of its business.

## 26.11   Pari passu ranking

Each Obligor shall ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

## 26.12   Negative pledge

In this Clause 26.12, **Quasi-Security** means an arrangement or transaction described in paragraph (b) below.

Except as permitted under paragraph (c) below:

(a)     No Obligor shall create or permit to subsist any Security over any of its assets.

(b)     No Obligor shall:

    (i)     sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by an Obligor or any other member of the Group;

    (ii)    sell, transfer or otherwise dispose of any of its receivables on recourse terms;

    (iii)   enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

ING    00191

(iv)    enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(c)    Paragraphs (a) and (b) above do not apply to any Security or (as the case may be) Quasi-Security, which is Permitted Security.

## 26.13   Disposals

(a)    Except as permitted under paragraph (b) below, no Obligor shall (and the Company shall ensure that no other member of the Group will) enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset.

(b)    Paragraph (a) above does not apply to any sale, lease, transfer or other disposal which is a Permitted Disposal.

(c)    Subject to the provisions of Clause 31 (The Security Agent), unless otherwise instructed by the Majority Lenders, the Majority Lenders give their consent to the Security Agent to approve any disposal of trade invoices contemplated under paragraph (g) of the definition of "Permitted Disposal".

## 26.14   Arm's length basis

(a)    Except as permitted by paragraph (b) below, no Obligor shall (and the Company shall ensure that no other member of the Group will) enter into any transaction with any person except on arm's length terms and for full market value.

(b)    The following transactions shall not be a breach of this Clause 26.14:

(i)    intra-Group loans permitted under Clause 26.15 (Loans or credit); and

(ii)    fees, costs and expenses payable under the Finance Documents in the amounts set out in the Finance Documents delivered to the Agent under Clause 5.1 (Initial conditions precedent) or agreed by the Agent.

*Restrictions on movement of cash-cash out*

## 26.15   Loans or credit

(a)    Except as permitted under paragraph (b) below, no Obligor shall (and the Company shall ensure that no other member of the Group will) be a creditor in respect of any Financial Indebtedness.

(b)    Paragraph (a) above does not apply to a Permitted Loan.

## 26.16   No Guarantees or indemnities

(a)    Except as permitted under paragraph (b) below, no Obligor shall (and the Company shall ensure that no other member of the Group will) incur or allow to remain outstanding any guarantee in respect of any obligation of any person.

(b)    Paragraph (a) does not apply to a guarantee which is a Permitted Guarantee.

ING   00192

**26.17   Dividends and share redemption**

(a)   Except as permitted under paragraph (b) below, the Company shall not (and will ensure that no other member of the Group will):

   (i)   declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital);

   (ii)   repay or distribute any dividend or share premium reserve;

   (iii)   pay or allow any member of the Group to pay any management, advisory or other fee to or to the order of any of the shareholders of the Company; or

   (iv)   redeem, repurchase, defease, retire or repay any of its share capital or resolve to do so.

(b)   Paragraph (a) above does not apply to a Permitted Distribution.

(c)   For the purposes of this Agreement and subject always to compliance with the covenants set out in Clause 25 (Financial Covenants), from the date of the HoldCo Facility until the HoldCo Facility Discharge Date the following limits shall apply to any payments or distributions made in accordance with paragraph (b) of the definition of "Permitted Distribution" (the **Distribution Limits**):

   (i)   in the Financial Years ending 31 December 2013 and 31 December 2014 respectively, any payments of dividend or distributions by the Company from the Group's consolidated disposable net income (as such term is interpreted in accordance with the Accounting Principles) for the immediately preceding Financial Year as evidenced by the Company's latest Annual Financial Statements (the **Eligible Dividend Income**) must not in aggregate exceed USD 95,000,000;

   (ii)   in any subsequent Financial Year, the Company must not make any payment of dividends or distribution from the amount representing 50 per cent. of the first USD 50,000,000 (the **Profits Cap**) from the Eligible Dividend Income except to the extent that it makes any interim payments of dividend or distributions in accordance with paragraph (iv) below;

   (iii)   to the extent that the Company does not pay out all of its Eligible Dividend Income by way of payment of dividend or distribution in any Financial Year, it may carry over the remaining Eligible Dividend Income to subsequent Financial Years (such excess together with the existing Eligible Dividend Income, the **Total Eligible Dividend Income**);

   (iv)   subject to paragraph (i) above, in any Financial Quarter, the Company may make interim payments of dividends or distributions out of the Total Eligible Dividend Income for the immediately preceding Financial Quarter on the following terms:

      (A)   such interim payments of dividend or distribution may only be made out of the amount representing the first 50 per cent. of the consolidated disposable net income (as such term is interpreted in accordance with the Accounting Principles) for that Financial Quarter together with any remaining available Total Eligible Dividend Income as evidenced by the Company's latest Quarterly Financial Statements;

      (B)   the Company will remain in compliance with its obligations under Clause 25.2(b) (Financial condition) immediately after the making of such interim payments of dividend or distribution; and

ING   00193

(C)     the making of such payments of dividend or distribution must not exceed in aggregate the Profits Cap.

(d)     To the extent any payments of dividend or distributions are made pursuant to paragraph (c) above of this Clause 26.17 but which are later found to have been made in breach of the Distribution Limits, the Company shall procure the immediate return of such amounts from its Parent to the Collection Accounts.  The obligations of the Company set out in this paragraph (d) are without prejudice to the provisions of Clause 27.3 (Other obligations).

*Restrictions on movement of cash–cash in*

## 26.18   Financial Indebtedness

(a)     Except as permitted under paragraph (b) below, no Obligor shall (and the Company shall ensure that no other member of the Group will) incur or allow to remain outstanding any Financial Indebtedness.

(b)     Paragraph (a) above does not apply to Financial Indebtedness which is Permitted Financial Indebtedness.

## 26.19   Share capital

No Obligor shall (and the Company shall ensure that no other member of the Group will) issue any shares except pursuant to a Permitted Share Issue.

*Miscellaneous*

## 26.20   Insurance

(a)     Each Obligor shall (and the Company shall ensure that each other member of the Group will) maintain insurances on and in relation to its business and assets against those risks and to the extent as is usual for companies carrying on the same or substantially similar business.

(b)     All insurances must be with reputable independent insurance companies or underwriters.

## 26.21   Treasury Transactions

No Obligor shall (and the Company will procure that no other member of the Group will) enter into any Treasury Transaction, other than in accordance with the Risk Policy.

## 26.22   Further assurance

(a)     Each Obligor shall (and the Company shall procure that each other member of the Group will) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Security Agent may reasonably specify (and in such form as the Security Agent may reasonably require in favour of the Security Agent or its nominee(s)):

(i)     to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of the Security Agent or the Finance Parties provided by or pursuant to the Finance Documents or by law;

ING    00194

(ii) to confer on the Security Agent or confer on the Finance Parties Security over any property and assets of that Obligor located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Transaction Security Documents; and/or

(iii) to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

(b) Each Obligor shall (and the Company shall procure that each other member of the Group will) take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent or the Finance Parties by or pursuant to the Finance Documents.

(c) On the date of the entry into effect (the **Belgian Law Date**) of the Belgian Act of 11 July 2013 amending the Belgian Civil Code in respect of security on movable assets (the **Belgian Act**), the Company undertakes to:

(i) procure that O.W. Global Trading SA creates and perfects a Belgian law pledge over all of its inventory located in storage terminals in Belgium by no later than the date falling three (3) Months from the Belgian Law Date (the **Registered Pledge**), which Registered Pledge must be registered to the full value of the secured obligations under the Finance Documents or such lower amount as may be agreed by the Majority Lenders; or

(ii) enter into good faith negotiations with the Agent (acting on behalf of the Majority Lenders) to find an alternative solution acceptable to the Agent (acting on the instructions of the Majority Lenders) to the Registered Pledge (the **Alternative Solution**) for a period of no less than 45 days from the Belgian Law Date (the **Resolution Period**); and

(iii) in the case that an Alternative Solution is agreed upon by the Agent by the end of the Resolution Period, fully implement, document and, if applicable, perfect such Alternative Solution by no later than the date falling three Months from the date on which such Alternative Solution was agreed upon by the Agent; or

(iv) in the case that:

(A) no Registered Pledge is in place by the date falling three Months from the Belgian Law Date;

(B) an Alternative Solution is not agreed upon by the Agent by the end of the Resolution Period; or

(C) an Alternative Solution which has been agreed upon has not been fully implemented, documented and perfected by the date falling three Months from the date on which such Alternative Solution was agreed upon by the Agent,

the Company shall, if requested by the Majority Lenders, partially cancel and/or prepay the Facilities by an amount of no less than USD 10,000,000 in accordance with the provisions of Clause 10.1 (Voluntary cancellation) and 10.2 (Voluntary prepayment of Utilisations) as applicable.

## 26.23   Compliance with Swiss Non-Bank Rules

(a) Each Swiss Obligor shall at all times be in compliance with the Swiss Non-Bank Rules.

ING   00195

(b)     For the purposes of paragraph (a) above, each Swiss Obligor shall assume that the aggregate number of Lenders under this Agreement which are Swiss Non-Qualifying Banks is ten.

(c)     No Obligor shall be in breach of this representation if in respect of either the Swiss Ten Non-Bank Rule or the Swiss Twenty Non-Bank Rule its number of creditors which are Swiss Non-Qualifying Banks is exceeded solely:

   (i)     by reasons of a failure by one or more Lenders to comply with Clauses 28.2(a) (Conditions of assignment or transfer), Clause 28.8 (Security over Lenders' rights) or Clause 28.9 (Exposure transfer transactions), or

   (ii)    because one or more Lenders, which indicated under Clause 17.4 (Lender Status Confirmation) that it is a Swiss Qualifying Bank, ceases to be a Swiss Qualifying Bank other than as a result of any change after the date it became a Lender under this Agreement in (or in the interpretation, administration or application of) any law or treaty, or any published practice or published concession of any relevant taxing authority.

## 26.24   Risk Policy

Each Obligor shall (and the Company shall procure that each other member of the Group will) comply with the Risk Policy and any additional internal credit committee policies, procedures or similar guidelines relating to the Group's policies in respect of its dealings with trade counterparties.

## 26.25   Sanctions

(a)     No Obligor shall (and the Company shall procure that no member of the Group will) engage in any transaction that violates any Sanctions.

(b)     No Obligor shall (and the Company shall procure that no member of the Group will) directly or indirectly transfer, use or apply, nor permit to be transferred, used or applied, or provide the benefits of any money, proceeds or services provided or received under a Facility or an Ancillary Facility or otherwise in connection with this Agreement if such is to or in favour of: (i) a person that is the government of a Restricted Country (unless the proposed dealings with such government are not restricted by such Sanctions), (ii) a person, corporate entity, government agency, vessel, or any other form of entity which is subject to any Sanctions (including Sanctions imposed generally against the country where such person is located, domiciled, resident, or under whose laws such person is organised or incorporated) unless the proposed dealings with such party or vessel are not restricted by such Sanctions, (iii) a person, corporate entity, government agency, vessel, or any other form of entity which is named on any Sanctions List or (iv) a person that is owned or controlled by any such person mentioned in (i), (ii) or (iii) above, or (v) any business activity that would be prohibited by then-applicable Sanctions, or in any other manner that would cause any person to be in breach of Sanctions.

(c)     No Obligor shall (and the Company shall procure that no member of the Group will) fund all or part of any repayment under a Facility or an Ancillary Facility out of proceeds directly derived from transactions which would be prohibited by Sanctions or would otherwise cause any person to be in breach of Sanctions.

(d)     Each Obligor shall (and the Company shall procure that each member of the Group will) ensure that appropriate controls and safeguards are in place designed to prevent any proceeds of a Facility or an Ancillary Facility from being used contrary to paragraphs (a), (b), or (c) above.

In respect of any Finance Party incorporated or established in Germany, the undertakings pursuant to this Clause 26.25 will be for the benefit of any such Finance Party, only if and to the extent that

ING    00196

making of or, as the case may be, benefitting from such undertakings does not result in a violation of or conflict with section 7 of the German Foreign Trade Ordinance (§ 7 der Außenwirtschaftsverordnung) or a similar applicable anti-boycott statute.

### 26.26  Anti-corruption law; Anti-Money Laundering Law

Each Obligor has (and the Company shall procure that each member of the Group has) conducted its businesses in compliance with applicable anti-corruption laws and Anti-Money Laundering Laws and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

### 26.27  Access

Each Obligor shall, and the Company shall ensure that each member of the Group will, (not more than once in every Financial Year unless the Agent reasonably suspects an Event of Default is continuing or may have occurred or may occur) permit the Agent and/or the Security Agent and/or accountants or other professional advisers and contractors of the Agent or Security Agent free access at all reasonable times and on reasonable notice at the risk and cost of the Obligor or Company to:

(a)     the premises, assets, books, accounts and records of each member of the Group; and

(b)     meet and discuss matters with senior management of the Company.

### 26.28  Storage of marine fuels

Each of the Company and O.W. Global Trading SA shall ensure that no more than 24,000 metric tonnes of marine fuels belonging to O.W. Global Trading SA is stored at any time in Belgium.

### 26.29  US laws

(a)     No Obligor may:

(i)     extend credit for the purpose, directly or indirectly, of buying or carrying Margin Stock; or

(ii)     use any Utilisation, directly or indirectly, to buy or carry Margin Stock or for any other purpose in violation of the Margin Regulations.

(b)     No Obligor may use any part of any Utilisation to acquire any security in violation of section 13 or 14 of the United States Securities Exchange Act of 1934.

(c)     Each Obligor must promptly upon becoming aware of it notify the Agent of:

(i)     any Reportable Event;

(ii)     the termination of or withdrawal from, or any circumstances reasonably likely to result in the termination of or withdrawal from, any Plan subject to Title IV of ERISA if such termination or withdrawal or other circumstances would require material additional contributions to be considered a standard termination or withdrawal; and

(iii)     a claim or other communication alleging material non-compliance with any law or regulation relating to any Plan.

(d)     Each Obligor and its ERISA Affiliates must be, and remain, in compliance in all respects with all laws and regulations relating to each of its Plans other than as would not be reasonably expected to give rise to a Material Adverse Effect.

(e)     Each of the Obligors and its ERISA Affiliates must ensure that no event or condition exists at any time in relation to a Plan which is reasonably likely to result in the imposition of Security on any of its assets or which is reasonably likely to have a Material Adverse Effect.

**26.30    Automatic sweep of bank accounts**

The Company shall ensure that each relevant Obligor shall:

(a)     set up and maintain an automatic sweep of all credit balances in any collection account which is not a Collection Account to one or more Collection Accounts on a daily basis; and

(b)     other than as set out in paragraph (a) above, no longer actively administer those bank accounts unless with the prior written approval of the Agent acting on behalf of the Majority Lenders.

**27.     EVENTS OF DEFAULT**

Each of the events or circumstances set out in this Clause 27 is an Event of Default (save for Clause 27.20 (Acceleration).

**27.1    Non-payment**

An Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless:

(a)     its failure to pay is caused by:

    (i)     administrative or technical error; or

    (ii)    a Disruption Event; and

(b)     payment is made within three Business Days of its due date.

**27.2    Financial covenants and other obligations**

(a)     Any requirement of Clause 25 (Financial Covenants) is not satisfied or an Obligor does not comply with the provisions of Clauses 23.27 (Sanctions), 24.4 (Borrowing Base), 24.6(d), 24.6(e), 24.6(f) (Information: miscellaneous), Clause 26.25 (Sanctions) or Clause 26.26 (Anti-corruption law; Anti-Money Laundering Law).

(b)     An Obligor does not comply with any provision of any Transaction Security Document.

**27.3    Other obligations**

(a)     An Obligor does not comply with any provision of the Finance Documents (other than those referred to in Clause 27.1 (Non-payment) and Clause 27.2 (Financial covenants and other obligations)).

(b)     No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within 10 Business Days (or in the case where a different grace period is expressly stated in respect of an Event of Default in this Clause 27, such other timeframe) of the earlier of (i) the Agent giving notice to the Company or relevant Obligor and (ii) the Company or an Obligor becoming aware of the failure to comply.

ING    00198

**27.4    Misrepresentation**

Any representation or statement made or deemed to be made by an Obligor in the Finance Documents or any other document delivered by or on behalf of any Obligor under or in connection with any Finance Document (excluding the representations made pursuant to Clause 23.27 (Sanctions)) is or proves to have been incorrect or misleading when made or deemed to be made and, if the circumstances resulting in such representation or statement being so incorrect or misleading are capable of being remedied so that such representation or statement would be so correct, such representations and warranty is not remedied within 10 Business Days after the earlier to occur of the date the Agent has given notice of such representation or statement being so incorrect or misleading to the Company and the date the relevant Obligor has actual knowledge thereof.

**27.5    Cross default**

(a)    Any Financial Indebtedness of any member of the Group is not paid when due nor within any originally applicable grace period.

(b)    Any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(c)    Any commitment for any Financial Indebtedness of any member of the Group is cancelled or suspended by a creditor of any member of the Group as a result of an event of default (however described).

(d)    Any creditor of any member of the Group becomes entitled to declare any Financial Indebtedness of any member of the Group due and payable prior to its specified maturity as a result of an event of default (however described).

(e)    No Event of Default will occur under this Clause 27.5 if the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness falling within paragraphs (a) to (d) above is less than USD 12,500,000 (or its equivalent in any other currency or currencies).

(f)    With respect to Wrist Marine Supplies A/S:

(i)    any of its Financial Indebtedness under the HoldCo Facility is not paid when due nor within any originally applicable grace period;

(ii)    any of its Financial Indebtedness under the HoldCo Facility is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described) relating to either a payment default or a breach of its financial covenants under the HoldCo Facility and such event of default is not remedied within any originally applicable grace period;

(iii)    any commitment for any of its Financial Indebtedness under the HoldCo Facility is cancelled or suspended by any lender under the HoldCo Facility as a result of an event of default (however described) relating to either a payment default or a breach of its financial covenants under the HoldCo Facility and such event of default is not remedied within any originally applicable grace period; or

(iv)    any lender under the HoldCo Facility becomes entitled to declare any of the Financial Indebtedness of the Holding Company of the Company due and payable prior to its specified maturity as a result of an event of default (however described) relating to either a payment default or a breach of its financial covenants under the HoldCo Facility and such event of default is not remedied within any originally applicable grace period.

ING    00199

**27.6    Insolvency**

(a)    A member of the Group (excluding any Non-Material Subsidiary):

    (i)    is unable or admits inability to pay its debts as they fall due;

    (ii)    is deemed to, or is declared to, be unable to pay its debts under applicable law;

    (iii)    suspends or threatens to suspend making payments on any of its debts; or

    (iv)    by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its indebtedness.

(b)    The value of the assets of any member of the Group (excluding any Non-Material Subsidiary) is less than its liabilities (taking into account contingent and prospective liabilities).

(c)    A moratorium is declared in respect of any indebtedness of any member of the Group (excluding any Non-Material Subsidiary).  If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium.

**27.7    US Bankruptcy Laws**

Any of the following occurs in respect of a US Obligor:

(a)    it makes a general assignment for the benefit of creditors;

(b)    it commences a voluntary case or proceeding under any US Bankruptcy Law;

(c)    an involuntary case under any US Bankruptcy Law is commenced against it and is not controverted within 20 days or is not dismissed or stayed within 60 days after commencement of the case; or

(d)    an order for relief or other order approving any case or proceeding is entered under any US Bankruptcy Law.

**27.8    Insolvency proceedings**

(a)    Any corporate action, legal proceedings or other procedure or step is taken in relation to:

    (i)    the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration, judicial management or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any member of the Group (excluding any Non-Material Subsidiary);

    (ii)    a composition, compromise, assignment or arrangement with any creditor of any member of the Group (excluding any Non-Material Subsidiary);

    (iii)    the appointment of a liquidator, receiver, administrative receiver, administrator, judicial manager, compulsory manager or other similar officer in respect of member of the Group (excluding any Non-Material Subsidiary) or any of its assets; or

    (iv)    enforcement of any Security over any assets of any member of the Group (excluding any Non-Material Subsidiary),

ING    00200

or any analogous procedure or step is taken in any jurisdiction.

(b)     Paragraph (a) shall not apply to:

    (i)     any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 21 days of commencement; or

    (ii)     any step or procedure permitted by Clause 26.6 (Merger).

**27.9     Creditors' process**

(a)     Subject to paragraph (b) below, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of USD 5,000,000 (or its equivalent in any other currency or currencies) and is not discharged within 30 days.

(b)     A Dutch executory attachment (*executorial beslag*) affects any asset of a member of the Group having an aggregate value of USD 2,000,000 (or its equivalent in any other currency or currencies).

**27.10     Unlawfulness and invalidity**

(a)     It is or becomes unlawful for an Obligor or any other member of the Group that is a party to a Transaction Security Document to perform any of its obligations under the Finance Documents, any Transaction Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective and the unlawfulness individually or cumulatively materially and adversely affects the interests of the Finance Parties under the Finance Documents.

(b)     Subject to the Legal Reservations, any obligation or obligations of any Obligor under any Finance Documents are not, or cease to be, legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Finance Parties under the Finance Documents.

(c)     Any Finance Document ceases to be in full force and effect or any Transaction Security ceases to be legal, valid, binding, enforceable or effective or is alleged by a party to it (other than a Finance Party) to be ineffective.

**27.11     Cessation of business**

Except as a result of a Permitted Disposal, any member of the Group suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business and, in the case of a member of the Group that is not an Obligor, where such suspension or cessation has or is reasonably likely to have a Material Adverse Effect.

**27.12     Change of ownership**

The Company ceases to own at least the same percentage of shares in the Obligors as on the date of this Agreement except as a result of a disposal which is a Permitted Disposal.

**27.13     Audit qualification**

The Auditors of the Group qualify the audited annual consolidated financial statements of the Company.

**27.14   Expropriation**

The authority or ability of any member of the Group (excluding any Non-Material Subsidiary) to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group (excluding any Non-Material Subsidiary) or any of its assets.

**27.15   Repudiation and rescission of agreements**

An Obligor (or any other relevant party) rescinds or purports to rescind or repudiates or purports to repudiate a Finance Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Finance Document or any Transaction Security.

**27.16   Litigation**

Any litigation, arbitration, administrative, governmental, regulatory or other investigations, proceedings or disputes are commenced or threatened in relation to the Finance Documents or the transactions contemplated in the Finance Documents or against any member of the Group or its assets which have or are reasonably likely to have a Material Adverse Effect.

**27.17   Declared Company**

The Minister (being the Minister for the purposes of Section 229 of the Companies Act (Chapter 50) of Singapore) declares any Obligor to be a company to which the provisions of Part IX of the Companies Act (Chapter 50) of Singapore apply.

**27.18   Material adverse change**

Any event or circumstance occurs which the Majority Lenders reasonably believe has or is reasonably likely to have a Material Adverse Effect.

**27.19   Conditions subsequent**

The Company or other relevant Obligor fails to provide any condition subsequent pursuant to and in accordance with Clause 5.3 (Conditions subsequent) or Clause 26.22(c) (Further assurance).

**27.20   Acceleration**

(a)   If an Event of Default described in Clause 27.7 (US Bankruptcy Laws) occurs, the Total Commitments and Ancillary Commitments will, if not already cancelled under this Agreement, be immediately and automatically cancelled and all amounts outstanding under the Finance Documents will be immediately and automatically due and payable, without the requirement of notice or any other formality.

(b)   On and at any time after the occurrence of an Event of Default which is continuing the Agent may, and shall if so directed by the Majority Lenders, by notice to the Company:

(i)   if not already cancelled under paragraph (a) above, cancel the Total Commitments and/or Ancillary Commitments at which time they shall immediately be cancelled;

(ii)   declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, at which time they shall become immediately due and payable;

ING   00202

(iii)    declare that all or part of the Utilisations be payable on demand, at which time they shall immediately become payable on demand by the Agent on the instructions of the Majority Lenders;

(iv)    declare all or any part of the amounts (or cash cover in relation to those amounts) outstanding under the Ancillary Facilities to be immediately due and payable, at which time they shall become immediately due and payable;

(v)    declare that all or any part of the amounts (or cash cover in relation to those amounts) outstanding under the Ancillary Facilities be payable on demand, at which time they shall immediately become payable on demand by the Agent on the instructions of the Majority Lenders;

(vi)    by notice to any Dutch Obligor, require such Dutch Obligor to give a guarantee or security interest in favour of the Finance Parties and/or the Security Agent and the relevant Dutch Obligor must comply with that request; and/or

(vii)    exercise or direct the Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

## 28.    CHANGES TO THE LENDERS

### 28.1    Assignments and transfers by the Lenders

(a)    Subject to this Clause 28, a Lender (the **Existing Lender**) may:

(i)    assign any of its rights; or

(ii)    transfer by novation any of its rights and obligations,

under any Finance Document to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the **New Lender**).

(b)    Each Party agrees that in case of a transfer pursuant to this Clause 28.1 (Assignments and transfers by the Lenders), the Transaction Security Documents and the guarantees granted by each Obligor under the Finance Documents shall be preserved for the benefit of the Security Agent, the New Lender and the remaining Secured Parties.

### 28.2    Conditions of assignment or transfer

(a)    The consent of the Company is required for an assignment or transfer by an Existing Lender unless the assignment or transfer is:

(i)    to another Lender or an Affiliate of a Lender which is, in each case, a Swiss Qualifying Bank;

(ii)    if the Existing Lender is a fund, to a fund which is a Related Fund of the Existing Lender which is a Swiss Qualifying Bank; or

(iii)    made at a time when an Event of Default is continuing.

(b)    The consent of the Company to an assignment or transfer (if required) must not be unreasonably withheld or delayed, provided that such consent shall be withheld if an assignment or transfer would lead to a breach of any of the Swiss Non-Bank Rules.  The Company will be deemed to have given

ING     00203

its consent five Business Days after the Company is given notice of the request unless consent is expressly refused by the Company within that time.

(c)     The consent of the Company to an assignment or transfer must not be withheld solely because the assignment or transfer may result in an increase to the Mandatory Cost.

(d)     If the consent of the Company is required for any assignment or transfer, the Agent is not obliged to enter into a Transfer Certificate or Assignment Agreement if the Company withholds its consent (irrespective of whether it is being reasonable in withholding that consent).

(e)     An assignment or transfer by an Existing Lender of any of its obligations under a Facility must be in a minimum amount of USD 1,000,000 (or its equivalent in any other currency or currencies).

(f)     An assignment will only be effective on:

(i)     receipt by the Agent (whether in the Assignment Agreement or otherwise) of written confirmation from the New Lender (in form and substance satisfactory to the Agent) that the New Lender will assume the same obligations to the other Finance Parties and the other Secured Parties as it would have been under if it was an Original Lender;

(ii)     the New Lender entering into the documentation required for it to accede as a Party and if the procedure set out in Clause 28.6 (Procedure for assignment) is complied with; and

(iii)     the performance by the Agent of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to a New Lender, the completion of which the Agent shall promptly notify to the Existing Lender and the New Lender.

(g)     A transfer will only be effective if the New Lender enters into the documentation required for it to accede as a Party and if the procedure set out in Clause 28.5 (Procedure for transfer) is complied with.

