# **<u>Exhibit 37</u>**

Page 1

- PAUL COPLEY - CONFIDENTIAL -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------ X

| | |
|---|---|
| CLEARLAKE SHIPPING PTE LTD., ) | |
| ) | CASE NO. |
| Plaintiff, ) | 14-cv-9287 (VEC) |
| ) | |
| -against- ) | |
| ) | |
| O.W. BUNKER (SWITZERLAND) SA. O.W. ) | |
| BUNKER USA INC., O.W. BUNKER | |
| HOLDING NORTH AMERICA, INC., NUSTAR ) | |
| ENERGY SERVICES INC., ING BANK | |
| N.V., ) | |
| | |
| Defendants. ) | |

_____

| | |
|---|---|
| BONNY GAS TRANSPORT LIMITED, as ) | |
| owner of the LNG FINIMA (IMO | CASE NO. |
| No.7702401), ) | 14-cv-9542 (VEC) |
| | |
| Plaintiff, ) | |
| | |
| -against- ) | |
| | |
| O.W. BUNKER GERMANY GMBH, NUSTAR ) | |
| TERMINALS MARINE SERVICES, N.V., | |
| NUSTAR ENERGY SERVICES, INC., ) | |
| ING BANK N.V., | |
| ) | |
| Defendants. ) | |

_____

| | |
|---|---|
| SHV GAS SUPPLY & RISK MANAGEMENT | |
| SAS AND EXMAR SHIPPING BVBA, as ) | CASE NO. |
| owner of the WAREGEM (IMO No. | 14-cv-9720 (VEC) |
| 9659127), ) | |
| | |
| Plaintiffs ) | |
| | |
| -against- ) | Witness: |
| | |
| OW BUNKER USA INC., OW BUNKER ) | PAUL COPLEY |
| HOLDING NORTH AMERICA INC., | |
| OW BUNKER NORTH AMERICA INC., ) | |
| NUSTAR ENERGY SERVICES INC., AND | |
| ING BANK NV, ) | Date: |

Page 48

1                  - PAUL COPLEY - CONFIDENTIAL -

2          Q.     For the HELLAS GLORY, the amount is

3     $980,959.81, correct?

4          A.     Yes.

5          Q.     For the VENUS GLORY, the amount is

6     USD 327,637.29, correct?

7                  MR. PAULSEN:  Objection.

8          A.     Yes.

9          Q.     For the AZURIT, the amount is USD

10    340,048.06, correct?

11                 MR. PAULSEN:  Objection.

12         A.     Yes.

13         Q.     It's also fair to say that should

14    ING Bank receive those monies, it does not have

15    any intention of paying NuStar, physical supplier,

16    for the bunkers that have been supplied, correct?

17                 MR. PAULSEN:  Objection, form.

18         A.     NuStar would have a claim on the

19    OW Bunker entity which it supplied.

20         Q.     Yes.  But in terms of whether -- as

21    ING as the security agent, if ING recoups these

22    monies, for example, by way of its maritime lien

23    claim, is it ING's intention to pay NuStar this

24    invoice amount?

25         A.     No.  ING's intention is to recover

Page 49

1                    - PAUL COPLEY - CONFIDENTIAL -

2       the value of the invoice plus interest and charges

3       and to then repay the syndicate of lenders because

4       these vessels, and the invoices in respect of

5       these vessels, were financed by the syndicate

6       prior to bankruptcy.

7            Q.     Right.  So again, getting back to my

8       question, just to make sure we're clear on the

9       record.

10                  It's -- ING Bank does not intend to

11      pay NuStar as physical supplier for the value that

12      it seeks?

13           A.     Yes, that's correct.

14                  ING will be repaying indebtedness to

15      the syndicate which financed the invoices.  NuStar

16      will have a claim against OW Bunker which was its

17      contractual counterparty.

18           Q.     Yes.  Except for the fact that the

19      assignment, according to ING's position, gives the

20      maritime lien to ING Bank, as opposed to OW, so

21      that there's no monies left for OW to recoup to

22      pay NuStar.

23                  MR. PAULSEN:  Objection, form.

24           A.     I don't agree.  OW Bunker entities

25      may well have other assets which are able to pay

1                    - PAUL COPLEY - CONFIDENTIAL -

2      right now?

3            A.      Yes.

4            Q.      What are those?

5            A.      The OW Bunker terms of -- OW Bunker

6      general terms and conditions or the DOT general

7      terms and conditions depending on the chargor.

8            Q.      When you say "DOT," what is that?

9            A.      Dynamic Oil Trading.

10           Q.      If in a particular transaction there

11     were any negotiations about the application of

12     terms other than the standard OW terms or the DOT

13     terms, would ING have had any involvement in

14     making the decision as to which terms would apply?

15           A.      No.

16           Q.      When you say that ING had access to a

17     summary of the circumstances under which the

18     bunkers were supplied, would that summary have

19     been prepared before during or after the bunker

20     transaction was completed?

21           A.      After.

22           Q.      Was there a particular person within

23     ING who -- strike that.

24                   How is it that ING would have access

25     to these summaries?

Page 61

1                    - PAUL COPLEY - CONFIDENTIAL -

2                    What I'm trying to get at, was it a

3       database they could jump into and access?  Was

4       there paper documentation, reports, et cetera,

5       provided by the OW entities?

6                    How was that access provided?

7          A.    Pursuant to the banking

8       documentation, the OW Bunker entity management

9       team had to submit a borrowing base certificate to

10      ING Bank in its capacity as agent, and attached to

11      that would have been a spreadsheet, were

12      spreadsheets, which set out the underlying

13      customers and amounts due from those customers

14      which were then financed.

15                   Because the way the facility operates

16      is ING Bank financed a percentage up to 90 percent

17      of individual invoices.  So it had to have a list

18      of those invoices and the amounts due from

19      customers, submitted to them under the banking

20      documentation.

21         Q.    Were those spreadsheet summaries you

22      just described also disclosed that -- strike that.

23                   Would those summaries disclose the

24      invoice amounts due from the OWB customer?

25         A.    Yes.

1              - PAUL COPLEY - CONFIDENTIAL -

2        specifically, but it must have.

3              Q.     What was ING's understanding of what

4        the $700 million credit facility was to be applied

5        for -- applied against?

6              A.     The facility was to be used -- sorry,

7        can I just clarify your question?

8              Q.     Yes.

9              A.     I'll answer, then you'll tell me if

10       I've not.

11             The facility was structured in a way

12       that the syndicate would lend a proportion against

13       receivables and a proportion against a very small

14       amount of inventory.  So, there were two classes

15       of receivables.  And the syndicate would lend up

16       to 90 percent of any individual receivable.

17             Q.     Two classes of receivables.  What

18       were those?

19             A.     The first class, from memory, were

20       customers who were of investment grade from a

21       credit rating perspective or the receivable was

22       credit insured by the group or the receivable was

23       backed by letter of credit issued by that customer

24       and those customers were financed at 90 percent,

25       and up to the cap the maximum they could borrow

Page 81

1                    - PAUL COPLEY - CONFIDENTIAL -

2          was 700 million in total.

3                    And then all other customers were, as

4          I understand it, financed at a borrowing rate of

5          50 percent against the account receivable.

6               Q.    Did ING have any understanding as to

7          what the dollars that were loaned to OWB were

8          going to be used for?

9                    MR. PAULSEN:  Objection to form.

10              A.    Yes.  The facility was -- was for the

11         general financing of OW Bunker's day-to-day

12         business, generally speaking.

13                   So it was -- it was a revolving

14         credit facility that was used for working capital

15         finance.  That was its principal use.

16              Q.    Did ING understand that in connection

17         with bunker transactions, one of the expense

18         components to OWB would have been the payment for

19         the actual bunkers themselves?

20              A.    I'm sure that's the case, yes.

21              Q.    Did OW Bunker have to provide to ING,

22         as the security agent, reports on a periodic basis

23         as to their financial condition?

24              A.    I don't know.

25              Q.    Did ING or the lenders have in place

Page 82

1                    - PAUL COPLEY - CONFIDENTIAL -
2        any procedures by which they would audit or
3        oversee OW Bunker's operations?
4             A.     Yes.
5             Q.     Okay.  Tell me a little bit about
6        those procedures.
7             A.     There was an annual -- the principal
8        audit was -- there was an annual audit of the
9        receivables financing process.  And in addition,
10       there was an inventory audit.  But the inventory
11       component of the collateral is insignificantly
12       small, so let's move on from that.
13                   In respect of the receivables, there
14       was an annual process which at the point of
15       bankruptcy was scheduled, it had not yet taken
16       place.
17            Q.     Since the credit facility went into
18       effect December 2013, had any annual audit of
19       receivables as you just described been conducted?
20            A.     No.
21            Q.     It was scheduled to take place for
22       when?
23            A.     I don't recall exactly.  I think it
24       was sometime in December 2014.
25            Q.     At the time of the filing of the

1                  - PAUL COPLEY - CONFIDENTIAL -

2       bankruptcy, what was the outstanding amount of

3       under the credit facility, roughly?

4            A.     It's approximately $647 million.

5            Q.     Was OW delinquent in terms of any

6       payments they owed to the lenders under the credit

7       facility at the time of the bankruptcy?

8            A.     By which you mean delinquent, it

9       hadn't paid back amounts that were due to the

10      syndicate.

11           Q.     Under the terms of the credit

12      facility and the security agreement, was OWB

13      obligated to make payments to draw -- to bring

14      down its credit on a periodic basis?  How did the

15      repayment process work?

16           A.     The answer is not usually.  So, what

17      would normally happen is the new sort of facility

18      was structured as we've discussed as a percentage

19      of receivables.  So if the receivables stayed

20      constant from time to time, all you'd be doing is

21      lending at different receivables to previously.

22      It would then be a true up.

23                  And generally speaking, there would

24      be an amount due or payable.  But you know, it

25      would be relatively small compared to the 700

Page 88

1                     - PAUL COPLEY - CONFIDENTIAL -

2          A.      Not to my knowledge.

3          Q.      You mentioned something about access

4     to the borrowing base -- strike that -- that the

5     lenders would have had access to the borrowing

6     base certificate.

7          A.      Yes.

8          Q.      Did I say that correctly?

9          A.      You did.

10         Q.      Can you tell me in layman's terms

11    what you're talking about?

12         A.      Sure.  That was a spreadsheet or PDF

13    of a spreadsheet that was submitted periodically

14    to the syndicate which set out the receivables,

15    the amounts that were eligible to be drawn against

16    and the amounts of borrowing, plus a spreadsheet

17    which would have included all the outstandings due

18    to customers in support of that borrowing base

19    certificate.

20              And that borrowing base certificate

21    was signed off by OW Bunker management, so that

22    would give the syndicate some information as to

23    the amount of the group what the outstanding

24    receivables were, the borrowing requirement was,

25    what the movement in the borrowing requirement was

Page 89

1              - PAUL COPLEY - CONFIDENTIAL -

2       on a periodic basis.

3              Q.    You say periodic basis.  How often?

4              A.    I think two weeks, it's in the

5       facility agreement.  I think it's every two weeks.

6              Q.    Did that borrowing base certificate

7       or the documents submitted when the borrowing base

8       certificate was submitted, did it also disclose

9       any of the expenses associated with any of the

10      invoices identified?

11             MR. PAULSEN:  Objection to form.

12             A.    From memory, it included by way of a

13      memo the outstanding accounts payable from memory.

14             Q.    Okay.  Give me a minute, please.

15             A.    Sure.

16             Q.    I'm going to ask you to turn to

17      Exhibit 8 which was the cooperation agreement with

18      OW Germany.  Just so we know in the transcript,

19      we're talking about the cooperation agreement.

20                   And I'm going to ask you to turn to

21      Page -- it's Page 16 of the document, but it's

22      Bates page ING HL -- you might not have the same

23      one -- strike that.

24                   It's Page 16 of the document.

25             A.    Got it.

# **Exhibit 38**

**STACIE SPECKMAN  -  December 09, 2015**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK


NIPPON KAISHA LINE          )
                            )
LIMITED, ET AL              )
                            )
                            )   C.A. NO: 1:14-cv-10091
v                           )
                            )
                            )
O.W. BUNKER USA, INC., ET AL   )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


ORAL DEPOSITION OF

STACIE SPECKMAN

DECEMBER 9, 2015


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**STACIE SPECKMAN  -  December 09, 2015**

1  correct?

2      A.    Upon the instructions of the principals who have

3  stemmed the bunkers, then we schedule the bunkers according to

4  either the instructions that they give us, if they tell us a

5  specific dock that it needs to be done at or a location or if

6  they tell us to use our better judgment as to where the bunkers

7  need to be done.

8            Many principals are not familiar with the port,

9  they don't know the ship's rotation, if they're calling more

10  than one berth.  So they will instruct us, "Get them delivered

11  while she's in port," that happens rarely.  They usually

12  suggest where they want the bunkers to be taken, and then we

13  coordinate accordingly.

14      Q.    Okay.  So this happens after the -- the owners or

15  charters have stemmed the vessel?

16      A.    That is correct.

17      Q.    And can you just tell me for clarification what you

18  mean by "stemmed"?

19      A.    Stem is a term used when they have purchased or

20  ordered bunkers for a vessel, so it's called a bunker stem.

21      Q.    So in this case it was with the RIGEL LEADER, ISS did

22  not purchase any bunkers?

23      A.    That is correct.

24            We would never ever purchase bunkers on behalf

25  of any principal.

