# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------x
HAPAG-LLOYD AKTIENGESELLSCHAFT,

                    Plaintiff,

                                    Case No.
        -against-                   14-cv-9949 (VEC)

U.S. OIL TRADING LLC, O.W. BUNKER
GERMANY GMBH, O.W. BUNKER & TRADING
A/S, ING BANK N.V., CREDIT AGRICOLE
S.A.,

                    Defendants.
--------------------------------x

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------x
HAPAG-LLOYD AKTIENGESELLSCHAFT,

                    Plaintiff,

                                    Case No.
        -against-                   14-cv-10027 (VEC)

O'ROURKE MARINE SERVICES, L.P.,
L.L.P., O.W. BUNKER GERMANY GMBH,
O.W. BUNKER USA, INC., ING BANK N.V.,

                    Defendants.
--------------------------------x

                        January 19, 2016
                        10:05 a.m.


        DEPOSITION of RULE 30(b)(6) WITNESS

                NORBERT KOCK

Page 2

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ---------------------------------x
     U.S. OIL TRADING LLC,
 3              Plaintiff,
 4              Case No.
     -against-    15-cv-6718 (VEC)
 5
     M/V VIENNA EXPRESS, her tackle,
 6   boilers, apparel, furniture,
     engines, appurtenances, etc.,
 7   in rem:  M/V SOFIA EXPRESS, her
     tackle, boilers, apparel, furniture,
 8   engines, appurtenances, etc., in rem,
              Defendants.
 9   ---------------------------------x
     HAPAG-LLOYD AKTIENGESELLSCHAFT, as
10   Claimant to the M/V VIENNA EXPRESS,
11             Counter-Claimant and
              Third-Party Plaintiff,
12
13   - against -
14   U.S. OIL TRADING LLC,
             Counter-Defendant and
15
     O.W. BUNKER GERMANY GMBH, O.W. BUNKER
16   & TRADING A/S, ING BANK N.V., and CREDIT
     AGRICOLE CORPORATE AND INVESTMENT BANK
17   a division or arm of CREDIT AGRICOLE S.A.,
18             Third-Party Defendant.
19   ---------------------------------x
20        Deposition of Rule 30(b)(6) Witness,
21   NORBERT KOCK, pursuant to Notice, held at the
22   offices of Freehill Hogan & Mahar LLP, 80 Pine
23   Street, New York, New York, before Roberta
24   Caiola, a Shorthand Reporter and Notary Public
25   within and for the State of New York.
```

Page 4

```
 1   A P P E A R A N C E S :
 2
 3   Attorneys for U.S. Oil Trading LLC:
 4   CLYDE & CO. US LLP
 5        405 Lexington Avenue
 6        New York, New York 10174
 7   BY:  CASEY BURLAGE, ESQ.
 8   AND:  JOHN KEOUGH, ESQ.
 9
10   Attorneys for O.W. Bunker Germany GMBH:
11   HILL RIVKINS LLP
12        45 Broadway, Suite 1500
13        New York, New York 10006-3739
14   BY:  JUSTIN M. HEILIG, ESQ.
15
16   Attorneys for O'Rourke Marine Services L.P.:
17   SIMMS SHOWERS LLP
18        201 International Circle, Suite 250
19        Hunt Valley, Maryland 21030
20   BY:  CASEY L. BRYANT, ESQ.
21        (Appearing Telephonically)
22
23   ALSO PRESENT:
24   Andrew Rona, The Interpreter
25
```

Page 3

```
 1   A P P E A R A N C E S :
 2
 3   Attorneys for Defendant ING Bank N.V.,
 4   as Security Agent:
 5   SEWARD & KISSEL LLP
 6        One Battery Park Plaza
 7        New York, New York 10004
 8   BY:  BRIAN P. MALONEY, ESQ.
 9   AND:  MICHAEL W. BROZ, ESQ.
10
11
12   Attorneys for Hapag-Lloyd Aktiengesellschaft:
13   FREEHILL HOGAN & MAHAR LLP
14        80 Pine Street
15        New York, New York 10005
16   BY:  MICHAEL FERNANDEZ, ESQ.
17   AND:  MICHAEL DEHART, ESQ.
18
19
20
21
22
23
24
25
```

Page 5

