# EXHIBIT 9

Page 1

- GOTZ LEHSTEN -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
BONNY GAS TRANSPORT LIMITED, as      )
owner of the LNG FINIMA (IMO         )
No.7702401),                         ) CASE NO.
                                     ) 14-cv-9542 (VEC)
            Plaintiff,               )
                                     )
     -against-                       )
                                     )
O.W. BUNKER GERMANY GMBH, NUSTAR     )
TERMINALS MARINE SERVICES, N.V.,     )
NUSTAR ENERGY SERVICES, INC.,        )
ING BANK N.V.,                       )
                                     )
            Defendants.              )
------------------------------------x )
HAPAG-LLOYD AKTIENGESELLSCHAFT,      )
                                     ) CASE NO.
            Plaintiff,               ) 14-cv-9949 (VEC)
                                     )
     -against-                       )
                                     )
U.S. OIL TRADING LLC, O.W. BUNKER    )
GERMANY GMBH, O.W. BUNKER & TRADING  )
A/S, ING BANK N.V., CREDIT AGRICOLE  )
S.A.,                                )
                                     )
            Defendants.              )
------------------------------x      )
HAPAG-LLOYD AKTIENGESELLSCHAFT,      )
                                     ) CASE NO.
            Plaintiff,               ) 14-cv-10027 (VEC)
                                     )
     -against-                       )
                                     )
O'ROURKE MARINE SERVICES, L.P.,      )
L.L.P., O.W. BUNKER GERMANY GMBH,    )
O.W. BUNKER USA, INC., ING BANK      )
N.V.,                                )
                                     )
            Defendants.              )
------------------------------x      )
                February 23, 2016
                    9:05 a.m.
        DEPOSITION OF GOTZ LEHSTEN

## Page 2

```
 1              - GOTZ LEHSTEN -
 2                      )
     UNITED STATES DISTRICT COURT     )
 3   SOUTHERN DISTRICT OF NEW YORK    )
     ----------------------------------x )
 4   U.S. OIL TRADING LLC,            ) CASE NO.
                                      ) 15-cv-6718 (VEC)
 5           Plaintiff,               )
                                      )
 6       -against-                    )
                                      )
 7   M/V VIENNA EXPRESS, her tackle,  )
     boilers, apparel, furniture,     )
 8   engines, appurtenances, etc.,    )
     in rem: M/V SOFIA EXPRESS, her   )
 9   tackle, boilers, apparel,        )
     furniture, engines, appurtenances, )
10   etc., in rem,                    )
                                      )
11           Defendants.              )
     ----------------------------------x
12   HAPAG-LLOYD AKTIENGESELLSCHAFT, as ) CASE NO.
     Claimant to the M/V VIENNA EXPRESS, )
13                                    )
             Counter-Claimant and     )
14           Third-Party Plaintiff,   )
                                      )
15       - against -                  )
                                      )
16   U.S. OIL TRADING LLC,            )
                                      )
17           Counter-Defendant and    )
                                      )
18   O.W. BUNKER GERMANY GMBH, O.W.   )
     BUNKER TRADING A/S, ING BANK N.V., )
19   and CREDIT AGRICOLE CORPORATE AND  )
     INVESTMENT BANK, a division or arm )
20   of CREDIT AGRICOLE S.A.,         )
21           Third-Party Defendant.   )
     ----------------------------------x
22   DATE: February 23, 2016
     TIME:  9:05 a.m.
23
24
25
```

## Page 3

```
 1              - GOTZ LEHSTEN -
 2           TELECONFERENCE DEPOSITION OF GOTZ
 3   LEHSTEN, a 30(b)(6) witness, held at the offices of
 4   McDermott Will & Emery, 340 Madison Avenue, New York,
 5   New York, pursuant to Notice, before Hope Menaker, a
 6   Shorthand Reporter and Notary Public of the State
 7   of New York.
```

