USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____3/22/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

CLEARLAKE SHIPPING PTE LTD,                          :
                                                     :
                          Plaintiff,                 :
                                                     :
            -against-                                :         14-CV-9287 (VEC)
                                                     :
O.W. BUNKER (SWITZERLAND) SA, O.W.                   :
BUNKER USA INC., O.W. BUNKER NORTH                   :
AMERICA INC., O.W. BUNKER HOLDING                   :
NORTH AMERICA INC., NUSTAR ENERGY                   :
SERVICES INC., ING BANK N.V.,                        :
                                                     :
                          Defendants.                :
------------------------------------------------------------X
                                                     :
NIPPON KAISHA LINE LIMITED, individually            :
and on behalf of M/V RIGEL LEADER (IMO              :
No.9604940),                                         :
                                                     :
                                                     :         14-CV-10091 (VEC)
                          Plaintiff,                 :
                                                     :
            -against-                                :
                                                     :
O.W. BUNKER USA INC., NUSTAR ENERGY                 :
SERVICES, INC., KIRBY INLAND MARINE LP,:
ING BANK N.V.,                                       :
                                                     :
                          Defendants.                :
------------------------------------------------------------X
 HAPAG-LLOYD AKTIENGESELLSCHAFT,                     :
                                                     :
                          Plaintiff,                 :
                                                     :         14-CV-9949 (VEC)
            -against-                                :
                                                     :
U.S. OIL TRADING L.L.C., O.W. BUNKER                :
GERMANY GMBH, O.W. BUNKER &                         :
TRADING A/S, ING BANK N.V. AND CREDIT              :
AGRICOLE S.A.,                                       :
                                                     :
                          Defendants.                :
------------------------------------------------------------- X

```
------------------------------------------------------------ X
U.S. OIL TRADING LLC,                                        :
                                                             :
                                    Plaintiff,               :
                                                             :
                       -against-                             :            15-CV-6718 (VEC)
                                                             :
M/V VIENNA EXPRESS, her tackle, boilers,                     :
apparel, furniture, engines, appurtenances, etc.,            :
in rem, and M/V SOFIA EXPRESS, her tackle,                   :
boilers, apparel, furniture, engines, appurtenances,         :
etc., in rem, and HAPAG-LLOYD                                :
AKTIENGESELLSCHAFT, as claimant to the in                    :
rem defendant M/V VIENNA EXPRESS,                            :
                                                             :
                                    Defendants.              :
                                                             :
------------------------------------------------------------ X
                                                             :
   HAPAG-LLOYD AKTIENGESELLSCHAFT,                           :
   as claimant to the in rem defendant M/V                   :
   VIENNA EXPRESS,                                           :
                                                             :
      Counter-Claimant and Third-Party Plaintiff,            :
                                                             :
                       -against-                             :
                                                             :
   U.S. OIL TRADING LLC,                                     :
                                                             :
                                 Counter-Defendant, and      :
                                                             :
O.W. BUNKER GERMANY GMBH, O.W.                               :
BUNKER & TRADING A/S, ING BANK                               :
N.V., CREDIT AGRICOLE CORPORATE                              :
AND INVESTMENT BANK, a division or                           :
arm of CREDIT AGRICOLE S.A.,                                 :
                                                             :
                       Third-Party Defendants.               :
                                                             :
------------------------------------------------------------ X
```

<u>AMENDED ORDER AND OPINION</u>[1]

VALERIE CAPRONI, United States District Judge:

Before the Court are motions for summary judgment filed in each of the above-captioned interpleader actions. The cases arise out of the collapse and insolvency of O.W. Bunker & Trading A/S ("O.W. Denmark") and its international subsidiaries (collectively, "O.W."). O.W. Denmark's United States subsidiary, O.W. Bunker USA Inc. ("O.W. USA"), filed a petition for relief under Chapter 11 of the Bankruptcy Code on November 13, 2014, in the District of Connecticut. *In re O.W. Bunker Holding N. Am. Inc.*, No. 14-51720 (AHWS) (Bankr. D. Conn. filed Nov. 13, 2014).[2] O.W.'s primary line of business was the supply of marine fuel, also known as "bunkers." In the aftermath of O.W.'s insolvency, its customers were uncertain whom to pay and were concerned about subjecting their vessels to multiple arrests while the issue was being sorted out. They initiated these interpleaders to resolve the competing claims to payment asserted by O.W., its lender, and suppliers in December 2014. The parties have been marooned in the Southern District ever since.

After discovery, which was conducted on a consolidated basis in the 24 interpleader cases that were pending before this judge as of June 30, 2015, the Court asked the parties to identify "test cases" that would efficiently present for decision the significant legal issues that needed to

---

[1]     This Opinion and Order supersedes the Court's January 9, 2017 Opinion and Order. The January 9, 2017 Opinion and Order mistakenly granted summary judgment to ING Bank, N.V. on its *in rem* claim against the stake in the Hapag-Lloyd test case (as defined below). ING Bank did not move for summary judgment on its entitlement to an *in rem* claim in the Hapag-Lloyd test case, and the Court expresses no opinion as to the merits of that claim. The Court's January 9, 2017 Opinion and Order is otherwise unchanged.

[2]     Facts relating to O.W. generally and the events giving rise to these cases are taken from the Court's earlier opinion in this case, *UPT Pool Ltd. v. Dynamic Oil Trading (Singapore) PTE. Ltd.* (*O.W. I*), No. 14-CV-9262 (VEC) et al., 2015 WL 4005527 (S.D.N.Y. July 1, 2015), *aff'd*, 814 F.3d 146 (2d Cir. 2016), supplemented, as necessary, by the Rule 56.1 Statements filed by the parties. This history is shared by these cases. Where appropriate, the Court cites to the factual record of the individual cases.

be decided.  Thereafter, motions for summary judgment were filed by the claimants to the interpleader funds—O.W., its lender, and suppliers—and motions for discharge were filed by the vessel owners and charterers (the "Vessel Interests") in the three "test cases" designated by the Court.  O.W., its secured lender, and its suppliers each moved for summary judgment on their asserted *in rem* claims to the interpleader funds.[3]  O.W. and its secured lender also assert *in personam* breach of contract claims against the Vessel Interests.  This Opinion resolves the competing *in rem* rights of O.W. and two of its suppliers.  For the reasons that follow, the Court DENIES the suppliers' motions for summary judgment in Case Nos. 14-CV-10091, 14-CV-9949, and 14-CV-9287, GRANTS IN PART O.W. USA's motion for summary judgment in Case No. 14-CV-10091, and GRANTS IN PART ING Bank's motion for summary judgment in Case No. 14-CV-9287.

## BACKGROUND

### 1.    O.W.'s Collapse and the Interpleader Actions

It is an understatement to say that O.W.'s collapse caused a significant disruption in the world of maritime bunkers.  As a bunker supplier and trader, O.W. both directly supplied bunkers to maritime vessels and acted as a bunker broker, arranging bunker deliveries by third-parties all over the world on behalf of O.W.'s customers.  *Hapag-Lloyd*, Dkt. 258 (Maloney Decl.) Ex. 35 (PriceWaterhouseCoopers Press Release, dated July 20, 2015).  O.W.'s trading business operated through a series of back-to-back contracts: between O.W. and the time-charterer or owner of the vessel; internally, between one O.W. entity and another; and finally, between a local O.W. entity—here O.W. USA—and a local supplier.  Payments for many of these transactions were outstanding at the time O.W. went out of business.

---

[3]    In accordance with orders of the Court, the interpleader funds serve as a substitute *res*.  *See, e.g.*, *Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC et al.* (*Hapag-Lloyd*), No. 14-CV-9949 (VEC), Dkt. 5.