(h)     If:

(i)     a Lender assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

(ii)     as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to make a payment to the New Lender or Lender acting through its new Facility Office under Clause 18.1 (Increased costs),

then the New Lender or Lender acting through its new Facility Office is only entitled to receive payment under that Clause to the same extent as the Existing Lender or Lender acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred. This paragraph (h) shall not apply in respect of an assignment or transfer made in the ordinary course of the primary syndication of the Facilities.

(i)     Each New Lender, by executing the relevant Transfer Certificate or Assignment Agreement, confirms, for the avoidance of doubt, that the Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the transfer or assignment becomes effective in accordance with this Agreement and that it is bound by that decision to the same extent as the Existing Lender would have been had it remained a Lender.

ING     00204

**28.3    Assignment or transfer fee**

Unless the Agent otherwise agrees and excluding an assignment or transfer (i) to an Affiliate of a Lender, (ii) to a Related Fund or (iii) made in connection with primary syndication of the Facilities, the New Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Agent (for its own account) a fee of USD 3,000.

**28.4    Limitation of responsibility of Existing Lenders**

(a)    Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

    (i)    the legality, validity, effectiveness, adequacy or enforceability of the Finance Documents, the Transaction Security or any other documents;

    (ii)    the financial condition of any Obligor;

    (iii)    the performance and observance by any Obligor or any other member of the Group of its obligations under the Finance Documents or any other documents; or

    (iv)    the accuracy of any statements (whether written or oral) made in or in connection with any Finance Document or any other document,

and any representations or warranties implied by law are excluded.

(b)    Each New Lender confirms to the Existing Lender, the other Finance Parties and the Secured Parties that it:

    (i)    has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Obligor and its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Lender or any other Finance Party in connection with any Finance Document or the Transaction Security; and

    (ii)    will continue to make its own independent appraisal of the creditworthiness of each Obligor and its related entities whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

(c)    Nothing in any Finance Document obliges an Existing Lender to:

    (i)    accept a re-transfer or re-assignment from a New Lender of any of the rights and obligations assigned or transferred under this Clause 28; or

    (ii)    support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by any Obligor of its obligations under the Finance Documents or otherwise.

**28.5    Procedure for transfer**

(a)    Subject to the conditions set out in Clause 28.2 (Conditions of assignment or transfer) a transfer is effected in accordance with paragraph (c) below when the Agent executes an otherwise duly completed Transfer Certificate delivered to it by the Existing Lender and the New Lender. The Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Transfer Certificate appearing on its face to comply with the terms of this

ING    00205

Agreement and delivered in accordance with the terms of this Agreement, execute that Transfer Certificate.

(b)     The Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or similar checks under all applicable laws and regulations in relation to the transfer to such New Lender.

(c)     Subject to Clause 28.10 (Pro rata interest settlement), on the Transfer Date:

(i)     to the extent that in the Transfer Certificate the Existing Lender seeks to transfer by novation its rights and obligations under the Finance Documents and in respect of the Transaction Security each of the Obligors and the Existing Lender shall be released from further obligations towards one another under the Finance Documents and in respect of the Transaction Security and their respective rights against one another under the Finance Documents and in respect of the Transaction Security shall be cancelled (being the **Discharged Rights and Obligations**);

(ii)    each of the Obligors and the New Lender shall assume obligations towards one another and/or acquire rights against one another which differ from the Discharged Rights and Obligations only insofar as that Obligor or other member of the Group and the New Lender have assumed and/or acquired the same in place of that Obligor and the Existing Lender;

(iii)   the Agent, the Arranger, the Security Agent, the New Lender, the other Lenders and any relevant Ancillary Lender shall acquire the same rights and assume the same obligations between themselves and in respect of the Transaction Security as they would have acquired and assumed had the New Lender been an Original Lender with the rights, and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Agent, the Arranger, the Security Agent, and any relevant Ancillary Lender and the Existing Lender shall each be released from further obligations to each other under the Finance Documents; and

(iv)    the New Lender shall become a Party as a "Lender".

**28.6    Procedure for assignment**

(a)     Subject to the conditions set out in Clause 28.2 (Conditions of assignment or transfer) an assignment may be effected in accordance with paragraph (c) below when the Agent executes an otherwise duly completed Assignment Agreement delivered to it by the Existing Lender and the New Lender. The Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Assignment Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Assignment Agreement.

(b)     The Agent shall only be obliged to execute an Assignment Agreement delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or similar checks under all applicable laws and regulations in relation to the assignment to such New Lender.

(c)     Subject to Clause 28.10 (Pro rata interest settlement), on the Transfer Date:

(i)     the Existing Lender will assign absolutely to the New Lender its rights under the Finance Documents and in respect of the Transaction Security expressed to be the subject of the assignment in the Assignment Agreement;

ING    00206

(ii)     the Existing Lender will be released from the obligations (the Relevant Obligations) expressed to be the subject of the release in the Assignment Agreement (and any corresponding obligations by which it is bound in respect of the Transaction Security); and

(iii)    the New Lender shall become a Party as a "Lender" and will be bound by obligations equivalent to the Relevant Obligations.

(d)     Lenders may utilise procedures other than those set out in this Clause 28.6 to assign their rights under the Finance Documents (but not, without the consent of the relevant Obligor or unless in accordance with Clause 28.5 (Procedure for transfer), to obtain a release by that Obligor from the obligations owed to that Obligor by the Lenders nor the assumption of equivalent obligations by a New Lender **provided that** they comply with the conditions set out in Clause 28.2 (Conditions of assignment or transfer).

## 28.7    Copy of Transfer Certificate, Assignment Agreement, an Accordion Accession Certificate or Increase Confirmation to Company

The Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate, an Assignment Agreement, an Accordion Accession Certificate or an Increase Confirmation, send to the Company a copy of that Transfer Certificate, Assignment Agreement, Accordion Accession Certificate or Increase Confirmation.

## 28.8    Security over Lenders' rights

In addition to the other rights provided to Lenders under this Clause 28, each Lender may without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create Security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

(a)     any charge, assignment or other Security to secure obligations to a federal reserve or central bank; and

(b)     in the case of any Lender which is a fund, any charge, assignment or other Security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

except that no such charge, assignment or Security shall:

(i)     release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or other Security for the Lender as a party to any of the Finance Documents;

(ii)     require any payments to be made by an Obligor or grant to any person any more extensive rights than those required to be made or granted to the relevant Lender under the Finance Documents; or

(iii)    result in a breach of the Swiss Non-Bank Rules.

## 28.9    Exposure transfer transactions

Nothing herein shall restrict the Lenders from entering into any arrangement with another person under which such Lender substantially transfers its credit risk exposure under this Agreement to that other person (including sub-participations and derivative transactions), provided that under such arrangement (and for the duration of such arrangement):

ING   00207

(a)     the relationship between the Lender and that other person is that of a debtor and creditor (including in the event of the bankruptcy or similar event of the Lender or an Obligor);

(b)     the other person will have no proprietary interest in the benefit of this Agreement or in any monies received by the Lender under or in relation to this Agreement;

(c)     the other person will under no circumstances be subrogated to, or substituted in respect of, the Lender's claims under this Agreement; and

(d)     the other person will under no circumstances otherwise have any contractual relationship with, or rights against, the Obligors under or in relation to this Agreement.

## 28.10   Pro rata interest settlement

(a)     If the Agent has notified the Lenders that it is able to distribute interest payments on a "pro rata basis" to Existing Lenders and New Lenders then (in respect of any transfer pursuant to Clause 28.5 (Procedure for transfer) or any assignment pursuant to Clause 28.6 (Procedure for assignment) the Transfer Date of which, in each case, is after the date of such notification and is not on the last day of an Interest Period):

(i)     any interest or fees in respect of the relevant participation which are expressed to accrue by reference to the lapse of time shall continue to accrue in favour of the Existing Lender up to but excluding the Transfer Date (Accrued Amounts) and shall become due and payable to the Existing Lender (without further interest accruing on them) on the last day of the current Interest Period (or, if the Interest Period is longer than six Months, on the next of the dates which falls at six Monthly intervals after the first day of that Interest Period); and

(ii)     the rights assigned or transferred by the Existing Lender will not include the right to the Accrued Amounts so that, for the avoidance of doubt:

(A)     when the Accrued Amounts become payable, those Accrued Amounts will be payable for the account of the Existing Lender; and

(B)     the amount payable to the New Lender on that date will be the amount which would, but for the application of this Clause 28.10, have been payable to it on that date, but after deduction of the Accrued Amounts.

(b)     In this Clause 28.10 references to "Interest Period" shall be construed to include a reference to any other period for accrual of fees.

## 29.     CHANGES TO THE OBLIGORS

### 29.1   Assignment and transfers by Obligors

No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

### 29.2   Additional Borrowers

(a)     Subject to compliance with the provisions of paragraphs (c) and (d) of Clause 24.8 (Know your customer checks), the Company may request that any of its wholly owned Subsidiaries which is not a Dormant Subsidiary becomes a Borrower.  On receipt of such a request, the Agent shall inform all of the Lenders.  That Subsidiary shall become a Borrower if:

ING     00208

(i)     it is incorporated in the same jurisdiction as an existing Borrower or otherwise all the Lenders approve the accession of that Subsidiary;

(ii)    the Company and that Subsidiary deliver to the Agent a duly completed and executed Accession Deed;

(iii)   the Company confirms that no Default is continuing or would occur as a result of that Subsidiary becoming an Additional Borrower; and

(iv)    the Agent has received all of the documents and other evidence listed in Part 4 of Schedule 2 (Conditions) in relation to that Additional Borrower, each in form and substance satisfactory to the Agent.

(b)     The Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part 4 of Schedule 2 (Conditions).

(c)     Other than to the extent that the Majority Lenders notify the Agent in writing to the contrary before the Agent gives the notification described in paragraph (b) above, the Lenders authorise (but do not require) the Agent to give that notification.  The Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

**29.3    Resignation of a Borrower**

(a)     With the prior consent of all the Lenders, the Company may request that a Borrower ceases to be a Borrower by delivering to the Agent a Resignation Letter.

(b)     The Agent shall accept a Resignation Letter and notify the Company and the other Finance Parties of its acceptance if:

(i)     the Company has confirmed that no Default is continuing or would result from the acceptance of the Resignation Letter;

(ii)    the Borrower is under no actual or contingent obligations as a Borrower under any Finance Documents; and

(iii)   where the Borrower is also a Guarantor (unless its resignation has been accepted in accordance with Clause 29.5 (Resignation of a Guarantor)), its obligations in its capacity as Guarantor continue to be legal, valid, binding and enforceable and in full force and effect and the amount guaranteed by it as a Guarantor is not decreased (and the Company has confirmed this is the case).

(c)     Upon notification by the Agent to the Company of its acceptance of the resignation of a Borrower, that company shall cease to be a Borrower and shall have no further rights or obligations under the Finance Documents as a Borrower.

(d)     The Agent may, at the cost and expense of the Company, require a legal opinion from counsel to the Agent confirming the matters set out in paragraph (b)(iii) above and the Agent shall be under no obligation to accept a Resignation Letter until it has obtained such opinion in form and substance satisfactory to it.

ING    00209

**29.4    Additional Guarantors**

(a)    Subject to compliance with the provisions of paragraphs (c) and (d) of Clause 24.8 (Know your customer checks), the Company may request that any of its wholly owned Subsidiaries (which is not a Dormant Subsidiary) become a Guarantor. On receipt of such a request, the Agent shall inform all of the Lenders.

(b)    The Company shall ensure that each Additional Borrower shall become an Additional Guarantor and shall grant such Transaction Security as the Security Agent and the Company may agree on or prior to the date specified in Part 3 of that Schedule.

(c)    In accordance with Clause 25.4 (Guarantor cover) and subject to paragraph (d) below, the Company shall procure that any other member of the Group, to the extent required to comply with the Company's obligations in Clause 25.4 (Guarantor cover), shall become an Additional Guarantor and grant Security as the Agent may require.

(d)    Without prejudice to the Company's obligation to comply with the requirements of Clause 25.4 (Guarantor cover) and paragraph (c) of this Clause, which obligations remain unaffected hereby, a CFC shall not be required to become an Additional Guarantor hereunder, it being understood that the Company may request that any of its wholly owned Subsidiaries (including, without limitation, any CFCs) becomes a Guarantor in accordance with the terms of this Clause 29.4 if it so elects.

(e)    A member of the Group shall become an Additional Guarantor if:

    (i)    the Company and the proposed Additional Guarantor deliver to the Agent a duly completed and executed Accession Deed; and

    (ii)    the Agent has received all of the documents and other evidence listed in Part 4 of Schedule 2 (Conditions) in relation to that Additional Guarantor, each in form and substance satisfactory to the Agent.

(f)    The Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part 4 Schedule 2 (Conditions).

(g)    Other than to the extent that the Majority Lenders notify the Agent in writing to the contrary before the Agent gives the notification described in paragraph (f) above, the Lenders authorise (but do not require) the Agent to give that notification.  The Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

**29.5    Resignation of a Guarantor**

(a)    The Company may request that a Guarantor (other than the Company) ceases to be a Guarantor by delivering to the Agent a Resignation Letter if all the Lenders and the other Obligors have consented to the resignation of that Guarantor.

(b)    The Agent shall accept a Resignation Letter and notify the Company and the Lenders of its acceptance if:

    (i)    the Company has confirmed that no Default is continuing or would result from the acceptance of the Resignation Letter;

    (ii)    no payment is due from the Guarantor under Clause 22.1 (Guarantee and indemnity); and

ING    00210

(iii)     where the Guarantor is also a Borrower, it is under no actual or contingent obligations as a Borrower and has resigned and ceased to be a Borrower under Clause 29.3 (Resignation of a Borrower).

(c)     Upon notification by the Agent to the Company of its acceptance of the resignation of a Guarantor, that company shall cease to be a Guarantor and shall have no further rights or obligations under the Finance Documents as a Guarantor.

## 29.6     Changes to the Obligors – FATCA

(a)     If, having been given at least 10 Business Days' notice of a request from the Company under any of Clauses 29.2 (Additional Borrowers) to 29.5 (Resignation of a Guarantor) above,  the Agent or a Lender reasonably believes that a Subsidiary becoming an Additional Borrower or an Additional Guarantor, or ceasing to be a Borrower or Guarantor, may constitute a Material Modification and the Agent or such Lender (as the case may be) notifies the Company and the Agent accordingly, that Subsidiary may, subject to paragraphs (b) below, not become an Additional Borrower or an Additional Guarantor, or cease to be a Borrower or Guarantor (as the case may be) without the consent of the Agent or that Lender (as the case may be).

(b)     The consent of a Lender shall not be required pursuant to paragraph (a) above if that Lender is a FATCA Protected Lender.

## 29.7     Repetition of Representations

Delivery of an Accession Deed constitutes confirmation by the relevant Subsidiary that the Repeating Representations are true and correct in relation to it as at the date of delivery as if made by reference to the facts and circumstances then existing.

## 30.     ROLE OF THE ADMINISTRATIVE PARTIES

## 30.1     Appointment of the Agent

(a)     Each of the other Administrative Parties, the Ancillary Lenders and the Lenders appoints the Agent to act as its agent under and in connection with the Finance Documents.

(b)     Each of the other Administrative Parties, the Ancillary Lenders and the Lenders authorises the Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Agent under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

(c)     Each Finance Party (other than the Agent) hereby releases the Agent from any restrictions on representing several persons and self-dealing under any applicable law, and in particular from the restrictions of Section 181 of the German Civil Code to make use of any authorisation granted under this Agreement and to perform its duties and obligations as agent hereunder, in each case to the extent legally possible to such Finance Party.  A Finance Party which is barred by its constitutional documents or by-laws from granting such exemption shall promptly notify the Agent accordingly.

## 30.2     Instructions

(a)     The Agent shall:

(i)     unless a contrary indication appears in a Finance Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Agent in accordance with any instructions given to it by:

ING    00211

(A)     all Lenders if the relevant Finance Document stipulates the matter is an all Lender decision; and

(B)     in all other cases, the Majority Lenders; and

(ii)    not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (i) above.

(b)     The Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or, if the relevant Finance Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Agent may refrain from acting unless and until it receives those instructions or that clarification.

(c)     Save in the case of decisions stipulated to be a matter for any other Lender or group of Lenders under the relevant Finance Document and unless a contrary indication appears in a Finance Document, any instructions given to the Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Finance Parties save for the Security Agent.

(d)     The Agent may refrain from acting in accordance with any instructions of any Lender or group of Lenders until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability which it may incur in complying with those instructions.

(e)     In the absence of instructions, the Agent may act (or refrain from acting) as it considers to be in the best interest of the Lenders.

(f)     The Agent is not authorised to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings relating to any Finance Document.   This paragraph (f) shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Transaction Security Documents or enforcement of the Transaction Security or Transaction Security Documents.

## 30.3   Duties of the Agent

(a)     The Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

(b)     The Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Agent for that Party by any other Party.

(c)     Except where a Finance Document specifically provides otherwise, the Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(d)     If the Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

(e)     If the Agent is aware of the non-payment of any principal, interest, commitment fee or other fee payable to a Finance Party (other than the Agent, the Arrangers or the Security Agent) under this Agreement, it shall promptly notify the other Finance Parties.

ING    00212

(f)      The Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

**30.4     Role of the Arrangers**

Except as specifically provided in the Finance Documents, the Arrangers have no obligations of any kind to any other Party under or in connection with any Finance Document.

**30.5     No fiduciary duties**

(a)      Nothing in any Finance Document constitutes the Agent or the Arrangers Bank being a trustee or fiduciary of any other person.

(b)      None of the Agent, the Arranger, or any Ancillary Lender shall be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

**30.6     Business with the Group**

The Agent, the Arranger, and each Ancillary Lender may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

**30.7     Rights and discretions**

(a)      The Agent and the Security Agent may:

    (i)      rely on:

        (A)      any representations, notice or document believed by it to be genuine, correct and appropriately authorised; and

        (B)      any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify;

    (ii)     assume that:

        (A)      any instructions received by it from the Majority Lenders, any Lenders or any group of Lenders are duly given in accordance with the terms of the Finance Documents; and

        (B)      unless it has received notice of revocation, that those instructions have not been revoked; and

    (iii)    rely on a certificate from any person:

        (A)      as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

        (B)      to the effect that such person approves of any particular dealing, transaction, step, action or thing,

    as sufficient evidence that that is the case and, in the case of paragraph (A) above, may assume the truth and accuracy of that certificate.

ING    00213

(b)     The Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Lenders) that:

    (i)     no Default has occurred (unless it has actual knowledge of a Default arising under Clause 27.1 (Non-payment));

    (ii)    any right, power, authority or discretion vested in any Party or any group of Lenders has not been exercised; and

    (iii)   any notice or request made by the Company (other than a Utilisation Request or Selection Notice) is made on behalf of and with the consent and knowledge of all the Obligors.

(c)     The Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

(d)     Without prejudice to the generality of paragraph (c) above or paragraph (e) below, the Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Agent (and so separate from any lawyers instructed by the Lenders) if the Agent in its reasonable opinion deems this to be desirable.

(e)     The Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

(f)     The Agent may act in relation to the Finance Documents through its officers, employees and agents and the Agent shall not:

    (i)     be liable for any error of judgment made by any such person; or

    (ii)    be bound to supervise, or be in any way responsible for, any loss incurred by reason of misconduct, omission or default on the part, of any such person,

unless such error or such loss was directly caused by the Agent's gross negligence or wilful misconduct.

(g)     Unless a Finance Document expressly provides otherwise the Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

(h)     Without prejudice to the generality of paragraph (g) above, the Agent:

    (i)     may disclose; and

    (ii)    on the written request of the Company or the Majority Lenders shall, as soon as reasonably practicable, disclose,

the identity of a Defaulting Lender to the Company and to the other Finance Parties.

(i)     Notwithstanding any other provision of any Finance Document to the contrary, none of the Agent or the Arrangers is obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(j)     The Agent is not obliged to disclose to any Finance Party any details of the rate notified to the Agent by any Lender or the identity of any such Lender for the purpose of paragraph (a)(i) of Clause 15.2 (Market disruption).

ING   00214

(k)     Notwithstanding any provision of any Finance Document to the contrary, the Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

## 30.8   Responsibility for documentation

None of the Administrative Parties, any Lender or any Ancillary Lender is responsible or liable for:

(a)     the adequacy, accuracy or completeness of any information (whether oral or written) supplied by an Administrative Party, a Lender, an Ancillary Lender, an Obligor or any other person in or in connection with any Finance Document or the Information Memorandum or the transactions contemplated in the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security; or

(c)     any determination as to whether any information provided or to be provided to any Finance Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

## 30.9   No duty to monitor

The Agent shall not be bound to enquire:

(a)     whether or not any Default has occurred;

(b)     as to the performance, default or any breach by any Party of its obligations under any Finance Document; or

(c)     whether any other event specified in any Finance Document has occurred.

## 30.10  Exclusion of liability

(a)     Without limiting paragraph (b) below, no Administrative Party will be liable (including, without limitation, for negligence or any other category of liability whatsoever) for:

(i)     any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or the Transaction Security, unless directly caused by its gross negligence or wilful misconduct;

(ii)    exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, any Finance Document, the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or the Transaction Security; or

ING    00215

(iii)    without prejudice to the generality of paragraphs (i) and (ii) above, any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of:

        (A)    any act, event or circumstance not reasonably within its control; or

        (B)    the general risks of investment in, or the holding of assets in, any jurisdiction,

    including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets (including any Disruption Event); breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b)    No Party (other than the relevant Administrative Party or an Ancillary Lender) may take any proceedings against any officer, employee or agent of an Administrative Party or any Ancillary Lender, in respect of any claim it might have against that Administrative Party or Ancillary Lender or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document or any Finance Document and any officer, employee or agent of an Administrative Party or any Ancillary Lender may enforce and enjoy the benefit of this Clause, subject to Clause 1.4(b) (Third party rights).

(c)    The Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by the Agent if the Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Agent for that purpose.

(d)    Nothing in this Agreement shall oblige the Agent or the Arrangers to carry out:

    (i)    any "know your customer" or other checks in relation to any person; or

    (ii)    any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Lender,

on behalf of any Lender and each Lender confirms to the Agent and the Arrangers that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Agent or the Arranger.

(e)    Without prejudice to any provision of any Finance Document excluding or limiting the Agent's liability, any liability of the Agent arising under or in connection with any Finance Document or the Transaction Security shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Agent or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Agent at any time which increase the amount of that loss.  In no event shall the Agent be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Agent has been advised of the possibility of such loss or damages.

## 30.11   Lenders' indemnity to the Agent

(a)    Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero)

ING   00216

indemnify the Agent, within three Business Days of demand, against any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Agent (otherwise than by reason of the Agent's gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to Clause 35.11 (Disruption to Payment Systems etc), notwithstanding the Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Agent) in acting as Agent under the Finance Documents (unless the Agent has been reimbursed by an Obligor pursuant to a Finance Document).

(b)     Subject to paragraph (c) below, the Company shall immediately on demand reimburse any Lender for any payment that Lender makes to the Agent pursuant to paragraph (a) above.

(c)     Paragraph (b) above shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Agent to an Obligor.

## 30.12   Resignation of the Agent

(a)     The Agent may resign and appoint one of its Affiliates acting through an office in the European Union as successor by giving notice to the Lenders and the Company.

(b)     Alternatively the Agent may resign by giving 30 days' notice to the Lenders and the Company, in which case the Majority Lenders (after consultation with the Company) may appoint a successor Agent.

(c)     If the Majority Lenders have not appointed a successor Agent in accordance with paragraph (b) above within 20 days after notice of resignation was given, the retiring Agent (after consultation with the Company) may appoint a successor Agent (acting through an office in the European Union).

(d)     If the Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as agent and the Agent is entitled to appoint a successor Agent under paragraph (c) above, the Agent may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Agent to become a party to this Agreement as Agent) agree with the proposed successor Agent amendments to this Clause 30 and any other term of this Agreement dealing with the rights or obligations of the Agent consistent with then current market practice for the appointment and protection of corporate trustees together with any reasonable amendments to the agency fee payable under this Agreement which are consistent with the successor Agent's normal fee rates and those amendments will bind the Parties.

(e)     The retiring Agent shall make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under the Finance Documents. The Company shall, within three Business Days of demand, reimburse the retiring Agent for the amount of all costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

(f)     The Agent's resignation notice shall only take effect upon the appointment of a successor.

(g)     Upon the appointment of a successor, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (e) above but shall remain entitled to the benefit of Clause 19.3 (Indemnity to the Agent) and this Clause 30 (and any agency fees for the account of the retiring Agent shall cease to accrue from (and shall be payable on) that date). Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

ING    00217

(h)     The Agent must resign in accordance with paragraph (b) above (and, to the extent applicable, must use reasonable endeavours to appoint a successor Agent (which must be a FATCA Exempt Party) pursuant to paragraph (c) above) if on or after the date which is three months before the earliest FATCA Application Date relating to any payment to the Agent under the Finance Documents, either:

    (i)     the Agent fails to respond to a request under Clause 17.8 (FATCA information) and the Company or a Lender reasonably believes that the Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

    (ii)    the information supplied by the Agent pursuant to Clause 17.8 (FATCA information) indicates that the Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date; or

    (iii)   the Agent notifies the Company and the Lenders that the Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

and (in each case) the Company or a Lender reasonably believes that a Party will be required to make a FATCA Deduction that would not be required if the Agent were to resign, and the Company or that Lender, by notice to the Agent, requires it to resign.

(i)     If, during the period in which the appointment of a successor Agent is being arranged, an Obligor or a Lender which is required to make a payment under the Finance Documents to the Agent may instead either:

    (i)     pay that amount direct to the required recipient(s); or

    (ii)    pay that amount in accordance with Clause 35.5(a)(ii) (Impaired Agent).

## 30.13   Replacement of the Agent

(a)     After consultation with the Company, the Majority Lenders may, by giving 30 days' notice to the Agent (or, at any time the Agent is an Impaired Agent, by giving any shorter notice determined by the Majority Lenders) replace the Agent by appointing a successor Agent (acting through an office in the European Union).

(b)     The retiring Agent shall (at its own cost if it is an Impaired Agent and otherwise at the expense of the Lenders) make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under the Finance Documents.

(c)     The appointment of the successor Agent shall take effect on the date specified in the notice from the Majority Lenders to the retiring Agent.  As from this date, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (b) above) but shall remain entitled to the benefit of Clause 19.3 (Indemnity to the Agent) and this Clause 30 (and any agency fees for the account of the retiring Agent shall cease to accrue from (and shall be payable on) that date).

(d)     Any successor Agent and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

ING     00218

### 30.14   Confidentiality

(a)   In acting as agent for the Finance Parties, the Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b)   If information is received by another division or department of the Agent, it may be treated as confidential to that division or department and the Agent shall not be deemed to have notice of it.

(c)   Notwithstanding any other provision of any Finance Document to the contrary, neither the Agent nor the Arrangers are obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

### 30.15   Relationship with the Lenders

(a)   Subject to Clause 28.10 (Pro rata interest settlement), the Agent may treat the person shown in its records as Lender at the opening of business (in the place of the Agent's principal office as notified to the Finance Parties from time to time) as the Lender acting through its Facility Office:

   (i)   entitled to or liable for any payment due under any Finance Document on that day; and

   (ii)   entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Finance Document made or delivered on that day,

unless it has received not less than five Business Days' prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

(b)   Each Lender shall supply the Agent with any information required by the Agent in order to calculate the Mandatory Cost in accordance with Schedule 4 (Mandatory Cost Formulae).