# **Exhibit 39**

**NEIL LIGERWOOD - December 04, 2015**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
SK SHIPPING CO., LTD. ET    )
AL                          )
                            )
            PLAINTIFFS,     )
                            )        CASE NUMBER
VS.                         )
                            )        1:15-cv-02141
NUSTAR ENERGY SERVICES,     )
INC., ET AL                 )
                            )
            DEFENDANTS.     )
```

*********************************************************

ORAL VIDEOCONFERENCE DEPOSITION OF

NEIL LIGERWOOD

DECEMBER 4, 2015

*********************************************************

NEIL LIGERWOOD - December 04, 2015

1    A.    Oh, I would not be able to confirm that
2  without looking into it.  I would doubt it.
3    Q.    Okay.  Turning your attention to page 283.
4    A.    All right.
5    Q.    You've previously identified the seller in
6  this stem as OW Bunker Middle East Dubai; is that
7  right?
8    A.    According to this document, that's what it
9  states, yes.
10   Q.    Wilhelmsen, do I have it right that Wilhelmsen
11 didn't really have any involvement in this particular
12 faction until the notification that this order had been
13 placed?
14               MR. HERSCHAFT: Object to form, but you
15 can answer.
16   A.    Correct.  We do not stem or have any financial
17 engagement in this contract between the customer and
18 the bunker supplier.
19   Q.    (BY MR. MALONEY) Did --
20               MR. HERSCHAFT:  Brian, if you could
21 repeat that question slowly, it broke up right in the
22 beginning.
23   Q.    (BY MR. MALONEY)  When the fuel was delivered
24 aboard the ship did Wilhelmsen purchase any of the fuel
25 delivered at that time?

1      A.    No.

2      Q.    Did Wilhelmsen agree with anyone on the price

3  of the fuel that would be delivered in this

4  transaction?

5      A.    No.

6      Q.    Wilhelmsen was responsible for logistics of

7  scheduling the fuel delivery after the order had been

8  placed, correct?

9      A.    Correct.

10     Q.    Do you have any understanding of which entity

11  over in Korea purchased the fuel?

12          MR. HERSCHAFT:  Object to the form, but

13  you can answer.

14     A.    Can you reask that question again, please?  It

15  was broken up.

16     Q.    (BY MR. MALONEY) There are two plaintiffs in

17  this case.  Their names are SK Shipping Co., Limited

18  and SK E&T PTE, Limited, and do you know which of those

19  two entities purchased the fuel in this case?

20     A.    No, I do not.

21     Q.    And have you ever seen the time charter that

22  was issued in this case to SK Shipping?

23     A.    No, we have not.

24     Q.    In the course of your business in the agency

25  division, would you have occasion to see time charters?

# **Exhibit 40**

Execution Version

# ENGLISH OMNIBUS
# SECURITY AGREEMENT

DATED 19ᵗʰ December 2013

**BETWEEN**

**THE CHARGORS LISTED IN SCHEDULE 1**

- and -

**ING BANK N.V.**
**as Security Agent**

ING   00001

# CONTENTS

**Clause**                                                                                                **Page**

1.    Interpretation ........................................................................................................................ 3
2.    Creation of Security ............................................................................................................. 6
3.    Representations - General .................................................................................................... 9
4.    Restrictions on Dealings ...................................................................................................... 10
5.    Perfection and Maintenance of Security ............................................................................. 11
6.    Preservation of Security ....................................................................................................... 16
7.    When Security becomes Enforceable .................................................................................. 18
8.    Enforcement of Security ....................................................................................................... 19
9.    Danish Limitations ............................................................................................................... 20
10.   German Limitations .............................................................................................................. 21
11.   Swiss Limitations ................................................................................................................. 21
12.   Receiver ................................................................................................................................. 22
13.   Powers of Receiver ............................................................................................................... 23
14.   Application of Proceeds ....................................................................................................... 25
15.   Delegation ............................................................................................................................. 25
16.   Further Assurances ............................................................................................................... 26
17.   Power of Attorney ................................................................................................................. 26
18.   Miscellaneous ....................................................................................................................... 26
19.   Release ................................................................................................................................... 27
20.   Governing Law ..................................................................................................................... 27
21.   Enforcement .......................................................................................................................... 27

                                                                                                          **Page**

**Schedules**
1.    Chargors ................................................................................................................................ 28
      Part 1      PART 1A - Receivables Chargors ........................................................................ 28
      Part 2      PART 1B - Danish Receivables Chargors ........................................................... 29
      Part 3      PART 2 - Insurance Chargors and Intra-Group Chargors ................................... 30
      Part 4      PART 3 - Brokerage Chargors ............................................................................ 31
2.    Insurance Policies ................................................................................................................. 32
3.    Existing Supply Contract Debtors of the Danish Receivables Chargors ........................... 33
4.    Deliverables: Intercompany Receivables ............................................................................ 57
      Part 1      Form of Notice of Assignment ........................................................................... 57
      Part 2      Form of Acknowledgment of Debtor .................................................................. 60
5.    Deliverables: Supply Contracts ........................................................................................... 61
      Part 1      Form of Invoice Notification .............................................................................. 61
      Part 2      Form of Notice of Assignment ........................................................................... 62
      Part 3      Form of Acknowledgment ................................................................................. 64
6.    Deliverables: Insurances ...................................................................................................... 65
      Part 1      Form of Notice of Assignment ........................................................................... 65
      Part 2      Form of Letter of Undertaking ........................................................................... 67
7.    Deliverables: Brokerage Agreements .................................................................................. 69
      Part 1      Form of Notice of Assignment ........................................................................... 69
      Part 2      form of Acknowledgment of Broker ................................................................... 71


Signatories .................................................................................................................................... 72

ING      00002

**THIS DEED** is dated _19th December_ 2013 and made

**BETWEEN:**

(1)     **THE COMPANIES** listed in Part 1A of Schedule 1 (each a **Receivables Chargor**);

(2)     **THE COMPANIES** listed in Part 1B of Schedule 1 (each a **Danish Receivables Chargor**);

(3)     **THE COMPANIES** listed in Part 2 of Schedule 1 (each an **Insurance Chargor** and an **Intra-Group Chargor**);

(4)     **THE COMPANIES** listed in Part 3 of Schedule 1 (each a **Brokerage Chargor**); and

(5)     **ING BANK N.V.** as agent and trustee for the Finance Parties (as defined in the Credit Agreement, as defined below) (the **Security Agent**).

The parties listed above in (1)-(4) inclusively shall be collectively referred to in this Deed as the **Chargors** and each a **Chargor**.

**BACKGROUND:**

(A)     In consideration of the Lenders making available the Facility (which consideration is acknowledged and agreed as being good and valuable consideration by each Chargor in this Deed), each Chargor enters into this Deed in connection with the Credit Agreement (as defined below).

(B)     It is intended that this document takes effect as a deed notwithstanding the fact that a Party may only execute this document under hand.

**IT IS AGREED** as follows:

**1.      INTERPRETATION**

**1.1     Definitions**

In this Deed:

**Act** means the Law of Property Act 1925.

**Brokerage Receivables** means any amount owing, or to be owed, to a Brokerage Chargor by a Broker under any Brokerage Agreement.

**Broker** means any of Jefferies Bache Ltd. or BNP Paribas Commodities Futures Ltd.

**Brokerage Agreement** means each of:

(a)     the brokerage agreement between O.W. Bunker & Trading A/S (referred to in error as O.W. Bunker & Trading Co Ltd in the brokerage agreement) and Jefferies Bache Ltd. effective as of 1 November 2007, including the Prudential-Bache International Limited terms and conditions;

(b)     the Terms of Business (Title Transfer Collateral Arrangement – Non-Segregated Account) agreement between O.W. Supply & Trading A/S and BNP Paribas

ING   00003

Commodity Futures Limited dated as of 19 September 2013, including the margin facilities letter dated 19 September 2013,

each as amended, restated, replaced or supplemented from time to time.

**Credit Agreement** means the USD 700,000,000 multicurrency revolving borrowing base facilities agreement dated on or about the date of this Deed between (among others) the Chargors and ING Bank N.V. as agent and security agent.

**Danish Chargor** means a Chargor incorporated under the laws of Denmark.

**Debtor** means each member of the Group which is indebted to an Intra-Group Chargor under an Intra-Group Loan.

**Enforcement Event** means an Event of Default which has occurred and is continuing and for which a notice has been served pursuant to Clause 27.20 (Acceleration) of the Credit Agreement.

**Excluded Cargo** means cargo owned by entities within the Group which are not Insurance Chargors and which is financed by third party financiers (such third party financiers being on the date of this Deed ING Belgium Brussels, Geneva Branch and BNP Paribas (Suisse) SA only).

**Excluded Tanks** means the tanks of marine fuels owned by entities within the Group which are not Insurance Chargors and which are financed by third party financiers (such third party financiers being on the date of this Deed ING Belgium Brussels, Geneva Branch and BNP Paribas (Suisse) SA only).

**Insurance Rights** means any rights in respect of insurance proceeds or claims belonging, or which will belong, to an Insurance Chargor in respect of the Insurances (excluding any such rights or claims relating exclusively to the Excluded Cargo and/or the Excluded Tanks).

**Insurances** means:

(a)    those insurance policies listed in Schedule 2 (Insurance Policies);

(b)    any insurance contract or policy taken out by, or on behalf of, an Insurance Chargor in place of or in renewal of the insurance policies listed in Schedule 2 (Insurance Policies); and

(c)    any other insurance contract or policy taken out by, or on behalf of, an Insurance Chargor or in which a Chargor has an interest in each case insuring the Eligible Inventory.

**Intercompany Receivables** means any amount owing, or to be owed, to an Intra-Group Chargor by a Debtor under any Intra-Group Loan and includes the principal amount outstanding and all interest, fees and other amounts payable to that Intra-Group Chargor from time to time under such Intra-Group Loan.

**Intra-Group Loan** means any loan or other Financial Indebtedness under any intra-group arrangement or loan, whether or not documented in writing.

**New Supply Contract** means any one-time contract, or contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the

ING    00004

Group, in each case governed by English law and relating to the sale of oil products traded by the Group, as governs the contractual relationship between the relevant debtor and a Danish Receivables Chargor following the date of this Deed (excluding in each case any such agreement between a Danish Receivables Chargor and DFDS A/S and any invoice issued thereunder).

**New Supply Receivables** means any amount owing, or to be owed, to a Danish Receivables Chargor under any New Supply Contract.

**Party** means a party to this Deed.

**Receiver** means an administrative receiver, receiver and manager or a receiver, in each case, appointed under this Deed.

**Secured Liabilities** means all present and future obligations and liabilities (whether actual or contingent and whether owed jointly or severally or in any other capacity whatsoever) of each Obligor to any Finance Party under any Finance Document, except for any obligation which, if it were so included, would result in this Deed contravening Section 47A of the Companies Ordinance (Cap. 32 of the Laws of Hong Kong) (as amended or re-enacted from time to time).

**Security Assets** means all assets and rights, title and interest of each Receivables Chargor, each Danish Receivables Chargor, each Insurance Chargor and each Brokerage Chargor held in those respective capacities which are the subject of any security created by this Deed.

**Security Period** means the period beginning on the date of this Deed and ending on the date on which all the Secured Liabilities have been unconditionally and irrevocably paid and discharged in full.

**Supply Contract** means any one-time contract, any contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, in each case governed by English law and relating to the sale of oil products traded by the Group, as governs:

(a)     the contractual relationship between the relevant debtor and a Receivables Chargor at any time;

(b)     the contractual relationship between the relevant debtor and a Danish Receivables Chargor as at the date of this Deed,

and shall in each case include any invoice issued thereunder (excluding in each case any such agreement between a Danish Receivables Chargor and DFDS A/S and any invoice issued thereunder).

**Supply Receivables** means any amount owing, or to be owed, to a Receivables Chargor or a Danish Receivables Chargor under any Supply Contract.

**Swiss Chargor** means a Chargor incorporated under the laws of Switzerland, or being resident in Switzerland for purposes of Swiss Withholding Tax.

**Tank Insurance Rights** means, in respect of those Insurances named as "Tank Insurances" in Schedule 2, the approval rights of BNP Paribas (Suisse) SA in respect of any claim under such Insurances.

ING     00005

**1.2**    **Construction**

(a)     Capitalised terms defined in the Credit Agreement have, unless expressly defined in this Deed, the same meaning in this Deed.

(b)     The provisions of clause 1.2 (Construction) to 1.17 (US terms) inclusive of the Credit Agreement apply to this Deed as though they were set out in full in this Deed, except that references to the Credit Agreement will be construed as references to this Deed.

(c)     A Finance Document or any other agreement or instrument includes (without prejudice to any prohibition on amendments) any amendment to that Finance Document or other agreement or instrument, including any change in the purpose of, any extension of or any increase in the amount of a facility or any additional facility;

(d)     the term **this Security** means any security created by this Deed; and

(e)     **assets** includes present and future properties, revenues and rights of every description.

(f)     Any covenant of a Chargor under this Deed (other than a payment obligation) shall remain in force during the Security Period.

(g)     If the Security Agent considers that an amount paid to a Finance Party under a Finance Document is capable of being avoided or otherwise set aside on the liquidation, administration or judicial management of the payer or otherwise, then that amount will not be considered to have been irrevocably paid for the purposes of this Deed.

(h)     Unless the context otherwise requires, a reference to a Security Asset includes the proceeds of sale of that Security Asset.

**2.**    **CREATION OF SECURITY**

**2.1**    **General**

(a)     All the security created under this Deed:

      (i)     is created in favour of the Security Agent;

      (ii)     is created over present and future assets of each Chargor;

      (iii)     is security for the payment of all the Secured Liabilities; and

      (iv)     is made with full title guarantee in accordance with the Law of Property (Miscellaneous Provisions) Act 1994.

(b)     If the rights of a Chargor under a document cannot be secured without the consent of a party to that document:

      (i)     that Chargor must notify the Security Agent promptly;

      (ii)     this Security will secure all amounts which that Chargor may receive, or has received, under that document but exclude the document itself; and

      (iii)     unless the Security Agent otherwise requires, that Chargor must use reasonable endeavours to obtain the consent of the relevant party to that document being secured under this Deed.

ING    00006

(c)     Without prejudice to Clause 31.2 of the Credit Agreement, the Security Agent holds the benefit of this Deed on trust for the Finance Parties.

## 2.2     Intercompany Receivables

(a)     Each Intra-Group Chargor hereby agrees to assign and hereby assigns absolutely, with effect as of the date of this Deed, subject to a proviso for re-assignment on redemption, all of its rights, title and interest in respect of the Intercompany Receivables.

(b)     To the extent that any right, title or interest described in paragraph (a) above is not assignable or capable of assignment, the assignment of that right, title or interest purported to be effected by paragraph (a) above shall operate as an assignment of any right, title and interest to any damages, compensation, remuneration, profit, rent or income which that Intra-Group Chargor may derive from that right, title or interest described in paragraph (a) above or be awarded or entitled to in respect of that right, title or interest described in paragraph (a) above.

(c)     To the extent that they do not fall within any other Subclause of this Clause and are not effectively assigned under paragraph (a) or (b) above, each Intra-Group Chargor hereby agrees to charge and hereby charges by way of first fixed charge all of its rights, title and interest in respect of the Intercompany Receivables.

## 2.3     Supply Receivables and New Supply Receivables

(a)     Each Receivables Chargor and each Danish Receivables Chargor hereby agrees to assign and hereby assigns absolutely, with effect as of the date of this Deed, subject to a proviso for re-assignment on redemption, all of its rights, title and interest in respect of the Supply Receivables.

(b)     Each Danish Receivables Chargor hereby agrees to assign and hereby assigns absolutely, with effect as of the date of this Deed, subject to a proviso for re-assignment on redemption, all of its rights, title and interest in respect of the New Supply Receivables.

(c)     To the extent that any right, title or interest described in paragraph (a) or (b) above is not assignable or capable of assignment, the assignment of that right, title or interest purported to be effected by paragraph (a) or (b) above shall operate as an assignment of any right, title and interest to any damages, compensation, remuneration, profit, rent or income which that Receivables Chargor or Danish Receivables Chargor may derive from that right, title or interest described in paragraph (a) or (b) above or be awarded or entitled to in respect of that right, title or interest described in paragraph or (b) above.

(d)     To the extent that they do not fall within any other Subclause of this Clause and are not effectively assigned under paragraph (a), (b) or (c) above, each Receivables Chargor and Danish Receivables Chargor hereby agrees to charge and hereby charges by way of first fixed charge all of its rights, title and interest in respect of the Supply Receivables, and each Danish Receivables Chargor hereby agrees to charge and hereby charges by way of first fixed charge all of its rights, title and interest in respect of the New Supply Receivables.

## 2.4     Insurance Rights

(a)     Each Insurance Chargor hereby agrees to assign and hereby assigns absolutely, with effect as of the date of this Deed, subject to a proviso for re-assignment on redemption, all of its rights, title and interest in respect of the Insurance Rights.

ING     00007

(b)     To the extent that any right, title or interest described in paragraph (a) above is not assignable or capable of assignment, the assignment of that right, title or interest purported to be effected by paragraph (a) above shall operate as an assignment of any right, title and interest to any damages, compensation, remuneration, profit, rent or income which that Insurance Chargor may derive from that right, title or interest described in paragraph (a) above or be awarded or entitled to in respect of that right, title or interest described in paragraph (a) above.

(c)     To the extent that they do not fall within any other Subclause of this Clause 2.4 and are not effectively assigned under paragraph (a) or (b) above, each Insurance Chargor hereby agrees to charge and hereby charges by way of first fixed charge all of its rights, title and interest in respect of the Insurance Rights.

**2.5     Brokerage Receivables**

(a)     Each Brokerage Chargor hereby agrees to assign and hereby assigns absolutely, with effect as of the date of this Deed, subject to a proviso for re-assignment on redemption, all of its rights, title and interest in respect of the Brokerage Receivables.

(b)     To the extent that any right, title or interest described in paragraph (a) above is not assignable or capable of assignment, the assignment of that right, title or interest purported to be effected by paragraph (a) above shall operate as an assignment of any right, title and interest to any damages, compensation, remuneration, profit, rent or income which that Brokerage Chargor may derive from that right, title or interest described in paragraph (a) above or be awarded or entitled to in respect of that right, title or interest described in paragraph (a) above.

(c)     To the extent that they do not fall within any other Subclause of this Clause and are not effectively assigned under paragraph (a) or (b) above, each Brokerage Chargor hereby agrees to charge and hereby charges by way of first fixed charge all of its rights, title and interest in respect of the Brokerage Receivables.

**2.6     Floating charge**

(a)     Each Chargor hereby agrees to charge and hereby charges, with effect as of the date of this Deed, by way of a first floating charge those assets specified in Clauses 2.2, 2.3, 2.4 and 2.5 (which are not at any time otherwise effectively charged or assigned by way of fixed charge or assignment under this Clause 2).

(b)     Except as provided below, the Security Agent may by notice to a Chargor convert the floating charge created by that Chargor under this Clause into a fixed charge as regards any of that Chargor's assets specified in that notice, if:

        (i)     an Enforcement Event occurs; or

        (ii)    the Security Agent considers those assets to be in danger of being seized or sold under any form of distress, attachment, execution or other legal process or to be otherwise in jeopardy.

(c)     The floating charge created by this Clause may not be converted into a fixed charge solely by reason of:

        (i)     the obtaining of a moratorium; or

        (ii)    anything done with a view to obtaining a moratorium,

ING    00008

under section 1A of the Insolvency Act 1986.

(d)     The floating charge created by this Clause will automatically convert into a fixed charge over all of a Chargor's Security Assets if an administrator or judicial manager is appointed or the Security Agent receives notice of an intention to appoint an administrator or judicial manager.

(e)     The floating charge created by this Clause is a **qualifying floating charge** for the purpose of paragraph 14 of Schedule B1 to the Insolvency Act 1986.

## 3.     REPRESENTATIONS - GENERAL

### 3.1     Nature of security

(a)     Each Receivables Chargor, Danish Receivables Chargor, Insurance Chargor and Intra-Group Chargor represents and warrants to each Finance Party that:

    (i)     it is the sole legal and beneficial owner of its Security Assets;

    (ii)     its Security Assets are free from any Security (except for the Security created by this Deed) and any other rights or interests in favour of third parties (except for the Tank Insurance Rights);

    (iii)     subject to the Legal Reservations set out in the legal opinion relating to Danish law provided pursuant to paragraph 4(b)(ii) of Part 2 of Schedule 2 (Conditions) of the Credit Agreement, all payments to it in respect of the Supply Receivables, the New Supply Receivables, the Intercompany Receivables are not subject to any right of set-off or similar right;

    (iv)     the obligations assumed by it in each Supply Contract, Intra-Group Loan and Insurances are (or in the case of New Supply Contracts upon entering into those New Supply Contracts will be) legal, valid, binding and enforceable obligations;

    (v)     it is not in default of any of its obligations under any Supply Contract, New Supply Contract, Intra-Group Loan or Insurances;

    (vi)     there is no prohibition on the assignment of its rights in any Supply Contract, New Supply Contract, Intra-Group Loan or the Insurances;

    (vii)     its entry into and performance of this Deed will not conflict with any term of any Supply Contract, New Supply Contract, Intra-Group Loan or the Insurances; and

    (viii)     subject to the Legal Reservations, each Receivables Chargor, Danish Receivables Chargor, Insurance Chargor and Intra-Group Chargor represents and warrants to each Finance Party that this Deed creates those Security it purports to create and is not liable to be avoided or otherwise set aside on its liquidation, administration, judicial management or otherwise.

(b)     Each Insurance Chargor represents and warrants to each Finance Party that none of the Insurances is required to be placed with an insurance company or underwriter authorised by the Panamanian Superintendence of Insurance and Reinsurance.

(c)     Each Brokerage Chargor represents and warrants to each Finance Party that:

ING     00009

(i)     subject to the creation of any Security or any transfer of title in the Security Assets pursuant to the terms of a Brokerage Agreement, it is the sole legal and beneficial owner of its Security Assets;

(ii)    its Security Assets are free from any Security (except for the Security created by this Deed, or pursuant to the terms of any Brokerage Agreement) and any other rights or interests in favour of third parties;

(iii)   the obligations assumed by it in each Brokerage Agreement are legal, valid, binding and enforceable obligations;

(iv)   it is not in default of any of its obligations under any Brokerage Agreement;

(v)    there is no prohibition on the assignment of its rights in any Brokerage Agreement, which has not been expressly waived in writing by the relevant Broker;

(vi)   its entry into and performance of this Deed will not conflict with any term of any Brokerage Agreement, which has not been expressly waived in writing by the relevant Broker; and

(vii)  subject to the Legal Reservations, each Brokerage Chargor represents and warrants to each Finance Party that this Deed creates those Security it purports to create and is not liable to be avoided or otherwise set aside on its liquidation, administration, judicial management or otherwise.

(d)    Each Danish Receivables Chargor represents and warrants at the date of this Deed that those entities listed in Schedule 1 (Existing Supply Contract Debtors of the Danish Receivables Chargors) are existing customers of the Group under a Supply Contract.

## 3.2    Times for making representations

(a)    The representations and warranties set out in this Deed (including in this Clause) are made on the date on which the Security is created under this Deed in respect of all Security Assets assigned or charged under Clause 2 (Creation of Security); and

(b)    Unless a representation is expressed to be given on a specific date, each representation under this Deed is deemed to be repeated by the relevant Security Provider during the Security Period on each date:

(i)    required under Clause 23.30 (Times for making representations) of the Credit Agreement; and

(ii)    upon which that Chargor acquires a Security Asset.

(c)    When a representation or warranty is deemed to be repeated, it is applied to the circumstances existing at the time of repetition.

## 4.    RESTRICTIONS ON DEALINGS

(a)    No Receivables Chargor, Insurance Chargor or Intra-Group Chargor may:

ING   00010

(i)     create or permit to subsist any Security on any Security Asset (other than this Security);

(ii)     sell, transfer, licence, lease or otherwise dispose of any Security Asset; or

(iii)    take any action which could adversely affect this Security,

except as expressly allowed under the Credit Agreement or this Deed.

(b)    No Danish Receivables Chargor may:

(i)     create or permit to subsist any Security on any Security Asset (other than this Security);

(ii)     sell, transfer, licence, lease or otherwise dispose of any Security Asset; or

(iii)    take any action which could adversely affect this Security,

except with the express prior consent of the Security Agent.

(c)    No Brokerage Chargor may:

(i)     create or permit to subsist any Security on any Security Asset (other than this Security);

(ii)     sell, transfer, licence, lease or otherwise dispose of any Security Asset;

(iii)    take any action which could adversely affect this Security,

except as expressly allowed under the Credit Agreement, the relevant Brokerage Agreement or this Deed.

## 5.    PERFECTION AND MAINTENANCE OF SECURITY

### 5.1    Registrations

The Chargors undertake to provide the following documents in form and substance satisfactory to the Security Agent within the timelines provided:

(a)    within 21 days of the date of this Deed, O.W. Bunkers (UK) Limited must provide evidence of the registration of the Security created by this Deed by the UK Companies House;

(b)    within 15 Business Days of the date of this Deed, each Danish Receivables Chargor must provide evidence of the registration of the negative pledge constituted by Clause 4(b) in the prescribed format with the Danish Persons Book (*Personbogen*);

(c)    promptly upon the execution of this Deed, each of Dynamic Oil Trading (Singapore) Pte. Ltd. and O.W. Bunker Far East (Singapore) Pte Ltd must provide written authorisations to enable Allen & Overy LLP to file statements containing particulars of the Security created by this Deed with the Accounting and Corporate Regulatory Authority in Singapore within 30 days of the date of this Deed; and

(d)    within 5 weeks (or such shorter period as stipulated under the Companies Ordinance (Cap. 32 of the Laws of Hong Kong (as amended or re-enacted from time to time)) of

ING   00011

the date of this Deed, O.W. Bunker China Limited must provide evidence of presentation of the prescribed particulars of the Security created by this Deed with the Hong Kong Companies Registry for registration and supply to the Security Agent (promptly upon receipt) the original certificate of registration in respect of this Deed.

### 5.2    Intra-Group Loans

(a)    Each Intra-Group Chargor must:

   (i)    subject to paragraph (b) below, on the date of this Deed give notice of the Security created by this Deed to each relevant Debtor in respect of the Intra-Group Loans by sending a notice to each such Debtor in substantially the form set out in Part 1 of 0 (Deliverables: Intercompany Receivables: Form of Notice of Assignment);

   (ii)    procure that each relevant Debtor delivers an acknowledgement to the Security Agent within 3 Business Days of the date of this Deed in substantially the form set out in Part 2 of 0 (Deliverables: Intercompany Receivables: Form of Acknowledgment); and

   (iii)    immediately pay any amount received by it in respect of an Intra-Group Loan directly into a Collection Account.

(b)    This Deed constitutes notice in writing to each Chargor of any charge or assignment of any debt owed by that Chargor as a Debtor to any Intra-Group Chargor under an Intra-Group Loan.

### 5.3    Supply Contracts and New Supply Contracts

(a)    Each Receivables Chargor must:

   (i)    within 10 Business Days of this Deed for existing Supply Contracts, and within 3 Business Days of entering into a new Supply Contract, give notice of the Security created by this Deed to each debtor in respect of such Supply Contract by sending a notice to each such debtor in substantially the form set out in Part 2 of Schedule 5 (Deliverables: Supply Contracts: Form of Notice of Assignment);

   (ii)    use all reasonable efforts to ensure that each relevant debtor delivers an acknowledgement to the Security Agent within 30 Business Days of the date of this Deed in substantially the form set out in Part 3 of Schedule 5 (Deliverables: Supply Contracts: Form of Acknowledgment); and

   (iii)    from the date of this Deed in the event that a Receivables Chargor should receive any Supply Receivables in contradiction to the notice set out in Part 2 of Schedule 5 (Deliverables: Supply Contracts: Form of Notice of Assignment), immediately pay any Supply Receivables into a Collection Account on receipt.

(b)    Each Danish Receivables Chargor must:

   (i)    from the date of this Deed, ensure that any invoice issued after the date of this Deed under any of its Supply Contracts contains the wording set out in Part 1

ING    00012

of Schedule 5 (Deliverables: Supply Contracts: Form of Invoice Notification);

(ii) on the date of this Deed, give notice of the Security created by this Deed to each debtor in respect of its Supply Contracts by sending a notice to each such debtor in substantially the form set out in Part 2 of Schedule 5 (Deliverables: Supply Contracts: Form of Notice of Assignment);

(iii) from the date of any New Supply Contract, ensure that any invoice issued under any New Supply Contract contains the wording set out in Part 1 of Schedule 5 (Deliverables: Supply Contracts: Form of Invoice Notification);

(iv) within 3 Business Days of the date of any New Supply Contract, give notice of the Security created by this Deed to each debtor in respect of the New Supply Contract by sending a notice to each such debtor in substantially the form set out in Part 2 of Schedule 5 (Deliverables: Supply Contracts: Form of Notice of Assignment);

(v) use all reasonable efforts to ensure that each relevant debtor delivers an acknowledgement to the Security Agent within 30 Business Days of the date of this Deed, or in respect of New Supply Contracts within 30 Business Days of the date of such New Supply Contract, in substantially the form set out in Part 3 of Schedule 5 (Deliverables: Supply Contracts: Form of Acknowledgment);