```
 1            INDEX
 2   Witness      Examination By      Page
 3   Norbert Kock   Mr. Maloney        12
 4              Mr. Heilig      120
 5              Mr. Keough      165
 6              Ms. Bryant      216
 7              Mr. Maloney      220
 8
 9   E X H I B I T S
10   Kock       Description        Page
11   Exhibit 1  Notice of Rule 30(b)(6)    12
12        Deposition
13   Exhibit 2  Notice of Rule 30(b)(6)    12
14        Deposition
15   Exhibit 3  Document Bates stamped USOT  24
16        000101 through USOT 107
17   Exhibit 4  Document Bates stamped     41
18        HPL-USOT page 131
19   Exhibit 5  Document Bates stamped     43
20        HPL-USOT 135 and HPL-USOT 136
21   Exhibit 6  Document Bates stamped     49
22        HPL-USOT 137 and HPL-USOT 138
23   Exhibit 7  Document Bates stamped     50
24        HPL-USOT 139 and HPL-USOT 140
25
```

Page 14

Norbert Kock (1-19-16)

1    interpreter here today and we'll do that.  Does
2    that make sense?
3
4        A.   That makes sense.
5        MR. FERNANDEZ:  Brian, at the
6    beginning, are we reserving all objections but
7    for form and foundation, federal stips or usual
8    stips?
9        MR. KEOUGH:  That's fine with me.
10   The witness will sign before any notary if he so
11   chooses.
12       MR. MALONEY:  Okay.
13      Q.   By whom are you employed?
14      A.   I'm employed by Hapag-Lloyd AG in
15   Hamburg.
16      Q.   That's the entity that's the named
17   party in this case?
18      A.   Yes.
19      Q.   Are there any other parent
20   companies or subsidiaries that you're employed
21   by?
22      A.   No.
23      Q.   What's your title?
24      A.   My title is Director of Purchasing
25   and Supply.

Page 15

Norbert Kock (1-19-16)

1
2      Q.   What are your job responsibilities
3    as the director of purchasing and supply?
4      A.   I am responsible for providing the
5    fleet of Hapag-Lloyd's owned and chartered
6    containers with fuel oil and lubricants, and
7    some selected chemicals, marine chemicals
8    worldwide.
9      Q.   You mentioned that Hapag-Lloyd has
10   a fleet.  Does it own many vessels?
11     A.   Hapag-Lloyd owns a good number of
12   vessels, but also chartered a good number of
13   vessels. The total capacity at the moment is
14   about 175 vessels operated.
15     Q.   So Hapag-Lloyd operates about 175
16   vessels?
17     A.   Yes.
18     Q.   That's either owned or chartered?
19     A.   Yeah.
20     Q.   I'm going to show you documents
21   that we've marked as Exhibits 1 and 2.  It's the
22   Notice of 30(b)(6) Deposition that we've issued
23   in two of these three cases.  I believe the
24   understanding is that you're here for a third
25   case as well, case number 15-cv-6718.

Page 16

Norbert Kock (1-19-16)

1
2      I'll ask you to take a look at the
3    documents that we've marked as Exhibits 1 and 2?
4      MR. FERNANDEZ:  Are there extra
5    copies, Brian?
6      MR. MALONEY:  Absolutely.  So
7    Exhibit 1 for the record is the Notice of
8    Deposition in case number 14-cv-9949, which is
9    Hapag-Lloyd against U.S. Oil Trading and others.
10   Exhibit Number 2 is 14 CV 10027, Hapag-Lloyd
11   against O'Rourke Marine Services, and others.
12     Q.   Sir, have you seen these documents
13   before?
14     A.   No.
15     Q.   What did you do to prepare for
16   today's deposition?
17     A.   For today's preparation we had a
18   brief meeting yesterday, because I've never been
19   part of such a deposition neither here nor
20   Germany, nor anywhere else in the world, and the
21   gentlemen explained to me a bit about the
22   procedure here and what it is all about.
23     Q.   Could you turn to page 3 of the
24   document that we've marked as Exhibit 1.  Have
25   you seen any of these topics before here on page

Page 17

Norbert Kock (1-19-16)

1
2    3?
3      MR. FERNANDEZ:  Objection to form.
4     A.   Some of this has been part of the
5    declaration I had given earlier this year.
6     Q.   You understand that you're
7    appearing here today as the corporate
8    representative of Hapag-Lloyd, and you prepared
9    yourself to answer questions about topics, such
10   as the topics that are listed here on page 3?
11     A.   Yes.
12     Q.   Who at Hapag-Lloyd is authorized to
13   procure fuel bunkers for the vessels?
14     A.   The Hapag-Lloyd purchasing
15   department.
16     Q.   Who is in the Hapag-Lloyd
17   purchasing department?
18     A.   As it's my department, I'm leading
19   that department as a director and I'm leading a
20   team of purchasing managers.  This team is
21   entitled also to order fuel oil -- we are
22   entitled and authorized to order and purchase
23   fuel oil.
24     Q.   And about how long have you been
25   the director of the fuel purchasing department

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Norbert Kock (1-19-16)

1
2 at Hapag-Lloyd?
3     A.    As a director, they put me into
4 that position I think it was in October 2007.
5     Q.    About how long have you been
6 working for Hapag-Lloyd?
7     A.    I started my career at Hapag-Lloyd
8 in 1990.
9     Q.    Were you employed by any other
10 companies previous to that?
11     A.    Yes.
12     Q.    Where were you employed prior to
13 1990?
14     A.    Prior to 1990 I have been employed
15 by a company called Sachs-Dolmar, which is a
16 chain saw manufacturer.
17     Q.    Would you mind spelling that for
18 the record?
19     A.    At that time the company's name
20 was --
21         THE INTERPRETER:  Spell just the
22 name.
23     A.    S-a-c-h-s then hyphen D-o-l-m-a-r.
24     Q.    What was your first position at
25 Hapag-Lloyd?

Norbert Kock (1-19-16)

1
2     A.    A purchasing manager for technical
3 spare parts and tools.
4     Q.    And you came to that position in
5 1990?
6     A.    Yes.
7     Q.    What did you do after that?
8     A.    They lifted me into the position of
9 a director.
10     Q.    So you were the purchasing --
11     A.    Between May 1990 and 1992 I was a
12 technical purchasing manager, and then I moved
13 over into the position of a fuel oil purchaser
14 in 1992, and stayed in this position until 2007.
15     Q.    Could you describe what your
16 responsibilities were as a fuel oil purchaser
17 during that time period, between 1992 and 2007?
18     A.    I was physically doing the
19 purchasing, there was no team.  I mean there was
20 a small team, the team was only limited to, when
21 I started, to two persons.
22     Q.    Was Hapag-Lloyd a smaller company
23 back in the 1990s?
24     A.    Yes.  At that time, yes.
25     Q.    About how large was Hapag-Lloyd in

Norbert Kock (1-19-16)

1
2 the 1990s?
3     A.    At that time we operated about 35,
4 40 vessels.
5     Q.    So by the time of about 2007,
6 Hapag-Lloyd had grown and you needed more
7 purchasers on the team?
8     A.    Yes.
9     Q.    So you've been director of the fuel
10 purchasing team from 2007 to the present?
11     A.    Right.
12     Q.    In about 2013 and 2014, about how
13 large was the bunker purchasing team at
14 Hapag-Lloyd?
15     A.    At that time we had a total team of
16 five persons, including me.  There was me as a
17 director and four purchasing managers.
18     Q.    Who were the purchasing managers on
19 your team?
20     A.    The purchasing manager on my team
21 at that time was Lukas Gaus.
22     Q.    L-u-k-a-s?
23     A.    Yes.  Then Gaus, G-a-u-s.  Nikolai
24 Doerner.
25     Q.    Would you mind spelling that?

Norbert Kock (1-19-16)

1
2     A.    Nikolai, N-i-k-o-l-a-i, and the
3 family name Doerner, it's D-o-e-r-n-e-r.  Then
4 we have Mrs. Niemeyer, Dorit Niemeyer.
5     Q.    N-i-e-m-e-y-e-r?
6     A.    Yeah, Niemeyer.  We had Ana Dubois.
7         THE INTERPRETER:  D-u-b-o-i-s.
8     Q.    So those individuals report to you,
9 correct?
10     A.    Yes.
11     Q.    Who do you report to?
12     A.    I report to the senior director of
13 purchasing and supply.  The name?
14     Q.    Yes.  Please.
15     A.    Ulf Naujeck.  U-l-f, then the
16 family name Naujeck, N-a-u-j-e-c-k.
17     Q.    Is the bunker purchasing team
18 located in Hamburg?
19     A.    Yes.
20     Q.    That is where Hapag-Lloyd is
21 headquartered?
22     A.    Yes.
23     Q.    About how many employees does
24 Hapag-Lloyd have in total today?
25         MR. FERNANDEZ:  Is this in Hamburg

6 (Pages 18 to 21)

Page 22

Norbert Kock (1-19-16)

1
2     or worldwide?
3         A.   I think worldwide about 12,000.
4     I'm not sure.  We have a lot of seafarers, we
5     have a lot of land-based people, we have a lot
6     of offices around worldwide.
7         Q.   So worldwide, ballpark, about
8     12,000 people?
9         A.   I would assume that, yes.
10        Q.   And in Hamburg, about how many
11    people in the headquarters?
12        A.   In Hamburg, I think about a
13    thousand.  This is also an estimation, I don't
14    have the actual figures.
15        Q.   Do you understand that the cases
16    that you're appearing here in connection as
17    Hapag-Lloyd's corporate representative today
18    involve certain bunker purchasing transactions
19    with vessels that involved Hapag-Lloyd,
20    including the SANTA ROBERTA, the SEASPAN
21    HAMBURG, the VIENNA EXPRESS, the SOFIA EXPRESS,
22    the DERBY D and SIDNEY EXPRESS?
23        A.   Yes.
24        Q.   Did Hapag-Lloyd own or charter
25    those vessels?

Page 23

Norbert Kock (1-19-16)

1
2         A.   The VIENNA EXPRESS is an owned
3     vessel.
4         Q.   We'll take them one by one as we go
5     through.  In connection with those vessels that
6     I just mentioned, did Hapag enter into a
7     contract with anyone whereby they purchased fuel
8     for those vessels?
9             MR. FERNANDEZ:  Objection to the
10    form.
11        A.   The purchasing is done by
12    Hapag-Lloyd's purchasing department.  We are not
13    entitling any other party to do the purchasing
14    for us, we are the responsible purchasers.
15        Q.   Understood.  So in connection with
16    those vessels that I mentioned, those six
17    vessels, who did Hapag-Lloyd's bunker purchasing
18    department purchase the fuel from?
19        A.   We purchased the fuel from O.W.
20    Bunker in Germany.
21        Q.   O.W. Bunker Germany, GMBH?
22        A.   Yes.
23        Q.   Did you enter into any agreements
24    with O.W. Bunker Germany about the price of fuel
25    that you would purchase from them?

Page 24

Norbert Kock (1-19-16)

1
2         A.   Yes.
3         Q.   Let me show you a document with
4     Bates numbers USOT 000101 through 107.  This is
5     a document that's attached to Hapag-Lloyd's
6     complaint that was filed December 17, 2014.
7             MR. MALONEY:  We'll mark it as
8     Exhibit 3.
9             (Kock Exhibit 3, Document Bates
10    stamped USOT 000101 through USOT 107, marked for
11    identification.)
12        Q.   Sir, have you seen this document
13    before?
14        A.   Yes.
15        Q.   What is this document?
16        A.   This is a contract pamphlet
17    covering our requirements, our fuel oil
18    requirements in the Ports of Antwerp and
19    Rotterdam during the period of January 1st and
20    December 31, 2014.
21        Q.   And the --
22        A.   For the below mentioned fuel oil
23    grades and expected quantities.
24        Q.   What does ARA mean at the top?
25        A.   ARA is the abbreviation for the

Page 25

Norbert Kock (1-19-16)

1
2     Ports of Hamburg, Rotterdam and Amsterdam.
3         Q.   This contract appears to relate to
4     fuel deliveries during the year 2014?
5         A.   Yes.
6         Q.   And the seller is listed as O.W.
7     Bunker Germany?
8         A.   Yes.
9         Q.   And the buyer is Hapag-Lloyd AG in
10    Hamburg?
11        A.   Yes.
12        Q.   Does this contract relate to
13    particular fuel deliveries, or is it a pricing
14    agreement that's used prior to particular
15    transactions being entered into?
16            MR. FERNANDEZ:  Objection to the
17    form.
18        A.   This is a pricing agreement on
19    expected annual quantities which we provided
20    here in column 3 and 4, because we contracted
21    some different fuel oil grades here in this
22    contract.  RMG, RMK 700, RMK 500 low sulfur, RMG
23    380 low sulfur, and distillate fuel like DMZ and
24    DMA, also low sulfur.
25            MR. FERNANDEZ:  For the record, the

7 (Pages 22 to 25)

Norbert Kock (1-19-16)

1  Norbert Kock (1-19-16)
2  witness is referring to USOT 101, the first page
3  of the document.
4      Q.    Was this agreement for one
5  transaction or more than one transaction?
6      A.    More than one transaction.
7      Q.    Were you involved or was a member
8  of your team involved in negotiating this
9  document?
10     A.    Yeah.  I was involved, team members
11 were involved, as well as the senior director of
12 purchasing and supply.
13     Q.    When was the first time that you
14 worked with O.W. Bunker Germany or other
15 entities in the O.W. Bunker Group?
16     A.    We started working with O.W. in
17 2007.
18     Q.    Did you often purchase fuel from
19 O.W. Bunker Germany?
20         MR. FERNANDEZ:  Objection to the
21 form.  Go ahead, you can answer.
22     A.    Yes.
23     Q.    Did you deal with any other
24 entities in the O.W. Bunker Group?
25     A.    No.

1  Norbert Kock (1-19-16)
2      Q.    Only with O.W. Germany?
3      A.    Yes.  There was a time in between
4  when they were -- when the company was named
5  Wrist Bunker.
6      Q.    Wrist, W-r-i-s-t?
7      A.    Yes.  This was the same people.
8      Q.    About how long did it take to
9  negotiate this document here, USOT page 101?
10     A.    This contract was negotiated for
11 the total requirements of that specific -- these
12 products during the period of 2014, though it
13 has been negotiated between October to
14 December 2013.
15     Q.    Did you have a pricing agreement in
16 place for the year 2013 with O.W. Germany?
17         MR. FERNANDEZ:  Objection to the
18 form.
19     A.    Might be.  I don't have access to
20 my records here.  So it could be that we had
21 selected products agreements also in 2013 also
22 in other areas, not only in Rotterdam and
23 Antwerp.
24     Q.    The line below the chart reads:
25         "The above mentioned quantities are

1  Norbert Kock (1-19-16)
2  indicative and the buyer is allowed to exceed or
3  reduce the quantities, along with buyer's
4  requirements, in the above mentioned ports by
5  plus or minus 20%."
6          Do you have an understanding of
7  what that means?
8      A.    In case of unexpected changes of
9  services there is a good chance that we will be
10 not able to take the expected quantities as
11 given in this contract here.  Or in case of
12 vessel sales, there might be a good chance to
13 buy less than previously agreed upon.  Or it's
14 the other way around, it could be even more
15 sometimes.
16         This is just a requirement to
17 secure that there is some kind of flexibility in
18 these quantities, that we are not bound to these
19 quantities, to have a flexibility of some plus
20 or minus 20 percent.
21     Q.    In case the vessel needs more or
22 less?
23     A.    In case the vessel needs more or
24 less, or in case we are just changing service
25 volumes from one area to another area.

1  Norbert Kock (1-19-16)
2  Sometimes it could happen that we will buy less
3  fuel oil in Northwest Europe and shift
4  quantities, more quantities to Asia; because
5  also maybe the price levels in Asia could drop
6  below Northwest Europe and we could take more in
7  Asia; to have that flexibility.
8      Q.    In the event you needed to make
9  those changes, you would communicate with
10 persons at O.W. Germany?
11     A.    Yes.
12     Q.    Under the heading marked
13 "Pre-Planning" the document reads "Monthly
14 pre-planning schedule to be sent in advance for
15 the following month."
16         Did Hapag-Lloyd send a schedule to
17 O.W. Germany?
18     A.    Yes.
19     Q.    What was the purpose of the monthly
20 pre-planning schedule?
21     A.    To give them an idea about the
22 estimated quantities which will be taken in that
23 month.  Plus, they have also to take care to
24 have enough product available for us.
25     Q.    Could you tell me what the line

Norbert Kock (1-19-16)
1
2  in this version of our terms and conditions.
3       Q.   Looking at page 102 --
4       A.   Claims.  This is paragraph 13 on
5  page 106 on top, any claim to the quality or the
6  description of this fuel oil must be notified in
7  writing promptly after the circumstances giving
8  rise to such claim have been discovered, if the
9  buyer do not notify the seller of such claim
10  within 60 calendar days of the date of delivery
11  for term contracted low sulfur fuel oil supplies
12  in Antwerp or Rotterdam.
13       So this mentioned here means we
14  have a special agreement on the -- or we have
15  had a special agreement on the quality claim of
16  60 days only for low sulfur fuel oils in Antwerp
17  and Rotterdam.  Then the next sentence says 30
18  days of the date of delivery for supplies of oil
19  in remaining ports worldwide.  So this pamphlet
20  here is not a standard Hapag -Lloyd pamphlet,
21  this pamphlet here has been negotiated with O.W.
22       Q.   So these terms and conditions apply
23  to purchases and sales with O.W. Bunker Germany,
24  is that your position?
25       A.   Yes.

Norbert Kock (1-19-16)
1
2       MR. FERNANDEZ:  Objection as to
3  form.
4       MR. KEOUGH:  Could you read back
5  the last question, I didn't hear the end of the
6  question.
7       (Record read.)
8       MR. FERNANDEZ:  In relation to the
9  vessels we're discussing here?  These are pretty
10  broad statements that are being made and I don't
11  think you've asked him about the vessels that
12  we're looking at here.
13       MR. MALONEY:  We'll get to it
14  vessel by vessel.
15       Q.   The document at pages 101 and 102
16  is on O.W. Bunker's letterhead, but the document
17  from pages 103 to 107 is on Hapag-Lloyd's
18  letterhead.
19       Do you understand the reason for
20  the difference?
21       A.   Because these negotiated terms and
22  conditions has been originally based upon our
23  terms and conditions.  There was some
24  corrections made to bring this into an
25  acceptable version, which also could be accepted

Norbert Kock (1-19-16)
1
2  by O.W. Bunker Germany, because they didn't
3  accept our required claim period of 60 days at
4  that time.
5       Q.   So is it fair to say that the
6  document at 101 and 102 was prepared by O.W.
7  Bunker Germany?
8       A.   Yes.
9       Q.   And that the terms and conditions
10  at pages 103 to 107 were prepared by
11  Hapag-Lloyd?
12       A.   Yes.
13       Q.   The SANTA ROBERTA, that's one of
14  the vessels at issue here today, was that on
15  time charter in 2014?
16       A.   It was a charter vessel.  I don't
17  know whether it was a time charter.  It was a
18  charter vessel at that time.
19       Q.   Do you know whether the
20  relationship was governed by a Charter Party
21  agreement?
22       A.   Yes, it must be a Charter Party.
23       Q.   Was it Hapag-Lloyd that was
24  responsible for purchasing the fuel for the
25  SANTA ROBERTA?

Norbert Kock (1-19-16)
1
2       A.   Yes.
3       Q.   Do you know who owned that vessel
4  in 2014?
5       A.   No.
6       Q.   How does the order come into the
7  bunker purchasing department, is it communicated
8  to your department by the vessel?
9       MR. FERNANDEZ:  Objection to the
10  form.
11       A.   There is no order coming into our
12  department.  There is a requisition coming from
13  the vessel into our department.
14       MR. MALONEY:  Let's mark this
15  document as Exhibit 4, it's HPL-USOT page 131.
16       (Kock Exhibit 4, Document Bates
17  stamped HPL-USOT page 131, marked for
18  identification.)
19       Q.   Have you seen this document before?
20       A.   Yes.
21       Q.   What is this document?
22       A.   This is a requisition of the SANTA
23  ROBERTA for 3,000 tons of heavy fuel oil and
24  100 tons of diesel oil at the U.S. East Coast or
25  West Coast, I don't know, and Canada.

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 42

Norbert Kock (1-19-16)

1        Q.    This email is coming from the
2   vessel --
3        A.    Sorry, sorry.  For me this looks
4   more than a pre-communication between the vessel
5   and the vessel's stowage center, because these
6   guys say, "Please note vessel intends to raise
7   the requisition for 3,000 tons."  So this has to
8   be coordinated with the responsible stowage
9   center.
10       Q.    Do you know any of the recipients
11  on this email?
12       A.    Yep.
13       Q.    Who is Harry Moran?
14       A.    I don't know Harry, but the next
15  address, Marine NONGA, this is TPA, at that time
16  was the stowage center.  I think Harry Moran was
17  part of the team.  The Marine NONGA was a big
18  branch of a centralized email address of a big
19  number of individuals, and just was putting
20  Harry Moran up front of it to be sure that he is
21  taking care to give his okay for 3,000 tons of
22  fuel oil.
23       Q.    What does TPA stand for?
24       A.    Tampa.  At that time this was the

Page 43

Norbert Kock (1-19-16)

1   location where these guys were sitting.
2        Q.    Is NONGA an acronym, N-O-N-G-A?
3        A.    Yeah, but I can't explain it.
4        Q.    What is Fleet 4?
5        A.    Fleet 4 is also a -- possibly
6   related to a stowage center, to another part.  I
7   can't really give a clear definition here
8   because I do not have the codes really here they
9   used at that time.
10       Q.    I have the same question about the
11  other persons copied on this email?
12       A.    Vpillai, I don't know that.
13  Michael Nigmann is known, he is one of the
14  controlling guys in our company.  Then we have
15  the RQMT-Section 4 mailbox included, but this is