## Page 4

```
 1              - GOTZ LEHSTEN -
 2      A P P E A R A N C E S
 3   KIESLICH & PARTNER RECHTSANWALTE
     Attorneys for the Witness
 4      Moorfuhrtweg 15
        22301 Hamburg, Germany
 5   BY: MARTIN KIESLICH, ESQ. (via teleconference)
 6   SEWARD & KISSEL LLP
     Attorneys for Defendant ING Bank N.V.,
 7   as Security Agent:
        One Battery Park Plaza
 8      New York, New York 10004
     BY:  BRIAN P. MALONEY, ESQ.
 9        LAURA E. MILLER, ESQ.
10   FREEHILL HOGAN & MAHAR LLP
     Attorneys for Hapag-Lloyd Aktiengesellschaft
11      80 Pine Street
        New York, New York 10005
12   BY: MICHAEL FERNANDEZ, ESQ.
         MICHAEL DEHART, ESQ.
13
     CLYDE & CO. US LLP
14   Attorneys for U.S. Oil Trading LLC
        405 Lexington Avenue
15      New York, New York 10174
     BY: CASEY D. BURLAGE, ESQ.
16
     McDERMOTT WILL & EMERY
17   Attorneys for O.W. Bunker Germany GMBH
        340 Madison Avenue
18      New York, New York 10173
     BY: DARREN AZMAN, ESQ.
19       MICHAEL GALEN, ESQ.
         ULRIKE WITT, ESQ. (via teleconference)
20   -and-
     HILL RIVKINS LLP
21      45 Broadway, Suite 1500
        New York, New York  10006
22   BY: JUSTIN M. HEILIG, ESQ. (via teleconference)
23   SIMMS SHOWERS LLP
     Attorneys for O'Rourke Marine Services L.P.
24      201 International Circle, Suite 250
        Hunt Valley, Maryland 21030
25   BY: MARIOS J. MONOPOLIS, ESQ. (via teleconference)
```

## Page 5

```
 1              - GOTZ LEHSTEN -
 2      APPEARANCES:  (cont'd)
 3      BLANK ROME LLP
        Attorneys for NuStar
 4         717 Texas Avenue, Suite 1400
           Houston, Texas  77002
 5      BY:  KEITH B. LETOURNEAU, ESQ.
 6
        ALSO PRESENT:
 7         Ms. A.J. Elterman, Interpreter
```

Page 34

- GOTZ LEHSTEN -

2  the executive vice presidents, the CEO, the CFO
3  and so on, they were what we call -- what you call
4  group management within the head office.
5      That would have been the Danish
6  entity; is that correct?
7      MR. HEILIG: Same objection.
8      A.  No, no. It's not the same company.
9  I think I'm not -- it's getting very complicated
10 now and we probably need hours to explain the
11 structure of the company.
12      O.W. Bunker & Trading of course also
13 had reselling business in Denmark. They had a
14 unit in Copenhagen, and they had a unit in
15 Warborg. That was part of my responsibility, but
16 O.W. Bunker & Trading was not the O.W. Bunker
17 Group.
18      Q.  So, is it fair to say that with
19 regard to your area, the reselling area, being an
20 executive vice president you had that
21 responsibility throughout the group, meaning all
22 the ó
23      A.  All reselling activities -- all
24 reselling activities in the group.
25      Q.  The group then consisted ó

Page 35

- GOTZ LEHSTEN -

2      A.  O.W. Bunker.
3      Q.  That group starting in 2000 -- 2000
4  consisted of how many different entities
5  worldwide?
6      A.  I don't have an exact number.
7      Q.  Just roughly?
8      A.  But how many -- somewhere between 25
9  and 30 to my best knowledge.
10     Q.  In 2014, at the time of the
11 collapse ó
12     A.  Sorry. Sorry. You asked for the
13 number at 2000.
14     Q.  Yes, sir. Sorry. Sorry.
15     A.  That probably has been something
16 around -- I don't know -- eight to ten. The
17 number I just gave before the number in 2014.
18     Q.  Okay. I understand. Thank you.
19        MR. FERNANDEZ: Can we take make like
20 a five-minute break? Can we take a
21 five-minute break, guys?
22        THE WITNESS: That's fine. Thank
23 you.
24        (Whereupon, there was a brief recess
25 in the proceedings.)