The parties to these cases are the counterparties to several of O.W.'s trading contracts and O.W.'s primary secured lender, ING Bank, N.V. ("ING").  O.W.'s insolvency put the Vessel Interests in what this Court has described as a "Sophie's Choice."  *O.W. I*, 2015 WL 4005527, at *2.  Both O.W. and some of its third-party suppliers (collectively, the "Physical Suppliers") demanded payment from the Vessel Interests for fuel that had been supplied in the days leading up to O.W.'s collapse and threatened to arrest the vessels in order to obtain payment.  *Id.*  Facing the potential risk of double, and in some cases triple, liability, and the disruption to business that would have been caused by multiple arrests of their vessels, Vessel Interests instituted more than 30 interpleader actions in this and other districts across the country.  *Id.*  Through the interpleaders, the Vessel Interests sought to resolve competing claims to payment in respect of the bunkers that had been delivered by the physical suppliers at the direction of O.W.  In connection with each interpleader action, the Vessel Interests deposited into the Court's register an amount equal to the value of the bunkers supplied plus 6% per annum.  *See, e.g.*, *Hapag-Lloyd*, Dkt. 5; *Nippon Kaisha Line Ltd. v. O.W. Bunker USA Inc. et al.* (*Nippon*) No. 14-CV-10091 (VEC), Dkt. 4.

The parties identified the three test cases presently before the Court, and the Court set a briefing schedule.  *See Hapag-Lloyd*, Dkt. 207.  Summary judgment motions were filed on an array of issues by several of the O.W. entities; two of the Physical Suppliers, NuStar Energy Services, Inc. ("NuStar") and U.S. Oil Trading, LLC ("USOT"); ING; and the vessel charterers themselves.

This Opinion addresses a threshold issue in the interpleader actions.  The Physical Suppliers, O.W. entities, and ING each assert an *in rem* right to the interpleader funds under the Commercial Instruments & Maritime Lien Act (CIMLA), 46 U.S.C. § 31342.  CIMLA codifies the common-law maritime lien for "necessaries"—essential supplies and services provided to a

vessel.  To the extent any party has a maritime lien, the interpleader funds stand as a substitute *res* for that lien, giving that party a priority interest in the interpleader stake.  *See Hapag-Lloyd*, Dkt. 5 ¶ 2.  The parties' *in personam* contract claims to the interpleader funds, as well as the Vessel Interests' motions to be discharged, will not be resolved here; they will be addressed separately to the extent they are not mooted by this Opinion.

## 2. The Test Cases

The test cases concern fuel delivered on O.W.'s behalf in mid-October 2014, shortly before O.W. USA filed for bankruptcy.  To give every party an opportunity to be heard, the test cases each involve either a different Physical Supplier or Vessel Interest.  Nonetheless, as is set forth in more detail below, the facts of the transactions at issue are materially similar: each case involves a time-charterer that arranged either directly or through an intermediary for O.W. to deliver bunkers at a U.S. port.  In each case, O.W., through its U.S. affiliate, O.W. USA, entered into a separate contract with a Physical Supplier, either NuStar or USOT.  None of the cases involves a direct contractual link between the Vessel Interests and the Physical Suppliers, although after the bunkers were ordered, the Physical Suppliers did coordinate delivery directly with the vessels and their local agents.  There is no dispute that the bunkers were provided, that the vessels signed delivery receipts, and that in all but one instance neither the Physical Suppliers nor O.W. has been paid.[4]

## A. The NuStar Test Cases: *Clearlake Shipping Pte Ltd. v. O.W. Bunker (Switzerland) SA*, No. 14-CV-9287 and *Nippon Kaisha Line Ltd. v. O.W. Bunker USA, Inc.*, No. 14-CV-10091

Two of the test cases relate to bunkers arranged by O.W. to be supplied at the Port of Houston.  In the first transaction, on October 14, 2014, Clearlake Shipping PTE Ltd.

---

[4]    O.W. has been paid by Hapag-Lloyd for bunkers delivered to the M/V *Santa Roberta*.  *Hapag-Lloyd*, Dkt. 227 (USOT's Rule 56.1 Statement) ¶ 58.

("Clearlake") ordered bunkers from O.W. Switzerland for two vessels, the M/V *Hellas Glory* and the M/V *Venus Glory*. *Clearlake Shipping PTE Ltd. v. O.W. Bunker (Switzerland) SA et al.* (*Clearlake*), No 14-CV-9287 (VEC), Dkt. 172 (ING's Rule 56.1 Statement) at ¶¶ 2, 5. The Clearlake-O.W. Switzerland transactions are memorialized in a pair of substantially similar sales order confirmations. *Clearlake*, Dkt. 170 (Belknap Decl.) Exs. 4, 5. Both confirmations identify the vessel (the M/V *Venus Glory* or M/V *Hellas Glory*), O.W. Switzerland as "seller," and NuStar as "supplier." *Id.*, Dkt. 170 (Belknap Decl.) Exs. 4, 5. The confirmations also specify the bunker fuel to be delivered, as well as the quantity, price, and date of delivery. *Id.*, Dkt. 170 (Belknap Decl.) Exs. 4, 5. O.W. Switzerland referred the orders to its affiliate, O.W. USA. *Id.* Exs. 6-9. O.W. USA confirmed the orders to NuStar the same day. *Id.*, Dkt. 170 (Belknap Decl.) Exs. 10-13. NuStar's sales confirmations identify O.W. USA as the buyer of the bunkers and NuStar as the seller. *Id.*, Dkt. 170 (Belknap Decl.) Exs. 11, 13.

The second transaction at the Port of Houston involves a similar series of back-to-back contracts. On October 7, 2014, Nippon Yusen Kabushiki Kaisha ("Nippon Yusen"), a company associated with the Nippon Yusen Kaisha Line family of companies ("NYK"), entered into an agreement with its sister company, Nippon Yusen Kaisha Trading Corporation ("NYKTC") for delivery of bunkers to the M/V *Riegel Leader*. *Nippon*, Dkt. 141 (O.W. USA's Rule 56.1 Statement) ¶¶ 4-6. NYKTC and Nippon Yusen operated pursuant to a purchase and sale agreement that was renewed quarterly and that required NYKTC to provide bunkers from one of several well-established physical suppliers, one of which was NuStar. *Id.*, Dkt. 136 (Belknap Decl.) Ex. 2; Dkt. 134 (NuStar's Rule 56.1 Statement) ¶ 6. NYKTC, in turn, contracted with O.W. USA to supply the bunkers to the *Riegel Leader*. *Id.*, Dkt. 141 (O.W. USA's Rule 56.1 Statement) ¶¶ 11-12. The confirmation between Nippon Yusen and O.W. USA is substantially the same as that between O.W. Switzerland and Clearlake. It identifies the vessel interest,

Nippon Yusen, as the buyer, and it identifies O.W. USA as the Seller. NuStar is identified as the supplier. *Id.*, Dkt. 142 (O'Connor Decl.) Ex. E. O.W. USA then entered into a separate agreement with NuStar to provide the bunkers at the Port of Houston. *Id.*, Dkt. 142 (O'Connor Decl.) Ex I. The O.W. USA-NuStar agreement identifies NuStar as the seller and O.W. USA as the buyer of the bunkers. *Id.*, Dkt. 142 (O'Connor Decl.) Ex I. In both cases, O.W. acted as the contractual counterparty for NuStar and the Vessel Interests. NuStar did not contract directly with either Nippon Yusen or Clearlake.

The bunkers were delivered or "stemmed" to the M/V *Riegel Leader* on October 16, 2016, and to the M/V *Hellas Glory* and M/V *Venus Glory* on October 20 and 26, 2014. *Clearlake*, Dkt. 168 (NuStar's Rule 56.1 Statement) ¶ 15; *Nippon*, Dkt. 134 (NuStar's Rule 56.1 Statement) ¶ 17. In all cases, delivery was coordinated between agents for NuStar and the local agents for the vessels. *Clearlake*, Dkt. 168 (NuStar's Rule 56.1 Statement) ¶ 14; *Nippon*, Dkt. 141 (O.W. USA's Rule 56.1 Statement) ¶ 21. While the significance of these interactions is disputed hotly, the facts are not: NuStar and its agents communicated with the port agents for the vessels to "lock down the delivery time and location." *Clearlake*, Dkt. 175 (Maloney Decl.) Ex. 22 (Thompson Tr.) at 17:23-18:14, 76:19-77:8; *Nippon*, Dkt. 142 (O'Connor Decl.) Ex. K (Thompson Tr.) at 17:12-18:14, 33:4-34:4, 76:19-77:8. Among other things, the local agents arranged a time for the bunkering operation and the logistics of delivery. *Id.* Delivery of the bunkers was accepted by the chief engineer or master of each vessel, who executed a "delivery note" or receipt. *Clearlake*, Dkt. 168 (NuStar's Rule 56.1 Statement) ¶¶ 15-17; *Nippon*, Dkt. 134 (NuStar's Rule 56.1 Statement) ¶¶ 17-19. The delivery notes each provide that

> Any disclaimer by the purchaser of the marine fuels covered by this note will have no force or effect. . . . Without limiting the foregoing, no disclaimer by the purchaser of marine fuels covered by this note will alter or waive: the information contained in this note; the seller's maritime lien against the receiving vessel or the cost of the marine fuels

covered by this note; or the receiving vessel's liability for the cost of the marine fuels
covered by this note.