(c)   Any Lender may by notice to the Agent appoint a person to receive on its behalf all notices, communications, information and documents to be made or despatched to that Lender under the Finance Documents.  Such notice shall contain the address, fax number and (where communication by electronic mail or other electronic means is permitted under Clause 37.6 (Electronic communication)) electronic mail address and/or any other information required to enable the sending and receipt of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, fax number, electronic mail address, department and officer by that Lender for the purposes of Clause 37.2 (Addresses) and paragraph (a)(ii) of Clause 37.6 (Electronic communication) and the Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Lender.

### 30.16   Credit appraisal by the Lenders and Ancillary Lenders

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Lender and Ancillary Lender confirms to the Agent, the Arranger and each Ancillary Lender that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

   (a)   the financial condition, status and nature of each member of the Group;

   (b)   the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Transaction Security and any other agreement, arrangement or document entered into,

ING    00219

made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(c)     whether that Lender or Ancillary Lender has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the Transaction Security, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(d)     the adequacy, accuracy or completeness of the Information Memorandum and any other information provided by the Agent, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)     the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

## 30.17   Base Reference Banks

If a Base Reference Bank (or, if a Base Reference Bank is not a Lender, the Lender of which it is an Affiliate) ceases to be a Lender, the Agent shall (in consultation with the Company) appoint another Lender or an Affiliate of a Lender to replace that Base Reference Bank.

## 30.18   Agent's management time

Any amount payable to the Agent under Clause 19.3 (Indemnity to the Agent), Clause 21 (Costs and Expenses) and Clause 30.11 (Lenders' indemnity to the Agent) shall include the cost of utilising the Agent's management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as the Agent may notify to the Company and the Lenders, and is in addition to any fee paid or payable to the Agent under Clause 16 (Fees).

## 30.19   Deduction from amounts payable by the Agent

If any Party owes an amount to the Agent under the Finance Documents the Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed.  For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

## 30.20   Reliance and engagement letters

Each Finance Party and Secured Party confirms that each of the Arrangers and the Agent has authority to accept on its behalf (and ratifies the acceptance on its behalf of any letters or reports already accepted by the Arrangers or Agent) the terms of any reliance letter or engagement letters relating to any reports or letters provided by accountants in connection with the Finance Documents or the transactions contemplated in the Finance Documents and to bind it in respect of those reports or letters and to sign such letters on its behalf and further confirms that it accepts the terms and qualifications set out in such letters.

ING    00220

**30.21 Register**

The Agent, acting for these purposes solely as an agent of the relevant Borrower, shall maintain a register (the **Register**) for the recordation of, shall record, the names and addresses of the Lenders and the respective amounts of the Commitments and Loans of each Lender from time to time. The Agent shall update the Register to reflect any assignments or transfers made pursuant to Clause 28 (Changes to the Lenders) and, notwithstanding anything else in this Agreement, such assignments or transfers are not effective until reflected in the Register. Absent manifest error, the entries in the Register shall be conclusive and binding for all purposes and the Borrower, the Agent and the Lenders shall treat each person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Agent shall make a copy of the Register available for inspection by the Company and the Borrower upon reasonable prior notice.

**31. THE SECURITY AGENT**

**31.1 Authority to act as agent**

Each of the Finance Parties irrevocably appoints the Security Agent individually in accordance with the following provisions of this Clause to act as agent under this Agreement and with respect to the Finance Documents, authorises the Security Agent on its behalf to (i) execute each Transaction Security Document expressed to be executed by the Security Agent on its behalf and (ii) to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Security Agent under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

**31.2 Security Agent as holder of Transaction Security**

(a) In this Clause 31,

**Security Agent Claim** has the meaning given to such term in paragraph (c) below; and

**Finance Party Claim** means any amount which an Obligor owes to a Finance Party under or in connection with the Finance Documents, notwithstanding from time to time any (however fundamental) amendment, supplement, novation, variation, increase, extension (whether of maturity or otherwise), restatement, re-enactment, replacement, change in purpose of, or addition of or to any of the Finance Documents (including the designation of any document as a Finance Document) and/or any facility or amount made available under any of the Finance Documents.

(b) Unless expressly provided to the contrary in any Finance Document, the Security Agent holds any security created by a Transaction Security Document governed by English law and the proceeds of that security on trust for the Finance Parties.

(c) Each Obligor must pay the Security Agent, as an independent and separate creditor, an amount equal to each Finance Party Claim on its due date (each a **Security Agent Claim**).

(d) Each Security Agent Claim is created on the understanding that the Security Agent must:

    (i)     share the proceeds of each Security Agent Claim with the other Finance Parties; and

    (ii)    pay those proceeds to the Finance Parties,

in accordance with Clause 35.6 (Partial payments) pro rata to their respective interests in the amounts outstanding under the Finance Documents.

ING    00221

(e)     The Security Agent may enforce performance of any Security Agent Claim in its own name as an independent and separate right.  This includes any suit, execution, enforcement of security, recovery of guarantees and applications for and voting in respect of any kind of insolvency proceeding.

(f)     Each Finance Party must, at the request of the Security Agent, perform any act required in connection with the enforcement of any Security Agent Claim.  This includes joining in any proceedings as co-claimant with the Security Agent.

(g)     Unless the Security Agent fails to enforce a Security Agent Claim within a reasonable time after its due date, a Finance Party may not take any action to enforce the corresponding Finance Party Claim unless it is requested to do so by the Security Agent.

(h)     Each Obligor irrevocably and unconditionally waives any right it may have to require a Finance Party to join in any proceedings as co-claimant with the Security Agent in respect of any Security Agent Claim.

(i)     Discharge by an Obligor of a Finance Party Claim will discharge the corresponding Security Agent Claim in the same amount.

(j)     Discharge by an Obligor of a Security Agent Claim will discharge the corresponding Finance Party Claim in the same amount.

(k)     The aggregate amount of the Security Agent Claims will never exceed the aggregate amount of Finance Party Claims.

(l)     A defect affecting a Security Agent Claim against an Obligor will not affect any Finance Party Claim.

(m)     A defect affecting a Finance Party Claim against an Obligor will not affect any Security Agent Claim.

(n)     If the Security Agent returns to any Obligor, whether in any kind of insolvency proceedings or otherwise, any recovery in respect of which it has made a payment to a Finance Party, that Finance Party must repay an amount equal to that recovery to the Security Agent.

**31.3    Instructions**

(a)     The Security Agent shall, subject to paragraph (e) below:

    (i)     exercise or refrain from exercising any right, power, authority or discretion vested in it as Security Agent in accordance with any instructions given to it by:

        (A)     all Lenders if the relevant Finance Document stipulates the matter is an all Lender decision; and

        (B)     in all other cases, the Majority Lenders; and

    (ii)     not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (i) above.

(b)     The Security Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or, if the relevant Finance Document stipulates the matter is an decision for any other Lender or group of Lenders, that other Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion

ING   00222

and the Security Agent may refrain from acting unless and until it receives those instructions or that clarification.

(c)     Save in the case of decisions stipulated to be a matter for any other Lender of group of Lenders under the relevant Finance Document and unless a contrary indication appears in a Finance Document, any instructions given to the Security Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Secured Parties.

(d)     Paragraph (a) above shall not apply:

   (i)      where a contrary indication appears in this Agreement;

   (ii)     where this Agreement requires the Security Agent to act in a specified manner or to take a specified action;

   (iii)    in respect of any provision which protects the Security Agent's own position in its personal capacity as opposed to its role of Security Agent for the Secured Parties including, without limitation, Clauses 31.6 (No duty to account) to Clause 31.11 (Exclusion of liability), Clause 31.14 (Confidentiality) to Clause 31.20 (Custodians and nominees) and Clause 31.23 (Acceptance of title) to Clause 31.26 (Disapplication of Trustee Acts);

   (iv)    in respect of the exercise of the Security Agent's discretion to exercise a right, power or authority under any of the Finance Documents.

(e)     If giving effect to instructions given by the Majority Lenders would (in the Security Agent's opinion) have an effect equivalent to an amendment or waiver, the Security Agent shall not act in accordance with those instructions unless consent to it so acting is obtained from each Party (other than the Security Agent) whose consent would have been required in respect of that amendment or waiver pursuant to Clause 41 (Amendments and Waivers).

(f)     In exercising any discretion to exercise a right, power or authority under the Finance Documents where either:

   (i)      it has not received any instructions as to the exercise of that discretion; or

   (ii)     the exercise of that discretion is subject to paragraph (d)(iv) above,

   the Security Agent shall do so having regard to the interests of all the Secured Parties.

(g)     The Security Agent may refrain from acting in accordance with any instructions of any Finance Party until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability (together with any applicable VAT) which it may incur in complying with those instructions.

(h)     Without prejudice to the provisions of the Transaction Security Documents, and the remainder of this Clause 31, in the absence of instructions, the Security Agent may act (or refrain from acting) as it considers in its discretion to be appropriate.

## 31.4    Duties of the Security Agent

(a)     The Security Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

ING    00223

(b)      The Security Agent shall promptly:

    (i)      forward to the Agent a copy of any document received by the Security Agent from any Obligor under any Finance Document; and

    (ii)     forward to a Party the original or a copy of any document which is delivered to the Security Agent for that Party by any other Party.

(c)      Except where a Finance Document specifically provides otherwise, the Security Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(d)      If the Security Agent receives notice from a Party referring to any Finance Document, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the Agent.

(e)      The Security Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

**31.5     No fiduciary duties to Obligors**

Except as provided in Clause 31.1 and 31.2, nothing in this Agreement constitutes the Security Agent as an agent, trustee or fiduciary of any Obligor.

**31.6     No duty to account**

The Security Agent shall not be bound to account to any other Secured Party for any sum or the profit element of any sum received by it for its own account.

**31.7     Business with the Group**

The Security Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

**31.8     Rights and discretions**

(a)      The Security Agent may:

    (i)      rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

    (ii)     assume that:

        (A)      any instructions received by it from a Finance Party or group of Lenders are duly given in accordance with the terms of the Finance Documents;

        (B)      unless it has received notice of revocation, that those instructions have not been revoked; and

        (C)      if it receives any instructions to act in relation to the Transaction Security, that all applicable conditions under the Finance Documents for so acting have been satisfied; and

    (iii)    rely on a certificate from any person:

ING     00224

(A) as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

(B) to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of paragraph (A) above, may assume the truth and accuracy of that certificate.

(b) The Security Agent may assume (unless it has received notice to the contrary in its capacity as security trustee for the Secured Parties) that:

(i) no Default has occurred;

(ii) any right, power, authority or discretion vested in any Party or any group of Creditors has not been exercised; and

(iii) any notice made by the Company is made on behalf of and with the consent and knowledge of all the Obligors.

(c) The Security Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

(d) Without prejudice to the generality of paragraph (c) above or paragraph (e) below, the Security Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Security Agent (and so separate from any lawyers instructed by any Finance Party) if the Security Agent in its reasonable opinion deems this to be desirable.

(e) The Security Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Security Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

(f) The Security Agent, any Receiver and any Delegate may act in relation to the Finance Documents and the Security Property through its officers, employees and agents and shall not:

(i) be liable for any error of judgment made by any such person; or

(ii) be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part of any such person,

(iii) unless such error or such loss was directly caused by the Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct.

(g) Unless this Agreement expressly specifies otherwise, the Security Agent may disclose to any other Party any information it reasonably believes it has received as security trustee under this Agreement.

(h) Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(i) Notwithstanding any provision of any Finance Document to the contrary, the Security Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion

ING    00225

if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

(j)  Each Finance Party (other than the Security Agent) hereby releases the Security Agent from any restrictions on representing several persons and self-dealing under any applicable law, and in particular from the restrictions of Section 181 of the German Civil Code to make use of any authorisation granted under this Agreement and to perform its duties and obligations as security agent hereunder, in each case to the extent legally possible to such Finance Party. A Finance Party which is barred by its constitutional documents or by-laws from granting such exemption shall promptly notify the Security Agent accordingly.

## 31.9  Responsibility for documentation

None of the Security Agent, any Receiver nor any Delegate is responsible or liable for:

(a)  the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Security Agent, a Obligor or any other person in or in connection with any Finance Document or the transactions contemplated in the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(b)  the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Security Property; or

(c)  any determination as to whether any information provided or to be provided to any Secured Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

## 31.10  No duty to monitor

The Security Agent shall not be bound to enquire:

(a)  whether or not any Default has occurred;

(b)  as to the performance, default or any breach by any Party of its obligations under any Finance Document; or

(c)  whether any other event specified in any Finance Document has occurred.

## 31.11  Exclusion of liability

(a)  Without limiting paragraph (b) below (and without prejudice to any other provision of any Finance Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate), none of the Security Agent, any Receiver nor any Delegate will be liable for:

(i)  any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or the Security Property unless directly caused by its gross negligence or wilful misconduct;

(ii)  exercising or not exercising any right, power, authority or discretion given to it by, or in connection with, any Finance Document, the Security Property or any other agreement,

ING  00226

arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or the Security Property;

(iii) any shortfall which arises on the enforcement or realisation of the Security Property; or

(iv) without prejudice to the generality of paragraphs (i) to (iii) above, any damages, costs, losses, any diminution in value or any liability whatsoever arising as a result of:

(v) any act, event or circumstance not reasonably within its control; or

(vi) the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets; breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b) No Party (other than the Security Agent, that Receiver or that Delegate (as applicable)) may take any proceedings against any officer, employee or agent of the Security Agent, a Receiver or a Delegate in respect of any claim it might have against the Security Agent, a Receiver or a Delegate or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document or any Security Property and any officer, employee or agent of the Security Agent, a Receiver or a Delegate may rely on this Clause subject to Clause 1.4 (Third party rights) and the provisions of the Third Parties Act.

(c) Nothing in this Agreement shall oblige the Security Agent to carry out:

(i) any "know your customer" or other checks in relation to any person; or

(ii) any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Finance Party,

on behalf of any Finance Party and each Finance Party confirms to the Security Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Security Agent.

(d) Without prejudice to any provision of any Finance Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate, any liability of the Security Agent, any Receiver or Delegate arising under or in connection with any Finance Document or the Security Property shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Security Agent, Receiver or Delegate (as the case may be) or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Security Agent, Receiver or Delegate (as the case may be) at any time which increase the amount of that loss. In no event shall the Security Agent, any Receiver or Delegate be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Security Agent, Receiver or Delegate (as the case may be) has been advised of the possibility of such loss or damages.

ING    00227

**31.12   Lenders' indemnity to the Security Agent**

(a)   Each Lender shall (to the extent of its Pro Rata Share), indemnify the Security Agent and every Receiver and every Delegate, within three Business Days of demand, against any cost, loss or liability incurred by any of them (otherwise than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct) in acting as Security Agent, Receiver or Delegate under, or exercising any authority conferred under, the Finance Documents (unless the relevant Security Agent, Receiver or Delegate has been reimbursed by a Obligor pursuant to a Finance Document).

(b)   Subject to paragraph (c) below, the Company shall immediately on demand reimburse any Lender for any payment that Lender makes to the Security Agent pursuant to paragraph (a) above.

(c)   Paragraph (b) above shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Security Agent to a Obligor.

**31.13   Resignation of the Security Agent**

(a)   The Security Agent may resign and appoint one of its Affiliates as successor by giving notice to the Agent and the Company.

(b)   Alternatively the Security Agent may resign by giving 30 days' notice to the Agent and the Company, in which case the Majority Lenders may appoint a successor Security Agent.

(c)   If the Majority Lenders have not appointed a successor Security Agent in accordance with paragraph (b) above within 20 days after notice of resignation was given, the retiring Security Agent (after consultation with the Agent) may appoint a successor Security Agent.

(d)   The retiring Security Agent shall, at its own cost, make available to the successor Security Agent such documents and records and provide such assistance as the successor Security Agent may reasonably request for the purposes of performing its functions as Security Agent under the Finance Documents.

(e)   The Security Agent's resignation notice shall only take effect upon:

   (i)   the appointment of a successor; and

   (ii)   the transfer of all the Security Property to that successor.

(f)   Upon the appointment of a successor, the retiring Security Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (b) of Clause 31.24 (Winding up of trust) and paragraph (d) above) but shall remain entitled to the benefit of this Clause 31 and Clause 19.4 (Indemnity to the Security Agent) (and any Security Agent fees for the account of the retiring Security Agent shall cease to accrue from (and shall be payable on) that date).  Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if that successor had been an original Party.

(g)   The Security Agent must resign in accordance with paragraph (b) above (and, to the extent applicable, must use reasonable endeavours to appoint a successor Security Agent (which must be a FATCA Exempt Party) pursuant to paragraph (c) above) if on or after the date which is three months before the earliest FATCA Application Date relating to any payment to the Security Agent under the Finance Documents, either:

ING   00228

(i)     the Security Agent fails to respond to a request under Clause 17.8 (FATCA information) and the Company or a Lender reasonably believes that the Security Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

(ii)    the information supplied by the Security Agent pursuant to Clause 17.8 (FATCA information) indicates that the Security Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date; or

(iii)   the Security Agent notifies the Company and the Lenders that the Security Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

and (in each case) the Company or a Lender reasonably believes that a Party will be required to make a FATCA Deduction that would not be required if the Security Agent were a FATCA Exempt Party, and the Company or that Lender, by notice to the Security Agent, requires it to resign.

(h)    The Majority Lenders may, by notice to the Security Agent, require it to resign in accordance with paragraph (b) above. In this event, the Security Agent shall resign in accordance with paragraph (b) above but the cost referred to in paragraph (d) above shall be for the account of the Company.

## 31.14   Confidentiality

(a)    In acting as agent for the Secured Parties, the Security Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b)    If information is received by another division or department of the Security Agent, it may be treated as confidential to that division or department and the Security Agent shall not be deemed to have notice of it.

(c)    Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

## 31.15   Information from the Lenders

Each Lender shall supply the Security Agent with any information that the Security Agent may reasonably specify as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent.

## 31.16   Credit appraisal by the Secured Parties

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Secured Party confirms to the Security Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)    the financial condition, status and nature of each member of the Group;

(b)    the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Security Property and any other agreement, arrangement or document entered into, made

ING   00229

or executed in anticipation of, under or in connection with any Finance Document or the Charged Property;

(c)  whether that Secured Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the Charged Property, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Charged Property;

(d)  the adequacy, accuracy or completeness of any information provided by the Security Agent, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)  the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

## 31.17  Reliance and engagement letters

The Security Agent may obtain and rely on any certificate or report from any Obligor's auditor and may enter into any reliance letter or engagement letter relating to that certificate or report on such terms as it may consider appropriate (including, without limitation, restrictions on the auditor's liability and the extent to which that certificate or report may be relied on or disclosed).

## 31.18  No responsibility to perfect Transaction Security

The Security Agent shall not be liable for any failure to:

(a)  require the deposit with it of any deed or document certifying, representing or constituting the title of any Obligor to any of the Charged Property;

(b)  obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any Finance Document or the Transaction Security;

(c)  register, file or record or otherwise protect any of the Transaction Security (or the priority of any of the Transaction Security) under any law or regulation or to give notice to any person of the execution of any Finance Document or of the Transaction Security;

(d)  take, or to require any Obligor to take, any step to perfect its title to any of the Charged Property or to render the Transaction Security effective or to secure the creation of any ancillary Security under any law or regulation, unless directly caused by its gross negligence or wilful misconduct; or

(e)  require any further assurance in relation to any Transaction Security Document.

## 31.19  Insurance by Security Agent

(a)  The Security Agent shall not be obliged:

(i)  to insure any of the Charged Property;

ING    00230

(ii)     to require any other person to maintain any insurance; or

(iii)    to verify any obligation to arrange or maintain insurance contained in any Finance Document,

(iv)    and the Security Agent shall not be liable for any damages, costs or losses to any person as a result of the lack of, or inadequacy of, any such insurance.

(b)    Where the Security Agent is named on any insurance policy as an insured party, it shall not be liable for any damages, costs or losses to any person as a result of its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Instructing Group requests it to do so in writing and the Security Agent fails to do so within fourteen days after receipt of that request.

## 31.20   Custodians and nominees

The Security Agent may appoint and pay any person to act as a custodian or nominee on any terms in relation to any asset of the trust as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to the trust created under this Agreement and the Security Agent shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Agreement or be bound to supervise the proceedings or acts of any person.

## 31.21   Delegation by the Security Agent

(a)    Each of the Security Agent, any Receiver and any Delegate may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any right, power, authority or discretion vested in it in its capacity as such.

(b)    That delegation may be made upon any terms and conditions (including the power to sub-delegate) and subject to any restrictions that the Security Agent, that Receiver or that Delegate (as the case may be) may, in its discretion, think fit in the interests of the Secured Parties.

(c)    No Security Agent, Receiver or Delegate shall be bound to supervise, or be in any way responsible for any damages, costs or losses incurred by reason of any misconduct, omission or default on the part of, any such delegate or sub-delegate.

## 31.22   Additional Security Agents

(a)    The Security Agent may at any time appoint (and subsequently remove) any person to act as a separate trustee or as a co-trustee jointly with it:

(i)     if it considers that appointment to be in the interests of the Secured Parties;

(ii)    for the purposes of conforming to any legal requirement, restriction or condition which the Security Agent deems to be relevant; or

(iii)    for obtaining or enforcing any judgment in any jurisdiction,

(iv)    and the Security Agent shall give prior notice to the Company and the Agent of that appointment.

ING    00231

(b)     Any person so appointed shall have the rights, powers, authorities and discretions (not exceeding those given to the Security Agent under or in connection with the Finance Documents) and the duties, obligations and responsibilities that are given or imposed by the instrument of appointment.

(c)     The remuneration that the Security Agent may pay to that person, and any costs and expenses (together with any applicable VAT) incurred by that person in performing its functions pursuant to that appointment shall, for the purposes of this Agreement, be treated as costs and expenses incurred by the Security Agent.

**31.23   Acceptance of title**

The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any Obligor may have to any of the Charged Property and shall not be liable for, or bound to require any Obligor to remedy, any defect in its right or title.

**31.24   Winding up of trust**

If the Security Agent, with the approval of the Agent, determines that:

(a)     all of the Secured Obligations (as defined in the Transaction Security Documents) and all other obligations secured by the Transaction Security Documents have been fully and finally discharged; and

(b)     no Secured Party is under any commitment, obligation or liability (actual or contingent) to make advances or provide other financial accommodation to any Obligor pursuant to the Finance Documents,

then:

(i)     the trusts set out in this Agreement shall be wound up and the Security Agent shall release, without recourse or warranty, all of the Transaction Security and the rights of the Security Agent under each of the Transaction Security Documents; and

(ii)    any Security Agent which has resigned pursuant to Clause 31.13 (Resignation of the Security Agent) shall release, without recourse or warranty, all of its rights under each Transaction Security Document.

**31.25   Powers supplemental to Trustee Acts**

The rights, powers, authorities and discretions given to the Security Agent under or in connection with the Finance Documents shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Security Agent by law or regulation or otherwise.

**31.26   Disapplication of Trustee Acts**

Section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Agent in relation to the trusts constituted by this Agreement. Where there are any inconsistencies between the Trustee Act 1925 or the Trustee Act 2000 and the provisions of this Agreement, the provisions of this Agreement shall, to the extent permitted by law and regulation, prevail and, in the case of any inconsistency with the Trustee Act 2000, the provisions of this Agreement shall constitute a restriction or exclusion for the purposes of that Act.

ING     00232

## 32.   BORROWING BASE

### 32.1   Borrowing Base – Security Agent role

The Security Agent shall:

(a)   determine that the Company has provided a Borrowing Base Certificate as and when required under this Agreement;

(b)   examine each Borrowing Base Certificate provided to the Security Agent to ensure that the calculations made by the Company in the relevant Borrowing Base Certificate, based on the figures set out therein, are accurate;

(c)   to the extent required, liaise with the Company to seek clarification and further information in relation to the calculations set out in each Borrowing Base Certificate;

(d)   inform the Agent of the Borrowing Base as reflected by each Borrowing Base Certificate;

(e)   consult with the Company in relation to the determination of the relevant Values and at its sole discretion consult other sources as it deems fit in connection therewith;

(f)   assess whether or not sufficient information has been provided by the Company in or in connection with any Borrowing Base Certificate;

(g)   reduce the Advance Rate in accordance with Clause 32.3 (Adjustment to Advance Rate);

(h)   in the event that the Company fails to do so, instruct reputable auditors or surveyors (at the cost of the Company) to conduct the annual borrowing base audit referred to in Clause 32.2 (Borrowing Base Audit); and

(i)   enter into discussions with the Company in relation to the scope of the annual borrowing base audit referred to in Clause 32.2 (Borrowing Base Audit).

### 32.2   Borrowing Base Audit

(a)   The Company must instruct reputable auditors or surveyors (at its own cost) to conduct an annual audit of the Collateral for the purposes of Clause 24.4 (Borrowing Base).

(b)   The Security Agent may once in any Financial Year of the Company, or as and when requested by the Security Agent if the Security Agent (acting on behalf of the Majority Lenders) reasonably suspects an Event of Default is continuing or may have occurred or may occur (and shall, if requested by the Agent, acting on the instructions of the Majority Lenders) on reasonable notice to the Company carry out an on-location review of all or any of the Collateral.

(c)   Prior to any such review, the Company and the Security Agent (acting on behalf of the Majority Lenders) (each acting reasonably) shall enter into good faith discussions to agree:

(i)   a mutually acceptable scope and cost of the review; and

(ii)   if applicable, the identity of the relevant auditor or surveyor.

(d)   If, at any time when an Event of Default is continuing, the Company is requested to by the Agent (acting on the instructions of the Majority Lenders), the Company shall instruct, at its own cost, reputable auditors or surveyors (as relevant) to carry out an on-location review of all or any of the Collateral.

(e)     Each Obligor agrees to fully co-operate, subject to any applicable law, with any review referred to in paragraphs (a), (b) and (d) above and to make the Collateral available for inspection at the Approved Locations for such period agreed between the Company and the Agent.

(f)     Copies of any reports produced following the reviews and audits referred to in this Clause shall be made available by the Agent to the Lenders as soon as practicable upon receipt.

**32.3   Adjustment to Advance Rate**

If at any time in relation to any asset which is comprised in the Borrowing Base at that time the Security Agent in its sole discretion (acting reasonably) considers that such asset no longer qualifies as eligible as a component to the Borrowing Base (based on the criteria set out in the definition of "Borrowing Base" and its component definitions), the Security Agent may, without prejudice to any rights under this Agreement and the Transaction Security Documents, by not less than five Business Days' notice, reduce the Advance Rate applied to that asset or not apply the Advance Rate to that asset.