(vi) from the date of this Deed, in the event that a Danish Receivables Chargor should receive any Supply Receivables or New Supply Receivables in contradiction to the wording set out in Part 1 of Schedule 5 (Deliverables: Supply Contracts: Form of Invoice Notification) or the notice set out in Part 2 of Schedule 5 (Deliverables: Supply Contracts: Form of Notice of Assignment), immediately pay any Supply Receivables or New Supply Receivables into a Collection Account on receipt;

(vii) not enter into any new one-time contract, or contract used as a framework agreement (howsoever described) or overarching general terms and conditions with any of those entities listed in Schedule 1 (Existing Supply Contract Debtors of the Danish Receivables Chargors) which would materially alter the Supply Contracts which the relevant Danish Receivables Chargor has in place with such debtors as at the date of this Deed without the prior written consent of the Security Agent; and

(viii) not enter into any new one-time contract, or contract used as a framework agreement (howsoever described) or overarching general terms and conditions with any of those entities with whom it enters into a New Supply Contract which would materially alter the New Supply Contract which the relevant Danish Receivables Chargor has in place with such debtors as at the date of that New Supply Contract without the prior written consent of the Security Agent.

**5.4    Insurances**

(a) Each Insurance Chargor must:

(i)     on the date of this Deed, or within 3 Business Days of acquiring any future Insurances, give notice of the Security created by this Deed to each relevant insurance company or underwriter in respect of the Insurances by sending a notice to each such insurance company or underwriters in substantially the form set out in Part 1 of Schedule 6 (Deliverables: Insurances: Form of Notice of Assignment);

(ii)    within 10 Business Days of this Deed, or within 10 Business Days of acquiring any future Insurances, procure the endorsement of a loss payable clause on the Insurances, in form and substance acceptable to the Security Agent, showing that the Security Agent is named as sole loss payee in respect of any proceeds of any claim under the Insurances (except for those claims made in respect of Excluded Cargo and/or Excluded Tanks or made by O.W. Cargo Denmark A/S under those Insurances listed as "Goods Insurances" and "Tank Insurances" in Schedule 2 (Insurances) in respect of cargo owned by it for which O.W. Cargo Denmark A/S may receive the proceeds directly from the relevant insurance company or underwriters);

(iii)   procure that each relevant insurance company or underwriters in respect of the Insurances delivers an acknowledgment or letter of undertaking to the Security Agent within 10 days of the date of this Deed, or 10 days of the date of any future Insurances, in substantially the form set out in Part 2 of Schedule 6 (Deliverables: Insurances: Acknowledgment).

(b)     Unless an Enforcement Event occurs, subject to paragraph (a) above, the Security Agent undertakes to promptly pay the proceeds it receives of any claim under the Insurances directly into the Collection Account of the Company which corresponds in terms of currency to the currency in which such proceeds are received by the Security Agent. If there is no such corresponding Collection Account, the Security Agent shall pay such proceeds into the Collection Account of the Company held in DKK with the costs of any currency conversion being borne by the Company.

(c)     Each Insurance Chargor undertakes to procure that none of its Affiliates which is named as additional assured or co-assured party on the Insurances at any time shall interfere in or obstruct in any claims made under the Insurances.

(d)     Notwithstanding the naming of the Security Agent as sole loss payee in respect of the Insurances, each Insurance Chargor must pay any amount received by it in respect of the Insurances directly into a Collection Account.

(e)     Each Insurance Chargor must insure, or procure the Insurance of, its assets against:

(i)     loss or damage by fire;

(ii)    other risks normally insured against by persons carrying on the same class of business as that carried on by it; and

(iii)   any other risks which the Security Agent may reasonably require.

(f)     The Insurances must be placed with an insurance company or underwriters acceptable to the Security Agent (it being noted that each insurance company or underwriter with whom the Insurances are currently placed at the time of this Deed are acceptable to the Security Agent).

ING     00014

(g)     No Insurance Chargor may do or permit anything to be done which may make void or voidable any Insurances.

(h)     Each Insurance Chargor must promptly pay all premiums and do all other things necessary to keep the Insurances in force.

## 5.5    Brokerage Agreements

(a)     Each Brokerage Chargor must:

(i)     on the date of this Deed give notice of the Security created by this Deed to each Broker in respect of the Brokerage Agreements by sending a notice to each such Broker in substantially the form set out in Part 1 of Schedule 7 (Deliverables: Brokerage Agreements: Form of Notice of Assignment);

(ii)    use all reasonable efforts to ensure that each relevant debtor delivers an acknowledgement to the Security Agent within 30 Business Days of the date of this Deed in substantially the form set out in Part 2 of Schedule 7 (Deliverables: Brokerage Agreements: Form of Acknowledgment); and

(iii)   procure that any withdrawal made by a Brokerage Chargor of any amounts standing to the credit of a Brokerage Account is promptly paid into a Collection Account.

## 5.6    Preservation

No Chargor may, without the prior consent of the Security Agent, take any action which might jeopardise the existence or enforceability of any such Intra-Group Loan, Supply Contract, New Supply Contract, Insurances or Brokerage Agreements.

## 5.7    Rights

(a)     Subject to the rights of the Security Agent under paragraph (b) below, each Chargor must duly and promptly perform its obligations, and diligently pursue its rights, in respect of its Security Assets, but only if and to the extent that the exercise of those rights in the manner proposed would not result in an Event of Default under the terms of the Credit Agreement.

(b)     After this Security has become enforceable or if the Security Agent otherwise deems it necessary to protect the Security created under this Deed:

(i)     the Security Agent may exercise (without any further consent or authority on the part of any Chargor and irrespective of any direction given by any Chargor) any of the rights of any Chargor in connection with any Security Asset;

(ii)    each Chargor must take such steps (at its own cost) as the Security Agent may require to enforce its rights in respect of Security Assets; this includes initiating and pursuing legal or arbitration proceedings in the name of that Chargor; and

(iii)   any payment received by a Chargor in respect of the Security Assets must be promptly paid by such Chargor to the Security Agent.

ING     00015

**5.8**  **Information**

    (a)    Each Chargor must supply the Security Agent and any Receiver with any information and documentation relating to any Security Asset requested by the Security Agent or any Receiver;

    (b)    Each Insurance Chargor must, following a request from the Security Agent or any Receiver, deposit with the Security Agent or such Receiver all policy documents, certificates, endorsements or cover notes relating to any Insurances and the receipt for the payment of any premium for any Insurances as the Security Agent may request.

    (c)    Each Insurance Chargor must promptly inform the Security Agent of full details of any claims being made by it or one of the other named assured parties on the Insurances in respect of the Insurances.

    (d)    Each Danish Receivables Chargor must promptly inform the Security Agent of any New Supply Contract under which the projected revenue is equal to or exceeds USD 1,000,000 per month.

The above listed information undertakings is subject to any Chargor's compliance with any disclosure obligations pursuant to the Danish Securities Trading Act and any applicable stock market regulation.

**6.**  **PRESERVATION OF SECURITY**

**6.1**  **Continuing security**

This Security is a continuing security and will extend to the ultimate balance of the Secured Liabilities, regardless of any intermediate payment or discharge in whole or in part.

**6.2**  **Reinstatement**

If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by a Finance Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration, judicial management or otherwise, without limitation, then the liability of the Chargors under this Deed will continue or be reinstated as if the discharge, release or arrangement had not occurred.

**6.3**  **Waiver of defences**

The obligations of the Chargors under this Deed will not be affected by any act, omission, matter or thing which, but for this Clause, would reduce, release or prejudice any of its obligations under this Deed including (without limitation and whether or not known to it or any Finance Party):

    (a)    any time, waiver or consent granted to, or composition with, any Obligor or other person;

    (b)    the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

ING  00016

(c)     the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person;

(d)     any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(e)     any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(f)     any amendment of any Finance Document or any other document or security including without limitation any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(g)     any unenforceability, illegality, invalidity or non-provability of any obligation of any person under any Finance Document or any other document or security; or

(h)     any insolvency or similar proceedings.

## 6.4     Immediate recourse

(a)     Each Chargor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other right or security or claim payment from any person before claiming from the Chargors under this Deed.

(b)     This waiver applies irrespective of any law or provision of a Finance Document to the contrary.

## 6.5     Appropriations

Each Finance Party (or any trustee or agent on its behalf) may at any time during the Security Period:

(a)     refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of the Secured Liabilities, or apply and enforce them in such manner and order as it sees fit (whether against the Secured Liabilities or otherwise) and the Chargors will not be entitled to the benefit of such moneys, security or rights; and

(b)     hold in an interest-bearing suspense account secured in favour of the Security Agent pursuant to a Transaction Security Document any moneys received from a Chargor or on account of such Chargor's liability under this Deed.

## 6.6     Deferral of Chargors' rights

(a)     Unless the Security Period has expired or the Security Agent otherwise directs, each Chargor will not exercise any rights which it may have by reason of performance by it of its obligations under this Deed or by reason of any amount being payable, or liability arising under this Deed:

(i)     to be indemnified by an Obligor;

ING     00017

(ii)    to claim any contribution from any Obligor of any Obligor's obligations under the Finance Documents;

(iii)   to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party;

(iv)    to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which the Chargor has granted security under this Deed;

(v)     to exercise any right of set-off against any Obligor; and/or

(vi)    to claim or prove as a creditor of any Obligor in competition with any Finance Party.

(b)    If the Chargor receives any benefit, payment or distribution in relation to such rights it must hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Finance Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for the Finance Parties and must promptly pay or transfer them to the Security Agent or as the Security Agent may direct for application in accordance with Clause 14 (Application of Proceeds).

## 6.7    Additional security

(a)    This Deed is in addition to and is not in any way prejudiced by any other security now or subsequently held by any Finance Party.

(b)    No prior security held by any Finance Party (in its capacity as such or otherwise) over any Security Asset will merge into this Security.

## 6.8    Security held by Chargors

Each Chargor may not, without the prior consent of the Security Agent, hold any security from any other Obligor in respect of such Chargor's liability under this Deed. Each Chargor will hold any security held by it in breach of this provision on trust for the Security Agent and must promptly transfer such security to the Security Agent to hold on behalf of each of the Finance Parties in accordance with Clause 31.2 of the Credit Agreement.

## 7.    WHEN SECURITY BECOMES ENFORCEABLE

## 7.1    Enforcement Event

This Security will become immediately enforceable if an Enforcement Event occurs.

## 7.2    Discretion

After this Security has become enforceable, the Security Agent may in its absolute discretion enforce all or any part of this Security in any manner it sees fit or as the Majority Lenders direct.

ING    00018

**7.3** **Power of sale**

The power of sale and other powers conferred by Section 101 of the Act, as amended by this Deed, will be immediately exercisable at any time after this Security has become enforceable.

**8.** **ENFORCEMENT OF SECURITY**

**8.1** **General**

(a) For the purposes of all powers implied by statute, the Secured Liabilities are deemed to have become due and payable on the date of this Deed.

(b) Section 103 of the Act (restricting the power of sale) and Section 93 of the Act (restricting the right of consolidation) do not apply to this Security.

**8.2** **No liability as mortgagee in possession**

Neither the Security Agent nor any Receiver will be liable, by reason of entering into possession of a Security Asset, to account as mortgagee in possession or for any loss on realisation or for any default or omission for which a mortgagee in possession might be liable.

**8.3** **Privileges**

Each Receiver and the Security Agent is entitled to all the rights, powers, privileges and immunities conferred by the Act on mortgagees and receivers duly appointed under the Act, except that Section 103 of the Act does not apply.

**8.4** **Protection of third parties**

No person (including a purchaser) dealing with the Security Agent or a Receiver or its or his agents will be concerned to enquire:

(a) whether the Secured Liabilities have become payable;

(b) whether any power which the Security Agent or a Receiver is purporting to exercise has become exercisable or is being properly exercised;

(c) whether any money remains due under the Finance Documents; or

(d) how any money paid to the Security Agent or to that Receiver is to be applied.

**8.5** **Redemption of prior mortgages**

(a) At any time after this Security has become enforceable, the Security Agent may:

(i) redeem any prior Security against any Security Asset; and/or

(ii) procure the transfer of that Security to itself; and/or

(iii) settle and pass the accounts of the prior mortgagee, chargee or encumbrancer; any accounts so settled and passed will be, in the absence of manifest error, conclusive and binding on each Chargor.

ING    00019

(b)     Each Chargor must pay to the Security Agent, immediately on demand, the costs and expenses incurred by the Security Agent in connection with any such redemption and/or transfer, including the payment of any principal or interest.

## 8.6     Contingencies

If this Security is enforced at a time when no amount is due under the Finance Documents but at a time when amounts may or will become due, the Security Agent (or the Receiver) may pay the proceeds of any recoveries effected by it into a suspense account.

## 8.7     Swiss insolvency law matters

The Security Agent shall enjoy full discretion as to the manner, time and place at which enforcement of this Security is to take place and the enforcement of this Security may take place outside debt enforcement proceedings (*Privatverwertung*). The Security Agent may commence other enforcement proceedings against any Chargor by way of special or general enforcement (*Betreibung auf Pfändung oder Konkurs*) pursuant to the Swiss Federal Act on Debt Enforcement and Bankruptcy.

## 9.     DANISH LIMITATIONS

Notwithstanding any provision of this Deed, the obligations of each Danish Chargor:

(a)     shall be limited if and to the extent required to comply with Danish statutory provisions including, without limitation, (i) Section 206(1) (as modified by Section 206(2)) of the Danish Companies Act and (ii) Section 210(1) (as modified by Section 210(2) and Sections 211 and 212 of the Danish Companies Act), and, accordingly, shall not include, and shall not be or be construed as, any indemnity, guarantee or security in respect of:

     (i)     any obligations incurred or undertaken in relation to the financing of a direct acquisition of shares issued or to become issued by such Danish Chargor or by a direct or indirect Qualifying Parent Company of such Danish Chargor (**Acquisition Debt**); nor

     (ii)     any obligations other than Acquisition Debt of a Non Qualifying Shareholder;

(b)     shall, in relation to a Danish Chargor other than O.W. Bunker & Trading A/S, further be limited to the amount equivalent to the higher of:

     (i)     the Equity on the date of this Deed; and

     (ii)     the Equity at the time or times that payment is requested from it, save that these limitations shall not apply to any obligations and liabilities of a Danish Chargor in respect of amounts relating to the Facilities under the Credit Agreement and placed at the disposal of the Danish Chargor by a Borrower under the Credit Agreement by way of a loan or otherwise (other than as share capital).

For the purpose of this Clause:

**Equity** means the equity (*egenkapital*) of such Danish Chargor calculated in accordance with the Accounting Principles;

ING     00020

**Qualifying Parent Company** means a parent company which is incorporated under the laws of any country covered by Executive Order No. 275 of 25 March 2010 on loans etc. to foreign parent companies, as amended and supplemented from time to time; and

**Non Qualifying Shareholder** means any shareholder or parent company other than a Qualifying Parent Company.

## 10.    GERMAN LIMITATIONS

The limitations on enforcement contained in Clause 22.13 of the Credit Agreement shall apply accordingly (*analog*) to an enforcement of the security granted under this Deed by a Chargor that is incorporated in Germany as a limited liability company (*Gesellschaft mit beschränkter Haftung*) or as a limited liability partnership (*Kommanditgesellschaft*) with a limited liability company as sole general partner (*Komplementär*).

## 11.    SWISS LIMITATIONS

(a)    If and to the extent that this Security is enforced for obligations of Affiliates of a Swiss Chargor other than its Subsidiaries and if this would constitute a repayment of capital (including by way of a violation of the legally protected reserves (*gesetzlich geschützte Reserven*)) or the payment of a (constructive) dividend (*Gewinnausschüttung*) by the Swiss Chargor and thus be restricted under then applicable Swiss corporate law (the **Restricted Obligations**), the use of such enforcement proceeds shall be limited to the amount of the unrestricted equity capital surplus (including the unrestricted portion of general and statutory reserves, other free reserves, retained earnings and, to the extent permitted by then applicable law, current net profits) available for distribution to the shareholders of the Swiss Chargor at the time of enforcement of the Security (the **Maximum Amount**), provided that this is a requirement under then applicable mandatory Swiss law and understood that such limitation shall not prevent the application of such enforcement proceeds in excess of the Maximum Amount, but that it will merely postpone the performance date therefor until such time or times as performance is again permitted.

If and to the extent that this Security is enforced for obligations of Subsidiaries which are not fully owned by the Swiss Chargor, the above mentioned restrictions shall, if required under then applicable mandatory Swiss law, apply accordingly to the pro rata share of the enforcement proceeds corresponding to the minority shareholding/s of any other shareholder/s in any such Subsidiary/ies.

(b)    In relation to an enforcement of this Security in satisfaction of Restricted Obligations, if and to the extent that the proceeds from such enforcement are by law subject to Swiss Withholding Tax, the Swiss Chargor shall use its best efforts to mitigate to the extent possible any Swiss Withholding Tax obligations to be levied on the use of the enforcement proceeds of the Security, in particular through a notification procedure.  To the extent a notification procedure is not available, the Security Agent undertakes to withhold from the enforcement proceeds of the Security an amount equivalent to the Swiss Withholding Tax at the then applicable rate, and subject to any applicable double taxation treaty or any other applicable treaty, that may be due by the Swiss Chargor to the Swiss Federal Tax Administration from the enforcement of the Security by the Security Agent under this Deed, and forward such amount to the Swiss Federal Tax Administration, in the name and for the account of the Swiss Chargor, upon presentation by the Swiss Chargor to the Security Agent of the relevant form of the Swiss Federal Tax Administration, together with its payment order form (which presentation shall be made, if needed, on a monthly basis), it being specified that (i) the Swiss Chargor shall, and shall procure that its Affiliates, fully cooperate in any mitigating efforts and in any efforts relating to the transfer of any refunds to the order of the Security Agent,

ING    00021

and (ii) the Swiss Chargor shall fill in and prepare the relevant form of the Swiss Federal Tax Administration and submit it to the Security Agent for approval, which approval shall not be unreasonably withheld.

As soon as possible after any such payment of Swiss Withholding Tax, the Swiss Chargor must:

(i) ensure that any person which is entitled to a full or partial refund of the Swiss Withholding Tax, is in a position to be so refunded; and

(ii) in case it has received any refund of the Swiss Withholding Tax, pay such refund to the Security Agent promptly upon receipt thereof.

(c) For the avoidance of doubt, where a deduction for Swiss Withholding Tax is required, the obligations of the Swiss Chargor under Clause 13.4 (Minimum Interest), Clause 17.1 (Tax gross-up) and Clause 17.2 (Tax indemnity) of the Credit Agreement will remain applicable, save to the extent and for as long as that would cause the Maximum Amount to be exceeded.

(d) If the enforcement of Restricted Obligations would be limited due to the effects referred to in this Clause 9, then the Swiss Chargor must:

(i) to the extent permitted by applicable law, revalue and/or realize any of its assets that are shown on its balance sheet with a book value that is significantly lower than the market value of such assets, and

(ii) reduce its share capital to the minimum allowed under then applicable law.

## 12. RECEIVER

### 12.1 Appointment of Receiver

(a) Except as provided below, the Security Agent may appoint any one or more persons to be a Receiver of all or any part of the Security Assets if:

(i) this Security has become enforceable; or

(ii) a Chargor so requests the Security Agent in writing at any time.

(b) Any appointment under paragraph (a) above may be by deed, under seal or in writing under its hand.

(c) Except as provided below, any restriction imposed by law on the right of a mortgagee to appoint a Receiver (including under section 109(1) of the Act) does not apply to this Deed.

(d) The Security Agent is not entitled to appoint a Receiver solely as a result of the obtaining of a moratorium (or anything done with a view to obtaining a moratorium) under section 1A of the Insolvency Act 1986.

(e) The Security Agent may not appoint an administrative receiver (as defined in section 29(2) of the Insolvency Act 1986) over the Security Assets if the Security Agent is prohibited from so doing by section 72A of the Insolvency Act 1986 and no exception to the prohibition on appointing an administrative receiver applies.

ING    00022

**12.2    Removal**

The Security Agent may by writing under its hand (subject to any requirement for an order of the court in the case of an administrative receiver) remove any Receiver appointed by it and may, whenever it thinks fit, appoint a new Receiver in the place of any Receiver whose appointment may for any reason have terminated.

**12.3    Remuneration**

The Security Agent may fix the remuneration of any Receiver appointed by it and the maximum rate specified in Section 109(6) of the Act will not apply.

**12.4    Agent of each Chargor**

(a)      A Receiver will be deemed to be the agent of each Chargor for all purposes and accordingly will be deemed to be in the same position as a Receiver duly appointed by a mortgagee under the Act.  Each Chargor is responsible for the contracts, engagements, acts, omissions, defaults and losses of a Receiver and for liabilities incurred by a Receiver.

(b)      No Finance Party will incur any liability (either to a Chargor or to any other person) by reason of the appointment of a Receiver or for any other reason.

**12.5    Relationship with Security Agent**

To the fullest extent allowed by law, any right, power or discretion conferred by this Deed (either expressly or impliedly) or by law on a Receiver may after this Security becomes enforceable be exercised by the Security Agent in relation to any Security Asset without first appointing a Receiver and notwithstanding the appointment of a Receiver.

**13.     POWERS OF RECEIVER**

**13.1    General**

(a)      A Receiver has all of the rights, powers and discretions set out below in this Clause in addition to those conferred on it by any law; this includes:

(i)       in the case of an administrative receiver, all the rights, powers and discretions conferred on an administrative receiver under the Insolvency Act, 1986; and

(ii)      otherwise, all the rights, powers and discretions conferred on a receiver (or a receiver and manager) under the Act and the Insolvency Act, 1986.

(b)      If there is more than one Receiver holding office at the same time, each Receiver may (unless the document appointing him states otherwise) exercise all of the powers conferred on a Receiver under this Deed individually and to the exclusion of any other Receiver.

**13.2    Possession**

A Receiver may take immediate possession of, get in and collect any Security Asset.

**13.3    Carry on business**

A Receiver may carry on any business of any Chargor in any manner he thinks fit.

ING   00023

**13.4    Employees**

(a)    A Receiver may appoint and discharge managers, officers, agents, accountants, servants, workmen and others for the purposes of this Deed upon such terms as to remuneration or otherwise as he thinks fit.

(b)    A Receiver may discharge any person appointed by any Chargor.

**13.5    Borrow money**

A Receiver may raise and borrow money either unsecured or on the security of any Security Asset either in priority to this Security or otherwise and generally on any terms and for whatever purpose which he thinks fit.

**13.6    Sale of assets**

(a)    A Receiver may sell, exchange, convert into money and realise any Security Asset by public auction or private contract and generally in any manner and on any terms which he thinks fit.

(b)    The consideration for any such transaction may consist of cash, debentures or other obligations, shares, stock or other valuable consideration and any such consideration may be payable in a lump sum or by instalments spread over any period which he thinks fit.

**13.7    Compromise**

A Receiver may settle, adjust, refer to arbitration, compromise and arrange any claim, account, dispute, question or demand with or by any person who is or claims to be a creditor of any Chargor or relating in any way to any Security Asset.

**13.8    Legal actions**

A Receiver may bring, prosecute, enforce, defend and abandon any action, suit or proceedings in relation to any Security Asset which he thinks fit.

**13.9    Receipts**

A Receiver may give a valid receipt for any moneys and execute any assurance or thing which may be proper or desirable for realising any Security Asset.

**13.10   Subsidiaries**

A Receiver may form a Subsidiary of any Chargor and transfer to that Subsidiary any Security Asset.

**13.11   Delegation**

A Receiver may delegate his powers in accordance with this Deed.

**13.12   Lending**

A Receiver may lend money or advance credit to any customer of any Chargor.

ING    00024

### 13.13   Protection of assets

A Receiver may effect any insurance and do any other act which any Chargor might do in the ordinary conduct of its business to protect or improve any Security Asset in each case as he thinks fit.

### 13.14   Other powers

A Receiver may:

(a)   do all other acts and things which he may consider desirable or necessary for realising any Security Asset or incidental or conducive to any of the rights, powers or discretions conferred on a Receiver under or by virtue of this Deed or law;

(b)   exercise in relation to any Security Asset all the powers, authorities and things which he would be capable of exercising if he were the absolute beneficial owner of that Security Asset; and

(c)   use the name of any Chargor for any of the above purposes.

## 14.   APPLICATION OF PROCEEDS

(a)   Any moneys received by the Security Agent or any Receiver after this Security has become enforceable must be applied in the following order of priority:

(i)   firstly, in or towards payment of or provision for all costs and expenses incurred by the Security Agent or any Receiver under or in connection with this Deed and of all remuneration due to any Receiver under or in connection with this Deed;

(ii)   secondly, in or towards payment of or provision for the Secured Liabilities; and

(iii)   then in payment of the surplus (if any) to any Chargor or other person entitled to it.

(b)   This Clause is subject to the payment of any claims having priority over this Security.

(c)   This Clause does not prejudice the right of any Finance Party to recover any shortfall from any Chargor.

## 15.   DELEGATION

### 15.1   Power of Attorney

The Security Agent or any Receiver may delegate by power of attorney or in any other manner to any person any right, power or discretion exercisable by it under this Deed.

### 15.2   Terms

Any such delegation may be made upon any terms (including power to sub-delegate) which the Security Agent or any Receiver may think fit.

ING   00025

### 15.3 Liability

Neither the Security Agent nor any Receiver will be in any way liable or responsible to any Chargor for any loss or liability arising from any act, default, omission or misconduct on the part of any delegate or sub-delegate.

## 16. FURTHER ASSURANCES

Each Chargor must, at its own expense, take whatever action the Security Agent or a Receiver may:

(a) reasonably require for the creating, perfecting or protecting any security intended to be created by this Deed;

(b) reasonably require for the facilitating the assignment or transfer of any rights or obligations of the Security Agent under this Deed; or

(c) require for the facilitating the realisation of any Security Asset, or the exercise of any right, power or discretion exercisable, by the Security Agent or any Receiver or any of its delegates or sub-delegates in respect of any Security Asset.

This includes:

(i) the execution of any transfer, conveyance, assignment or assurance of any property, whether to the Security Agent or to its nominee; or

(ii) the giving of any notice, order or direction and the making of any registration,

which, in any such case, the Security Agent may think expedient.

## 17. POWER OF ATTORNEY

Each Chargor, by way of security, irrevocably and severally appoints the Security Agent, each Receiver and any of its delegates or sub-delegates to be its attorney to take any action which that Chargor is obliged to take under this Deed. Each Chargor ratifies and confirms whatever any attorney does or purports to do under its appointment under this Clause.

## 18. MISCELLANEOUS

### 18.1 Covenant to pay

Each Chargor must pay or discharge the Secured Liabilities in the manner provided for in the Finance Documents.

### 18.2 Tacking

Each Lender must perform its obligations under the Credit Agreement (including any obligation to make available further advances).

### 18.3 New Accounts

(a) If any subsequent charge or other interest affects any Security Asset, the Finance Party may open a new account with a Chargor.

ING   00026

(b)   If the Finance Party does not open a new account, it will nevertheless be treated as if it had done so at the time when it received or was deemed to have received notice of that charge or other interest.

(c)   As from that time all payments made to the Finance Party will be credited or be treated as having been credited to the new account and will not operate to reduce any Secured Liability.

**18.4   Time deposits**

Without prejudice to any right of set-off any Finance Party may have under any other Finance Document or otherwise, if any time deposit matures on any account a Chargor has with any Finance Party within the Security Period when:

(a)   this Security has become enforceable; and

(b)   no Secured Liability is due and payable,

that time deposit will automatically be renewed for any further maturity which that Finance Party considers appropriate.

**19.   RELEASE**

At the end of the Security Period, the Security Agent must, at the request and cost of a Chargor, take whatever action is necessary to release its Security Assets from this Security.

**20.   GOVERNING LAW**

This Deed, the Security constituted hereunder and any non-contractual obligations arising out of or in connection with this Deed are governed by English law.

**21.   ENFORCEMENT**

Clause 46 (Enforcement) of the Credit Agreement shall apply to this Deed as if set out in full herein.

**THIS DEED** has been entered into as a deed and delivered on the date stated at the beginning of this Deed.

ING     00027

## SCHEDULE 1

## CHARGORS

## PART 1A - RECEIVABLES CHARGORS

| Name of Receivables Chargor | Original Jurisdiction | Registration number (or equivalent, if any) |
|---|---|---|
| O.W. Bunkers (UK) Limited | England | 03978855 |
| O.W. Bunker Germany GmbH | Germany | HRB 100089 (*Amtsgericht Hamburg*) |
| O.W. Bunker China Limited | Hong Kong | 0900648 |
| O.W. Bunker Malta Ltd. | Malta | C22059 |
| O.W. Bunker (Netherlands) B.V. | The Netherlands | 24325325 |
| Bergen Bunkers AS | Norway | 943 659 524 |
| Dynamic Oil Trading (Singapore) Pte. Ltd. | Singapore | 201221068G |
| O.W. Bunker Far East (Singapore) Pte Ltd | Singapore | 199201808K |
| O.W. Bunker (Switzerland) SA | Switzerland | CH-660.1.788.005-9 |
| O.W. Global Trading SA | Switzerland | CH-660.0.411.011-1 |
| O.W. Bunker Middle East DMCC | U.A.E. | A limited liability company incorporated in the Dubai Multi Commodities Centre, United Arab Emirates, with registration number DMCC1013, formed pursuant to Dubai Regulation No. 4 of 2002 (as amended) and the Dubai Multi Commodities Centre DMCC Company Regulations 2003 (as amended) |
| O.W. Bunker North America Inc. | Connecticut, USA | 1088636 |
| O.W. Bunker USA Inc. | Texas, USA | 0801553486 |

ING   00028

## PART 1B - DANISH RECEIVABLES CHARGORS

| Name of Danish Receivables Chargor | Original Jurisdiction | Registration number (or equivalent, if any) |
|---|---|---|
| O.W. Bunker & Trading A/S | Denmark | 66441717 |
| O.W. Supply & Trading A/S | Denmark | 17729071 |

ING     00029

**PART 2 - INSURANCE CHARGORS AND INTRA-GROUP CHARGORS**

| Name of Insurance Chargor / Intra-Group Chargor | Original Jurisdiction | Registration number (or equivalent, if any) |
|---|---|---|
| O.W. Bunker & Trading A/S | Denmark | 66441717 |
| O.W. Supply & Trading A/S | Denmark | 17729071 |
| O.W. Bunkers (UK) Limited | England | 03978855 |
| O.W. Bunker Germany GmbH | Germany | HRB 100089 (*Amtsgericht Hamburg*) |
| O.W. Bunker China Limited | Hong Kong | 0900648 |
| O.W. Bunker Malta Ltd. | Malta | C22059 |
| O.W. Bunker (Netherlands) B.V. | The Netherlands | 24325325 |
| Bergen Bunkers AS | Norway | 943 659 524 |
| O.W. Bunker Panama S.A. | Panama | Microjacket 650354, Document 1514888 |
| Dynamic Oil Trading (Singapore) Pte. Ltd. | Singapore | 201221068G |
| O.W. Bunker Far East (Singapore) Pte Ltd | Singapore | 199201808K |
| O.W. Bunker (Switzerland) SA | Switzerland | CH-660.1.788.005-9 |