16  more an informal message for these guys at that
17  time.
18       MR. MALONEY:  Let's take a look at
19  a document Bates labeled HPL-USOT page 135 and
20  136.
21       (Kock Exhibit 5, Document Bates
22  stamped HPL-USOT 135 and HPL-USOT 136, marked
23  for identification.)
24       Q.    This is an email dated

Page 44

Norbert Kock (1-19-16)

1   September 26, 2014 from the SANTA ROBERTA to
2   RQMT-Section 4 and others?
3        A.    Yes.
4        Q.    Have you seen this email before?
5        A.    Yes.
6        Q.    What does this document refer to?
7        A.    This document refers to the bunker
8   requisition form which should be attached to
9   this email here.
10       Q.    On page 136, is that the bunker
11  requisition form?
12       A.    Yes.
13       Q.    Is this a request from the vessels,
14  the stem bunkers, at Tacoma, Washington?
15       MR. FERNANDEZ:  Objection to the
16  form.
17       A.    This is a bunker requisition asking
18  Hapag-Lloyd fuel purchasing to deliver the
19  mentioned quantities and qualities.
20       Q.    Who is iocdo@nrcc.com in the cc
21  line of this email?
22       A.    I don't know.  It's not known to
23  me.  Maybe it's one of the owner's addresses,
24  the owner of the vessel, because SANTA ROBERTA

Page 45

Norbert Kock (1-19-16)

1   is a charter vessel, or was a charter vessel at
2   that time.  It's an MSC vessel, we can see it on
3   the email here above the vessel's name.  We also
4   can identify the email address, VP line is also
5   MSC, so it's the owner, but the IOCDO email, I
6   have no idea what this is.
7        Q.    What is "RQMT-Section 4"?
8        A.    This is the mailbox of our
9   department for that bunker section.
10       Q.    Your bunker purchasing department?
11       A.    This is our purchasing department.
12  We have a couple of mailboxes available, the
13  service is divided.
14       Q.    Would you receive emails at this
15  address?
16       A.    Pardon?
17       Q.    Would you receive emails at this
18  RQMT address?
19       A.    Not me personally.  This is an
20  email address of one of our purchasing managers
21       Q.    Which person is that?
22       A.    I can't remember who was taking
23  care for the section 4 in 2014.
24       Q.    Did section 4 --

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

1           Norbert Kock (1-19-16)
2       A.   I can remember Lukas Gaus was
3    taking care of section 1 in that year.  I can
4    remember Mr. Doerner was taking care of section
5    2.  Ms. Niemeyer was taking care of section 3,
6    I'm not really sure.  So Mrs. Dubois should be
7    responsible for section 4 at that time.
8       Q.   What's your level of confidence in
9    that recollection?
10      A.   75 percent.
11           MR. KEOUGH:  Object.
12           MR. FERNANDEZ:  Let's not speculate
13   or guess, if you know something you know
14   something.  If you don't know you don't know.
15      A.   That's two years ago.
16      Q.   Would there be a document that
17   would refer to which persons of your team were
18   responsible for which sections?
19      A.   Yes.
20      Q.   Would that document be in your
21   files back in Hamburg?
22      A.   Yes.
23      Q.   What did the sections relate to?
24   Were they geographic designations?
25      A.   That's how it started.  That's how

1           Norbert Kock (1-19-16)
2    it started.  We had a strict geographically --
3           THE INTERPRETER:  Limitation.
4       A.   -- limitation that each section was
5    taking care just for a specific geographic
6    region.  It started with section 1 responsible
7    for U.S. and South Americas.  Section 2
8    responsible for North West Europe, section 3 was
9    responsibilities for Asia Pacific area, and then
10   we added at that time a section 4 responsible
11   for the Mediterranean area, and also certain
12   parts of the U.S.
13           This was always handled also kind
14   of flexible in case of somebody was going on
15   vacation or being absent, on sick leave.  Also,
16   the discipline of the vessels, taking care to
17   direct the emails into the correct requirement
18   section was not 100 percent.
19      Q.   Was there a reorganization at a
20   certain point as to these sections?
21      A.   Yes.
22      Q.   When was that?
23      A.   This was the hiring of Mrs. Dubois
24   and Mr. Gaus.
25      Q.   So sometime in 2014?

1           Norbert Kock (1-19-16)
2       A.   Yes.  2013-2014.
3       Q.   Could you tell me just generally
4    how were the sections reorganized?
5       A.   We came to the conclusion that it
6    would not be longer feasible to just have the
7    strict geographical limitation, but also to look
8    more into the services.  So there was a more
9    service-oriented pattern brought forward.
10      Q.   What's the next step for the bunker
11   purchasing department at Hapag-Lloyd after a
12   bunker requisition form comes in from the
13   vessel?
14      A.   To confirm it.  To confirm the
15   receipt of that document.
16      Q.   After the bunker purchasing
17   department at Hapag-Lloyd confirms receipt of a
18   bunker requisition form, what do members of your
19   team do next?
20      A.   Next they are looking whether the
21   requisition makes sense.  Whether there are
22   ports around this port which has been named
23   here, Tacoma, on the vessel schedule which might
24   be more economic to buy fuel oil, for example.
25   Then to communicate with the vessel to check

1           Norbert Kock (1-19-16)
2    whether it would be possible for the vessel to
3    maybe go also to another port to buy it more
4    economically.
5       Q.   Let's take a look at the next
6    exhibit.
7           (Kock Exhibit 6, Document Bates
8    stamped HPL-USOT 137 and HPL-USOT 138, marked
9    for identification.)
10      Q.   I'm handing you a document that's
11   been marked as Exhibit 6, Bates labeled HPL-USOT
12   137 and 138.  Have you seen this document
13   before?
14      A.   Yes.
15      Q.   What is this document?
16      A.   This is the confirmation of the
17   responsible section manager, which was Lukas
18   Gaus here at that time.  That he received the
19   vessel's requirement and that he would suggest
20   to not only concentrate on Tacoma, but also do
21   it for all those agents in Oakland with an
22   inquiry.
23           This is generally being done for
24   all bunker requisitions coming from vessels to
25   make sure the guys onboard know that we received

13 (Pages 46 to 49)

Page 50

1          Norbert Kock (1-19-16)
2    the requirement, otherwise they are not sure.
3    They might be asking us or picking on us.
4          (Kock Exhibit 7, Document Bates
5    stamped HPL-USOT 139 and HPL-USOT 140, marked
6    for identification.)
7          Q.   I'm handing you a document that
8    we've marked as Exhibit 7, pages 139 to 140
9    HPL-USOT 139 to 140.
10         So after you've confirmed receipt
11   of the bunker requisition, what is the next step
12   for the bunker purchase department?
13         A.   To investigate the local markets to
14   start a tender process, an inquiry.
15         Q.   The email that I've placed in front
16   of you that's stamped pages 139 to 140, is that
17   a tender or inquiry?
18         A.   Yes.
19         Q.   Is this an email blast to multiple
20   participants?
21         A.   Pardon?
22         Q.   Is this an email that's sent out to
23   your counterparties?
24         A.   Yes.
25         Q.   About how many counterparties did

Page 51

1          Norbert Kock (1-19-16)
2    the bunker purchasing department have in 2014?
3          A.   In total?
4          MR. FERNANDEZ:  Objection to the
5    form.
6          Q.   Was it more than ten?
7          A.   Yes, about 50; 40, 50.
8          Q.   Around the world?
9          A.   Yes.
10         Q.   Would Mr. Gaus send this to a
11   selection of those counterparties only in the
12   ports, the applicable ports?
13         A.   Yeah.
14         MR. FERNANDEZ:  Objection to the
15   form.
16         Q.   After this inquiry is sent out,
17   would the bunker purchasing department receive
18   quotes for the supply?
19         A.   Yes.
20         Q.   Would that be from entities like
21   the O.W. Bunker Group?
22         A.   Yes.
23         Q.   Anyone else?
24         A.   Traders.  I mean specifically here
25   for this region at the U.S. West Coast there's

Page 52

1          Norbert Kock (1-19-16)
2    no other -- at that time there was no other
3    chance for us but to go to traders.
4          Q.   Would you have any preference to
5    use O.W. Bunker as opposed to another trader?
6          A.   No.
7          Q.   Would your primary consideration be
8    price or something else?
9          A.   Price is one of the considerations,
10   yes, but also the product quality which is
11   offered by the trader.
12         (Kock Exhibit 8, Document Bates
13   stamped HPL-USOT 144 to HPL-USOT 146, marked for
14   identification.)
15         Q.   We have marked as the next exhibit,
16   Exhibit 8, a document Bates labeled HPL-USOT 144
17   to 146.
18         This is an email chain between
19   Mr. Gaus and Andre Maierhofer,
20   M-a-i-e-r-h-o-f-e-r?
21         A.   Yes.
22         Q.   Do you know Mr. Maierhofer?
23         A.   Yes.
24         Q.   Who is he?
25         A.   He is one of the salespersons of

Page 53

1          Norbert Kock (1-19-16)
2    Peninsula Petroleum.
3          Q.   What is Peninsula Petroleum?
4          A.   Peninsula Petroleum is a, in
5    certain areas of the world a physical supplier,
6    in other areas acting as a trader.
7          Q.   Were they in competition with O.W.
8    Germany?
9          A.   Yes.
10         Q.   Were they providing a quote here to
11   fuel the SANTA ROBERTA?
12         A.   Yes.
13         Q.   At the top of the email
14   Mr. Maierhofer says, "Hi Lukas, any feedback on
15   this one, are we in the ballpark?"
16         Do you understand what he means by
17   that sentence?
18         A.   He demanded for a feedback from
19   Lukas Gaus whether his quotation is favorable or
20   not that he possibly could --
21         (Discussion between interpreter and
22   the witness.)
23         MR. KEOUGH:  The witness is
24   conferring with the interpreter and I'm not sure
25   what's being discussed while the question is

14 (Pages 50 to 53)

Page 54

Norbert Kock (1-19-16)

1  pending.  I would ask respectfully that the
2  witness speak on the record.
3
4         If you need to use the interpreter
5  perhaps you could tell Mr. Maloney and they can
6  discuss it with your lawyer.  I think the record
7  should -- to keep the record accurate we need to
8  have some order in that respect, if that's okay.
9  I'm sorry to interrupt.
10     Q.   Did you understand my question,
11  sir?
12     A.   Could you please ask your question
13  again?
14         (Record read.)
15     A.   Yes.  This was part of the
16  negotiation process between Lukas Gaus and
17  Andreas Maierhofer.  Andreas Maierhofer offered
18  product and he wanted to get a feedback whether
19  the price levels and the product quality was
20  favorable for us or not.
21     Q.   Okay.  Thank you.  Did Peninsula
22  Petroleum get the contract for the supply to the
23  SANTA ROBERTA?
24     A.   No.
25         MR. MALONEY:  Let's take a look at

Page 55

Norbert Kock (1-19-16)

1  a document I'll mark as Exhibit 9.
2         (Kock Exhibit 9, Document Bates
3  stamped HPL-USOT 142, marked for
4  identification.)
5         MR. MALONEY:  It's Bates labeled
6  HPL-USOT page 142.
7     Q.   This is an email from Karl Heinz
8  Selmer to Mr. Gaus.  Have you seen this document
9  before?
10     A.   Yes.
11     Q.   What are typicals?
12     A.   Typicals are naming the
13  specifications of the fuel oil which are
14  allowing us to calculate the specific energy of
15  the offered product, and to see the ignition
16  purposes of the fuel oil.
17     Q.   Do you have an understanding what
18  Mr. Selmer is referring to under Tacoma, Oakland
19  and LA in this email?
20     A.   Yeah, he is mentioning the required
21  parameters to calculate the energy.  He is
22  informing us about the product viscosity, the
23  API, which is the density of the product, the
24  weight, the water content, the ash content, the

Page 56

Norbert Kock (1-19-16)

1  sulfur content.  This is the basic requirement
2  from us, to have this information.
3     Q.   Would there be additional
4  communications, other than by email, with
5  traders like O.W. Bunker?
6     A.   Yes.
7     Q.   What would those communications be?
8     A.   Telephone, it's telephone
9  communications.  Most of the negotiation stuff
10  was done by telephone.  So if a seller cannot
11  reach the responsible purchaser he will write an
12  email.
13         MR. MALONEY:  We've been going for
14  about an hour and a half, would you like to take
15  a five-minute break?
16         THE WITNESS:  Yes.
17         (Short recess taken.)
18  BY MR. MALONEY:
19     Q.   We've been talking about the fuel
20  supply to the SANTA ROBERTA.  Who received the
21  nomination for the fuel supply after the traders
22  put in their offers to the bunker purchasing
23  department of Hapag-Lloyd?
24         MR. FERNANDEZ:  Objection to the

Page 57

Norbert Kock (1-19-16)

1  form.
2     A.   O.W. Germany.
3         MR. MALONEY:  I'm going to mark as
4  Exhibit 10 a document Bates labeled HPL-USOT 147
5  through 150.
6         (Kock Exhibit 10, Document Bates
7  stamped HPL-USOT 147 through HPL-USOT 150,
8  marked for identification.)
9     Q.   Do you recognize this document,
10  sir?
11     A.   Yes.
12     Q.   What is this document?
13     A.   This is the formal order
14  confirmation sent by Mr. Karl Heinz Selmer to
15  Mr. Lukas Gaus, to confirm the order they had
16  received from us.
17     Q.   Page 148, the attachment to this
18  email, is this the sales order confirmation that
19  was sent from O.W. Bunker Germany to Hapag-Lloyd
20  AG?
21     A.   Yes.
22     Q.   The seller in this document is
23  listed as O.W. Bunker Germany GMBH?
24     A.   Yes.

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 58

Norbert Kock (1-19-16)

1  Q.    And it's for the supply of fuel to
2  the SANTA ROBERTA?
3      A.    The supplier has been mentioned as
4  U.S. Oil.  U.S. Oil has been mentioned as their
5  physical supplier.
6      Q.    Did Hapag-Lloyd have any control
7  over the selection of the physical supplier?
8      A.    No.
9      Q.    Did Hapag-Lloyd direct O.W. Germany
10  to use U.S. Oil for the supply of fuel in
11  Tacoma?
12      A.    No.
13      Q.    What is Norton Lilly?
14      A.    Norton Lilly is the local agency of
15  Hapag-Lloyd in this area.
16      Q.    Can you explain what a port agent
17  is?
18      A.    The agent is responsible to
19  coordinate also bunker supplies or lubricant
20  supplies between the local vendors and the
21  vessel; and in case of fuel oil supplies also
22  the engaged quality control, which is normally a
23  bunker surveyor engaged by us.
24      Q.    Was there a bunker surveyor engaged
25

Page 59

Norbert Kock (1-19-16)

1  in connection with this supply?
2      A.    Yes.
3      Q.    Who was that, if you recall?
4      A.    Oiltest.
5      Q.    Does a port agent such as Norton
6  Lilly, or a bunker surveyor such as Oiltest, do
7  they have any responsibility for purchasing
8  fuel?
9      A.    No.
10      Q.    They are not authorized by
11  Hapag-Lloyd to purchase fuel?
12      A.    No.
13      Q.    It's fair to say that they're
14  involved in the logistics of coordinating the
15  delivery after the order is placed?
16      A.    Yes.
17      Q.    Under remarks there's a designation
18  that says "HALO GTC2007 shall apply."  What does
19  that mean?
20      A.    They are referring to an earlier
21  accepted set of terms and conditions of
22  Hapag-Lloyd, which has been created in 2006, but
23  the business condition between O.W. Bunker
24  Germany and Hapag-Lloyd were begun or started in
25

Page 60

Norbert Kock (1-19-16)

1  2007.  This was a year when O.W. Bunker accepted
2  our terms and conditions of 2006.
3      What they are mentioning here is
4  that they are delivering or that they will
5  deliver based on our GTCs of 2007, but 2007 was
6  the date of the signature.  The date, the year
7  of the start between the business relationship
8  of Hapag-Lloyd and O.W. Bunker Germany.
9      Q.    Is it correct that Hapag-Lloyd had
10  terms and conditions in 2007, a prior version
11  from the document you reviewed earlier, or am I
12  misunderstanding your response?
13      A.    The valid version at that time when
14  the business connection was established was
15  based on 2006.  There's no version available
16  from 2007.
17      Q.    Do you know whether the 2006
18  version of the terms and conditions has been
19  produced in this case?
20      A.    Yeah.
21      MR. FERNANDEZ:  It has.
22      Q.    This confirmation memorializes the
23  agreement between O.W. Germany and Hapag for the
24  purchase of fuel bunkers for the SANTA ROBERTA?
25

Page 61

Norbert Kock (1-19-16)

1      A.    Yes.
2      Q.    On page 149 there is a paragraph
3  marked "Terms," and that reads that "the sale
4  and delivery of the marine fuels described above
5  are subject to the O.W. Bunker Group's terms and
6  conditions of sale for marine bunkers," and it
7  refers to Hapag-Lloyd as buyer and O.W. Bunker
8  Germany as seller.
9      What's your understanding of this
10  paragraph?
11      A.    This is a -- this is a standard
12  term in their pamphlet.
13      Q.    Did the O.W. Bunker Group's terms
14  and conditions apply to this fuel transaction?
15      A.    No.
16      Q.    Is the basis for your statement the
17  remarks that are listed on page 148?
18      MR. FERNANDEZ:  Objection to the
19  form.
20      A.    In the sales order confirmation
21  they confirmed that the Hapag-Lloyd terms and
22  conditions shall apply.
23      Q.    Was it always the case that
24  Hapag-Lloyd's terms and conditions applied to
25

16 (Pages 58 to 61)

Page 62

Norbert Kock (1-19-16)

1
2  agreements with O.W. Germany?
3      A.   Yes.
4      Q.   In every fuel transaction that you
5  conducted with them?
6      A.   Yes.
7      Q.   Were there ever any conflicts
8  between the Hapag-Lloyd Group's terms and
9  conditions and the O.W. Bunker Group's terms and
10  conditions?
11      A.   Yes.
12      Q.   Were there any disputes with O.W.
13  Germany about that?
14          MR. FERNANDEZ:  Objection to the
15  form.
16      A.   No, because our requirement when we
17  started the business relationship was to accept
18  our terms and conditions of purchasing.  That's
19  the same with any other supplier working for us,
20  everybody has to accept our terms and conditions
21  for purchasing, otherwise we won't come into
22  business with these guys.
23          (Kock Exhibit 11, Document Bates
24  stamped HPL-USOT 151 through HPL-USOT 153
25  marked for identification.)

Page 63

Norbert Kock (1-19-16)

1
2      Q.   What's been marked as Exhibit 11 is
3  a document labeled HPL-USOT 151 through 153,
4  it's an email from Mr. Gaus dated October 1,
5  2014.
6          Have you seen this email before?
7      A.   Yes.
8      Q.   What is this email?
9      A.   This is our written order
10  confirmation to O.W. Bunker Germany.
11      Q.   Is this order confirmation
12  automatically generated by your system?
13      A.   Yes.
14      Q.   Does Mr. Gaus have to fill in any
15  of the information?
16      A.   Yes.
17      Q.   How does it work?
18      A.   It's an infrastructure available
19  showing all these different paragraphs here
20  which comes along with delivery, survey,
21  sampling, payment, invoicing; but the individual
22  order quantity, product quality, the estimated
23  date of arrival of the vessel, this has to be
24  included manually into this infrastructure.  The
25  infrastructure we are working with is an SAP

Page 64

Norbert Kock (1-19-16)

1
2  system.
3      Q.   So Mr. Gaus has to fill in the
4  information next to reference number, account,
5  seller in the middle of the page here on page
6  151?
7      A.   Yes.
8      Q.   The information about the local
9  physical supplier that would be used by O.W.
10  Germany, is that information that Mr. Gaus would
11  have received from Mr. Selmer?
12      A.   Yes, and it's needed for logistical
13  reasons.
14      Q.   Would this purchase order be
15  generated before or after the order was agreed?
16      A.   The order agreement has taken place
17  during a telephone call, this is the normal way
18  we are purchasing; and then the written order
19  would be processed later on, it could be the
20  same day or it could be the next day depending
21  on what time the order is placed.
22      Q.   On page 152 there are additional
23  provisions as to quality and quantity of the
24  fuel relating to a survey and sampling of the
25  fuel, do you see that?

Page 65

Norbert Kock (1-19-16)

1
2      A.   Um-hum.
3      Q.   Those are obligations that O.W.
4  Germany took on?
5      A.   This is a standard requirement of
6  Hapag-Lloyd.  These procedures are standard
7  procedures from Hapag-Lloyd.  Any vendor
8  supplier has to follow, or seller has to follow
9  these procedures.
10      Q.   Do you know if Hapag-Lloyd made any
11  payment on the supply to O.W. to the SANTA
12  ROBERTA?
13      A.   Yes.
14      Q.   What's your understanding?
15      A.   We make payment to the seller.
16          MR. MALONEY:  Let me show you what
17  I will have marked as Exhibit 12.
18          (Kock Exhibit 12, Document Bates
19  stamped HPL-USOT 80, marked for identification.)
20      Q.   This is a document Bates labeled
21  HPL-USOT 80.  Have you seen this document
22  before?
23      A.   Yes.
24      Q.   What is this document?
25      A.   This is the sales invoice of O.W.

17 (Pages 62 to 65)

Page 66