Page 36

- GOTZ LEHSTEN -

2        (Whereupon, Exhibit 5 was marked at
3  this time.)
4        MR. FERNANDEZ: We have marked for
5  purposes of identification Exhibit 5 which is
6  the Hapag notice of the Rule 30(b)(6)
7  deposition of O.W. Bunker Germany. That same
8  notice has been served and applies to all
9  three cases that are currently before Judge
10 Caproni in the Southern District of New York.
11        MR. HEILIG: I just wanted to show
12 you the document that he's talking about.
13        MR. FERNANDEZ: Are you guys ready to
14 go?
15        MR. HEILIG: Ready.
16     Q.  Mr. Lehsten, just generally, can you
17 describe for us what the business of O.W. was
18 prior to its insolvency?
19        MR. HEILIG: Objection. Are you
20 talking O.W. Germany? You just said O.W.
21     Q.  The O.W. group and then we're going
22 to talk about O.W. Germany.
23     A.  Okay. I'm a bit surprised about the
24 question. O.W. Bunker Group, as I mentioned
25 before, O.W. Bunker was one of the biggest players

Page 37

- GOTZ LEHSTEN -

2  in the global bunker market.
3        They provided all kind of services to
4  the bunker industry, mainly on the physical side
5  where they were acting as physical suppliers in
6  various areas, and secondly, the reselling
7  business where they have sold deliveries to
8  clients and bought from physical suppliers ó
9  third-party physical suppliers to provide the
10 delivery.
11        That was the two main business
12 activities. So that was also, as I mentioned,
13 cargo trading for the supplier or resupplier,
14 replenishment of their own physical division, but
15 also trading cargo for third party. Another area
16 was hedging or risk management department selling
17 risk management products to clients but also to
18 suppliers.
19     Q.  Out of those general categories
20 insofar as O.W. Germany was concerned, what
21 responsibilities or what involvement did O.W.
22 Germany have in the marketplace?
23        MR. HEILIG: Objection to form.
24        Go ahead.
25     A.  O.W. Germany had two divisions, one

Page 38

- GOTZ LEHSTEN -

reselling division and one physical division. The physical division was handling providing, offering physical supplies in all German ports, while the reselling division was mainly responsible to find local clients in Germany, but also in northern Europe and also to handle all inquiries from the rest of the group for Germany.

Q. Okay. Insofar as O.W. Germany's interaction with my client, Hapag-Lloyd, would you -- how would you describe the services that O.W. Germany provided to Hapag?

A. O.W. -- Hapag-Lloyd and O.W. Bunker Germany had two main business. One was the contract business. One was spot business for ó ja.

MR. HEILIG: Mike, just a brief objection. We've designated Mr. Gronenberg to testify about Topic Number 1 so just to clarify that. He's our designee under the rules for that subject.

Q. Is it fair to say that O.W. Germany acted as traders in the bunker market?

MR. LETOURNEAU: Objection to form.

A. Basically it's a definition.

Page 39

- GOTZ LEHSTEN -

Basically we call ourselves resellers. Others may call it trading. Resellers is by definition basically where you value X in your own name, where you sell it to somebody in your own name and you purchase from a third party for your own account.

So, many different words for bunker traders, right? In U.S., I think they're called marketers, whatever that means. I have no clue.

Q. Okay. But the bottom line, whether you call it a reseller or trader, you were -- O.W. Germany was acting in its own name and it was purchasing bunkers for its own account?

A. Yes.

MR. HEILIG: Objection. Form.

MR. FERNANDEZ: I'm trying to move it along.

Q. I want to talk to you next about the credit lines that the O.W. Bunker Group had in place at various points in time. Is that something you're familiar with, credit lines from outside investors?

MR. HEILIG: Note my objection pursuant to our written objection to the

Page 40

- GOTZ LEHSTEN -

deposition topic.

A. The only part I have been involved when it comes to credit lines was that I have been part of the credit committee in the group, deciding about credit given to customers.

MR. FERNANDEZ: Just off the record.

(Whereupon, a brief discussion was held off record.)

Q. Sir, are you aware in your capacity as executive vice president, and whatever other roles you were appointed to as of December of 2013, that the O.W. group had entered into a security agreement with what I'll describe as a consortium of banks, but I'll refer to it as the ING Security Agreement.