*Clearlake*, Dkt. 168 (NuStar's Rule 56.1 Statement) ¶ 17; *Nippon*, Dkt. 134 (NuStar's Rule 56.1

Statement) ¶ 18.

NuStar billed O.W. USA for all three bunkering transactions pursuant to a "bulk

contract" or "pricing agreement" between O.W. USA and NuStar.  *Clearlake*, Dkt. 172 (ING's

Rule 56.1 Statement) ¶¶ 18-21; *Nippon*, Dkt. 141 (O.W. USA's Rule 56.1 Statement) ¶ 25.  The

bulk contract identifies O.W. as the purchaser of the bunkers and provides for a monthly true-up

of the price of bunkers provided by NuStar.  *Clearlake*, Dkt. 175 (Maloney Decl.) Ex. 20;

*Nippon*, Dkt. 142 (O'Connor Decl.) Ex. O.  Under the contract, payments were due from O.W.

within 30 days of delivery.  *Clearlake*, Dkt. 175 (Maloney Decl.) Ex. 20; *Nippon*, Dkt. 142

(O'Connor Decl.) Ex. O.  Based on a credit review, NuStar had previously extended O.W. USA

a $40 million line of credit; the line of credit was in effect at the time of these events.  *Clearlake*,

Dkt. 172 (ING's Rule 56.1 Statement) ¶¶ 22-25.  After O.W.'s financial distress became known

to NuStar, it sent an invoice directly to Clearlake.  *Id.*, Dkt. 168 (NuStar's Rule 56.1 Statement) ¶

19.

**B.**    ***Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading, LLC*, No. 14-CV-9949[5]**

The third test case concerns bunkers provided by USOT to four vessels at the Port of

Tacoma.[6]  The orders for those bunkers originated with time-charterer Hapag-Lloyd

Aktiengesellschaft ("Hapag-Lloyd").  In all four instances, Hapag-Lloyd solicited bids from

---

[5]      A companion case arising out of the same bunkering transactions, Docket No. 15-CV-6718, was also
designated as a test case.  That case was initiated by USOT in the Western District of Washington, transferred to this
Court on January 29, 2015, and designated as related to the interpleader action in No. 14-CV-9949.  *Hapag-Lloyd*,
Dkt. 89.

[6]      The vessels are the M/V *Santa Roberta*, the M/V *Seaspan Hamburg*, the M/V *Vienna Express*, and the M/V
*Sofia Express*.  *Hapag-Lloyd*, Dkt. 227 (USOT's Rule 56.1 Statement) ¶¶ 26, 60, 90, 122.

several bunker traders to supply bunkers to the vessels somewhere on the West Coast of the United States in mid-October 2014. *Hapag-Lloyd*, Dkt. 227 (USOT's Rule 56.1 Statement) ¶¶ 29, 63, 92, 124. O.W. Germany offered Hapag-Lloyd several options for delivery at Tacoma, Oakland, or Los Angeles. *Id.*, Dkt. 258 (Maloney Decl.) Exs. 53-56. In each case, O.W. included pricing information for Tacoma from USOT and identified USOT as one of several possible suppliers at the port. *Id.* Personnel at Hapag-Lloyd included this information in internal spreadsheets used to analyze the competing bids, and in all four cases selected O.W. Germany to provide the bunkers. *Id.*, Dkt. 258 (Maloney Decl.) Exs. 47-50.

All four transactions were documented in a series of back-to-back contracts between Hapag-Lloyd and O.W. Germany, O.W. Germany and O.W. USA, and O.W. USA and USOT. *Hapag-Lloyd*, Dkt. 258 (Maloney Decl.) Exs. 4, 8, 12 (M/V *Santa Roberta*), Exs. 5, 9, 13 (M/V *Seaspan Hamburg*), Exs. 6, 10, 14 (M/V *Sofia Express*), Exs. 7, 11, 15 (M/V *Vienna Express*). The agreements between Hapag-Lloyd and O.W. Germany identify O.W. Germany as the seller, Hapag-Lloyd as buyer, and USOT as supplier. *Id.*, Dkt. 258 (Maloney Decl.) Exs. 4-7. The agreements between O.W. USA and USOT, in turn, identify O.W. USA as buyer and USOT as seller. *Id.*, Dkt. 258 (Maloney Decl.) Exs. 12-15. USOT disputes whether its counterparty was O.W. USA or its parent, O.W. Denmark, but it concedes that it had no contractual agreement with Hapag-Lloyd relative to these bunkers. *See id.*, Dkt. 261 (USOT's Resp. to ING's Rule 56.1 Statement) ¶ 10. According to USOT, its customer for the bunkers was O.W. *Id.*, Dkt. 227 (USOT's Rule 56.1 Statement) ¶¶ 7-8.

Delivery of the bunkers was arranged by USOT and local agents for Hapag-Lloyd. In advance of delivery, the local agent confirmed the orders with USOT. *Hapag-Lloyd*, Dkt. 227 (USOT's Rule 56.1 Statement) ¶¶ 12-13, 48-51 (M/V *Santa Roberta*), 80-82 (M/V *Vienna Express*), 111-113 (M/V *Seaspan Hamburg*), 141-146 (*M/V Sofia Express*). USOT and the local

agent then arranged the logistics of delivery.  *Id.*  The bunkers were delivered in mid and late

October.  *Id.* Dkt. 227 (USOT's Rule 56.1 Statement) ¶¶ 53 (M/V *Santa Roberta*), 84 (M/V

*Vienna Express*), 116 (M/V *Seaspan Hamburg*), 149 (M/V *Vienna Express*).  In each case, the

chief engineer or master of the vessel signed a bunker delivery note or receipt, including the

volume and quantity of the fuel received.  *Id.* Dkt. 227 (USOT's Rule 56.1 Statement) ¶¶ 55

(M/V *Santa Roberta*), 86 (M/V *Vienna Express*), 118 (M/V *Seaspan Hamburg*), 151 (M/V

*Vienna Express*).  The delivery receipts provide that:

> No disclaimer stamp of any type or form will be accepted on this bunker certificate, nor
> should any such stamp . . . alter, change or waive U.S. Oil's Maritime Lien against the
> vessel or waive the vessel's ultimate responsibility and liability for the debt incurred
> through this transaction.

*Id.*

USOT initially billed O.W., *Hapag-Lloyd*, Dkt. 261 (USOT's Resp. to ING's Rule 56.1

Statement) ¶ 7, with payment due from O.W. within 30 days of delivery.  *Id.*, Dkt. 258 (Maloney

Decl.) Exs. 18, 21, 24, 27.  Previously, based on a review of O.W. Denmark's credit history,

USOT had provided O.W. a $10 million line of credit; the line of credit was in effect at the time

of these events.  *Id.*, Dkt. 231 (ING's Rule 56.1 Statement) ¶¶ 13-15.  When USOT did not

receive timely payment, it demanded payment directly from Hapag-Lloyd.  *Id.*, Dkt. 1 (Compl.)

Ex. 6.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "'Where the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks omitted)).  Courts "'construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant.'"  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (*per curiam*) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79-80 (2d Cir. 2009) (alteration omitted)).