**33.     CONDUCT OF BUSINESS BY THE FINANCE PARTIES**

No provision of this Agreement will:

(a)     interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)     oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c)     oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

**34.     SHARING AMONG THE FINANCE PARTIES**

**34.1   Payments to Finance Parties**

(a)     Subject to paragraph (b) below, if a Finance Party (a **Recovering Finance Party**) receives or recovers any amount from an Obligor other than in accordance with Clause 35 (Payment Mechanics) (a **Recovered Amount**) and applies that amount to a payment due under the Finance Documents then:

(i)     the Recovering Finance Party shall, within three Business Days, notify details of the receipt or recovery, to the Agent;

(ii)    the Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Agent and distributed in accordance with Clause 35 (Payment Mechanics), without taking account of any Tax which would be imposed on the Agent in relation to the receipt, recovery or distribution; and

(iii)   the Recovering Finance Party shall, within three Business Days of demand by the Agent, pay to the Agent an amount (the **Sharing Payment**) equal to such receipt or recovery less any amount which the Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made, in accordance with Clause 35.6 (Partial payments).

ING    00234

(b)     Paragraph (a) above shall not apply to any amount received or recovered by an Ancillary Lender in respect of any cash cover provided for the benefit of that Ancillary Lender.

**34.2     Redistribution of payments**

The Agent shall treat the Sharing Payment as if it had been paid by the relevant Obligor and distribute it between the Finance Parties (other than the Recovering Finance Party) (the **Sharing Finance Parties**) in accordance with Clause 35.6 (Partial payments) towards the obligations of that Obligor to the Sharing Finance Parties.

**34.3     Recovering Finance Party's rights**

On a distribution by the Agent under Clause 34.2 (Redistribution of payments) of a payment received by a Recovering Finance Party from an Obligor, as between the relevant Obligor and the Recovering Finance Party, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by that Obligor.

**34.4     Reversal of redistribution**

If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

(a)     each Sharing Finance Party shall, upon request of the Agent, pay to the Agent for the account of that Recovering Finance Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on the Sharing Payment which that Recovering Finance Party is required to pay) (the **Redistributed Amount**); and

(b)     as between the relevant Obligor and each relevant Sharing Finance Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by that Obligor.

**34.5     Exceptions**

(a)     This Clause 34 shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this Clause, have a valid and enforceable claim against the relevant Obligor.

(b)     A Recovering Finance Party is not obliged to share with any other Finance Party any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(i)     it notified the other Finance Party of the legal or arbitration proceedings; and

(ii)     the other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

**34.6     Ancillary Lenders**

This Clause 34 shall not apply to any receipt or recovery by a Lender in its capacity as an Ancillary Lender at any time prior to service of notice under Clause 27.20 (Acceleration). Following service of notice under Clause 27.20 (Acceleration), this Clause 34 shall apply to all receipts or recoveries by a Lender in its capacity as an Ancillary Lender.

ING     00235

35.    **PAYMENT MECHANICS**

35.1   **Payments to the Agent**

(a)    On each date on which an Obligor or a Lender is required to make a payment under a Finance Document, excluding a payment under the terms of an Ancillary Document, that Obligor or Lender shall make the same available to the Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b)    Payment shall be made to such account in the principal financial centre of the country of that currency (or, in relation to euro, in a principal financial centre in such Participating Member State or London, as specified by the Agent) and with such bank as the Agent, in each case, specifies.

35.2   **Distributions by the Agent**

Each payment received by the Agent under the Finance Documents for another Party shall, subject to Clause 35.3 (Distributions to an Obligor) and Clause 35.4 (Clawback and pre-funding) be made available by the Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office), to such account as that Party may notify to the Agent by not less than five Business Days' notice with a bank specified by that Party in the principal financial centre of the country of that currency (or, in relation to euro, in the principal financial centre of a Participating Member State or London, as specified by that Party).

35.3   **Distributions to an Obligor**

The Agent may (with the consent of the Obligor or in accordance with Clause 36 (Set-Off)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

35.4   **Clawback and pre-funding**

(a)    Where a sum is to be paid to the Agent under the Finance Documents for another Party, the Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

(b)    Unless paragraph (c) below applies, if the Agent pays an amount to another Party and it proves to be the case that the Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Agent shall on demand refund the same to the Agent together with interest on that amount from the date of payment to the date of receipt by the Agent, calculated by the Agent to reflect its cost of funds.

(c)    If the Agent has notified the Lenders that it is willing to make available amounts for the account of a Borrower before receiving funds from the Lenders then if and to the extent that the Agent does so but it proves to be the case that it does not then receive funds from a Lender in respect of a sum which it paid to a Borrower:

(i)     the Agent shall notify the Company of that Lender's identity and the Borrower to whom that sum was made available shall on demand refund it to the Agent; and

(ii)    the Lender by whom those funds should have been made available or, if that Lender fails to do so, the Borrower to whom that sum was made available, shall on demand pay to the

ING    00236

Agent the amount (as certified by the Agent) which will indemnify the Agent against any funding cost incurred by it as a result of paying out that sum before receiving those funds from that Lender.

## 35.5 Impaired Agent

(a) If, at any time, the Agent becomes an Impaired Agent, an Obligor or a Lender which is required to make a payment under the Finance Documents to the Agent in accordance with Clause 35.1 (Payments to the Agent) may instead either:

(i) pay that amount direct to the required recipient(s); or

(ii) if in its absolute discretion it considers that it is not reasonably practicable to pay that amount direct to the required recipient(s), pay that amount or the relevant part of that amount to an interest-bearing account held with an Acceptable Bank within the meaning of paragraph (a) of the definition of "Acceptable Bank" and in relation to which no Insolvency Event has occurred and is continuing, in the name of the Obligor or the Lender making the payment (the **Paying Party** and designated as a trust account for the benefit of the Party or Parties beneficially entitled to that payment under the Finance Documents (the **Recipient Party** or **Recipient Parties**).

In each case such payments must be made on the due date for payment under the Finance Documents.

(b) All interest accrued on the amount standing to the credit of the trust account shall be for the benefit of the Recipient Party or the Recipient Parties pro rata to their respective entitlements.

(c) A Party which has made a payment in accordance with this Clause 35.5 shall be discharged of the relevant payment obligation under the Finance Documents and shall not take any credit risk with respect to the amounts standing to the credit of the trust account.

(d) Promptly upon the appointment of a successor Agent in accordance with Clause 30.13 (Replacement of the Agent), each Paying Party shall (other than to the extent that that Party has given an instruction pursuant to paragraph (e) below) give all requisite instructions to the bank with whom the trust account is held to transfer the amount (together with any accrued interest) to the successor Agent for distribution to the relevant Recipient Party or Recipient Parties in accordance with Clause 35.2 (Distributions by the Agent).

(e) A Paying Party shall, promptly upon request by a Recipient Party and to the extent:

(i) that it has not given an instruction pursuant to paragraph (d) above; and

(ii) that it has been provided with the necessary information by that Recipient Party,

give all requisite instructions to the bank with whom the trust account is held to transfer the relevant amount (together with any accrued interest) to that Recipient Party.

## 35.6 Partial payments

(a) If the Agent or the Security Agent receives a payment for application against amounts due in respect of any Finance Documents that is insufficient to discharge all the amounts then due and payable by an Obligor under those Finance Documents, the Agent or the Security Agent, as the case may be, shall apply that payment towards the obligations of that Obligor under those Finance Documents in the following order:

ING   00237

(i) **first**, in or towards payment pro rata of any unpaid fees, costs and expenses owing to a Receiver, Security Agent or Delegate under the Transaction Security Documents;

(ii) **secondly**, in or towards payment pro rata of any unpaid fees, costs and expenses owing to an Administrative Party or the Security Agent under the Finance Documents;

(iii) **thirdly**, in or towards payment pro rata of any accrued interest, fee or commission due but unpaid under those Finance Documents;

(iv) **fourthly**, in or towards payment pro rata of any principal due but unpaid under those Finance Documents; and

(v) **fifthly**, in or towards payment pro rata of any other sum due but unpaid under the Finance Documents.

(b) The Agent shall, if so directed by the Majority Lenders, vary the order set out in paragraphs (a)(i) to (v) above.

(c) Paragraphs (a) and (b) above will override any appropriation made by an Obligor.

## 35.7 Set-off by Obligors

All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

## 35.8 Business Days

(a) Any payment under the Finance Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b) During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

## 35.9 Currency of account

(a) Subject to paragraphs (b) to (e) below, the Base Currency is the currency of account and payment for any sum due from an Obligor under any Finance Document.

(b) A repayment of a Utilisation or Unpaid Sum or a part of a Utilisation or Unpaid Sum shall be made in the currency in which that Utilisation or Unpaid Sum is denominated, pursuant to this Agreement, on its due date.

(c) Each payment of interest shall be made in the currency in which the sum in respect of which the interest is payable was denominated, pursuant to this Agreement, when that interest accrued.

(d) Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(e) Any amount expressed to be payable in a currency other than the Base Currency shall be paid in that other currency.

ING    00238

### 35.10   Change of currency

(a)   Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

    (i)   any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Agent (after consultation with the Company); and

    (ii)   any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Agent (acting reasonably).

(b)   If a change in any currency of a country occurs, this Agreement will, to the extent the Agent (acting reasonably and after consultation with the Company) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the Relevant Interbank Market and otherwise to reflect the change in currency.

### 35.11   Disruption to Payment Systems etc

If either the Agent determines (in its discretion) that a Disruption Event has occurred or the Agent is notified by the Company that a Disruption Event has occurred:

(a)   the Agent may, and shall if requested to do so by the Company, consult with the Company with a view to agreeing with the Company such changes to the operation or administration of the Facilities as the Agent may deem necessary in the circumstances;

(b)   the Agent shall not be obliged to consult with the Company in relation to any changes mentioned in paragraph (a) if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to such changes;

(c)   the Agent may consult with the Finance Parties in relation to any changes mentioned in paragraph (a) but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

(d)   any such changes agreed upon by the Agent and the Company shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of Clause 41 (Amendments and Waivers);

(e)   the Agent shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Agent) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this Clause 35.11 unless directly caused by its gross negligence or wilful misconduct; and

(f)   the Agent shall notify the Finance Parties of all changes agreed pursuant to paragraph (d) above.

ING    00239

36.    **SET-OFF**

(a)    A Finance Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation.  If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

(b)    Any credit balances taken into account by an Ancillary Lender when operating a net limit in respect of any overdraft under an Ancillary Facility shall on enforcement of the Finance Documents be applied first in reduction of the overdraft provided under that Ancillary Facility in accordance with its terms.

37.    **NOTICES**

37.1    **Communications in writing**

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or letter.

37.2    **Addresses**

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a)    in the case of each Original Obligor, that identified with the name of the Company next to its signature below;

(b)    in the case of each Administrative Party (excluding the Agent), each Lender, each Ancillary Lender and any other Obligor, that notified in writing to the Agent on or prior to the date on which it becomes a Party; and

(c)    in the case of the Agent and the Security Agent, that identified with its name below,

or any substitute address, fax number or department or officer as the Party may notify to the Agent (or the Agent may notify to the other Parties, if a change is made by the Agent) by not less than five Business Days' notice.

37.3    **Delivery**

(a)    Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(i)    if by way of fax, when received in legible form; or

(ii)    if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 37.2 (Addresses), if addressed to that department or officer.

(b)    Any communication or document to be made or delivered to the Agent or the Security Agent will be effective only when actually received by the Agent or Security Agent and then only if it is expressly

ING    00240

marked for the attention of the department or officer identified with the Agent's or Security Agent's signature below (or any substitute department or officer as the Agent or Security Agent shall specify for this purpose).

(c)     All notices from or to an Obligor shall be sent through the Agent.

(d)     Any communication or document made or delivered to the Company in accordance with this Clause 37.3 will be deemed to have been made or delivered to each of the Obligors.

(e)     Any communication or document which becomes effective, in accordance with paragraphs (a) to (d) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

**37.4     Notification of address and fax number**

Promptly upon changing its address or fax number, the Agent shall notify the other Parties.

**37.5     Communication when Agent is Impaired Agent**

If the Agent is an Impaired Agent the Parties may, instead of communicating with each other through the Agent, communicate with each other directly and (while the Agent is an Impaired Agent) all the provisions of the Finance Documents which require communications to be made or notices to be given to or by the Agent shall be varied so that communications may be made and notices given to or by the relevant Parties directly.   This provision shall not operate after a replacement Agent has been appointed.

**37.6     Electronic communication**

(a)     Any communication to be made between any two Parties under or in connection with the Finance Documents may be made by electronic mail or other electronic means to the extent that those two Parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication and if those two Parties:

        (i)     notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

        (ii)    notify each other of any change to their address or any other such information supplied by them by not less than five Business Days' notice.

(b)     Any electronic communication made between those two Parties will be effective only when actually received in readable form and in the case of any electronic communication made by a Party to the Agent or the Security Agent only if it is addressed in such a manner as the Agent or Security Agent shall specify for this purpose.

(c)     The Agent and the Company agree that, unless and until notified to the contrary, electronic mail to the electronic mail addresses identified with its respective name next to its respective signature below is an accepted form of communication.

(d)     Any electronic communication which becomes effective, in accordance with paragraph (b) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

ING     00241

**37.7**   **Use of websites**

(a)   The Company may satisfy its obligation under this Agreement to deliver any information in relation to those Lenders (the **Website Lenders**) who accept this method of communication by posting this information onto an electronic website designated by the Company and the Agent (the **Designated Website**) if:

   (i)   the Agent expressly agrees (after consultation with each of the Lenders) that it will accept communication of the information by this method;

   (ii)   both the Company and the Agent are aware of the address of and any relevant password specifications for the Designated Website; and

   (iii)   the information is in a format previously agreed between the Company and the Agent.

   If any Lender (a **Paper Form Lender**) does not agree to the delivery of information electronically then the Agent shall notify the Company accordingly and the Company shall at its own cost supply the information to the Agent (in sufficient copies for each Paper Form Lender) in paper form.  In any event the Company shall at its own cost supply the Agent with at least one copy in paper form of any information required to be provided by it.

(b)   The Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Company and the Agent.

(c)   The Company shall promptly upon becoming aware of its occurrence notify the Agent if:

   (i)   the Designated Website cannot be accessed due to technical failure;

   (ii)   the password specifications for the Designated Website change;

   (iii)   any new information which is required to be provided under this Agreement is posted onto the Designated Website;

   (iv)   any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

   (v)   the Company becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

   If the Company notifies the Agent under paragraph (c)(i) or paragraph (c)(v) above, all information to be provided by the Company under this Agreement after the date of that notice shall be supplied in paper form unless and until the Agent and each Website Lender is satisfied that the circumstances giving rise to the notification are no longer continuing.

(d)   Any Website Lender may request, through the Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated Website.  The Company shall at its own cost comply with any such request within ten Business Days.

**37.8**   **English language**

(a)   Any notice given under or in connection with any Finance Document must be in English.

(b)   All other documents provided under or in connection with any Finance Document must be:

ING    00242

(i)     in English; or

(ii)    if not in English, and if so required by the Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 38.    CALCULATIONS AND CERTIFICATES

### 38.1   Accounts

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

### 38.2   Certificates and determinations

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

### 38.3   Day count convention

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the Relevant Interbank Market differs, in accordance with that market practice.

## 39.    PARTIAL INVALIDITY

If, at any time, any provision of a Finance Document is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction (or of the same jurisdiction to the extent that such illegality invalidity or unenforceability does not apply to the entire provision or obligations thereunder) will in any way be affected or impaired.

## 40.    REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of any Finance Party or Secured Party, any right or remedy under a Finance Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Finance Document.   No election to affirm any Finance Document on the part of any Finance Party or Secured Party shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy.   The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law.

## 41.    AMENDMENTS AND WAIVERS

### 41.1   Required consents

(a)    Subject to Clause 41.2 (All Lender matters) and Clause 41.3 (Other exceptions), any term of the Finance Documents (other than the Mandate Letter) may be amended or waived only with the consent of the Majority Lenders and the Company and any such amendment or waiver will be binding on all Parties.

ING     00243

(b)     The Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 41.

(c)     Without prejudice to the generality of paragraphs (c), (d) and (e) of Clause 30.7 (Rights and discretions), the Agent may engage, pay for and rely on the services of lawyers in determining the consent level required for and effecting any amendment, waiver or consent under this Agreement.

(d)     No amendment or waiver may be made before the date falling ten Business Days after the terms of that amendment or waiver have been notified by the Agent to the Lenders, unless each Lender is a "FATCA Protected Lender". The Agent shall notify the Lenders reasonably promptly of any amendments or waivers proposed by the Company.

(e)     Each Obligor agrees to any such amendment or waiver permitted by this Clause 41 which is agreed to by the Company. This includes any amendment or waiver which would, but for this paragraph (e), require the consent of all of the Guarantors.

**41.2    All Lender matters**

An amendment, waiver or (in the case of a Transaction Security Document) a consent of, or in relation to, any term of any Finance Document that has the effect of changing or which relates to:

(a)     the definitions of "Approved Location", "Borrowing Base" (and any of the defined terms used therein), "Majority Lenders", "Prohibited Payment", "Restricted Countries", "Restricted Person", "Sanctions" and "Sanctions Lists" in Clause 1.1 (Definitions);

(b)     an extension to the date of payment of any amount under the Finance Documents;

(c)     a reduction in the Margin or a reduction in the amount of any payment of principal, interest, fees or commission payable;

(d)     a change in currency of payment of any amount under the Finance Documents;

(e)     an increase in any Commitment or the Total Commitments, an extension of any Availability Period or any requirement that a cancellation of Commitments reduces the Commitments of the Lenders in proportion to their Pro Rata Share under the relevant Facility;

(f)     a change to the Borrowers or Guarantors other than in accordance with Clause 29 (Changes to the Obligors);

(g)     any provision which expressly requires the consent of all the Lenders;

(h)     Clause 2.4 (Finance Parties' rights and obligations), Clause 11 (Mandatory Prepayment and Cancellation), Clause 12.8 (Application of prepayments), Clause 28 (Changes to the Lenders), this Clause 41, Clause 45 (Governing Law) or Clause 46 (Enforcement);

(i)     (other than as expressly permitted by the provisions of any Finance Document) the nature or scope of:

(i)     the guarantee and indemnity granted under Clause 22 (Guarantee and Indemnity);

(ii)     the Charged Property; or

(iii)     the manner in which the proceeds of enforcement of the Transaction Security are distributed

ING     00244

(except in the case of paragraphs (ii) and (iii) above, insofar as it relates to a sale or disposal of an asset which is the subject of the Transaction Security where such sale or disposal is expressly permitted under this Agreement or any other Finance Document); or

(j)     the release of any guarantee and indemnity granted under Clause 22 (Guarantee and Indemnity)) or of any Transaction Security unless permitted under this Agreement or any other Finance Document or relating to a sale or disposal of an asset which is the subject of the Transaction Security where such sale or disposal is expressly permitted under this Agreement or any other Finance Document,

shall not be made, or given, without the prior consent of all the Lenders.

**41.3**    **Other exceptions**

(a)    An amendment or waiver which relates to the rights or obligations of the Agent, the Arranger, the Security Agent or any Ancillary Lender (each in their capacity as such) may not be effected without the consent of the Agent, the Arranger, the Security Agent or that Ancillary Lender.

(b)    If the Agent or a Lender reasonably believes that an amendment or waiver (as the case may be) may constitute a Material Modification and the Agent or that Lender (as the case may be) notifies the Company and the Agent accordingly, that amendment or waiver (as the case may be) may, subject to paragraph (c) below, not be effected without the consent of the Agent or that Lender (as the case may be).

(c)    The consent of a Lender shall not be required pursuant to paragraph (b) above if that Lender is a FATCA Protected Lender.

**41.4**    **Excluded Commitments**

If any Defaulting Lender fails to respond to a request for a consent, waiver, amendment of or in relation to any term of any Finance Document or any other vote of Lenders under the terms of this Agreement within 10 Business Days of that request being made (unless the Company and the Agent agree to a longer time period in relation to any request):

(a)    its Commitment(s) shall not be included for the purpose of calculating the Total Commitments under the relevant Facility/ies when ascertaining whether any relevant percentage (including, for the avoidance of doubt, unanimity) of Total Commitments has been obtained to approve that request; and

(b)    its status as a Lender shall be disregarded for the purpose of ascertaining whether the agreement of any specified group of Lenders has been obtained to approve that request.

**41.5**    **Replacement of Lender**

(a)    If:

(i)    any Lender becomes a Non-Consenting Lender (as defined in paragraph (d) below); or

(ii)    an Obligor becomes obliged to repay any amount in accordance with Clause 11.1 (Illegality) or to pay additional amounts pursuant to Clause 13.4 (Minimum interest), Clause 18.1 (Increased costs), Clause 17.1 (Tax gross-up) or Clause 17.2 (Tax indemnity) to any Lender,

then the Company may, subject always to compliance with the Swiss Non-Bank Rules, on 10 Business Days' prior written notice to the Agent and such Lender, replace such Lender by requiring

ING   00245

such Lender to (and, to the extent permitted by law, such Lender shall) transfer pursuant to Clause 28 (Changes to the Lenders) all (and not part only) of its rights and obligations under this Agreement to a Lender or other bank, financial institution, trust, fund or other entity (a **Replacement Lender**) selected by the Company, which confirms its willingness to assume and does assume all the obligations of the transferring Lender in accordance with Clause 28 (Changes to the Lenders) for a purchase price in cash payable at the time of transfer in an amount equal to the outstanding principal amount of such Lender's participation in the outstanding Utilisations and all accrued interest (to the extent that the Agent has not given a notification under Clause 28.10 (Pro rata interest settlement)), Break Costs and other amounts payable in relation thereto under the Finance Documents.

(b)    The replacement of a Lender pursuant to this Clause 41.5 shall be subject to the following conditions:

    (i)    the Company shall have no right to replace the Agent or Security Agent;

    (ii)    neither the Agent nor the Lender shall have any obligation to the Company to find a Replacement Lender;

    (iii)    in the event of a replacement of a Non-Consenting Lender such replacement must take place no later than 15 Business Days after the date on which that Lender is deemed a Non-Consenting Lender;

    (iv)    in no event shall the Lender replaced under Clause 41.5 be required to pay or surrender to such Replacement Lender any of the fees received by such Lender pursuant to the Finance Documents; and

    (v)    the Lender shall only be obliged to transfer its rights and obligations pursuant to paragraph (a) above once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer.

(c)    A Lender shall perform the checks described in paragraph (b)(v) above as soon as reasonably practicable following delivery of a notice referred to in paragraph (a) above and shall notify the Agent and the Company when it is satisfied that it has complied with those checks.

(d)    In the event that:

    (i)    the Company or the Agent (at the request of the Company) has requested the Lenders to give a consent in relation to, or to agree to a waiver or amendment of, any provisions of the Finance Documents;

    (ii)    the consent, waiver or amendment in question requires the approval of all the Lenders; and

    (iii)    Lenders whose Commitments aggregate more than $66^{2\cdot3}$ per cent. of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated more than $66^{2\cdot3}$ per cent. of the Total Commitments prior to that reduction) have consented or agreed to such waiver or amendment,

then any Lender who does not and continues not to consent or agree to such waiver or amendment shall be deemed a **Non-Consenting Lender**.

**41.6    Disenfranchisement of Defaulting Lenders**

(a)    For so long as a Defaulting Lender has any Available Commitment, in ascertaining:

ING    00246

      (i)     the Majority Lenders; or

      (ii)    whether:

           (A)    any given percentage (including, for the avoidance of doubt, unanimity) of the Total Commitments under the relevant Facility/ies; or

           (B)    the agreement of any specified group of Lenders,

           has been obtained to approve any request for a consent, waiver, amendment or other vote of Lenders under the Finance Documents,

that Defaulting Lender's Commitments under the relevant Facility/ies will be reduced by the amount of its Available Commitments under the relevant Facility/ies and, to the extent that that reduction results in that Defaulting Lender's Total Commitments being zero, that Defaulting Lender shall be deemed not to be a Lender for the purposes of paragraphs (i) and (ii) above.

(b)     For the purposes of this Clause 41.6, the Agent may assume that the following Lenders are Defaulting Lenders:

      (i)     any Lender which has notified the Agent that it has become a Defaulting Lender;

      (ii)    any Lender in relation to which it is aware that any of the events or circumstances referred to in paragraphs (a), (b), (b) or (c) of the definition of "Defaulting Lender" has occurred,

unless it has received notice to the contrary from the Lender concerned (together with any supporting evidence reasonably requested by the Agent) or the Agent is otherwise aware that the Lender has ceased to be a Defaulting Lender.

**41.7    Replacement of a Defaulting Lender**

(a)     The Company may, at any time a Lender has become and continues to be a Defaulting Lender, by giving 10 Business Days' prior written notice to the Agent and such Lender and subject always to compliance with the Swiss Non-Bank Rules:

(b)     (i)     replace such Lender by requiring such Lender to (and, to the extent permitted by law, such Lender shall) transfer pursuant to Clause 28 (Changes to the Lenders) all (and not part only) of its rights and obligations under this Agreement;

      (ii)    require such Lender to (and, to the extent permitted by law, such Lender shall) transfer pursuant to Clause 28 (Changes to the Lenders) all (and not part only) of the undrawn Commitments of the Lender; or

      (iii)   require such Lender to (and, to the extent permitted by law, such Lender shall) transfer pursuant to Clause 28 (Changes to the Lenders) all (and not part only) of its rights and obligations in respect of each Facility,

to a Lender or other bank, financial institution, trust, fund or other entity (a **Replacement Lender**) selected by the Company, which confirms its willingness to assume and does assume all the obligations, or all the relevant obligations, of the transferring Lender in accordance with Clause 28 (Changes to the Lenders) for a purchase price in cash payable at the time of transfer which is either:

      (A)    in an amount equal to the outstanding principal amount of such Lender's participation in the outstanding Utilisations and all accrued interest (to the extent that the Agent has not given a

ING   00247

notification under Clause 28.10 (Pro rata interest settlement)), Break Costs and other amounts payable in relation thereto under the Finance Documents; or

(B)      in an amount agreed between that Defaulting Lender, the Replacement Lender and the Company and which does not exceed the amount described in paragraph (b) above.

(c)      Any transfer of rights and obligations of a Defaulting Lender pursuant to this Clause 41.7 shall be subject to the following conditions:

(i)      the Company shall have no right to replace the Agent or Security Agent;

(ii)     neither the Agent nor the Defaulting Lender shall have any obligation to the Company to find a Replacement Lender;

(iii)    the transfer must take place no later than 15 Business Days after the notice referred to in paragraph (a) above;

(iv)    in no event shall the Defaulting Lender be required to pay or surrender to the Replacement Lender any of the fees received by the Defaulting Lender pursuant to the Finance Documents; and

(v)     the Defaulting Lender shall only be obliged to transfer its rights and obligations pursuant to paragraph (a) above once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer to the Replacement Lender.

(d)      The Defaulting Lender shall perform the checks described in paragraph (c)(v) above as soon as reasonably practicable following delivery of a notice referred to in paragraph (a) above and shall notify the Agent and the Company when it is satisfied that it has complied with those checks.