| O.W. Global Trading SA | Switzerland | CH-660.0.411.011-1 |
| O.W. Bunker Middle East DMCC | U.A.E. | A limited liability company incorporated in the Dubai Multi Commodities Centre, United Arab Emirates, with registration number DMCC1013, formed pursuant to Dubai Regulation No. 4 of 2002 (as amended) and the Dubai Multi Commodities Centre DMCC Company Regulations 2003 (as amended) |
| O.W. Bunker North America Inc. | Connecticut, USA | 1088636 |
| O.W. Bunker USA Inc. | Texas, USA | 0801553486 |

ING     00030

## PART 3 - BROKERAGE CHARGORS

| Name of Brokerage Chargor | Original Jurisdiction | Registration number (or equivalent, if any) |
|---|---|---|
| O.W. Bunker & Trading A/S | Denmark | 66441717 |
| O.W. Supply & Trading A/S | Denmark | 17729071 |

ING    00031

**SCHEDULE 2**

**INSURANCE POLICIES**

| Policy | Principal Insured Party | Insurer | Policy Number | Policy Date | Governing Law |
|---|---|---|---|---|---|
| **Credit Insurance** | Dynamic Oil Trading (Singapore) Pte. Ltd. | Atradius | 363523 | 30 May 2013 | Danish |
| **Credit Insurance** | O.W. Bunker & Trading A/S | Atradius | 116426 | 30 May 2013 | Danish |
| **Goods Insurance** | O.W. Bunker & Trading A/S | Codan | 663 142 455 2 | 1 January 2013 <br><br> Printed 13 February 2013 | English |
| **Tank Insurance** | O.W. Bunker & Trading A/S | Codan | 663 163 638 1 | 1 January 2013 | Danish |

ING    00032

Execution Version

## SCHEDULE 3

### EXISTING SUPPLY CONTRACT DEBTORS OF THE DANISH RECEIVABLES CHARGORS

| Customer number | Customer Name | Address | City | Country |
|---|---|---|---|---|
| 10031 | OWB Denmark WW (Aalborg, North) | Stigsborgvej 60 | Nørresundby | DK |
| 11620 | D/S Norden A/S | Strandvejen 52 | Hellerup | DK |
| 10070 | O.W. Bunker Germany GmbH - WW | Neumühlen 11 | Hamburg | DE |
| 12235 | DFDS A/S | Sundkrogsgade 11 | København Ø | DK |
| 15355 | Compania Sud Americana | Plaza Sotomayor No. 50 | Valparaiso | CL |
| 10072 | OWB Singapore WW | 300 Beach Road | Singapore | SG |
| 11124 | Unifeeder A/S | Hveensgade 1 | Århus | DK |
| 10825 | O.W. Bunker WW CPH | Strandvejen 58 st.th. | Hellerup | DK |
| 10020 | O.W. Bunkers (UK) Limited | Pilgrim House, First Floor | Windsor | GB |
| 26462 | Maersk Line | Esplanaden 50 | København K | DK |
| 19637 | Norient Product Pool | Strandvejen 52 | Hellerup | DK |
| 24265 | NYK Trading Corporation, Japan | World Trade Center Bldg., 34F | Tokyo | JP |
| 10099 | O.W. Bunker Malta Limited WW | 55, Kastoros Str. | Piraeus | GR |
| 11537 | Zim Integrated Shipping Services Ltd. | Andre Sakharov Str. 9, Matam | Haifa | IL |
| 10807 | O.W. Bunker (Switzerland) SA-WW | Rue Adrien-Lanchenal 20 | Geneva | CH |
| 14827 | A/S Dan-Bunkering Ltd. | Strandvejen 5 | Middelfart | DK |
| 14836 | Dockwise Shipping B.V. | Lage Mosten 23 | Breda | NL |
| 11746 | Frontline Shipping Ltd. | Bryggegata 3 | Oslo | NO |
| 11007 | Bergen Bunkers AS *USE 30895/1210* | Torgallmenningen 9, P.O. Box 874 | Bergen | NO |
| 23287 | Effo P/F | Odinshædd 3 | Torshavn | FO |
| 28577 | Western Bulk Carriers AS | Henrik Ibsens Gate 100 | Oslo | NO |
| 10063 | O.W. Bunker Middle East DMCC | Indigo Tower - Office #709-710 | Dubai | AE |
| 10800 | O.W. Bunker Sweden AB | Box 53023 | Göteborg | SE |

ING   00033

| | | | | |
|---|---|---|---|---|
| 10058 | O.W. Bunker China Ltd.Shanghai | Rm EF, 13/F, Time Square, 500 Zhang Yang | Shanghai | CN |
| 14362 | Oldendorff Carriers GmbH & Co. KG | Willy-Brandt Allee 6 | Lübeck | DE |
| 24408 | Nordic Bulk Carriers A/S | Tuborg Havnevej 4-8, 1. | Hellerup | DK |
| 25251 | Mols-Linien AS | Sverigesgade 6 | Aarhus C | DK |
| 10822 | TBS (TRL) | Orhantepe Mah. Cinarli Sokak | Kartal, Istanbul | TR |
| 13720 | Lauritzen Bulkers A/S | attn: Bunkerdept. | København K | DK |
| 10005 | O.W. Bunker Far East (S) Pte Ltd | 300 Beach Road | Singapore | SG |
| 29053 | Seago Line A/S | Esplanaden 50 | København | DK |
| 19549 | SSE Energy Supply Ltd | Grampian House | Perth | GB |
| 10078 | OWB Dubai-Korea | 7th Floor, Posco P&S Tower, 735-3 | Seoul | KR |
| 26158 | Hafnia Management A/S | Strandvejen 102 E | Hellerup | DK |
| 11515 | BP Shipping Ltd. | 2nd floor, Building G | Sunbury on Thames | GB |
| 12825 | Herning Shipping a.s. | Theresavej 1 | Herning | DK |
| 21619 | Sea Fuels VOF | Hereplein 5 | Groningen | NL |
| 21523 | Mitsui & Co. Petroleum Ltd. | 2-1, Ohtemachi 1 - Chome-Ku | Tokyo | JP |
| 11314 | World Fuel Services (Denmark) Aps | Torvebyen 8, 1.th | Køge | DK |
| 28768 | Global Maritime Investments Cyprus Ltd. | 21 Whitefriars Street | London | GB |
| 24496 | Maersk Tankers A/S | Esplanaden 50 | København K | DK |
| 11112 | Finnlines Deutschland Gmbh | Einsiedelstr. 43-45 | Lübeck | DE |
| 27765 | Stena Weco A/S | 113 Rungsted Strandvej | Rungsted Kyst | DK |
| 14168 | K/S Combi Lift | Batterivej 7-9 | Korsør | DK |
| 19538 | Sigma Tankers Inc | c/o Heidmar (Far East) Pte Ltd | Norwalk | US |
| 13390 | Lauritzen Kosan A/S | attn: Bunkerdept. | København K | DK |
| 11083 | Spliethoff's Bevrachtingskantoor B.V. | Radarweg 36 | Amsterdam | NL |
| 11006 | Bebeka U.A. | Taco Mesdagplein 7 | Groningen | NL |
| 10006 | O.W. Bunker Malta Limited | 55, Kastoros Str., (8TH floor) | Piraeus | GR |
| 26823 | XO Shipping A/S | Strandvejen 56, st. | Hellerup | DK |
| 14681 | Seaside Navigation A/S | Philip Heymans Allé 3 | Hellerup | DK |
| 12108 | Transfennica Ltd. | Eteläranta 12 | Helsinki | FI |
| 22383 | Stena Sonangol Suezmax Pool LLC | 2727 Allen Parkway | Houston | US |

34

0030155-0001031 AMBA:3992481.11

ING   00034

| 12296 | ULTRABULK A/S | Smakkedalen 6 | Gentofte | DK |
| 23113 | Clipper Group A/S | Harbour House | København Ø | DK |
| 11300 | Royal Arctic Line A/S | Postbox 8100 | Aalborg Øst | DK |
| 14230 | Polska Zegluga Morska (PZM) | Plac Rodla 8 | Sczcecin | PL |
| 23754 | Eucon Shipping and Transport Ltd | Seattleweg 7 | Pernis-Rotterdam | NL |
| 10003 | O.W. Supply & Trading A/S | Stigsborgvej 60 | Nørresundby | DK |
| 11453 | SKS Obo Ltd. | Folke Bernadottes Vei 38 | Fyllingsdalen | NO |
| 13620 | Knutsen OAS Shipping AS | Smedesundet 40 | Haugesund | NO |
| 13728 | OSG Ship Management, Inc. (U.S.) | 1301 Avenue of the Americas | New York | US |
| 11010 | T.K.B. Shipping A/S | Standvejen 102b, 3. floor | Hellerup | DK |
| 29279 | O.W. Bunker USA Inc. | 2603 Augusta Drive | Houston | US |
| 12840 | Princess Cruises Lines Ltd. | Attn.: Sheryl Tan | Santa Clarita | US |
| 22417 | Compania Libra De Navegacion Uruguay | Edificio Plaza Mayor | Montevideo | UY |
| 13819 | Scandinavian Bunkering | Øvre Langgate 50 | Tønsberg | NO |
| 25705 | Copenship Bulkers A/S | Håbets Allé 26B | Brønshøj | DK |
| 26459 | MCC Transport Singapore Pte. Ltd. | 200 Cantonment Road | Singapore | SG |
| 25100 | Falcon Navigation A/S | Orient Plads 1 | København Ø | DK |
| 15025 | BigLift Holding B.V. | Radarweg 36 | Amsterdam | NL |
| 23774 | Westfal-Larsen Shipping AS | Fortunen 1 | Bergen | NO |
| 12717 | PGS Geophysical A/S | Lilleakerveien 4c | Oslo | NO |
| 27740 | Petro Summit Pte Ltd | 60 Anson Road, #05-03 | Singapore | SG |
| 21096 | EDF Trading Ltd. | 80 Victoria Street | London | GB |
| 10092 | O.W. Supply Switzerland A/S | Stigsborgvej 60 | Nørresundby | DK |
| 24310 | Arab Maritime Petroleum | 21 Giza Street | Giza | EG |
| 11551 | Conti-Lines N.V. | Generaal Lemanstraat 82/92 | Berchem, Antwerp | BE |
| 21486 | Maersk Supply Services A/S | Esplanaden 50 | København K | DK |
| 13486 | Colonial Navigation Co. Inc. | 750 Lexington Ave - 26th Floor | New York | US |
| 12890 | Clipper Project Shipping Ltd. | Harbour House | København Ø | DK |
| 23871 | Grieg Star Shipping AS | Grieg-Gaarden C. Sundtsgate 17/19 | Bergen | NO |
| 15729 | Nordic Tankers A/S | Harbour House | København Ø | DK |

0030155-0001031 AMBA:3992481.11

35

ING 00035

| | | | | |
|---|---|---|---|---|
| 13289 | Star Tankers Inc | 20 Glover Avenue | Norwalk | US |
| 13918 | Cargo-Levant Schiffahrtsgesellschaft mbH | Domshof 18-20 | Bremen | DE |
| 11667 | Arhangelskiy Tralovyy Flot | bd. Leningradskiy 324 | Arkhangelsk | RU |
| 28639 | Silver Green TC AS | Nordre Nostekai 1 | Bergen | NO |
| 13058 | Lemissoler Shipmanagement Ltd. | Eleni Court 17-21b Agias Zonis | Lemesos | CY |
| 13893 | Pioneer Navigation Ltd. | c/o Atlas Shipping Ltd. | Stamford | US |
| 12140 | Holland America Line Inc. | 300, Elliott Avenue West | Seattle | US |
| 17119 | Carnival UK | Box 1178 - Accounts Payable | Southampton Hampshire | GB |
| 16612 | CGG Services SA | 27 avenue Carnot | Massy | FR |
| 10073 | OWB Canary Islands, S.L. WW | Calle Sucre, No 8 - El Sebadal | Las Palmas, De G.C. | ES |
| 19820 | Aida Cruises - German Branch of | Attn: AIDAfuel | Rostock | DE |
| 11195 | Sea Bunkering Int. B.V. | Hereplein 5 | Groningen | NL |
| 18955 | Star Tankers Ltd | c/o Salhus Shipping AS | Karmsund | NO |
| 17050 | Wallem Commercial Services Ltd. | 12/F. Warwick House East | Quarry Bay, Hong Kong | HK |
| 25628 | White Whale Shipping Ltd | Marazlievskaya 2 | Odessa | UA |
| 16130 | Ilva Servizi Marittimi S.P.A. | Via Pionieri Aviatori d'Italia 8 | Genova | IT |
| 21043 | Daitoh Trading | Asahi Seimei Otemachi Building 6F | Tokyo | JP |
| 29082 | OW Bunker Middle East DMCC Beijing | Indigo Tower - Office #709-710 | Dubai | AE |
| 13134 | Simonsen Chartering Aps | Christiansmindevej 76 | Svendborg | DK |
| 24100 | Pacific Fish Company Ltd. | P.O. Box 411240, Melbourne | Florida | US |
| 15977 | Costank (S) Pte. Ltd. | 9, Temasek Boulevard, | Singapore | SG |
| 12036 | Novorossiysk Shipping Company | 1 UL Svobody | Novorossiysk | RU |
| 15202 | Norasia Container Line Ltd | c/o CSAV GmbH | Hamburg | DE |
| 14138 | Fayette Int. Holdings Ltd. | Room 1518, Kwanghwamun Officia Building | Jongno-Gu, Seoul | KR |
| 21683 | Offshore Heavy Transport AS | P.O. Box 1468 - Vika | Oslo | NO |
| 12808 | Orient Shipping Rotterdam B.V. | P.O. Box 1575 | Rotterdam | NL |
| 13222 | Key Maritime Rederi A/S*BLOCKED* | Skudehavnsvej 5 | Copenhagen | DK |
| 13875 | BBC Chartering & Logistic GmbH & Co. KG | 0 | Leer | DE |
| 30731 | Solitaire Marine Contractors NV | c/o Allseas Marine Contractors NV | Chatel St Denis | CH |
| 12694 | Champion Tankers AS | Tveitaråsveien 12 | Bergen | NO |

| ID | Company | Address | City | Country |
|---|---|---|---|---|
| 14183 | Intermare Transport GmbH | Ferdinandstraße 5 | Hamburg | DE |
| 23748 | Breadbox Shipping Lines B.V. | Westfrankelandsedijk 1 | Schiedam | NL |
| 11290 | Chemoil Monde Export SAM | Place Des Moulins | Monte Carlo | MC |
| 21366 | Alpina Shipping Agencies Aps | Ramsherred 19 | Næstved | DK |
| 10077 | OW Icebunker LTD WW | Stigsborgvej 60 | Nørresundby | DK |
| 15163 | Samskip | Holtabakka v/Holtaveg | Reykjavík | IS |
| 20857 | O.W. Bunker Spain S.L | Princesa 25 ú 3.4 | Madrid | ES |
| 15785 | Dorado Tankers Pool Inc | c/o Heidmar | Norwalk | US |
| 28994 | OWB WW Russia | Stigsborgvej 60 | Nørresundby | DK |
| 11706 | Odfjell Tankers AS | Conrad Mohrsv. 29 | Bergen | NO |
| 15476 | Broström AB | Östra Hamngatan 7 | Göteborg | SE |
| 12394 | ED & F Man Shipping Ltd. | 7th Floor, Cottons Centre | London | GB |
| 16700 | Americas Bulk Transport (BVI) Limited | 109 Long Wharf | Newport | US |
| 22684 | Blue Fin Tankers Pool, Inc. | 65 Chulia Street | Singapore | SG |
| 19302 | Lauritzen Tankers A/S | Sankt Annæ Plads 28 | København K | DK |
| 20135 | Stena Bulk LLC | 2727 Allen Parkway | Houston | US |
| 13735 | Bunkers International Corp. | 110 Timberlachen Circle | Lake Mary | US |
| 14859 | Exmar Marine N.V. | De Gerlachekaai 20 | Antwerp | BE |
| 29940 | Höegh LNG AS | Drammensveien 134 | Oslo | NO |
| 27427 | Han Gang Tankers Inc | 8 Temasek Boulevard #22-06 | Singapore | SG |
| 25706 | Copenship MPP A/S | Håbets Allé 26B | Brønshøj | DK |
| 24528 | Kristina Cruises Oy ** BLOCKED ** | Kirkkokatu 16 | Kotka | FI |
| 10023 | O.W.Bunker South Africa Pty | P.O. Box 16469 | Vlaeberg, Cape Town | ZA |
| 15640 | BHP Billiton Marketing AG Baar CH | Verheeskade 25, 2521 BE | Gravenhage | NL |
| 19231 | Scorpio Handymax Tanker Pool Ltd. | 'Le Millenium' | Monaco | MC |
| 11821 | Fred Olsen Cruise Line | White House Road | Ipswich | GB |
| 14526 | Clipper Bulk A/S | Harbour House | København Ø | DK |
| 11380 | North-Western Shipping Co. | Bolshaya Morskaya Str. 37 | St. Petersburg | RU |
| 22294 | M M Shipping (S)*BLOCKED* | 120 Lower Delta Road | Singapore | SG |
| 20240 | Stena Bulk AB | Danmarksterminalen | Göteborg | SE |

| ID | Company | Address | City | Country |
|---|---|---|---|---|
| 27605 | Hero Shipping Ltd. | 198 Old Bakery Street | Valetta | MT |
| 24954 | Primetransport LTD | 5, Vera Inber str | Odessa | UA |
| 12523 | Latvian Shipping Co. | 1 Elizabetes str. | Riga | LV |
| 10837 | O.W. Bunker Middle East DMCC - Brazil ME | Indigo Tower - Office #709-710 | Dubai | AE |
| 27072 | DSD Shipping AS | Ankerbygget, Kongsgaardbakken 1 | Stavanger | NO |
| 22812 | Fortuna Seaside Bulk Carriers Ltd | c/o Seaside Navigation ApS | Hellerup | DK |
| 11207 | Thenamaris Ships Management Inc. | 16 Athinas & | Vouliagmeni-Athens | GR |
| 27457 | OceanConnect Marine Pte Ltd. | 1 Temasek Avenue | Singapore | SG |
| 26183 | Tschudi Lines North Sea AS*BLOCKED* | 4 Sadama Str. | Tallinn | EE |
| 11970 | Österström Logistics | Box 8809 | Gothenborg | SE |
| 22210 | Finbeta S.p.a. *BLOCKED* | Via Nazionale Piemonte 4 | Savona | IT |
| 23221 | SKS Tankers Ltd | Folke Bernadottes Vei 38 | Fyllingsdalen | NO |
| 19016 | Kew Finance Limited | c/o Marigulf Shipping | Tirat Karmel | IL |
| 16067 | Heerema Marine Contractors | Vondellaan 55 | Leiden | NL |
| 24508 | Alianca Navegacao e Logistica Ltda | schiffahrts-Gesellschaft KG | Hamburg | DE |
| 28998 | Ace Shipping A/S | Strandvejen 56, st. | Hellerup | DK |
| 11590 | Alpha Trading SpA (Genova) | Via Brigata Liguria 3/19 | Genova | IT |
| 11022 | H. Folmer & Co. | Fredericiagade 57 | København K | DK |
| 20711 | TBS Worldwide Services Inc | c/o TBS Shipping Services Inc | New York | US |
| 21598 | Palmali Shipping SA | P.O. box 556, Charlestown | West Indies | KN |
| 11610 | Aalborg Portland A/S | Postbox 165 | Aalborg | DK |
| 22714 | Union Maritime Ltd. | Portland House | London | GB |
| 21451 | Navigator Gas L.L.C. | 21 Palmer Street | London | GB |
| 15714 | Monjasa A/S | Strevelinsvej 34 | Fredericia | DK |
| 11075 | Norwegian Oil Trading A/S | Tenvikveien 373 - 375 | Nøtterøy | NO |
| 11652 | Stema Shipping A/S | Nyhavn 28 | Aabenraa | DK |
| 21392 | Golden Ocean Trading LTD | Bryggegata 3 | Oslo | NO |
| 13127 | Morskaya Zvezda | 2, Kalinina Prospect | Kaliningrad | RU |
| 13111 | Hamburg Süd | Willy-Brandt-Strasse 59-61 | Hamburg | DE |
| 22193 | Kristensons-Petroleum Inc. | 21 East Front Street, | Red Bank | US |

38

| ID | Name | Address | City | Country |
|---|---|---|---|---|
| 14096 | Besiktas Likit Tasimacilik Denizcilik | Piyalepasa Bulvari, Memorial Is | Okmeydani, Istanbul | TR |
| 11475 | Mitsui OSK Lines Ltd. | Attn: Bunker Department | London | GB |
| 10082 | OW Tankers | Stigsborgvej 60 | Nørresundby | DK |
| | MLB Denmark Manfred | | | |
| 29974 | Lauterjung*BLOCKED* | Sdr. Havnegade 34 | Kolding | DK |
| 25233 | Defense etat major des armées | DLSEA EMM, 2 rue Royale, | Paris | FR |
| 10001 | O.W. Bunker & Trading A/S | Stigsborgvej 60 | Nørresundby | DK |
| 18834 | Tschudi Offshore & Towage | Herenweg 133 | Heemstede | NL |
| 23052 | Jumbo Shipping Vof | P.O. Box 23016 | KA Rotterdam | NL |
| 24541 | Rederi AB Älvtank | Donsö Hamnväg 27 | Donsö | SE |
| 29131 | Snug Due S.R.L | Via Serra 2/9 | Genova | IT |
| 28785 | Van Uden Maritime B.V. | Brielselaan 85 | Rotterdam | NL |
| 14958 | Companhia Libra de Navegacao | Av Rio Branco 4-6 e 7 andares | Rio de Janeiro | BR |
| 13394 | General Maritime Management, LLC | 299 Park Avenue | New York | US |
| 12800 | Rederiet Nielsen & Bresling A/S | Kullinggade 31 B, 1.Th | Svendborg | DK |
| 20752 | Marida Tankers Inc., | 8 Temasek Boulevard | Singapore | SG |
| 28340 | UAB "MAK Investment" | g.43-38, m.Perkunkiemio | Vilniaus | LT |
| 22899 | Shell International Trading and Shipping | STF/536 80 Strand | London | GB |
| 21701 | C Transport Cape Size | 7 Rue du Gabian | Monte Carlo | MC |
| 30781 | Koch Shipping Inc. | 20 Greenway Plaza | Houston | US |
| 10844 | O.W. Bunker Middle East DMCC - India ME | Indigo Tower - Office #709-710 | Dubai | AE |
| 15306 | Rohde Nielsen A/S | Nyhavn 20 | København K | DK |
| 15359 | United Feeder Services LTD | 3, Thalias Street | Limassol | CY |
| 19396 | Saga Forest Carriers Int. AS | PO Box 104 | Nøtterøy | NO |
| 13616 | Teekay Chartering Limited. | Suite 2000, Bentall 5 | Vancouver, B.C. | CA |
| 27446 | Integr8 Fuels Inc | Trust Company Complex | Majuro | MH |
| 11424 | Fairfield Chemical Carriers | 5, River Road/Suite 25 | Wilton | US |
| 22099 | Sea Connect UAB | 21 J. Zauerveino Street | Klaipeda | LT |
| 15228 | CSSA Chartering & Shipping Services S.A. | World Trade Center 1 | Geneva | CH |
| 20424 | Navesco S.A. | Av Calle 116 No. 7-15 Piso 17 | Bogota | CO |

39

0030155 0001031 AMBA:3992481.11

ING    00039

| | | | | |
|---|---|---|---|---|
| 12024 | Costa Crociere SPA | Piazza Piccapietra 48 | Genova | IT |
| 21452 | Losinjska Plovidba - Brodarstvo D.O.O. | Splitska Ulica 2/IV | Rijeka | HR |
| 30377 | Audacia Marine Contractors NV | c/o Allseas Marine Contractors SA | Châtel-St-Denis | CH |
| 22707 | Nile Dutch Africa Line BV | P.O. Box 21032 | Rotterdam | NL |
| 11252 | J. Poulsen Shipping A/S | Batterivej 7-9 | Korsør | DK |
| 10050 | O.W. Bunker China Ltd. (HK) | Room 1710-11, Shui On Centre | Wanchai | HK |
| 24227 | Agroship Ltd | 2 nd Floor | London | GB |
| 25146 | Maritime Shipping Trading Inc | Capital Plaza, piso 15 Paseo Roberto Mot | Ciudad de Panama | PA |
| 27708 | Seabourn Cruise Line Limited | Attn: Fuel Accounting | Seattle | US |
| 11102 | Neste Shipping OY | P.O. Box 740 | Espoo | FI |
| 15509 | Kristian Gerhard Jebsen Skipsrederi | Folke Bernadottesvej 38 | Fyllingsdalen | NO |
| 17163 | Koma Shipping Services Ltd. | Komsomolskaya ul. 3A | Murmansk | RU |
| 26247 | Global Seatrade C.V. | P.O. Box 206 | Urk | NL |
| 13296 | Ocean Energy Ltd. | Trust House 112 | Kingstown | VC |
| 24628 | Pleiades Shipping Agents SA | 262, Kifissias Avenue | Athens | GR |
| 27606 | Aarsleff Bilfinger Berger | PO Box 9861 | Newark | GB |
| 22962 | Continental Lines NV | Generaal Lemanstraat 82-92 | Berchem, Antwerp | BE |
| 11556 | Fortuna Bulk Carriers Ltd. | Philip Heymans Allé 3 | Hellerup | DK |
| 18362 | Subsea 7 (UK Service Company) Ltd | Prospect Road | Aberdeenshire | GB |
| 15876 | Row Management Ltd D/B/A ResidenSea | 14471 Miramar Parkway, Suite 401 | Miramar | US |
| 16419 | Ultrabulk S.A | Av.el Bosque Norte no 500, Floor 20th | Santiago | CL |
| 27408 | Pacific Basin Chartering Ltd | c/o Pacific Basin Shipping (Hong Kong) L | Tortola | VG |
| 12377 | Charles M. Willie & Co. Shipping | Celtic House | Cardiff | GB |
| 27616 | Aqua Shipping Ltd. | 198 Old Bakery Street | Valetta | MT |
| 16141 | German Tanker Shipping GmbH & Co KG | Hans-Boeckler Str. 50 | Bremen | DE |
| 19429 | Eide Marine Services AS | Røysanes | Høylandsbygd | NO |
| 30437 | Toyota Tsusho Petroleum Pte Ltd | 2-3-13 Konan Minato-Ku | Tokyo | JP |
| 21530 | Misje Bulk AS | Postboks 1994 | Bergen | NO |
| 13094 | Westrybflot JSC | 27 A, Komsomolskaya Str. | Kaliningrad | RU |
| 18962 | Ethiopian Shipping & Logistics Services | P.O. Box 2572 | Addis Ababa | ET |

0030155-0001031 AMBA:3992481.11

40

ING    00040

| ID | Company | Address | City | Country |
|---|---|---|---|---|
| 11635 | Bunker Oil AS | Hessa Tankanlegg | Ålesund | NO |
| 25820 | Bulk & Metal Transport (UK) LLP | 26-28 Bedford Row | London | GB |
| 23141 | Baltic Eagle Tanker Co.Ltd Valetta Malta | Ticaret AS, Piyalepasa Bulvari | Okmeydani, Istanbul | TR |
| 11041 | North Sea Bunker GmbH | Postfach 111104 | Lübeck | DE |
| 11105 | H.H. Danship AS | Havnegaarden | Svendborg | DK |
| 18682 | Herning Shipping France S.A.R.L. | 77, Avenue des Freres Roustan | Golfe-Juan | FR |
| 13103 | Westfal-Larsen & Co. AS | Fortunen 1 | Bergen | NO |
| 15219 | SwissMarine Services S.A. | 13, route de Florissant | Geneva | CH |
| 11154 | Utkilen AS | P.O. Box 1163 | Bergen | NO |
| 12886 | Baltic Group Ltd. (Klaipeda) *Blocked* | P.O. Box 76 | Klaipeda | LT |
| 25136 | Atlantico Shipping S.L. | Calle Jose Artes de Arcos, 34 | Almeria | ES |
| 24935 | Odfjell & Vapores. S.A | Plaza Sotomayor # 50 | Valparaiso | CL |
| 29400 | Dan-Bunkering (Monaco) S.A.M. | 4, Avenue des Citronniers | Monaco | MC |
| 16547 | Vega - Reederei Friedrich Dauber | Grosse Elbstrasse 145 A | Hamburg | DE |
| 26051 | North Sea Container Line AS (NCL) | Postboks 291 | Haugesund | NO |
| 12501 | Bidsted & Co. A/S | Tuborg Havnevej 18 | Hellerup | DK |
| 30160 | Otella De Pexhe Sarl Guinee | Avenue de la republic Guinee ,Conakry, | Mohamedou ELGHOURBY | GN |
| 21732 | Synergas S.r.l. | Via Riviera di Chiaia 247 | Naples | IT |
| 27944 | Falcon Rederi A/S | Orient Plads 1, | Copenhagen | DK |
| 22125 | Flinter Shipping BV | PO BOX 349 | Barendrecht | NL |
| 29376 | Tune Chemical Tankers | 10 Burg van der Jagtkade | HELLEVOETSLUIS | NL |
| 28383 | E.ON Global Commodities SE | Holzstrasse 6 | Düsseldorf | DE |
| 11219 | KPI Bridge Oil Ltd. (Cayman Island) | 4th Floor, Cardinal Place | London | GB |
| 25939 | Rubio Holding Limited | Arch. Makarios III 58, Iris Tower | Nicosia | CY |
| 16421 | Lundqvist Rederierna AB | Norra Esplanad Gatan 9B | Mariehamn | FI |
| 27347 | ARG Shipping | 21, E.Birznieka-Upisa iela | Riga | LV |
| 27672 | Kas Tanker Co. Ltd. | c/o Besiktas Likit Tas.Dnz.Tic.A.S. | Valletta/Malta | MT |
| 13888 | JSC Yugreftransflot | 5, Rybakov Str. | Sevastopol | UA |
| 24018 | Halten AS | Olav Tryggvasons Gate 40 | Trondheim | NO |
| 23053 | Euronav NV | Belgica House | Antwerp | BE |

ING    00041

| ID | Company | Address | | City | Country |
|---|---|---|---|---|---|
| 30533 | Murueta Atlántico Alcudia Shipping A.I.E | Calle San Vicente 8 | | Bilbao | ES |
| 29781 | Mahesh Timber Singapore Pte Ltd | 3 Shenton Way, #08-04 Shenton House | | Singapore | SG |
| 11058 | Intercontinental Bunkering BV | 's Gravenweg 39 | | Capelle a/d IJssel | NL |
| 26332 | Noble Chartering Corp. | 4 Stamford Plaza | | Stamford | US |
| 20582 | Oil & Marine Technology S.A. | Cuba Avenue, 34th Street | 0 | | PA |
| 21034 | Norden Shipping (Singapore) Pte Ltd | 6 Temasek Boulevard | | Singapore | SG |
| 27781 | Kolka Navigation Inc | c/o Latvian Shipping Co | | Riga | LV |
| 23292 | Koch Shipping Inc. | 4111 E. 37th Street North Floor C3 | | Wichita | US |
| 23349 | Conti-USA Inc. | 1700 E. Las Olas blvd., Suite 205 | | Florida | US |
| 13059 | Canfornav Inc. | 800 René-Lévesque Blvd. West | | Montreal,Quebec | CA |
| 15255 | Wilson Eurocarriers AS | Bredbenken 1 | | Bergen | NO |
| 29241 | Barbaros Maritime Ltd | 198 Old Bakery Street | | Valetta | MT |
| 25303 | Van Oord Shipmanagement BV | PO Box 8574 | | Rotterdam | NL |
| 16962 | Furetank Rederi AB | Korsholmebacke 1 | | Donsö | SE |
| 23867 | Siem Offshore Rederi AS | Markensgt. 8 | | Kristiansand | NO |
| 28876 | SAIF Shipping Srl | Piazza Rossetti 5 | | Genova | IT |
| 11461 | Jo Tankers B.V. | Kokstadflaten 5 | | BERGEN | NO |
| 20095 | Sociedade Pesca Silva Vieira, Lda. | Apartado 4 | | Gafanha da Nazaré | PT |
| 30480 | Sable Navigation Inc. | c/o Latvian Shipping Co | | Riga | LV |
| 29909 | W Shipping LTD | Office 32, 3rd Floor Of Scouros Court | | Larnaca | CY |
| 14642 | Norfos Shipping Ltd. | Pärnu mnt. 82 - M5 | | Tallinn | EE |
| 16452 | Navision Shipping Company A/S | Strandvejen 102 E | | Hellerup | DK |
| 29093 | Global Cargo Logistics, Ltd. | 450 Seventh Avenue, Suite 605 | | New York | US |
| 14840 | Cockett Marine Oil(Asia) Pte Ltd | 1 Maritime Square | | Singapore | SG |
| 12301 | Christophersen SA | Tereinta y Tres 1387 | | Montevideo | UY |
| 24873 | Bluewater Energy Services B.V. | Marsstraat 33 | | Hoofddorp | NL |
| 24681 | Falcon Maritime A/S | Orient Plads 1 | | København Ø | DK |
| 16344 | Compania Chilena de Navegación SA | Plaza De La Justicia 59 | | Valparaiso | CL |
| 24571 | Palmali International SA | Rue de Villereuse 22 | | Geneva | CH |
| 19477 | Ignazio Messina & C. S.p.A. | Via Gabriele d' Annunzio 91 | | Genova | IT |

ING     00042

| ID | Company | Address | City | Country |
|---|---|---|---|---|
| 11044 | Petrol Bunkering & Trading PBT Ltd | Luzernerstr. 10 | Rotkreuz | CH |
| 11012 | World Fuel Services Europe Ltd. | 62 Buckingham Gate | London | GB |
| 11030 | J. Lauritzen A/S | St. Anne Plads 28 | København K | DK |
| 27600 | Koch Nitrogen Shipping Ltd | 4111 E. 37th Street North Floor 4 | Wichita | US |
| 14880 | Suisse-Atlantique Societe de | Avenue des Baumettes No. 7 | Lausanne | CH |
| 12211 | Atlantic Ro-Ro Carriers, Inc. | 95 River St., 3rd Floor | Hoboken | US |
| 29907 | Louis Dreyfus Suisse | c/o Sangamon Transportation | Wilton | US |
| 21417 | Genshipping Corporation Monrovia | c/o Splosna Plovba | Portoroz | SI |
| 29728 | Hanseatic Chartering Ltd | Hanseatic House | Limassol | CY |
| 28984 | Medmaritime Ltd, | 85 St John Street | Valletta | MT |
| 28888 | Sakala Maritime Company Ltd. I.O.M | c/o Eesti Merelaevandus AS | Tallinn | EE |
| 27623 | Grosshipmanagement Limited | Arch. Makariou III, 58 | Nicosia | CY |
| 12168 | Gard Shipping AS | Beddingen 24 | Oslo | NO |
| 11927 | Compass International As. Ltd. | Vesterkaj 6 | | 0 DK |
| 27745 | CONTI 154. Schiffahrts-GmbH & Co. Bulker | Bahnhofstr. 28-31 | Bremen | DE |
| 29467 | Dragonera Shipping A/S | Orient Plads 1 | Copenhagen | DK |
| 29560 | Harjumaa Maritime Company Ltd. I.O.M | Eesti Merelaevandus OU | Tallinn | EE |
| 30490 | Saldus Navigation Inc. | c/o Latvian Shipping Co. | Riga | LV |
| 11121 | Cockett Marine Oil Limited | Carrick House | Kent | GB |
| 25288 | Mercado Group S.A. | Cuba ave.,34-th Street | Panama City | PA |
| 27211 | Nisa Marítima SA | Calle Fuenpodrida nº 17 | Valencia | ES |
| 19540 | Atlantic Fish Murmansk | Tralovaya 14 | Murmansk | RU |
| 10098 | O.W. Bunker & Trading (Chile) DK | Stigsborgvej 60 | Nørresundby | DK |
| 11097 | Maxcom Bunker Spa | Via Bartolomeo Bosco 57/7B | Genova | IT |
| 23924 | JSC "SVH-Freight" | Marine House | Moscow | RU |
| 14695 | Columbia Shipmanagement Ltd. | Dodekanison Street | Limassol | CY |
| 29129 | Scan-Trans Carriers ApS | Vesterkaj 6 | Næstved | DK |
| 21273 | Chemoil Belgium N.V. | Lambrechtshoekenlaan 145 | Merksem, Antwerp | BE |
| 20192 | Sociedade de Pesca Novo Horizante, Lda | Avenida dos Bacalhoeiros | Gafanha da Nazaré | PT |
| 10069 | O.W. Bunker Germany GmbH - Physical | Neumühlen 11 | Hamburg | DE |

0030155-0001031 AMBA:399248111

43

| 28684 | Lotos Asfalt Sp. z. o. o. | Ul. Elblaska 135 | Gdansk | PL |
| 11067 | Klaveness Maritime Logistics AS | Harbitzalléen 2A | Oslo | NO |
| 12006 | Merlin Petroleum Co. Inc. | 311 Post Road East | Westport | US |
| 23078 | Ace-Tankers C.V. | Strawinskylaan 1057 | Amsterdam | NL |
| 27052 | Mina Shipping DMCC | Office 1004, Reef Tower | Dubai | AE |
| 27713 | Avant Oil Services Ltd | Norra Esplanadgatan 4 B | Mariehamn | FI |
| 26241 | Interglobal Shipping 3001 Ltd | 6 Kerminiski Street | Tel Aviv | IL |
| 28514 | Aurora Holdings Limited | 2nd Floor, Level 5 | Floriana | MT |
| 14346 | Northern Shipping Company | Nab. Severnoy Dviny, 36 | Arkhangelsk | RU |
| 26805 | Silvergreen | Ulsmågveien 7 | Nesttun, Bergen | NO |
| 11854 | Hanseatic Bunker Services GmbH | Willy-Brandt-Strasse 49 | Hamburg | DE |
| 29568 | Statoil Shipping Inc | 120 Long Ridge Road | Stamford | US |
| 25196 | Maestro Bulk Ltd. | Ave du Guintzet 8 | Fribourg | CH |
| 20798 | Rudder S.A.M. | Le Panorama - bloc A/B | Monte Carlo | MC |
| 30614 | Devmarin Denizcilik A.S. | Fahrettin Kerim Gokay Cadessi 14 | Istanbul | TR |
| 18992 | Esvagt A/S | Adgangsvejen 1 | Esbjerg | DK |
| 13729 | Scotline Ltd. | 75 Main Road , Gidea Park | Essex | GB |
| 28810 | Solal Shipping S.A. **BLOCKED** | Via España, 122 | Panama City | PA |
| 10064 | OWB Canary Islands S.L | Calle Sucre, No 8 - El Sebadal | Las Palmas, De G.C. | ES |
| 14171 | Marnavi S.P.A. Naples | Via Santa Brigida 39 | Napoli | IT |
| 30678 | Smiltene Navigation Inc. | c/o Latvian Shipping Co, | Riga | LV |
| 26943 | E.ON Global Commodities SE | Holzstrasse 6 | Düsseldorf | DE |
| 14964 | Kent Line International Ltd. | 300, Union Street | Saint John, New Brunswick | CA |
| 23756 | Feederlink Shipping & Trading BV | Seattleweg 15 | Pernis-Rotterdam | NL |
| 20871 | Maestro Reefers A/S | Slusaholmen 2-4 | København SV | DK |
| 21844 | OXL NV | Vismijnstraat 23B | Zeebrugge | BE |
| 23147 | Total EP Norge AS | P.O. Box 168 | Stavanger | NO |
| 23244 | American RO-RO Carriers | P.O. Box 33 | Lysaker | NO |
| 11805 | Norwegian Cruise Lines (NCL) | 7665 Corporation Drive | Miami | US |
| 23759 | Holwerda Shipmanagement BV | Marktweg 75, | Heerenveen | NL |

44

ING   00044

| | | | | |
|---|---|---|---|---|
| 15263 | Strategic Bulk Carriers | c/o MT Maritime | Southport | US |
| 16291 | Briese Schiffahrts GmbH & Co. KG | Hafenstr. 12 | Leer | DE |
| 21301 | CSAV Sud Americana De Vapores S.A. | Edificio Frontenac Local 2-B | Ciudad de Panama | PA |
| 11419 | Clipper Holding | Harbour House | København Ø | DK |
| 25249 | Container Leasing A/S | Dyrehavegårdsvej 18 | Lyngby | DK |
| 27858 | Jade S.A. | 3, Patriarchou Ioakeim | Athens | GR |
| 11938 | Cooltrans Ltd. ** BLOCKED ** | Kreutzwaldi 10-9 | Tallinn | EE |
| 13482 | Polembros Shipping Limited | 4, Mavrokordatou Str. | Piraeus | GR |
| 10062 | OWB Icebunker PH | Stigsborgvej 60 | Nørresundby | DK |
| 21510 | Sigguk A/S | Baldrianvej 2 | Vodskov | DK |
| 20667 | Vikingshuset Shipping Inc | 810 Highway 6 South | Houston | US |
| 11618 | JSC "Murmansk Trawl Fleet" | 43, Schmidta | Murmansk | RU |
| 30472 | Snug S.R.L. | Via Serra 2/9 | Genova | IT |
| 15181 | Farstad Shipping ASA | Boks 1301, Sentrum | Ålesund | NO |
| 26782 | Integr8 Fuels Oslo AS | Lysaker Torg 5 | Lysaker | NO |
| 29188 | Chemtrans A.G. | Suite 1405 | New York | US |
| 13269 | Setaf-Saget | B.P. 104 | Suresnes Cedex | FR |
| 27813 | Neptune Shipping & Trading Limited | Trust Company Complex | Majuro | MH |
| 29058 | CTC Ltd. Bermuda | 7 Rue du Gabian | Monte Carlo | MC |
| 29903 | Amirtol CI Physical | Calle Sucre, No 8 - El Sebadal | Las Palmas, De G.C. | ES |
| 21694 | Great White Fleet Ltd | Clarendon House | Hamilton | BM |
| 14486 | Bunker's LLC | 90 Broad Street, 7th Floor | New York | US |
| 14698 | Carisbrooke Shipping Ltd | Bridge House | Isle of Wight | GB |
| 23898 | Shell Int. Trading and Shipping | STF/536 80 Strand | London | GB |
| 10801 | OWB Singapore AUS | 300 Beach Road | Singapore | SG |
| 11224 | Deutsche Calpam GmbH | Grosse Elbstrasse 141A | Hamburg | DE |
| 29798 | United Freight Carriers LLC | 80 Broad Street | | 0 LR |
| 23300 | DFDS Logistics AS | Drammensveien 288 | Oslo | NO |
| 13504 | Schulte & Bruns Chartering GmbH & Co. KG | Deverhafen / Dockerhouse | Papenburg | DE |
| 11361 | Sobelmar Antwerp N.V. | Bredabaan 405 | Brasschaat | BE |

0030155 0001031 AMBA-3992481.11

45

| ID | Company | Address | City | | Country |
|---|---|---|---|---|---|
| 27663 | Antibes Shipping Limited | Fort Anne | | 0 | IM |
| 23750 | Chemgas Shipping BV | Van Vollenhovenstraat 3 | Rotterdam | | NL |
| 13895 | Lotos Petrobaltic S.A. | Ul. Stary Dwor | Gdansk | | PL |
| 30192 | Briese Schiffahrts GmbH & Co KG | | Leer | 0 | DE |
| 13878 | Briese Schiffahrts GmbH & Co. KG | | Leer | 0 | DE |
| 14812 | Dania Marine *BLOCKED* | Daniavej 15 | Mariager | | DK |
| 29205 | CONTI 52. Container Schifffahrts-GmbH & CO | Bahnhofstr. 28-31 | Bremen | | DE |
| 19393 | KGJ Cement AS | Folke Bernadottesvej 38 | Fyllingsdalen | | NO |
| 11173 | A/S Dan-Bunkering Ltd. | Strandgade 4A | København K | | DK |
| 16911 | Thorco Shipping A/S | Jessens Mole 15 | Svendborg | | DK |
| 30487 | Prima Shipping Ltd | 198 Old Baker Street | Valetta | | MT |
| 25630 | Agder Ocean Reefer KS | c/o Agder Ocean Shipping AS | Grimstad | | NO |
| 29586 | ARTE Bunkering OU | Astangu 26-28 | Tallin | | EE |
| 13133 | Empresa de Pesca San Jacinto | Av. Fernao de Magalhaes | Coimbra | | PT |
| 11081 | Furness Withy Chartering Ltd | 23 Finsbury Circus | London | | GB |
| 27956 | CONTI 169. Schifffahrts-GmbH & Co. Bulker | Bahnhofstr. 28-31 | Bremen | | DE |
| 22096 | AMN Bulk Carriers Inc | c/o Nomikos & Son | London | | GB |
| 26713 | Ukrferry Shipping Company | Sabanskiy lane 4A | Odessa | | UA |
| 11068 | Wilhelmsen Marine Fuels AS | P.O. Box 33 | Lysaker | | NO |
| 25240 | Eesti Merevaelandus AS | Sadama 4 | Tallinn | | EE |
| 27459 | OceanConnect Marine UK Ltd. | The Old Trading House | London | | GB |
| 19337 | Master/Owners of MV "VLIEDIEP" | c/o MTL Maritime Transport+Logistik | Duisburg | | DE |
| 27040 | Spike Shipping Ltd. | 198 Old Bakery Street | Veletta | | MT |
| 21647 | Western Bulk Pte Ltd | 6 Battery Road, #38-01A | Singapore | | SG |
| 23908 | Sermar Line Srl | via Alessandro Volta 2 | Venice | | IT |
| 25086 | ADM International Sarl | 201 Broad Street | Stamford | | US |
| 18665 | Atlantis Tankers | Muallim Naci Caddesi No: 93 | Kuruçesme | | TR |
| 27635 | Aldabra Shipping Company | 26 Finch Road | | 0 | IM |
| 12985 | Ole Edvardsen AS | Postboks 433 | Ålesund | | NO |

| ID | Company | Address | City | | Country |
|---|---|---|---|---|---|
| 15178 | North Sea Shipping A/S | | Bakkasund | 0 | NO |
| 27918 | Naviera Chilena del Pacifico, S.A. | Avda. Apoquindo 3650 Of. 601 | Santiago | | CL |
| 29397 | Palmali Gas Shipping Co. Ltd | Villa Aurora 14 | | 0 | MT |
| 11572 | Eastern Mediterranean Maritime Ltd. | 69,Grigoriou Lamparaki Street | Glyfada | | GR |
| 16043 | Bominflot Bunkergesellschaft fuer | Grosse Bäckerstr. 11 | Hamburg | | DE |
| 29128 | Batterfisa SIA Vessel Dorado | c/o Warnemünder Hochseefischerei GmbH | Sassnitz - Neu Mukran | | DE |
| 22978 | Gemini Tankers LLC | 1 Station Place | Stamford | | US |
| 29574 | UAB Laivu Technika | Naujoji uosto g. 3 | Klaipeda | | LT |
| 19268 | GAC Bunker Fuels Ltd. | Argonaut Park | Slough | | GB |
| 16974 | Transgrain Shipping BV | Willemsplein 492 | Rotterdam | | NL |
| 29577 | Sole Transportation | c/o CFL Shipmanagement BV | UTRECHT | | NL |
| 14874 | Shell International Trading & Shipping | Shell Centre | London | | GB |
| 26628 | Acontium Ship Management Ltd | P.O.Box 56220 | Limassol | | CY |
| 10095 | O.W. Bunker Australia Pty Ltd | Melbourne 3004 | Melbourne, Victoria | | AU |
| 23566 | Alvarado Shipping Limited | Fort Anne, Douglas | | 0 | IM |
| 29091 | CONTI 164. Schifffahrts-GmbH & Co. Bulker | Bahnhofstr. 28-31 | Bremen | | DE |
| 21125 | Clipper Bulk (Singapore) Pte Ltd | 8 Shenton Way | Singapore | | SG |
| 26120 | FTO Bunkering Ltd. | P.O.Box 3387, Road Town | Tortola | | VG |
| 27817 | Dalmare SpA | Via Castelli 6 | Livorno, Liguria | | IT |
| 14325 | Seychelles Petroleum Company Ltd. | P.O.Box 57524 | Limassol | | CY |
| 28985 | Destinar Limited | Arch. Makarios III | Nicosia | | CY |
| 28119 | Super Shipping Ltd | 198 Old Bakery Street | Valetta | | MT |
| 11212 | Malik Supply A/S | Skibbrogade 5, 3TV | Aalborg | | DK |
| 24454 | Copenship Singapore Pte Ltd | 137 Amoy Street | Singapore | | SG |
| 25521 | Viterra S.A. | Rue du Mont-Blanc 7 | Geneva | | CH |
| 29223 | Terry Shipping Corporation | 4th Floor, | London | | GB |
| 15871 | BP Singapore Pte. Ltd. | 1, Harbour Front Avenue | Singapore | | SG |
| 13188 | Ocean Food GmbH & Co. KG | Im Fährhafen Sassnitz | Sassnitz - Neu Mukran | | DE |
| 15571 | JSC "Sevmorneftegeofizika" | 17, Karl Marx Street | Murmansk | | RU |
| 20966 | Hjerting Mutual Service ApS | D. Lauritzensvej 12 | Esbjerg | | DK |

0030155-0001031 AMBA.3992481.11

ING   00047

| | | | | | |
|---|---|---|---|---|---|
| 24840 | Trident Maritime Agency, Inc. | 39 Broad Street, 19th Floor | New York | | US |
| 26605 | Torvald Klaveness Group | Harbitzalleen 2 A | Oslo | | NO |
| 30312 | Master and Owners M.V. CHL Innovator | Commodity Handling Private Ltd | Rotterdam | | NL |
| 13403 | Swedia Rederi AB | Donsö Hamväg 45 | Donsö | | SE |
| 28735 | Venus Shipping Aps | Laehegnet 31 P.O Box 529 | Vestbjerg | | DK |
| 27946 | Hanse Capital Gruppe | Georg-Sasse-Strasse 5 | Hamburg | | DE |
| 25595 | Bergen Shipping Ltd. | Cevizli Mah. Toros Cad. Fethi Bey Sk. No | Istanbul | | TR |
| 15604 | Uni-Tankers | Turbinevej 10 | Middelfart | | DK |
| 30925 | K and D | 10 West Street unit 27E | NY | | US |
| 11816 | Statoil ASA | OTS PRO TE FCS E-3 ST-FO | Stavanger | | NO |
| 15061 | GEFO Gesellschaft für Öltransporte mbH | Kurze Mühren 2 | Hamburg | | DE |
| 11435 | Sealift NV | Hofstraat 16 | Antwerp | | BE |
| 30679 | J.L. Shipping S.L. | Calle Gregorio Marañon 1. Bajo 2. | Gijón | | ES |
| 26131 | Euroshipping | Vojkovo Nabrezje 38 | Koper | | SI |
| 27481 | Master/owners of MV Victoriadiep | c/o MTL Maritime Transport & Logistik | Duisburg | | DE |
| 30010 | Scheepvaartonderneming Anja II CV | Postbox 54 | Heerenveen | | NL |
| 14607 | Liberty Maritime Corp. | 1979 Marcus Avenue | New York | | US |
| 23589 | K/S Erria Helen | 2nd Floor, Amager Strandvej 390 | Kastrup | | DK |
| 29655 | Owners aht AMBER II | Amber Navigation Limited, Malta | | 0 | PL |
| 28847 | Siem AHTS Pool AS | Markensg. 8 | Kristiansand | | NO |
| 16157 | Union Transport Group Plc | Imperial House 21-25 North Street, | Bromley, Kent | | GB |