```
 1           Norbert Kock (1-19-16)
 2  Germany to Hapag-Lloyd.
 3       Q.   Do you see there that the date of
 4  the invoice was October 9th of 2014?
 5       A.   Yes.
 6       Q.   With a due date of November 8,
 7  2014?
 8       A.   Yes.
 9       Q.   This invoice was paid?
10       A.   Yes.
11       Q.   What is the box in the middle on
12  the top, it says October 20, 2014?
13       A.   This is the booking date our
14  accounting department booked this invoice into
15  the system.  Mrs. Sakowski is an employee at the
16  accounting department.
17       Q.   There is some handwriting and there
18  is also a bar code on this version of the
19  document, I would like to take those marks one
20  at a time.
21            What's the handwriting in the upper
22  right-hand corner, if you know?
23       A.   I don't know.
24       Q.   In the middle right below the
25  accounting department's stamp, do you know what
```

Page 67

```
 1           Norbert Kock (1-19-16)
 2  this is?
 3       A.   This is the name of the team leader
 4  of our accounting department, Mrs. Kargel.
 5            THE INTERPRETER:  K-a-r-g-e-l.
 6       Q.   Do you have an understanding of
 7  what the bar code refer to?
 8       A.   This could be the invoicing system
 9  at that time was read automatically into our SAP
10  system, and I think this bar code assisted the
11  system to read the invoice specifics, or the
12  invoice details.
13       Q.   Do you have any understanding of
14  what the numbers refer to there?
15       A.   No.  That's a code.
16       Q.   The handwritten numerals to the
17  left?
18       A.   For me it looks like the euro U.S.
19  dollar cost at that time.
20       Q.   If the O.W. Bunker Group had not
21  gone bankrupt in early November, would these
22  transactions as to these six vessels all have
23  taken place in the same manner, which is to say
24  bunker requisition form, offers to sellers,
25  nomination to a particular seller, delivery,
```

Page 68

```
 1           Norbert Kock (1-19-16)
 2  invoice and payment to that seller?
 3       A.   Yes.
 4            MR. FERNANDEZ:  Objection to the
 5  form.
 6       Q.   Is there anything about the other
 7  five transactions involving the SEASPAN HAMBURG,
 8  the VIENNA EXPRESS, SOFIA EXPRESS, the DERBY D
 9  or the SIDNEY EXPRESS that would be different
10  from the transaction we just reviewed relating
11  to the SANTA ROBERTA?
12            MR. FERNANDEZ:  Objection to the
13  form.
14            MR. KEOUGH:  Objection to the form.
15       A.   If O.W. not had gone bust, no.
16            (Kock Exhibit 13, Document Bates
17  stamped HPL-USOT page 38, marked for
18  identification.)
19       Q.   We have marked as Exhibit 13 a
20  document Bates labeled HPL-USOT 38.  Have you
21  seen this document before?
22       A.   Yes.
23       Q.   Was this a document produced from
24  Hapag-Lloyd's own files?
25       A.   No.
```

Page 69