MR. MALONEY: Objection to form.

MR. HEILIG: Object to form.

A. Of course, to some extent, I have been informed by the CFO and Treasury at that time that they have been in negotiations with the bank's syndicate but that -- those informations were -- I didn't have very deep insight into those discussions; only that the agreement has been fixed in a certain time. But don't ask me about

Page 41

- GOTZ LEHSTEN -

details of particulars about that agreement.

Q. Okay. Do you know if the O.W. Bunker Group prior to 2013 had any type of credit or security agreement that was in place by any lending institution? This was -- this is prior to 2013.

MR. HEILIG: Object to form.

A. I couldn't -- I can't reply.

Q. You don't know?

A. I have never been involved in the finance issues of the group.

Q. All right. But you were in charge of the trading or the reselling and the profits and losses generated in that division; is that correct?

MR. HEILIG: Object to form.

A. I don't understand your question.

Q. I'm just trying to understand what information you would have provided and what involvement you would have had with regard to a decision by the O.W. Bunker Group to go out and seek a credit line.

MR. MALONEY: Objection to form.

Q. Let me just back up a little bit.

11 (Pages 38 to 41)

Page 82

- GOTZ LEHSTEN -

1
2     So it's a reseller's day-to-day business that they
3     take business in and then based on market
4     circumstances, believe or whatever reason the
5     market is soft or whatever to get a better buying
6     price from the distributor -- from the local
7     distributor.
8         That's part of reseller's business,
9     to sell to the customers first and then later on
10    buy best possible from the distributor.
11        Q.    Mr. Lehsten, would you agree with me,
12    sir, that this margin information that's being
13    shared between O.W. Germany and O.W. U.S.A. they
14    are sharing margin information?
15        A.    Yes, they do, because it was
16    according to the terms and policy that they have
17    an open book principle.
18        Q.    If these two companies were acting as
19    separate companies doing an arm's-length
20    transaction, you would agree with me that they
21    would never share margin information, right?
22            MR. FERNANDEZ: Objection.
23            MR. HEILIG: Objection to form.
24        A.    It was difficult to hide because they
25    had access to the same IT software.

Page 83

- GOTZ LEHSTEN -

1
2        Q.    But if they were acting in an
3     arm's-length transaction between each other, O.W.
4     U.S.A. and O.W. Germany would never share their
5     margins, would they, sir?
6             MR. HEILIG: Objection.
7             MR. FERNANDEZ: Objection to form.
8        Q.    They did in this case. But if they
9     were acting in an arm's-length transaction, you
10    would agree with me they would never share their
11    margins.
12            MR. FERNANDEZ: Objection to form.
13            MR. HEILIG: Same objection.
14            You can answer.
15       A.    Sorry. I couldn't get you. That's
16    very theoretical question, isn't it?
17       Q.    Well, no, it's not. It's how you do
18    business with parties with whom you engage in an
19    arm's-length transaction.
20            You don't share your margins with
21    parties with whom you maintain arm's-length
22    transactions, do you?
23            MR. FERNANDEZ: Objection.
24            MR. HEILIG: I'll object. This
25    question has become argumentative.

Page 84

- GOTZ LEHSTEN -

1
2         To the best you can answer the
3     questions, the witness can proceed.
4        A.    We had a business model that we had
5     an open book principle where the units have shared
6     margins. That how it is. So ó
7        Q.    If O.W. U.S.A. had not been part of
8     the O.W. Bunker Group, you would agree with me
9     that you would never have shared that margin with
10    them.
11            Isn't that true?
12            MR. HEILIG: Objection to form.
13            MR. FERNANDEZ: Objection. Form.
14       A.    That question is too hypothetical. I
15    don't want to answer that one.
16       Q.    Are you not -- are you refusing to
17    answer my question, sir?
18       A.    I'm not refusing because I simply
19    don't know, because that's the way we worked
20    internally at O.W. Bunker.
21       Q.    I'm not asking internally. I'm
22    asking an arm's-length transaction with a third
23    party with whom you're doing business, you would
24    never share your margin information with such a
25    party, would you, sir?