## 1.     CIMLA

O.W. and the Physical Suppliers each contend that they are entitled to summary judgment on their *in rem* claim to a maritime lien.  Maritime liens for necessaries arise exclusively under CIMLA.  To be entitled to a lien, a party must "provid[e] necessaries to a vessel on the order of the owner or a person authorized by the owner."  46 U.S.C. § 31342.  Disaggregating Section 31342, there are three elements that a party must prove to establish possession of a maritime lien.  A party must establish (1) that the goods or services at issue were "necessaries," (2) that it "provided" the necessaries "to a vessel" and (3) that it did so "upon the order of the owner of such vessel or a person authorized by the owner."[7]  *Integral Control Sys. Corp. v. Consol. Edison Co. of N.Y.*, 990 F. Supp. 295, 298 (S.D.N.Y. 1998) (quoting *Port of Portland v. M/V Paralla*, 892 F.2d 825, 827 (9th Cir. 1989)).  All parties agree that fuel bunkers qualify as "necessaries" for purposes of CIMLA.  The crux of the dispute concerns the meaning of the term "provided" and whether either O.W. or the Physical Suppliers provided bunkers "on the order of the owner" of the vessels or the owners' agents.

---

[7]     As originally codified by Congress, a claimant was required to "furnish" as opposed to "provide" necessaries.  CIMLA was re-codified in 1988.  *See* Pub. L. 100-710, Title I, 102 Stat. 4748.  It is generally accepted that no substantive changes were made at that time and that cases interpreting the original statute remain instructive. *See ING Bank N.V. v. M/V TEMARA* (*Temara I*), No. 16-CV-95 (KBF), 2016 WL 4471901, at *5 n.5 (S.D.N.Y. Aug. 24, 2016).

The requirements of CIMLA are interpreted narrowly under the doctrine of *stricti juris*. *See Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 982 F.2d 765, 768 (2d Cir. 1992); *Bankers Trust Co. v. Hudson River Day Line,* 93 F.2d 457, 459 (2d Cir. 1937) ("Maritime liens are 'stricti juris and will not be extended by construction, analogy or inference.'" (quoting *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 12 (1920))).  A strict approach is in keeping with the overriding purpose of maritime liens and necessary to prevent a proliferation of liens that might hinder international commerce.  *See Itel*, 982 F.2d at 768 (maritime liens are for the benefit of "both the ship and its creditors" but must be narrowly construed because they are "secret lien[s] arising by operation of law").  Maritime liens reduce the counterparty risk associated with supplying a vessel that may not call at the same port again. But because maritime liens are not publicly documented, the risk that a vessel is secretly encumbered may deter parties from doing business with the vessel or its owners in the future. *Id.*; *see also Tramp Oil & Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42, 46 (1st Cir. 1986) (rejecting a less restrictive approach on the grounds that it might require a "vessel seeking to avoid a lien . . . to delve far deeper into every transaction than is commercially reasonable"). Perverse incentives are also possible; for example, parties confident that they have a lien on a vessel may be less likely to conduct due diligence or carefully memorialize their agreements.

## 2.    USOT and NuStar did not provide necessaries "on the order" of the vessels or their agents

The Physical Suppliers did not provide necessaries "on the order" of the Vessel Interests. In reaching this conclusion, the Court joins the other district courts to consider this issue since O.W.'s collapse.  *See Valero Mktg. & Supply Co. v. M/V ALMI SUN*, 160 F. Supp. 3d. 973 (E.D. La. 2016) (Brown, J.); *O'Rourke Marine Servs. L.P., L.L.P. v. M/V COSCO HAIFA*, 179 F. Supp. 3d 333 (S.D.N.Y. 2016) (Scheindlin, J.); *Temara I*, No. 16-CV-95 (KBF), 2016 WL

4471901 (Forrest, J.); *NuStar Energy Servs., Inc. v. M/V COSCO AUCKLAND*, No. 14-CV-3648 (KPE), Dkt. 98 (S.D. Tex. Dec. 1, 2016) (Ellison, J.).  Each of these courts rejected substantially the same arguments made by the Physical Suppliers in this case and on materially similar facts.

CIMLA creates a presumption that certain officers, such as the master of a vessel or an agent of the charterer, act with authority to encumber the vessel.  *See* 46 U.S.C. § 31341(a); *O'Rourke*, 179 F. Supp. 3d at 338.  While this list is not necessarily exhaustive, a direct contractual or agency nexus between the supplier and the vessel or its agents is typically required.  *See O'Rourke*, 179 F. Supp. 3d at 338; *Integral Control Sys.*, 990 F. Supp. at 299; *see also Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV* (*Lake Charles*), 199 F.3d 220, 229 (5th Cir. 1999); *Galehead, Inc. v. M/V ANGLIA*, 183 F.3d 1242, 1245 (11th Cir. 1999); *Port of Portland*, 892 F.2d at 828.  This rule can be criticized as formalistic, but it serves the purposes of CIMLA and is consistent with the Second Circuit's commitment to a strict approach to maritime liens.  *See Integral Control Sys.*, 990 F. Supp. at 301 (citing *Itel*, 982 F.2d at 768). Requiring a direct contractual link between the vessels' agents and the provider of necessaries reduces the risk of a multiplicity of liens, which could be inadvertent and unknown to the vessel's owners.  *Cf. Tramp Oil*, 805 F.2d at 46 (vessels owners should not be required to delve into every past transaction in order to ensure that no liens arose).  Requiring a direct contractual link also lessens the potential that the vessels will become embroiled in disputes between remote third parties.  *See Temara I,* 2016 WL 4471901, at *9 (contrary rule would "allow vessels to be arrested and encumbered based on the contractual disputes that arise between general contractors and subcontractors or even, as in this case, between subcontractors and sub-subcontractors"). And, finally, like any bright-line rule, requiring a direct contractual relationship makes it less likely that a party without such a relationship will mistakenly believe that its payment is secured

by virtue of a lien against a vessel, as opposed to through a contractual security interest, assignment, or letter of credit arranged by the counterparties.

Subcontractors who deal with a contractor or a middle-man lack a direct connection to the vessel. *See Lake Charles*, 199 F.3d at 229; *see also Integral Control Sys.*, 990 F. Supp. at 299 (quoting 2 *Benedict on Admiralty* § 40 (7th ed. 1997) for the proposition that "there is a considerable body of law . . . that a subcontractor cannot assert a maritime lien"). While a subcontractor may "provide" necessaries to the vessel,[8] its counterparty is the contractor, not any of the parties authorized by Section 31341(a) to encumber the vessel. *See Lake Charles*, 199 F.3d at 230 (explaining that the "nature of the relationship between each pair of entities" determines whether a party provides necessaries "on the order" of the vessel). For example, the stevedores in *Lake Charles* were subcontractors because they were engaged by the seller to complete its performance. *Id.* They did not enter into a contractual arrangement with the vessel itself. *See id.* ("We view the facts as more akin to those in which general contractors have been engaged to supply a service and have called upon other firms to assist them in meeting their contractual obligations."); *see also Integral Control Sys.*, 990 F. Supp. at 297 (identifying as subcontractors, independent contractors that had been hired to complete the general contractor's performance). *Lake Charles* is not binding on this Court, but its reasoning borrows from the decision in *Integral Control Systems*, and it has been endorsed by other judges in this district. *See O'Rourke*, 179 F. Supp. 3d at 337-38; *Temara I*, 2016 WL 4471901, at *7.

---

[8]   Because the Physical Suppliers did not provide necessaries "on the order" of the vessels or their agents, the Court need not determine whether they "provided" necessaries within the meaning of the statute.

The Physical Suppliers are indistinguishable from the subcontractors in *Lake Charles* and *Integral Control Systems*.[9]  As in those cases, the Physical Suppliers contracted with another party, here O.W., that in turn contracted directly with the Vessel Interests.  The Physical Suppliers invoiced O.W., and O.W. separately invoiced the Vessel Interests.  In each case, there was no contractual agreement between the Physical Supplier and Vessel Interests, and the contracts uniformly describe O.W. as either buyer or seller.  The economic realities of the transactions are also the same.  Just as in *Lake Charles*, the general contractor, O.W., bore the risk of non-performance to the Vessel Interests.  As counsel to NuStar candidly acknowledged at oral argument, had NuStar failed to perform, O.W. would have been required to find an alternative supplier, potentially at a higher cost.  Tr. (Dec. 1, 2016 Oral Arg.) at 15:22-16:4 (THE COURT: "[If] you could not stem the vessel[,] [w]ould OW have been liable in breach to the vessel?" [NUSTAR]: "I think that's probably correct, yes.").  *Cf. Lake Charles*, 199 F.3d at 230 ("[The contractor] accepted all the risk associated with the occurrence of events that would increase the costs of stevedoring services beyond what the sales contract provided.").  Like Judges Forrest and Scheindlin, this Court concludes that the Physical Suppliers acted as subcontractors.  *See O'Rourke*, 179 F. Supp. 3d at 338; *Temara I*, 2016 WL 4471901, at *7.