## 42.   CONFIDENTIALITY

### 42.1   Confidential Information

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 42.2 (Disclosure of Confidential Information) and Clause 42.3 (Disclosure to numbering service providers), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

### 42.2   Disclosure of Confidential Information

Any Finance Party may disclose:

(a)      to any of its Affiliates and Related Funds and any of its or their officers, directors, employees, professional advisers, auditors, insurers, insurance brokers, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph (a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

ING    00248

(b)     to any person:

   (i)      to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents or which succeeds (or which may potentially succeed) it as Agent or Security Agent and, in each case, to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

   (ii)     with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or one or more Obligors and to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

   (iii)    appointed by any Finance Party or by a person to whom paragraph (b)(i) or (ii) above applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf (including, without limitation, any person appointed under paragraph ((c)) of Clause 30.15 (Relationship with the Lenders));

   (iv)     who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in paragraph (b)(i) or (b)(ii) above;

   (v)      to whom information is required or requested to be disclosed by any tribunal or court of competent jurisdiction or any governmental, quasi-governmental, administrative or supervisory, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

   (vi)     to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

   (vii)    to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) pursuant to Clause 28.8 (Security over Lenders' rights);

   (viii)   who is a Party; or

   (ix)     with the consent of the Company,

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

   (A)      in relation to paragraphs (b)(i), (b)(ii) and (b)(iii) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

   (B)      in relation to paragraph (b)(iv) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential

ING      00249

Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(C)    in relation to paragraphs (b)(v), (b)(vi) and (b)(vii) above, the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances; and

(c)    to any person appointed by that Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this paragraph (c) if the service provider to whom the Confidential Information is to be given has entered into a confidentiality agreement substantially in the then currently recommended form of the Loan Market Association Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Company and the relevant Finance Party; and

(d)    to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Obligors if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

## 42.3    Disclosure to numbering service providers

(a)    Any Finance Party may disclose to any national or international numbering service provider appointed by that Finance Party to provide identification numbering services in respect of this Agreement, the Facilities and/or one or more Obligors the following information:

(i)    names of Obligors;

(ii)    country of domicile of Obligors;

(iii)    place of incorporation of Obligors;

(iv)    date of this Agreement;

(v)    Clause 45 (Governing Law);

(vi)    the names of the Agent and the Arranger;

(vii)    date of each amendment and restatement of this Agreement;

(viii)    amounts of, and names of, the Facilities (and any tranches);

(ix)    amount of Total Commitments;

(x)    currencies of the Facilities;

(xi)    type of the Facilities,

(xii)    ranking of the Facilities;

ING    00250

(xiii)    Termination Date for the Facilities;

(xiv)    changes to any of the information previously supplied pursuant to paragraphs (i) to (xiii) above; and

(xv)    such other information agreed between such Finance Party and the Company,

to enable such numbering service provider to provide its usual syndicated loan numbering identification services.

(b)    The Parties acknowledge and agree that each identification number assigned to this Agreement, the Facilities and/or one or more Obligors by a numbering service provider and the information associated with each such number may be disclosed to users of its services in accordance with the standard terms and conditions of that numbering service provider.

(c)    The Company represents that none of the information set out in paragraphs (i) to (xv) of paragraph (a) above is, nor will at any time be, unpublished price-sensitive information.

(d)    The Agent shall notify the Company and the other Finance Parties of:

(i)    the name of any numbering service provider appointed by the Agent in respect of this Agreement, the Facilities and/or one or more Obligors; and

(ii)    the number or, as the case may be, numbers assigned to this Agreement, the Facilities and/or one or more Obligors by such numbering service provider.

**42.4    Entire agreement**

This Clause 42 constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

**42.5    Inside information**

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

**42.6    Notification of disclosure**

Each of the Finance Parties agrees (to the extent permitted by law and regulation) to inform the Company:

(a)    of the circumstances of any disclosure of Confidential Information made pursuant to paragraph (b)(v) of Clause 42.2 (Disclosure of Confidential Information) except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

(b)    upon becoming aware that Confidential Information has been disclosed in breach of this Clause 42.

ING    00251

## 42.7    Continuing obligations

The obligations in this Clause 42 are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of twelve months from the earlier of:

(a)    the date on which all amounts payable by the Obligors under or in connection with the Finance Documents have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b)    the date on which such Finance Party otherwise ceases to be a Finance Party.

# 43.    DISCLOSURE OF LENDER DETAILS BY AGENT

## 43.1    Supply of Lender details to Company

The Agent shall provide to the Company, within five Business Days of a request by the Company (but no more frequently than once per calendar month), a list (which may be in electronic form) setting out the names of the Lenders as at that Business Day, their respective Commitments, the address and fax number (and the department or officer, if any, for whose attention any communication is to be made) of each Lender for any communication to be made or document to be delivered under or in connection with the Finance Documents, the electronic mail address and/or any other information required to enable the sending and receipt of information by electronic mail or other electronic means to and by each Lender to whom any communication under or in connection with the Finance Documents may be made by that means and the account details of each Lender for any payment to be distributed by the Agent to that Lender under the Finance Documents.

## 43.2    Supply of Lender details at Company's direction

(a)    The Agent shall, at the request of the Company, disclose the identity of the Lenders and the details of the Lenders' Commitments to any:

(i)    other Party or any other person if that disclosure is made to facilitate, in each case, a refinancing of the Financial Indebtedness arising under the Finance Documents or a material waiver or amendment of any term of any Finance Document; and

(ii)    member of the Group.

(b)    Subject to paragraph (c) below, the Company shall procure that the recipient of information disclosed pursuant to paragraph (a) above shall keep such information confidential and shall not disclose it to anyone and shall ensure that all such information is protected with security measures and a degree of care that would apply to the recipient's own confidential information.

(c)    The recipient may disclose such information to any of its officers, directors, employees, professional advisers, auditors and partners as it shall consider appropriate if any such person is informed in writing of its confidential nature, except that there shall be no such requirement to so inform if that person is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by duties of confidentiality in relation to the information.

## 43.3    Supply of Lender details to other Lenders

(a)    If a Lender (a **Disclosing Lender**) indicates to the Agent that the Agent may do so, the Agent shall disclose that Lender's name and Commitment to any other Lender that is, or becomes, a Disclosing Lender.

ING    00252

(b)     The Agent shall, if so directed by the Requisite Lenders, request each Lender to indicate to it whether it is a Disclosing Lender.

## 44.     COUNTERPARTS

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

## 45.     GOVERNING LAW

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

## 46.     ENFORCEMENT

### 46.1     Arbitration

(a)     This Clause 46.1 shall be governed by English law.

(b)     Unless specifically provided for in another Finance Document in relation to that Finance Document and subject to Clause 46.2 (Option to Litigate), any dispute, claim, difference or controversy arising out of, relating to or having any connection with any Finance Document (including, without limitation, a dispute relating to any non-contractual obligations arising out of, or in connection with, any Finance Document or a dispute regarding the existence, validity, interpretation, performance or termination of any Finance Document) (a **Dispute**), shall be referred to and finally resolved by arbitration under the LCIA Arbitration Rules as amended from time to time (the **Rules**) and by this Clause 46.1.

(c)     The Rules are incorporated by reference into this Clause 46.1 and capitalised terms used in this Clause which are not otherwise defined in this Agreement have the meaning given to them in the Rules.

(d)     The number of arbitrators shall be three.  Claimant(s) to the Dispute shall nominate one arbitrator for appointment by the LCIA Court.  Respondent(s) shall nominate one arbitrator for appointment by the LCIA Court.  The LCIA Court shall appoint the chairman.

(e)     The seat or legal place of arbitration shall be London.  The language used in the arbitral proceedings shall be English.

(f)     All documents submitted in connection with the proceedings shall be in the English language, or if in another language, accompanied by an English translation.

(g)     Service of any Request (as defined in the Rules) must be made pursuant to the Rules at the address given for sending of notices under Clause 37 (Notices).

(h)     Except as permitted under Clause 46.2 (Option to Litigate), each Party agrees:

(i)     not to commence, procure or participate in, or otherwise be involved in, any action or proceeding of any court or other tribunal with respect to a matter which is already the subject of arbitral proceedings commenced pursuant to this Clause 46.1 (except for compelling arbitration, restraining court proceedings brought in breach of this Agreement or initiating actions to obtain a judgment recognising or enforcing an arbitral award or any order for conservatory or provisional measures); and

ING    00253

(ii)     to waive any right it may have to appeal any arbitral award or order, to the extent such waiver is permitted by law.

(i)      For the avoidance of doubt, where an Arbitral Tribunal is appointed pursuant to this Clause 46.1 the whole of its award is deemed for the purposes of the New York Convention on the Recognition and Enforcement of Arbitral Awards of 1958 to be contemplated by this Agreement.

(j)      The parties to arbitral proceedings and the arbitrators undertake to keep confidential all awards in their arbitration, together with all materials in the proceedings created for the purpose of the arbitration and all other documents produced by another party in the proceedings not otherwise in the public domain, save and to the extent that disclosure may be required of a party by legal duty, to protect or pursue a legal right or to enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority.

## 46.2     Option to Litigate

(a)      Notwithstanding Clause 46.1 (Arbitration), the Agent (acting on the instructions of the Majority Lenders) may by notice (a **Litigation Notice**) in writing to the Parties require that all Disputes or a specific Dispute be litigated.  A Litigation Notice shall specify the following:

(i)      that a Dispute has arisen;

(ii)     the Parties involved in the Dispute; and

(iii)    the nature of the Dispute to be settled by litigation.

(b)      A Litigation Notice may be served at any time following a Dispute arising, **provided that** if a Request (as defined in the Rules) has been served in relation to that Dispute, a Litigation Notice must be given by no later than 28 days after the service of the Request.

(c)      If a Litigation Notice is given by the Agent pursuant to this Clause 46.2, the Parties agree that:

(i)      the English courts have exclusive jurisdiction to settle any Dispute which is the subject of any such Litigation Notice and each Party submits to the exclusive jurisdiction of the English courts;

(ii)     the courts of England are the most appropriate and convenient courts to settle any such Dispute and accordingly each Party agrees not to argue to the contrary and waives objection to the English courts on the grounds of inconvenient forum or otherwise in relation to proceedings in connection with any Finance Document; and

(iii)    the Parties cannot commence arbitration proceedings in respect of the Dispute(s) specified in the Litigation Notice and any arbitration proceedings commenced in respect of any such Disputes will be terminated,

(d)      This Clause 46.2 is for the benefit of the Finance Parties only.  To the extent permitted by law and subject to the terms of this Clause 46.2 (Option to Litigate), the Finance Parties:

(i)      shall not be prevented from taking proceedings relating to a Dispute in any other court with jurisdiction; and

(ii)     may take concurrent proceedings in any number of jurisdictions.

ING    00254

**46.3    Service of process**

(a)    Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in England and Wales):

    (i)    irrevocably appoints O.W. Bunkers (UK) Limited (whose address for this purpose is identified with its name next to its signature below) as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document (and O.W. Bunkers (UK) Limited by its execution of this Agreement, accepts that appointment); and

    (ii)    agrees that failure by an agent for service of process to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

(b)    If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Company (on behalf of all the Obligors) must immediately (and in any event within five days of such event taking place) appoint another agent on terms acceptable to the Agent. Failing this, the Agent may appoint another agent for this purpose.

(c)    Each Obligor expressly agrees and consents to the provisions of this Clause 46 and Clause 45 (Governing Law).

**46.4    WAIVER OF TRIAL BY JURY**

EACH PARTY WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION IN CONNECTION WITH ANY FINANCE DOCUMENT OR ANY TRANSACTION CONTEMPLATED BY ANY FINANCE DOCUMENT.  THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO TRIAL BY THE COURT.

**47.    USA PATRIOT ACT**

Each Finance Party that is subject to the requirements of the USA Patriot Act hereby notifies each Obligor that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Obligors, which information includes the name and address of the Obligors and other information that will allow such Finance Party to identify the Obligors in accordance with the USA Patriot Act.  Each Obligor agrees that it will provide each Finance Party with such information as it may request in order for such Finance Party to satisfy the requirements of the USA Patriot Act.

**THIS AGREEMENT** has been entered into on the date stated at the beginning of this Agreement.

ING    00255

# SCHEDULE 1

## THE ORIGINAL PARTIES

## PART 1

## THE ORIGINAL OBLIGORS

| Name of Original Borrower | Original Jurisdiction | Registration number (or equivalent, if any) |
|---|---|---|
| O.W. Bunker (Belgium) NV | Belgium | Registered with the Crossroads Bank for Enterprises under number 862,078,095 Commercial Court of Antwerp |
| O.W. Bunker & Trading A/S | Denmark | 66441717 |
| O.W. Bunker China Limited | Hong Kong | 0900648 |
| O.W. Bunker (Netherlands) B.V. | the Netherlands | 24325325 |
| Dynamic Oil Trading (Singapore) Pte. Ltd. | Singapore | 201221068G |
| O.W. Bunker Far East (Singapore) Pte Ltd | Singapore | 199201808K |
| O.W. Global Trading SA | Switzerland | CH-660.0.411.011-1 |
| O.W. Bunker Middle East DMCC | U.A.E. | A limited liability company incorporated in the Dubai Multi Commodities Centre, United Arab Emirates, with registration number DMCC1013, formed pursuant to Dubai Regulation No. 4 of 2002 (as amended) and the Dubai Multi Commodities Centre Company Regulations 2003 (as amended) |
| O.W. Bunker North America Inc. | Connecticut, USA | 1088636 |

ING   00256

| Name of Original Guarantor | Original Jurisdiction | Registration number (or equivalent, if any) |
|---|---|---|
| O.W. Bunker (Belgium) NV | Belgium | Registered with the Crossroads Bank for Enterprises under number 862,078,095 Commercial Court of Antwerp |
| O.W. Bunker & Trading A/S | Denmark | 66441717 |
| O.W. Supply & Trading A/S | Denmark | 17729071 |
| O.W. Bunkers (UK) Limited | England | 03978855 |
| O.W. Bunker Germany GmbH | Germany | HRB 100089 (*Amtsgericht Hamburg*) |
| O.W. Bunker China Limited | Hong Kong | 0900648 |
| O.W. Bunker Malta Limited | Malta | C22059 |
| O.W. Bunker (Netherlands) B.V. | the Netherlands | 24325325 |
| Bergen Bunkers AS | Norway | 943 659 524 |
| O.W. Bunker Panama S.A. | Panama | Microjacket 650354, Document 1514888 |
| Dynamic Oil Trading (Singapore) Pte. Ltd. | Singapore | 201221068G |
| O.W. Bunker Far East (Singapore) Pte Ltd | Singapore | 199201808K |
| O.W. Bunker (Switzerland) SA | Switzerland | CH-660.1.788.005-9 |
| O.W. Global Trading SA | Switzerland | CH-660.0.411.011-1 |
| O.W. Bunker Middle East DMCC | U.A.E. | A limited liability company incorporated in the Dubai Multi Commodities Centre, United Arab Emirates, with registration number DMCC1013, formed pursuant to Dubai Regulation No. 4 of 2002 (as amended) and the Dubai Multi Commodities Centre Company Regulations 2003 (as amended) |
| O.W. Bunker North America Inc. | Connecticut, USA | 1088636 |
| O.W. Bunker USA Inc. | Texas, USA | 0801553486 |

ING   00257

## PART 2

## THE ORIGINAL LENDERS

| Name of Original Lender | Facility A Commitment | Facility B Commitment | Status as Swiss Qualifying Bank: Yes/No |
|---|---|---|---|
| ABN AMRO Bank N.V. | 26,666,666.67 | 53,333,333.33 | Yes |
| Commerzbank Aktiengesellschaft | 13,750,000.00 | 13,750,000.00 | Yes |
| Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. | 26,666,666.67 | 53,333,333.33 | Yes |
| Crédit Agricole (Suisse) S.A. | 13,750,000.00 | 13,750,000.00 | Yes |
| Danske Bank A/S | 26,666,666.66 | 53,333,333.33 | Yes |
| Deutsche Bank AG, Amsterdam branch | 13,750,000.00 | 13,750,000.00 | Yes |
| Fifth Third Bank | 13,750,000.00 | 13,750,000.00 | No |
| ING Bank N.V. | 26,666,666.66 | 53,333,333.34 | Yes |
| NATIXIS | 26,666,666.67 | 53,333,333.33 | Yes |
| Nordea Bank Danmark A/S | 26,666,666.67 | 53,333,333.34 | Yes |
| Société Générale | 16,250,000.00 | 16,250,000.00 | Yes |
| Standard Chartered Bank | 13,750,000.00 | 13,750,000.00 | Yes |
| UBS AG | 25,000,000.00 | 25,000,000.00 | Yes |

ING    00258

## SCHEDULE 2

## CONDITIONS

## PART 1

**CONDITIONS PRECEDENT TO DELIVERY OF FIRST UTILISATION REQUEST**

**1.** **Corporate documents – Original Obligors (other than Dutch Obligors)**

(a) A copy of the constitutional documents of each Original Obligor (as defined in Clause 1 (Definitions and Interpretation)).

(b) If applicable, a copy of a resolution of the board of directors (or equivalent body) of each Original Obligor (or, in the case of any Panamanian Obligor, a copy of the minutes of a meeting of the shareholders of such Panamanian Obligor authorizing the resolutions taken at (and together with a copy of the minutes of) a meeting of the board of directors of such Panamanian Obligor):

    (i) approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute, deliver and perform the Finance Documents to which it is a party;

    (ii) in the case of a Belgian Obligor, determining (and setting out the motivation for that determination) that it has a corporate benefit which justifies the assumption of any obligations it has pursuant to the Finance Documents and that the assumption of such obligations and the granting of the Transaction Security Documents relate to and serve its corporate purpose;

    (iii) authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf;

    (iv) authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party; and

    (v) in the case of an Obligor other than the Company, authorising the Company to act as its agent in connection with the Finance Documents.

(c) A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above in relation to the Finance Documents and related documents.

(d) To the extent required for the purpose of issuing any Legal Opinion, a copy of a resolution signed by all the holders of the issued shares in each Original Obligor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Original Obligor is a party.

(e) In the case of any Belgian Obligor, a copy of the minutes of the shareholders' meeting or a unanimous written resolution of the shareholders of each Belgian Original Obligor approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party, for the purpose of Article 556 of the Belgian Company Code.

**2.** **Corporate documents – Original Obligors (Dutch Obligors)**

(a) A copy of:

ING  00259

(i)      the articles of association (*statuten*) of each Dutch Obligor; and

(ii)     the deed of incorporation (*akte van oprichting*) of each Dutch Obligor.

(b)   An up-to-date extract of the registration of each Dutch Obligor in the Dutch Trade Register of the Chamber of Commerce.

(c)   A copy of a resolution of the managing board of each Dutch Obligor approving the terms of, and the transactions contemplated by, the Finance Documents and including a declaration by each managing director on conflict of interest (*tegenstrijdig belang*) within the meaning of Article 2:129(6)/ 2:239(6) of the Dutch Civil Code.

(d)   If applicable, a copy of a resolution of the supervisory board of each Dutch Obligor approving the terms of, and the transactions contemplated by, the Finance Documents and including a statement by each member of the supervisory board on conflict of interest (*tegenstrijdig belang*) within the meaning of Article 2:140(5)/2:250(5) of the Dutch Civil Code.

(e)   If applicable, a copy of a resolution of the general meeting of shareholders of each Dutch Obligor approving the terms of, and the transactions contemplated by the Finance Documents.

(f)   Either an unconditional positive works council advice (*advies*) and the related request for advice in respect of the transactions contemplated by the Finance Documents or a confirmation by the management board of the relevant Dutch Obligor that no works council (*ondernemingsraad*) having jurisdiction over that Dutch Obligor has been installed and no works council will be installed in the foreseeable future.

(g)   A specimen of the signature of each person authorised to represent a Dutch Obligor in connection with any Finance Document.

3.   **Corporate certificates – agreed form**

A signed undated copy of each of the corporate certificates referred to in paragraph 1 of Part 2 of Schedule 2 in the agreed form.

4.   **Legal opinions – agreed form**

A final draft of each of the legal opinions listed in Part 2 of Schedule 2 in the agreed form.

5.   **Transaction Security Documents – agreed**

A final draft of each of the following Transaction Security Documents in the agreed form:

(i)      the Belgian Receivables Security;

(ii)     the Dutch Accounts Security;

(iii)    the Dutch Inventory Security; and

(iv)    the English Omnibus Security.

6.   **Other documents and evidence**

(a)   Evidence that any process agent referred to in Clause 46.1 (Option to Litigate), if not an Original Obligor, has accepted its appointment.

ING    00260

(b)    A confirmation that each Lender has received all documents and evidence it requires for the purposes of its "know your customer" or similar identification procedures.

ING   00261

## PART 2

## CONDITIONS PRECEDENT TO FIRST UTILISATION

1.      **Corporate certificates**

(a)      A certificate of each Original Obligor (signed by a director or company secretary):

(i)      confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on any Original Obligor to be exceeded; and

(ii)      certifying that each copy document specified in paragraphs 1, 2 and 5 of Part 1 of Schedule 2 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the first Utilisation Date.

(b)      If any Original Obligor is incorporated or organised in the US or any US State, a certificate as to the existence and good standing of the relevant Original Obligor from the appropriate governmental authorities in the relevant Original Obligor's jurisdiction of incorporation or organisation.

(c)      In the case of O.W. Bunker Panama S.A., a copy of its public registry certificate (*Certificado de Registro Público*) dated not later than five (5) Business Days prior to the first Utilisation Date.

2.      **Finance Documents**

(a)      This Agreement executed by the members of the Group party to this Agreement.

(b)      The Fee Letters executed by the Company.

(c)      The following Transaction Security Documents executed by the relevant Original Obligors:

(i)      the Belgian Receivables Security;

(ii)      the Dutch Accounts Security;

(iii)      the Dutch Inventory Security; and

(iv)      the English Omnibus Security.

(d)      A document or notice incorporating the Minimum Ancillary Facility Terms duly executed by each Ancillary Lender and the relevant Borrower(s) in respect of any Ancillary Facility to be made available at the first Utilisation Date.

3.      **Insurance**

(a)      A letter from each of Willis and Marsh as insurance broker dated no earlier than five Business Days before the date of this Agreement listing the insurance policies of the Group and confirming that they are on risk and that the insurance for the Group at the date of that letter is at an acceptable level (as approved by the Majority Lenders) and covering appropriate risks for the business carried out by the Group.

(b)      A list from Atradius confirming a list of Trade Creditors of the Receivables Obligors which are covered by the credit insurance policies of the Group as at a date no earlier than 3 Business Days

ING    00262

before the date of this Agreement and confirming the respective credit limits which are insured in respect of each such Trade Creditor.

4. **Legal opinions**

The following legal opinions, each addressed to the Agent, the Security Agent and the Original Lenders:

(a) A legal opinion of Allen & Overy LLP, legal advisers to the Agent and the Arrangers as to English law substantially in the form distributed to the Original Lenders prior to signing this Agreement.

(b) A legal opinion of the following legal advisers to the Agent and Arranger:

    (i) Allen & Overy LLP as to matters of enforceability, choice of laws and recognition of foreign judgements under Belgian law;

    (ii) Gorrissen Federspiel as to matters of due execution, capacity, choice of laws and recognition of foreign judgements under Danish law;

    (iii) Allen & Overy LLP as to matters of enforceability, due execution, capacity, choice of laws and recognition of foreign judgements under Dutch law;

    (iv) Allen & Overy LLP as to matters of enforceability, due execution, capacity, choice of laws and recognition of foreign judgements under English law;

    (v) Allen & Overy as to matters of due execution, capacity, choice of laws and recognition of foreign judgements under Hong Kong law;

    (vi) Ganado Advocates as to matters of due execution, capacity, choice of laws and recognition of foreign judgements under Maltese law;

    (vii) Advokatfirmaet Wiersholm AS as to matters of due execution, capacity, choice of laws and recognition of foreign judgements under Norwegian law;

    (viii) Arias, Fábrega & Fábrega as to matters of due execution, capacity, choice of laws and recognition of foreign judgements under Panamanian law;

    (ix) Allen & Overy LLP as to matters of due execution, capacity, choice of laws and recognition of foreign judgements under Singapore law;

    (x) Lenz & Staehelin as to matters of due execution, capacity, choice of laws and recognition of foreign judgements under Swiss law; and

    (xi) Allen & Overy LLP as to matters of recognition of foreign arbitral awards under UAE law,

each substantially in the form distributed to the Original Lenders prior to signing this Agreement.

(c) A legal opinion of the following legal advisers to the Company:

    (i) Clifford Chance LLP as to matters of due execution and capacity under Belgian law;

ING    00263

      (ii)    Clifford Chance Partnerschaftsgesellschaft as to matters of enforceability, due execution, capacity, choice of laws and recognition of foreign judgements under German law;

      (iii)   Clifford Chance LLP as to matters of due execution and capacity under UAE Law;

      (iv)   Shipman & Goodwin LLP as to matters of due execution, capacity, choice of laws under Connecticut law; and

      (v)    Andrews Kurth LLP as to matters of due execution, capacity, choice of laws and recognition of foreign judgements under Texan law,

each substantially in the form distributed to the Original Lenders prior to signing this Agreement.

**5.**    **Other documents and evidence**

(a)    Evidence that the fees, costs and expenses then due from the Company pursuant to Clause 16 (Fees), Clause 16.5 (Other Fees), Clause 16.6 (Commission and fees on Ancillary Facilities), Clause 17.4 (Lender Status Confirmation) and Clause 21 (Costs and Expenses) have been paid or will be paid by the first Utilisation Date.

(b)    The Group Structure Chart.

(c)    The initial Borrowing Base Certificate.

(d)    A copy of the agreed form report to be delivered by the Auditors pursuant to paragraph (c) of Clause 24.2 (Provision and contents of Compliance Certificate), including a statement that a satisfactory subordination of the shareholder loans made to O.W. Global Trading SA has been implemented in accordance with Article 725 of the Swiss Code of Obligations, together with confirmation from the Auditors that such report can be relied upon by the Finance Parties.

(e)    Evidence that all Existing Financial Indebtedness has been repaid in full and cancelled or that it will be as a result of making the Utilisations on the first Utilisation Date.

(f)    Evidence that any Existing Security has been unconditionally and irrevocably released in full or that it will be as a result of making the Utilisations on the first Utilisation Date.

(g)    A copy, certified by an authorised signatory of the Company to be a true copy, of the Original Financial Statements of each Obligor.

(h)    The Risk Policy.

(i)    A Certificate of the Company addressed to the Finance Parties confirming that the aggregate of earnings before interest, tax, depreciation and amortisation (calculated on the same basis as EBITDA, as defined in Clause 25 (Financial Covenants)) of the Original Guarantors (in each case calculated on an unconsolidated basis and excluding all intra-Group items and investments in Subsidiaries of any member of the Group) exceeds 80% of the EBITDA (as defined in Clause 25 (Financial Covenants).

(j)    A letter from the Company to the Agent specifying details of each of those bank accounts referred to in Clause 26.30 (Automatic sweep of bank accounts) including details of each account name, account number and the name and address of the bank where each account is held.

ING   00264

(k)     Written authorisation from each Singapore Obligor authorising Allen & Overy LLP to file a statement containing prescribed particulars of the charge created pursuant to the English Omnibus Security with the Accounting and Corporate Regulatory Authority in Singapore.

(l)     A copy of the consent of all relevant insurers or insurance brokers to the granting of security pursuant to the English Omnibus Security over the Insurance Rights (as defined in the English Omnibus Security).