| 16131 | Express Shipping A/S | C/O East Express ApS | Saeby | | DK |
| 26304 | Columbia Shipmanagement | Grose Elbstrase 275 | Hamburg | | DE |
| 12774 | Mistral Wind International SAL | P.O. Box 173-175 | Beirut | | LB |
| 12876 | Admanthos Shipping Agency Inc. | 46 Southfield Avenue - Suite 320 | Stamford | | US |
| 13814 | SMT Shipmanagement & Trans Ltd. | 702A Nicolaou Pentadromos Cntr | Limassol | | CY |
| 25190 | Empire Navigation Inc | 58, Vouliagmenis Ave. & 37, Asklipiou St | Glyfada-Athens | | GR |
| 11051 | Heinrich Wegener & Sohn | Focksweg 34 | Hamburg | | DE |
| 15404 | Murmansk Gubernsky Flot**USE 12634** | 43, Shmidta Str. | Murmansk | | RU |
| 11339 | Kangamiut Seafood A/S | Nordre Ringvej 5 | Dronninglund | | DK |

0030155-0001031 AMBA 3992481.11

48

| 16840 | Westport Petroleum, Inc. | 810 Cresent Centre Drive Suite 530 | Franklin | | US |
|---|---|---|---|---|---|
| 30481 | Kazdanga Navigation Inc. | c/o Latvian Shipping Co. | Riga | | LV |
| 27384 | Statoil Refining Denmark A/S | Melbyvej 17 | Kalundborg | | DK |
| 13069 | Baltrader Shipping Comp. | Schaarsteinwegsbrücke 2 | Hamburg | | DE |
| 29984 | Uni-Chartering France | 609 Chemin de Pigranel La Tane | | 0 | FR |
| 30241 | Universal Solutions Group LLc | P.O. Box 1726 | East Greenwich | | US |
| 31116 | Master/Owners/Charterers BBC Shanghai | Hafenstr. 12 | Leer | | DE |
| 15638 | Tokyo Marine Co. Ltd. | c/o Tokyo Marine Europe Ltd. | London | | GB |
| 16239 | Gdynia Maritime University | Ul. Morska 81-87 | Gdynia | | PL |
| 27804 | CSL Norway AS | Sandviksbodene 68, 1st Floor | Bergen | | NO |
| 12513 | Itochu Enex Co., Ltd. | Granpark Tower 29th&30th fl. | Tokyo | | JP |
| 19338 | Master/Owners of MV "VOSSDIEP" | c/o MTL Maritime Transport+Logistik | Duisburg | | DE |
| 21228 | Erria A/S | Amager Standvej 390, 2 sal | Kastrup | | DK |
| 13528 | Chinese-Polish Joint Stock Shipping Co | Reg. No. 004390 C/o Chipolbrok Gdynia | Gdynia | | PL |
| 30023 | K/S Difko Virtsu | c/o Rederiet Otto Danielsen A/S | Virum | | DK |
| 13908 | Seavoss Schiffahrt GmbH | Moltke Str. 7 | Elmshorn | | DE |
| 27491 | Master/Owner/Charterer Vennendiep | c/o Mtl Maritime Transport & Logistik | Duisburg | | DE |
| 25114 | Rio Tinto Shipping (Asia) Pte Ltd. | 12 Marina Boulevard #20-01 | Singapore | | SG |
| 29390 | Atlantsolia EHF | Lonsbraut 2 | Hafnarfjordur | | IS |
| 19334 | Master/Owners of MV "VECHTDIEP" | c/o MTL Maritime Transport+Logistik | Duisburg | | DE |
| 23526 | Belneto Container Chartering & Logistik | c/o MTL Maritime Transport & Logistik | Duisburg | | DE |
| 30149 | Bomin Deutschland GmbH & Co. KG | Grosse Bäckerstrasse 11 | Hamburg | | DE |
| 20496 | Antalya Shipping Limited | 26 Athole Street | | 0 | IM |
| 29072 | Transportes Maritimos Kochifas S.A | Camibo A Chinquihue KM 7 | | 0 | CL |
| 28770 | HC "Euro-Massengutfrachter" GmbH & Co. KG | c/o MTL Maritime Transport + Logistik | Duisburg | | DE |
| 27182 | KB International Co., Ltd | RM 215, Wonyang Plaza B/D 620-29 | Busan | | KR |
| 20793 | Tschudi Lines Baltic Sea AS*BLOCKED* | Sadama Str 4 | Tallinn | | EE |
| 24350 | MS Thea Marieke C.V | c/o Echoship ApS | Svendborg | | DK |
| 29021 | Bore Ltd | Torggatan 14B | Mariehamn | | FI |

| | | | | |
|---|---|---|---|---|
| 27829 | Baltnav A/S | Strandvejen 102E | Hellerup | DK |
| 30763 | Kenter Shipping SRL | Via Orefici 8/39 | Genova | IT |
| 22935 | Aggregate Industries Ltd | Marston House, Marston Bigot | Somerset | GB |
| 19251 | Fehn Schiffahrts GmbH & Co. KG | | 0 | DE |
| 25944 | Sea Trucks Nigeria Ltd. | 4a Lees Road | Ikoyi - Lagos | NG |
| 12127 | Tina Shipping | Kullinggade 31e,1.tv | Svendborg | DK |
| 30662 | SMTV - G.Messina Spa | Via Orefici 8/39 | Genoa | IT |
| 30833 | Kensill Trading LTD. | Quijano Chamers | Tortola | VG |
| 19606 | GAC Bunker Fuels (UAE) Limited | P.O. Box 18068 | Dubai | AE |
| 24069 | Akbasoglu Shipping Group | Icmeler Mevkii, Sahilyolu Cad. | Istanbul | TR |
| 20002 | Medex Container Services Ltd | 22 Lascaris Wharf | Valletta | MT |
| 22454 | Brochart KB | Trappvägen 5 | Sollentuna | SE |
| 18351 | Navinorte S.A. | Gregorio Marañón 1 - Bajo | Gijon | ES |
| 25135 | Naviera de Galicia S.A (NAVIGASA) | Muelle del Este s/n | Corunna | ES |
| 30859 | Net Denizcilik Teknik Hizmetler Makine | c/o Gemmar Gemi Isletmeleri A.S. | Tuzla | TR |
| 14365 | Heidmar Inc. | 20 Glover Avenue | Norwalk | US |
| 23743 | CFL Shipmanagement BV | 4de verdieping, Catharijnesingel 30 | Utrecht | NL |
| 19854 | Global Vision Bunkers B.V. | Drieluik 5 | Capelle a/d IJssel | NL |
| 13839 | Briese Schiffahrts GmbH & Co. KG | | 0 Leer | DE |
| 15027 | Island Oil Limited | 145-149 Chr. Hadjipavlou St | Limassol | CY |
| 30438 | Fred. Olsen Windcarrier AS | Tollbugata 1B | Oslo | NO |
| 13521 | Clipper Holding B.V. | Harbour House | København Ø | DK |
| 12102 | Rederi AB Transatlantic | Lindholmsallén 10 | Göteborg | SE |
| 30282 | MT Sloman Themis Schiffahrtsgesellschaft | Schiffahrts-Aktiengesellschaft | Bremen | DE |
| 14552 | Maersk Broker KS ( Fr.cia) | Centerhavn 23 | Fredericia | DK |
| 16206 | Arklow Shipping Nederland BV. | P.O. Box 8746 | Rotterdam | NL |
| 12836 | Pan Oceanic Shipping (BVI) Ltd. | 300 Kensal Road | London | GB |
| 13892 | Crown Mary Shipping BV | c/o Echoship ApS | Svendborg | DK |
| 17951 | Zegluga Gdanska Spolka Z O.O. | ul. Ponczosznikow 2 | Gdansk | PL |
| 25055 | Petredec Ltd | c/o Petredec S.A.M. | Monaco | FR |

0030155-0001031 AMBA.3992481.11

ING   00050

| Number | Company | Address | City | | Country |
|---|---|---|---|---|---|
| 26930 | Space Shipping Ltd. | 198 Old Bakery Street | Valletta | | MT |
| 11429 | Schultz Shipping | Vestre Havneplads 2 | Kalundborg | | DK |
| 16682 | Unibaltic Shipping Ltd | 229, Arch Makarios III Ave | Limassol | | CY |
| 30300 | Masters/Owners/Charterers Ameland | Briese Chartering GMBH & CO. KG | Leer | | DE |
| 15670 | JSC "Fishing Fleet FOR" | Suvorova str. 57 | Kaliningrad | | RU |
| 11079 | Bominflot Ltd. (UK) | 5-7 Ravensbourne Road | Bromley, Kent | | GB |
| 29066 | Sirius Maritime Limited | 60 Nevis street, St. John's, Antigua | | 0 | LV |
| 23593 | K/S Erria Dorthe | 2nd Floor, Amager Strandvej 390 | Kastrup | | DK |
| 30310 | Sarmat Denizcilik Nakliyat | Kosuyolu, Cenap Sahabettin Sok. No:4 | Istanbul | | TR |
| 26281 | K/S Nordic Nelly | c/o Clipper Group A/S | København Ø | | DK |
| 25965 | Dalaro Shipping Ltd | A.T. Stavrinides Tower 3 rd Floor | Limassol | | CY |
| 23523 | Master/Owners of MV Amazondiep | c/o MTL Maritime Transport + Logistik | Duisburg | | DE |
| 23744 | Canada Feeder Lines BV | Hoge der A 9-1 | Groningen | | NL |
| 19966 | Uni-Chartering Ltd. Turkey | Bagdat Cad. Gocke Sok | Istanbul | | TR |
| 22990 | Master/Owners of 'MV Vikingdiep' | c/o MTL Maritime Transport + Logistik | Duisburg | | DE |
| 18810 | Fesco | Aleutskaya Str. 15 | Vladivostok | | RU |
| 15804 | Van Oord Dredging and Marine | Schaardijk 211 | Rotterdam | | NL |
| 22473 | Solda Trading S.A. | 34 Str. Cuba Avenue | Panama | | PA |
| 19336 | Master/Owners of MV 'VEERSEDIEP' | c/o MTL Maritime Transport+Logistik | Duisburg | | DE |
| 23592 | K/S Erria Julie | 2nd Floor, Amager Strandvej 390 | Kastrup | | DK |
| 24613 | TransAtlantic Lines LLC | c/o Transatlantic Lines terminal | Greenwich | | US |
| 13999 | Neste Oil OYJ | c/o Neste Oil Oyj, Marine Sales | Neste Oil | | FI |
| 12494 | Peter Madsen Rederi A/S | Godthåbsvej 89, 1. | Skanderborg | | DK |
| 28720 | Anship Company Limited | Stroenie 1 | Moscow | | RU |
| 30651 | Masters/Owners/Charterers Tiverton | Bremer Reederei und B GmbH | Bremen | | DE |
| 20779 | Daneborg Shipping Ltd | Lastekodu Str. 43 | Tallinn | | EE |
| 24939 | Carbofer Maritime Trading *BLOCKED* | c/o Carbofer General Tra ding SA | Copenhagen | | DK |
| 19403 | JSC "FC Sogra" | Smidta Str. 43, Office 524 | Murmansk | | RU |
| 13219 | Star Reefers Pool Inc. | 3rd Floor | London | | GB |
| 18737 | Ajax Offshore Bunkering Services Ltd. | 124 Ayias Paraskevis Street | Limassol | | CY |

0030155-0001031 AMBA:3992481.11

ING   00051

| 29716 | NTO Shipping GmbH & Co. | c/o MTL Maritime Transport & Logistik GM | Duisburg | | DE |
|---|---|---|---|---|---|
| 18914 | J Aron & Company Inc. | 85 Broad Street | New York | | US |
| 11462 | Trumf Bunker A/S | Turbinevej 10 | Middelfart | | DK |
| 11673 | P/R Anke Angela Kap. K.D.Oelze | Kullinggade 31E, 1.tv | Svendborg | | DK |
| 29569 | Schulte & Bruns UK Ltd | suite 2, First floor | Newcastle | | GB |
| 19332 | Master/Owners of MV 'VARNADIEP' | c/o MTL Maritime Transport+Logistik | Duisburg | | DE |
| 30342 | Transverde Freight SA | 3 Tobolskaya Street | St. Petersburg | | RU |
| 23065 | Sirius Chartering AB | Hälleflundregatan 16 | Västra Frölunda | | SE |
| 25672 | Master/Owners/Charterers of UBC Montreal | MTL Maritime Transport + Logistic GMBH&C | Duisburg | | DE |
| 27739 | Polaris Maritime Company Limited | 60 Nevis Street, St. John's, Antigua | | 0 | AG |
| 11222 | Fratelli Cosulich SpA (Genova) | Molo Ponte Morosini, 41 | Genova | | IT |
| 22680 | Trulsen Schiffahrt GmbH | Siemensstrasse 43 | Rellingen | | DE |
| 24780 | Nordtrade Ltd. | UniMarine Business Center | Riga | | LV |
| 23569 | Sia Unitek | 4, Katrinas Str. | Ventspils | | LV |
| 30826 | Sahin Gemicilik ve Denizcilik Nakliyat San | Sair Esref Bulvari No:23/5 | Çankaya - IZMIR | | TR |
| 30274 | Masters/Owners/Charterers Vegadiep | c/o MTL Maritime Transport & Logistik | Duisburg | | DE |
| 13211 | Neu Seeschiffahrt GmbH | Alsterufer 12 | Hamburg | | DE |
| 29868 | SweOffshore Maritime AB | Fabriksgatan 10 | Göteborg | | SE |
| 12704 | Torm A/S | Tuborg Havnevej 18 | Hellerup | | DK |
| 15423 | Fedcominvest Monaco Sam | 7, Boulevard de Moulins | Monaco | | MC |
| 11527 | JV 'ORIMI-SHIP' | 3, Tobolskaya Street | St. Petersburg | | RU |
| 19278 | CFD Shipping | 89, Lunina Ave., | Mariupol | | UA |
| 29124 | MV Jonas | c/o Rederei Gerd A. Görke | KORSOR | | DK |
| 28252 | M/V "Anne Dorte" | c/o Echoship ApS | Svendborg | | DK |
| 11634 | Topoil AB | Sven Källfelts gata 209 | Västra Frölunda | | SE |
| 30270 | Registered shipowner of Magdalena | Ilze Shipping Company Ltd | | 0 | AG |
| 30601 | K/S ID ICE | c/o Investeringsgruppen Danmark A/S | Hellerup | | DK |
| 29035 | Masters/Owners/Charterers Veelerdiep | c/o MTL Maritime Transport + Logistik | Duisburg | | DE |
| 27403 | Master/Owners of "Vriesendiep" | c/o MTL Maritime Transport+Logistik | Duisburg | | DE |
| 30081 | Gemini Maritime Company Limited | 60 Nevis Street St.John | Riga | | LV |

ING   00052

| 18880 | Rederi Ab Vidar | Hampspinnaregatan 2 A 4 | Åbo | FI |
|---|---|---|---|---|
| 21322 | OAO Atlantrybflot | 57 Suvorova Street | Kaliningrad | RU |
| 21996 | Cattlefield Shipping Limited | Agias Fylaxeos, 118 CHRISTABEL HOUSE, | Limassol | CY |
| 20119 | Istanbul Denizcilik Tasimacilik | Piyalepasa Bulvari Memorial Center | Okmeydani, Istanbul | TR |
| 10498 | O.W. Bunker Panama, S.A. | Diablo Heights | Panama | PA |
| 14285 | Wijnne & BarendsCargadoors- en | Handelskade Oost 5 | Delfzijl | NL |
| 30899 | Masters/Owners/Charterers Hollum | Briese Chartering GMBH & CO. KG | 0 | DE |
| 11613 | Echoship Aps | Kullinggade 31 E | Svendborg | DK |
| 15100 | Glander International Inc. | 2401 PGA Boulevard, Suite 236 | Palm Beach Gardens | US |
| 30630 | Nes h.f | Fjardargata 13 - 15 | 222 Hafnarfjordur | IS |
| 15631 | PK Dry Cargo S.R.L. | PK Drycargo Srl | Ravenna | IT |
| 14553 | MTL Maritime Transport & | August-Hirsch-Str.10 | Duisburg | DE |
| 27179 | Valhalla Marine Sarl | La Combe-Leonard 5 | Rochefort | CH |
| 30144 | Sagittarius Shipping Company Limited | 7 Visbijas prospekts | Riga | LV |
| 29797 | Ginsor Ltd | Quijano & Associates (BVI) Limited, Quij | Tortola | VG |
| 30273 | Olympian Enterprises Incorporated | c/o Diamantis Pateras Maritime Ltd | Majuro | MH |
| 23591 | K/S Erria Nimmer | 2nd Floor, Amager Strandvej 390 | Kastrup | DK |
| 11009 | JMB Bjerrum & Jensen ApS | Gyldenbjergsvej 10 | Svendborg | DK |
| 11586 | Tokyo Marine Co. Ltd. (Tokyo) | 1-1, 1-chome, Nihonbashi-Honcho | Tokyo | JP |
| 12847 | Deutsche Fischfang-Union | Postfach 540 | Cuxhaven | DE |
| 19328 | Masters/Own./Charters Slochterdiep | c/o MTL Maritime Transport & Logistik | Duisburg | DE |
| 27031 | Master/Owners/Charteres Velserdiep | MTL Maritime Transport & Logistik GmbH | Duisburg | DE |
| 19333 | Master/Owners of MV "VASADIEP" | c/o MTL Maritime Transport+Logistik | Duisburg | DE |
| 19339 | Master/Owners/Charterers "ZUIDERDIEP" | c/o MTL Maritime Transport + Logostik | Duisburg | DE |
| 30722 | Midland Drybulk Holding Limited | 24 De Castro Street, Wickhams Cay 1 | Road Town Tortola | VG |
| 25080 | FF-SKAGEN | Havnevagtvej 5 | Skagen | DK |
| 11544 | Diverse Debitorer **** not used***** | | 0 | 0 0 |
| 11089 | ICS Petroleum (Montreal) Ltd. | Suite 302 | Montreal, Q.C. | CA |
| 10489 | OW Tankers | Stigsborgvej 60 | Nørresundby | DK |
| 12670 | Målløy Havneservice | P.O. Box 132 | Målløy | NO |

| | | | | | |
|---|---|---|---|---|---|
| 30608 | Ocean Wave Maritime Co | 46 Filonos Street | | Piraeus | GR |
| 30641 | Hans-Peter Wegener KG ms Wega | c/o Reederei Hans Peter Wegener | | Jork | DE |
| 10168 | Rederiet O.W. Aalborg A/S | | 0 | Nørresundby | DK |
| 10169 | Rederiet O.W. Copenhagen A/S | | 0 | Nørresundby | DK |
| 23678 | K-Line (Europe) Ltd. | River Plate House | | London | GB |
| 16586 | Onego Shipping & Chartering B.V. | Spui 24 | | Rhoon | NL |
| 16095 | Fast Lines Belgium N.V. | Ernest Van Dijckkaai 15/17 | | Antwerp 1 | BE |
| 29475 | Holcim Agregati AD | Koste Racina nr.16 | | Belgrade | RS |
| 27442 | GT Trading Finland Oy | Haukilahdenkatu 5 B | | Espoo | FI |
| 29224 | K/S Navision Alliance | c/o Navision Chartering | | Hellerup | DK |
| 11024 | H. C. Grube | Enighedsstraede 1 | | Marstal | DK |
| 14701 | Atrica-Marine Ltd | Paljassaare 28 | | Tallinn | EE |
| 12306 | UAB "Juru agentura FORSA" | 21, J. Zauerveino Str. | | Klaipeda | LT |
| 29473 | FANTY G GMBH | Dunavska Str.26 | | Vidin | BG |
| 21167 | Global Yacht Fuel, Inc. | 412 S.e. 17th Street | | Fort Lauderdale | US |
| 11241 | Vista Shipping Agency A/S | 9 - 2, Lehiku Tee | | Tallinn | EE |
| 12288 | Seatamar Shipping GmbH & Co. KG | Deichstr. 27 | | Hamburg | DE |
| 30433 | Robertson Group Ltd | 3A, Little Denmark Complex, 147 main St. | | | VG |
| 11116 | Arklow Shipping | North Quay | | Co. Wicklow | IE |
| 30825 | Bordo Blue Shipping co. Ltd | Trust Company Complex Ajeltake Road | | Ajeltake Island | MH |
| 29342 | Carina Shipping Ltd. | c/o Daneborg Shipping Ltd. | | Talinn | EE |
| 13749 | Scan-Trans Chartering Aps *BLOCKED* | Vestre Kaj 6 | | Naestved | DK |
| 18418 | Safmarine Container Lines N.V. | De Gerlachekaai 20 | | Antwerp | BE |
| 30803 | Veritas Shipping Ltd. | 12/13 Vincenti Buildings, Strait Street | | Valetta | MT |
| 11797 | Hans Lehmann KG | Seelandstrasse 15 | | Lübeck | DE |
| 19650 | A2SEA A/S | Kongens Kvarter 51 | | Fredericia | DK |
| 29245 | MS "Saturn" | c/o Nørresundby Shipping A/S | | Aalborg | DK |
| 29114 | Sky Pacific Limited | Room 1211, Wing on centre | | Hong Kong | CN |
| 29549 | Fenja Reefer's International Ltd | Postveien 25 | | Skudeneshavn | NO |
| 11180 | Baltic Bunkering AB | Skarpängsvägen 29 | | Mariehamn | FI |

54

0030155-0001031 AMBA.3992481 11

| 29497 | FM Bunkering | Tellenmattstrasse 23, | Oberwil b. Zug | CH |
| 30085 | Iskes Offshore BV | Centerhavn 23 | Fredericia | DK |
| 12641 | Balta SA | Ul. Mariacka 4 | Gdansk | PL |
| 30806 | Owners Lisa S | O/C JMB Bjerrum & Jensen ApS | Svendborg | DK |
| 29123 | UMS Ltd. | 17a Duntes Str | Riga | LV |
| 30492 | Reederei H.-P. Wegener | Groß Hove 82a | | DE 0 |
| 13702 | Sirius Rederi AB | P.O. Box 39 | Donsö | SE |
| | M/S "Marie Lehmann" Schifffahrts-GmbH & | | | |
| 29347 | Co | Seelandstrasse 15 | Lübeck | DE |
| 30700 | Offshore Marine Services Aps | Nordic Offshore Marine | Faaborg | DK |
| 16531 | Interbunker Management Ltd. | Othon Court Office No 3 | Limassol | CY |
| 29254 | Reederei Lehmann GmbH & Co. KG | Seelandstrasse 15 | Lübeck | DE |
| 11750 | Preem  AB | FE 2000 | Sandviken | SE |
| 28868 | Rederiet Junior ApS | Ndr. Kajgade 9 A | Svendborg | DK |
| 28286 | Bravo Shipping Ltd. | 198 Old Bakery Street, | Valetta | MT |
| 16819 | Reiter Petroleum Inc. | 625 President Kennedy | Montreal, Quebec | CA |
| 11943 | Oliuverzlun Islands HF | Hofdatun 2 | Reykjavik | IS |
| 21799 | Vardberg Fisheries Inc. | c/o Maritime Management AS | Aalesund | NO |
| 10086 | OWB Group Administration | Stigsborgvej 60 | Nørresundby | DK |
| 13962 | Ship-Service SA | Lucka 7/9 | Warszawa | PL |
| 30663 | Misr Petroleum Co. | P.O. Box 228 | Cairo | EG |
| 10034 | O.W. Bunker (Netherlands) B.V. | Waalhaven O.Z. 83- Gebouw 1, 1st Floor | Rotterdam | NL |
| 15898 | OOO "Refrybflot Shipping Company" | 1 Epronozskaya Str., 4th Floor | Kaliningrad | RU |
| 21566 | OOO "Komtreyd" - Winbox | Aleksandra Nevskogo-9, 424 | St. Petersburg | RU |
| 13021 | Hanwa Co. Ltd., Tokyo | 6-18-2 Ginza, Chuo-ku | Tokyo | JP |
| 10051 | Wrist Europe (Aalborg) | Stigsborgvej 60 | Nørresundby | DK |
| 10002 | O.W. Bunker Copenhagen A/S | Strandvejen 58 st.th. | Hellerup | DK |
| 10828 | Ove Wrist Group | Stigsborgvej 60 | Nørresundby | DK |
| 20034 | Sea Trader International Ltd | Suite 1702, 17th Floor, Chinachem Centu | Wanchai | HK |
| 10033 | O.W. Group Administration A/S | Stigsborgvej 60 | Nørresundby | DK |

0030155-0001031 AMBA:3992481.11

ING    00055

| 10094 | Wrist Marine Logistics | Stigsborgvej 60 | Nørresundby | | DK |
|-------|------------------------|----------------|-------------|---|----|
| 10052 | Seastar Catering | Stigsborgvej 60 | Nørresundby | | DK |
| 29229 | OMV Istrabenz Ltd | Ferrarska 7 | Slovenia | | SI |
| 10049 | O.W. Bunker (Belgium) NV | Tavernierkaai 2 | Antwerp | | BE |
| 11274 | Arctic Oil AS – Commission | | 0 | 0 | NO |
| 10090 | Rederiet OW Scandinavia A/S | Stigsborgvej 60 | Nørresundby | | DK |

56

0030155 0001031 AMBA:3992481.11

ING    00056

Execution Version

## SCHEDULE 4

## DELIVERABLES: INTERCOMPANY RECEIVABLES

### PART 1

### FORM OF NOTICE OF ASSIGNMENT

To:     All Debtors within the Group

[Date]

Dear Sirs,

**English Omnibus Security Agreement dated [         ] between (amongst others) O.W. Bunker & Trading A/S and ING Bank N.V. as Security Agent (the Security Agreement)**

This letter constitutes notice to you that under the Security Agreement we have assigned by way of security to ING Bank N.V. (the **Security Agent**) all our rights in respect of each intra-group loan or other arrangement which we have made available to you (the **Intra-Group Loans**).

We confirm that:

(a)     we will remain liable under the Intra-Group Loans to perform all the obligations  assumed  by us under the Intra-Group Loans; and

(b)     none of the Security Agent, its agents, any receiver or any other person will at any time be under any obligation or liability to you under or in respect of the Intra-Group Loans.

We will also remain entitled to exercise all our rights, powers and discretions under the Intra-Group Loans, and you should continue to give notices under the Intra-Group Loans to us and to make payments under the Intra-Group Loans to the following account [*details of Collection Account*], unless and until you receive notice from the Security Agent to the contrary.  In this event, all the rights, powers and discretions will be exercisable by, and notices must be given to, the Security Agent or as it directs.

This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Please acknowledge receipt of this letter by sending the attached acknowledgement to the Security Agent at ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP N 04 046) Attention: Agency Desk – Ops & IT Banking Wholesale Lending Operations Agency, with a copy to us.

ING     00057

Yours faithfully,


O.W. BUNKER & TRADING A/S                          )
acting by                                          )
                                                   )Title:


O.W. SUPPLY & TRADING A/S                          )
acting by                                          )
                                                   )Title:


O.W. BUNKERS (UK) LIMITED                          )
acting by                                          )
                                                   )Title:


O.W. BUNKER GERMANY GMBH                           )
acting by                                          )
                                                   )Title:


O.W. BUNKER CHINA LIMITED                          )
acting by                                          )
                                                   )Title:


O.W. BUNKER MALTA LTD.                             )
acting by                                          )
                                                   )Title:


O.W. BUNKER (NETHERLANDS) B.V.                     )
acting by                                          )
                                                   )Title:


BERGEN BUNKERS AS                                  )
acting by                                          )
                                                   )Title:


DYNAMIC OIL TRADING (SINGAPORE) PTE. LTD.)
acting by                                          )
                                                   )Title:


O.W. BUNKER FAR EAST (SINGAPORE) PTE LTD  )
acting by                                          )
                                                   )Title:


O.W. BUNKER (SWITZERLAND) SA                       )
acting by                                          )
                                                   )Title:


O.W. GLOBAL TRADING SA                             )
acting by                                          )
                                                   )Title:

ING   00058

O.W. BUNKER MIDDLE EAST DMCC                )
acting by                                   )
                                            )Title:


O.W. BUNKER NORTH AMERICA INC.              )
acting by                                   )
                                            )Title:

O.W. BUNKER USA INC.                        )
acting by                                   )
                                            )Title:

ING     00059

## PART 2

## FORM OF ACKNOWLEDGMENT OF DEBTOR

To:    ING Bank N.V. as Security Agent

Copy:  O.W. Bunker & Trading A/S, [Group Treasury Manager]

[Date]

Dear Sirs,

We confirm receipt from (amongst others) [               ] (the **Chargor**) of a notice dated [               ] of an assignment on the terms of the Security Agreement dated [               ] (the **Security Agreement**) of all the Chargor's rights in respect of all intra-group loans and arrangements made available to us (the **Intra-Group Loans**).

We confirm that we will pay all sums due, and give notices, under the Intra-Group Loans as directed in that notice.

We confirm that we will not take or omit to take any action which might impair the priority achieved or intended to be achieved by the Security Agreement.

This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Yours faithfully,

................................

(Authorised signatory)

[Debtors]

ING    00060

## SCHEDULE 5

## DELIVERABLES: SUPPLY CONTRACTS

## PART 1

## FORM OF INVOICE NOTIFICATION

NOTICE OF ASSIGNMENT OF RIGHTS

All [*name of Danish Receivables Chargor*]'s rights under this invoice and the supply contract between us (the **Supply Contract**) have been assigned in favour of ING Bank N.V. pursuant to a security agreement dated [●] 2013. You are authorised and instructed without further obligation to [*name of Danish Receivables Chargor*] to pay all amounts payable under this invoice to the following account with ING Bank N.V.:

[*insert Blocked Collection Account details*]

Any amendment to these payment instructions may not be made without the express written consent of ING Bank N.V.

ING     00061

## PART 2

## FORM OF NOTICE OF ASSIGNMENT

To:      [Supply Contract counterparty]

[Date]

Dear Sirs,

**English Omnibus Security Agreement dated [          ] between (amongst others) O.W. Bunker & Trading A/S and ING Bank N.V. as Security Agent (the Security Agreement)**

This letter constitutes notice to you that under the Security Agreement we have assigned by way of security to ING Bank N.V. (the **Security Agent**) all our rights in respect of the supply contract between us as may be constituted or supplemented by the OWB general terms and conditions as provided to you and as amended, restated or supplemented from time to time (the **Contract**).

We confirm that:

(c)      we will remain liable under the Contract to perform all the obligations assumed by us under the Contract; and

(d)      none of the Security Agent, its agents, any receiver or any other person will at any time be under any obligation or liability to you under or in respect of the Contract.

We will also remain entitled to exercise all our rights, powers and discretions under the Contract, and you should continue to give notices under the Contract to us, unless and until you receive notice from the Security Agent to the contrary. In this event, all the rights, powers and discretions will be exercisable by, and notices must be given to, ING Bank N.V. or as it directs.

We authorise and instruct you without further obligation to us to pay all amounts payable under any invoice issued in respect of the Contract to the following account with ING Bank N.V.:

*[Receivables Chargors: insert Collection Account details]*
*[Danish Receivables Chargors: insert Blocked Collection Account details]*

Any amendment to these payment instructions may not be made without the express written consent of ING Bank N.V.. Any such payment by you will extinguish the corresponding payment obligation to us in respect of that particular invoice under the Contract.

*[Danish Receivables Chargors:* Please note that we have agreed that we will not enter into any new one-time contract, or contract used as a framework agreement (howsoever described) or overarching general terms and conditions which would materially alter the Contract without the prior written consent of the Security Agent]

This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Please acknowledge receipt of this letter by sending the attached acknowledgement to the Security Agent at ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP

ING   00062

N 04 046) Attention: Agency Desk – Ops & IT Banking Wholesale Lending Operations Agency, with a copy to us.

Yours faithfully,

................................

*[Receivables Chargor][Danish Receivables Chargor]*

(Authorised signatory)

ING    00063

# PART 3

## FORM OF ACKNOWLEDGMENT

To:     ING Bank N.V. as Security Agent

Copy:   [Receivables Chargor][Danish Receivables Chargor]

[Date]

Dear Sirs,

We confirm receipt from [            ] (the **Chargor**) of a notice dated [            ] of an assignment on the terms of the Security Agreement dated [            ] 2013 of all the Chargor's rights in respect of the supply contract between us to which each invoice issued by you to us relates, as may be constituted or supplemented by the OWB general terms and conditions as provided by you to us and as amended, restated or supplemented from time to time (the **Contract**).

We confirm that we will pay all sums due, and give notices, under the Contract as directed in that notice.

This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Yours faithfully,

................................

(Authorised signatory)

*[Supply Contract Counterparty]*

ING    00064

## SCHEDULE 6

## DELIVERABLES: INSURANCES

## PART 1

## FORM OF NOTICE OF ASSIGNMENT

### (for attachment by way of endorsement to the Insurance Policies)

To:     [Insurer]

Copy:   ING Bank N.V. (the **Security Agent**)

[Date]

Dear Sirs,

### Security agreement dated [●] 2013 between O.W. Bunker & Trading A/S and others and the Security Agent (the Security Agreement)

This letter constitutes notice to you that under the Security Agreement, [each of the companies listed at the end of this notice as chargors (together the **Chargors**)][*in respect of Dynamic Credit Insurance: Dynamic Oil Trading (Singapore) Pte. Ltd. (the* **Chargor**)] has assigned in favour of the Security Agent as agent and trustee for the Finance Parties referred to in the Security Agreement (the **Security Agent**) as first priority assignee all amounts payable to it under or in connection with the contract of insurance (with reference number [●]) taken out with you by or on behalf of it or under which it has a right to claim (and any renewal or replacement of such contract of insurance) and all of its rights in connection with those amounts.

A reference in this letter to any amounts excludes all amounts received or receivable under or in connection with any third party liability insurance and required to settle a liability of a Chargor to a third party.

On behalf of [each of] the Chargor[s], we confirm that:

(a)     the [relevant] Chargor will remain liable under each such contract of insurance to perform all the obligations assumed by it under that contract of insurance; and

(b)     none of the Security Agent, its agents, any receiver or any other person will at any time be under any obligation or liability to you under or in respect of any such contract of insurance.

The [relevant] Chargor will also remain entitled to exercise all of its rights under each such contract of insurance and you should continue to give notices under each such contract of insurance to the relevant Chargor, unless and until you receive notice from the Security Agent to the contrary.  In this event, unless the Security Agent otherwise agrees in writing:

(a)     all amounts payable to the [relevant] Chargor under each such contract of insurance must be paid to the Security Agent; and

(b)     any rights of the [relevant] Chargor in connection with those amounts will be exercisable by, and notices must be given to, the Security Agent or as it directs.

ING   00065

The instructions in this letter may not be revoked or amended without the prior written consent of the Security Agent.

Please note on the relevant contracts the Security Agent's interest as sole loss payee (as per the agreed loss payable clause to be provided to you within 10 Business Days of this notice by the Chargor[s], which loss payable clause may not be revoked without the prior written consent of the Security Agent) and the Security Agent's interest as first priority assignee of those amounts and rights and send to the Security Agent at ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP N 04 046) Attention: Agency Desk – Ops & IT Banking Wholesale Lending Operations Agency, with a copy to ourselves the attached acknowledgement confirming your agreement to the above and giving the further undertakings set out in the acknowledgement.

We acknowledge that you may comply with the instructions in this letter without any further permission from us and without any enquiry by you as to the justification for or validity of any request, notice or instruction.

This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Yours faithfully,

……………………………………
For *[CHARGORS]*

ING    00066

## PART 2

## FORM OF LETTER OF UNDERTAKING

To:     ING Bank N.V. (the **Security Agent**)

Copy:   [Chargors]

[Date]

Dear Sirs,

**Security agreement dated [●] 2013 between O.W. Bunker & Trading A/S and others
and the Security Agent (the Security Agreement)**

We confirm receipt from certain chargors (the **Chargors**) of a notice dated [●] of an assignment by each Chargor upon the terms of the Security Agreement of all amounts payable to it under or in connection with any contract of insurance taken out with us by or on behalf of it or under which it has a right to claim (the **Policy**) and all of its rights in connection with those amounts.

We confirm receipt of the attached agreed loss payable clause which may not be revoked without the prior written consent of ING Bank N.V..

A reference in this letter to any amounts excludes all amounts received or receivable under or in connection with any third party liability insurance and required to settle a liability of a Chargor to a third party.

In consideration of your agreeing to the Chargors or any of them continuing their insurance arrangements with us we:

1.      accept the instructions contained in the notice and agree to comply with the notice and undertake to endorse the notice and agreed loss payable clause on the Policy;

2.      confirm that we have not received notice of the interest of any third party in those amounts and rights;

3.      undertake to note on the Policy your interest as loss payee in accordance with the agreed loss payable clause and as first priority assignee of those amounts and rights;

4.      undertake to disclose to you without any reference to or further authority from any Chargor any information relating to the Policy which you may at any time request (including the amount of any outstanding premia);

5.      undertake to notify you of any breach by any Chargor of any of the Policy and to allow you or any of the other Secured Creditors (as defined in the Security Agreement) to remedy that breach; and

6.      undertake to forward to you promptly any notice of cancellation in respect of the Policy received by us from the underwriters.

This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

ING   00067

Yours faithfully,

…………………………..
for [Insurer]

[*AGREED LOSS PAYABLE CLAUSE TO BE ATTACHED*]

ING     00068

## SCHEDULE 7

## DELIVERABLES: BROKERAGE AGREEMENTS

## PART 1

## FORM OF NOTICE OF ASSIGNMENT

To:     [Broker]

[Date]

Dear Sirs,

**English Omnibus Security Agreement dated [          ] between (amongst others) O.W. Bunker & Trading A/S, O.W. Supply & Trading A/S and ING Bank N.V. as Security Agent (the Security Agreement)**

This letter constitutes notice to you that, with your prior written consent, under the Security Agreement we have assigned by way of security to ING Bank N.V. (the **Security Agent**) all our rights in respect of each amount owing, or to be owed, by you to us under the [*describe relevant brokerage agreement*] between us (the **Brokerage Agreement**).

We confirm that:

(a)     we will remain liable under the Brokerage Agreement to perform all the obligations assumed by us under the Brokerage Agreement; and

(b)     none of the Security Agent, its agents, any receiver or any other person will at any time be under any obligation or liability to you under or in respect of the Brokerage Agreement.

We will also remain entitled to exercise all our rights, powers and discretions under the Brokerage Agreement, and you should continue to give notices under the Brokerage Agreement to us and to make payments under the Brokerage Agreement to the following account [*details of Collection Account / Blocked Collection Account*], unless and until you receive notice from the Security Agent to the contrary. In this event, all the rights, powers and discretions will be exercisable by, and notices must be given to, the Security Agent or as it directs. Any amendment to these payment instructions may not be made without the express written consent of ING Bank N.V..

This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Please acknowledge receipt of this letter by sending the attached acknowledgement to the Security Agent at ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP N 04 046) Attention: Agency Desk – Ops & IT Banking Wholesale Lending Operations Agency, with a copy to O.W. Bunker & Trading A/S.

ING    00069

Yours faithfully,


[O.W. BUNKER & TRADING A/S                    )
acting by                                      )
                                               )Title: ]

[O.W. SUPPLY & TRADING A/S                     )
acting by                                      )
                                               )Title: ]

ING     00070

## PART 2

## FORM OF ACKNOWLEDGMENT OF BROKER

To:     ING Bank N.V. as Security Agent

Copy:   O.W. Bunker & Trading A/S, [Group Treasury Manager]

[Date]

Dear Sirs,

We confirm receipt from [O.W. Bunker & Trading A/S][O.W. Supply & Trading A/S] (the **Chargor**) of a notice dated [          ] (the **Notice**) of an assignment on the terms of the Security Agreement dated [          ] (the **Security Agreement**) of all the Chargor's rights in respect of each amount owing, or to be owed, by us to the Chargor under the Brokerage Agreement.  Capitalised terms used in this acknowledgement shall have the meaning ascribed to such terms in the Notice.

We confirm that we will pay all sums due, and give notices, under the Brokerage Agreements as directed in that Notice.

This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Yours faithfully,

...............................

(Authorised signatory)

*[Broker]*

ING    00071

## SIGNATORIES

**Chargors**

EXECUTED as a deed by
**O.W. BUNKER & TRADING A/S**
as Danish Receivables Chargor, Insurance Chargor, Intra-Group Chargor and Brokerage Chargor

acting by _____  ) MORTEN SKOU
                                )Title: Attorney-in-fact

acting by _____  ) JIM PEDERSEN
                                )Title: Attorney-in-fact

Witness:
Name:  KENT LARSEN
Address:  MULTEBÆRVEJ 4
          9440 AABYBRO