```
 1           Norbert Kock (1-19-16)
 2       Q.   How did Hapag-Lloyd come into
 3  possession of this document?
 4       A.   This has been shown to me during
 5  the preparation of this event.
 6       Q.   Was that the first time you saw a
 7  copy of this document?
 8       A.   Yeah.
 9       Q.   Did U.S. Oil Trading have an
10  account with Hapag-Lloyd?
11       A.   No.
12       Q.   And this is not an invoice that was
13  sent to Hapag-Lloyd?
14       A.   No.
15            (Kock Exhibit 14, Document Bates
16  stamped HPL-USOT pages 170 and HPL-USOT 171,
17  marked for identification.)
18       Q.   We have marked as Exhibit 14 a
19  document Bates labeled HPL-USOT pages 170 to
20  173.  Have you seen this email and its
21  attachments before?
22       A.   This is the confirmation of the
23  SANTA ROBERTA advising us about the received
24  fuel oil.
25       Q.   And on page 172 what does this
```

18 (Pages 66 to 69)

Page 70

Norbert Kock (1-19-16)

1    attachment refer to?
2         A.   This is a payment advice that
3    Hapag-Lloyd is going to pay the different
4    amounts for the different stamps to O.W. Bunker
5    Germany.
6         Q.   Payment advice, is that what
7    Zahlungsbeleg refers to?
8         A.   Yes.
9         MR. FERNANDEZ:  Just note my
10   objection.  You marked Exhibit 14 which is
11   numbered 170 through 173, I think that may have
12   been marked in error.  You have 170 and 171 seem
13   to be standalone documents.  Then 172 and 173 I
14   don't believe are affixed to the bunker delivery
15   note.  You can certainly ask the witness that,
16   but please note my objection to the way this
17   exhibit has been marked.
18         MR. MALONEY:  So noted.  I agree
19   with your characterization, Mr. Fernandez.
20        Q.   So is it the case, Mr. Kock, that
21   the bunker delivery note at page 171 is the
22   attachment to page 170?
23        A.   Yes.
24        Q.   And then the next pages 172 and 173

Page 71

Norbert Kock (1-19-16)

1
2    refer to a separate document?
3         A.   Yes.  So this payment advice is
4    normally not going through our department.  It's
5    done by our accounting department, and our
6    accounting department is sending it out to the
7    different vendors they are paying.
8         MR. FERNANDEZ:  Are we able to
9    break these apart so the record is clear and
10   mark the two pages 14?
11        MR. MALONEY:  I'm happy to mark
12   pages 172 and 173 as Exhibit 15.
13        MR. FERNANDEZ:  Thank you.
14        (Kock Exhibit 15, Document Bates
15   stamped HPL-USOT 172 and HPL-USOT 173, marked
16   for identification.)
17        Q.   Just to clear up the record.  How
18   does the bunker purchasing department at
19   Hapag-Lloyd use the bunker delivery note that
20   was communicated to it here in Exhibit 14?
21        A.   The quantity stated on the bunker
22   delivery note, the metric tons, will be booked
23   as a stop receipt into our SAP system against
24   the existing purchase order.
25        Q.   If, for example, there was a

Page 72

Norbert Kock (1-19-16)

1
2    dispute about the quantity or the quality of the
3    fuel listed on the bunker delivery note, who
4    would Hapag-Lloyd deal with as to that dispute?
5         A.   The responsible purchaser.
6         Q.   So is that O.W. Bunker Germany?
7         MR. FERNANDEZ:  Could you reframe
8    the question please.
9         MR. MALONEY:  Sure.
10        Q.   So once the bunker purchasing
11   department receives a bunker delivery note, they
12   check the quantity and quality against the
13   original purchase order placed with the seller,
14   is that fair?
15        A.   Yes.
16        Q.   And if there were any disputes
17   would Hapag-Lloyd go to its seller to resolve
18   those?
19        A.   Yes.
20        Q.   In this case that would be O.W.
21   Bunker Germany?
22        A.   Yes.
23        Q.   Do you know if there were any such
24   disputes about this particular transaction?
25        A.   I can't remember.  I don't think

Page 73

Norbert Kock (1-19-16)

1
2    there was a dispute here in this respect.
3         Q.   Now turning to Exhibit 15 which is
4    Bates labeled HPL-USOT 172 to 173.  It appears
5    there are seven separate fuel transactions with
6    different vessels, is that correct?
7         A.   Yes.
8         Q.   One of those vessels is the SANTA
9    ROBERTA?
10        A.   Yes.
11        Q.   This document reflects payment made
12   to O.W. Germany on the SANTA ROBERTA and other
13   transactions?
14        A.   Yes.
15        Q.   Would you mind translating for the
16   record what the German text reads after "ladies
17   and gentlemen"?
18        A.   This is separate -- there is a
19   separate payment of the below mentioned items.
20   We did --
21        THE INTERPRETER:  On advisement of
22   the correctness.
23        A.   Of the supplies.
24        THE INTERPRETER:  Of the supplies
25   or.

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 74

Norbert Kock (1-19-16)

1
2    A.    Or performance.
3          THE INTERPRETER:  Performance and
4    its calculation.
5    A.    And its calculation we paid.
6    Q.    Who is Frau Bolgow?
7    A.    Frau Bolgow is a manager, a worker
8    in the accounting department.
9    Q.    This document was dated
10   November 6th of 2014?
11   A.    Yes.
12         (Kock Exhibit 16, Document Bates
13   stamped HPL-USOT 87 through HPL-USOT 89, marked
14   for identification.)
15   A.    May I say something?
16   Q.    Absolutely.
17   A.    There is something wrong here
18   because the attachments are Hapag-Lloyd's crew
19   lists, and the first page here is referring to
20   an invoice and bunker delivery note coming from
21   O.W. Bunker Germany.
22   Q.    We've marked as Exhibit 16
23   documents that have been Bates labeled HPL-USOT
24   87 through 89.  The witness has referenced that
25   page 87 refers to an invoice and bunker delivery

Page 75

Norbert Kock (1-19-16)

1
2    note from O.W. Bunker Germany, but the following
3    pages appear to refer to an unrelated document.
4          MR. MALONEY:  I would just ask
5    counsel to follow up on whether the correct
6    attachments have been produced at page 87.
7          MR. FERNANDEZ:  Okay.
8    Q.    I would like to turn to the SEASPAN
9    HAMBURG.
10         (Kock Exhibit 17, Document labeled
11   "Time Charter," Bates stamped HPL-USOT 201 to
12   HPL-USOT 205, marked for identification.)
13   Q.    Was the SEASPAN HAMBURG on time
14   charter by Hapag-Lloyd in 2014?
15   A.    That's what the pamphlet says.
16   It's a time charter contract.
17   Q.    We've marked as Exhibit 17 a
18   document labeled "Time Charter," it's marked
19   HPL-USOT pages 201 to 205.
20         Is this the time charter for the
21   SEASPAN HAMBURG?
22         MR. KEOUGH:  Objection to the form.
23         MR. FERNANDEZ:  Objection.
24   Q.    Have you seen this document before,
25   sir?

Page 76

Norbert Kock (1-19-16)

1
2    A.    No.
3    Q.    Do you know who owns the SEASPAN
4    HAMBURG?
5    A.    SEASPAN, but SEASPAN is a -- I
6    don't know where the SEASPAN is here.  I can't
7    confirm this.
8    Q.    Is this a document produced from
9    Hapag-Lloyd's files?
10   A.    This is a document which is
11   produced between our chartering department and
12   the vessel's manager or owner.  We are not
13   involved in that business, or our department,
14   our purchasing department is not involved in
15   that business.
16   Q.    Do you see under line 37 of this
17   document, on page 201, the passage that reads
18   that the charterers shall provide and pay for
19   all fuel and MDO, with certain exceptions stated
20   there in the clause?
21   A.    I see it.
22   Q.    Do you have an understanding
23   whether that was the case for the SEASPAN
24   HAMBURG, that the Hapag-Lloyd was the
25   responsible party for purchasing fuel?

Page 77

Norbert Kock (1-19-16)

1
2    A.    Yes.
3    Q.    That's the case?
4    A.    Yes.
5    Q.    Who would be the person in the
6    chartering department responsible for
7    negotiating that?
8    A.    Mr. Tim Petersen.
9    Q.    Tim Petersen?
10   A.    Tim Petersen, he was assigned
11   together with his manager director, Mr. Glen
12   Hards.
13   Q.    So you recognize those signatures
14   there on page 205 as Mr. Petersen and Mr. Hards?
15   A.    Yes.
16         (Kock Exhibit 18, Document Bates
17   stamped HPL-USOT 90 through HPL-USOT 91, marked
18   for identification.)
19   Q.    We've marked as Exhibit 18 a
20   document Bates labeled HPL-USOT 90 through 91.
21   Have you seen this document before?
22   A.    Yes.
23   Q.    What is this document?
24   A.    This is another bunker requisition
25   form sent by the SEASPAN HAMBURG to our

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 78

Norbert Kock (1-19-16)

1  department.
2  Q.  Does RQMT stand for requirement?
3  A.  Yes.
4  Q.  What is TIW in the subject line?
5  A.  This is the abbreviation of the
6  port.
7  Q.  Tacoma Washington?
8  A.  This is a -- I think this is a
9  code.  This is a UN code -- no, this is not a UN
10  code.  For me this is a self-created
11  abbreviation from the vessel.
12  Q.  Is there any physical supplier
13  specified in this email or its attachment?
14  A.  No.
15  (Kock Exhibit 19, Document Bates
16  stamped HPL-USOT 92 through HPL-USOT 94, marked
17  for identification.)
18  Q.  We've marked as Exhibit 192 emails
19  and attachments that have been Bates labeled
20  HPL-USOT 92, 93 and 94, and it appears that
21  there are two emails and then a document behind
22  that; is that fair to say?
23  A.  There's also some hiccup here I
24  see, because the covering page is referring to

Page 79

Norbert Kock (1-19-16)

1  an inquiry Mr. Lukas Gaus placed into the market
2  for this vessel calling for Tacoma, Oakland and
3  Los Angeles in a row, and behind there is
4  communication between Karl Heinz Selmer and O.W.
5  Bunker and Lukas Gaus about the typical
6  specifications of the ordered product, and
7  another attachment referring to our price
8  comparison we are doing.
9  So the first page here has nothing
10  to do with the attachments and behind.  I would
11  have expected here a copy of the inquiry from
12  Mr. Lukas Gaus, like we had it for the previous
13  vessel.
14  Q.  Noted.
15  MR. FERNANDEZ:  The top page, is
16  that what you're referring to?
17  A.  This is the top page for our
18  inquiry.
19  Q.  Page 92 refers to the inquiry that
20  was sent into the marketplace by Hapag-Lloyd,
21  correct?
22  A.  Yes.
23  Q.  Then page 93, is that a response
24  from O.W. Bunker Germany?

Page 80

Norbert Kock (1-19-16)

1  A.  Yes.
2  Q.  Page 94 is a separate document?
3  A.  Yes.
4  Q.  What does the heading mean on page
5  94?
6  A.  This is a price comparence (sic)
7  showing --
8  Q.  Is it a price comparison?
9  A.  The meaning here is
10  Preisvereinbarungen.
11  THE INTERPRETER:  Agreement.
12  A.  Which means agreement.
13  Q.  It says for HFO and MDO?
14  A.  Yes.
15  Q.  What is HFO and MDO?
16  A.  HFO is heavy fuel, a heavy fuel
17  oil, and MDO means marine distillate oil.
18  Q.  This chart refers to the vessel,
19  the SEASPAN HAMBURG?
20  A.  Yes.
21  Q.  Who fills out a chart like this?
22  A.  The responsible purchaser.
23  Q.  This appears to be a document
24  filled out by Karl Heinz Selmer, is that

Page 81

Norbert Kock (1-19-16)

1  correct?
2  MR. KEOUGH:  Objection.
3  A.  This document has been filled out
4  by the responsible purchaser.
5  Q.  Who is the responsible purchaser?
6  A.  At that time it looks like Lukas
7  Gaus was working on this vessel here, and he's
8  using this piece of paper here to compare all
9  the incoming orders to evaluate which offer is
10  best, most favorable for Hapag-Lloyd.
11  So I call it price comparence sheet
12  because it's not an agreement.  After we find an
13  agreement here and it states with whom Mr. Gaus
14  was making this agreement here, with O.W. Bunker
15  Germany and Karl Heinz Selmer.
16  Q.  In the lower right, does that refer
17  to the price that was agreed with O.W. Germany?
18  A.  In the lower right, the
19  1.5 million?
20  Q.  Yes.
21  A.  This is the total, the total U.S.
22  dollar order amount based on the order quantity
23  multiplied with the price O.W. Bunker Germany
24  gave us.

21 (Pages 78 to 81)

Page 82

Norbert Kock (1-19-16)

1      Q.   Do you know why O.W. Bunker is
2  listed twice over there on the left, in the
3  first column entitled "Anbieter"?
4      MR. KEOUGH: Objection.
5      A.   Because they offered twice. They
6  offered us $520 in Oakland and they offered us
7  $523 in Tacoma. Although it looks like the $523
8  is more expensive than the other ones, we picked
9  it because it was representing the highest
10 energy contents.
11      So for us it lowers energy costs,
12 and also a very good ignition product, the CCAI
13 value gives you some kind of knowledge about the
14 ignition quality of the offered fuel oil, and
15 825 is very good.
16      Q.   So because the fuel had a higher
17 quality at a lower price O.W. Bunker got the
18 nomination?
19      A.   Yes. You can see there's a column
20 here under "Bestellkombination," there is the
21 first column here.
22      MR. KEOUGH: You can say it in
23 English please.
24      A.   This is the total cost weighted on
25

Page 83

Norbert Kock (1-19-16)

1  energy contents.
2      MR. KEOUGH: Which column are you
3  referring to, sir?
4      THE INTERPRETER: The one before
5  last.
6      MR. KEOUGH: Mr. Interpreter, since
7  we haven't sworn you in yet --
8      MR. MALONEY: He has been sworn.
9      MR. KEOUGH: Okay. Please go
10 ahead, sir.
11      THE INTERPRETER: The one before
12 last, it says IFO/MFO.
13      THE INTERPRETER: The total cost by
14 weight/energy.
15      A.   Sorry to correct you. It's not by
16 weight, the energy is weighted in this cost
17 here.
18      THE INTERPRETER: Considered,
19 listed weighted.
20      A.   No, weighted, because we do an
21 energy calculation here. We have an Energlewert
22 here also. This Energlewert will be weighted in
23 the total cost. So this offer here, the second
24 offer by O.W. was for us the most economic
25

Page 84

Norbert Kock (1-19-16)

1  offer. You can see it on the weighted U.S.
2  dollar amount.
3      Q.   Do you know what is GEFO in the
4  first column of the persons who offered?
5      A.   GEFO is a Hamburg-based trader, who
6  is also working based on our terms and
7  conditions. As any other parties here mentioned
8  as well.
9      Q.   And Peninsula refers to Peninsula
10 Petroleum?
11      A.   Yes.
12      Q.   This document is dated October 10,
13 2014, is that correct?
14      A.   This was the date of the fixing
15 here, right, October 10th.
16      (Kock Exhibit 20, Document Bates
17 stamped HPL-USOT 95 through HPL-USOT 98, marked
18 for identification.)
19      MR. FERNANDEZ: Off the record.
20      (Off-the-record discussion held.)
21      Q.   We've marked as Exhibit 20 a
22 document Bates labeled HPL-USOT 95 through 98.
23 Have you seen this document before, sir?
24      A.   Yes.
25

Page 85

Norbert Kock (1-19-16)

1      Q.   What is this document?
2      A.   This is an order confirmation
3  coming from O.W. Bunker Germany to Hapag-Lloyd
4  confirming the bunker deal for the SEASPAN
5  HAMBURG at Tacoma.
6      Q.   Just like with the SANTA ROBERTA,
7  O.W. Bunker Germany is the seller?
8      A.   Yes.
9      Q.   And Hapag-Lloyd AG is the buyer?
10      A.   Yes.
11      Q.   The same remarks "HALO GCT2007
12 shall apply" are listed on page 96?
13      A.   Yes.
14      Q.   Norton Lilly is being used as a
15 port agent?
16      A.   Right.
17      Q.   On page 95 Mr. Selmer writes to
18 Mr. Gaus "Dear Lukas, thank you for your
19 support."
20      Do you have an understanding of
21 what he means by that?
22      A.   To receive the offer. Sorry, to
23 receive the order.
24      (Kock Exhibit 21, Document Bates

22 (Pages 82 to 85)

Page 86

Norbert Kock (1-19-16)

1
2  stamped HPL-USOT pages 105 and HPL-USOT 106,
3  marked for identification.)
4      Q.    We've marked as Exhibit 21 an email
5  Bates stamped HPL-USOT pages 105 to 106.  Have
6  you seen this email before?
7      A.    Yes.
8      Q.    What is this email?
9      A.    This is an information back to the
10 local agent, Norton Lilly, and the vessel, and
11 the people in the stowage center, as well as to
12 the bunker surveyor informing them about the
13 done stem, that there will be 2,900 for the
14 SEASPAN HAMBURG and at Tacoma to coordinate the
15 supplier.
16     (Kock Exhibit 22, Document Bates
17 stamped HPL-USOT 113 and HPL-USOT 114, marked
18 for identification.)
19     Q.    Marked as Exhibit 22 an email with
20 attachment, Bates labeled HPL-USOT 113 and 114.
21 Have you seen this document before?
22     A.    Yes.
23     Q.    What is this document?
24     A.    This is an email from the SEASPAN
25 HAMBURG after sending to the responsible

Page 87

Norbert Kock (1-19-16)

1
2  purchaser confirming the receipt of 2900 tons
3  fuel oil at Tacoma on the 16th of October 2014.
4      Q.    This email went to the Hapag-Lloyd
5  bunker purchasing department?
6      A.    Yes, as well as to the technical
7  department.  I think it might be a
8  superintendent department of SEASPAN had been
9  copied.
10     Q.    On the face of the page, on page
11 114, what is the attachment?
12     A.    This is the attachment to that
13 email.
14     Q.    Do you have any understanding of
15 the large stamp marked "SEASPAN HAMBURG Bunker
16 Receipt"?
17     A.    No, this stamp has not been created
18 by our department.  It looks like this stamp has
19 been created by the vessel's owner or manager.
20     Q.    It reads that, "Bunkers are
21 received onboard and taken into custody for and
22 on behalf of Charterers only for the account of
23 the Charterer.  No lien" it's illegible for the
24 next two words "or accountability for the supply
25 and/or payment is accepted by the Owner or

Page 88

Norbert Kock (1-19-16)

1
2  Manager, Master, Officers or crew or agents for
3  the Owner Or Manager."
4      Have you seen stamps like this
5  before in the course of your work at
6  Hapag-Lloyd?
7      A.    Occasionally.
8      Q.    What is the effect of a stamp like
9  this?
10     MR. KEOUGH:  Objection.
11     MR. FERNANDEZ:  Objection.
12     A.    For our department, I don't see
13 any.
14     (Kock Exhibit 23, Document Bates
15 stamped HPL-USOT 24, marked for identification.)
16     Q.    We have marked as Exhibit 23 a
17 document Bates labeled HPL-USOT 24.  Have you
18 seen this document before?
19     A.    Yes.
20     Q.    What is this document?
21     A.    This is the invoice from O.W.
22 Hamburg to Hapag-Lloyd for the supply of fuel
23 oil at Tacoma.
24     Q.    The invoice from O.W. Germany to
25 Hapag-Lloyd?

Page 89

Norbert Kock (1-19-16)

1
2      A.    Right.
3      Q.    There are again some stamps on the
4  invoice.  Was this booked by Hapag-Lloyd's
5  accounting department in October 28th of 2014?
6      A.    Yes.  You like the name.  It has
7  been booked by the accounting manager,
8  Mrs. Yaylaoglu.  I think she's coming from
9  Turkey.
10     Q.    Do you know whether this invoice
11 was paid by Hapag-Lloyd to O.W. Germany?
12     A.    Yes.
13     Q.    Yes, it was paid?
14     A.    No.  Wait.  Due date November 15th.
15 I strongly believe we have stopped it.
16     Q.    Ordinarily the terms of payment are
17 within 30 days from the date of delivery listed
18 there on the invoice?
19     A.    Right, providing the invoice is
20 coming within 14 days or 15 days after supply.
21 If not, we are paying 15 days after receipt of
22 the invoice.
23     MR. MALONEY:  I think it's a good
24 time for a lunch break.
25     (Lunch recess taken at 12:54 p.m.)

23 (Pages 86 to 89)

Page 90

1              Norbert Kock (1-19-16)
2         (Resumed 1:48 p.m.)
3         (Kock Exhibit 24, Document Bates
4    stamped HPL-USOT 00115, marked for
5    identification.)
6         (Kock Exhibit 25, Document Bates
7    stamped HPL-USOT pages 58 through HPL-USOT 60,
8    marked for identification.)
9         (Kock Exhibit 26, Document Bates
10   stamped HPL-USOT pages 128 to HPL-USOT 129,
11   marked for identification.)
12        (Kock Exhibit 27, Document Bates
13   stamped HPL-USOT page 78, marked for
14   identification.)
15        (Kock Exhibit 28, Document Bates
16   stamped HPL-USOT 126, marked for
17   identification.)
18        (Kock Exhibit 29, Document Bates
19   stamped HPL-USOT 189 to HPL-USOT 192, marked for
20   identification.)
21        (Kock Exhibit 30, Document Bates
22   stamped, marked for identification.)
23        (Kock Exhibit 31, Document Bates
24   stamped HPL-USOT 199 through HPL-USOT 200,
25   marked for identification.)

Page 91

1              Norbert Kock (1-19-16)
2         MR. MALONEY:  We're back from
3    lunch.
4         Q.   I'm going to hand you a document
5    marked as Kock Exhibit 24, document Bates
6    labeled HPL-USOT 00115.
7              Is this email and attachment from
8    the SOFIA EXPRESS?
9         A.   Yes.
10        Q.   What does this document refer to?
11        A.   It's a bunker requisition for the
12   Port of Tacoma on the 29th of October, coming
13   from the vessel's master.
14        Q.   Do you know, was the SOFIA EXPRESS
15   owned by Hapag-Lloyd?
16        A.   This is a Hapag-Lloyd vessel.
17        Q.   Was Hapag also operating that
18   vessel?
19        A.   Yes.
20        Q.   In October of 2014?
21        A.   Yes.
22        Q.   This email went to the bunker
23   purchasing department?
24        A.   Yes.  To the requirement section,
25   3.

Page 92

1              Norbert Kock (1-19-16)
2         Q.   I hand you a document that we've
3    marked as Exhibit 25, it's labeled HPL-USOT
4    pages 58 through 60.
5              Have you seen this document before?
6         A.   Yes.
7         Q.   What is this document?
8         A.   This is the written purchase order
9    to our product center at O.W. Bunker Germany
10   GMBH.
11        Q.   Is this document generated in the
12   ordinary course of Hapag-Lloyd's business?
13        A.   Yes.
14        Q.   Was it generated at or near the
15   time that the order was placed?
16        A.   Yes.
17        Q.   Is it the regular practice of the
18   bunker purchasing department to generate
19   purchase orders such as these?
20        A.   Yes.
21        Q.   I'm handing you a document that
22   I've marked as Exhibit 26, it's labeled HPL-USOT
23   pages 128 to 129.  Have you seen this document
24   before?
25        A.   Yes.

Page 93

1              Norbert Kock (1-19-16)
2         Q.   What is this document?
3         A.   This is the bunker receipt the
4    SOFIA EXPRESS sent us after receiving the bunker
5    replenishment at Tacoma on October 29, 2014.
6         Q.   The email is directed to Ship
7    Management Fuel.  What is Ship Management Fuel?
8         A.   Ship Management Fuel is our ship
9    management department.
10        Q.   At Hapag-Lloyd?
11        A.   At Hapag-Lloyd.
12        Q.   Is that different from the bunker
13   requirement department?
14        A.   It's a neighbor department of our
15   purchasing department.
16        Q.   I'm going to hand you a document
17   that I've marked as Exhibit 27, it's labeled
18   HPL-USOT page 78.
19              My question again is have you seen