Page 85

- GOTZ LEHSTEN -

1
2             MR. FERNANDEZ: Objection.
3             MR. HEILIG: Objection.
4        A.    You asked about my opinion.
5        Q.    No. I'm asking you about your
6     business practices.
7             Are you telling me that you would
8     share your margins with a third party with whom
9     you're not affiliated?
10            MR. FERNANDEZ: Objection to form.
11            MR. HEILIG: Objection.
12       A.    We probably had seen that even out in
13    the bunker industry with companies that are not
14    part of the group that there's sort of an open
15    book principle.
16       Q.    Is it your testimony that O.W. as a
17    business practice would share its margins with
18    parties who are not affiliated with O.W.?
19            MR. HEILIG: Objection. Form.
20            MR. FERNANDEZ: Objection to form.
21       A.    I don't know where we're going here.
22    Sorry. I don't understand.
23            MR. HEILIG: To the extent you can
24    answer the question, you can proceed.
25       A.    Of course I mean all kind of

Page 94

- GOTZ LEHSTEN -

    MR. BURLAGE:  I'll follow up after you are done, Marios.
    EXAMINATION BY MR. MONOPOLIS:
    Q.  My name is Marios Monopolis.  I'm an attorney for O'Rourke Marine Services, and my questions are in reference to the case filed by Hapag-Lloyd against O'Rourke, O.W. Germany, O.W. U.S.A. and ING Bank.  I presume given your earlier testimony, are you familiar with that case generally?
    A.  I think I have seen it somewhere in the notes, yes.
    Q.  Are you familiar with the role of O.W. Germany played with respect to the physical supply or the general supply of the vessels the DERBY D and the SYDNEY EXPRESS?
    A.  No.  It's the first time I hear those vessels' names.
    Q.  Are you familiar with the role O.W. Germany played with the supply of bunkers to any Hapag-Lloyd vessels?
    A.  No.  As I mentioned earlier, when it comes to day-to-day business and reselling day-to-day business Hapag-Lloyd, then it's best to

Page 95

- GOTZ LEHSTEN -

talk to Mr. Gronenberg.  I have nothing to do with day-to-day reselling business and of O.W. Bunker Germany.
    Q.  But O.W. Germany was involved on some level with the -- with the supply to the DERBY D and the SYDNEY EXPRESS, wasn't it?
    MR. HEILIG:  Object to form.
    You can answer if you know.
    A.  I cannot answer that question.  I mean if it's to who belongs that vessel.  Is it Hapag-Lloyd vessel?
    Q.  Yes.  Those vessels were chartered by ó
    A.  Okay.  Then I can say that if O.W. Bunker Germany did the sales to Hapag-Lloyd and if it's a delivery in the U.S., then they have done the purchase through O.W. Bunker Houston.
    Q.  O.W. Bunker Houston, is that O.W. U.S.A. or is that another O.W. entity based in the U.S.?
    A.  O.W. Bunker Houston was what we called the sourcing center or purchase center for all U.S. ports.
    Q.  I apologize that this is repetitive

Page 96

- GOTZ LEHSTEN -

and so this might go to Mr. Gronenberg's testimony tomorrow, but I'm looking at Topic 12, "the understanding by O.W. Germany of the role that O.W. Germany played with respect to the supply of bunkers to the vessels."
    Mr. Lehsten, is it your testimony that you don't have an understanding of what role O.W. Germany played?
    MR. HEILIG:  Objection to form.
    A.  Okay.  I think that you need to clarify which part you believe I said that I ó
    Q.  That you didn't have an understanding?
    A.  Yes.
    Q.  I asked you about the names of the vessels and you told me, I believe you told me ó please correct me if I'm wrong -- you didn't know what the vessels were.
    A.  No.  These ships' names are not familiar to me and so if you say it's Hapag-Lloyd's two ships, I then, of course, I know that O.W. Bunker Germany did sales to Hapag-Lloyd and explained to you in which way we have handled those transactions.