---

[9]      NuStar contends that the difference between this case and *Lake Charles, Port of Portland*, and *Integral Control Systems* is that in those cases the "order" given to the supplier originated with the contractor rather than with the vessel.  *Clearlake*, Dkt. 188 (NuStar Opp.) at 11-12.  To the extent that is true, it is only because the subcontractors in those cases played a less significant role in the overall transaction.  The fact that NuStar provided all or nearly all of the services required of O.W. may be evidence of a direct relationship between NuStar and the vessel's agents, as the Court discusses below, but it is not grounds to distinguish *Lake Charles* or *Integral Control Systems*.  The Court in *Integral Control Systems* addressed essentially this argument in distinguishing the Eleventh Circuit's decision in *Marine Coatings*: "one would expect the factors upon which the Eleventh Circuit focused to be present in most cases where the owner of a vessel places her into the hands of a general contractor for substantial repair or conversion, except in the unlikely circumstance of an owner who disappears from the work site, leaves no agent behind, and does not return until the work has been completed."  990 F. Supp. at 301.  Likewise, in *Port of Portland*, the subcontractor's involvement was "rather certain" and seemingly well known to the vessel interests.  *Port of Portland*, 892 F.2d at 828.

The Physical Suppliers argue that a contractual or agency relationship to the Vessel Interests is not required so long as the order for necessaries originated with a party that has statutory authority to encumber the vessel.  It is a viscerally appealing argument, but it is inconsistent with the strict approach described above.  The Physical Suppliers rely heavily on *Marine Fuel Supply & Towing Inc. v. M/V KEN LUCKY*, 869 F.2d 473 (9th Cir. 1988).  In *Ken Lucky*, the Ninth Circuit held that a physical supplier of bunkers could assert a maritime lien because the "managing agent [for the vessel] did order the fuel and it is also clear that [the supplier] delivered the fuel *to the vessel*." *Id.* at 477.  The holding in *Ken Lucky* elides an important distinction, however: the defendants in *Ken Lucky* conceded that the physical supplier had sold the bunkers to an agent of the vessel.  *See id.* at 476.  The *Ken Lucky* court went on to detail the direct connections between agents of the vessel and the supplier.  *See id.* at 477-78.  Moreover, reading *Ken Lucky* to endorse the Physical Suppliers' approach is inconsistent with the Ninth Circuit's decision a year later in *Port of Portland*, which held that subcontractors could not assert a lien without evidence of a direct connection to an agent of the vessel.  *Port of Portland*, 892 F.2d at 828.

As a fallback position, both Physical Suppliers argue that a direct relationship exists to the Vessel Interests.  Because USOT was identified as O.W.'s supplier in internal analyses prepared by Hapag-Lloyd personnel, USOT contends that it, rather than O.W., was nominated as the supplier.  Both USOT and NuStar were identified as the supplier in the order confirmations exchanged by O.W. and the Vessel Interests.  The Physical Suppliers also worked directly with the port agents for the vessels to arrange delivery and to complete the bunkering operations.  And, finally, the chief engineer of each vessel executed a receipt, or delivery note, confirming that the fuel had been received.

17

Direct contacts between the Physical Suppliers and agents of the vessel can be relevant if they demonstrate a direct contractual or agency relationship.[10]  For example, when a vessel requires a contractor to use a specific subcontractor there may be a basis to argue that the contractor engaged the subcontractor with actual authority from the vessel, creating a direct link between the vessel and the subcontractor.  *See Port of Portland,* 892 F.2d at 828 ("[A]n owner can still become responsible for the services of a subcontractor, if the owner has ordered the general contractor to retain that subcontractor." (citing *The Juniata*, 277 F. 438, 440 (D. Md. 1922))).  But evidence that the supplier was known to the vessel and coordinated with the vessel to satisfy its obligations to a third party does not establish a legally significant relationship between the vessel and subcontractors.  *See Integral Control Sys.*, 990 F. Supp. at 299-300 (subcontractor's selection must be "ordered" by the vessel (quoting *Port of Portland*, 892 F.2d at 828)); *see also O'Rourke*, 179 F. Supp. 3d at 338.  Underscoring the legal insignificance of such contacts, bunkering could not occur without such coordination.

Several cases, nearly all from the Eleventh Circuit, suggest that close coordination can give rise to a lien even if there is no legally significant relationship between the supplier and vessel.  *See Galehead*, 183 F.3d at 1245-46; *Bonanni Ship Supply, Inc. v. United States*, 959 F.2d 1558, 1565 (11th Cir. 1992); *Marine Coatings, Inc. of Ala. v. United States*, 932 F.2d 1370, 1376 (11th Cir. 1991); *Stevens Tech. Servs., Inc. v. United States*, 913 F.2d 1521, 1535 (11th Cir. 1990).  In *Stevens Technical Services*, for example, the Eleventh Circuit considered, among other

---

[10]     In other cases, the Physical Suppliers have argued that O.W. was an agent of the Vessel Interests.  The Physical Suppliers make that argument in these cases as well, albeit in footnotes.  *See Hapag-Lloyd*, Dkt. 262 (USOT Opp.) at 19 n.15; *Nippon*, Dkt. 150 (NuStar Opp.) at 7 n.11.  This argument has been rejected by the other district courts involved in the O.W. universe of cases.  *Temara I*, 2016 WL 4471901, at *6-7; *Valero Mktg. & Supply Co. v. M/V ALMI SUN*, No. 14-2712, 2015 WL 9459971, at *10 (E.D. La. Dec. 2, 2015), *reconsideration denied* 160 F. Supp. 3d 973 (E.D. La. 2016).  This Court agrees.  There is no evidence that O.W. was an agent of the Vessel Interests, either on a theory of implied or apparent authority.  *See Hapag-Lloyd*, Dkt. 261 (USOT's Resp. to ING's Rule 56.1 Statement) ¶ 18 (conceding that Hapag-Lloyd never communicated directly with USOT or informed USOT that O.W. would act as Hapag-Lloyd's agent).

things, the fact that the vessel interests approved the subcontractor's work and coordinated its performance and that the general contractor refused to take responsibility for the subcontractors. 913 F.2d at 1535. The Physical Suppliers rely on these cases to argue that a "totality of the circumstances" analysis should apply. *See* Tr. (Dec. 1, 2016 Oral Arg.) at 8:12-24 (arguing that under Fifth Circuit case law "you have to look at the totality of the circumstances in evaluating whether or not a maritime lien exists"), 76:4-19 ([NUSTAR]: "we should have a maritime lien for Nustar premised upon that, premised upon an evaluation of the totality of the circumstances.").

But as Judge Haight said, describing *Marine Coatings*, these cases are "navigating outside the mainstream" of American maritime law. *See Integral Control Sys.*, 990 F. Supp. at 301 (explaining that *Marine Coatings* is inconsistent with *Itel*). The Eleventh Circuit's multi-factor analysis has all the shortcomings that the Second Circuit's *stricti juris* approach is designed to avoid: a multi-factor analysis that looks at whether the subcontractor was sufficiently well known to the vessel, whether it was identified in advance, the significance of its performance to the overall job, and whether the vessels accepted performance directly from the subcontractor. Such a test would add significant uncertainty in an area of the law that demands definite answers. As the Physical Suppliers acknowledge, it is possible under a totality-of-the-circumstances analysis for multiple parties to the same transaction to be entitled to a lien. *See* Tr. (Dec. 1, 2016 Oral Arg.) at 11:3-10 ([NUSTAR]: "I've seen case law that suggests that there is only one party that has a maritime lien, but I've seen no justification as to why that should be so." THE COURT: "Because otherwise, the vessel runs the risk of being arrested twice on the same debt." [NUSTAR]: "That's true."). If that were the prevailing rule, it would ultimately complicate maritime commerce because it would make it harder for vessels to procure supplies. Nor is such a test easy to apply: there is no principled distinction between a subcontractor

responsible for approximately 40% of a project, as in *Marine Coatings*, 932 F.2d at 1376 n.9, and one that does 60% or even 90% of the work.