(m)     A copy of the consent of each Broker to the granting of security pursuant to the English Omnibus Security over the Brokerage Receivables (as defined in the English Omnibus Security).

(n)     A copy of any other Authorisation or other document, opinion or assurance which the Agent considers to be necessary or desirable (if it has notified the Company accordingly) in connection with the entry into and performance of the transactions contemplated by any Finance Document or for the validity and enforceability of any Finance Document.

ING     00265

## PART 3

## CONDITIONS SUBSEQUENT

1. **Corporate filings**

(a)    Within 10 Business Days from the date of this Agreement, or from the date of the relevant Accession Deed (as the case may be), evidence that the resolutions passed by the shareholders of each Belgian Obligor for the purpose of Article 556 of the Belgian Company Code have been filed with the competent Commercial Court.

(b)    Within 3 Business Days from the date of this Agreement, an authentication certificate issued by the legal registrar at the DMCC identifying the current shareholders and directors of each Original Obligor established under the laws of the UAE.

2. **Transaction Security - filings**

(a)    Evidence of the registration of the Dutch Omnibus Security with the Dutch Tax authorities within 10 Business Days of the date of the Dutch Omnibus Security;

(b)    Evidence of the registration of the Security created by the English Omnibus Security by the UK Companies House within 21 days of the date of the English Omnibus Security.

(c)    Evidence of the registration of the negative pledge constituted by Clause 4(b) of the English Omnibus Security by each Danish Obligor in the prescribed format with the Danish Persons Book (*Personbogen*) within 15 Business Days of the date of the English Omnibus Security;

(d)    Evidence of the registration of the particulars of charge created pursuant to the English Omnibus Security with the Accounting and Corporate Regulatory Authority in Singapore within 30 days of the date of the English Omnibus Security;

(e)    Evidence of the presentation of the prescribed particulars of the Dutch Accounts Security with the Hong Kong Companies Registry for registration immediately after execution of the Dutch Accounts Security (and in any event within 5 weeks (or such shorter period as stipulated under the Companies Ordinance (Cap. 32 of the Laws of Hong Kong) (as amended or re-enacted from time to time) of the date of its execution) and supply to the Security Agent (promptly upon receipt) the original certificate of registration in respect of the Dutch Accounts Security;

(f)    Evidence of presentation of the prescribed particulars of the English Omnibus Security with the Hong Kong Companies Registry for registration immediately after execution of the English Omnibus Security (and in any event within 5 weeks (or such shorter period as stipulated under the Companies Ordinance (Cap.32 of the Laws of Hong Kong) (as amended or re-enacted from time to time) of the date of its execution) and supply to the Security Agent (promptly upon receipt) the original certificate of registration in respect of the English Omnibus Security; and

(g)    Within 20 Business Days of the date of this Agreement, an original notarised copy of each Finance Document to which a Panamanian Obligor is a party and which has been executed outside of the Republic of Panama authenticated by a Panamanian Consul or pursuant to the 1961 Hague Convention Abolishing the Requirement of Legalization of Foreign Public Documents.

ING    00266

**3.      Transaction Security – notices, acknowledgments and deliverables**

(a)     A copy of all notices and deliverables required to be sent under the Transaction Security Documents on the date of such Transaction Security Documents executed by each relevant Obligor, being:

    (i)      as soon as possible following the first Utilisation, evidence of the service of a notice by each Danish Obligor which is a Receivables Obligor to each debtor in respect of existing Supply Contracts (as such terms are defined in the English Omnibus Security) as referred to in Clause 5.3(b)(ii) of the English Omnibus Security.

    (ii)     evidence (which can be by way of an electronic confirmation of receipt) that each debtor under a Supply Contract has received a copy of the notice set out in Part 2 of Schedule 5 of the English Omnibus Security;

    (iii)    evidence of the service of a notice by each Intra-Group Chargor to each debtor in respect of the Intra-Group Loans (as such terms are defined in the English Omnibus Security) as referred to in Clause 5.2(a)(i) of the English Omnibus Security;

    (iv)    evidence of the service of a notice by each Insurance Chargor to each relevant insurance company or underwriter in respect of the Insurances by sending a notice to each such insurance company or underwriters as referred to in Clause 5.4(a)(i) of the English Omnibus Security;

    (v)     evidence of the service of a notice by each Brokerage Chargor to each Broker in respect of the Brokerage Agreements as referred to in Clause 5.5(a)(i) of the English Omnibus Security; and

    (vi)    evidence of the service of each notice to the Account Bank in respect of the Collection Accounts, Blocked Collection Accounts and Mirrored Accounts as referred to in Clause 3.1(a) of the Dutch Accounts Security;

(b)     Within 1 day of the date of the Dutch Inventory Security, evidence of the submission of the Dutch Inventory Security for registration with the Dutch tax authorities (*Belastingdienst Ondernemingen*); and promptly thereafter, evidence of the registration thereof;

(c)     Within 10 days of the date of the English Omnibus Security, a signed copy from each relevant insurance company or underwriters in respect of the Insurances of an acknowledgment or letter of undertaking to the Security Agent as referred to in Clause 5.4(a)(iii) of the English Omnibus Security (excluding from Atradius);

(d)     Within 10 days of the date of the Belgian Receivables Security, a copy of the duly issued Letter of Undertaking (as defined in the Belgian Receivables Security);

(e)     Within 10 Business Days of the date of the English Omnibus Security:

    (i)      evidence of the service of a notice by each Receivables Obligor to each debtor in respect of existing Supply Contracts (as such terms are defined in the English Omnibus Security) as referred to in Clause 5.3(a)(i) of the English Omnibus Security; and

    (ii)     evidence showing the endorsement on each insurance policy of the agreed form loss payable clause referred to in Clause 5.4(a)(ii) of the English Omnibus Security or other endorsement acceptable to the Agent;

(f)     Within 10 Business Days of the date of the Belgian Receivables Security:

ING    00267

(i)    evidence showing the endorsement of the agreed form loss payable clause referred to in Clause 4.1(b)(ii) of the Belgian Receivables Security;

(ii)    evidence of service of the notice of assignment of the Supply Receivables to each relevant debtor as referred to in Clause 4.1(c)(ii) of the Belgian Receivables Security;

(g)    Duly executed copies of each acknowledgment from each relevant third party in accordance with the timelines set out in each Transaction Security Document;

## 4.    Release documentation

(a)    On the first Utilisation Date, an executed copy of the Spanish law notarial deed in respect of certain of the Existing Security.

(b)    On the first Utilisation Date, a copy of the updated shareholders' register of O.W. Bunker (Belgium) N.V. which reflects the release of the Existing Security over its shares.

ING    00268

## PART 4

## CONDITIONS PRECEDENT REQUIRED TO BE DELIVERED BY AN ADDITIONAL OBLIGOR

1.     **Corporate documents - Additional Obligors (other than Dutch Obligors)**

(a)     A copy of the constitutional documents of the Additional Obligor (as defined in Clause 1 (Definitions and Interpretation)).

(b)     A copy of a resolution of the board of directors (or equivalent body) of the Additional Obligor (or, in the case of any Panamanian Additional Obligor, a copy of the minutes of a meeting of the shareholders of such Panamanian Additional Obligor authorizing the resolutions taken at (and together with a copy of the minutes of) a meeting of the board of directors of such Panamanian Additional Obligor):

   (i)     approving the terms of, and the transactions contemplated by, the Accession Deed and the Finance Documents and resolving that it execute, deliver and perform the Accession Deed and any other Finance Document to which it is party;

   (ii)     in the case of a Belgian Obligor, determining (and setting out the motivation for that determination) that it has a corporate benefit which justifies the assumption of any obligations it has pursuant to the Finance Documents and that the assumption of such obligations and the granting of the Transaction Security Documents relate to and serve its corporate purpose;

   (iii)     authorising a specified person or persons to execute the Accession Deed and other Finance Documents on its behalf;

   (iv)     authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices (including, in relation to an Additional Borrower, any Utilisation Request or Selection Notice) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party; and

   (v)     authorising the Company to act as its agent in connection with the Finance Documents

(c)     A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above.

(d)     To the extent reasonably required for the purpose of issuing any Legal Opinion, a copy of a resolution signed by all the holders of the issued shares of the Additional Obligor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Additional Obligor is a party.

(e)     In the case of any Belgian Obligor, a copy of the minutes of the shareholders' meeting or a unanimous written resolution of the shareholders of each Belgian Original Obligor approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party, for the purpose of Article 556 of the Belgian Company Code together with evidence that an extract of such resolutions has been duly filed with the clerk of the competent commercial court in accordance with Article 556 of the Belgian Company Code.

(f)     In the case of any Panamanian Obligor, a copy of its public registry certificate (*Certificado de Registro Público*) dated not later than five Business Days prior to the date on which that Additional Obligor accedes to this Agreement pursuant to Clause 29 (Changes to the Obligors).

ING     00269

2. **Corporate documents - Additional Obligors (Dutch Obligors)**

(a)     A copy of:

   (i)     the articles of association (*statuten*) of each Dutch Obligor; and

   (ii)    the deed of incorporation (*akte van oprichting*) of each Dutch Obligor.

(b)     An up-to-date extract of the registration of each Dutch Obligor in the Dutch Trade Register of the Chamber of Commerce.

(c)     A copy of a resolution of the managing board of each Dutch Obligor approving the terms of, and the transactions contemplated by, the Finance Documents and including a declaration by each managing director on conflict of interest (*tegenstrijdig belang*) within the meaning of Article 2:129(6)/ 2:239(6) of the Dutch Civil Code.

(d)     If applicable, a copy of a resolution of the supervisory board of each Dutch Obligor approving the terms of, and the transactions contemplated by, the Finance Documents and including a statement by each member of the supervisory board on conflict of interest (*tegenstrijdig belang*) within the meaning of Article 2:140(5)/2:250(5) of the Dutch Civil Code.

(e)     If applicable, a copy of a resolution of the general meeting of shareholders of each Dutch Obligor approving the terms of, and the transactions contemplated by the Finance Documents.

(f)     Either an unconditional positive works council advice (*advies*) and the related request for advice in respect of the transactions contemplated by the Finance Documents or a confirmation by the management board of the relevant Dutch Obligor that no works council (*ondernemingsraad*) having jurisdiction over that Dutch Obligor has been installed and no works council will be installed in the foreseeable future.

(g)     A specimen of the signature of each person authorised to represent a Dutch Obligor in connection with any Finance Document.

3.     A certificate of an authorised signatory of the Additional Obligor certifying that:

   (a)     each copy document listed in this Part 4 of Schedule 1 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of the Accession Deed; and

   (b)     the borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

4.     If any Additional Obligor is a US Obligor, a certificate as to the existence and good standing of the relevant Additional Obligor from the appropriate governmental authorities in the relevant Additional Obligor's jurisdiction of incorporation or organisation.

5.     An Accession Deed executed by the Additional Obligor and the Company.

6.     A copy of any other Authorisation or other document, opinion or assurance which the Agent considers to be necessary or desirable in connection with the entry into and performance of the transactions contemplated by the Accession Letter or for the validity and enforceability of any Finance Document.

7.     If available, the latest audited financial statements of the Additional Obligor.

ING   00270

8.      The following legal opinions, each addressed to the Agent, the Security Agent and the Lenders:

(a)     A legal opinion of the legal advisers to the Agent in England, as to English law in the form distributed to the Lenders prior to signing the Accession Deed.

(b)     If the Additional Obligor is incorporated in or has its "centre of main interest" or "establishment" (as referred to in Clause 23.25 (Centre of main interests and establishments)) in a jurisdiction other than England and Wales or is executing a Finance Document which is governed by a law other than English law, a legal opinion of the legal advisers to the Agent in the jurisdiction of its incorporation, "centre of main interest" or "establishment" (as applicable) or, as the case may be, the jurisdiction of the governing law of that Finance Document (the **Applicable Jurisdiction**) as to the law of the Applicable Jurisdiction and in the form distributed to the Lenders prior to signing the Accession Deed.

9.      If the proposed Additional Obligor is incorporated in a jurisdiction other than England and Wales, evidence that the process agent specified in Clause 46.1 (Arbitration), if not an Obligor, has accepted its appointment in relation to the proposed Additional Obligor.

10.     Any Transaction Security Documents which are required by the Agent to be executed by the proposed Additional Obligor.

11.     Any notices or deliverables required to be given or executed under the terms of those Transaction Security Documents.

ING    00271

# SCHEDULE 3

# FORM OF UTILISATION REQUEST

From:   [Borrower]/[Company]*
To:     [Agent]
Dated:

Dear Sirs

### O.W. Bunker & Trading A/S – USD 700,000,000 Multicurrency Revolving Borrowing Base Facilities Agreement dated [●] 2013 (the Facilities Agreement)

1.      We refer to the Facilities Agreement.  This is a Utilisation Request.  Terms defined in the Facilities Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2.      We wish to borrow a Loan on the following terms:

    (a)     Borrower:       [    ]

    (b)     Proposed Utilisation Date:       [    ] (or, if that is not a Business Day, the next Business Day)

    (c)     Facility to be utilised:   [Facility A]/[Facility B]

    (d)     Currency of Loan:      [    ]

    (e)     Amount:      [    ] or, if less, the Available Facility

    (f)     Interest Period: [    ]

3.      We confirm that each condition specified in Clause 5.2 (Further conditions precedent) is satisfied on the date of this Utilisation Request.

4.      [This Loan is to be made in [whole]/[part] for the purpose of refinancing [identify maturing Loan]./[The proceeds of this Loan should be credited to [account]].

5.      This Utilisation Request is irrevocable.

Yours faithfully

_____

authorised signatory for

[the Company on behalf of [insert name of relevant Borrower]]/ [insert name of Borrower]*

ING    00272

NOTES:

**Note:** **PLEASE ENSURE THAT THE AMOUNT LENT BY EACH LENDER IN RELATION TO A LOAN/COMMITMENT TO ANY BORROWER IS AT LEAST EUR 100,000 (OR ITS EQUIVALENT IN ANOTHER CURRENCY). OTHERWISE, INSERT A CONFIRMATION BY EACH RELEVANT LENDER WHO LENDS TO THE RELEVANT BORROWER THAT SUCH LENDER IS A PROFESSIONAL MARKET PARTY WITHIN THE MEANING OF THE DUTCH FSA.**

\*       Amend as appropriate.  The Utilisation Request can be given by the Borrower or by the Company.

\*\*      Select the Facility to be utilised and delete references to the other Facilities.

ING     00273

## SCHEDULE 4

### MANDATORY COST FORMULAE

1. The Mandatory Cost is an addition to the interest rate to compensate Lenders for the cost of compliance with (a) the requirements of the Bank of England, the Financial Conduct Authority and/or the Prudential Regulation Authority (or, in any case, any other authority which replaces all or any of its functions) or (b) the requirements of the European Central Bank.

2. On the first day of each Interest Period (or as soon as possible thereafter) the Agent must calculate, as a percentage rate, a rate (the **Additional Cost Rate**) for each Lender, in accordance with the paragraphs set out below. The Mandatory Cost will be calculated by the Agent as a weighted average of the Lenders' Additional Cost Rates (weighted in proportion to the percentage participation of each Lender in the relevant Loan) and will be expressed as a percentage rate per annum.

3. The Additional Cost Rate for any Lender lending from a Facility Office in a Participating Member State will be the percentage notified by that Lender to the Agent. This percentage will be certified by that Lender in its notice to the Agent to be its reasonable determination of the cost (expressed as a percentage of that Lender's participation in all Loans made from that Facility Office) of complying with the minimum reserve requirements of the European Central Bank in respect of loans made from that Facility Office.

4. The Additional Cost Rate for any Lender lending from a Facility Office in the UK will be calculated by the Agent as follows:

   (a)   in relation to a sterling Loan:

   $$\frac{AB + C(B-D) + E \times 0.01}{100 - (A+C)} \text{ per cent. per annum}$$

   (b)   in relation to a Loan in any currency other than sterling:

   $$\frac{E \times 0.01}{300} \text{ per cent. per annum.}$$

Where:

A   is the percentage of Eligible Liabilities (assuming these to be in excess of any stated minimum) which that Lender is from time to time required to maintain as an interest free cash ratio deposit with the Bank of England to comply with cash ratio requirements.

B   is the percentage rate of interest (excluding the Margin and the Mandatory Cost and, if the Loan is an Unpaid Sum, the additional rate of interest specified in paragraph (a) of Clause 13.3 (Default interest)) payable for the relevant Interest Period on the Loan.

C   is the percentage (if any) of Eligible Liabilities which that Lender is required from time to time to maintain as interest bearing Special Deposits with the Bank of England.

D   is the percentage rate per annum payable by the Bank of England to the Agent on interest bearing Special Deposits.

E   is designed to compensate Lenders for amounts payable under the Fees Rules and is calculated by the Agent as being the average of the most recent rates of charge supplied by

ING    00274

the Base Reference Banks to the Agent pursuant to paragraph 7 below and expressed in pounds per £1,000,000.

5.　For the purposes of this Schedule:

(a)　**Eligible Liabilities** and **Special Deposits** have the meanings given to them from time to time under or pursuant to the Bank of England Act 1998 or (as may be appropriate) by the Bank of England;

(b)　**Fees Rules** means the rules on periodic fees contained in the Financial Conduct Authority and Prudential Regulation Authority Fees Manuals or such other law or regulation as may be in force from time to time in respect of the payment of fees for the acceptance of deposits;

(c)　**Fee Tariffs** means the fee tariffs specified in the Fees Rules under the activity group A.1 Deposit acceptors (ignoring any minimum fee or zero rated fee required pursuant to the Fees Rules but taking into account any applicable discount rate); and

(d)　**Tariff Base** has the meaning given to it in, and will be calculated in accordance with, the Fees Rules.

6.　In application of the above formulae, A, B, C and D will be included in the formulae as percentages (i.e. 5 per cent. will be included in the formula as 5 and not as 0.05). A negative result obtained by subtracting D from B is taken as zero. The resulting figures must be rounded to four decimal places.

7.　If requested by the Agent, each Base Reference Bank must, as soon as practicable after publication by the Financial Conduct Authority or the Prudential Regulation Authority of its Fee Tariffs in respect of a financial year, supply to the Agent, the total rate of charge payable by that Base Reference Bank to the Financial Conduct Authority and the Prudential Regulation Authority pursuant to the Fees Rules in respect of that financial year (calculated for this purpose by that Base Reference Bank as being the sum of the average of the Fee Tariffs of the Financial Conduct Authority and the average of the Fee Tariffs of the Prudential Regulation Authority applicable to that Base Reference Bank for that financial year) and expressed in pounds per £1,000,000 of the Tariff Base of that Base Reference Bank.

8.　Each Lender must supply any information required by the Agent for the purpose of calculating its Additional Cost Rate. In particular, but without limitation, each Lender must supply the following information on or before the date on which it becomes a Lender:

(a)　the jurisdiction of its Facility Office; and

(b)　any other information that the Agent may reasonably require for such purpose.

Each Lender must promptly notify the Agent of any change to the information provided by it pursuant to this paragraph.

9.　The percentages of each Lender for the purpose of A and C above and the rates of charge of each Base Reference Bank for the purpose of E above must be determined by the Agent based upon the information supplied to it pursuant to paragraphs 7 and 8 above and on the assumption that, unless a Lender notifies the Agent to the contrary, each Lender's obligations in relation to cash ratio deposits and Special Deposits are the same as those of a typical bank from its jurisdiction of incorporation with a Facility Office in the same jurisdiction as its Facility Office.

ING    00275

10.      The Agent has no liability to any person if such determination results in an Additional Cost Rate which over or under compensates any Lender and is entitled to assume that the information provided by any Lender or Base Reference Bank pursuant to paragraphs 3, 7 and 8 above is true and correct in all respects.

11.      The Agent must distribute the additional amounts received as a result of the Mandatory Cost to the Lenders on the basis of the Additional Cost Rate for each Lender based on the information provided by each Lender and each Base Reference Bank pursuant to paragraphs 3, 7 and 8 above.

12.      Any determination by the Agent pursuant to this Schedule in relation to a formula, the Mandatory Cost, an Additional Cost Rate or any amount payable to a Lender will, in the absence of manifest error, be conclusive and binding on all Parties.

13.      The Agent may from time to time, after consultation with the Company and the Lenders, determine and notify to all Parties any amendments which are required to be made to this Schedule in order to comply with any change in law, regulation or any requirements from time to time imposed by the Bank of England, the Financial Conduct Authority, the Prudential Regulation Authority or the European Central Bank (or, in any case, any other authority which replaces all or any of its functions) and any such determination will, in the absence of manifest error, be conclusive and binding on all Parties.

ING    00276

## SCHEDULE 5

## FORM OF TRANSFER CERTIFICATE

To:     ING Bank N.V. as Agent and ING Bank N.V. as Security Agent

From:   [*The Existing Lender*] (the **Existing Lender**) and [*The New Lender*] (the **New Lender**)

Dated:

**O.W. Bunker & Trading A/S – USD 700,000,000 Multicurrency Revolving Borrowing Base Facilities Agreement dated [●] 2013 (the Facilities Agreement)**

1.      We refer to the Facilities Agreement.  This agreement (the **Agreement**) shall take effect as a Transfer Certificate for the purpose of the Facilities Agreement.  Terms defined in the Facilities Agreement have the same meaning in this Agreement unless given a different meaning in this Agreement.

2.      We refer to Clause 28.5 (Procedure for transfer) of the Facilities Agreement:

   (a)     The Existing Lender and the New Lender agree to the Existing Lender transferring to the New Lender by novation and in accordance with Clause 28.5 (Procedure for transfer) all of the Existing Lender's rights and obligations under the Facilities Agreement and the other Finance Documents which relate to that portion of the Existing Lender's Commitment(s) and participations in Utilisations under the Facilities Agreement as specified in the Schedule.

   (b)     The proposed Transfer Date is [     ].

   (c)     The Facility Office and address, fax number and attention details for notices of the New Lender for the purposes of Clause 37.2 (Addresses) are set out in the Schedule.

3.      The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of Clause 28.4 (Limitation of responsibility of Existing Lenders).

4.      The New Lender confirms that it [is]/[is not] a Swiss Qualifying Bank.

5.      This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

6.      This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

7.      This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note:   The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

ING    00277

Note:  **PLEASE ENSURE THAT THE AMOUNT TRANSFERRED BY ONE LENDER TO ANOTHER LENDER IN RELATION TO A LOAN/COMMITMENT TO ANY BORROWER IS AT LEAST EUR 100,000 (OR ITS EQUIVALENT IN ANOTHER CURRENCY). OTHERWISE, INSERT A CONFIRMATION BY THE NEW LENDER WHO LENDS TO THE RELEVANT BORROWER THAT THE NEW LENDER IS A PROFESSIONAL MARKET PARTY WITHIN THE MEANING OF THE DUTCH FSA.**

Note:  **Please seek Singapore legal advice on amendments required to address the Singapore Banking Act if a Lender is to be based in or lend out of Singapore.**

ING      00278

## THE SCHEDULE

### Commitment/rights and obligations to be transferred

*[insert relevant details]*

*[Facility Office address, fax number and attention details for notices and account details for payments,]*

[Existing Lender]                                   [New Lender]

By:                                                 By:

This Agreement is accepted as a Transfer Certificate for the purposes of the Facilities Agreement by the Agent and the Transfer Date is confirmed as [       ].

For the purposes of the Maltese Civil Code, it is expressly agreed that the Security created pursuant to the Transaction Security Documents shall be preserved for the benefit of the New Lender and all remaining Lenders.  The Company represents and warrants that its authority to act as Obligors' Agent on behalf of the Maltese Obligor(s), pursuant to Clause 2.5 (Obligors' Agent) of the Facilities Agreement, has not been revoked.

**O.W. Bunker & Trading A/S** as Obligors' Agent

By:

**[Agent]**

By:

**[Security Agent]**

By:

ING    00279

## SCHEDULE 6

## FORM OF ASSIGNMENT AGREEMENT

To:    [      ] as Agent and [      ], [      ] as Security Agent, [      ] as Company, for and on behalf of each Obligor

From:  [the *Existing Lender*] (the **Existing Lender**) and [the *New Lender*] (the **New Lender**)

Dated:

**O.W. Bunker & Trading A/S – USD 700,000,000 Multicurrency Revolving Borrowing Base Facilities Agreement dated [●] 2013 (the Facilities Agreement)**

1.    We refer to the Facilities Agreement.  This is an Assignment Agreement.  This agreement (the **Agreement**) shall take effect as an Assignment Agreement for the purpose of the Facilities Agreement.  Terms defined in the Facilities Agreement have the same meaning in this Agreement unless given a different meaning in this Agreement.

2.    We refer to Clause 28.6 (Procedure for assignment) of the Facilities Agreement:

   (a)   The Existing Lender assigns absolutely to the New Lender all the rights of the Existing Lender under the Facilities Agreement, the other Finance Documents and in respect of the Transaction Security which correspond to that portion of the Existing Lender's Commitment(s) and participations in Utilisations under the Facilities Agreement as specified in the Schedule.

   (b)   The Existing Lender is released from all the obligations of the Existing Lender which correspond to that portion of the Existing Lender's Commitment(s) and participations in Utilisations under the Facilities Agreement specified in the Schedule.

   (c)   The New Lender becomes a Party as a Lender and is bound by obligations equivalent to those from which the Existing Lender is released under paragraph (b) above.

3.    The proposed Transfer Date is [      ].

4.    On the Transfer Date the New Lender becomes Party to the relevant Finance Documents as a Lender.

5.    The Facility Office and address, fax number and attention details for notices of the New Lender for the purposes of Clause 37.2 (Addresses) are set out in the Schedule.

6.    The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of Clause 28.4 (Limitation of responsibility of Existing Lenders).

7.    The New Lender confirms that it [is]/[is not] a Swiss Qualifying Bank.

8.    This Agreement acts as notice to the Agent (on behalf of each Finance Party) and, upon delivery in accordance with Clause 28.7 (Copy of Transfer Certificate, Assignment Agreement, an Accordion Accession Certificate or Increase Confirmation to Company), to the Company (on behalf of each Obligor) of the assignment referred to in this Agreement.

ING    00280

9.      It is expressly agreed that the Transaction Security Documents and the guarantees granted by each Obligor under the Finance Documents shall be preserved for the benefit of the Security Agent, the New Lender and the remaining Secured Parties.

10.     This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

11.     This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

12.     This Agreement has been entered into on the date stated at the beginning of this Agreement.

Note:   **The execution of this Assignment Agreement may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions. It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

Note:   **PLEASE ENSURE THAT THE AMOUNT ASSIGNED BY ONE LENDER TO ANOTHER LENDER IN RELATION TO A LOAN/COMMITMENT TO ANY BORROWER IS AT LEAST EUR 100,000 (OR ITS EQUIVALENT IN ANOTHER CURRENCY). OTHERWISE, INSERT A CONFIRMATION BY THE NEW LENDER WHO LENDS TO THE RELEVANT BORROWER THAT THE NEW LENDER IS A PROFESSIONAL MARKET PARTY WITHIN THE MEANING OF THE DUTCH FSA.**

Note:   **Please seek Singapore legal advice on amendments required to address the Singapore Banking Act if a Lender is to be based in or lend out of Singapore.**

ING     00281

## THE SCHEDULE

**Commitment/rights and obligations to be transferred by assignment, release and accession**

[*insert relevant details*]

[*Facility office address, fax number and attention details for notices and account details for payments*]

[Existing Lender]                                       [New Lender]

By:                                                     By:

This Agreement is accepted as an Assignment Agreement for the purposes of the Facilities Agreement by the Agent and the Transfer Date is confirmed as [ ].