EXECUTED as a deed by
**O.W. SUPPLY & TRADING A/S**
as Danish Receivables Chargor, Insurance Chargor, Intra-Group Chargor and Brokerage Chargor

acting by _____  ) MORTEN SKOU
                                )Title: Attorney-in-fact

acting by _____  ) JIM PEDERSEN
                                )Title: Attorney-in-fact

Witness:
Name:  KENT LARSEN
Address:  MULTEBÆRVEJ 4
          9440 AABYBRO

EXECUTED as a deed by
**O.W. BUNKERS (UK) LIMITED**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by _____  ) MORTEN SKOU
                                )Title: Attorney-in-fact

acting by _____  ) JIM PEDERSEN
                                )Title: Attorney-in-fact

Witness:
Name:  KENT LARSEN
Address:  9440 AABYBRO

ING   00072

EXECUTED as a deed by
**O.W. BUNKER GERMANY GMBH**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by _____ )   MORTEN SKOU
                                                        )Title: Attorney-in-fact

acting by _____ )   JIM PEDERSEN
                                                        )Title: Attorney-in-fact

Witness:
Name:       KENT LARSEN
Address:    MULTEBARVEJ 4
                  9440 AABYBRO

SIGNED, SEALED and DELIVERED                )
as a deed by                                                   )
**O.W. BUNKER CHINA LIMITED**                   )
as Receivables Chargor, Insurance Chargor and
Intra-Group Chargor
acting by its duly authorised attorneys            )
MORTEN SKOU _____ and  JIM PEDERSEN  )
in the presence of:

Witness:          KENT LARSEN
Signature: ..........................................

⊙ L.S

EXECUTED as a deed by
**O.W. BUNKER MALTA LTD.**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by _____ )   MORTEN SKOU
                                                        )Title: Attorney-in-fact

acting by _____ )   JIM PEDERSEN
                                                        )Title: Attorney-in-fact

Witness:
Name:       KENT LARSEN
Address:    MULTEBARVEJ 4
                  9440 AABYBRO

ING   00073

EXECUTED as a deed by
**O.W. BUNKER (NETHERLANDS) B.V.**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by _____ )   MORTON SKOU
)Title: Attorney-in-fact

acting by _____ )   JIM PEDERSEN
)Title: Attorney-in-fact

Witness:
Name:   KENT LARSEN
Address:   MULTEBÆRVEJ 4
9440 AABYBRO

EXECUTED as a deed by
**BERGEN BUNKERS AS**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by _____ )   MORTEN SKOU
)Title: Attorney-in-fact

acting by _____ )   JIM PEDERSEN
)Title: Attorney-in-fact

Witness:
Name:   KENT LARSEN
Address:   MULTEBÆRVEJ 4
9440 AABYBRO

EXECUTED as a deed by
**O.W. BUNKER PANAMA S.A.**
as Insurance Chargor and Intra-Group Chargor

acting by _____ )   MORTEN SKOU
)Title: Attorney-in-fact

acting by _____ )   JIM PEDERSEN
)Title: Attorney-in-fact

Witness
Name:   KENT LARSEN
Address:   MULTEBÆRVEJ 4
9440 AABYBRO

ING   00074

EXECUTED as a deed by
**DYNAMIC OIL TRADING (SINGAPORE) PTE. LTD.**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by its Attorney,

_____, pursuant to a Power of Attorney dated ___9 DECEMBER 2013___
MORTEN SKOU

acting by its Attorney,

_____, pursuant to a Power of Attorney dated ___9 DECEMBER 2013___
JIM PEDERSEN
in the presence of:-

Witness:     KENT LARSEN
Name.        MULTEBAERVEJ 4
Address:     9440 AABYBRO

EXECUTED as a deed by
**O.W. BUNKER FAR EAST (SINGAPORE) PTE LTD**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by its Attorney,

_____, pursuant to a Power of Attorney dated ___19 DECEMBER 2013___
MORTEN SKOU

acting by its Attorney,

_____, pursuant to a Power of Attorney dated ___19 DECEMBER 2013___
Jim PEDERSEN
in the presence of:-

Witness:     KENT LARSEN
Name:        MULTEBAERVEJ 4
Address:     9440 AABYBRO

EXECUTED as a deed by
**O.W. BUNKER (SWITZERLAND) SA**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by _____ )
          JIM PEDERSEN        )Title: Attorney-in-fact

acting by _____ )
          MORTEN SKOU         )_____

ING    00075

)Title: Attorney-in-fact

Witness:
Name: *KENT LARSEN*
Address: *MULTEBARVEJ 4*
*9440 AABYBRO*

EXECUTED as a deed by
**O.W. GLOBAL TRADING SA**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by _____ ) *MORTEN SKOU*
                                )Title: Attorney-in-fact

acting by _____ ) *JIM PEDERSEN*
                                )Title: Attorney-in-fact

Witness:
Name: *KENT LARSEN*
Address: *MULTEBARVEJ 4*
*9440 AABYBRO*

EXECUTED as a deed by
**O.W. BUNKER MIDDLE EAST DMCC**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by _____ ) *MORTEN SKOU*
                                )Title: Attorney-in-fact

acting by _____ ) *JIM PEDERSEN*
                                )Title: Attorney-in-fact

Witness:
Name: *KENT LARSEN*
Address: *MULTEBARVEJ 4*
*9440 AABYBRO*

EXECUTED as a deed by
**O.W. BUNKER NORTH AMERICA INC.**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by _____ ) *MORTEN SKOU*
                                )Title: Attorney-in-fact

acting by _____ ) *JIM PEDERSEN*
                                )Title: Attorney-in-fact

Witness:
Name: *KENT LARSEN*
Address: *MULTEBARVEJ 4*
*9440 AABYBRO*

ING    00076

EXECUTED as a deed by
**O.W. BUNKER USA INC.**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor

acting by _____ )   MORTEN SKOU
                          )Title: Attorney-in-fact

acting by _____ )   JIM PEDERSEN
                          )Title: Attorney-in-fact

Witness:
Name:
Address:

KENT LARSEN
MULTEBÆRVEJ 4
9440 AABYBRO

**Security Agent**

ING BANK N.V.

acting by _____ )_____
                          )Title:

acting by _____ )_____
                          )Title:

ING   00077

EXECUTED as a deed by
**O.W. BUNKER USA INC.**
as Receivables Chargor, Insurance Chargor and Intra-Group Chargor


acting by _____)_____
                                                           )Title: Attorney-in-fact


acting by _____)_____
                                                           )Title: Attorney-in-fact
Witness:
Name:
Address:


**Security Agent**

ING BANK N.V.

acting by _____) _Director_____
              _R. M. Rhut_                  )Title:

acting by _____)_____
              _F. DEELEN_                   )Title: _MANAGING DIRECTOR_

ING    00078

# **Exhibit 41**

1
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2
     *********************************************************
3
VALERO MARKETING AND
SUPPLY COMPANY
4
                                   Docket No. 2:14-CV-02712
5                                  Section G
                                   New Orleans, Louisiana
6                                  February 3, 2016

7    M/V ALMI SUN, IMO NO. 9579535,
     Her Engines, Apparel, Furniture,
8    Equipment, Appurtenances,
     Tackle, etc., *in rem*
9
     *********************************************************
10
         TRANSCRIPT OF THE CROSS-MOTION FOR SUMMARY JUDGMENT
11       HEARD BEFORE THE HONORABLE NANNETTE JOLIVETTE BROWN
               UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14   FOR THE PLAINTIFF:          MR. THOMAS JAMES WAGNER
                                 MR. MICHAEL H. BAGOT, JR.
15                               Wagner, Bagot & Rayer LLP
                                 Pan American Life Center
16                               601 Poydras Street
                                 Suite 1660
17                               New Orleans, LA  70130-6029
                                 twagner@wb-lalaw.com
18
     FOR THE DEFENDANT:          MR. GARY ALAN HEMPHILL
19                               Phelps Dunbar, LLP
                                 Canal Place
20                               365 Canal Street
                                 Suite 2000
21                               New Orleans, LA  70130-6534
                                 gary.hemphill@phelps.com
22
     Official Court Reporter:    Lanie M. Smith, RPR, CRR
23                               500 Poydras Street, B-275
                                 New Orleans, Louisiana 70130
24                               (504) 589-7782

25        Proceedings recorded by mechanical stenography,
     transcript produced via computer.

1           **P R O C E E D I N G S**

2              (Call to order of the court.)

3           THE COURTROOM MANAGER:  We have Civil Action 14-2712,

4    *Valero Marketing and Supply Company versus M/V ALMI SUN.*

5              Counsel, make your appearance, please.

6           MR. WAGNER:  Tom Wagner and Michael Bagot for the

7    plaintiff, Valero Marketing.

8           MR. HEMPHILL:  Gary Hemphill for the claimant in the

9    *in rem* action, Verna Marine.

10          THE COURT:  All right.  And whose motion is this?

11   We're hearing the cross-motion for summary judgment.  That

12   would be your motion, correct?

13          MR. HEMPHILL:  Yes, Your Honor.

14             Your Honor, may I say for the record -- and I'm

15   sure I speak for Mr. Wagner -- that neither he nor I were ever

16   as young as those three candidates you just admitted.  We

17   certainly didn't appear that way ever.

18             It is my motion, Your Honor; but it occurred to

19   me that in light of the three specific questions that you asked

20   us to be prepared to address, you may prefer to hear from

21   Valero first since the questions appear to be directed to them.

22          THE COURT:  Not necessarily.  It's the -- I mean, I'll

23   ask you.  I was grappling with -- I think they filed a motion

24   for reconsideration in the interim and still going back and

25   forth so maybe I was a little bit more focused on their

1    questions -- I mean, questions I needed to ask them.

2         But let me ask you:  Is it Verna's position that

3    you don't have to pay anyone for the bunkers?

4         MR. HEMPHILL:  Absolutely not, Your Honor.  We have an

5    obligation to one party or the other, and we're prepared to pay

6    one party or the other.  Obviously we just don't want to pay

7    twice.  One of the things that we were able to establish in the

8    deposition of our corporate representative last week -- which,

9    of course, I knew already -- is that my client has actually put

10   up security now in two different jurisdictions.  We put up a

11   letter of undertaking here for $200,000 to secure the claims so

12   the vessel could be released; and we put up comparable security

13   of $279,000 in the English arbitration proceedings.

14        The reason for the difference is in English

15   arbitration, as the Court knows, attorneys' fees are

16   recoverable and here they are not.  To obtain that security, my

17   client had to put up an equivalent amount of cash to secure

18   those letters of undertaking which were issued by an

19   underwriter.  These are not insured claims; but the underwriter

20   agreed to post that security in exchange for my client, as I

21   say, putting up cash security.

22        So we now have $479,000 of cash tied up in

23   connection with the purchase of bunkers of less than $125,000.

24   If we got to the point in this case where there was a final

25   unappealable judgment finding that we were not responsible to

1   Valero, then payment would be paid to the OW entities and their

2   receivers and ING Bank that have made the claim that is secured

3   in England.  And it might be appropriate for me at this point

4   to remind the Court of the last time you and I had a conference

5   together, which was by telephone just last week in connection

6   with the attachments prompted by ING Bank.

7            THE COURT:  Okay.  You're involved in that case as

8   well.

9            MR. HEMPHILL:  Yes, ma'am.  On behalf of the vessel

10  owner.  And it's relevant because this is precisely the same

11  set of circumstances; and it's important because it

12  demonstrates to the Court that ING Bank, which is the successor

13  in interest to the OW entities which are in receivership, are

14  aggressively pursuing these claims.  So the vessels involved in

15  that particular claim were subject to Rule B attachments; and

16  as the Court knows, a total of over $3 million of security,

17  both in New York and here, was posted.

18            So this is not an idle threat.  We're not

19  inventing this risk of double liability.  It's a very real,

20  tangible thing and certainly -- I'll repeat.  We recognize that

21  we owe someone.  We're anxious to pay someone and put this

22  behind us.  We're taking all these steps simply to try to avoid

23  having to pay twice.

24            Your Honor, this issue has been well-briefed.

25  The Court wrote a very detailed 30-page order so I won't rehash

1  those legal issues, but I will try to address specifically the

2  three questions the Court posed.

3          The first being basically what happened in the

4  corporate deposition of our representative and the answer is

5  there was nothing new.  The Witness confirmed that OW Bunkers

6  Malta, which is the entity with which he dealt -- and just by

7  way of a quick background --

8          THE COURT:  They're in bankruptcy too, right?

9          MR. HEMPHILL:  All the OW Bunker entities are, yes,

10  ma'am.

11          My client, through their technical manager, dealt

12  with OW Bunker Malta.  OW Bunker Malta, pursuant to some

13  contractual agreement that no one is privy to and we can't get

14  because they're in bankruptcy, then subcontracted that

15  obligation to OW Bunker USA based in Connecticut, also in

16  bankruptcy and then OW Bunker USA contracted with Valero.  So

17  that's the arc of the contractual relations.

18          Our corporate representative confirmed that

19  OW Malta was not his company's agent, that all that he did was

20  make a purchase from OW Bunker Malta, that he had absolutely no

21  direct communications with Valero at any time and no

22  contractual relationship with Valero at any time.

23          The second question -- well, before I go to the

24  second question, I think just as a general observation then the

25  record is totally devoid of any evidence that there was an

1    agency relationship between my client and any OW entity.

2    That's consistent with all the documents that we've seen,

3    Your Honor.  And, if I may, you have seen most of these; but

4    let me just quickly refer to them because they're very relevant

5    in this context.  This is the sales contract confirmation --

6    and this is in the record as Document 14-3 -- and I've

7    highlighted there this is from Valero; and they're clearly

8    saying that it is sold to OW Bunker USA, Inc.  No mention of my

9    client or the technical managers of the vessel -- none

10   whatsoever.  And then in this other paragraph I've highlighted

11   here, it clearly says the agreement is between David Olson of

12   Valero and OW Bunker USA.  So clearly from Valero's standpoint,

13   before all of this blew up, they considered that they had a

14   contractual relationship strictly with OW Bunker USA.  No

15   mention of any contractual arrangement with the owners of the

16   vessel.  There's no allegation that they made any attempt to

17   contact the owners of the vessel until the OW entities went

18   into bankruptcy.  That was the sales order confirmation.

19          That was followed up with this document which was

20   the actual invoice that Valero sent to OW Bunker USA.  And,

21   again, the communications are strictly between Valero and its

22   customer, OW Bunker USA.  No invoice was sent to my client, no

23   communication was sent to my client at the time the services

24   were provided and my client didn't enter into the picture at

25   all until the OW entities went bankrupt.  On the other end of

1  the transaction, this is the document -- again, this is already

2  in the record, but it's worth taking a look at.  This is the

3  sales order confirmation that OW Malta sent to my client.  And

4  Almi Tankers here, just for the record -- and this was

5  explained in the corporate deposition -- is the technical

6  manager of my client Verna.  So they were acting on behalf of

7  Verna when they contacted OW Malta.

8         So you can see, Your Honor, there's a very

9  typical and straightforward contractual and commercial

10  relationship.  There was a sale from Valero to OW USA, some

11  sort of transfer.

12         THE COURT:  Hold on a second.  (Conferring with law

13  clerk.)

14         I'm sorry.  Go ahead.

15         MR. HEMPHILL:  So there was a straightforward, very

16  traditional, very standard set of commercial transactions so

17  that there were contracts between Valero and OW and a separate

18  contract between OW and my client.

19         There's been a suggestion, without any proof at

20  all, that OW was actually acting as the agent for my client

21  and, again, a suggestion that OW was simply in the business of

22  being some kind of broker, that they would be the middleman in

23  this sort of transaction and just take a commission.  Well,

24  there's no evidence to support that.  The corporate

25  representative that we presented said that he felt that -- that

1   he never had any dealings with Valero at all.  He dealt only

2   with OW and as far as he was concerned OW was the seller --

3           THE COURT:  Well, that's the real -- sort of what the

4   real divide is -- isn't that correct -- to understand the case

5   law correctly?  If these facts that are largely undisputed are

6   characterized as a contractor/subcontractor situation, then

7   clearly the law of the circuit says that there is no maritime

8   lien on the vessel.  However, if these facts -- again, that

9   don't seem to be disputed -- are characterized as more of a

10  middleman situation, then there would be a lien.

11          MR. HEMPHILL:  I think that's correct, Your Honor; and

12  I think you've analyzed the facts as we've presented them to

13  you -- which are largely not in dispute -- very well in your

14  order.  You are my best authority in this courtroom on how

15  those facts should be viewed.  I think it's important to note

16  that the facts really aren't in dispute, and that it is a

17  question that's ripe for summary judgment.

18              There was one other thing I wanted to present to

19  the Court and ask the Court to take judicial notice of and this

20  is an article, Your Honor, from a trade publication called

21  *Ship & Bunker* and it's dealing with the fallout from the demise

22  of the OW entities.  And the part I've highlighted here, I

23  think, is important for the Court to understand because it

24  describes the business of OW.  And if I can just read that

25  highlighted section, it says:  "OW Bunker business model was

1    about buying in order to sell at a later stage.  It bought the

2    fuel from suppliers, mainly refiners or other traders" -- and

3    Valero is a refiner -- "and later sold it to shipowners and

4    distributed or stored these goods for a period of time."

5              So that was OW's business.  They weren't an

6    agent.  They weren't operating on a commission.  They bought

7    from companies like Valero and they sold to companies like

8    Verna, my client.  So there were commercial arm's-length

9    transactions all documented in the record.  All the invoices

10   went in the standard way that I've just described with there

11   being no hint of agency and no hint of a direct contractual

12   relationship between Valero and Verna.

13             And I think that leads me to what I believe may

14   be the most important question that Your Honor asked which was

15   the third one.  Did Valero directly contract with Verna?  And

16   the answer to that is plainly no.  I don't think they'll be any

17   dispute about that.  And in the absence of that direct

18   contractual relationship, I don't think the *Lake Charles*

19   *Stevedores* case leaves any room for doubt.  Valero, although

20   it's certainly entitled to be paid, is not entitled to a lien

21   in such a fashion that it would require my client to have to

22   pay twice.

23             Valero's remedy is to do what they've done.  And

24   we'll make this submission to the Court as well and ask the

25   Court to take judicial notice of it; but Valero has filed a

1   claim in the bankruptcy proceedings in Connecticut and they

2   have reached a settlement of their claim with the bankruptcy

3   trustee where their claim is recognized in full and they will

4   be paid out of the proceeds of that bankruptcy, whatever it may

5   prove to be.  Unfortunately for Valero, that is their remedy in

6   this case; and that's their only remedy.

7          THE COURT:  All right.  Thank you.

8          MR. WAGNER:  Good morning, Your Honor.  Tom Wagner

9   representing Valero.

10              In answering Your Honor's questions, I would like

11  to ground my argument and ask the Court to focus on the

12  authority under which we have a lien.  There's a lot said about

13  agency, there's a lot said about direct contract, there's a lot

14  said about who is doing what.  But the law -- the statute says

15  "a person" -- Valero -- "providing necessaries to a vessel on

16  the order of the owner or person authorized by the owner."  It

17  does not say --

18         THE COURT:  Owner or person authorized by the owner?

19         MR. WAGNER:  That's correct, Your Honor.  The important

20  thing about this is it doesn't say "contract," "privity,"

21  "direct" or "agency."

22         THE COURT:  Right.  But the thing is we have some case

23  law that tries to interpret that.

24         MR. WAGNER:  And we do, and I'm going to get to that.

25  But the response that Verna argues is direct privity, agency,

1    not whether or not we were authorized by the owner to provide

2    the vessel with bunkers.  And the facts, especially with the

3    deposition of Mr. Karkantzos, establishes that fact.  Now let's

4    start -- first of all, I will give you a summary of what was

5    established by that which we in a way knew, but didn't have

6    evidence of before, that the confirmation order for the ship's

7    bunker originated from Verna, the owner; that Almi Tankers SA

8    was the ship's manager and Verna's agent; that Verna and Almi

9    Tankers knew -- knew that OW Malta, the party that it said it

10   was buying bunkers from, could not itself provide or sell or

11   supply the bunkers; that Verna and Almi Tankers actually knew

12   that Valero was the designated physical supplier of the bunkers

13   before its performance and that Valero not only accepted -- I'm

14   sorry -- Verna and Almi not only accepted Valero as the

15   providers, but contracted and contacted directly --

16           THE COURT:  Let me ask you a question.  But did they

17   direct that Valero be the supplier?

18           MR. WAGNER:  They did not select Valero.  They approved

19   its selection.  But when they have prior knowledge and they

20   integrate with the supplier, the case law says that they accept

21   them as the provider for the vessel.  And here's the critical

22   piece of evidence --

23           THE COURT:  Say that again because my computer isn't

24   working.  You said when they what in contract with the

25   supplier?  You said --

 1          MR. WAGNER:  They have knowledge of it and directly

 2     interact with the supplier.

 3          THE COURT:  You think that's enough?  Tell me the case

 4     law.  I don't know that knowledge is enough.

 5          MR. WAGNER:  Not knowledge, but approval and

 6     interacting with the actual performance of the supply.

 7          (Visual display.)

 8          MR. WAGNER:  And here is the critical piece of evidence

 9     that was produced in connection with Verna's testimony.  I've

10     just -- I don't know.  Do you have this on the screen,

11     Your Honor?

12          THE COURT:  Yes, I do.

13          MR. WAGNER:  This is a --

14          MR. BAGOT:  Judge, for the record that's Exhibit 5 to

15     the opposition to the cross-motion.

16          THE COURT:  Okay.  Thank you.

17          MR. WAGNER:  This is an e-mail from Almi Tankers to the

18     master of the vessel and it is indicating:  (As read) Please be

19     advised that we have stemmed bunkers -- that's a maritime term.

20     I think Your Honor is familiar with it.  It's ordering the

21     bunkers to be stemmed to the vessel to be delivered at

22     Corpus Christi as follows -- IFO 380 CST (RMG 380).  Supplier

23     Valero.  Please coordinate with the agent for prompt delivery

24     avoiding any delays and keep them regularly posted on your ETA.

25     Please coordinate with the suppliers and the master and do your

1    utmost -- the bunkers to be delivered without delay.

2              Now here we get to something very critical.  On

3    the BDN -- and that's maritime acronym for bunker delivery

4    notice or in our case bunker certificate which is the document

5    that is executed by the ship and by Valero -- there has to be

6    the following items and any disparity has to be addressed on

7    the spot.  The spot means the chief engineer whom they are

8    saying didn't have authority to deal with this or to confirm

9    the contact or contract with us, name and IMO number of ship,

10   bunkering port, date of commencement, name and address and

11   telephone number of marine oil fuel supplier -- that's us --

12   product name and grade.  That's what we're supplying.

13   Quantity, metric tons, density, sulfur content.  All of the

14   details that Verna and Almi Tankers needs to run that vessel

15   are directly controlled by the chief engineer and by Valero in

16   this supply.  Of note is the absence of any reference to any

17   OW Bunkers entity involved in this commercial transaction and

18   delivery or the insurance that it complies with Verna's order

19   for fuel to run the ship.

20        THE COURT:  But it is, right?  I mean, this is just a

21   confirmation that they're getting what they ordered.  I hate to

22   make it so simplistic, but is that really what it is is to

23   confirm that they're getting what they order before we accept

24   it?

25        MR. WAGNER:  With respect, it is a --

1          THE COURT:  Are you arguing that it's a separate

2    contract?

3          MR. WAGNER:  I'm arguing that it gives rise to a

4    contractual relationship, but what it does mostly is it

5    confirms that we are supplying bunkers on order of the vessel

6    owner.

7          THE COURT:  All right.  So, you know, I don't know that

8    that's -- that's not in dispute.  I mean, the dispute is, you

9    know, who --

10          MR. WAGNER:  Your Honor.

11          THE COURT:  For the purposes of a maritime lien, who

12    has the lien?

13          MR. WAGNER:  It is a person who supplies necessaries --

14    fuel -- on order of the owner or one authorized by the owner.

15          THE COURT:  But we just explained that the owner made

16    his order to the OW Malta group, the owner; and we've already

17    discussed that even if he knew ultimately in some way that

18    Valero would be the party to deliver it, the case law says that

19    that doesn't matter.

20          MR. WAGNER:  Your Honor, with respect --

21          THE COURT:  Well, tell me where it fits.  You know,

22    because I understand your position; but, you know, and these

23    factors are, you know, there's no disputed -- the facts aren't

24    disputed, but I just have to decide does it belong in one

25    column, you know, or the next.  You know, either it is -- you

1   do have a maritime lien based on these facts or not.  So I'm

2   looking at the cases out of the circuit, you know, and trying

3   to see what is this more -- our circuit, not the Ninth Circuit.

4   What are these facts more akin to?

5           MR. WAGNER:  Can I address it factually and legally?

6           THE COURT:  Uh-huh.

7           MR. WAGNER:  Factually this is evidence of an order by

8   Almi Tankers, the operator of the vessel, to its officers and

9   crew to -- for approving the delivery by the physical supplier,

10  Valero, of the fuel that it's ordered.  It is evidence that

11  these bunkers are supplied on order of the owners.  It's not

12  evidence -- it doesn't disprove that other parties aren't --

13  don't have some contractual claims or issues or something

14  related to the transaction, but it does establish the

15  requirement under the statute.  There is no suggestion here

16  that Almi Tankers is telling OW Bunkers to do this.  It is a

17  suggestion that Almi Tankers is telling its crew to engage in a

18  transaction approving its order of the bunkers by the supplier

19  Valero.  It says -- we submit respectfully that it satisfies

20  the standards announced in *Lake Charles Stevedores* as well as

21  the standards in other circuits.

22          The critical distinction between *Lake Charles*

23  *Stevedores* and our case is that the contract involved -- the

24  engagement involved by Broussard Rice Mill therein is a sale of

25  rice to a time charter.  A sale of rice is not a contract for

1    providing necessaries to the vessel.  It is a sale of rice.

2    And in connection with that sale of rice, there were multiple

3    things that the rice seller had to do:  Had to grow the rice,

4    had to mill it, had to deliver it, had to check its quality,

5    had to truck it, had to unload the trucks.  None of which, none

6    of which are maritime -- providing maritime necessaries.  The

7    last item of which it ordered as a seller of rice.  Not the

8    ship.  The rice seller ordered that Lake Charles Stevedore load

9    the vessel.  Importantly Broussard Rice Mill was paid in full,

10   okay, and then they went under.  I understand that that is a

11   fact that may not be dispositive, but here we're arguing back

12   and forth on who's going to have to pay, what entities that are

13   in the middle here and all of that.  Well, in that case, the

14   stevedoring services were paid for by the ship and the only

15   minute element was a couple of cents on the dollar for

16   stevedoring services as distinguished from our case.  The

17   vessel needs fuel to run.  It doesn't need rice.  It doesn't

18   need cargo.  It needs fuel.

19        THE COURT:  So nobody doubts that this isn't necessary.

20        MR. WAGNER:  Nobody doubts it's necessary, but the

21   entire contract was.  The entire transaction was the provision

22   of fuel to run the vessel -- not to grow the rice, not to truck

23   it, not to this, not to that -- but to supply the vessel with

24   bunkers and only Valero could do that.  Valero was designated

25   as the supplier, it was accepted as the supplier and then the

1   ship itself directly interacted -- no supervision, no quality

2   control, no involvement at all of these alleged other parties

3   who supposedly have some rights and claims.  Our point here is

4   very specific -- that the engagement and the relationship

5   between Valero, the supplier, and the ship and this transaction

6   falls squarely within the provision of the statute that we were

7   authorized by a person -- authorized by the vessel to deliver

8   the necessaries; and that is Almi Tankers SA.

9        THE COURT:  But that was long after the transaction was

10   in process, right?

11        MR. WAGNER:  No, Your Honor, this is before.  This is

12   before we delivered.  They told us to -- this was instructing

13   the crew for our delivery to them.  Not for OW Bunker's

14   delivery, not for USA or Malta or whoever these -- we've got

15   all these references to contracts and terms that are not before

16   the Court and they have no effect on whether or not a supplier

17   has a maritime lien.  That lien arises by operation of law, not

18   by these tertiary or secondary or ancillary contracts.  In this

19   case -- and importantly, this Bunker notice --

20        THE COURT:  So why didn't they contract directly with

21   the -- why didn't Verna contract directly with Valero?  If this

22   is what you're saying, that months before this process went

23   into effect, they were communicating and requesting this fuel,

24   then why didn't they just contact --

25        MR. WAGNER:  I don't know why they didn't contact

1    Valero directly, but that is not a critical issue as far as

2    being authorized by them to make the delivery.

3        THE COURT:  Well, it's an issue because, you know, the

4    industry has created this monster, right; and everyone is

5    engaged in it and everything was fine until this collapse.  So,

6    you know -- because there wouldn't be a problem.  You wouldn't

7    be before me if we didn't have this chain of bankruptcies.  So,

8    you know, it is what it is.

9        But to see and find a maritime lien for your client,

10   you know, in this whole scenario, the effect of it is they'll

11   get to jump the line.  They'll get 100 percent, where other

12   people in the bankruptcy might not get 100 percent -- is that

13   correct -- get 100 percent?

14       MR. WAGNER:  We get what the Court determines we're

15   entitled to in supplying the bunkers.  We say it's the value we

16   put on the -- we charged for the bunkers.  It will be

17   Your Honor's decision as to what amount we're actually awarded;

18   but the whole purpose -- the whole purpose of the Maritime Lien

19   Statute is to promote the providing of necessaries on credit at

20   a risk, but the risk is secured by the lien.

21           He's saying we should have demanded that some

22   OW Bunker's entity pay us.  You're going to take maritime

23   commerce and bring it to a halt if the actual supplier has to

24   demand payment before it acts.  The whole point of the statute

25   was to recognize that a party like Valero, acting upon the

1    orders of a vessel, has -- it may provide the necessaries on

2    credit and be secured for that provision by a lien.  That's

3    fact -- Fifth Circuit law from before *Lake Charles* confirmed

4    that fact.  I had a quote here to read to you, but...

5            THE COURT:  What case is this?

6            MR. WAGNER:  This is *Gulf Trading versus the VESSEL*

7    *HOEGH SHIELD*, 658 F.2d 363.  Now, it did involve an order

8    from -- I will acknowledge this -- it did involve an order from

9    a time charter, but I think the comment the Fifth Circuit makes

10   in here about the material man's lien is very relevant to this

11   case.  "Granting the materialman a lien encourages the prompt

12   furnishing of necessaries to vessels so that they can speedily

13   turn around and put to sea.  This is especially significant

14   today when the emphasis on vessel performance is reduced port

15   time and increased speed."

16           "It was the intent of Congress to make it easier

17   and more certain for stevedores and others" -- like Valero --

18   "to protect their interests by making maritime liens available

19   where traditional services are routinely rendered."

20           Your Honor, this is a classic case, I submit,

21   where you have a bunch of middlemen who don't really change the

22   fact that --

23           THE COURT:  So -- but he says they're not really

24   middlemen because they don't get a commission.  A middleman

25   gets a commission.  That's how you characterize it or -- not an

1    agent -- you know, you get a percentage.  You don't --

2         MR. WAGNER:  Your Honor, we're not a subcontractor.

3    We're not one of a multitude of contractors.  We refine the

4    oil; we made it to standards; we had it ready, willing and

5    available for oceangoing vessels and we provided it.  We did

6    everything.  We're not a subcontractor.

7         THE COURT:  What's interesting about the whole thing,

8    though, is -- I really haven't found anything that is, you

9    know, squarely equivalent to this factual situation and it does

10   seem like the industry itself, you know, like I said before,

11   sort of created this monster and now it's collapsed, you know,

12   and it's only because this has happened, we have this massive

13   international bankruptcy, that the industry is going to have to

14   change how it does this, right?  Because it does -- it confuses

15   or it creates an issue with regard to the law.  Is this a

16   maritime lien or not and, you know, it is what the industry

17   decided to do in this collapse that turns this thing upside

18   down.  So, you know, I guess what I'm saying is what is the

19   appropriate remedy to have?  The industry has got to correct

20   itself.

21        MR. WAGNER:  Your Honor, I think that the response to

22   that is that the maritime -- you say "the industry" -- the

23   maritime community itself --

24        THE COURT:  Well, this particular -- the way, you know,

25   these bunkers are supplied.  There's obviously -- you know,

1    because your contract specifically said, didn't it, that you