20   this document before?
21        A.   Yes.
22        Q.   And what is this document?
23        A.   This is an invoice issued by O.W.
24   Bunker to Hapag-Lloyd AG for the supply of fuel
25   oil in the Port of Tacoma to the SOFIA EXPRESS.

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 94

Norbert Kock (1-19-16)

1
2    Q.    It's dated November 1st of 2014?
3    A.    Yes.
4    Q.    This copy is a little bit hard to
5    read.  Underneath the line items for quantity
6    supplied and quality there's a notation that
7    it's a "non-taxable delivery abroad."
8          Do you have an understanding of
9    what that means?
10   A.    No.
11   Q.    I can't read the handwriting on the
12   right.  Do you have any understanding of what
13   that notation refers to?
14   A.    It looks like that a claim has been
15   issued on this supplier and the payment, the
16   normal payment run has been stopped due to this
17   claim.
18   Q.    Are you referring to a claim with
19   respect to the quantity or quality of fuel
20   delivered, or something else?
21   A.    In this specific case I can't
22   remember.
23   Q.    It's your understanding that this
24   invoice has not been paid, correct?
25   A.    Yes.

Page 95

Norbert Kock (1-19-16)

1
2    Q.    I hand you a document that I've
3    marked as Exhibit 28, Bates labeled HPL-USOT
4    126.  This is an email from Dorit Niemeyer to
5    Mr. Selmer, dated November 5th of 2014, and the
6    exhibit goes on to page 127 with its attachment.
7          I'll just ask you to take a look at
8    that document?
9    A.    Mrs. Niemeyer issued a claim.
10   Q.    Does this --
11   A.    Based on a different analyzed
12   product density compared to the given density on
13   the bunker delivery receipt, so we had a short
14   delivery.
15   Q.    What is a short delivery?
16   A.    A product density, I mean, the
17   delivered metric tons will be calculated based
18   on a delivered volume, which has a delivery
19   temperature and a specific product density.
20   Based on these three items you can calculate
21   metric tons which will be invoiced from a
22   volume, because the bunker barge while alongside
23   the vessel can be weighted.
24          You cannot only do a volume
25   measurement, you measure the barrels or gallons

Page 96

Norbert Kock (1-19-16)

1
2    or liters or cubic meters, and if the product
3    density is analyzed lighter than the given
4    density on the bunker delivery receipt, you will
5    calculate a loss to the shipowner because this
6    is a pure commercial claim.
7    Q.    Would the bunker purchasing
8    department ever send a claim like this to the
9    local physical supplier?
10   A.    No.  We have no relation to this
11   physical supplier, we have no contract with
12   them.
13   Q.    The information on page 127 details
14   the claim that Ms. Niemeyer made?
15   A.    Yes.  This is the fuel survey
16   report we received from the attending surveyor
17   who was at the scene witnessing the quantity
18   determination onboard of the bunker barge, and
19   witnessing also the sample drawing, and then
20   arranging later on the analysis here.
21   Q.    Does the review of that email
22   refresh your recollection as to whether that
23   refers to the claim that's indicated on the
24   invoice?
25   A.    It looks like, yes.

Page 97

Norbert Kock (1-19-16)

1
2    Q.    I'm going to hand you a document
3    that I've marked as Exhibit 29, it's Bates
4    labeled HPL-USOT 189 to 192.
5          This is an email from Mr. Selmer to
6    Ms. Niemeyer concerning the VIENNA EXPRESS.  Do
7    you see that?
8    A.    Yes.
9    Q.    The email is in German.  Does it
10   read, in sum and substance, "Thank you for the
11   nomination.  Have a beautiful sunny day"?
12   A.    Right.
13   Q.    Does this email attach the sales
14   order confirmation between Hapag-Lloyd and O.W.
15   Germany?
16   A.    Yes.
17   Q.    O.W. Germany got the nomination for
18   the VIENNA EXPRESS?
19   A.    Yes.
20   Q.    O.W. Germany is listed here as the
21   seller on the transaction?
22   A.    Yes.
23   Q.    The payment terms and terms and
24   conditions remarks are the same as the previous
25   transactions we've reviewed?

25 (Pages 94 to 97)

Page 98

Norbert Kock (1-19-16)

1    A.   Yes.
2    Q.   I hand you a document that I've
3  marked as Exhibit 30, Bates labeled HPL-USOT
4  pages 182 to 184.  Have you seen this document
5  before?
6    A.   Yes.
7    Q.   What is this document?
8    A.   This is the official written order
9  from Hapag-Lloyd to O.W. Bunker Germany
10 confirming the order for VIENNA EXPRESS,
11 2,700 tons of fuel oil at the Port of Tacoma on
12 October 16, 2014.
13   Q.   I hand you a document that I've
14 marked as Exhibit 31, Bates labeled HPL-USOT 199
15 through 200.
16       Do you know who Victoria Bohn is?
17   A.   I don't know Victoria Bohn.  It
18 looks like she's working in or she worked at the
19 O.W. Bunker Hamburg department for issuing
20 invoices, though she's addressing this mail here
21 to our accounting department, Mrs. Sakowski:
22       "Good morning, Mrs. Sakowski.
23 Attached you received invoice and delivery note
24 for the bunker delivery of VIENNA EXPRESS in

Page 99

Norbert Kock (1-19-16)

1  Tacoma on October 18, 2014.  The original
2  documents will follow by courier."
3    Q.   The attachment to this email on
4  page 200, is that the invoice from O.W. Germany
5  to Hapag-Lloyd?
6    A.   Yes.
7    Q.   Again, it was booked on October 29,
8  2014 by Hapag-Lloyd's accounting department?
9    A.   Yes.
10   Q.   This invoice also was not paid?
11   A.   Not paid, the security was issued.
12       (Kock Exhibit 32, Document Bates
13 stamped HPL-USOT 197 to HPL-USOT 198, marked for
14 identification.)
15   Q.   We have marked as Exhibit 32 a
16 document Bates labeled HPL-USOT 197 to 198.
17 Have you seen this document before, sir?
18   A.   Yes.
19   Q.   What is this document?
20   A.   This is an email to our requirement
21 section 3, as well as to our ship management
22 department, confirming the bunker delivery at
23 Tacoma on 18/10/2014.
24       MR. MALONEY:  Let's go off the

Page 100

Norbert Kock (1-19-16)

1  record.
2        (Off the record.)
3        (Exhibit 33, Hapag-Lloyd Terms and
4  Conditions of Purchasing, Bates stamped HPL-OMS
5  1 through HPL-USOT 5, marked for
6  identification.)
7        (Exhibit 34, Email and attachments
8  Bates stamped HPL-OMS 00057 through HPL-OMS
9  00058, marked for identification.)
10       (Exhibit 35, Document Bates stamped
11 ING HL 2718 through ING HL 20, marked for
12 identification.)
13       (Exhibit 36, Document Bates stamped
14 HPL-OMS 28 through HPL-OMS 30, marked for
15 identification.)
16       (Exhibit 37, Document Bates stamped
17 ING HL 32 and ING HL 33, marked for
18 identification.)
19       (Exhibit 38, Document Bates stamped
20 HPL-OMS 63 through HPL-OMS 69, marked for
21 identification.)
22       (Exhibit 39, Document Bates stamped
23 HPL-OMS 42 and HPL-OMS 43, marked for
24 identification.)

Page 101

Norbert Kock (1-19-16)

1        MR. MALONEY:  We've taken a short
2  break just to get some additional documents
3  marked, and we're going to turn now to the
4  SIDNEY EXPRESS and DERBY D.
5    Q.   I'm handing you a document, sir,
6  that I've marked as Exhibit 33, it's HPL-OMS
7  pages 1 through 5.  Do you recognize this
8  document?
9    A.   This is a set of Hapag-Lloyd Terms
10 and Conditions of Purchasing.
11   Q.   This was produced in connection
12 with the O'Rourke Marine Services action, case
13 number 14-cv-10027.
14       Do you have any understanding of
15 whether there were different terms and
16 conditions that applied to the SIDNEY EXPRESS
17 and the DERBY D as to the other four vessels we
18 have just reviewed?
19   A.   No.
20   Q.   What is your understanding?
21   A.   We had a set of terms and
22 conditions negotiated with O.W. Bunker for the
23 supply of fuel oil and distillates in Rotterdam
24 and Antwerp in the late 2013, which was also

26 (Pages 98 to 101)

Page 106

Norbert Kock (1-19-16)

1   securance (sic) has been issued.
2
3       Q.   Security has been issued in the
4   court in these actions?
5       A.   Yes.
6       Q.   Was the DERBY D a vessel that was
7   owned by Hapag-Lloyd or chartered, on charter to
8   Hapag?
9       A.   This was a charter to Hapag-Lloyd.
10      Q.   Do you know who owned the DERBY D
11  in 2014?
12      A.   No.
13      Q.   Do you know whether the charter was
14  governed by a Charter Party?
15      A.   It must be governed by a Charter
16  Party, because a Charter Party is a contract
17  between the vessel's owner and the charterer.
18      Q.   I show you a document that I have
19  marked as Exhibit 38, it's labeled HPL-OMS 63
20  through 69.
21          MR. MALONEY:  I'll note for the
22  record that there is a designation, an entire
23  Bates stamped document number HPL-OMS 63 through
24  122 is hereby deemed confidential.
25          MR. DEHART:  Under the terms of the

Page 107

Norbert Kock (1-19-16)

1
2   confidentiality agreement it applies to all
3   these actions?
4       Q.   Have you seen this document before,
5   sir?
6       A.   I can't remember.
7       Q.   Is this a document that would have
8   been negotiated by your chartering department?
9       A.   Yes.
10      Q.   There on page 69, the last page of
11  the document, are those Mr. Petersen and
12  Mr. Hards' signatures?
13      A.   Yes.
14      Q.   Did you know or do you know who
15  owns the DERBY D?
16      A.   No.
17      Q.   On page 1 of this document it says
18  the Charter Party was made and concluded in
19  Hamburg between Containers Lines Inc., Monrovia,
20  and Hapag-Lloyd.
21          Do you have any reason to doubt
22  whether Containers Lines Inc. are the owners of
23  this vessel, the DERBY D?
24          MR. FERNANDEZ:  Objection.
25      A.   This is not our business.  This is

Page 108

Norbert Kock (1-19-16)

1
2   not our department's business, so I'm not in
3   that stuff.
4       Q.   On page 64 at line 39, is it fair
5   to say that the charterers were responsible for
6   the purchasing of fuel while it was on charter?
7       A.   Based on this definition here in
8   this contract, yes.
9          MR. FERNANDEZ:  Objection to --
10  just objection.
11      Q.   I'm going to hand you a document
12  that I've marked as Exhibit 39, and it's labeled
13  HPL-OMS pages 42 and 43.  Have you seen this
14  document before?
15      A.   Yes.
16      Q.   Is this another inquiry to the
17  market?
18      A.   Yes.
19      Q.   None of the recipients are
20  identified.  Is there a reason why these
21  inquiries are sent without a listing of who is
22  to receive them?
23      A.   Yeah.  The recipients will be only
24  blank carbon copied to not allow them who is
25  participating in this inquiry.

Page 109

Norbert Kock (1-19-16)

1       Q.   To not --
2       A.   We are not interested to allow them
3   to know who is competing to maybe contact each
4   other to manipulate prices.
5       Q.   There's no reference to any local
6   physical suppliers on page 42 and 43, is there?
7       A.   No.
8       Q.   Do you know if this inquiry was
9   sent directly to O'Rourke Marine Services?
10      A.   This inquiry has not been sent to
11  O'Rourke.
12      Q.   Did Hapag-Lloyd have any
13  relationship with O'Rourke Marine Services
14  directly?
15      A.   No, no relationship directly.  We
16  only have relationship to sellers accepting our
17  terms and conditions of purchasing.
18      Q.   O.W. Germany accepted Hapag-Lloyd's
19  terms and conditions?
20      A.   Yes.
21      Q.   Did U.S. Oil Trading accept
22  Hapag-Lloyd's terms and conditions?
23          MR. KEOUGH:  Objection.
24      A.   We had no contact with these guys.

28 (Pages 106 to 109)

Page 110

Norbert Kock (1-19-16)

1
2    Q.    Did O'Rourke Marine Services accept
3 the terms and conditions?
4    A.    We had no direct contact to this
5 company.
6    Q.    You can put that aside.
7       (Kock Exhibit 40, Document Bates
8 stamped HPL-OMS 21 through HPL-OMS 22, marked
9 for identification.)
10    Q.    I have marked as Exhibit 40 a
11 document labeled HPL-OMS pages 21 through 22.
12 Do you recognize this document?
13    A.    Yes.
14    Q.    What is it?
15    A.    This is a sales order confirmation
16 coming from O.W. Bunker Germany confirming the
17 sale of 50 tons of marine gas oil, 0.1 percent
18 sulfur, at the Port of Houston, delivery on
19 November 5, 2014.
20    Q.    And again, the seller is O.W.
21 Bunker Germany in this document?
22    A.    Yes.
23    Q.    And the purchaser is Hapag-Lloyd
24 AG?
25    A.    Yes.

Page 111

Norbert Kock (1-19-16)

1
2    Q.    Under your remarks it says "HALO
3 GTC2005(E) shall apply"?
4    A.    It looks like a typo to me.
5    Q.    Why do you say that?
6    A.    Because in all previous order
7 confirmations were relating to the GTCs of 2007,
8 which was in fact 2006.
9    Q.    That was when the relationship with
10 O.W. Bunker Germany commenced?
11    A.    Yes.
12    Q.    The line above says "All per ISO
13 8217 2005(E)." Is it possible that someone
14 transposed the quality standard and the terms
15 and conditions?
16    A.    It looks like because the E is --
17       THE INTERPRETER:  In parentheses.
18    A.    Yeah.
19    Q.    Does the quality standard
20 designation look correct to you?
21    A.    Yes.  The ISO 8217 2005 exists,
22 it's an old version.
23       (Kock Exhibit 41, Document Bates
24 stamped HPL-OMS 18 through HPL-OMS 20, marked
25 for identification.)

Page 112

Norbert Kock (1-19-16)

1
2    Q.    I've marked as Exhibit 41 a
3 document labeled HPL-OMS pages 18 through 20.
4 Have you seen this document before?
5    A.    Yes.
6    Q.    What is this document?
7    A.    This is a written order from
8 Hapag-Lloyd, Mr. Lukas Gaus, to O.W. Bunker
9 Germany GMBH, confirming the purchase of 50 tons
10 of marine distillate DMA 0.1 percent sulfur at
11 the Port of Houston, delivery to take place on
12 November 5, 2014.
13    Q.    Do you see in the second paragraph
14 it says that "All fuel delivered to Hapag-Lloyd
15 AG as well as to Hapag-Lloyd Kreuzfahrten ISO
16 8217 Fourth Edition 2010," it says 2010(E)?
17    A.    Right.
18    Q.    Is it the 2010(E) quality standard
19 that applies to this transaction?
20    A.    This is a standard text in this
21 contract.  In this case the purchaser did not
22 correct down to 2005 spec that O.W. was
23 confirming to us.
24    Q.    So would the sales order
25 confirmation govern that question?

Page 113

Norbert Kock (1-19-16)

1
2    A.    Yes.
3    Q.    Because this document is
4 automatically generated by Hapag-Lloyd's
5 systems?
6    A.    Yes.
7    Q.    Do you know how many physical
8 suppliers are based in Houston, Texas, physical
9 suppliers of fuel?
10    A.    No.
11       (Kock Exhibit 42, Document Bates
12 stamped HPL-OMS page 45, marked for
13 identification.)
14    Q.    Marked as Exhibit 42 a document
15 labeled HPL-OMS page 45.  Have you seen this
16 document before?
17    A.    Yes.
18    Q.    And do you know what it refers to?
19    A.    It refers to the delivery of the
20 order of Mr. Jonas Hanke to O.W. Germany for
21 arrange to supply of marine distillates to the
22 DERBY D in Houston on November 5th.
23       I think this is the covering email
24 here to that document number 40 we discussed
25 earlier.  This is a covering email here for the

29 (Pages 110 to 113)

Page 114

Norbert Kock (1-19-16)
1
2  order confirmation for the Exhibit Number 40.
3       Q.    What you're saying is that the
4  second email below in this email chain from
5  Mr. Selmer refers to a sales order confirmation,
6  and that sales order confirmation appears to be
7  the document we've marked as Exhibit 40?
8       A.    Yeah, because also this says order
9  number of O.W. similar.  They are referring to
10 the sales order confirmation number 1980-28364.
11 which is similar to this one here.
12      Q.    So it's your testimony that the
13 sales order number on Exhibit 40 is 119-28364?
14      A.    Yes.
15      Q.    The sales order confirmation number
16 on Exhibit 42 also refers to number 119-283364?
17      A.    Yes.
18      Q.    Mr. Selmer writes to Mr. Hanke
19 "supply by truck, do you know what that refers
20 to"?
21      A.    To the supply of the ordered
22 50 metric tons of marine distillates or marine
23 gas oil at Houston.  So the supply has been
24 arranged by tank trucks and not by barge.
25      Q.    Hapag-Lloyd also received an

Page 115

Norbert Kock (1-19-16)
1
2  invoice for this supply from O.W. Germany, is
3  that right?
4       A.    Yes.
5            (Kock Exhibit 43, Document Bates
6  stamped ING HL 270015, marked for
7  identification.)
8       Q.    I would like to hand you a document
9  that we've marked as Exhibit 43 labeled ING HL
10 270015.  Are you familiar with this document?
11      A.    No.  No.  I can't remember.
12      Q.    This document is not from
13 Hapag-Lloyd's files, is it?  It was produced by
14 ING Bank N.V..
15      A.    I don't know.  This looks strange
16 to me because of that Danish stamp here,
17 "BOGFORT."  I've never seen this before, I can't
18 remember.
19      Q.    Okay.  You can put that aside.  Do
20 you know whether O.W. Germany was paid for the
21 fuel supplied to the DERBY D?
22      A.    No, I don't know.
23      Q.    When did you become aware that O.W.
24 Germany, or the O.W. Bunker Group, was
25 experiencing any financial distress?

Page 116

Norbert Kock (1-19-16)
1
2       A.    It was the beginning of November
3  when it was in the newspaper.
4       Q.    What do you remember about that?
5       A.    That we received a newspaper
6  article announcing that there will be trouble,
7  they might have problems to maintain supplies.
8  That's when we contacted O.W. Germany and there
9  it was they sold the assets of Singapore, the
10 Singapore products company.
11      Q.    Did you have a call with someone at
12 O.W. Germany?
13      A.    We tried to make several calls with
14 O.W. Germany, but it was difficult at that time
15 to get through to reach somebody giving us clear
16 information.
17      Q.    Did you have at least one
18 discussion with them where they discussed
19 Singapore?
20      A.    This was not kind enough of a
21 discussion, it was always a very fast speak
22 because they were not really involved also in
23 Hamburg, they had problems to really disclose or
24 explain what's going on.
25      Q.    What happened next?

Page 117

Norbert Kock (1-19-16)
1
2       A.    We stopped, we stopped paying
3  invoices and we tried to, because we understand
4  at that time that they were no longer able to
5  deliver also our contracts in Rotterdam and
6  Antwerp, so we immediately tried to find other
7  sellers to deliver instead.
8       Q.    Did you receive any communications
9  from local physical suppliers?
10           MR. FERNANDEZ:  Objection.
11      A.    I can't remember.
12      Q.    Did you receive any threats to
13 arrest vessels owned or chartered by
14 Hapag-Lloyd?
15      A.    Could you please repeat it?
16      Q.    Did Hapag-Lloyd receive any threats
17 to arrest vessels owned or chartered by
18 Hapag-Lloyd after the insolvency?
19           MR. FERNANDEZ:  Objection.
20      A.    At that time, no, I can't remember.
21 It was later.
22      Q.    Did you receive any communications
23 later from local physical suppliers in that
24 vein?
25      A.    Later on we had demands from

30 (Pages 114 to 117)

Page 118

Norbert Kock (1-19-16)

1
2  physical suppliers in Antwerp and Rotterdam.
3     Q.    Only in Rotterdam and Antwerp or
4  elsewhere as well?
5        MR. FERNANDEZ:  Objection.
6     A.    There was a lot of communication
7  going on at that time, I do not have this exact
8  amount of communication now, I can't remember
9  it.  It's in the records, but I can't remember
10 it.
11    Q.    How about with respect to the cases
12 that you're appearing for here today, did you
13 have any communications with O'Rourke Marine
14 Services after the bankruptcy of the O.W. Bunker
15 Group?
16       MR. FERNANDEZ:  Objection.
17    A.    I can't remember.
18    Q.    The same question for U.S. Oil
19 Trading.  Did Hapag-Lloyd have any
20 communications with U.S. Oil Trading after the
21 bankruptcy of the O.W. Bunker Group?
22       MR. FERNANDEZ:  Objection.
23    A.    It could be done via our legal or
24 insurance department.
25    Q.    To your knowledge, no one in the

Page 119

Norbert Kock (1-19-16)

1
2  bunker purchasing department received
3  communications from U.S. Oil Trading or O'Rourke
4  Marine Services after the insolvency of the O.W.
5  Bunker Group in early November 2014?
6        MR. FERNANDEZ:  Objection.
7        MR. KEOUGH:  Objection.
8     A.    I don't remember.
9     Q.    So you have no recollection
10 whatsoever of any communications with either
11 O'Rourke Marine or U.S. Oil Trading after the
12 bankruptcy, is that your testimony?
13       MR. FERNANDEZ:  Objection.
14    A.    I would have been or I should have
15 been able to look at my records because maybe
16 there's something in it if it had been passed to
17 our legal department, our insurance department
18 to take care of that.
19       MR. MALONEY:  Those are all the
20 questions that I have for you at this time,
21 Mr. Kock.  Thank you for your time and I'll pass
22 the witness.
23       (Short recess taken.)
24       MR. HEILIG:  Mark these as the next
25 exhibits.

Page 120

Norbert Kock (1-19-16)

1
2        (Kock Exhibit 44, Notice of Rule
3  30(b)(6) Deposition, marked for identification.)
4        (Kock Exhibit 45, Notice of Rule
5  30(b)(6) Deposition, marked for identification.)
6        (Kock Exhibit 46, First Amended
7  Complaint For Interpleader and Declaratory
8  Judgment, marked for identification.)
9        (Kock Exhibit 47, Declaration of
10 Norbert Kock, marked for identification.)
11 EXAMINATION BY MR. HEILIG:
12    Q.    Good afternoon, sir.  My name is
13 Justin Heilig.  I represent O.W. Bunker Germany
14 in three of the actions pending in New York
15 which involve the vessels VIENNA EXPRESS, SOFIA
16 EXPRESS, the SANTA ROBERTA, SEASPAN HAMBURG, as
17 well as the SIDNEY EXPRESS and the DERBY D.
18       Please note that when I refer to
19 the vessels, plural, I'm referring to those six
20 specific vessels unless otherwise noted, okay?
21    A.    Okay.
22    Q.    When I refer to the bunker
23 transactions I'm speaking about the supply of
24 bunker fuel to those six vessels in October of
25 2014, okay?

Page 121

Norbert Kock (1-19-16)

1
2     A.    Okay.
3     Q.    When I refer to USOT I'm referring
4  to U.S. Oil Trading, one of the parties to two
5  of those actions.  When I refer to OMS I'm
6  speaking about O'Rourke Marine Services, a party
7  to one of those actions, all right?
8     A.    Um-hum.
9     Q.    We've been discussing those names
10 and vessels throughout the day today, so you
11 should already be familiar with them.
12       First let me thank you for coming
13 all this way from Hamburg to testify today, we
14 appreciate it.  I'm going to first have you look
15 at documents that have been marked as exhibits
16 44 and 45, they are the notices of deposition
17 issued by O.W. Germany in these actions.
18       Sir, have you seen these documents
19 before today?
20    A.    I'm not sure.