Page 97

- GOTZ LEHSTEN -

    Whether those ships have been involved, I don't know and suggest you ask Mr. Gronenberg.
    There have been probably many, many involved every day from Hapag-Lloyd and different other customers.
    Q.  Okay.  Would you say, taking into account your response just now, would you say that O.W. Germany likely played the same role with respect to the two vessels I've identified, the DERBY D and the SYDNEY EXPRESS, that it played with the other vessels implicated in today's deposition?
    MR. FERNANDEZ:  Objection.
    MR. HEILIG:  Objection to form.
    MR. FERNANDEZ:  Objection to form.
    Lack of foundation.  Calls for speculation.
    A.  The role of a reseller is basically always the same as I understood your question correctly.
    Q.  Okay.
    MR. MONOPOLIS:  That's -- I think that's it for O'Rourke, but like the others, I'm going to reserve our rights with respect

Page 110

- GOTZ LEHSTEN -

2 global sales director.
3    Q.  About what time did all of those
4 events you just described take place?
5    A.  Those tendering could take a month or
6 two.
7    Q.  Understood.  My question wasn't about
8 the duration of the negotiations.  It was when
9 they took place.
10       Was it in, for example, 2013/'14?
11 When did those negotiations take place?
12    A.  That's why I tried to find a date
13 here on the contract, and the negotiations for the
14 following year were normally taking place in the
15 first quarter of the year before.
16    Q.  Before what?
17    A.  For contracts.  As I mentioned
18 earlier, there were two kind of businesses.
19 Hapag-Lloyd, there was a contract business where
20 we entered into supply contracts with Hapag-Lloyd
21 in different ports and there was the so-called
22 spot business where basically we offered on their
23 specific inquiries with deliveries, the shortened
24 orders for the next week or the week after.
25    Q.  Understood.

Page 111

- GOTZ LEHSTEN -

2       So, as far as you understand, this
3 contract did not deal with spot transactions or
4 did deal with spot transactions?
5    A.  Yes.  This contract was a one-year
6 contract to supply all their demand in ARA.
7    Q.  Can you please take a look at Page 17
8 of 76, which is the second page, and do you see on
9 the left-hand side where it says, "max claim
10 notice period"?
11    A.  Yes.
12    Q.  Can you take a moment just to read
13 the entry to the right of that and what it says
14 there?
15    A.  Yes.  I'm aware of that clause.
16 Please ask the question.
17    Q.  So just so I can make the record
18 clear, what it states is "Sixty calendar days of
19 the date of delivery for term contracted low
20 sulphur fuel oil supplied in Antwerp or Rotterdam.
21 Thirty calendar days of the date of delivery for
22 supplies in all remaining ports worldwide."
23       So Mr. Lehsten, is there -- to your
24 understanding is there a reason why there is a
25 separate calendar date period for claims for ports

Page 112

- GOTZ LEHSTEN -

2 in Antwerp or Rotterdam from other ports
3 worldwide?
4    A.  The reason, it's actually very simple
5 issue here.  When they take the low sulphur fuel,
6 for example, in '14 which they only had to use in
7 certain so-called SECA areas -- areas SECA.  You
8 are familiar with SECA?
9    Q.  Emission control areas?
10    A.  Yes, exactly.  In those areas, you
11 have to use low sulphur fuel oil.  So if you take
12 bunkers in Rotterdam, then you only have to use a
13 low sulphur fuel oil until you enter the
14 Mediterranean.  So until you use it, bunkers you
15 have taken on board it may take the whole round
16 trip through Asia to come back to the next low
17 emission area.
18       So it will be difficult for customers
19 like Hapag-Lloyd to ascertain quality issues here
20 within 60 days and that's what we agreed.  Okay.
21 Since you're not going to use that on probably the
22 next 30 days, we agree that you are still after
23 60 days you can file a claim against O.W. Bunker
24 if you find that low sulphur fuel oil not within
25 specification.