At best (from the Physical Suppliers' perspective), the summary judgment record shows that the Vessel Interests viewed NuStar and USOT as acceptable suppliers.  There is no evidence that the Vessel Interests required O.W. to use the Physical Suppliers to satisfy its obligations or that the Physical Suppliers were directly engaged by agents of the Vessel Interests.  To the contrary, the evidence on this point is that the Vessel Interests were indifferent to the identity of the suppliers.  The representatives of each of the Vessel Interests testified that the physical supplier was O.W.'s choice.  *See Hapag-Lloyd*, Dkt. 233 (Maloney Decl.) Ex. 3 (Kock Tr.) at 58:7-13, 141:19-22; *Clearlake*, Dkt. 175 (Maloney Decl.) Ex. 1 (Saifulin Tr.) at 56:15-19; *Nippon*, Dkt. 142 (O'Connor Decl.) Ex. B (Sano Tr.) at 19:12-20:2.  Nippon Yusen's agreement with NYKTC bears this out: it requires NYKTC to provide bunkers from a group of major suppliers, including, in addition to NuStar, Bomin, BP, Chemoil, Matrix, Total and Shell.  *Nippon*, Dkt. 142 (O'Connor Decl.) Ex. B (Sano Tr.) at 19:6-11.  Likewise, when O.W. provided bids to Hapag-Lloyd, it included multiple different suppliers, depending on the port of call.  For example, in Los Angeles, O.W. used O.W. itself, and in Oakland it used P66.  *Hapag-Lloyd* Dkt 258 (Maloney Decl.) Ex. 55.  The uncontradicted testimony from the Vessel Interests is that they saw the choice of physical supplier as essentially O.W.'s to make.  *See Hapag-Lloyd*, Dkt. 233 (Maloney Decl.) Ex. 3 (Kock Tr.) 138:3-18, 141:12-22, 158:5:16; *Nippon*, Dkt. 142 (O'Connor Decl.) Ex. B (Sano Tr.) at 19:12-20:2.  In short, the inclusion of the Physical Suppliers on the

confirmations provided by O.W. and the Vessel Interests does not amount to a "selection" by the Vessel Interests of NuStar or USOT.[11]

The interactions between the Physical Suppliers and the port agents for the Vessel Interests also do not establish a direct relationship between the suppliers and vessels.[12]  In each of the test cases there is evidence that the Physical Suppliers communicated with the local company that had been hired by the Vessel Interests to arrange supplies in port.  For example, before docking at the Port of Tacoma, the M/V *Sofia Express*'s port agent kept USOT personnel informed of her anticipated time of arrival and scheduled a time for the bunkering operation. *Hapag-Lloyd*, Dkt. 227 (USOT's Rule 56.1 Statement) ¶¶ 141-147.  The Physical Suppliers try to transmute this evidence of logistical arrangements into evidence that the port agents themselves *ordered* the Physical Suppliers to provide bunkers.  But all of these interactions concerned performance of existing obligations of O.W. and the Physical Suppliers.   None of the communications purports to create a new contract, and the record evidence is that port agents do not normally purchase bunkers on behalf of the vessels.  *See Hapag-Lloyd*, Dkt. 258 (Maloney Decl.) Ex. 3 (Kock Tr.) at 58:14-59:17; *Clearlake*, Dkt 175 (Maloney Decl.) Ex. 23 (Laney Tr.) at 17:10-18, 33:6-15; *Nippon*, Dkt. 142 (O'Connor Decl.) Ex. K (Thompson Tr.) at 18:15-25.

---

[11]      The evidence that the Vessel Interests were aware of the Physical Suppliers' identities and tacitly "selected" them is potentially a question of fact, particularly as to Hapag-Lloyd, which included USOT in internal analyses of competing bids.  If a question of fact exists on this point, however, it is not material.  There is no dispute that the Vessel Interests did not contract with the Physical Suppliers, and the Physical Suppliers do not argue that the contracts required O.W. to use them as suppliers.

[12]      The Court assumes *arguendo* that the port agents with whom the Physical Suppliers interacted had legal authority to bind the vessels.  The parties dispute this point, but it is ultimately irrelevant because no legally significant relationships were formed.

Assuming that the port agents could have ordered bunkers from the Physical Suppliers, they did not do so in these cases.[13]

Finally, the bunker receipts signed by the chief engineers for each vessel did not create a contract nor do they amount to a ratification of a contract. Accepting the bunkers and signing a receipt may give rise to a maritime lien when doing so creates a contractual relationship. *See Atl. & Gulf Stevedores, Inc. v. M/V GRAND LOYALTY*, 608 F.2d 197, 202 (5th Cir. 1979). But here, the contractual relationships between O.W., the Vessel Interests, and Physical Suppliers had already been fully formed when the bunkers were delivered. Nor do the receipts amount to a ratification of the contracts by the Vessel Interests. The doctrine of contract ratification requires evidence of "full knowledge of the material facts relating to the transaction" and "clearly established" assent to be bound. *Aegan Bunkering (USA) LLC v. M/T AMAZON*, No. 14-CV-9447 (KBF), 2016 WL 4471895, at *10 (S.D.N.Y. Aug. 24, 2016) (Forrest, J.) (quoting *Chem. Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999)). As the other district courts involved in O.W. cases have explained, bunkering receipts do not come close to meeting this standard. *See, e.g.*, *Temara I*, 2016 WL 4471901 at *10; *O'Rourke*, 179 F. Supp. 3d at 339. Read most charitably, the receipts are evidence that the fuel was delivered to and accepted by the vessels. Without more, acceptance of performance under a pre-existing contract does not establish a direct relationship giving rise to a lien.[14] *See Lake Charles*, 199 F.3d at 229.

---

[13]     The Physical Suppliers devote significant effort to arguing that they were under no duty to inquire whether their counterparties had authority to encumber the vessels. *Hapag-Lloyd*, Dkt. 262 (USOT Opp.) at 21-24; *Nippon*, Dkt. 150 (NuStar Opp.) at 7 n.11. This argument largely misses the mark. CIMLA relieved suppliers of a duty of inquiry with respect to "no lien" clauses by codifying a presumption that certain agents act with authority to bind the vessel. *See* 46 U.S.C. § 31341(a). The presumption only applies, however, when the supplier is given an order by one of the parties listed in the statute who have presumptive authority. The question here is whether the Physical Suppliers were given an order by such a party and not whether they would hypothetically be entitled to rely on such an order if they had received one.

[14]     Although the Physical Suppliers do not argue that the bunker receipts themselves give rise to maritime liens, that argument has been raised and rejected in other cases. *See, e.g.*, *Temara I*, 2016 WL 4471901 at *10.

In sum, while the Court sympathizes with the Physical Suppliers, which apparently believed that they held maritime liens and may be financially harmed by this Court's holding that they do not, the contractual relationships between the parties in this case are clear, and those relationships must be respected. The Physical Suppliers delivered the bunkers to the vessels at the direction of O.W. None of the Physical Suppliers entered into a contract with the Vessel Interests or their agents, and the undisputed evidence is that the Vessel Interests did not require O.W. to use the Physical Suppliers. These back-to-back contracts were intended, in part, to avoid multilateral obligations that could embroil the vessels in litigation between suppliers. It is unfortunate that it may be that the Physical Suppliers, the only parties who are out of pocket, will suffer from O.W.'s bankruptcy (although ING is also likely to be out millions of dollars as a result of O.W.'s bankruptcy).[15] Ultimately, however, that is not a reason for the Court to depart from the Second Circuit's strict approach to maritime liens.