Signature of this Agreement by the Agent constitutes confirmation by the Agent of receipt of notice of the assignment referred to in this Agreement, which notice the Agent receives on behalf of each Finance Party.

For the purposes of the Maltese Civil Code, it is expressly agreed that the Security created pursuant to the Transaction Security Documents shall be preserved for the benefit of the New Lender and all remaining Lenders. The Company represents and warrants that its authority to act as Obligors' Agent on behalf of the Maltese Obligor(s), pursuant to Clause 2.5 (Obligors' Agent) of the Facilities Agreement, has not been revoked.

**O.W. Bunker & Trading A/S** as Obligors' Agent

By:

**[Agent]**

By:

**[Security Agent]**

By:

ING    00282

## SCHEDULE 7

## FORM OF ACCESSION DEED

To:     ING Bank N.V. as Agent and ING Bank N.V. as Security Agent for itself and each of the Finance Parties

From:   [*Subsidiary*] and O.W. Bunker & Trading A/S

Dated:  [●]

Dear Sirs

### O.W. Bunker & Trading A/S – USD 700,000,000 Multicurrency Revolving Borrowing Base Facilities Agreement dated [●] 2013 (the Facilities Agreement)

1.      We refer to the Facilities Agreement.  This deed (the **Accession Deed**) shall take effect as an Accession Deed for the purposes of the Facilities Agreement.  Terms defined in the Facilities Agreement have the same meaning in paragraphs 1-[3]/[4] of this Accession Deed unless given a different meaning in this Accession Deed.

2.      [*Subsidiary*] agrees to become an Additional [Borrower]/[Guarantor] and to be bound by the terms of the Facilities Agreement and the other Finance Documents as an Additional [Borrower]/[Guarantor] pursuant to Clause [29.2 (Additional Borrowers)]/[Clause 29.4 (Additional Guarantors)] of the Facilities Agreement.  [*Subsidiary*] is a company duly incorporated under the laws of [*name of relevant jurisdiction*] and is a limited liability company and registered number [    ].

3.      [The Company confirms that no Default is continuing or would occur as a result of [*Subsidiary*] becoming an Additional Borrower].

4.      [*Subsidiary's*] administrative details for the purposes of the Facilities Agreement are as follows:

        Address:

        Fax No.:

        Attention:

5.      [*Subsidiary*] (for the purposes of this paragraph [4]/[5], the **Acceding Debtor**) intends to [incur liabilities under the following documents]/[give a guarantee, indemnity or other assurance against loss in respect of liabilities under the following documents]:

        [Insert details (date, parties and description) of relevant documents]

        the **Relevant Documents**.

**IT IS AGREED** as follows:

(a)     The Acceding Debtor and the Security Agent agree that the Security Agent shall hold:

        (i)     any Security in respect of liabilities created or expressed to be created pursuant to the Relevant Documents;

ING    00283

(ii)     all proceeds of that Security; and

(iii)    all obligations expressed to be undertaken by the Acceding Debtor to pay amounts in respect of the liabilities to the Security Agent as trustee for the Secured Parties (in the Relevant Documents or otherwise) and secured by the Transaction Security together with all representations and warranties expressed to be given by the Acceding Debtor (in the Relevant Documents or otherwise) in favour of the Security Agent as trustee for the Secured Parties,

on trust for the Secured Parties on the terms and conditions contained in the Security Documents.

(b)     This Accession Deed and any non-contractual obligations arising out of or in connection with it are governed by English law.

**THIS ACCESSION DEED** has been signed on behalf of the Security Agent (for the purposes of paragraph [4]/[5] above only), signed on behalf of the Company and executed as a deed by [*Subsidiary*] and is delivered on the date stated above.

[*Subsidiary*]

[**EXECUTED AS A DEED**                    )

By: [*Subsidiary*]                         )

_____     Director

_____     Director/Secretary

*OR*

[**EXECUTED AS A DEED**

By: [*Subsidiary*]

_____     Signature of Director

_____

in the presence of                          Name of Director

_____     Signature of witness

_____     Name of witness

_____     Address of witness

ING    00284

_____          Occupation of witness]


**The Company**

_____          [*Company*]

By:


**The Security Agent**

[*Full Name of Current Security Agent*]

By:

Date:

ING     00285

## SCHEDULE 8

## FORM OF RESIGNATION LETTER

To:      [     ] as Agent

From:   [*resigning Obligor*] and [*Company*]

Dated:

Dear Sirs

**O.W. Bunker & Trading A/S – USD 700,000,000 Multicurrency Revolving Borrowing Base Facilities Agreement dated [●] 2013 (the Facilities Agreement)**

1.    We refer to the Facilities Agreement.  This is a Resignation Letter.  Terms defined in the Facilities Agreement have the same meaning in this Resignation Letter unless given a different meaning in this Resignation Letter.

2.    Pursuant to [Clause 29.3 (Resignation of a Borrower)]/[Clause 29.5 (Resignation of a Guarantor)], we request that [*resigning Obligor*] (the **Resigning Obligor**) be released from its obligations as a [Borrower]/[Guarantor] under the Facilities Agreement and the Finance Documents.

3.    Each Obligor (other than the Resigning Obligor) consents to the release of the Resigning Obligor and agrees that this Resignation Letter shall affect its respective obligations as Obligor or a Lender's respective rights in respect of the Obligors under the Finance Documents.  Each Obligor (other than the Resigning Obligor) jointly and severally assumes, for all effects and purposes at law, the Resigning Obligor's obligations released by paragraph 2 above.

4.    We confirm that:

      (a)    no Default is continuing or would result from the acceptance of this request; and

      (b)    [     ] *

5.    This Resignation Letter and any non-contractual obligations arising out of or in connection with it are governed by English law.


[Company]               [resigning Obligor]

By:                     By:

NOTES:

\*        Insert any other conditions required by the Facilities Agreement

ING    00286

## SCHEDULE 9

## FORM OF COMPLIANCE CERTIFICATE

To:     [     ] as Agent

From:  [*Company*]

Dated:

Dear Sirs

**O.W. Bunker & Trading A/S – USD 700,000,000 Multicurrency Revolving Borrowing Base Facilities Agreement dated [●] 2013 (the Facilities Agreement)**

1.      We refer to the Facilities Agreement.  This is a Compliance Certificate.  Terms defined in the Facilities Agreement have the same meaning when used in this Compliance Certificate unless given a different meaning in this Compliance Certificate.

2.      We confirm that:

*Current Ratio*: The ratio of Current Assets to Current Liabilities is not less than 1:1.

*Consolidated Tangible Net Worth*: Consolidated Tangible Net Worth of the Group is not less than USD [140,000,000][150,000,000].*

*Maximum Indebtedness*: Borrowings does not exceed:

(a)     in respect of Borrowings owed by Borrowers only, USD 800,000,000 plus the aggregate amount raised pursuant to Clause 2.3 (Accordion); and

(b)     in respect of all Borrowings of the Group, USD 1,050,000,000 plus the aggregate amount raised pursuant to Clause 2.3 (Accordion).

3.      [We confirm that no Default is continuing.]**

4.      [We confirm that the aggregate of the earnings before interest, tax, depreciation and amortisation (calculated on the same basis as EBITDA, as defined in Clause 25 (Financial Covenants)) of the Guarantors (calculated on an unconsolidated basis and excluding all intra-group items and investments in Subsidiaries of any member of the Group) exceeds 80% of the EBITDA, as defined in Clause 25 (Financial Covenants).

.       Delete as applicable

Signed      .................................................      .................................................

             Director                                     Director
             of                                           of

[Certification of Auditor in the agreed form]

ING    00287

..............................................................................

for and on behalf of

[*name of Auditors of the Company*]***

NOTES:

\*        Delete as applicable.

\*\*        If this statement cannot be made, the certificate should identify any Default that is continuing and the steps, if any, being taken to remedy it.

\*\*\*        Only applicable if the Compliance Certificate accompanies the audited financial statements and is to be signed by the Auditors.

ING    00288

**SCHEDULE 10**

**TIMETABLES**

|  | Loans in USD | Loans in sterling | Loans in other currencies |
|---|---|---|---|
| Agent notifies the Company if a currency is approved as an Optional Currency in accordance with Clause 5.4 (Conditions relating to Optional Currencies) | - | - | U-4 |
| Delivery of a duly completed Utilisation Request (Clause 6.1 (Delivery of a Utilisation Request)) or a Selection Notice (Clause 14.1 (Selection of Interest Periods and Terms)) | U-3  9.30am | U-1  9.30am | U-3  9.30am |
| Agent determines (in relation to a Utilisation) the Base Currency Amount of the Loan, if required under Clause 6.4 (Lenders' participation) and notifies the Lenders of the Loan in accordance with Clause 6.4 (Lenders' participation) | U-3  Noon | U-1  Noon | U-3  Noon |
| Agent receives a notification from a Lender under Clause 7.2 (Unavailability of a currency) | Quotation Day  9.30am | - | Quotation Day  9.30am |
| Agent gives notice in accordance with Clause 7.2 (Unavailability of a currency) | Quotation Day  5.30p.m. | - | Quotation Day  5.30p.m. |
| IBOR is fixed | Quotation Day 11.00 a.m.  in respect of LIBOR and 11.00 a.m. (Brussels time) in respect of EURIBOR and 11:00 a.m. (Copenhagen time) in respect of CIBOR, NIBOR and STIBOR. | Quotation Day 11.00 a.m. | Quotation Day 11.00 a.m. |

"U"   =   date of utilisation or, if applicable, in the case of a Loan that has already been borrowed, the first day of the relevant Interest Period for that Loan.

"U – X"=   X Business Days prior to date of utilisation

ING   00289

## SCHEDULE 11

## FORM OF INCREASE CONFIRMATION

To:     ING Bank N.V. as Agent, ING Bank N.V. as Security Agent and O.W. Bunker & Trading A/S as Company, for and on behalf of each Obligor

From:   [the *Increase Lender*] (the **Increase Lender**)

Dated:

**O.W. Bunker & Trading A/S – USD 700,000,000 Multicurrency Revolving Borrowing Base Facilities Agreement dated [●] 2013 (the Facilities Agreement)**

1.      We refer to the Facilities Agreement.  This agreement (the **Agreement** shall take effect as an Increase Confirmation for the purpose of the Facilities Agreement.  Terms defined in the Facilities Agreement have the same meaning in this Agreement unless given a different meaning in this Agreement.

2.      We refer to clause 2.2 (Increase) of the Facilities Agreement.

3.      The Increase Lender agrees to assume and will assume all of the obligations corresponding to the Commitment specified in the Schedule (the **Relevant Commitment**) as if it was an Original Lender under the Facilities Agreement.

4.      The proposed date on which the increase in relation to the Increase Lender and the Relevant Commitment is to take effect (the **Increase Date**) is [●].

5.      On the Increase Date, the Increase Lender becomes party to the relevant Finance Documents as a Lender.

6.      The Facility Office and address, fax number and attention details for notices to the Increase Lender for the purposes of Clause 37.2 (Addresses) are set out in the Schedule.

7.      The Increase Lender expressly acknowledges the limitations on the Lenders' obligations referred to in paragraph (g) of Clause 2.2 (Increase).

8.      The Increase Lender confirms that it [is]/[is not] a Swiss Qualifying Bank.

9.      This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

10.     This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

11.     This Agreement has been entered into on the date stated at the beginning of this Agreement.

ING    00290

Note:   The execution of this Increase Confirmation may not be sufficient for the Increase Lender to obtain the benefit of the Transaction Security in all jurisdictions.  It is the responsibility of the Increase Lender to ascertain whether any other documents or other formalities are required to obtain the benefit of the Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.

Note:   PLEASE ENSURE THAT THE AMOUNT LENT BY EACH LENDER IN RELATION TO A LOAN/COMMITMENT TO ANY BORROWER IS AT LEAST EUR 100,000 (OR ITS EQUIVALENT IN ANOTHER CURRENCY).  OTHERWISE, INSERT A CONFIRMATION BY THE NEW LENDER WHO LENDS TO THE RELEVANT BORROWER THAT THE NEW LENDER IS A PROFESSIONAL MARKET PARTY WITHIN THE MEANING OF THE DUTCH FSA.

ING    00291

**THE SCHEDULE**

**Relevant Commitment/rights and obligations to be assumed by the Increase Lender**

[*insert relevant details*]

[*Facility office address, fax number and attention details for notices and account details for payments*]

[Increase Lender]

By:

This Agreement is accepted as an Increase Confirmation for the purposes of the Facilities Agreement by the Agent and the Increase Date is confirmed as [      ].


Agent

By:


Security Agent

By:


NOTE:

*          Only if increase in the Total Commitments

ING    00292

## SCHEDULE 12

## FORM OF ACCORDION INCREASE CERTIFICATE

From:   [*The Accordion Increase Lender*] (the **Accordion Increase Lender**) and [●] (as **Borrower**)

To:   ING Bank N.V. (as **Agent**)

Date:   [●]

### O.W. Bunker & Trading A/S – USD 700,000,000 Facility Agreement
### dated [●] (the Agreement)

1.   We refer to the Agreement.  This is an Accordion Increase Certificate.  Terms defined in the Agreement have the same meaning in this Accordion Increase Certificate unless given a different meaning in this Accordion Increase Certificate.

2.   [*Accordion Increase Lender*] confirms that is bound by the terms of the Agreement as a Lender with effect from the Accordion Increase Effective Date.

3.   [*Accordion Increase Lender*]'s Commitment under the Facilities is increased to USD[●](split between Facility A – USD [●] and Facility B – USD [●]) with effect from the Accordion Increase Effective Date.

4.   This Accordion Increase Certificate and any non-contractual obligations arising out of or in connection with it are governed by English law.

5.   This Accordion Increase Certificate is a Finance Document.


[*Borrower*]

By:

[*Accordion Increase Lender*]

By:


This Agreement is accepted as a Accordion Increase Certificate for the purposes of the Agreement by the Agent and the Security Agent.

[*Agent*]                                             [*Security Agent*]

By:                                                   By:

ING    00293

## SCHEDULE 13

## FORM OF ACCORDION ACCESSION CERTIFICATE

To:     ING Bank N.V. as Agent

From:   [●]

Date:   [●]

### O.W. Bunker & Trading A/S – USD 700,000,000 Facility Agreement
### dated [●] (the Facilities Agreement)

1.      We refer to the Facilities Agreement.  This is an Accordion Accession Certificate.  This Accordion Accession Certificate shall take effect as an Accordion Accession Certificate for the purpose of the Facilities Agreement.  Terms defined in the Facilities Agreement have the same meaning in this Accordion Accession Certificate unless given a different meaning in this Accordion Accession Certificate.

2.      Pursuant to Clause 2.3 (Accordion) we have agreed to acquire a participation in the Facilities of USD*[insert amount]*(split between Facility A – USD [●] and Facility B – USD [●] on [*insert Accordion Increase Effective Date*].

3.      On the Accordion Increase Effective Date, the Accordion Acceding Lender will become party to the relevant Finance Documents as a Lender.

4.      The Facility Office and address, fax number and attention details for notices to the Accordion Acceding Lender for purposes of Clause 37.2 (Addresses) are:

        Address:        [●]

        Fax number:     [●]

        Attention:      [●]

5.      We expressly acknowledge the limitations on the Existing Lenders' obligations referred to in Clause 2.3(j) (Accordion).

6.      This Accordion Accession Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Accordion Accession Certificate.

7.      This Accordion Accession Certificate and any non-contractual obligations arising out of or in connection with it are governed by English law

This Accordion Accession Certificate has been entered into on the date stated at the beginning of this Accordion Accession Certificate.

**[Accordion Acceding Lender]**

By:

This Agreement is accepted as an Accordion Accession Certificate for the purposes of the Facilities Agreement by the Agent and the Accordion Increase Effective Date is confirmed as [●].

ING   00294

ING Bank N.V. as Agent

By:

**Note:**  **PLEASE ENSURE THAT THE AMOUNT LENT BY EACH LENDER IN RELATION TO A LOAN/COMMITMENT TO ANY BORROWER IS AT LEAST EUR 100,000 (OR ITS EQUIVALENT IN ANOTHER CURRENCY).  OTHERWISE, INSERT A CONFIRMATION BY THE NEW LENDER WHO LENDS TO THE RELEVANT BORROWER THAT THE NEW LENDER IS A PROFESSIONAL MARKET PARTY WITHIN THE MEANING OF THE DUTCH FSA.**

**Note:**  **Please seek Singapore legal advice on amendments required to address the Singapore Banking Act if a Lender is to be based in or lend out of Singapore.**

ING    00295

## SCHEDULE 14

## FORM OF BORROWING BASE CERTIFICATE

**ING** 🐝                          DRAFT          DRAFT                                    Ⓦ Bunker

O.W. Bunker & Trading A/S Borrowing Base Facility          20 October 2013
Total Revolving Credit Facility          USD          600,000,000

| Outstandings in USD | BANK 1 | BANK 2 | BANK 3 | BANK 4 | BANK 5 | BANK 6 | TOTAL |
|---|---|---|---|---|---|---|---|
| Ancillary Facilities | - | | | | | | - |
| Syndicated Loans | | | | | | | - |
| **Total** | - | - | - | - | - | - | - |

| Currency USD | OWB | DOT | Total | | Advance rate | Calculated Facility before cap | Reduction (cap) | Facility Available |
|---|---|---|---|---|---|---|---|---|
| **Eligible receivables** | | | | | | | | |
| Gross | 1,029,481,131 | 177,850,715 | 1,207,331,846 | | | | | |
| Operations not included | -124,005,793 | | -124,005,793 | | | | | |
| Non eligible receivables | -190,439,598 | -89,749,085 | -280,188,683 | | | | | |
| | 715,035,740 | 88,101,630 | 803,137,370 | | | | | |
| **Distribution of eligible receivables** | | | | | | | | |
| Insured | 560,783,384 | 55,670,039 | 616,453,424 | | 90% | 554,808,081 | | 554,808,081 |
| Tier 1 | 3,980,715 | | 3,980,715 | | 90% | 3,582,644 | | 3,582,644 |
| Tier 2 | 150,271,641 | 32,431,591 | 182,703,232 | | 50% | 91,351,616 | -16,351,616 | 75,000,000 |
| | 715,035,740 | 88,101,630 | 803,137,370 | | | | | |
| **Eligible inventory** | | | | | | | | |
| Inventory OWGT | 32,319,219 | | 32,319,219 | | 85% | 27,471,336 | | 27,471,336 |
| **Net value Borrowing Base** | 660,862,061 | | | | | | | 660,862,061 |
| **Total Exposure** | - | | | | | | | |
| **Available to draw** | 600,000,000 | | | | | | | |

Trade Creditors          [ .................X... ]   this balance is provided for information purposes only, as stipulated in the Credit Agreement

O.W. Bunker & Trading A/S confirms the information contained in this Certificate is accurate and true, that any effect
on the accuracy of the information has been duly investigated and immediately communicated to the Bank

ING     00296

## SCHEDULE 15

## MINIMUM ANCILLARY FACILITY TERMS

**Minimum Ancillary Facility Terms**

These Minimum Ancillary Facility Terms are the minimum terms and conditions on which the Ancillary Lender may make an Ancillary Facility available to each Borrower.

Unless otherwise defined herein, defined terms used in these Minimum Ancillary Facility Terms shall have the same meaning as defined in (and construed in accordance with) the committed USD 700,000,000 multicurrency borrowing base credit facility (the **Credit Facility**) dated ___ December 2013 as amended, restated or supplemented from time to time between, inter alios, each Borrower, ING Bank N.V. as Agent and Security Agent, and the Ancillary Lender.

| | |
|---|---|
| **Borrower(s)** | [*name(s) of borrower(s)*], which must each be a Borrower under the Credit Facility |
| **Bank** | [*name Ancillary Facility Lender* ] |
| **Maximum Facility Amount** | Up to a maximum amount of USD 50,000,000, except for a maximum period of two (2) Months from the date of the Credit Facility, Nordea Bank Danmark A/S may make available Ancillary Commitments in a maximum amount of USD 100,000,000. |
| **Purpose** | Clause 4 (*Purpose*) of the Credit Facility shall be incorporated in these Minimum Ancillary Facility Terms as if references therein to the "Facility" were references to these Minimum Ancillary Facility Terms. |
| **Accommodations** | The [*name of Bank*] Ancillary Facility shall be available for utilisation for any of the following instruments:<br><br>a) an overdraft facility (an **Ancillary Facility Overdraft**); and<br><br>b) a facility for the issuance of Credit Instruments of a maturity of no longer than eighteen (18) months (each an **Ancillary Facility Credit Instrument**),<br><br>in each case in a form complying with market practices and agreed between each Borrower and the Bank. |
| **Ancillary Facility** | Subject to Clauses 7.3(c) (Revaluation) and 11.3 (Borrowing Base and additional collateral) of the Credit Agreement, the [*name of Bank*] Ancillary Facility shall consist of a facility, available for Accommodations in an amount equal to or less than the Maximum Facility Amount.<br><br>The [*name of Bank*] Ancillary Facility will be an Ancillary Facility (as defined in the Credit Agreement) and will therefore be subject to those terms and conditions set out in the Credit Agreement and the other Finance Documents as applicable to any Ancillary Facility. If there is any inconsistency between the terms of these Minimum Ancillary Facility Terms or the [*name of Bank*] Ancillary Facility and the Credit Agreement, the Credit Agreement shall prevail except for:<br><br>• Clause 38.3 (Day count convention) which shall not prevail for the purposes of calculating fees, interest and commission relating to the [*name of Bank*] Ancillary Facility; and |

ING  00297

|  | • where the [*name of Bank*] Ancillary Facility comprises more than one account, to the extent required to permit the netting of balances on those accounts, the terms of the [*name of Bank*] Ancillary Facility shall prevail; and<br><br>• where the relevant term of these Minimum Ancillary Facility Terms or the Credit Agreement would be contrary to, or inconsistent with, the law governing the relevant Ancillary Document, in which case that term of these Minimum Ancillary Facility Terms or the Credit Agreement shall not prevail. |
|---|---|
| **Conditions precedent** | No Borrower may deliver an Ancillary Facility Utilisation Request in respect of the [*name of Bank*] Ancillary Facility unless [*name of Bank*] has received a copy of these Minimum Ancillary Facility Terms signed by Borrower and on the first Utilisation Date the Borrower must have complied with all conditions precedent set out in Clause 5 (Conditions of Utilisation) of the Credit Facility and thereafter with all conditions precedent set out in Clause 5.2 (Further conditions precedent) of the Credit Facility. |
| **Form of Ancillary Facility Utilisations** | A Borrower may request the utilisation of the [*name of Bank*] Ancillary Facility by way of Ancillary Facility Credit Instruments and Ancillary Facility Overdrafts (each an **Ancillary Facility Utilisation**). |
| **Availability** | The [*name of Bank*] Ancillary Facility shall be available during the Ancillary Availability Period to each Borrower only. |
| **Ancillary Availability Period** | The [*name of Bank*] Ancillary Facility shall be available for a maximum period (the **Ancillary Availability Period**) commencing on the date of these Minimum Ancillary Facility Terms and terminating on the earlier of (a) the Termination Date in respect of Facility B (the **Maturity Date**), (b) the End Date (if applicable), (c) the date on which the Ancillary Facility is repaid, prepaid and cancelled in accordance with the terms of the Credit Facility and (d) the date on which an acceleration notice is sent pursuant to Clause 27.20 of the Credit Facility. |
| **Drawdown** | The aggregate of the Ancillary Facility Utilisations under the [*name of Bank*] Ancillary Facility shall not exceed the Ancillary Commitments of the Bank, nor that Bank's Available Commitment (before taking into account the effect of the Ancillary Facility on that Available Commitment). |
| **Ancillary Facility Credit Instrument Utilisations** | Except as otherwise stipulated herein, a Borrower may utilise the [*name of Bank*] Ancillary Facility by way of an Ancillary Facility Credit Instrument on such utilisation terms as each Borrower and the Bank may agree.<br><br>Each Ancillary Facility Utilisation Request in respect of an Ancillary Facility Credit Instrument will not be regarded as having been duly completed unless:<br><br>(i) the Ancillary Facility Lender is informed of the identity of the beneficiary and the purpose of issue of the Ancillary Facility Credit Instrument;<br><br>(ii) the proposed Ancillary Utilisation Date is a Business Day within the Ancillary Availability Period;<br><br>(iii) the amount of the Ancillary Facility Credit Instrument is less than or equal to the Available Ancillary Facility;<br><br>(iv) the Expiry Date is 18 months or less after the date of issuance; and<br><br>(vi) on the date of the Ancillary Facility Utilisation Request and on the proposed |

ING   00298

| | Ancillary Utilisation Date, no Ancillary Facility Default has occurred and is continuing and the Repeating Representations are true.<br><br>No further Ancillary Facility Utilisations may be made on the Maturity Date. |
|---|---|
| **Ancillary Facility Credit Instruments** | Each Borrower irrevocably and unconditionally authorises and directs the Bank to pay any claim made or purported to be made under a Credit Instrument requested by it (or deemed to have been requested by it) and which appears on its face to be in order (a "claim") without any inquiry into its justification or into the validity, genuineness or accuracy of any statement contained therein or any certificate annexed thereto or received in connection therewith and without any reference to or any further necessity for confirmation or verification by each Borrower or any other person and despite any contestation on the part of each Borrower. Each Borrower shall immediately on demand pay to the Bank an amount equal to the amount of any claim under that Credit Instrument into such account as the Bank specifies. |
| **Cash cover** | A Borrower providing cash cover for an Ancillary Facility Credit Instrument means a Borrower paying an amount in the currency of that Ancillary Facility Credit Instrument to an interest-bearing account in the name of that Borrower and the following conditions being met:<br><br>(i) the account is with the Bank;<br><br>(ii) until no amount is or may be outstanding under that Ancillary Facility Credit Instrument, withdrawals from the account may only be made to pay the Bank amounts due and payable to it under the [*name of Bank*] Ancillary Facility in respect of that Ancillary Facility Credit Instrument; and<br><br>(iii) if requested by the Bank, that Borrower has executed a security document over that account, in form and substance satisfactory to the Bank, creating a first ranking security interest over that account in favour of the Bank.<br><br>The Bank's right to retain any cash cover from a Borrower shall be subject to the terms of the paragraph entitled Sharing between Ancillary Lenders and Equalisation below. |
| **Ancillary Facility Overdraft Utilisations** | Except as otherwise stipulated herein, a Borrower may utilise the [*name of Bank*] Ancillary Facility by way of an Ancillary Facility Overdraft on such utilisation terms as each Borrower and the Bank may agree.<br><br>Each Ancillary Facility Utilisation Request in respect of an Ancillary Facility Overdraft will not be regarded as having been duly completed unless:<br><br>(i) the Ancillary Facility Lender is informed of the terms of the Ancillary Facility Overdraft;<br><br>(ii) the proposed Ancillary Utilisation Date is a Business Day within the Ancillary Availability Period;<br><br>(iii) the amount of the Ancillary Facility Overdraft is less than or equal to the Available Ancillary Facility;<br><br>(iv) the termination date for the Ancillary Facility Overdraft falls on or before the Maturity Date; and<br><br>(v) on the date of the Ancillary Facility Utilisation Request and on the proposed Ancillary Utilisation Date, no Ancillary Facility Default has occurred and is continuing and the Repeating Representations are true. |