2    had a maritime lien or somewhere I saw that there was some

3    language that we know does not create a maritime lien just

4    because you had it in that particular agreement.  The case law

5    is clear on that.  But it was in the agreement; so, you know --

6          MR. WAGNER:  Your Honor, what I'm trying to say is that

7    oftentimes in the process of getting ships in and out of port,

8    there are multiple parties and multiple entities involved and

9    oftentimes -- it doesn't matter what industry.  This is the

10   maritime industry.  This isn't just the bunkering industry.

11   Somebody goes under like rice -- like Broussard Rice went

12   under, and in that case what are the rights?  That is the

13   reason for the maritime lien.  It was established to protect

14   the American supplier of foreign vessels, to take the risk away

15   from him.  By the same token, we have this bunkering receipt

16   that reflects the maritime lien in this e-mail that I referred

17   you to.  That is the BDN he's referring to.  He's telling his

18   chief engineer to address any of these issues on the spot.  If

19   there was an issue of whether or not we had a maritime lien, he

20   could have addressed that on the spot as was the case in

21   *Ferromet* cited by us.  He could have stamped it and said, "No,

22   you don't have a lien with us.  You didn't contract with us.

23   We don't have privity with you.  We don't have an agent."  But

24   he didn't and he was directed to go ahead and act on the spot

25   directly with the supplier.

1          There couldn't be any more evident connection and

2     approval -- acceptance by the owner of the provision of our

3     supplies to them with notice of our lien.  In fact, in the

4     e-mails from Verna and Almi Tankers --

5          THE COURT:  So you're saying acceptance is enough to

6     establish a maritime loan?

7          MR. WAGNER:  Not in and of itself; but in this entire

8     record of connections, it authorized its chief engineer to deal

9     with the transaction on the spot with only one party and that's

10    Valero.  And having done so, it could have done the same thing

11    the chief engineer did in *Ferromet* versus PANTAZIS L and that

12    was stamp it, "No lien."  At which point we wouldn't have

13    delivered.  At which point we would have said, "Oh, we're going

14    to have to arrest you.  Give us back our bunkers."

15          And that's what PANTAZIS L is all about.  They

16    have the right to do that if they contest the lien.  And,

17    Your Honor, I think one important thing here to remember is

18    this party is not without remedies.  They wrote the bank and

19    they wrote OW Bunker and said, "Look, we're going to pay.  We

20    reserve the right to pay us and pay OW Bunker the difference."

21    They never did that.  They instituted -- they didn't get sued.

22    They instituted arbitration proceedings asking that they not be

23    liable to OW Bunker.  They had a remedy before Your Honor under

24    either FRCP Rule 14(c), which is a third-party claim against

25    somebody who may owe all or part of this debt in admiralty or

1   Rule 22 which is an interpleader action, pay the whole thing,

2   name both parties, let them dispute it.  There's a lot of

3   references to a lot of tangential cases and activities.  That's

4   not before Your Honor, and that is not appropriate.  But this

5   party had the ability to protect itself.

6           Lastly *Res Cogitans* has nothing to do with this

7   case.  It doesn't authorize double exposure; and, in fact,

8   that's exactly what Rule 22 is all about.  A defendant can use

9   interpleader just as a plaintiff can.  The directions given to

10  the ship were specific to deal with a supplier for these

11  specific terms and this particular provision and supply and

12  they did.

13          We exchanged samples -- not samples between us

14  and supposedly our venditi, OW Bunker.  The only parties that

15  have samples in this case are Verna, the ship and Valero, the

16  provider and that's in case something was wrong with the

17  bunkers.  There is clearly, by operation of law, a lien in our

18  favor for supplying them the bunkers, just like there is

19  clearly on their part a right against us if there's something

20  wrong with the bunkers.

21          Your Honor, this is the reason for the statute is

22  to protect the materialman against these kinds of consequences.

23          At the end of the day, I think that the testimony

24  of the operator, Mr. Karkantzos -- I'm sorry.  I have a hard

25  time pronouncing his name -- and the document here and the

1    other documents he produced, established, as a matter of fact

2    and law, that Valero provided fuel to the ship on orders from

3    and approval by Almi Tankers, its technical -- its operator of

4    the ship.  The other issues regarding --

5          THE COURT:  Before we go further, though -- because I

6    don't want to lose that thought.  I'd like to hear from him.

7    To me this is your strongest point thus far, Counsel.  I don't

8    mean to interrupt you.

9          MR. WAGNER:  That's fine.

10         THE COURT:  But this is an issue that I've been

11   struggling with.

12              So what about that argument that actually you

13   have rights against each other for the quality of the bunkers

14   or delivery of the bunkers; and that is, if I remember

15   correctly, one of the stronger elements of the case law that

16   would indicate a maritime lien?

17         MR. HEMPHILL:  Well, I'm not totally sure that I'm

18   following his argument on that point or the question; but maybe

19   I can rephrase it --

20         THE COURT:  Okay.

21         MR. HEMPHILL:  -- and see if that's the issue that

22   troubles you.  And it's a question I intended to put on the

23   table as part of my reply comments.  And that is, there is a

24   serious argument here that had Valero simply not shown up and

25   made no delivery at all that the vessel would have had a

1    contract cause of action against them; and it's hard for me to

2    imagine anyone could seriously make that argument in the

3    absence of any contractual --

4              THE COURT:  Is that your argument?

5              MR. HEMPHILL:  -- arrangement at all.

6              THE COURT:  Is that your argument?

7              MR. WAGNER:  What?

8              THE COURT:  Is that your argument?

9              MR. WAGNER:  I am sure we would have been liable for

10   not showing up.

11             MR. HEMPHILL:  You would have been liable to

12   OW Bunker USA, the only party with whom it had a contract.  It

13   would have had no contractual obligation to the ship at all.

14             THE COURT:  To me, that is a key issue.  And you're

15   saying, yes, you would have if you didn't show up?  Counsel --

16   I'm sorry.  I don't want to call you by your first name --

17             MR. WAGNER:  Oh, absolutely, Your Honor.  Your Honor,

18   we took an obligation to supply his ship.  If we don't supply

19   his ship and the ship misses some deadlines and we violated

20   that obligation, they have plenty of rights against us.

21             THE COURT:  Or against OW --

22             MR. WAGNER:  Against us.  They have against OW as well.

23             THE COURT:  Then they would have a right of action

24   against you.

25             MR. WAGNER:  Your Honor, the fallacy in this argument

1    seems to me that the Court is saying it has to -- that the lien

2    is dependent upon privity of contract, and the lien is

3    dependent upon operation of law.

4            THE COURT:  Right.  Now, I'm not saying that.  What I'm

5    talking about is the cases and how the case -- how the cases

6    are guiding me to try to characterize the transaction here.

7    So, no, I'm not looking for privity of contract.  I want to

8    make it clear that's not what I'm looking at.  I'm just trying

9    to understand, you know, who controlled the situation and who

10   had -- and there is a -- the name of the case doesn't come to

11   mind about, you know, whether or not the parties would have a

12   cause of action against each other.  I don't know if it's in

13   context or whatever.

14           MR. WAGNER:  There's some mention of that --

15           THE COURT:  There's no case on point -- there's not a

16   case that says these are the factors that you look to from the

17   Fifth Circuit to say whether you have a maritime lien or not.

18   We're looking at a number of different cases and I've looked at

19   the cases even from, you know, the Ninth Circuit and the

20   Second Circuit to try to see if we could -- Oh, *Lake Charles*

21   *Stevedore*.

22           MR. HEMPHILL:  Your Honor, that's -- and I think we're

23   really getting to the gist of this now.  Mr. Wagner obviously

24   makes a passionate argument, but his argument needs to be made

25   in the Fifth Circuit.  The Fifth Circuit has decided all of

1    these issues.  As you yourself noted on Page 24 of your

2    opinion, the *Lake Charles Stevedores* case, the Fifth Circuit

3    found that it was important that the vessel in that instance

4    would not have had a contractual cause of action against the

5    stevedore had the stevedore not appeared to perform.  That's

6    precisely the situation we have here.

7            It was important to the Fifth Circuit that the

8    vessel in that case -- in the *Lake Charles Stevedore* case --

9    had no control over the selection or the operations of the

10    supplier.  It was simply informed as a matter of courtesy and

11    business coordination who was going to be the supplier.  It

12    could have been anyone.  It happened to be Valero.  And the

13    Fifth Circuit has definitely said -- clearly said, as you have

14    pointed out, that it's not enough that the owner knew that the

15    supplier in this case was going to be Valero.

16            I think the Fifth Circuit really could not have

17    been more clear and, you know, sometimes we get involved in the

18    detail and we miss some of the most obvious commentary.  And I

19    saw this, Judge, in the very first substantive paragraph of the

20    Court's opinion.  And I've highlighted it there -- and pardon

21    my notes on the side -- but if I can just read that:  "The

22    district court held that LCS" -- that's the stevedore -- "was

23    not entitled to a lien because there was no contract between

24    the stevedore and the charterers."  That's the case here.

25            They go on to say, "there was no evidence that

1    Broussard" -- the bankrupt entity -- "was the owner's or
2    charterer's agent."
3             That's precisely the same as the situation that
4    we have here.
5             And they finally say:  "And the owner's or
6    charterer's knowledge that the stevedore was apparently the
7    stevedoring concern hired by the bankrupt entity was
8    insufficient to create a lien."
9             Those are the three issues that we've been
10   talking about.  The district court found they had no lien.  The
11   Fifth Circuit confirmed it.
12        THE COURT:  The three issues we've been talking about
13   because I read that case and I'm trying to figure out what the
14   Fifth Circuit has told us. So you're correct.  That is the
15   exact paragraph that I was looking at.
16        MR. HEMPHILL:  I think, frankly, the issues the Court
17   is grappling with need to be argued across the street.  The
18   Fifth Circuit has given us direction in the *Lake Charles*
19   *Stevedore* case, and I believe Your Honor has properly analyzed
20   it in the order that you've already entered.
21        THE COURT:  Thank you.
22             Now, Counsel, I'll let you address because, you
23   know, that is -- I'll be honest.  My opinions are very clear
24   what I'm thinking.  There's no mystery about what I'm thinking.
25   Is there something that distinguishes this case?  If this is

1   what the -- this is what the circuit has told us is district

2   court's -- the best, I guess, guidance that we have.  What

3   makes this situation different and not -- from a legal point of

4   view, that would, you know -- that I should know to say --

5   okay.  So it doesn't, you know, this really doesn't fit.  I

6   know you've got this guidance from the Fifth Circuit, but this

7   is really different because tell me why and why, you know, if

8   the circuit were looking at it and I can't anticipate -- I

9   mean, this is a hard -- I have no idea, to be honest with you,

10  I have no idea what the circuit would do even when they get

11  this.  But tell me now.  This is your opportunity.  What

12  distinguishes this?  What makes this case different that I

13  should find a maritime lien in the face of that guidance from

14  the circuit?

15          MR. WAGNER:  I would think there are about two or three

16  very critical factual differences.  The biggest factual

17  difference is this is not a case of knowledge of a stevedore

18  subcontractor being involved by a multipurpose rice seller and

19  so -- and saying that its little segment of that job

20  constitutes a maritime lien.  This is a situation where the

21  contract itself is not -- is itself -- the transaction itself

22  is not to sell rice, but to provide the ship with fuel.  That's

23  the beginning and end of the contract.  And the provision and

24  supply of that fuel was done exclusively by Valero, not as an

25  ancillary obligation of -- that it had to a seller of rice, but

1  as a direct obligation it undertook with respect to the vessel

2  with direct interaction, supervision and involvement of the

3  vessel owner in that supply.  And I'm talking about approval of

4  the standards required for the order of the fuel that was

5  involved.  That's not what we're dealing with in *Lake Charles*

6  *Stevedores*.  It's a small segment to load and trim the vessel.

7  In our case, this boat is going nowhere if we don't supply the

8  bunkers that we undertook.  It is that element, that factual

9  element, that the fact that our service comprises the entire

10  order by the owner for supplies, that distinguishes it

11  completely from the subcontractor line of cases which are

12  mostly cases in which a shipyard or a general contractor has a

13  contract with a ship and undertakes a thousand different

14  activities or commits contractually and a small subcontractor

15  with one small element of that, claims a lien.  That's not what

16  we are.  We are the entire undertaking, the entire provision

17  that the shipowner ordered.

18           Secondly, it's not just -- it's not in a

19  subcontractor role where our work is guaranteed, supervised,

20  controlled, managed by this, quote, general contractor.

21  OW Malta is nowhere in sight.  OW USA is nowhere in sight.  The

22  compliance for the vessel owner's order is done between the

23  shipowner and Valero, period.

24           Thirdly, in recognition of that compliance, both

25  parties looked at and exchanged with each other, the fuel that

1    was being bunkered and signed-off on Valero's bunkering

2    certificate meeting all of these standards that Verna insisted

3    it had.  There's no OW Bunkers involved in that transaction.

4    No OW Bunkers dealing in it, any way insuring it.  And with

5    respect, if we had not honored the obligation to supply the

6    vessel as we had committed to do, Verna -- the ship, was

7    certainly a beneficiary -- a third-party beneficiary to our

8    undertaking.  Had relied on it.  This was clear from the

9    communication it made to the vessel to deal with -- deal with

10   Valero, and I guarantee you we would have been called into

11   court and obligated.  In essence it is by operation of law on

12   these facts -- the provision, not for the sale of rice and one

13   small item of it, but the order of fuel to run the ship.  That

14   started with the owner and that the owner's operator approved

15   us doing and agreed to us doing and then had its own

16   personnel -- not any parties under contract to him.  There were

17   no people there.  That separates this case from the case from

18   *Lake Charles Stevedores*.  And, again, the only thing standing

19   in the way of recognizing the lien is the -- I think, is the

20   potential equity claim, "Oh, I might be held to pay twice."

21          Well, that could have been dealt with by

22   interpleader or a third-party action; and that wasn't dealt

23   with.

24          THE COURT:  All right.  So let's just talk practically

25   here then.  So what's -- what's the end game?  Tell me what is

1   your -- what are you trying to accomplish for your client?  You

2   want this lien so you get paid first?

3          MR. WAGNER:  We want this lien so we get paid.

4          THE COURT:  As opposed to waiting your turn in the

5   bankruptcy that's been filed?

6          MR. WAGNER:  That's the reason for the lien,

7   Your Honor.

8          THE COURT:  I know.  I'm just trying to have some --

9   I'm sort of, you know -- I'm sort of -- I'm bogged down in the

10  law in the sense -- but that's my job -- but I'm trying to see

11  the bigger picture so practically how this thing unfolds and

12  I'm not -- I'm also sensitive to the fact that this -- you

13  know, I don't see how one decision here is really going to

14  impact that much more -- many more cases.  But I'm still trying

15  to have an idea of, you know, what practically will happen from

16  this point and what practically you are asking for is that I

17  recognize this lien --

18         MR. WAGNER:  That's correct, Your Honor.

19         THE COURT:  -- so that you get paid and you get paid as

20  soon as I decide how much you get paid.

21         MR. WAGNER:  As intended under the Federal Maritime

22  Lien Act.  The whole concept here really is an admiralty

23  concept regarding the personification of the ship and the

24  recognition that the ship has obligations with respect to

25  various providers or to torts or to different things.  And the

 1    statute is a codification of that maritime principal in

 2    relation to the provision of necessaries that the ship needs to

 3    go.  And the Congress is essentially saying, "You don't have to

 4    worry about the shipowner going bankrupt, the operator going

 5    bankrupt, somebody defaulting with the funds.  You provide

 6    it -- you provide these necessaries to let the ship do its job

 7    and you will be protected and you don't have to worry about

 8    those ancillary issues.

 9          THE COURT:  So at this point, though, you've already

10    arrested the vessel.  They've deposited funds here and

11    somewhere else?

12          MR. HEMPHILL:  Yes, Your Honor.  We've provided

13    security here in lieu of the vessel so the vessel could be

14    released and also in the England arbitration proceedings.

15          THE COURT:  So if I was to find that there wasn't a

16    maritime lien, what happens next?

17          MR. HEMPHILL:  Once that becomes final and

18    unappealable, we would go pay the ING Bank in the English

19    arbitration proceedings.

20          THE COURT:  And then it would trickle down?

21          MR. WAGNER:  Your Honor, but the whole point --

22          THE COURT:  I know.  I'm just trying to understand

23    practically.

24          MR. WAGNER:  With respect, Your Honor.

25          THE COURT:  I understand that.  You're saying you have

1    a maritime lien.  You shouldn't have to go through that

2    process.  That's what the statute was meant to protect you

3    from -- your client from.

4         MR. WAGNER:  I'm saying with respect, Your Honor.

5    Forgive me for this remark.  I'm saying what he just said is

6    irrelevant.  It doesn't matter what happens.  It's irrelevant.

7    The whole point of the maritime lien is to avoid this very kind

8    of --

9         THE COURT:  And I understand that.  I absolutely

10   understand that.  I understand the importance of it.  I was

11   just trying to get a bigger picture of what's going on.

12        MR. WAGNER:  I hear you.

13        THE COURT:  Not that it's going to influence, but I

14   just want to understand, you know, what happens next.  Because

15   you both actually made -- at least in your first motion -- your

16   motion -- y'all made equity arguments.  You both did.  So I'm

17   just now following up since I've got you both here to see where

18   the equities lie.  And I know sometimes they come into play in

19   maritime decisions, but other times they don't.

20        MR. WAGNER:  Your Honor, as long as we're talking about

21   equity, I will make this one equitable observation.

22        THE COURT:  Go ahead.

23        MR. WAGNER:  There's only one party in this entire

24   arrangement who's out of pocket.  Valero.  They got the fuel,

25   and they used it.  They didn't pay for it.  OW Bunker hasn't

1    paid for anything.  They didn't pay us.  They didn't pay each

2    other.  They're not out of pocket.  We honored our obligation

3    for which we were entitled to a lien; but they said, "Oh,

4    equity.  We might this and we might that."

5              No, Your Honor.  I think that the purpose in the

6    lien -- Maritime Lien Act -- is for our protection under the

7    facts of this case; and I don't think Your Honor can minimize

8    the direct one-on-one.  And, in fact, even in the subcontractor

9    cases, the case by Judge Brown -- 15 percent.

10   THE COURT:  The other Judge Brown.

11   MR. WAGNER:  The late Judge Brown.  I think it was

12   Judge Brown.

13   THE COURT:  My admiralty law professor.  I'll tell you

14   he was my admiralty law professor.

15   MR. WAGNER:  Oh my first Fifth Circuit argument, Your

16   Honor, I got handed my hat.  One brave man.

17   THE COURT:  He was a nice law professor.

18   MR. WAGNER:  For the life of, me I cannot remember that

19   case.  It may come to me as we're talking about it.  I did cite

20   it, but it was a subcontractor situation in a conversion or

21   renovation of vessel, which undertook only 15 percent of the

22   overall contract.  No contract between the subcontract.

23   15 percent.  The Court recognized the lien because of the

24   direct interaction between the owner/operator and the

25   subcontractor's work.  And I think it's Judge Brown, and I

1    think it's Fifth Circuit.  There's a chance that it might have

2    been at the time you had the Department A and the Department B

3    of the Fifth Circuit with one of them becoming the 11th.  So he

4    might have been writing from the 11th Circuit, but we can

5    ignore that little fact.

6              I would suggest that Your Honor's focus include

7    that decision as well, and forgive me for not remembering the

8    name of the case.

9              THE COURT:  That's fine.  We'll find it.  You did

10   reference it.  You have something else?

11             He does make an interesting point about how --

12   that it's hard to characterize this transaction into the

13   *Lake Charles Stevedore* case.  It is different.  I mean, it is

14   different in that regard in that it is the same item, the fuel,

15   that everyone along the chain of command is dealing with.  I

16   know I put that pretty simplistically, but it's kind of hard.

17   Which makes it a little bit different from a number of

18   subcontractors that a general contractor is dealing with, where

19   the subcontractor is only dealing with the small portion of --

20             MR. HEMPHILL:  Well, I suppose --

21             THE COURT:  -- the job.

22             MR. HEMPHILL:  -- that's inherent in the definition of

23   a subcontractor or it's implied; but factually that's not what

24   was involved in *Lake Charles Stevedore*.  You had a straight

25   line from the owner of the vessel through various charterers to

1    this entity that hired the stevedore.  And it's a distinction

2    without a difference, indeed, to say that there's a difference

3    between the necessary under the statute which is stevedoring

4    and a necessary under the statute which is bunkering.  A

5    necessary is a necessary is a necessary and stevedoring and

6    bunkering are the equivalent.  And I think it's on that point

7    that Counsel is misreading and compressing the statute to

8    ignore one of the critical components that *Lake Charles*

9    *Stevedores* talked about.

10             The statute says that one gets a lien under three

11   circumstances:  If you provide a necessary.  We agree it was a

12   necessary.

13             To a vessel.  We agree that it was supplied to a

14   vessel.

15             But, thirdly, it has to be on the order of

16   someone authorized to bind the owner of the vessel.

17             The Congress could have done --

18        THE COURT:  Okay.  So but I think what he's saying is

19   that last e-mail -- is that what you were trying to say -- that

20   last e-mail that was before they entered into the contract with

21   OW Malta or OW Malta USA, that's the order, right?  That's when

22   they made the order directly.

23        MR. HEMPHILL:  No, ma'am.  That's not at all the case,

24   and let me make --

25        THE COURT:  But I'm just saying that's your argument,

1    and he presented the e-mail and the testimony?

2         MR. WAGNER:  Our argument is that it confirms that it

3    was an order from Almi Tankers for Valero to supply the vessel.

4              Now, it's not before those sales contracts were

5    issued.

6         THE COURT:  Okay.  I thought it was.

7         MR. WAGNER:  Some of which we're not privy to.  So we

8    don't know about them, but we get that communication to deliver

9    and we do and the ship gets that communication to accept the

10   delivery and confirm the terms.

11        MR. HEMPHILL:  Purely informational.  And it wasn't

12   even a communication that went from Verna, the owner, to

13   Valero.  It went from Verna to the crew.

14             And just to put that in context, the technical

15   manager of the vessel is sitting in Greece.  He orders fuel

16   from OW Malta.  In due course he is told that the actual

17   supplier of that fuel will be Valero.  Then as a matter of

18   advising his employees, the master of who he should expect to

19   come to the vessel, he sends a simple e-mail to the master

20   saying, "You're going to stem a certain quantity of bunkers at

21   Corpus Christi" so the master knows what he should be expecting

22   in terms of quantity and quality.  "And by the way, it's going

23   to be Valero that's supplying it."  That's after all the

24   contracts are --

25        THE COURT:  Let me ask you something.  So in the

1  situation where there is a necessary, does someone always have

2  a lien, a maritime lien?  And, if so, who would you say -- if

3  it's not Verna, then who?

4          MR. HEMPHILL:  OW Malta, with whom we dealt.

5          THE COURT:  They would have the lien?

6          MR. HEMPHILL:  That is the party that we purchased the

7  bunkers from.  So to finish just the thought on the

8  interpretation of the statute.

9          THE COURT:  I'm sorry.  I didn't mean to interrupt you.

10          MR. HEMPHILL:  I'm glad you did, Your Honor, because

11  these are difficult issues, even for old salts like Mr. Wagner

12  and I who have been dealing with them for a long time.  I see

13  the *Lake Charles Stevedores* case as providing excellent

14  guidance through the difficult -- I'll use the maritime

15  analogy.  It helps us navigate difficult waters.

16          But as I was saying, the statute has three

17  components.  It has to be a necessary to a vessel upon the

18  order of someone authorized to bind the vessel.  The first two

19  are not in dispute.  What's in dispute is the third.  Was

20  OW USA authorized to bind the vessel?  And they were not unless

21  there is a basis for a finding that OW USA was acting as the

22  vessel's agent.  That's what the deposition was about.  That's

23  what all the contracts show.  There was no suggestion of an

24  agency relationship and there's no evidence at all to show in

25  the record in any way that that part of the statute has been

1    met.

2            And that's the part of the statute that

3    Mr. Wagner wants to read out of it when he says that that's

4    what Congress wanted to do.  It wanted to protect American

5    suppliers.  And what the Congress could have done is just

6    limited the Lien Act to those first two components and said,

7    "Any time an American supplier supplies a vessel, period, they

8    get a lien."  They could have done that and if that's all the

9    statute says, yes, they would have had a lien in this case.

10   But that's not all the statute says.  It says there has to be a

11   showing that the necessaries were ordered by someone authorized

12   to bind the vessel.  And that's the component that's missing

13   here.

14           And I think we can't lose sight of the equities.

15   I have always recognized in my submissions to Your Honor that

16   there are equities on both sides of this case.  Valero deserves

17   to be paid.  Yes, they supplied bunkers.  The stronger equity,

18   though, is in favor of the vessel owner who did nothing but

19   order bunkers from a company.  They contracted with OW Malta

20   and had a contractual obligation to pay for those bunkers.

21   That's all they did.

22           But Valero did something a little bit more.

23   Their business arrangement, their business model, their

24   business decision was to make the sale to OW USA on credit

25   terms.  They made that business decision, and I'm sure they

1    made it because they have to in order to be competitive in the

2    industry.  They knowingly took the risk that something like

3    this could happen.  In this case it happens to be the

4    bankruptcy of an intermediary, but there could be other

5    circumstances where they would have been equally without lien

6    remedy.

7              If, for example, this vessel had left the Port of

8    Corpus Christi immediately after the supplies, the bunkers had

9    been taking on board and gone to sea and been in an accident

10   and sunk or burned up, the lien is gone.  The lien is

11   contingent upon there being a *re,* a thing.  And if that thing

12   is lost, then whatever lien they might have had would have

13   automatically been extinguished.

14             And I'm sure counsel will agree with me on that.

15   So they took that risk.  They knowingly took that risk by

16   making that sale to OW USA on credit terms, that whatever lien

17   rights they might have had could be lost.  In this case, they

18   had no lien rights to begin with; but in another case, if they

19   had lien rights, they took the risk that those lien rights

20   would be lost.

21             So when one balances those equities, Judge -- and

22   here's the point of all this.  Again, there's equities on both

23   sides; but when you balance those equities, Valero knowingly

24   took a commercial risk.  The owners did not.  So to the extent

25   the equities are relevant in this balancing act that the Court

1  is struggling with, the equities are in favor of the shipowner

2  who did nothing -- who took no -- knowingly took no commercial

3  risk.  I don't think we have to get to that because

4  *Lake Charles Stevedores* is so clear.  I think we may be

5  rehashing all the arguments at this point --

6            THE COURT:  Anything you want to add?

7            MR. WAGNER:  Only to something he said.  Not

8  something --

9            MR. HEMPHILL:  Before I do stop, I would like, if I

10  could, just to make clear what's in the record.

11            THE COURT:  Yes.

12            MR. HEMPHILL:  The deposition of -- the corporate

13  deposition of Verna, which we will submit.  I'm sure we'll

14  submit that jointly, and we agree to all the exhibits that were

15  attached to that.  I'd like that to be in the record.

16            THE COURT:  Do we have that?  We have it.

17            MR. HEMPHILL:  If not, I'll leave it with your staff.

18            THE COURT:  Sure.

19            MR. HEMPHILL:  And I'd like to have in the record the

20  article to which I referred earlier since I did refer to it,

21  the *Ship & Bunker* with the Court.

22            MR. WAGNER:  Your Honor, we would submit that that is

23  irrelevant.  We don't have an objection to the timeliness of

24  it, but we don't think it's relevant.

25            MR. HEMPHILL:  As long as there's an acknowledgment

1   that it's authentic, we can put it in.  We can argue about

2   relevance later.  But since I did refer to it and I do think it

3   explains the business of OW in a way that's meaningful.  It

4   goes back to this point that Your Honor talked about earlier,

5   and you asked Mr. Wagner about.  They were not an agent, and

6   they didn't get a commission.  This shows what the industry

7   understands about how OW's business works.  They're not an

8   agent.  They don't operate off a commission.  They buy -- in

9   this case, from Valero -- and they turn around and they sell to

10  the shipowner in this case.  So that's the point of that, and

11  that's why that's relevant.  And then the other item, just to

12  include in the record, I'll refer to as the settlement of --

13  including Valero and a number of other suppliers in the

14  bankruptcy court in Connecticut.  I have a copy of that that I

15  can leave with the Court.

16          THE COURT:  Okay.  Do you have any objection to that?

17          MR. WAGNER:  Same objection.

18          THE COURT:  Okay.  That it's irrelevant?

19          MR. WAGNER:  Right.

20          THE COURT:  So this will be the final -- because it was

21  your motion.  So I'll let you --

22          MR. WAGNER:  Your Honor, I ask Your Honor not to lose

23  focus of the statute.  "On order of the owner or person

24  authorized by the owner."  It does not contain the words, as

25  used to be required, "on the credit of the vessel" or "to bind

1    the vessel."  That does not appear in the statute.

2              That used to be a very, very influential argument

3    that "Oh, they didn't really rely on the credit of the vessel."

4    That is not an issue here.

5              Second, and just as importantly, there are

6    different rights and remedies that parties have in maritime

7    law.  The remedy for a maritime lien is -- I'm not telling

8    Your Honor anything you don't know, but it's an important

9    distinction.  It is *in rem*.  It is against the ship.  The ship

10   goes down, we don't have that right.  To say that a party has

11   only one type of right, an *in rem* right, and that's that.  Or

12   to say that the party doesn't have other remedies for recovery,

13   *in personam* remedies, against other parties.  They're not

14   mutually exclusive.

15             The fact that we may have a right in bankruptcy

16   does not mean we don't have a maritime lien, and that's why

17   this is irrelevant.  The question is:  Were we authorized by

18   the owner to fuel the vessel?  Absolutely.  And that's it.

19        THE COURT:  All right.  Thank you.  Thank you, all.

20   It's been very interesting.

21        MR. WAGNER:  Thank you, Your Honor.

22        THE COURT:  I'm going to take it under advisement.  I

23   know you have a quickly-approaching trial date so I will --

24   we'll be working on this one immediately.

25        MR. WAGNER:  Your Honor, with apologies, our pretrial

1    order is due today.  We have been engaged in this.  Can we

2    extend it a day?

3              THE COURT:  Sure.

4              MR. WAGNER:  Thank you.

5              THE COURT:  When is the pretrial conference?

6              MR. WAGNER:  It's next Tuesday or Wednesday.

7              THE COURT:  How about until Friday?

8              MR. HEMPHILL:  It's not Tuesday, Your Honor.  I promise

9    you it's not Mardi Gras Day.

10             MR. WAGNER:  That is Mardi Gras Day.

11             MR. BAGOT:  It's Ash Wednesday, Your Honor.

12             THE COURT:  How about I give you until Friday?

13             MR. WAGNER:  Thank you, Your Honor.  That's greatly

14   appreciated.

15             THE COURT:  You don't need to enjoy Mardi Gras.  Come

16   on.

17             MR. WAGNER:  I'm a fuddy-duddy, Your Honor.  I don't

18   get invited to anything.

19             MR. HEMPHILL:  Thank you, Your Honor.  I appreciate

20   your time.

21             THE COURT:  Friday is fine.  Thank you.

22             Let me take a quick break before I take the next

23   matter.  Thank you.

24             THE COURTROOM MANAGER:  All rise.  Court is in recess.

25                  (WHEREUPON, the proceedings were adjourned.)