21    Q.    Do you understand that you've been
22 designation by Hapag-Lloyd as the corporate
23 representative to testify about the topics
24 listed in Annex A of both notices?
25    A.    Yes.

31 (Pages 118 to 121)

Norbert Kock (1-19-16)

1
2    Q.   You can put them aside, we're done
3  with them.  Earlier I believe you testified that
4  Hapag-Lloyd began doing business with O.W.
5  Germany in 2007, is that correct?
6    A.   That's correct.
7    Q.   So Hapag didn't have any dealings
8  with O.W. Germany before 2007?
9    A.   No.
10    Q.   Was Hapag aware of O.W. Germany's
11  presence in the market before 2007?
12    A.   Yes.
13    Q.   Is there a reason why you didn't do
14  business with O.W. Germany before that time?
15    A.   Before that time we've done no
16  business with O.W. because the reputation of
17  O.W. was a poor reputation in the local market.
18    Q.   Okay.  So by 2007 then, is it fair
19  to say O.W. Germany's reputation improved in the
20  local market?
21    A.   For me personally, not really.
22    Q.   Okay.
23    A.   But this was different to my
24  management.
25    Q.   So it was management's decision to

Norbert Kock (1-19-16)

1
2  begin doing business in 2007 with O.W. Germany?
3    A.   Yes, because O.W. at that time
4  reached a position at the market which could not
5  be an oversight.  They really grow up to real
6  big oil trader, bunker trader.
7    Q.   Okay.  I believe you testified
8  earlier that as a condition of doing business
9  with O.W. Germany, O.W. Germany had to accept
10  Hapag's terms and conditions?
11    A.   Right.  This was the kind of my
12  personal securant, or securing that we have a
13  real plain and sound business case with O.W.
14  Germany.
15    Q.   Okay.  So if I understand you
16  correctly, the acceptance of Hapag's terms by
17  O.W. Germany gave Hapag some feeling of comfort
18  or some level of security that they could do
19  business --
20    A.   Confidence.
21    Q.   Confidence that they could do
22  business with O.W. Germany?
23    A.   Yes.
24    Q.   Let's take a look at a document
25  that has been marked as Exhibit 46, it's the

Norbert Kock (1-19-16)

1
2  First Amended Complaint filed by Hapag-Lloyd in
3  action 14-cv-9949.
4         MR. HEILIG:  I should clarify for
5  the record that this is the pleading without
6  exhibits.
7    Q.   Sir, have you seen this document
8  before today?
9    A.   I've seen a lot of documents today.
10  I'm not sure.  I don't think so.
11    Q.   Did you review any documents to be
12  filed by Hapag in these lawsuits before they
13  were filed?
14         In other words, did you review any
15  of the pleadings before they were submitted by
16  Hapag's U.S. attorneys to the court?
17    A.   I was doing testimonies last year
18  in writing and I had to review them carefully.
19    Q.   So you reviewed them for factual
20  accuracy?
21         MR. FERNANDEZ:  Objection.  I think
22  we're talking about different things, just to be
23  fair to the witness.  We're on pleadings and I
24  think he's referring to maybe his declaration.
25  I think you have to be careful with the words

Norbert Kock (1-19-16)

1
2  you have.
3         MR. HEILIG:  Fair enough.
4    Q.   Let's just take a look at the
5  document then.  Would you mind looking at page
6  5, and specifically paragraph 17?
7    A.   Yes.
8    Q.   In reviewing this document now,
9  does this refresh your recollection as to
10  whether you've seen this document prior to
11  today?
12    A.   Yes.  This was the contract we have
13  discussed earlier today.
14    Q.   If we look at the document
15  previously marked as Exhibit Number 3, the ARA
16  contract.  Is this the document that you're
17  referring to?
18    A.   Right.
19         MR. FERNANDEZ:  Just note my
20  continued line of objection with regard to
21  pleadings and legal issues.  He's in the fuel
22  department, so I'm going to have a continuing
23  line of objections relative to pleadings and
24  anything relative to that type of issue.
25    A.   In fact, just to make it clear, I

Page 126

Norbert Kock (1-19-16)

1  have no understanding about what is a pleading.
2        THE WITNESS:  Maybe you could
3  translate this for me, what is a pleading?
4        (Interpreter conferring with the
5  witness)
6        MR. FERNANDEZ:  A lawsuit.
7     Q.    This document was filed by Hapag
8  with the court specifying what their allegations
9  are as to the facts and to the relationships of
10  the parties, as well as to the relief sought by
11  Hapag?
12     A.    I was not engaged in it.
13     Q.    Okay.  But you understand the
14  reference in paragraph 17 is to this ARA
15  contract in Exhibit 3?
16     A.    Yes.
17     Q.    I believe you testified earlier the
18  ARA contract dealt with the Ports of Antwerp,
19  Rotterdam, and was it Amsterdam as well?
20     A.    Amsterdam.  May I interrupt?
21     Q.    Sure.
22     A.    Because this contract is clearly
23  stating Antwerp and Rotterdam, so Amsterdam is
24  not included.  This is the abbreviation, this is

Page 127

Norbert Kock (1-19-16)

1  a common abbreviation in North Europe or
2  Northwest Europe to say we are talking about
3  Antwerp, Rotterdam and Amsterdam, but the
4  contract we have been agreed upon was only based
5  in Antwerp and Rotterdam.
6     Q.    So perhaps a better title for the
7  document would be AR contract?
8     A.    Right.
9     Q.    What relevance does Exhibit 3, the
10  ARA contract, what relevance does it have to
11  bunker transactions that took place at U.S.
12  ports?
13     A.    No relevance.
14     Q.    Okay.  So that contract does not
15  govern the transactions that we've been
16  discussing today with respect to the vessels?
17        MR. KEOUGH:  Objection.
18     A.    This was the contract based on
19  Rotterdam and Antwerp supplies.
20     Q.    Paragraph 1 the on the same page
21  says, "In the normal course of business
22  Hapag-Lloyd" and it's abbreviated HLag "would
23  remit payment to O.W. Germany for bunker
24  supplied under the Hapag Marine Fuel Contract,"

Page 128

Norbert Kock (1-19-16)

1  and that's a reference to this ARA contract.
2        So if I understand you correctly,
3  the ARA contract does not have any relevance to
4  bunker transactions at U.S. ports.  So my
5  question is, is this still correct, that in the
6  normal course of business Hapag would remit
7  payment to O.W. Germany for bunker transactions
8  taking place at U.S. ports?
9        MR. KEOUGH:  Objection to the form.
10        MR. FERNANDEZ:  Objection.
11     A.    Yes.
12     Q.    So even though this contract in
13  Exhibit 3 might not be relevant, payment would
14  still be remitted from Hapag to O.W. Germany for
15  bunker transactions for which O.W. Germany
16  received the nomination?
17        MR. FERNANDEZ:  Objection to the
18  form.
19        MR. KEOUGH:  Objection.
20     Q.    In other words, Hapag would not pay
21  a physical supplier directly?
22     A.    No.
23     Q.    Never.  Okay.  Did Hapag ever
24  receive invoices directly from the physical

Page 129

Norbert Kock (1-19-16)

1  suppliers for bunker nominations awarded to O.W.
2  Germany?
3     A.    There is a chance that this has
4  been done in the course of bankruptcy when we
5  had to cover on a very short notice bunker
6  deliveries in the Port of Antwerp and Rotterdam.
7     Q.    Prior to the bankruptcy did that
8  ever occur?
9     A.    No, not prior.
10     Q.    Let's look at what has been marked
11  as Exhibit 47, and this is Mr. Kock's
12  Declaration from action 15-cv-6718, which was
13  transferred from the U.S. District Court of the
14  Western District of Washington to the Southern
15  District of New York.
16        Sir, do you recognize this
17  document?
18     A.    Yes.
19     Q.    This is a declaration that you
20  signed on behalf of Hapag-Lloyd?
21     A.    Yes.
22     Q.    I take it then that you reviewed
23  this document for the accuracy of its contents
24  before signing?

33 (Pages 126 to 129)

Page 130

Norbert Kock (1-19-16)

1
2     A.   Yes.
3     Q.   And it's accurate, to the best of
4  your knowledge and belief?
5     A.   Yes.
6     Q.   Let's take a look at page 2,
7  paragraphs 4 and 5; well really 4, 5 and 6.  It
8  appears that these paragraphs discuss the
9  submission of bunker requisitions via email from
10  the vessels and then the fuel department, your
11  department evaluating those requisitions.
12      Does this declaration essentially
13  summarize the bunkering process that we
14  discussed earlier with Mr. Maloney, ING's
15  counsel?
16     A.   Yes.
17     Q.   Can you tell me a bit more about
18  what goes into the evaluation process discussed
19  in paragraph 5 after receipt of a bunker
20  requisition from a vessel?
21     A.   In general, we try to supply on the
22  most economic basis our fleet of container
23  vessels.  We are always trying to have advantage
24  of local price differences.  So if vessels comes
25  to the U.S. East Coast we do not concentrate on

Page 131

Norbert Kock (1-19-16)

1
2  only one port, for example New York, we will
3  always include other ports in the chain of the
4  vessel's schedule which could be then Halifax,
5  North Fork, Savannah.
6      We will tender all these ports
7  together in one go and then select the most
8  economic offer at the specific port, which could
9  be then New York or even Halifax or North Fork
10  or Savannah, that's what we are evaluating.
11     Q.   I believe we saw documents earlier
12  in which the physicals or the fuel specs were
13  provided by O.W. Germany to Hapag-Lloyd for
14  Tacoma, Oakland and Los Angeles on the West
15  Coast?
16     A.   Yes.
17     Q.   That would be the same?
18     A.   It's the same pattern.  It's the
19  same pattern in Northwest Europe where we are
20  also trying to compare in between Rotterdam,
21  Antwerp and Hamburg sometimes.
22     Q.   If I understand your earlier
23  testimony correctly, Hapag will evaluate both
24  the price as well as the fuel specs.  If it's a
25  better fuel spec it might agree to accept a

Page 132

Norbert Kock (1-19-16)

1
2  worse price term, because the energy content of
3  the fuel is better for the vessels?
4     A.   Yes, right.
5     Q.   Would Hapag also take into
6  consideration whether a trader would be able to
7  supply at multiple ports, as opposed to just one
8  port?
9     A.   This is not our preference.
10     Q.   In paragraph 5 of your declaration
11  you discuss beginning the process of soliciting
12  bids for the supply of fuel from various
13  traders, and there's a footnote, footnote 1,
14  which discusses the distinction between a trader
15  and a bunker broker.
16      I was wondering if you could just
17  describe for me what that distinction is in a
18  bit of greater detail?
19     A.   Yeah, I mean --
20     MR. KEOUGH:  Objection.
21     A.   We have a clear understanding about
22  the role of a bunker broker and the bunker
23  trader, because the bunker broker is just
24  knowing a supplier and he's knowing a shipowner
25  requiring fuel oil, and he's bringing together

Page 133

Norbert Kock (1-19-16)

1
2  those parties.
3      And then he's cashing in his, what
4  is it, margin and stepping back and leaving the
5  shipowner together with the physical supplier to
6  arranging and agreeing on the business.  The
7  contract comes together or works together
8  between the shipowner, the buyer and the
9  physical supplier locally.
10      So this is not what we are after
11  because we are trying to secure not only the
12  quality of the product, but also the legal
13  status of the contract, that's why we are just
14  working with parties accepting our terms and
15  conditions of purchasing.
16      So this needs to be -- it could be
17  a physical supplier accepting them, but in most
18  cases, especially U.S.-based physical suppliers
19  are not interested to accept them because they
20  might be too sharp for them, so we are taking
21  advantage of the services of a bunker trader.
22  If the bunker trader is owing the product that's
23  what we are demanding, we are expecting that
24  he's owning the product.
25     MR. FERNANDEZ:  Owing?

Page 134

Norbert Kock (1-19-16)

1
2      THE WITNESS:  He owns.
3      THE INTERPRETER:  Owning.
4      A.    He owns the product and is selling
5  it to us on this risk, and based also on his
6  invoice.
7      Q.    Do you know whether it's customary
8  for a broker to simply invoice its commission
9  for the full selling invoice price for the
10 bunker fuel?
11     A.    What I was experiencing in the past
12 was that the invoice was always coming from the
13 physical supplier.  When we have been doing
14 business, we are brokers, long, long ago.
15     Q.    And the broker would issue its own
16 invoice for its commission?
17     A.    Yeah.
18     Q.    Let's pose a hypothetical.  If O.W.
19 Germany were acting as a broker in a transaction
20 in which U.S. Oil physically supplied the fuel,
21 again, if O.W. Germany were acting as a broker
22 U.S. Oil would have issued an invoice to
23 Hapag-Lloyd, and O.W. Germany would have issued
24 a separate invoice to Hapag-Lloyd for its
25 commission?

Page 135

Norbert Kock (1-19-16)

1
2      MR. KEOUGH:  Objection to the form.
3      A.    Probably, yes.
4      Q.    But that's not what occurred here?
5      A.    No.
6      Q.    In footnote 2 of your declaration
7  you say you completely disagree with U.S. Oil's
8  characterization of O.W. Denmark as a bunker
9  broker.
10     Again, I believe you've answered
11 this from your perspective.  From Hapag's
12 perspective O.W. Germany was its contractual
13 counterparty, correct?
14     A.    O.W. Germany was our contractual
15 counterparty.
16     Q.    Hapag-Lloyd did not contract with
17 O.W. Denmark in these transactions?
18     A.    Never.
19     Q.    And O.W. Germany was a trader in
20 part because it agreed to A, sell the bunker
21 fuel to Hapag-Lloyd; and B, agree to accept
22 Hapag-Lloyd's terms and conditions; and C,
23 assume the risk for that sale?
24     A.    That's right.
25     MR. KEOUGH:  Objection.

Page 136

Norbert Kock (1-19-16)

1
2      Q.    In paragraph 9, which starts on the
3  bottom of page 3 and goes to the top of page 4,
4  you discuss an incident where Hapag faced a
5  significant claim in the United States in the
6  1990s involving a foreign bunker broker.
7      Would you mind just explaining a
8  bit more about that, that claim and that issue,
9  explain its relevance to these transactions here
10 today?
11     A.    The relevance to this or to these
12 transactions is to try to explain why we are
13 changing the policy from using brokers to using
14 traders instead, because at that time we had a
15 claim, I think it was on the U.S. West Coast,
16 and the fuel was not stable so the vessel had
17 experienced severe operational problems.
18     They could manage to operate, but
19 it was taking additional manpower to clean out
20 the filters and to clean up the purification
21 plant of that vessel so the vessel could
22 maintain the voyage, but only with additional
23 manpower, as far as I can remember.
24     So we claimed the delivery with the
25 physical supplier, I do not recognize, it's too

Page 137

Norbert Kock (1-19-16)

1
2  long ago, and he did not answer our claim.  He
3  just stepped back and stopped communicating with
4  us.
5      Q.    Okay.  Had they been paid by that
6  time?
7      A.    They had been paid.
8      Q.    So essentially Hapag had no
9  recourse --
10     A.    The money was out and there was no
11 more trigger to motivate them to answer.
12     Q.    Okay.  Paragraph 7 on page 3 you
13 state, "O.W. Germany solicited business as
14 having the ability to serve as a one-stop shop
15 for the sales/supply of fuel to vessels, thereby
16 undertaking complete responsibility for all
17 aspects of the transaction, including inter alia
18 procurement delivery supply quality and
19 quantity."
20     What did you mean by a one-stop
21 shop?
22     A.    To have one party responsible for
23 supply to our vessel.
24     Q.    Is this --
25     A.    Not to interact with all these

35 (Pages 134 to 137)

Page 138

Norbert Kock (1-19-16)

1  Norbert Kock (1-19-16)
2  parties which could be an in between.
3      Q.    Is it fair so say then that Hapag
4  did not care what happened downstream of O.W.
5  Germany in terms of dealing with subcontractors,
6  physical suppliers?
7          MR. KEOUGH:  Objection.
8      A.    That's not our business.
9      Q.    If I understand correctly from what
10  you said a few minutes ago, O.W. Germany's
11  solicitation of business, as having the ability
12  to serve as a one-stop shop, satisfied Hapag's
13  upper management that they could begin doing
14  business with O.W. Germany in 2007, is that
15  correct?
16          MR. FERNANDEZ:  Objection to the
17  form.  You can answer the question.
18      A.    Yes, it seems so.
19      Q.    So if I understand sort of as a
20  synthesis of what you said already, Hapag-Lloyd
21  never authorized or pointed O.W. Germany as an
22  agent to order fuel on Hapag's behalf, is that
23  correct?
24          MR. KEOUGH:  Objection.
25      A.    Never.

Page 139

1  Norbert Kock (1-19-16)
2      Q.    Did Hapag-Lloyd ever advise U.S.
3  Oil or O'Rourke Marine that O.W. Germany was
4  acting as an agent of Hapag-Lloyd?
5      A.    No.
6      Q.    Let's take a look at Exhibit H 1
7  which is attached to your declaration toward the
8  back.  I would also like you to take a look at
9  Exhibit 3, the third page of Exhibit 3 which is
10  Bates stamped USOT 000103 through 107.  I want
11  you to compare these two.
12          It seems like we have two sets of
13  terms and conditions used by Hapag-Lloyd.  The
14  version attached to Exhibit 3 appears to be
15  3 pages long, and the version appearing at
16  Exhibit H 1 of your declaration is 5 pages long.
17          Do you understand what the
18  difference is between these two versions?
19      A.    The first version here which was
20  dated 2006, this is the version we were
21  discussing earlier today, which has been always
22  mentioned by O.W. as the terms and conditions of
23  2007.
24      Q.    And that's the version attached as
25  Exhibit H 1 to your declaration?

Page 140

1  Norbert Kock (1-19-16)
2      A.    Yes.
3      Q.    The 2006 version?
4      A.    Yes.
5      Q.    And the version attached to
6  Exhibit 3?
7      A.    This is the version which has been
8  negotiated with O.W. Bunker during the process
9  of negotiating the contract in Rotterdam and
10  Antwerp.
11      Q.    The ARA contract?
12      A.    The ARA contract.
13      Q.    Which has no relevance to the
14  transactions at issue here in these actions?
15          MR. KEOUGH:  Objection to the form.
16      A.    Right.
17      Q.    So really the version attached to
18  Exhibit H 1 are the terms that apply to the
19  contracts between Hapag-Lloyd and O.W. Germany
20  for these transactions?
21      A.    Yeah.
22          MR. KEOUGH:  Objection.
23      A.    This has been also confirmed by
24  O.W..
25      Q.    It's signed and stamped by O.W.

Page 141

1  Norbert Kock (1-19-16)
2  Germany?
3      A.    Yeah, but it has been also
4  confirmed by O.W. in their order.
5      Q.    In their sales order confirmations.
6  Even though Hapag's purchase order confirmations
7  refer to the latest edition, it's the sales
8  order confirmation and O.W. Germany's
9  identification of the 2006 version that apply?
10      A.    Yes.
11          MR. KEOUGH:  Objection.
12      Q.    Correct me if I'm wrong, but I
13  believe you testified earlier that Hapag did not
14  control O.W. Germany's selection of a physical
15  supplier or a subcontractor for the purchase of
16  a bunker fuel that had been supplied to Hapag?
17          MR. KEOUGH:  Objection.
18      A.    This is not our business.
19      Q.    So Hapag did not instruct O.W.
20  Germany to use certain physical suppliers at
21  various ports?
22      A.    No.
23          MR. KEOUGH:  Objection.
24          MR. HEILIG:  Let's take a 3-minute
25  break and mark some exhibits.

36 (Pages 138 to 141)

Page 142

Norbert Kock (1-19-16)

1  
2      (Kock Exhibit 48, Document Bates  
3  stamped HPL-USOT 154 through 159, marked for  
4  identification.)  
5      (Kock Exhibit 49, Agency Agreement,  
6  Bates stamped HPL-USOT 285 through 309, marked  
7  for identification.)  
8      (Kock Exhibit 50, Document Bates  
9  stamped HPL-USOT 160 through 162, marked for  
10  identification.)  
11      (Kock Exhibit 51, Document Bates  
12  stamped OWG-9949-230 through 233, marked for  
13  identification.)  
14      Q.   Earlier we walked through various  
15  documents relating to the supply of bunkers to  
16  the SANTA ROBERTA.  I just want to go back  
17  through those as quickly as possible and look at  
18  some of the previously marked exhibits for  
19  clarification purposes, and also to look at some  
20  new exhibits.  Like I said, I will try to go  
21  through them as quickly as possible so that I'm  
22  not rehashing the same issues.  
23      I believe you testified earlier,  
24  and correct me if I'm wrong, that these  
25  transactions essentially transpired in the same  

Page 143

Norbert Kock (1-19-16)

1  
2  manner.  That the procedure of the requisition,  
3  the soliciting bids, the nomination, the  
4  exchange of order confirmations and the  
5  invoicing were all essentially the same, is that  
6  correct?  
7      A.   Yes.  
8      Q.   Let's first look at Exhibit  
9  Number 4, an email from the vessel.  I believe  
10  you said that this is essentially, to use an  
11  American idiomatic expression, it's essentially  
12  a heads-up.  It's just a notification from the  
13  vessel saying at some point in the near future  
14  we're going to issue a requisition form for  
15  bunkers?  
16      A.   Yes.  Our procedure says before a  
17  vessel is raising a bunker requisition to our  
18  department, they have to recheck that  
19  requisition with the local stowage planner,  
20  because bringing 3,000 metric tons of fuel oil  
21  onboard of the vessel has an impact to the  
22  vessel's operation, and this has to be  
23  coordinated also with the stowage center not to  
24  get in conflict with coming container freight in  
25  that port or leaving container freight onboard  

Page 144

Norbert Kock (1-19-16)

1  
2  because those containers have a specific weight.  
3      So the stowage planner needs to  
4  know that there might be fuel oil coming, that's  
5  the reason in this message here the vessel was  
6  sending to the stowage guys.  
7      Q.   So essentially --  
8      A.   To get reconfirmed is it okay for  
9  you.  
10      Q.   It's replanning, it's looking ahead  
11  to what will happen in the future?  
12      A.   Yes.  
13      Q.   If we look at Exhibit 5, the  
14  document page 135 and the reverse side which is  
15  136, this is the email from the vessel with the  
16  actual requisition form, correct?  
17      A.   Yes.  
18      Q.   Does the master of a Hapag vessel  
19  ever communicate directly with the physical  
20  supplier or trader?  
21      A.   No.  
22      MR. KEOUGH:  Objection.  
23      Q.   Does the master have authority from  
24  Hapag to do so?  
25      A.   No.  

Page 145

Norbert Kock (1-19-16)

1  
2      MR. KEOUGH:  Objection.  