Page 113

- GOTZ LEHSTEN -

2    Q.  Understood.  Understood.
3       Earlier do you recall your testimony
4 and I believe it was Mr. Letourneau who had
5 asked -- was asking you the question, but you had
6 said that depending on certain customer demands
7 the O.W. group would agree to other standard terms
8 and conditions other than the O.W. Bunker Group's
9 terms and conditions.  Do you recall that
10 testimony?
11    A.  Yes.
12    Q.  Can you please just take a look at
13 where on the same page we were just looking at
14 where it says, "Terms and conditions.  Hapag-Lloyd
15 AG standard terms and conditions.  Version 2014 to
16 apply."
17       And then after that it has an
18 "(Version 7.11.3849.0015623934)."
19       Do you see that?
20    A.  Yes, I do.
21    Q.  Would this contract fall within your
22 understanding of your testimony earlier that
23 Hapag-Lloyd had demanded that O.W. agree to its
24 terms, meaning Hapag-Lloyd's terms and conditions,
25 for this contract?

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022

```
                                                   Page 114
 1             - GOTZ LEHSTEN -
 2        A.   That was a condition to -- to be
 3   reseller for them.
 4        Q.   Can you repeat that, please?
 5        A.   The condition dealing or selling to
 6   Hapag-Lloyd's was that we accept their terms and
 7   conditions; not only in contracts, on all
 8   deliveries.
 9        Q.   So Hapag-Lloyd -- in order to do
10   business with Hapag-Lloyd, O.W. Germany was
11   required to accept Hapag-Lloyd's conditions not
12   only for spot deals, but also for contracts like
13   these?
14             MR. HEILIG: Objection.
15             MR. FERNANDEZ: Objection to form.
16        A.   For all deals. For all deals.
17        Q.   For all deals. Okay.
18             Can you please turn to the last page
19   of this document? It's Page 22 of 76.
20        A.   Yes.
21        Q.   Do you see in Clause 18 titled "Law
22   and Arbitration." If you go towards the bottom,
23   there's a sentence that begins, "German law shall
24   apply on the 'fuel' contract."
25             Do you see that sentence?
```

```
                                                   Page 115
 1             - GOTZ LEHSTEN -
 2        A.   There's "German law shall apply on
 3   the --"
 4             Yes.
 5        Q.   What is your understanding of the
 6   "fuel contract" in quotation marks there?
 7        A.   Fuel contract is any contract. Could
 8   be part of -- on a contract sales, could be spot
 9   deal.
10        Q.   So it's not limited to deals that
11   have been consummated under this agreement,
12   correct?
13        A.   No. It's on all deals. All terms
14   and conditions will apply.
15        Q.   So your understanding is that fuel
16   contract means all deals with Hapag by O.W.
17   Germany?
18        A.   Yes, exactly.
19        Q.   Okay. And just to confirm, it is ó
20   O.W. Germany has their place of business in
21   Hamburg, Germany, correct, or did at the time that
22   this was entered?
23        A.   Yes.
24        Q.   Okay. That was -- you said you did
25   negotiate this -- had personal involvement
```

```
                                                   Page 116
 1             - GOTZ LEHSTEN -
 2   negotiating this contract, correct?
 3        A.   Yeah. All long-lasting contracts,
 4   right, I negotiate with Hapag-Lloyd but not the
 5   spot business.
 6        Q.   Not the spot business. Okay.
 7        A.   No, not the day-to-day spot business.
 8        Q.   Got it.
 9             But again, those spot deals would
10   fall within the fuel contract that -- as it's
11   referred to in this -- on this page, correct? Is
12   that your testimony?
13        A.   I'm not sure I understand. The spot
14   business was simply given to the spot inquiries
15   were given to O.W. Bunker Germany salesperson and
16   they were handling it day-to-day. The contract
17   sales, right? They passed on the next delivery
18   they required for the ship in ARA and that he had
19   the supplies.
20             On the contract, you're basing not ó
21   you have set the terms right, you have set the
22   prices. You're not negotiating like on a spot
23   deal. We're just performing the contract.
24             So that's more administration work
25   you can say. And then you have the spot deals
```

```
                                                   Page 117
 1             - GOTZ LEHSTEN -
 2   where they ask you for particular delivery in a
 3   certain port and then, on that day, they will fix
 4   a deal or they lose it.
 5        Q.   But in either situation that you just
 6   described, the spot deal or the ARA deals, the ó
 7   O.W. Germany would be conducting business with
 8   Hapag -- basis Hapag-Lloyd's terms and conditions;
 9   is that correct?
10        A.   Yes.
11        Q.   And was it the intent of O.W. Germany
12   to have German law apply to those contracts in
13   those deals with Hapag?
14        A.   No. We actually don't like German
15   law here, but it was a tradition, right? And
16   since adapt -- suppliers have accepted their terms
17   and conditions, it was a matter of being
18   competitive on the terms and conditions. So we
19   agreed or accepted without really wanting it. If
20   that makes sense. It was a commercial decision.
21        Q.   Correct. So it was a commercial
22   decision to get the business from Hapag to do the
23   deals under their terms and conditions which
24   require German law, correct?
25        A.   Yes, that's correct.
```