### 3. The O.W. Entities "Provided" Necessaries to the Vessel Interests and Hold Maritime Liens

Having found that the Physical Suppliers do not hold liens, the Court must address whether the O.W. entities hold *in rem* claims against the vessels.[16] The parties agree that O.W. received the order for necessaries directly from the Vessel Interests and their agents.[17] Until

---

[15]    The O.W. liquidation plan carves out from the Bankruptcy discharge any claims in this action. *Nippon*, Dkt. 150 (NuStar Opp.) at 16.

[16]    The Court does not address in this Opinion whether any liens held by O.W. were properly assigned to ING.

[17]    Belatedly, NuStar has questioned whether O.W. provided necessaries "on the order of" Nippon Yusen. *Nippon*, Dkt. 150 (NuStar Opp.) at 12-13 & n.18. O.W.'s counterparty in the Nippon transaction was NYKTC, which is an affiliated subsidiary of the NYK group of companies. *See supra* at 7. NuStar admitted in its amended answer that NYKTC was an agent of Nippon Yusen. *Nippon*, Dkt. 102 (Am. Answer) ¶ 4. The parties did not take discovery relative to whether NYKTC was an agent of Nippon Yusen, presumably because the question appeared settled. *See* Tr. (Dec. 1, 2016 Oral Arg.) at 64:1:17 ([O.W.]: "OW USA has consistently alleged that NYKTC was an agent for the vessel. NYK line has never, up until apparently today, denied that allegation. NuStar, up until it responded to O.W. USA's Rule 56.1 Statement of facts, had actually admitted to that fact. These are facts which OW USA had relied upon throughout the discovery process for the last two years. Had we known that their positions

recently, uniform case law held that a contractor like O.W. could "provide" necessaries to a vessel indirectly through performance by a subcontractor.  *See, e.g.*, *Galehead,* 183 F.3d at 1245; *Exxon Corp. v. Cent. Gulf Lines, Inc.,* 780 F. Supp. 191, 194 (S.D.N.Y. 1991) (finding that intermediary "furnished" bunkers within the meaning of CIMLA).  The Physical Suppliers did not raise this issue in their briefs.  Nonetheless, the Court recognizes that other district courts hearing O.W.-related cases have split on this issue.  In *O'Rourke* and *Valero*, Judges Scheindlin and Brown held that O.W. provided necessaries through the physical suppliers.  *O'Rourke*, 179 F. Supp. 3d at 339, at *5; *Valero*, 160 F. Supp. 3d at 985-86.  Recently, in *Temara II*, Judge Forrest held that O.W. was not a statutory "provider" of necessaries.  *ING Bank, N.V. v. M/V TEMARA* (*Temara II*), No. 16-cv-95, 2016 WL 6156320, at *9 (S.D.N.Y. Oct. 21, 2016).  The Court concludes below that a contractor such as O.W., dealing directly with a vessel owner or representative, may "provide" necessaries through an intermediary, so long as the necessaries are provided to a vessel, rather than for the vessel owner's personal use.

The Second Circuit has given relatively little guidance on the meaning of the term "provided" in CIMLA.  In *Itel Containers*, the Circuit held that a supplier did not provide necessaries if the necessaries were sold to a charterer in bulk for use by a fleet.  *See Itel Containers*, 982 F.2d at 768; *see also Piedmont & George's Creek Coal Co.,* 254 U.S. at 12. The Court concluded that necessaries must be ear-marked for a specific vessel at the time of the sale to give rise to a lien.  *See Itel Containers*, 982 F.2d at 768.  The reasoning in *Itel* reflects CIMLA's underlying policy that a lien should be available when a supplier relies on the credit of the vessel, rather than on the *in personam* credit of its counterparty.  *See Equilease Corp v. M/V*

---

were different earlier, perhaps we might have litigated the case differently during the discovery process.").  NuStar is bound by its admission.  The Court assumes for purposes of analysis that NYKTC acted as an agent of Nippon Yusen in the transactions at issue in these cases.

*SAMPSON*, 793 F.2d 598, 605 (5th Cir. 1986) ("the idea of credit to the vessel being a prerequisite to a lien . . . [is] still very much with us today"); *cf. Bankers Trust Co.*, 93 F.2d at 459 (supplies must be delivered to a specific ship, "otherwise they are furnished to the owner"). The party that bears the risk of dealing with a transient vessel is the "provider" of necessaries. *See Lake Charles*, 199 F.3d at 230; *see also Temara II*, 2016 WL 6156320, at *6 ("In terms of statutory intent and relevant case law, the term 'provided' clearly embodies a concept of payment protection for an entity that has put itself at financial or other risk in providing necessaries to vessels.").

A supplier may "provide" necessaries to a vessel indirectly through a subcontractor. *See Lake Charles*, 199 F.3d at 232 ("Under the circumstances here, the delivery of the rice, though performed by LCS, is attributed to Broussard."); *Galehead*, 183 F.3d at 1245 ("The bunkers were supplied pursuant to an agreement made between Genesis and Polygon. That agreement caused, or provided for, the delivery of the fuel to the vessel. Therefore, Polygon 'provided' necessaries to the vessel under the contract irrespective of how, or by whom, the delivery was carried out."); *The Golden Gate Knutsen v. Associated Oil Co.,* 52 F.2d 397, 400 (9th Cir. 1931). When a subcontractor delivers necessaries to a vessel, it does so pursuant to its contract with the contractor, and the subcontractor's performance is attributed to the contractor. *Galehead*, 183 F.3d at 1245. Ultimately, in this scenario, the contractor is responsible to the vessel for performance. This rule has been adopted previously in this district, under somewhat similar circumstances. In *Exxon*, the Court held that Exxon could assert a lien for supplying bunkers, even though Exxon's involvement was limited to arranging for a local supplier to deliver the fuel. 780 F. Supp. at 194.

The back-to-back contracts entered into by O.W., the Physical Suppliers, and the Vessel Interests establish O.W. as the "provider" of necessaries. In this respect, O.W. is

indistinguishable from the contractors in *Lake Charles* and *Galehead*: it entered into a contract that required it to provide necessaries; then, through a chain of separate, but clearly documented transactions, caused its subcontractors to deliver the necessaries to the vessels.  Had the subcontractors, NuStar and USOT, failed to deliver the bunkers, O.W. would have been liable to the Vessel Interests for breach.  *See* Tr. (Dec. 1, 2016 Oral Arg.) at 37:10-17 ([HAPAG]: "What the testimony reflects is that at all times OW Germany remained responsible to Hapag. If for whatever reason US Oil could not or would not do the supply, OW Germany -- and this is in the testimony -- had the obligation to substitute similar fuel at the agreed price."); *see also id.* at 51:1-5 (THE COURT: "It sounds like everybody agrees that OW was on the hook. So that if who[m]ever the physical supplier was supposed to be had failed to deliver, the vessel would have had a claim against OW, and OW would have had to find a supplier, and with prices going up, OW would bear that risk.").  As far as the Vessel Interests were concerned, O.W. bore the risk of arranging for delivery and would have been required to provide an alternative bunker supplier if the chosen supplier had failed to perform.  *See Hapag-Lloyd*, Dkt. 258 (Maloney Decl.) Ex. 3 (Kock Tr.) at 133:10-24 ("[W]e are trying to secure not only the quality of the product, but also the legal status of the contract, that's why we are just working with parties accepting our terms and conditions of purchasing . . . we are taking advantage of the services of a bunker trader.").  Likewise, O.W. was obligated to pay the Physical Suppliers even if it was not paid by the Vessel Interests.

The Court's analysis is consistent with the reasoning in *Temara II*.  In that case Judge Forrest concluded that O.W. had not "provided" the bunkers at issue because it did not face "real risk of financial loss" in the transactions.  *Temara II*, 2016 WL 6156320, at *8.  Notably, the record in *Temara II* was "devoid of information regarding O.W. Bunker's arrangements down the chain."  *Id.*  By contrast, in this case O.W. has submitted sales confirmations documenting

each discrete transaction, and the parties to these cases agree that O.W. bore financial risk in the transactions and O.W. was liable to the Vessel Interests in the event NuStar or USOT failed to deliver.  *See* Tr. (Dec. 1, 2016 Oral Arg.) at 59:15-60:2 ([ING]: "To address briefly the Temara action, as has been pointed out already, the issue there was a record 'devoid of documentation' . . . . Here, by contrast, we know the supply chain is fully documented, and as everyone has admitted, both Hapag and the physical suppliers, OW Germany bore the risk of loss and had direct contractual liability to Hapag-Lloyd.").  The fact that O.W., by virtue of its bankruptcy proceedings, is no longer required to satisfy its debt to the Physical Suppliers does not alter the analysis.  The potential for a maritime lien is intended to encourage parties to agree to provide necessaries to vessels.  Considered *ex ante*, at the time O.W. agreed to provide necessaries and entered into its arrangement with the Physical Suppliers and Vessel Interests, it bore the risk of non-payment by the vessels and the risk that the Physical Suppliers would not deliver.