ING   00299

| | No further Ancillary Facility Utilisations may be made on the Maturity Date; and |
|---|---|
| **Prepayment / Repayment** | Without prejudice to a Borrower's right to prepay an Ancillary Facility Utilisation at any time, each Borrower shall repay its Ancillary Outstandings (i) in the case of Ancillary Facility Credit Instruments, on the relevant Expiry Date for that Ancillary Facility Utilisation, and (ii) in all other case, on the last day of the Ancillary Availability Period.  On the Maturity Date in respect of the [*name of Bank*] Ancillary Facility shall be cancelled and reduced to zero. |
| **Interest** | The Interest payable in respect of each Ancillary Facility Overdraft under the [*name of Bank*] Ancillary Facility shall be documented on equivalent terms to Clause 13 (*Interest*) of the Credit Facility unless another frequency of payment of interest is agreed between the Ancillary Facility Lender and the Borrower, but the rate per annum shall comprise: |
| | (i) Margin for Facility B (except where the Margin for Facility A applies for any Ancillary Commitments made available by Nordea Bank Danmark A/S in accordance with Clause 8 of the Credit Facility); |
| | (ii) relevant base rate agreed between the relevant Borrower and the Ancillary Facility Lender; |
| | (iii) Mandatory Cost, if any. |
| **Ancillary Facility Credit Instrument Fees** | The Ancillary Facility Credit Instrument Fee shall be 1.00 per cent. per annum on each Ancillary Facility Credit Instrument payable quarterly in arrears (unless otherwise agreed between the Borrower and the relevant Ancillary Facility Lender) from the first Utilisation Date until and including the Expiry Date (which must be a minimum of 10 Business Days after the issuance of the Ancillary Facility Utilisation). |
| | All other fees set out in Clause 16 (*Fees*) of the Credit Facility shall apply equally to the [*name of Bank*] Ancillary Facility, with no double counting. |
| | In each case all fees applicable to the [*name of Bank*] Ancillary Facility shall be calculated by and paid directly to the Bank. |
| **Equalisation between Lenders** | The receipt by the Bank of any Ancillary Outstandings from the Borrower (or cash cover in respect of those Ancillary Outstandings) shall be subject to the terms of Clause 8.6 (*Adjustment for Ancillary Facilities upon acceleration*) of the Credit Facility. |
| **Assignments and transfers** | An assignment or transfer by the Bank of its rights and/or obligations under the [*name of Bank*] Ancillary Facility shall be subject to Clause 29 (*Changes to the Lenders*) of the Credit Facility. No Borrower may transfer any of its rights and obligations under the [*name of Bank*] Ancillary Facility. |
| | References to the Bank in these Minimum Ancillary Facility Terms shall be construed as to include its successors in title, permitted assigns and permitted transferees. |
| **Payment Mechanics** | Payments to be made by the Bank to each Borrower under these Minimum Ancillary Facility Terms shall not be made available to the Agent but shall be made directly to each Borrower or to such relevant third party as that Borrower directs. |
| **Incorporation of** | The provisions set out in the followings clauses of the Credit Facility are |

ING    00300

| terms | incorporated mutatis mutandis into these Minimum Ancillary Facility Terms: |
|---|---|
| | (i) Clause 9 (*Ancillary Facilities*); |
| | (ii) Clause 10 (*Voluntary Prepayment and Cancellation*); |
| | (iii) Clause 11 (*Mandatory Prepayment and Cancellation*); |
| | (iv) Clause 17 (*Tax Gross Up and Indemnities*); |
| | (v) Clause 18 (*Increased Costs*); |
| | (vi) Clause 21 (*Costs and Expenses*); |
| | (vii) Clause 23 (*Representations*); |
| | (viii) Clause 24 (*Information Undertakings*); |
| | (ix) Clause 25 (*Financial Covenants*); |
| | (x) Clause 26 (*General Undertakings*); |
| | (xi) Clause 27 (*Events of Default*); |
| | (xii) Clause 28.8 (*Security over Lenders' rights*); |
| | (xiii) Clause 32 (*Borrowing Base*); |
| | (xiv) Clause 34 (*Sharing among the Finance Parties*); |
| | (xv) Clause 37.7 (*Use of websites*); and |
| | (xvi) Clause 42 (*Confidentiality*), |
| | it being understood that in these Clauses (to the extent relevant): |
| | (A) any references to "Agent", "Lender", "Finance Party" and "Majority Lenders" shall be construed as references to the Bank; |
| | (B) any references to "the Company", "Obligor" and "Borrower" shall be construed as references to the Borrower; |
| | (C) a reference to "Facility" shall be construed as a reference to the [*name of Bank*] Ancillary Facility; |
| | (D) a reference to "Commitment" shall be construed as a reference to the Ancillary Commitment; |
| | (E) a reference to "Available Commitment" shall be construed as a reference to the Available Ancillary Facility; |
| | (F) a reference to "Loan" shall be construed as a reference to an Ancillary Facility Credit Instrument, Ancillary Facility Overdraft and/or Ancillary Facility Utilisation; and |
| | (G) any references to "Agreement" and "Finance Documents" shall be construed as references to the [*name of Bank*] Ancillary Facility (subject to these Minimum Ancillary Facility Terms). |
| | Any amendments made to the Minimum Ancillary Facility Terms as set out in the Credit Facility after the date of the [*name of Bank*] Ancillary Facility shall be automatically incorporated in the [*name of Bank*] Ancillary Facility. |
| **Other provisions** | Each Borrower and the Bank may agree such other terms and provisions based on normal commercial principles in respect of the [*name of Bank*] Ancillary Facility, subject always to any conflict with these Minimum Ancillary Facility Terms which shall prevail. |

ING    00301

| | |
|---|---|
| **Amendments and waivers** | The Bank and the Borrower may agree to amend the terms of the [*name of Bank*] Ancillary Facility, subject always to no conflict with these Minimum Ancillary Facility Terms. |
| | No amendment may be made to these Minimum Ancillary Facility Terms without the consent of the Agent (acting on behalf of the Majority Lenders). |
| | Waivers in respect of an Ancillary Facility Event of Default shall be subject to Clause 41.1 (*Required consents*) of the Credit Agreement. |
| **Governing Law** | These Minimum Ancillary Facility Terms shall be governed by English law. |
| **Definitions** | **Available Ancillary Facility** means the Ancillary Facility Amount less the Base Currency Amount of any Ancillary Facility Utilisation outstanding or due to be made on or before the proposed Ancillary Utilisation Date (other than Ancillary Facility Utilisations due to be repaid or prepaid on or before such date). |
| | **Ancilllary Facility Amount** means the Commitments made available by the Ancilllary Facility Lender under the Ancillary Facility. |
| | **Ancillary Facility Default** means an Ancillary Facility Event of Default or any event or circumstance specified in Clause 27 (*Events of Default*) of the Credit Facility as incorporated by reference in "Events of Default" above which would (with the lapse of time, the giving of notice, the making of any determination under the Finance Documents or any combination of the foregoing) be an Ancillary Facility Event of Default. |
| | **Ancillary Facility Event of Default** means any event or circumstance specified in Clause 27 (*Events of Default*) of the Credit Facility as incorporated by reference in "Events of Default" above. |
| | **Ancillary Facility Utilisation Request** means a notice substantially in the form to be agreed by the Bank and each Borrower, and must include all details specified. |
| | **Ancillary Utilisation Date** means the date on which an Ancillary Facility Utilisation is, or is to be, made or issued. |
| | **End Date** means the date on which an Ancillary Facility is stated to expire. |
| | **Expiry Date** means, in relation to any Ancillary Facility Credit Instrument, the last day on which the Bank is under any liability (whether actual or contingent) under such Ancillary Facility Credit Instrument. |

ING   00302

## SIGNATURES

This Agreement was executed outside Belgium.

**THE COMPANY**

**O.W. BUNKER & TRADING A/S**

By: _____  By: _____

NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

Address: Stigsborgvej 60 DK-9400 Nørresundby, Denmark

Fax: +45 98 13 16 64

Email: kela@owbunker.dk

Attention: Group Treasury Manager

**THE ORIGINAL BORROWERS**

**O.W. BUNKER (BELGIUM) NV**

By: _____  By: _____

NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**O.W. BUNKER & TRADING A/S**

By: _____  By: _____

NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**O.W. BUNKER CHINA LIMITED**

By: _____  By: _____

NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**O.W. BUNKER (NETHERLANDS) B.V.**

By: _____  By: _____

NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**DYNAMIC OIL TRADING (SINGAPORE) PTE. LTD.**

By: _____  By: _____

0030155-0001031 AMBA 4005161.16  222

NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**O.W. BUNKER FAR EAST (SINGAPORE) PTE LTD**

By: _____  By: _____
NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**O.W. GLOBAL TRADING SA**

By: _____  By: _____
NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**O.W. BUNKER MIDDLE EAST DMCC**

By: _____  By: _____
NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**O.W. BUNKER NORTH AMERICA INC.**

By: _____  By: _____
NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**THE ORIGINAL GUARANTORS**

**O.W. BUNKER (BELGIUM) NV**

By: _____  By: _____
NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**O.W. BUNKER & TRADING A/S**

By: _____  By: _____
NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**O.W. SUPPLY & TRADING A/S**

By: _____  By: _____
NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

**O.W. BUNKERS (UK) LIMITED**

By: _____  By: _____

Address: Sir Henry Darvill House, 8-10 William Street, Windsor, Berkshire, SL4 1BA, England

NAME: MORTEN SKOU  NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT  TITLE: ATTORNEY IN FACT

ING    00304

**O.W. BUNKER GERMANY GMBH**

By: _____    By: _____

NAME: MORTEN SKOU    NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT    TITLE: ATTORNEY IN FACT

**O.W. BUNKER CHINA LIMITED**

By: _____    By: _____

NAME: MORTEN SKOU    NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT    TITLE: ATTORNEY IN FACT

**O.W. BUNKER MALTA LIMITED**

By: _____    By: _____

NAME: MORTEN SKOU    NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT    TITLE: ATTORNEY IN FACT

**O.W. BUNKER (NETHERLANDS) B.V.**

By: _____    By: _____

NAME: MORTEN SKOU    NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT    TITLE: ATTORNEY IN FACT

**BERGEN BUNKERS AS**

By: _____    By: _____

NAME: MORTEN SKOU    NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT    TITLE: ATTORNEY IN FACT

**DYNAMIC OIL TRADING (SINGAPORE) PTE. LTD.**

By: _____    By: _____

NAME: MORTEN SKOU    NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT    TITLE: ATTORNEY IN FACT

**O.W. BUNKER FAR EAST (SINGAPORE) PTE LTD**

By: _____    By: _____

NAME: MORTEN SKOU    NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT    TITLE: ATTORNEY IN FACT

**O.W. BUNKER (SWITZERLAND) SA**

By: _____    By: _____

NAME: MORTEN SKOU    NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT    TITLE: ATTORNEY IN FACT

**O.W. GLOBAL TRADING SA**

By: _____    By: _____

NAME: MORTEN SKOU    NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT    TITLE: ATTORNEY IN FACT

0030155-0001031 AMBA 4005161.16

224

**O.W. BUNKER MIDDLE EAST DMCC**

By:                      By:

NAME: MORTEN SILOU       NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT      TITLE: ATTORNEY IN FACT

**O.W. BUNKER NORTH AMERICA INC.**

By:                      By:

NAME: MORTEN SILOU       NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT      TITLE: ATTORNEY IN FACT

**O.W. BUNKER USA INC.**

By:                      By:

NAME: MORTEN SILOU       NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT      TITLE: ATTORNEY IN FACT

**O.W. BUNKER PANAMA S.A.**

By:                      By:

NAME: MORTEN SILOU       NAME: JIM PEDERSEN
TITLE: ATTORNEY IN FACT      TITLE: ATTORNEY IN FACT

**THE ARRANGERS**

**ABN AMRO BANK N.V.**

By:                      By:

**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                      By:

**DANSKE BANK A/S**

By:                      By:

**ING BANK N.V.**

By:                      By:

**NATIXIS**

By:                      By:

ING  00306

**O.W. BUNKER MIDDLE EAST DMCC**

By:                                    By:


**O.W. BUNKER NORTH AMERICA INC.**

By.                                    By:


**O.W. BUNKER USA INC.**

By:                                    By:


**O.W. BUNKER PANAMA S.A.**

By:                                    By:


**THE ARRANGERS**


**ABN AMRO BANK N.V.**

By:                                    By:


**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                                    By


**DANSKE BANK A/S**

By.                                    By:


**ING BANK N.V.**

By:                                    By


**NATIXIS**

By.                                    By:

ING   00307

**O.W. BUNKER MIDDLE EAST DMCC**

By:                              By:


**O.W. BUNKER NORTH AMERICA INC.**

By:                              By:


**O.W. BUNKER USA INC.**

By:                              By:


**O.W. BUNKER PANAMA S.A.**

By:                              By:


**THE ARRANGERS**


**ABN AMRO BANK N.V.**

By:                              By:


**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                              By:

*Rabobank International Trade & Commodity Finance*
Rob C.M. Reefman
Rabobank  Director Energy

*Rabobank International Trade & Commodity Finance*
Dirk W.M.C. Kuiper
Rabobank  Global Head Energy

**DANSKE BANK A/S**

By:                              By:


**ING BANK N.V.**

By:                              By:


**NATIXIS**

By:                              By:

ING     00308

**O.W. BUNKER MIDDLE EAST DMCC**

By:                                        By:

**O.W. BUNKER NORTH AMERICA INC.**

By:                                        By:

**O.W. BUNKER USA INC.**

By:                                        By:

**O.W. BUNKER PANAMA S.A.**

By:                                        By:

**THE ARRANGERS**

**ABN AMRO BANK N.V.**

By:                                        By:

**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                                        By:

**DANSKE BANK A/S**

By:        _Bjarne Stubager_             By:     _Michael Bech_
                                                    _Director_

**ING BANK N.V.**

By:                                        By:

**NATIXIS**

By:                                        By:

ING    00309

**O.W. BUNKER MIDDLE EAST DMCC**

By:                                    By:


**O.W. BUNKER NORTH AMERICA INC.**

By:                                    By:


**O.W. BUNKER USA INC.**

By:                                    By:


**O.W. BUNKER PANAMA S.A.**

By:                                    By:


**THE ARRANGERS**


**ABN AMRO BANK N.V.**

By:                                    By:


**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                                    By:


**DANSKE BANK A/S**

By:                                    By:


**ING BANK N.V.**

By:                                    By:

_G A Goedhuis_                          _P. R. C. van Danne._


**NATIXIS**

By:                                    By:

0030155-0001031 AMBA 4005161 16            225

ING    00310

**O.W. BUNKER MIDDLE EAST DMCC**

By:                                              By:


**O.W. BUNKER NORTH AMERICA INC.**

By:                                              By:


**O.W. BUNKER USA INC.**

By:                                              By:


**O.W. BUNKER PANAMA S.A.**

By:                                              By:


**THE ARRANGERS**


**ABN AMRO BANK N.V.**

By:                                              By:


**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                                              By:


**DANSKE BANK A/S**

By:                                              By:


**ING BANK N.V.**

By:                                              By:


**NATIXIS**

By:                                              By:

François-Xavier DUPREELLE

0030155-0001031 AMBA:4005161.16                  225        Bruno Mazoyer

ING    00311

**NORDEA BANK DANMARK A/S**

By:                                    By:

     Olaf Ziegler                           Michael Hornnes
     Senior Legal Counsel

**THE AGENT**

**ING BANK N.V.**

By:                                    By:

Address:    ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP
            N 04 046)

Fax:       +31 20 565 8226

Email:     Rene.van.Versendaal@INGBank.com / Kenneth.van.Coblijn@INGBank.com /
           Ger.B.Schinning@INGBank.com

Attention:  Agency Desk - Ops&IT Banking Wholesale Lending Operations Agency


**THE SECURITY AGENT**

**ING BANK N.V.**

By:                                    By:


**THE COORDINATOR**

**ING BANK N.V.**

By:                                    By:


**THE ORIGINAL LENDERS**

**ABN AMRO BANK N.V.**

By:                                    By:


**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                                    By:

ING   00312

**NORDEA BANK DANMARK A/S**

By:                                          By:

**THE AGENT**

**ING BANK N.V.**

By:          *R. Knaap*                    By:          *G.B. Schinning*

Address:     ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP
             N 04 046)

Fax:         +31 20 565 8226

Email.       Rene.van.Versendaal@INGBank.com / Kenneth.van.Coblijn@INGBank.com /
             Ger.B.Schinning@INGBank.com

Attention:   Agency Desk - Ops&IT Banking Wholesale Lending Operations Agency

**THE SECURITY AGENT**

**ING BANK N.V.**

By:                                          By:

**THE COORDINATOR**

**ING BANK N.V.**

By:                                          By:

**THE ORIGINAL LENDERS**

**ABN AMRO BANK N.V.**

By:                                          By:

**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                                          By:

ING    00313

**NORDEA BANK DANMARK A/S**

By:                                         By:


**THE AGENT**

**ING BANK N.V.**

By:                                         By:

Address:     ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP
             N 04 046)

Fax:         +31 20 565 8226

Email:       Rene.van.Versendaal@INGBank.com / Kenneth.van.Coblijn@INGBank.com /
             Ger.B.Schinning@INGBank.com

Attention:   Agency Desk - Ops&IT Banking Wholesale Lending Operations Agency


**THE SECURITY AGENT**

**ING BANK N.V.**

By:                                         By:

         R. M. Pilhet                              F. DEELEN

**THE COORDINATOR**

**ING BANK N.V.**

By:                                         By:


**THE ORIGINAL LENDERS**

**ABN AMRO BANK N.V.**

By:                                         By:


**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                                         By:

ING    00314

**NORDEA BANK DANMARK A/S**

By:                                By:


**THE AGENT**

**ING BANK N.V.**

By:                                By:

Address:    ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP
            N 04 046)

Fax:        +31 20 565 8226

Email:      Rene.van.Versendaal@INGBank.com / Kenneth.van Coblijn@INGBank.com /
            Ger.B.Schinning@INGBank.com

Attention:  Agency Desk - Ops&IT Banking Wholesale Lending Operations Agency


**THE SECURITY AGENT**

**ING BANK N.V.**

By:                                By:


**THE COORDINATOR**

**ING BANK N.V.**

By:                                By:


**THE ORIGINAL LENDERS**

**ABN AMRO BANK N.V.**

By:                                By:


**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                                By:

ING   00315

**NORDEA BANK DANMARK A/S**

By:                                          By:


**THE AGENT**

**ING BANK N.V.**

By.                                          By:

Address:     ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP
             N 04 046)

Fax:         +31 20 565 8226

Email:       Rene.van.Versendaal@INGBank.com / Kenneth.van.Coblijn@INGBank.com /
             Ger.B.Schinning@INGBank.com

Attention:   Agency Desk - Ops&IT Banking Wholesale Lending Operations Agency


**THE SECURITY AGENT**

**ING BANK N.V.**

By                                           By.


**THE COORDINATOR**

**ING BANK N.V.**

By:                                          By:


**THE ORIGINAL LENDERS**

**ABN AMRO BANK N.V.**

By                                           By:


**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                                          By:

ING    00316

**NORDEA BANK DANMARK A/S**

By:                                          By:


**THE AGENT**

**ING BANK N.V.**

By:                                          By:

Address:     ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP
             N 04 046)

Fax:         +31 20 565 8226

Email:       Rene.van.Versendaal@INGBank.com / Kenneth.van.Coblijn@INGBank.com /
             Ger.B.Schinning@INGBank.com

Attention:   Agency Desk - Ops&IT Banking Wholesale Lending Operations Agency


**THE SECURITY AGENT**

**ING BANK N.V.**

By:                                          By:


**THE COORDINATOR**

**ING BANK N.V.**

By:                                          By:


**THE ORIGINAL LENDERS**

**ABN AMRO BANK N.V.**

By:                                          By:


**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.**

By:                    *Rabobank International*      By:            Rabobank International
                       *Trade & Commodity Finance*                 Trade & Commodity Finance
                       Rob C.M. Reefman                             Dirk W.M.C. Kuiper
            **Rabobank** Director Energy                 **Rabobank** Global Head Energy


0030155-0001031 AMBA:4005161.16              226

**COMMERZBANK AKTIENGESELLSCHAFT**

By: _[signature]_                By: _[signature]_

Michaela Kleinfelder
Vice President

**CREDIT AGRICOLE (SUISSE) S.A.**

By:                    By:


**DANSKE BANK A/S**

By:                    By:


**DEUTSCHE BANK AG, AMSTERDAM BRANCH**

By:                    By:


**FIFTH THIRD BANK**

By:                    By:


**ING BANK N.V.**

By:                    By:


**NATIXIS**

By:                    By:


**NORDEA BANK DANMARK A/S**

By:                    By:


**SOCIETE GENERALE**

By:                    By:

ING    00318

**COMMERZBANK AKTIENGESELLSCHAFT**

By:                              By:


**CREDIT AGRICOLE (SUISSE) S.A.**

By:                              By:

Claude RUCHAUBERT
Member of the
Management Committee

Olivier LE BIHAN
Membre du Comité de Direction

**DANSKE BANK A/S**

By:                              By:


**DEUTSCHE BANK AG, AMSTERDAM BRANCH**

By:                              By:


**FIFTH THIRD BANK**

By:                              By:


**ING BANK N.V.**

By:                              By:


**NATIXIS**

By:                              By:


**NORDEA BANK DANMARK A/S**

By:                              By:


**SOCIETE GENERALE**

By:                              By:

ING    00319

**COMMERZBANK AKTIENGESELLSCHAFT**

By:                                    By:


**CREDIT AGRICOLE (SUISSE) S.A.**

By:                                    By:


**DANSKE BANK A/S**

By:        Bjarne Stubøger           By:        Michael Bech
                                                 Director


**DEUTSCHE BANK AG, AMSTERDAM BRANCH**

By:                                    By:


**FIFTH THIRD BANK**

By:                                    By:


**ING BANK N.V.**

By:                                    By:


**NATIXIS**

By:                                    By:


**NORDEA BANK DANMARK A/S**

By:                                    By:


**SOCIETE GENERALE**

By:                                    By:

ING     00320

**COMMERZBANK AKTIENGESELLSCHAFT**

By:                                By:


**CREDIT AGRICOLE (SUISSE) S.A.**

By:                                By:


**DANSKE BANK A/S**

By:                                By:


**DEUTSCHE BANK AG, AMSTERDAM BRANCH**

By: *[signature]*                  By: *[signature]*

                                   *M. Verbeek*

**FIFTH THIRD BANK**

By:                                By:


**ING BANK N.V.**

By:                                By:


**NATIXIS**

By:                                By:


**NORDEA BANK DANMARK A/S**

By:                                By:


**SOCIETE GENERALE**

By:                                By:

ING    00321

**COMMERZBANK AKTIENGESELLSCHAFT**

By:                                    By:


**CREDIT AGRICOLE (SUISSE) S.A.**

By:                                    By:


**DANSKE BANK A/S**

By:                                    By:


**DEUTSCHE BANK AG, AMSTERDAM BRANCH**

By:                                    By:


**FIFTH THIRD BANK**

By: _LARRY HAYES_                      By:


**ING BANK N.V.**

By:                                    By:


**NATIXIS**

By:                                    By:


**NORDEA BANK DANMARK A/S**

By:                                    By:


**SOCIETE GENERALE**

By:                                    By:

ING    00322

**COMMERZBANK AKTIENGESELLSCHAFT**

By:                                        By:


**CREDIT AGRICOLE (SUISSE) S.A.**

By:                                        By:


**DANSKE BANK A/S**

By:                                        By:


**DEUTSCHE BANK AG, AMSTERDAM BRANCH**

By:                                        By:


**FIFTH THIRD BANK**

By:                                        By:


**ING BANK N.V.**

By:                                        By:

R. M. Pilut                                F. Deelen


**NATIXIS**

By:                                        By:


**NORDEA BANK DANMARK A/S**

By:                                        By:


**SOCIETE GENERALE**

By:                                        By:

ING   00323

**COMMERZBANK AKTIENGESELLSCHAFT**

By:                                By:


**CREDIT AGRICOLE (SUISSE) S.A.**

By:                                By:


**DANSKE BANK A/S**

By:                                By:


**DEUTSCHE BANK AG, AMSTERDAM BRANCH**

By:                                By:


**FIFTH THIRD BANK**

By:                                By:


**ING BANK N.V.**

By:                                By:


**NATIXIS**

By:                                By:

François-Xavier DUPREELLE

Bruno Mazoyer

**NORDEA BANK DANMARK A/S**

By:                                By:


**SOCIETE GENERALE**

By:                                By:

ING    00324

**COMMERZBANK AKTIENGESELLSCHAFT**

By:                                By:


**CREDIT AGRICOLE (SUISSE) S.A.**

By:                                By:


**DANSKE BANK A/S**

By:                                By:


**DEUTSCHE BANK AG, AMSTERDAM BRANCH**

By:                                By:


**FIFTH THIRD BANK**

By:                                By:


**ING BANK N.V.**

By:                                By:


**NATIXIS**

By:                                By:


**NORDEA BANK DANMARK A/S**

By:  Olaf Ziegler                  By:  Michael Hornnes
     Senior Legal Counsel

**SOCIETE GENERALE**

By:                                By:

**COMMERZBANK AKTIENGESELLSCHAFT**

By:                                 By:


**CREDIT AGRICOLE (SUISSE) S.A.**

By:                                 By:


**DANSKE BANK A/S**

By:                                 By:


**DEUTSCHE BANK AG, AMSTERDAM BRANCH**

By:                                 By:


**FIFTH THIRD BANK**

By:                                 By:


**ING BANK N.V.**

By:                                 By:


**NATIXIS**

By:                                 By:


**NORDEA BANK DANMARK A/S**

By:                                 By:


**SOCIETE GENERALE**

By:                                 By:

Pierre-Antoine BARREAULT
Deputy Head of Corporate
Commodity and Trade Finance

**SOCIETE GENERALE**
GLFI/ENR/NAT/TCF/TRD
17 Cours Valmy
92987 PARIS LA DEFENSE 7 Cedex

0030155-0001031 AMBA:4005161.16                 227

ING    00326

**STANDARD CHARTERED BANK**

By: _____          By: _____

**UBS AG**

By: _____          By: _____

ING    00327

**STANDARD CHARTERED BANK**

By:                                                    By:


**UBS AG**

By:                                                    By:

UBS AG
Edouard Huberdeau
Executive Director

UBS AG
Nicolas Gay-Crosier
Executive Director

ING     00328