```
 1                         * * * *

 2                REPORTER'S CERTIFICATE

 3

 4         I, Lanie M. Smith, CRR, RPR, Official Court

 5    Reporter, United States District Court, Eastern District of

 6    Louisiana, do hereby certify that the foregoing is a true and

 7    correct transcript, to the best of my ability and

 8    understanding, from the record of the proceedings in the

 9    above-entitled and numbered matter.

10

11

12                              /s/ Lanie M. Smith

13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

# **Exhibit 42**

- STEFAN MUSFELDT -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
BONNY GAS TRANSPORT LIMITED, as      )
owner of the LNG FINIMA (IMO         )
No.7702401),                         ) CASE NO.
                                     ) 14-cv-9542 (VEC)
            Plaintiff,               )
                                     )
      -against-                      )
                                     )
O.W. BUNKER GERMANY GMBH, NUSTAR     )
TERMINALS MARINE SERVICES, N.V.,     )
NUSTAR ENERGY SERVICES, INC.,        )
ING BANK N.V.,                       )
                                     )
            Defendants.              )
----------------------------------x  )
HAPAG-LLOYD AKTIENGESELLSCHAFT,      )
                                     ) CASE NO.
            Plaintiff,               ) 14-cv-9949 (VEC)
                                     )
      -against-                      )
                                     )
U.S. OIL TRADING LLC, O.W. BUNKER    )
GERMANY GMBH, O.W. BUNKER & TRADING  )
A/S, ING BANK N.V., CREDIT AGRICOLE  )
S.A.,                                )
                                     )
            Defendants.              )
----------------------------------x  )
HAPAG-LLOYD AKTIENGESELLSCHAFT,      )
                                     ) CASE NO.
            Plaintiff,               ) 14-cv-10027 (VEC)
                                     )
      -against-                      )
                                     ) Pages 11-17 and 42-46
O'ROURKE MARINE SERVICES, L.P.,      ) have been designated
L.L.P., O.W. BUNKER GERMANY GMBH,    ) Highly Confidential
O.W. BUNKER USA, INC., ING BANK N.V.,)
                                     )
            Defendants.              )
----------------------------------x  )
            March 17, 2016
              9:00 a.m.
    DEPOSITION OF STEFAN MUSFELDT, a
    30(b)(6) witness

```
 1        - STEFAN MUSFELDT - HIGHLY CONFIDENTIAL -
 2   security challenge.
 3              Do you see that?
 4        A.    Yes.
 5        Q.    Are you familiar with what a security
 6   challenge would be under this agreement?
 7        A.    Yes.
 8        Q.    And essentially, I can paraphrase, a
 9   security challenge would be a written challenge by
10   O.W. Germany to the security arrangements or
11   assignments that are set forth in the English
12   Omnibus Security Agreement.
13              MR. MALONEY:  Objection to form.
14              MR. HEILIG:  Objection.
15        A.    Yes.
16        Q.    Okay?
17        A.    Yes.
18        Q.    Has O.W. Germany filed a security
19   challenge challenging the assignment of supply
20   receivables under the English Omnibus Security
21   Agreement?
22              MR. MALONEY:  Objection to form.
23        A.    Yes.
24        Q.    You have?  You have filed it?
25        A.    Yes.
```

```
 1            - STEFAN MUSFELDT - HIGHLY CONFIDENTIAL -
 2       Q.      And when did you do that?
 3       A.      That was the end of December 2015.
 4       Q.      That, I presume that was filed in
 5   writing?
 6       A.      It was the first filed by e-mail and
 7   then sent by hard copy a day later, yes.
 8       Q.      Who was it sent to?
 9       A.      It was sent to Paul Copley of PwC and
10   somebody else.  I don't really recall his name,
11   from ING in the Netherlands.
12       Q.      Can you tell me what date that was
13   sent?
14       A.      December 21st -- or '2nd, 21st or
15   '2nd.
16       Q.      How big a document is this, are we
17   talking about?
18       A.      Well, there has been some documents
19   included with the written statements of -- I would
20   say around fifty pages.
21       Q.      Does this document set forth
22   O.W. Germany's position with respect to the
23   enforceability of the assignment under the English
24   Omnibus Security Agreement?
25                MR. HEILIG:  Objection to form.
```

1                    - STEFAN MUSFELDT -

2              MR. AZMAN:  Does anyone on the phone

3         want to ask questions of the witness?

4              MS. BRYANT:  No thank you, we're

5         good.

6              MR. MALONEY:  Two-minute break.

7              MR. AZMAN:  We're going to take a

8         very quick two-minute break, and then ING

9         will ask their questions if they have any.

10             (Whereupon, there was a brief recess

11        in the proceedings.)

12             MR. AZMAN:  Let's go back on the

13        record.  I think ING has one or two

14        questions.

15   EXAMINATION BY MR. MALONEY:

16        Q.    Mr. Musfeldt, good afternoon.  My

17   name is Brian Maloney.  I represent ING Bank in

18   this case.

19             Mr. Musfeldt, I just wanted to direct

20   your attention to the definition of "collection

21   proceeds" in the Cooperation Agreement.  It's on

22   Page 3.

23        A.    Okay.

24        Q.    Mr. Musfeldt, would O.W. Germany

25   agree that any proceeds of receivables received by

Page 48

```
 1                  - STEFAN MUSFELDT -
 2   either ING Bank or O.W. Germany in the U.S.
 3   litigation we have been discussing today should be
 4   handled in an agreed manner in accordance with the
 5   Cooperation Agreement that these parties signed?
 6        A.     That's right.
 7               MR. MALONEY:  No further questions.
 8               MR. AZMAN:  Keith, we don't have any
 9        further questions here.  Do you have any
10        additional questions?
11               MR. LETOURNEAU:  I do.  Just a
12        couple.
13   FURTHER EXAMINATION BY MR. LETOURNEAU:
14        Q.     Mr. Musfeldt, let me draw your
15   attention back to the English Omnibus Security
16   Agreement, Exhibit 31, and specifically back to
17   the clause Mr. Burlage discussed with you moments
18   ago 5.7(b)(ii)on Page 15.
19               Do you have that in front of you,
20   sir?
21        A.     Yes.
22        Q.     Just so that we're clear in terms of
23   the question, that Clause (b)(ii) reads, "After
24   the security has become enforceable or if the
25   security agent otherwise deems it necessary to
```