3      Q.   So then the master doesn't have any  
4  authority to either negotiate or alter the terms  
5  of a purchase contract that Hapag has entered  
6  into with a physical supplier or trader?  
7      A.   No.  
8      Q.   The master's role is to simply  
9  notify Hapag of what the vessel needs in terms  
10  of fuel, right?  
11      A.   Right.  
12      MR. KEOUGH:  Objection.  
13      Q.   That's the requisition form,  
14  correct?  
15      A.   Right.  
16      Q.   And that form is not an order, the  
17  order comes from Hapag, correct?  
18      A.   Right.  
19      Q.   And the order is placed by Hapag  
20  with O.W. Germany, right?  
21      A.   Right.  
22      Q.   Okay.  So when we get down further  
23  through the process by stamping a bunker  
24  delivery note, the master is merely confirming  
25  the receipt of fuel, right?  

37 (Pages 142 to 145)

Page 146

Norbert Kock (1-19-16)

1
2    A.   Right.
3          MR. KEOUGH:  Objection to the form.
4    Q.    The master doesn't have authority
5    to bind Hapag to the terms that are on a bunker
6    delivery?
7          MR. KEOUGH:  Objection.
8    A.   No.
9    Q.    The master doesn't have authority
10   to deviate from Hapag's terms and conditions
11   which govern the purchase contract?
12         MR. KEOUGH:  Objection.
13   A.    They do not have an authorization
14   from Hapag-Lloyd.
15   Q.    If you look at Exhibit 6.  Again,
16   this is just Hapag's confirmation email to the
17   vessel indicating that the requisition form has
18   been received, and that Hapag will make
19   arrangements accordingly, correct?
20   A.    Yes.
21         MR. KEOUGH:  Objection.
22   Q.    If we look at the date on
23   Exhibit 6.  What's the date on the email?
24   A.    The date?
25   Q.    Yes.

Page 147

Norbert Kock (1-19-16)

1
2    A.    The date was September 30, 2014.
3    Q.    What's the date on the email with
4    the requisition form from the vessel?
5    A.    This was September 26th.  This was
6    sent on a Friday and has been answered on a
7    Tuesday.  There was a weekend in between.
8    Q.    Are there individuals in your team
9    in the office over the weekend who would be I
10   guess conducting the evaluation process?
11   A.    No.
12   Q.    So then on Monday morning, for
13   example, they would have looked on the valuation
14   process that we discussed earlier?
15   A.    Yes.
16   Q.    And by Tuesday they would get back
17   to the vessel?
18   A.    Yeah.  I would have been expected
19   to do it on Monday orally, but there might be a
20   reason that they couldn't do it so they did it
21   on a Tuesday morning.
22   Q.    Please do not admonish your
23   subordinates based on what we've said today.
24         Look at Exhibit 7.  The first page,
25   document number 139 and the reverse side, 140.

Page 148

Norbert Kock (1-19-16)

1
2    I believe you testified that this would be
3    Hapag's email to the market soliciting bids to
4    supply the SANTA ROBERTA, is that correct?
5    A.    Correct.
6    Q.    Okay.  On the reverse we have the
7    actual inquiry form, is that right?
8    A.    Yes.
9    Q.    Do you see a paragraph about
10   halfway down the page that begins "Please take
11   into consideration"?
12   A.    Yes.
13   Q.    This paragraph makes reference to
14   Hapag's terms and conditions?
15   A.    That's true.
16   Q.    And it's the latest edition?
17   A.    That's true.
18   Q.    So would this alter in any way your
19   earlier testimony about which version of Hapag's
20   terms applies to its contracts with O.W.
21   Germany?
22         MR. MALONEY:  Objection to the
23   form.
24   A.    This is a standard text here, and
25   what we can see in O.W.'s order confirmation is

Page 149

Norbert Kock (1-19-16)

1
2    that they were referring to the terms and
3    conditions from 2006, and we accepted that.
4    Q.    Okay.
5    A.    Because we did not protest.
6    Q.    So in other words, this doesn't
7    change your earlier testimony?
8    A.    No.
9    Q.    Okay.  Let's take a look at
10   Exhibits 8 and 9.  I just want you to look at
11   the first page of Exhibit 8 and Exhibit 9.  I
12   believe Exhibit 8 is one where we've put several
13   documents together that perhaps should not have
14   been together, but that's all right.
15         I believe you testified earlier
16   that what we have in Exhibit 8 is one of the
17   offers from Peninsula Petroleum, which is
18   another trader, is that correct?
19   A.    Right.
20   Q.    Exhibit 9 we have the typical
21   supply by O.W. Germany with the specifications
22   for the fuel?
23   A.    Right.
24   Q.    If you look at the third page of
25   Exhibit 8.  Am I correct that you described this

38 (Pages 146 to 149)

Norbert Kock (1-19-16)

1              Norbert Kock (1-19-16)
2  earlier as a price comparison?
3     A.   Yes.
4     Q.   Essentially, this shows
5  Hapag-Lloyd's process of evaluating the bids or
6  the offers that it received from various
7  traders?
8     A.   That's true.
9     Q.   One of which would be O.W. Bunker
10  Germany?
11    A.   Yes.
12    Q.   Is this an internal document?
13    A.   Yes.
14    Q.   So this would not have been shared
15  with O.W. Germany?
16    A.   No.
17    Q.   And would not have been shared with
18  the physical suppliers?
19    A.   Or anybody else.
20    Q.   Anybody else?
21    A.   Just internally, and if there is an
22  audit going on.
23    Q.   If we look at the furthest column
24  to the left we have the names of the various
25  traders that issued offers to Hapag-Lloyd, is

Norbert Kock (1-19-16)

1              Norbert Kock (1-19-16)
2  that correct?
3     A.   Right.
4     Q.   Remind me, did you identify GF or
5  GEFO before?
6     A.   Yes.
7     Q.   And who is that?
8     A.   This is a German-based or a
9  Hamburg-based trader we are using from time to
10  time.
11    Q.   So if we look at the next column to
12  the right, number 1, offer, we see that -- how
13  do you pronounce it?
14    A.   GEFO is the abbreviation for
15  Gesellschaft transport.
16       THE INTERPRETER:  Society for oil
17  transportation.
18    A.   This is a tanker owner operating in
19  the Baltic mainly and the North Sea coast area,
20  owning tankers and operate them, and having a
21  fuel oil purchasing department which were grown
22  into also a trading department offering their
23  services to external other shipowners.
24    Q.   Okay.  So it appears from this
25  document that GEFO's second offer was 553

Norbert Kock (1-19-16)

1              Norbert Kock (1-19-16)
2  presumably per metric ton, and O.W. Bunker's
3  first offer was 554 per metric ton?
4     A.   You have to be careful with the
5  last column here which is stating which port is
6  offered.  So could be please repeat your
7  question?
8     Q.   I'm not sure I had a pending
9  question.  It just appears that the offer stated
10  for GEFO is a dollar less than O.W. Bunker
11  Germany in that first column entitled "Offer"?
12    A.   That's true.
13    Q.   If I understand your earlier
14  testimony, the lowest price did not necessarily
15  win the nomination because the fuel quality
16  might be better?
17    A.   Yes.
18    Q.   And that's a factor that would be
19  taken into consideration which Hapag?
20    A.   The energy contents, right.
21    Q.   The energy contents, right.  If we
22  go over three columns it's again entitled "One
23  offer," but it appears to be for the marine
24  diesel oil header column?
25    A.   Yes.

Norbert Kock (1-19-16)

1              Norbert Kock (1-19-16)
2     Q.   We see GEFO's first offer was
3  better than O.W. Bunker Germany, then O.W.
4  Bunker Germany made a second bid at a lower
5  price, is that correct?
6     A.   Where are you at the moment?
7     Q.   Under the MDO O.W. Bunker 2 TE, it
8  looks like the price went from 895 to 885?
9     A.   Yes.
10    Q.   So at some point O.W. Bunker
11  Germany improved its offer to the MDO.  Do I
12  understand correctly that the negotiation of
13  pricing would have taken place likely over the
14  phone?
15    A.   Yes.
16    Q.   Okay.  Again, this is just an
17  internal document that would not have been
18  shared?
19    A.   That's correct.
20    Q.   Let's take a look at a document
21  that's been marked as Exhibit 48, this is Bates
22  number HPL-USOT 154 through 159.
23       Do you recall if you looked at an
24  email similar to this earlier on today?
25    A.   Yes.

Norbert Kock (1-19-16)

1
2    Q.    I believe we discussed a bit about
3  Norton Lilly and Oiltest, is that correct?
4    A.    Yes.
5    Q.    If I understand correctly, Norton
6  Lilly was the local agent at the port?
7    A.    That's right.
8    Q.    And Oiltest was the surveyor
9  appointed to essentially run quality control on
10 the fuel specs?
11   A.    Yes, and quality.
12   Q.    What would be the purpose of the
13 email at pages 154 to 155?
14   A.    To inform the local agent, the
15 vessel, the stowage planners, as well as the
16 attending surveyor about this order we did.
17   Q.    So it's really logistics and
18 coordinating the physical supplier at the port?
19   A.    It's only logistics.
20   Q.    Neither Norton Lilly nor Oiltest
21 plays any part in the negotiation or the
22 formation of a contract for the purchase of fuel
23 oil?
24   A.    No.
25   Q.    Do you know whether Hapag's

Norbert Kock (1-19-16)

1
2  relationship with Norton Lilly is governed by
3  written contracts?
4    A.    I'm not involved in that business,
5  but there must be a contract onboard, otherwise
6  they won't work for us.
7    Q.    Let's look at a document that has
8  been marked as Exhibit 49, Bates stamps HPL-USOT
9  285 through 309.
10   Sir, have you seen this document
11 before today?
12   A.    No.
13   Q.    I take it then it's fair to say you
14 did not play any part in drafting or negotiating
15 this document?
16   A.    That's correct.
17   Q.    And you're not familiar with its
18 terms?
19   A.    No.
20   Q.    Well then we'll move on.
21   MR. FERNANDEZ:  Just for the
22 record, what you marked as Exhibit 49 has been
23 marked confidential pursuant to the
24 confidentiality agreement.
25   MR. HEILIG:  They should have asked

Norbert Kock (1-19-16)

1
2  whether that was a preexisting stamp or if you
3  had done it.
4    MR. FERNANDEZ:  We had done it.
5    MR. HEILIG:  There's no testimony
6  to mark as confidential.
7    Q.    Earlier we discussed a bit about
8  what would happen if a claim were to arise in a
9  particular transaction.
10   Would a claim arise based on the
11 survey conducted by Oiltest, for example?
12   A.    For example, yes.
13   Q.    Let's take a look at a document
14 that's been marked as Exhibit Number 50, this is
15 Bates number HPL-USOT 160 through 162.  Do you
16 recognize these documents?
17   A.    Yes.
18   Q.    Page 161, is this a fuel survey
19 report submitted by Oiltest to Hapag-Lloyd for
20 the SANTA ROBERTA transaction?
21   A.    Yes.
22   Q.    So the fuel surveyor would have
23 completed the document on page 161?
24   A.    Yes.
25   Q.    Page 162 we have a photograph which

Norbert Kock (1-19-16)

1
2  appears to be a photograph of the samples taken?
3    A.    That's right.
4    Q.    From the fuel?
5    A.    Yes.
6    Q.    Does Hapag-Lloyd require a
7  photograph of the samples to I guess demonstrate
8  their existence?
9    A.    Their integrity, right.
10   Q.    Would these documents be the type
11 of documents to notify Hapag of a potential
12 claim based on the specifications of the fuel?
13   A.    Yes.
14   Q.    If a claim were presented by
15 Hapag-Lloyd, I believe you testified that it
16 would be presented to O.W. Germany?
17   A.    Yes.
18   Q.    And to no one else?
19   A.    Right.
20   Q.    And Hapag-Lloyd didn't care what
21 happened downstream of O.W. Germany with respect
22 to those claims, correct?
23   A.    That's right.
24   Q.    All right.  And if it were
25 determined or agreed by the parties that the

Elisa Dreier Reporting Corp., a U.S. Legal Support Company  (212) 557-5558
950 Third Avenue, New York, NY  10022

Page 158

Norbert Kock (1-19-16)

1
2 claim was valid, there would be an adjustment in
3 price to O.W. Germany's invoice to Hapag-Lloyd?
4     A.    That's right.
5     Q.    Irrespective of whether or not
6 there would be a corresponding reduction or
7 adjustment in price of the physical supplier's
8 invoice to O.W.?
9     A.    We have no relation to the physical
10 supplier.  We are just dealing with O.W.
11 Germany.
12    Q.    This all stems from that issue in
13 the '90s where you dealt with the broker who
14 simply washed his hands with the situation, and
15 left Hapag with the recourse?
16    A.    Yes.
17    Q.    Let's take a look at Exhibit 14.  I
18 believe this was an email from the vessel
19 attaching the bunker delivery note that was sent
20 directly to Hapag?
21    A.    Yes.
22    Q.    Would Hapag have also received a
23 copy of the bunker delivery note from O.W.
24 Germany at some point?
25    A.    It could have been done at some

Page 159

Norbert Kock (1-19-16)

1
2 point together with the invoice.
3     Q.    Okay.  Let's take a look at a
4 document that has been marked as Exhibit 51,
5 Bates number OWG-9949-230 through 233.
6          The email on page 230 is in German
7 so I will have to rely on you to translate, or
8 our trusted translator.  Can you describe this
9 email for me?
10    A.    Yeah.  This is a message from
11 Victoria Bohn who's an administrative worker at
12 O.W. at that time addressing this email to
13 Marion Sakowski, who is a manager in our
14 accounting department saying hello Frau Sakowski
15 or hello Mrs. Sakowski, attached you receive
16 invoice and bunker delivery note for the
17 bunkering of M/V, Motor Vessel SANTA ROBERTA
18 Tacoma on October 9, 2014.  The original will
19 follow per courier.
20    Q.    So Hapag would receive copies of
21 the bunker delivery note and the invoice and the
22 original by mail?
23    A.    Yes.
24    Q.    If we look at the third page,
25 document number 232, we have a copy of O.W.

Page 160

Norbert Kock (1-19-16)

1
2 Germany's invoice to Hapag-Lloyd for the SANTA
3 ROBERTA transaction, correct?
4     A.    That's right.
5     Q.    This one is not stamped because it
6 has not yet been entered into Hapag's accounting
7 system?
8     A.    That's right.
9     Q.    Looking earlier we looked at the
10 stamped version of the invoice?
11    A.    Yes.
12    Q.    And it would have been entered in
13 the system?
14    A.    This is depending on where the
15 copies are coming from.  If the copies are
16 coming out of our system and they had been
17 booked into the system there is a stamp.  In
18 this case here, this is communication from O.W.
19 Bunker to our bookkeeping department, and at
20 that time the invoice has not been booked.
21    Q.    The stamp is Hapag's stamp?
22    A.    Yes.
23    Q.    Do you know whether Hapag would
24 have stamped the copy received by email or would
25 Hapag have waited for the original to arrive by

Page 161

Norbert Kock (1-19-16)

1
2 courier?
3     A.    At that time the accounting
4 department was not allowed to process invoices
5 coming by email.  The local taxing authorities
6 in German were demanding us just to process
7 original invoices received and not copies.
8     Q.    So it's fair to assume the stamped
9 version we looked at earlier was the hard copy
10 received by Hapag-Lloyd?
11    A.    Yes.
12    Q.    Let's take a look at Exhibit 15.
13 Just remind me again what the German word
14 translates to?
15    A.    This is the payment notice that
16 there is money in the pipeline.
17    Q.    We looked earlier and saw that the
18 SANTA ROBERTA is identified on this document?
19    A.    Yes.
20    Q.    How would Hapag-Lloyd make payment
21 to O.W. Germany, physical payment; was it by
22 check or wire payment?
23    A.    Wire payment.
24    Q.    Would this document be issued
25 before or after the actual wire payment was

41 (Pages 158 to 161)

Page 198

Norbert Kock (1-19-16)

1
2          MR. FERNANDEZ:  Objection.
3      A.   It should have been Captain Grundel
4  if he was onboard at that time, yes.
5      Q.   According to the crew list he was
6  the captain?
7      A.   Yes.
8      Q.   At that time, right?
9      A.   Yes.
10         MR. FERNANDEZ:  Objection.
11     Q.   Is the SOFIA EXPRESS still owned by
12  Hapag-Lloyd?
13     A.   Yes.
14     Q.   Is the VIENNA EXPRESS still owned
15  by Hapag-Lloyd?
16     A.   Yes.
17     Q.   I direct your attention to
18  Exhibit 32, to the second page which is marked
19  HPL-USOT 00198.  Would you look at the second
20  page please, sir?
21         Is that the bunker delivery receipt
22  for the VIENNA EXPRESS?
23     A.   Yes.
24     Q.   Is it your understanding that the
25  chief engineer of the VIENNA EXPRESS signed that

Page 199

Norbert Kock (1-19-16)

1
2  bunker delivery receipt?
3          MR. FERNANDEZ:  Objection.
4      A.   Yeah, it has been signed by the
5  chief engineer.
6      Q.   And the chief engineer signed that
7  on behalf of the vessel?
8          MR. FERNANDEZ:  Objection.
9      Q.   Using the stamp marked there?
10         MR. FERNANDEZ:  Objection.
11         MR. MALONEY:  Objection.
12         MR. HEILIG:  Objection.
13     A.   He signed it on behalf of
14  Hapag-Lloyd.
15     Q.   And it bears the stamp also on the
16  right side, Hapag-Lloyd VIENNA EXPRESS, do you
17  see that?
18     A.   Yes.
19     Q.   In the course of your duties as the
20  director of purchasing, you're use to seeing
21  stamps of the vessel and Hapag-Lloyd on these
22  bunker delivery receipts?
23         MR. FERNANDEZ:  Objection.
24     A.   When it was a Hapag-Lloyd vessel,
25  yes.

Page 200

Norbert Kock (1-19-16)

1
2      Q.   I'm showing you what's been
3  produced by your counsel as HPL-USOT page 89,
4  which appears to be a crew list for the VIENNA
5  EXPRESS, which I'm placing before you.
6          Do you recognize that the name of
7  the chief engineer depicted on that page -- do
8  you recognize whether the name of the chief
9  engineer is depicted on that page?
10     A.   It looks like the chief engineer,
11  Marek Sojda, was the responsible chief engineer
12  for the vessel at that time, and the signature
13  looks like Sojda.  I would agree.
14     Q.   Other than the document that you've
15  reviewed in Germany and here, the testimony that
16  you described, did you review any diaries or
17  calendar that you may have kept in October of
18  2014?
19     A.   No.
20     Q.   In preparation for your testimony
21  today?
22     A.   No.
23     Q.   At the time, in October of 2014,
24  did you have a practice of maintaining a
25  notebook or a diary of the work that was going

Page 201

Norbert Kock (1-19-16)

1
2  on in your department?
3      A.   No.
4      Q.   In the course of your experience as
5  the director of purchasing for Hapag-Lloyd, have
6  you come to learn that a supplier of fuel to a
7  vessel, a Hapag-Lloyd vessel, may have a right
8  to assert a lien against the vessel itself?
9          MR. FERNANDEZ:  Objection.
10         MR. HEILIG:  Objection.
11         MR. MALONEY:  Objection.
12     A.   Maybe a seller, but a supplier, no.
13     Q.   You've developed some familiarity
14  that a seller might have a lien against a
15  Hapag-Lloyd vessel in some circumstances, is
16  that fair to say?
17         MR. FERNANDEZ:  Objection.
18     A.   I think this is part also of our
19  terms and conditions.
20     Q.   Prior to the O.W. bankruptcy, did
21  you have any experience with any seller or
22  supplier claiming that they had a lien against a
23  Hapag-Lloyd vessel for non-payment?
24     A.   No.
25         MR. HEILIG:  Objection.

51 (Pages 198 to 201)

## Page 210

Norbert Kock (1-19-16)

1            Norbert Kock (1-19-16)
2 Lilly to assist you with?
3        MR. FERNANDEZ: Objection to the
4 form.
5        MR. MALONEY: Objection to the
6 form.
7        MR. HEILIG: Objection.
8    A.   Yes.
9    Q.   Would you look at paragraph 19. Do
10 you see at the end of the second sentence in
11 that paragraph you say:
12      "Additionally, execution of the
13 bunker delivery receipt simply acknowledged
14 receipt of the fuel as to volume and delivery
15 temperature only and did not ratify performance
16 of USOT concerning delivery of fuel."
17      Do you see that?
18    A.   Yes.
19    Q.   What did you mean by "ratify
20 performance of USOT concerning delivery of
21 fuel"?
22    A.   That we just confirm the quality,
23 correction, the volume, the delivered volume and
24 the delivered temperature, and that the final
25 metric tons which will be invoiced later by the

## Page 211

1            Norbert Kock (1-19-16)
2 seller, O.W., will be calculated based on the
3 analyzed product entity which comes later.
4    Q.   That quality analysis that you
5 described?
6    A.   Yes.
7    MR. KEOUGH: Let's mark this as
8 Exhibit 53 and 54.
9    (Kock Exhibit 53, Time Charter with
10 attachments, Bates stamped HPL-USOT 201 through
11 241, marked for identification.)
12    (Kock Exhibit 54, Time Charter,
13 Bates stamped HPL-USOT 242 through 284, marked
14 for identification.)
15    Q.   I'm showing you what's been marked
16 as Exhibit 53. Do you recognize that as the
17 time charter produced by your counsel in the
18 case that is similar to Exhibit 17, but it
19 contains the riders and additional pages that
20 are lacking from Exhibit 17?
21    A.   Our department is not involved in
22 negotiating charter parties.
23    Q.   I'm just asking you if you
24 recognize this exhibit as a more complete
25 document?

## Page 212

1            Norbert Kock (1-19-16)
2    A.   Yes, it contains much more
3 paperwork.
4    Q.   Than Exhibit 17?
5    MR. FERNANDEZ: Objection to the
6 form.
7    Q.   Does it contain the additional
8 pages of the time charter produced by your
9 attorneys, which are omitted from Exhibit 17?
10    A.   I don't know.
11    MR. FERNANDEZ: Objection.
12    Q.   Would you look at the document
13 please?
14    MR. DEHART: Can we note on the
15 record that this document has been designated as
16 confidential?
17    MR. KEOUGH: Yes.
18    A.   That's a lot of paperwork in behind
19 stating clauses to the Charter Party.
20    MR. KEOUGH: Off the record.
21    (Off the record)
22    Q.   Is it correct that what's been
23 marked as Exhibit 53 contains the Bates numbers
24 HPL-USOT 201 through 241, is that right?
25    A.   Yes.

## Page 213

1            Norbert Kock (1-19-16)
2    Q.   You understand this is a document
3 produced by your attorneys in this case for
4 Hapag-Lloyd?
5    A.   No.
6    MR. KEOUGH: I'll ask counsel if
7 he's prepared to stipulate to that effect?
8    MR. FERNANDEZ: I'll take it under
9 advisement.
10    MR. KEOUGH: Thank you.
11    Q.   Would you please place Exhibit 54
12 in front of the witness. Showing you that
13 document, do you recognize that as a copy of a
14 time charter produced by your counsel, which
15 bears the Bates numbers HPL-USOT 242 through
16 284?
17    A.   But I can't identify who was issued
18 this document here, because it's not my
19 business.
20    MR. KEOUGH: That appears to be a
21 time charter for the SANTA ROBERTA. Exhibit 53
22 was a time charter for the SEASPAN HAMBURG.
23    MR. FERNANDEZ: Also marked
24 confidential for purposes of this litigation.
25    MR. KEOUGH: Yes, I take it it is.

54 (Pages 210 to 213)