Elisa Dreier Reporting Corp., a U.S. Legal Support Company (212)557-5558
950 Third Avenue, New York, NY 10022



# ERRATA SHEET
S.D.N.Y. Civil Action Nos. 14-cv-9542, 14-cv-9949, 14-cv-10027, and 15-cv-6718 (VEC)
Witness: Götz Lehsten
Deposition Date: February 23, 2016

| Pages: Lines | Change | Reason |
| --- | --- | --- |
| 34:15 | Change "Warborg" to "Aalborg" | Transcription error |
| 42:19-20 | Change "need to develop the business" to "wanted to grow the business and develop our market share" | Grammar/translation/clarification |
| 42:20-22 | Change "And, of course … oil prices" to "Liquidity was key for volume growth and development, and oil prices had an influence on overall liquidity" | Transcription error/grammar/translation/clarification |
| 42:22 | Change "End" to "At the end" | Grammatical correction |
| 43:6-7 | Change "have probably used much less money as" to "employed much less capital compared to" | Grammar/translation/clarification |
| 44:2 | Change "terminal" to "turnover" | Transcription error |
| 46:15 | Change "terminal" to "trading" | Transcription error |
| 46:16 | Change "terminal" to "trade" | Transcription error |
| 71:25 | Change "claim" to "client" | Transcription error |
| 73:8 | Change "Klaus" to "Claus" | Spelling error |
| 110:15 | Change "first" to "fourth" | Transcription error |
| 117:15 | Change "tradition" to "condition" | Transcription error |
| 125:17 | Change "Warborg" to "Aalborg" | Transcription error |
| 125:23 | Change "Warborg, that's W-A-R-B-O-R-G" to "Aalborg, that's A-A-L-B-O-R-G" | Transcription error |

Date: 15.4.16                                    Signature: _____

**Nr. 27 der Urk. Rolle für das Jahr 2016**

Vorstehende, vor mir vollzogene Namensunterschrift des

Götz Dieter Lehsten, geb. am 20.03.1962,
wohnhaft Am Hohen Ufer 21, 23730 Neustadt in Holstein
- ausgewiesen durch Personalausweis -

beglaubigte ich hiermit.

Der Notar fragte den Beteiligten, ob er oder eine Person, mit der sich der Notar zur gemeinsamen Berufsausführung verbunden hat in der Angelegenheit, die Gegenstand der Beglaubigung ist, außerhalb seiner Amtstätigkeit bereits tätig war oder ist, soweit sie nicht im Auftrag aller Beteiligten ausgeübt wurde. Der Beteiligte erklärte, dass dies nicht der Fall ist.

Neustadt in Holstein, den 15.04.2016



Notar



– LEERRAUM –
Landgericht Lübeck

– LEERSEITE –
Landgericht Lübeck



APOSTILLE
(Convention de La Haye du 5 octobre 1961)

1. Land: Bundesrepublik Deutschland

Diese öffentliche Urkunde

2. ist unterschrieben von

Dr. Hauke Seidel

3. in seiner Eigenschaft als Notar

4. sie ist versehen mit dem Siegel des

Notars Dr. Hauke Seidel in Neustadt i. H.

Bestätigt

in Lübeck  6. am 21. April 2016

7. durch den Präsidenten des Landgerichts Lübeck

8. unter 910 a – 504/2016

9. Siegel

10. Unterschrift
 In Vertretung
 Hartmut Schneider