The Court concludes that the O.W. entities are entitled to a maritime lien in case nos. 14-CV-9287 and 14-CV-10091.

## 4.      Equity and Public Policy Do Not Require a Different Result

The Physical Suppliers argue, with some force, that permitting O.W. or ING to benefit from a maritime lien without paying the suppliers that actually delivered the fuel is an inequitable result.  Although these cases involve interpretation of a Federal statute, there is no doubt that maritime liens are an equitable remedy.  *See Mullane v. Chambers*, 438 F.3d 132, 138 (1st Cir. 2006).  The Court is required to balance Congress's intent to protect American materialmen who deal with flighty vessels with the longstanding Federal policy disfavoring maritime liens.  *See Piedmont & George's Creek Coal Co.*, 254 U.S. at 12.  Evidence of unclean hands or bad faith on the part of O.W. might be grounds to disregard or equitably transfer its lien.  CIMLA incorporates traditional equitable doctrines like unclean hands and equitable

subrogation.  *See Tramp Oil & Marine Ltd. v. M/V MERMAID I*, 630 F. Supp. 630, 633 (D.P.R.

1986); *Session v. I.T.O. Corp. of Ameriport*, 618 F. Supp. 325, 329 (D.N.J. 1985).

     The Physical Suppliers have not seriously argued that any equitable doctrine bars O.W.'s

recovery and the parties agreed at oral argument that fraud and bad faith have not been pled in

these cases.  Tr. (Dec. 1, 2016 Oral Arg.) at 86:2-4 (THE COURT: "Does anybody disagree?

Does anybody say that fraud or bad faith was at all alleged either in claims or counterclaims in

these cases?  I'm seeing shakes of head all around.").  Maritime law recognizes a right of

subrogation in two circumstances: first, in respect of "advances" of money to a vessel owner or

agent that satisfy a third party's lien, and second, through contractual assignment pursuant to an

agreement.  *Tramp Oil*, 630 F. Supp. at 633 (citing Tetley, *Assignment and Transfer of Maritime

Liens: Is There Subrogation of the Privilege?*, 15 J. Mar. L. & Comm. 3, 393 (1984)).  The

Physical Suppliers did not satisfy any debt owed by the Vessel Interests nor did they insist that

O.W. assign its rights against the Vessel Interests.  Likewise, while "unclean hands" equitably

bars a party from benefitting from its own breach, it typically requires, at a minimum, evidence

of bad faith.  *See CMA CGM S.A. v. AZAP Motors, Inc.*, No. 14-CV-504, 2015 WL 9601157, at

*7 (E.D. Va. Nov. 25, 2015), *adopted*, 2016 WL 50926 (E.D. Va. Jan. 4, 2016).  There is no

evidence in these test cases that O.W. provided false information to the Physical Suppliers or

entered into agreements with them knowing that it would not pay for the bunkers.

     The unfortunate reality of these cases is that O.W.'s bankruptcy has caused hardship for

creditors, especially trade creditors like the Physical Suppliers.  The underlying contractual

arrangement between the parties—back-to-back contracts between the vessels, bunker traders,

and suppliers—shifted to O.W. the risk that the vessels would not pay their bills.  In so doing, it

substituted O.W. as the counterparty to the Physical Suppliers.  In ordinary times, the Physical

Suppliers benefit from this arrangement, as they can better evaluate the credit of bunker traders,

like O.W., with whom they deal repeatedly than the credit of owners or charters of vessels with whom they interact only sporadically. *See Hapag-Lloyd*, Dkt. 227 (USOT's Rule 56.1 Statement) ¶ 18 ("Given the time and operational constraints of the vessels . . . it has not been practical for USOT to conduct an adequate credit check of each vessel's [owner or charterer]."). The parties agree that both Physical Suppliers undertook a careful review of O.W.'s credit before extending O.W. a line of credit with 30-day terms. *Hapag-Lloyd*, Dkt. 231 (ING's Rule 56.1 Statement) ¶¶ 13-15; *Clearlake*, Dkt. 172 (ING's Rule 56.1 Statement) ¶¶ 22-27; *Nippon*, Dkt. 141 (O.W. USA's Rule 56.1 Statement) ¶¶ 18-19.  Additional contractual protections were available to the Physical Suppliers.  Notably, they could have demanded an assignment of O.W.'s rights against the charterers, or they could have insisted that the Vessel Interests become parties to the supply contracts. *Cf. Tramp Oil*, 805 F.2d at 46 (noting that equity did not favor a broker because they "already have the means to protect their interests [] with no additional delay in payment" by securing an assignment of the . . . lien); Tr. (Dec. 1, 2016 Oral Arg.) at 14:9-18 (THE COURT: "Couldn't they get an assignment of lien from their counterparty?"  [NUSTAR]: "That is a possibility, assuming their counterparty is willing to give one.").

The Court's sympathetic view of the Physical Suppliers' situation is not, however, boundless, and it does not extend to rewriting the consistent, and nearly uniform, case law denying subcontractors a maritime lien.  This rule is rooted in the long-standing Federal policy disfavoring maritime liens. *See Piedmont & George's Creek Coal Co.*, 254 U.S. at 12.  Because the Physical Suppliers do not hold maritime liens, they do not have *in rem* claims against the interpleader stake.  Ultimately, their real problem is the low priority given to an unsecured

creditor in a bankruptcy.[18]  A low priority in bankruptcy almost always causes hardship, but that is not something that this Court, even sitting in equity, can alleviate.

## CONCLUSION

The Physical Suppliers' motions for summary judgment in each of the three tests cases are DENIED: in case no. 14-CV-9287, docket entry 167; in case no. 14-CV-10091, docket entry 133; in case no. 14-CV-9949, docket entry 223; and in case no. 15-CV-6718, docket entry 173.

ING's motion for summary judgment in the Clearlake test case (*Clearlake*, Dkt. 171) is GRANTED IN PART to the extent ING has moved for summary judgment on its claim that O.W. Switzerland holds a maritime lien and *in rem* interest in the interpleader *res*.  ING's motion for summary judgment as to the validity of the O.W. entities' assignment of their liens to ING remain pending.

O.W. USA's motion for summary judgment in the Nippon Yusen test case (*Nippon*, Dkt. 140) is GRANTED IN PART with respect to O.W. USA's claim that the O.W. entities hold a maritime lien and *in rem* interest in the interpleader *res*.  O.W. USA's motion for summary judgment on its *in personam* claims against Nippon Yusen remains pending.

By **January 16, 2017**, the parties are directed to inform the Court of the following:

1. ING must inform the Court whether its motions for summary judgment with respect to its possession of a valid assignment of the O.W. entities' liens are moot in light of this Opinion;

2. O.W. USA must inform the Court whether its *in personam* claims against Nippon Yusen are moot in light of this Opinion; and

---

[18]     NuStar's priority in the O.W. bankruptcy is uncertain.  NuStar filed proofs of claim in the O.W. bankruptcy cases, but the value of those claims depends on whether it is entitled to administrative priority under Section 503(b)(9) of the Bankruptcy Code.  That issue is not before this Court.

3. O.W. Germany must inform the Court whether its *in personam* claims against Hapag-
   Lloyd are moot in light of this Opinion.

The Clerk of Court is respectfully directed to close the open motions at the following

docket entries:  in case no. 14-CV-9287, docket entry 167; in case no. 14-CV-10091, docket

entry 133; and in case no. 14-CV-9949, docket entry 223.

**SO ORDERED.**

**Date:  March 3, 2017**                         **VALERIE CAPRONI**
**New York, New York**                      **United States District Judge**